**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MARK ROSENKER, Chairman, | ) | No. 1:06-cv-01928-JDB |
| National Transportation Safety Board, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### <u>ERRATA</u>

Defendant Mark Rosenker, Chairman, National Transportation safety Board, by and through undersigned counsel, hereby submits a corrected version of Defendant's Motion for Summary Judgment and Motion to Strike (Dkt. Entry 23).  Due to an inadvertent error, the undersigned counsel filed a late draft of the motion, rather than the final version.  A corrected version of the entire motion is attached as Exhibit 1 hereto.

Dated May 8, 2008                    Respectfully submitted,


                                    _____/s/_____
                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                    United States Attorney


                                    _____/s/_____
                                    RUDOLPH CONTRERAS, D.C. BAR #434122
                                    Assistant United States Attorney

                                    /s/_____
                                    BRANDON L. LOWY
                                    Special Assistant United States Attorney
                                    555 Fourth St., N.W.
                                    Washington, D.C.  20530
                                    Phone: (202) 307-0364
                                    Fax: (202) 514-8780
                                    Brandon.Lowy@usdoj.gov


                                    Attorneys for Defendant

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK ROSENKER, Chairman, | ) | No. 1:06-cv-01928-JDB |
| National Transportation Safety Board, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE (CORRECTED VERSION)</u>

Defendant, Mark Rosenker, Chairman of the National Transportation Safety Board ("NTSB", "Defendant", or the "Agency"), through undersigned counsel, hereby submits the following Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56(b) and (c), and Motion to Strike, pursuant to Fed. R. Civ. P. 12(f).  Plaintiff Marjorie Murtagh Cooke brings a single count complaint, pursuant to the Fair Labor Standards Act ("FLSA"), alleging that she was limited segregated, and classified in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her Equal Employment Opportunity ("EEO") complaint of unequal pay and sexual discrimination.  However, the record clearly proves, and Plaintiff cannot rebut, the Agency's non-discriminatory reasons for taking the actions regarding Plaintiff's employment that it did throughout the period in question.  Accordingly, Plaintiff's claim must fail.

A Statement of Material Facts Not Genuinely in Dispute, a Memorandum of Points and Authorities in support of this Motion, the Declarations of responsible officials, and a proposed

Order are filed herewith.  For the reasons provided in the attached Memorandum of Points and

Authorities, there are no material facts in dispute and, the facts in this case establish that

summary judgment should be granted in the Agency's favor as a matter of law.

Dated: May 7, 2008.                    Respectfully Submitted,


                                       ___/s/_____
                                       JEFFREY A. TAYLOR, D.C. BAR # 498610
                                       United States Attorney



                                       ___/s/_____
                                       RUDOLPH CONTRERAS, D.C. BAR #434122
                                       Assistant United States Attorney


                                       ___/s/_____
                                       BRANDON L. LOWY
                                       Special Assistant United States Attorney
                                       555 Fourth Street, N.W.
                                       Washington, D.C. 20530
                                       (202) 307-0364


                                       Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK ROSENKER, Chairman, | ) | No. 1:06-cv-01928-JDB |
| National Transportation Safety Board, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rule 7(h), Defendant hereby submits the following statement of material facts as to which there is no genuine dispute.

1.      Plaintiff was the Director of the Office of Marine Safety ("OMS") at the National Transportation Safety Board ("NTSB"), at the GS-15 level, from 1997 until 2005.  First Am. Compl. ¶ 8.

2.      Plaintiff filed a formal EEO Complaint against the NTSB on April 16, 2005.  Exhibit 1, Formal Complaint of Discrimination, ("Ex. 1").

### Re-advertisement of SES Director Position After First Panel

3.      In December 2004, Managing Director Daniel Campbell cancelled the July 2004 Office of Marine Safety ("OMS") position advertisement prior to a selection being made because he believed that the pool of qualified applicants was too narrow and insufficiently robust.  See Exhibit 2, Deposition of Daniel Campbell, ("Ex. 2") at 93:17, 96:13-97:18.

<u>2005 Reconstituted Selection Panel: Non-selection for SES position</u>

4.     Managing Director Joe Osterman decided that he would only interview the top five

candidates selected for an interview by the reconstituted 2005 panel because he thought that it

was improper for the panel to recommend the incumbent of the position for an interview when

the incumbent was ranked by the panel to be outside the top five candidates.  Exhibit 3, Fed. R.

Civ. P. 30(b)(6) Deposition of Joseph Osterman, ("Ex. 3") at 105:5-108:9, 138:7-17, 154:1-7.

<u>Refusal to Offer Plaintiff a Senior Level Position</u>

5.     Managing Director ("MD") Joe Osterman reviewed Plaintiff's proposal outlining the

duties and responsibilities of a Senior Level position that Plaintiff suggested be created for her,

and then met with Acting Chairman Mark Rosenker, Executive Director Dan Campbell, and

Chairman Designee Ellen Engleman Conners regarding their evaluation of the Agency's need for

such a position.  <u>See</u> Ex. 3 at 159:8-163:11.

6.     MD Joe Osterman, Acting Chairman Mark Rosenker, Executive Director Dan Campbell,

and Chairman Designee Ellen Engleman Conners agreed that there was not sufficient work to

justify the SL position as proposed by Plaintiff.  <u>See</u> Ex. 3 at 164:5-9.

<u>Detail from OMS to Office of Safety Recommendations and Communications ("SRC")</u>

7.     Following Plaintiff's non-selection as Director of OMS at the SES level, MD Osterman

offered Plaintiff a planning manager position as a detail in the Office of Safety

Recommendations and Communications ("SRC"), "because there was an immediate need for a

15-level manager in [that office] for a specific duration of time."  Ex. 3 at 164:18-21.

8.     Osterman "considered Ms. Murtagh a good planner and felt that [the] fit would be good

for the agency…."  Ex. 3 at 178:16-179:1.

2

<u>Transfer from SRC to Office of Management</u>

9.      During Plaintiff's detail in the Office of Safety Recommendations and Communications,

MD Osterman had time to evaluate the needs of the agency, and particularly the Office of

Management, wherein he needed a GS-15 level associate managing director for strategic

management, or chief planning officer for the agency.  <u>See</u> Ex. 3 at 201:17-202:2.

10.     Osterman offered the position to Plaintiff when her detail ended in SRC and told Plaintiff

"that [he] wouldn't make her do it, [Plaintiff] had the option of saying no, but that [he] thought

that [Plaintiff's] planning and presentation, especially strategic planning skills, were good."  Ex.

3 at 201:21-202:8-11.

11.     When MD Osterman planned to transfer Plaintiff to the Office of Management after

Plaintiff declined an associate managing director position, he informed Plaintiff "that we would

put [Plaintiff] in a program management position, program analyst position until such time that

we could determine what other positions became available at the 15 level."  Ex. 3 at 203:7-11.

<u>Performance Appraisals</u>

12.     In 2005, Plaintiff received comments from the Managing Director on her work products,

and likewise received feedback from her supervisors in the Office of the Managing Director,

once transferred to that position.  <u>See</u> Ex. 3 at 210:18-211:3.

13.     MD Campbell evaluated the modal office directors every time he had a conversation with

them about anything of substance.  Ex. 2 at 20:7-8.

14.     "Performance was evaluated in the context of in the way in which reports were brought to

[MD Campbell].  [His] direct reports had really little doubt about whether or not they were doing

a good job." Ex. 2 at 25:17-19.

<u>Performance Standards</u>

15.    With the assistance of the Human Resources Division, Ms. Czech, Plaintiff's supervisor

in the Office of Management, worked on formulating performance standards for Plaintiff's new

program analyst position while she served there.  Exhibit 4, Declaration of Barbara Czech, ("Ex.

4"), at ¶ 8.

16.    Plaintiff retired before the performance standards were finalized.  Ex. 4 at ¶ 10.


Dated: May 7, 2008.                    Respectfully Submitted,


                                       ___/s/_____
                                       JEFFREY A. TAYLOR, D.C. BAR # 498610
                                       United States Attorney



                                       ___/s/_____
                                       RUDOLPH CONTRERAS, D.C. BAR #434122
                                       Assistant United States Attorney



                                       ___/s/_____
                                       BRANDON L. LOWY
                                       Special Assistant United States Attorney
                                       555 Fourth Street, N.W.
                                       Washington, D.C. 20530
                                       (202) 307-0364

                                       Attorneys for Defendant


4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK ROSENKER, Chairman, | ) | No. 1:06-cv-01928-JDB |
| National Transportation Safety Board, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges that she was limited segregated, and classified in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her complaint of unequal pay and sexual discrimination.  The National Transportation Safety Board ("NTSB") made no retaliatory decisions regarding Plaintiff's employment with the Agency.  The Agency had legitimate, non-discriminatory reasons for not selecting Plaintiff as the SES Director of the Office of Marine Safety, detailing and transferring Plaintiff to the other offices within the Agency, and taking other actions that Plaintiff alleges were retaliatory.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant moves for summary judgment because there is no genuine issue of material fact and the Agency is entitled to summary judgment as a matter of law.

## FACTUAL BACKGROUND

NTSB adopts, by reference, its Statement of Material Facts not in Genuine Dispute, attached hereto.

NTSB is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety.  Exhibit 5, NTSB 2005 Annual Report, ("Ex. 5).  As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate modal offices: the Office of Highway Safety ("OHS"); the Office of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous Materials Safety ("OPHS"); and the Office of Marine Safety ("OMS").  Am. Compl. ¶ 6.  Effective November 5, 2000, ORS and OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH").  See id. at ¶ 7.

Each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the Board and releases to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future accidents; and conducts investigations into selected accidents involving safety issues of concern to the Board.  See 49 C.F.R. § 800.2. The recommendations that follow from accident investigations are the enduring products of the Safety Board; they constitute the means for suggesting change that will make transportation safer.  Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function of the NTSB.  Exhibit 6, Affidavit of Daniel Campbell, (Ex. 6).  The NTSB is aviation-centric because aviation safety is the reason the NTSB exists.  Exhibit 7, Deposition of Ellen Engleman Conners, ("Ex. 7") at 31:8-9.

The NTSB investigates and establishes the facts, circumstances and cause or probable cause of major marine casualty (except public vessels) occurring on the navigable waters or

territorial sea of the United States or involving a vessel of the United States, under regulations

prescribed jointly by the NTSB and the head of the department in which the Coast Guard is

operating.  49 U.S.C. § 1331.  However, Marine is the only mode in which the NTSB is not the

primary investigative authority for major transportation accidents.  Exhibit 8, Affidavit of Daniel

Campbell (add'l pages), ("Ex. 8").  Pursuant to the International Maritime Organization treaty,

the Coast Guard and NTSB have shared jurisdiction to investigate any international marine

accidents involving U.S. flagged vessels or in which United States has a substantial interest.

Exhibit 9, Declaration of Joseph Osterman, ("Ex. 9") at ¶ 7.  Between 2000 and 2005, the NTSB

never took the lead on a marine investigation outside of the territorial seas of the United States

and not involving a U.S. flagged vessel.  Id. at ¶ 8.  Between 1999 and 2005, OMS launched an

investigation of approximately one international accident per year.  Id.

        In 1997, as a result of the restructuring, Ms. Cooke's title changed from Chief of the

Marine Division, within the NTSB's Office of Surface Transportation Safety, to Director of

OMS.  Am. Compl. ¶ 8.  The directors of OHS, ORS, OPHS and OMS (collectively the "surface

modal offices") reported directly to the Managing Director ("MD").  See Id. at ¶ 9.  Following

the restructuring, it was the NTSB's intent that each of the four modal office directors be

classified and paid at the Senior Executive Service ("SES") level. Exhibit 10, Affidavit of Ellen

Engleman Conners, ("Ex. 10"); Ex. 7 at 33:20-34:1; Ex. 2 at 62:10-63:16.  However, for a period

of time immediately following the restructuring, each of the surface modal office directors were

classified at the GS-15 level and paid in accordance with the General Schedule ("GS ") scale.

See Am. Compl. ¶ 9.  Pursuant to Office of Personnel Management ("OPM") regulations, all

SES positions must be advertised and competed.  See OPM Guide to Senior Executive Service,

3

p. 11.  An employee who encumbers a GS-level position that is reclassified to the SES level, may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment.  Id.  Ms. Cooke has never held a career SES appointment. Exhibit 11, Declaration of Emily Carroll, ("Ex. 11") at ¶ 12.  During all relevant time periods, NTSB's Office of Aviation Safety ("OAS") existed as a separate unit and its director was paid at the SES level.  Id. at ¶ 8.

In 2001, when an SES employee at the NTSB retired and an SES slot became available, MD Daniel Campbell recommended that the SES slot be assigned to the position of the Director of ORPH because Mr. Bob Chipkevich was the most senior of the modal office directors and ran the most complex of the three surface modal offices (OHS, ORPH, and OMS). Exhibit 12, Affidavit of Daniel Campbell (2nd add'l pages), ("Ex. 12").  Mr. Chipkevich, who at the time was OPRH Director at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position.  In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy, that slot was allocated to the position of Director of OHS, see Ex. 11 at ¶ 16, because OHS was a larger office than OMS and because there are approximately 43,000 highway deaths each year, in contrast to several hundred marine deaths per year.  See Ex. 10.  Thus, it was determined that OHS could have a greater effect on transportation safety than OMS, and the scope of responsibilities of OHS was much larger than the scope of responsibilities of OMS.  See Ex. 7 at 100:13-21; see also Ex. 2 at 67:19-68:3.  Mr. Joe Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level.  The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES.  Ex. 11 at ¶ 17.

At this point, the Director of OMS remained the only modal office director position at NTSB that was still categorized as a GS-15 position, and Plaintiff became concerned that she was receiving unequal pay to the male office directors who were working at the SES level. Exhibit 13, Deposition of Plaintiff Marjorie Murtagh Cooke, ("Ex. 13") at 48:12-17.  In 2004, NTSB received an additional SES slot from OPM, which was allocated to the position of Director of OMS.  See Exhibit 14, Letter Dated 5/26/04 to Chairman Carmody, ("Ex. 14"); Ex. 11 at ¶ 18.  Once the allocation decision was made, the Directorship of OMS was advertised in July 2004 as an SES position and applications for the position were accepted, including Plaintiff's.  See Am. Compl. ¶¶ 16-17; Ex. 11 at ¶ 17.  The 2004 OMS position advertisement was subsequently cancelled prior to a selection being made because the NTSB believed that the pool of qualified applicants was not large enough, and there was a rumor that the position had been "wired" for Plaintiff.  Ex. 2 at 93:20-22, 94:1, 97:17-18, 182:15-17.  No interviews were conducted.  Exhibit 15, Declaration of Elaine Weinstein, ("Ex. 15") at ¶ 10.

The Director of OMS position was readvertised as an SES position in early 2005, and Plaintiff again submitted an application for the position.  Exhibit 16, Qualifications Brief of Marjorie M. Murtagh, ("Ex. 16"); Ex. 11 at ¶ 23; Am. Compl. ¶ 19.  In the midst of the SES selection process, Plaintiff filed a formal EEO complaint with the Agency on April 16, 2005, alleging a violation of the Equal Pay Act (EPA) because Plaintiff earned less than the other modal office directors who held SES positions. Ex. 1.  In or around late April 2005, Plaintiff learned that she had not been selected for the SES position, and that the NTSB recommended John Spencer to OPM, and he was approved for an appointment to the SES.  Ex. 11 at ¶ 25; Exhibit 17, Request for Personnel Action re: Spencer Appointment to SES, ("Ex. 17").

5

When Mr. Spencer began his tenure as the Director of OMS, he received assignments from the MD, such as: reduce the backlog of reports due from the office, restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities.  Ex. 9 at ¶ 10.

As an alternative to the SES position, Plaintiff proposed that she take a Senior Level ("SL") position within the Office of Management.  Ex. 3 at 145:7-9, 149:2-4.  However, after discussing the issue with the Executive Director, the Acting Chairman, and the Chairman Designee, Mr. Osterman met with Plaintiff and informed her that the decision was made that there was not adequate justification for a SL position in the international marine area.  Ex. 3 at 163:22-164:12.  In June 2005, Plaintiff was sent on a 120-day detail to the Office of Safety Recommendations.  Exhibit 18, Notification of Personnel Action re: Murtagh Detail, ("Ex. 18").  When the detail was completed, Plaintiff was transferred to a GS-15 Senior Program Analyst position in the Office of Management.  Exhibit 19, Notification of Personnel Action re: Murtagh Reassignment, ("Ex. 19").  On April 28, 2006, Ms. Cooke filed a complaint in the United States District Court for the District of Columbia asserting violations of the Equal Pay Act, 29 U.S.C. 206(d) and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).  Plaintiff retired from NTSB on July 4, 2006.  Exhibit 20, Notification of Personnel Action re: Murtagh Retirement Voluntary, ("Ex. 20").  On October 26, 2006, the District Court transferred the Equal Pay Act claim to the Court of Federal Claims and the Plaintiff's retaliation claim remains in this Court.

Plaintiff now brings a single count complaint under the anti-retaliation provision of the Fair Labor Standards Act ("FLSA"), alleging that her employer "has limited, segregated, and classified Plaintiff in a way which deprives her of employment opportunities and otherwise

6

adversely affects her status as an employee because of Plaintiff's complaints of unequal pay and

sexual discrimination." Am. Compl. ¶ 31.  The Plaintiff fails to establish her claim of retaliation

because Defendant has legitimate, non-retaliatory reasons for its actions, which withstand a

claim of pretext.  Plaintiff cannot rebut the fact that the Agency did not select her for an SES

position because she was not the most qualified candidate for the job.  Further, Plaintiff cannot

rebut the fact that there was not a need within the Agency for someone in an SL position

working in the international marine area.  Finally, Plaintiff cannot rebut the fact that the Agency

sent her on a temporary detail and then reassigned her to another office because those actions

met the existing needs of the Agency.  Therefore, NTSB is entitled to judgment as a matter of

law.

## ARGUMENT

### I.    Legal Standards

#### A.    Motion for Summary Judgment

Summary judgment is appropriate when the record shows that no genuine issue exists as

to any material fact and the moving party is entitled to judgment as a matter of law.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27

F.3d 635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue of material fact exists,

the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most

favorable to the non-moving party.  Matsushita, 475 U.S. at 587.  The mere existence of a factual

dispute, however, will not defeat summary judgment.  The non-moving party must show that the

dispute is genuine and material to the case.  That is, the factual dispute must be capable of

7

affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  Anderson, 477 U.S. at 247-48; Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  Id. (citing Anderson, 477 U.S. at 249-50.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" Celotex Corp., 477 U.S. at 323 (citations omitted).

Mere conclusory allegations are not enough to survive a motion for summary judgment. Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993); Rowland v. Riley, 5 F. Supp.2d 1, 3 (D.D.C. 1998); Benn v. Unisys Corp., 176 F.R.D. 2 (D.D.C. 1997).  Likewise, an affidavit which merely recites conclusory allegations will not defeat summary judgment.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").  As the Supreme Court has instructed:  "the plain language of Rule 56(c)) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

        B.      Retaliation Under the Fair Labor Standards Act

In order to state a claim for retaliation under the FLSA, the plaintiff must allege that her employer was aware that she was engaged in statutorily protected activity, that her employer took adverse action against her, and that there was a causal relationship between the two.  Hicks,

8

503 F. Supp. 2d at 51 (citing <u>Caryk v. Coupe</u>, 663 F.Supp. 1243, 1253 (D.D.C.1987).   Although

this Circuit has not conducted further analysis on the issue, a number of other circuits find the

Title VII analysis instructive when interpreting the FLSA.   <u>See</u> <u>Darveau v. Detecon, Inc.</u>, 515

F.3d 334, 342 (4th Cir.2008) ("Of particular note here, we and other courts have looked to Title

VII cases in interpreting the FLSA.") (citing <u>Shaliehsabou v. Hebrew Home of Greater Wash.,</u>

<u>Inc.</u>, 363 F.3d 299, 305-07 (4th Cir.2004); <u>Nichols v. Hurley</u>, 921 F.2d 1101, 1103-10 (10th

Cir.1990); <u>Brewster v. Barnes</u>, 788 F.2d 985, 990 n.7 (4th Cir.1986)).  As a supporting example,

the <u>Darveau</u> court noted that "both statutes provide the same broad definition of a prohibited

retaliatory act; each statute renders it unlawful to 'discriminate against' any employee who has

engaged in the described protected activities." <u>Darveau v. Detecon, Inc.</u>, 515 F.3d at 342

(<u>comparing</u> 29 U.S.C. § 215(a)(3) (FLSA) <u>with</u> 42 U.S.C. § 2000e-3(a) (2000) (Title VII)).

     This Court recently instructed that in a Title VII suit, "where an employee has suffered an

adverse employment action and an employer has asserted a legitimate, non-discriminatory reason

for the decision, the district court need not- *and should not*-decide whether the plaintiff actually

made out a prima facie case under <u>McDonnell Douglas</u>."   <u>Pardo-Kronemann v. Jackson</u>, **--**

F.Supp.2d **--**, 2008 WL 836153 (D.D.C.2008) (Bates, J.) (emphasis in original) (quoting <u>Brady</u>

<u>v. Office of the Sergeant at Arms, U.S. House of Reps.</u>, 520 F.3d 490, slip op. at 7

(D.C.Cir.2008)).  Given that retaliation claims under the FLSA and Title VII are generally

analyzed identically when differing language does not dictate otherwise, <u>see</u> <u>Mansfield</u>, 432 F.

Supp. 2d at 74, the same standard should apply in retaliation cases filed under FLSA as is

applied under Title VII.  Nevertheless, in assessing whether the plaintiff can provide evidence of

retaliatory motive sufficient to survive summary judgment, the <u>McDonnell Douglas</u> *prima facie*

analysis is a useful guideline and it is used for that purpose here.  See Pardo-Kronemann, 2008
WL 836153, *6-*7 (using *prima facie* construct as a tool for analysis of the evidence for
purposes of summary judgment).

Assuming, *arguendo*, that Brady's admonition does not apply to FLSA cases, a Plaintiff
may proceed using direct evidence of retaliation or under the now-familiar formula enunciated in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Community Affairs
v. Burdine, 450 U.S. 248 (1981).  No direct evidence of intentional retaliation exists in this case.
 Accordingly, to prove her case, Plaintiff must meet all the elements of the McDonnell Douglas
formula.  To establish a *prima facie* case of retaliation, Plaintiff must show that:  (1) she engaged
in protected activity; (2) the employer took an adverse employment action against her; and (3)
that there is a causal link between the protected activity and the adverse action.  Holcomb v.
Powell, 433 F.3d 889, 901-02, (D.C. Cir. 2006) (citing Forkkio v. Powell, 306 F.3d 1127, 1131;
Brown v. Brody, 199 F.3d at 452; Lockamy v. National Labor Relations Bd., 182 F. Supp. 2d 26,
33 (D.D.C. 2001); see also Hicks, 503 F. Supp. 2d at 51 (setting out the same requirements as
applied to FLSA).

If Plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the Agency to
articulate a legitimate, non-discriminatory reason for its actions.  Burdine, 450 U.S. at 253;
McDonnell Douglas, 411 U.S. at 802.  Once the Agency has articulated a legitimate, non-
discriminatory reason for its actions, the *prima facie* inference of discrimination drops from the
case.  St. Mary's Honor Center v. Hicks, 509 U.S. 507, 510-11 (1993); Burdine, 450 U.S. at 255.
 Plaintiff then must prove that the Agency's proffered reason was not the true reason for its
actions and was only a pretext for unlawful discrimination.  Burdine, 450 U.S. at 253;

McDonnell Douglas, 411 U.S. at 804; see also St. Mary's Honor Center, 509 U.S. at 507-08;

Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998).  The burden of

persuasion that discrimination motivated the Agency's actions remains at all times with Plaintiff.

St. Mary's Honor Center, 509 U.S. at 507; Burdine, 450 U.S. at 253; Aka, 156 F.3d at 1289.

As demonstrated below, applying the governing procedural and substantive law to the

undisputed facts of this case yields the conclusion that summary judgment should be entered

against Plaintiff.

## II.    Under FLSA, Plaintiff First Engaged in Protected Activity on April 16, 2005.

The Fair Labor Standards Act ("FLSA") at 29 U.S.C. § 215(a)(3), prohibits an employer

from retaliating against an employee who has asserted her FLSA rights. In order to establish a

prima facie case of FLSA retaliation, a plaintiff must demonstrate that: "(1) she engaged in

activity protected under [the] act; (2) she subsequently suffered adverse action by the employer;

and (3) a causal connection existed between her activity and the adverse action." Richmond v.

Oneok, Inc., 120 F.3d 205, 208-09 (10th Cir.1997); see also Hicks v. Ass'n of Am. Med.

Colleges, et al., 503 F.Supp.2d 48, 51 (D.D.C.2007) (Huvelle, J.).  An employee engages in

FLSA protected activity when she has (1) filed any complaint; (2) instituted or caused to be

instituted any proceeding under or related to the FLSA; (3) testified or is about to testify in any

FLSA proceeding; or (4) served or is about to serve on an industry committee. 29 U.S.C. §

215(a)(3).[1]

---

1. In this regard, the FLSA anti-retaliation provision provides a considerably narrower range of protected
activity than Title VII's broader coverage.  Under Title VII, it is an unlawful employment practice for an
employer to discriminate against an employee because he has merely "*opposed* any practice made an
unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

Plaintiff alleges that she engaged in protected activity by her "complaints" of unequal pay and sexual discrimination. See Am. Comp. ¶ 31. However, Plaintiff files the instant action under the FLSA, not Title VII. As such, complaints of sexual discrimination (presumably under Title VII) are not relevant to a charge of retaliation for filing a complaint under the FLSA. The triggering event, for purposes of the FLSA, is the date on which she, in fact, filed the complaint or caused to be instituted any proceeding under or related to the FLSA, as required by the statute.

Equal Employment Opportunity Commission ("EEOC") regulations required Plaintiff to undergo pre-complaint counseling with an EEO Counselor as a prerequisite to filing a formal written EEO complaint "in order to try to informally resolve the matter." 29 CFR § 1614.105(a). The pre-complaint process was initiated no earlier than when Plaintiff contacted the EEO Director on February 7, 2005. See Am. Compl. ¶ 20. During the pre-complaint process, the aggrieved individual provides informal oral allegations or claims to the EEO Counselor and after receiving proper notice from the EEO Counselor, may submit a formal written complaint:

> Unless the aggrieved person agrees to a longer counseling period … the Counselor shall conduct the final interview with the aggrieved person within 30 days of the date the aggrieved person contacted the agency's EEO office to request counseling. If the matter has not been resolved, the aggrieved person shall be informed in writing by the Counselor, not later than the thirtieth day after contacting the Counselor, of the right to file a discrimination complaint. The notice shall inform the complainant of the right to file a discrimination complaint within 15 days of receipt of the notice….

29 CFR § 1614.105(d).

The EEOC regulations further stipulate the requirements of a properly filed complaint,

---

participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a).

12

i.e., it must contain a signed statement from the person claiming to be aggrieved or that person's attorney; the signed statement must be sufficiently precise to identify the aggrieved individual and the agency and to describe generally the actions or practices that form the basis of the complaint; and, the complaint must contain a telephone number and address where the complainant or representative can be reached.[2]  29 CFR § 1614.106(c).  Plaintiff initially contacted the NTSB EEO Director on February 7, 2005, and subsequently filed a formal written EEO complaint with the NTSB EEO Director on April 16, 2005, alleging a violation of the Equal Pay Act ("EPA").  Ex. 1.  Only Plaintiff's formal written complaint meets the requirements of 29 C.F.R. § 1614.106(c).  Since an EEO complaint that alleges a violation of the EPA is a "proceeding under or related to the FLSA", in filing her formal written EEO complaint, Plaintiff engaged in protected activity.  Thus, Plaintiff's protected activity commenced on April 16, 2005.  While any alleged adverse action that she suffered subsequent to April 16, 2005, arguably satisfies the second prong of a prima facie case, anything that occurred prior to that date does not meet the requirements of 29 USC § 215(a)(3).

　　In her Complaint, Plaintiff ignores entirely the date in which she filed her formal EEO complaint, April 16, 2005, and claims that she filed a sexual discrimination complaint on February 7, 2005, when she spoke orally with the NTSB EEO Director and began her pre-complaint EEO counseling period.  See Am. Comp. ¶ 20.  However, the majority of judges in this District who have addressed the issue of whether informal complaints constitute protected

---

2. In a specific reference to EEOC's requirements in this regard, in Federal Express Corp. v. Holowecki et al., 128 S.Ct. 1147, 1150 (2008), the Supreme Court stated "an agency is entitled to deference when it adopts a reasonable interpretation of its regulations, unless its position is plainly erroneous or inconsistent with the regulation."

activity under FLSA § 215(a)(3), have recognized the clear guidelines set forth by the Federal

Regulations.  See Hicks, 503 F.Supp.2d at 52.  Judge Robertson has noted in dicta that the

"narrow holdings of the Second and Fourth Circuits[,]"which have found that informal oral

complaints do not constitute protected activity, "are more consistent with FLSA's language…."

Rodriguez v. Puerto Rico Fed. Affairs Admin., 338 F.Supp.125, 130-31 (D.D.C. 2004).  In 2006,

Judge Urbina agreed with Judge Robertson's view and provided greater analysis regarding those

circuit decisions.  See Mansfield v. Billington, 432 F. Supp. 2d 64 (D.D.C. 2006) (citing

Lambert v. Genesee Hosp., 10 F.3d 46, 55 (2d Cir.1993); Ball v. Memphis Bar-B-Q Co. Inc.,

228 F.3d 360, 364 (4th Cir.2000).  In Genesee, for example, several female employees alleged

that they were retaliated against in violation of the Equal Pay Act, but because the plaintiffs'

retaliation claims all arose out of informal, oral complaints to a supervisor, the Second Circuit

held that the plaintiffs failed to state a cause of action under § 215(a)(3). See Genesee, 10 F.3d at

54-56.  The court in Ball held that "FLSA's language did not protect a plaintiff who told his

employer that he might testify if a co-worker brought an employment discrimination lawsuit

because the Act protects the act of giving testimony, not merely voicing opposition to an

employer."  Mansfield, 432 F. Supp. 2d at 73 (describing Ball, 228 F.3d at 363-65).

        Judge Urbina's analysis of Genessee and Ball is persuasive because "[w]hen a statute is

unambiguous on its face…courts ought to apply the clearly expressed intent of the statute's

language."  Mansfield, 432 F. Supp. 2d at 74 (citing Chevron, U.S.A., Inc. v.

Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984)).  The plain language of the EPA's

retaliation provision, which discusses the filing of "any complaint" in the context of formal legal

actions, 29 U.S.C. § 215(a)(3), expressly limits the scope of its application. Id. at 74 (citing Ball,

14

228 F.3d at 364). In contrast, Title VII protects employees who have "*opposed any practice made an unlawful employment practice by this subchapter*", 42 U.S.C. § 2000e-3(a) (emphasis added), which is considerably more inclusive than the language of the EPA's anti-retaliation provision that protects the filing of "any complaint" in the context of specific formal actions. Id. (citing Genessee, 10 F.3d at 55). "Although the D.C. Circuit broadly interprets remedial civil rights statutes, especially as they relate to employment discrimination, Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 885 (D.C.2003), this generalized purpose is insufficient to outweigh the plain language of the statute here, Friends of the Earth v. Envtl. Prot. Agency, 446 F.3d 140, 145 (D.C. Cir. 2006) (stating that "[t]he most reliable guide to congressional intent is the legislation the Congress enacted," and when Congress gives a statute plain language, courts cannot set it aside)." Id.

Judge Sullivan has also considered this issue, but agreed with the majority of circuits, which have held that informal complaints to an employer constitute statutorily protected activity under the statute. See Haile-Iyanu v. Central Parking System of VA, Inc., 2007 WL 1954325 (D.D.C. 2007). In Haile-Iyanu, the Court found that the "has filed any complaint" language in 29 U.S.C. § 215(a)(3) is open to different interpretations, and explained that if such language was "meant to pertain to formal legal actions, then it would appear as if 'or instituted or caused to be instituted any proceeding under or related to this chapter' would be rendered mere surplusage." See id. at *9-10 (quoting Valerio v. Putnam Associates Inc., 173 F.3d 35, 42 (1st Cir. 1999). Further, the Court noted the Supreme Court's opinion that the FLSA anti-retaliation provision has the purpose of "encourag[ing] employees to report violations to their employers", Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 292-93 (1960), and that it should follow

the "'routine [broad] construction given similar anti-retaliation provisions'" in other statutes that classify informal complaints as protected activity.  Id. at *11 (quoting Lambert v. Ackerley, 180 F.3d 997, 1006 (9th Cir.1999)).  Thus, if one presumes that presenting oral informal EPA allegations to an EEO Counselor qualified as engaging in a "proceeding under or related to the FLSA", at best Plaintiff engaged in protected activity no earlier than February 7, 2005, the date upon which Plaintiff alleges that she spoke to the NTSB EEO Counselor regarding unequal pay. See Am. Compl. ¶ 20.

However, Plaintiff's claim in this case is analogous to those in Genesee and Ball. Plaintiff claims that in or about April 2004, she met with Chairman Ellen Engleman Conners and informed Engleman Conners that she was the "only Director of the four modal investigation offices without SES status and that as a result she made substantially less money than all three of her male counterparts."  Am. Compl. ¶ 13.  Plaintiff also states that after this meeting she made several attempts to meet with Engleman Conners to seek her approval for overtime pay, but Engleman Conners refused to meet with her.  Id. at ¶ 15.  Even considering these statements in the light most favorable to Plaintiff, they neither claim nor imply that Plaintiff alleged a violation of the EPA, or overtime provisions of the FLSA, during any conversation with Engleman Conners.  Rather, Plaintiff clearly attributed the difference in salary between her and the male office directors to the fact that she did not have Senior Executive Service status.  Ex. 13 at 47:9-12, 50:8-10.  Even if one presumes that an informal oral protest to one's supervisor about an alleged EPA or FLSA violation is protected activity under § 215(a)(3), Plaintiff's actions fall short of that standard.  As this Court noted Hicks, "[n]ot all amorphous expressions of discontent

related to wages and hours constitute complaints filed within the meaning of § 215(a)(3)."
Hicks, 503 F. Supp. 2d at 52 (quoting Ackerley, 180 F.3d at 1007).

The plain language of the EPA's retaliation provision expressly limits the scope of its application to "formal legal actions, such as instituting proceedings, testifying, and serving on an industry committee." Mansfield, 432 F. Supp. 2d at 74. (citing Ball, 228 F.3d at 364). In accordance with Judge Urbina's analysis in Mansfield, Plaintiff first engaged in protected activity under 29 U.S.C. § 215(a)(3) when she filed a formal written Equal Pay Act complaint with the NTSB EEO Director on April 16, 2005. Therefore, Plaintiff cannot establish a prima facie case of retaliation with regard to alleged adverse employment actions that occurred prior to that date. Consequently, the allegations contained in ¶¶ 15 and 17-20 of the Complaint are insufficient to sustain a claim of retaliation as a matter of law, and should therefore be dismissed. Even if it is assumed that Plaintiff's February 7, 2005 contact with the EEO Director for the purpose of initiating informal counseling should be considered as "filing a complaint" under the statute, any allegations regarding events that occurred prior to that date should be dismissed.

## III.    Plaintiff Retired From the NTSB Voluntarily

Plaintiff cannot meet the threshold requirements for proving a claim of constructive discharge.[3] She has provided no facts to support an assertion that she was forced to resign from the NTSB in the face of unbearable conditions, and Defendant is entitled to summary judgment as a matter of law.

_____

3. It is debatable whether Plaintiff in fact has articulated a cognizable claim of constructive discharge in her complaint, as it is not clearly stated or described.

An order granting summary judgment for defendant on this issue is warranted if plaintiff has failed to offer evidence on which a reasonable fact finder could reasonably find that Plaintiff was constructively discharged when she retired.  Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 78 (D.D.C.2006) (Bates, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  The Supreme Court articulated the following standard for the constructive discharge doctrine in the Title VII context:  "The inquiry is objective: Did the working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004).   Not only must the employee be driven to quit due to unbearable conditions, but the employer must be found to have deliberately made working conditions intolerable.  See Robinson-Reeder v. Am. Council on Educ., 532 F.Supp.2d 6 at 17 (D.D.C.2008) (Bates, J.); Clark v. Marsh, 665 F.2d 1168, 1167 (D.C. Cir.1981).  Further, where retaliation is alleged to have precipitated the constructive discharge, the plaintiff must meet the high threshold of showing "aggravating factors" that created objectively intolerable working conditions.  Robinson-Reeder at 17 (citing Clark at 1174).

While in the instant case the Plaintiff is alleging retaliation under the Fair Labor Standards Act, Title VII cases nevertheless have precedential value, as the analysis is identical.[4] For over two decades the D.C. Circuit has maintained that the objective Title VII standard is also employed to adjudicate constructive discharge claims under other statutes that protect employees who exercise statutory rights from adverse job actions, including rights under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3).  See Simpson v. Federal Mine Safety and Health Review Com'n, 842 F.2d 453, 461-62 (D.C. Cir.1988).  Not only must the conditions be objectively

---

4. See supra Section III, B.

intolerable, but a claim of constructive discharge must be supported by more than an employee's

subjective opinion that his position had become so intolerable and difficult that he must resign.

See Downey v. Isaac, 622 F. Supp. 1125 (D.D.C.1985), aff'd, 794 F.2d 753 (D.C. Cir. 1986)

(table).  In fact, "absent some indication that the employer was trying to drive the employee from

the workplace entirely or that the employee 'quit just ahead of the fall of the axe,' the law will

not permit a resignation to be transformed into a discharge." Kalinoski, 435 F. Supp. 2d at 78

(quoting Lindale v. Tokheim Corp., 145 F.3d 953, 956 (7th Cir.1998)).  That point is critical in

this case because Plaintiff relies exclusively on her own self-serving assertions, which are

insufficient both as matters of fact and law.

        Plaintiff alleges that Defendant retaliated against her by conducting an "adverse

employment action," that is, an act that "can be performed only by the exercise of specific

authority granted by the employer," Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 768

(1998) (Thomas, J., dissenting), by, inter alia, not selecting Plaintiff to be an SES Director of the

Office of Marine Safety.  See Ex. 13 at 18:10-45:22.  However, Plaintiff's allegation of an

adverse employment action alone is insufficient to sustain a constructive discharge claim.

Plaintiff's nonselection cannot reasonably be interpreted as an intolerable working condition.

Critical to a finding of constructive discharge is a showing of the existence of what the Supreme

Court termed "an aggravated case of . . . hostile working environment." Penn. State Police, 542

U.S. at 154 (2004).  Accord  Mungin v. Katten Muchin & Zavis, 116 F.3d at 1558 (D.C.

Cir.1997) (showing of "aggravating factors" required); Dashnaw v. Pena, 12 F.3d 1112, 1115

(D.C. Cir.), cert. denied, 513 U.S. 959 (1994); Clark v. Marsh, 665 F.2d at 1174.  "Aggravating

factors" are those factors that would force an employee to leave.  Clark v.  Marsh, 665 F.2d at

19

1174.  Even a finding that retaliation had occurred would be insufficient to establish that a

voluntary resignation was actually a constructive discharge.  See Dashnaw, 12 F.3d at 1115.

      An objective assessment of Plaintiff's allegations, as well as Plaintiff's own subjective

opinion regarding her office situation, confirm that her working conditions throughout her

employment were quite tolerable.  Although Plaintiff served on a detail under Unclassified

Duties in the Office of Safety Recommendations and Advocacy, see Ex. 13 at 32:3-5, 34:10-11,

149:15-18, and exhibit 2 thereto, and transferred to the Office of Management to work as a

Senior Program Analyst, see Id. at 34:11-12, 151:15-16, 152:20-22, and exhibit 3 thereto, there

is no evidence to suggest that she was subjected to intolerable or even unfriendly working

conditions.  The instant situation fits squarely into the example used by the Kalinoski court to

illustrate the narrow scope of the constructive discharge doctrine:

> It does not apply to a case in which an employee decides to resign or
> retire because he does not want to accept a new assignment, a transfer,
> or other measures that the agency is authorized to adopt, even if those
> measures make continuation in the job so unpleasant for the employee
> that he feels that he has no realistic option but to leave. … [T]he fact
> that an employee is faced with an unpleasant situation or that his choice
> is limited to two unattractive options does not make the employee's
> decision any less voluntary.

Kalinoski v. Gutierrez, 435 F. Supp. 2d at 79 (quoting Staats v. U.S. Postal Serv., 99 F.3d 1120,

1124 (Fed. Cir. 1996).  Details and reassignments are common personnel actions throughout the

Federal Government and are permissible means to enable an agency to best accomplish its

mission.

      Further, nothing about the timing of Plaintiff's retirement suggests it was a constructive

discharge.  Plaintiff has provided no evidence to support an argument that her situation became

progressively unbearable to the point where she had no choice but to retire from the agency.  In

20

fact, Plaintiff stated that the working conditions in her office environment changed at no point

during the time in question, and Plaintiff never expressed any unhappiness with the working

conditions in her office environment following her formal EEO complaint in April 2005.  See

Ex. 13 at 153:9-16, 153:23-154:1.  Rather than cite to any intolerability of her working

conditions, Plaintiff stated: "essentially the reason why I retired" is that "I was not working in

marine."  Id. at 44.  Thus, she fails to meet the high threshold to demonstrate the existence of

aggravating factors that made her working conditions intolerable.

        In addition, Plaintiff's claims of retaliation based on her non-selection and transfer

among offices do not qualify as "aggravating factors" that would cause a reasonable person to be

forced to leave her employment.  If that were to be the case, then any claim of retaliation would

convert a subsequent resignation or retirement into a constructive discharge.  The law in this

Circuit, however, requires a considerably greater showing.  Plaintiff points to no specific acts of

retaliation that occurred prior to her resignation that caused her to no longer be able to cope with

her working conditions.  See Am. Compl. ¶ 26.  She continued to earn a GS-15 salary and has

made no allegation of mistreatment by the supervisors for whom she worked while detailed and

reassigned.   In fact, while Plaintiff became eligible for retirement in October 2005, she retired in

July 2006.  See Ex. 13 at 160:16-24. Yet, she has not indicated that her working conditions

changed appreciably during that time.  In fact, even if Plaintiff's allegations were accepted as

true, she identifies neither any objectively intolerable conditions nor an increase in alleged

retaliatory conduct that would lead a reasonable person to believe she had no option but to

resign.[5]

In sum, Plaintiff's allegations, even if taken as true, do not rise to the level required to support a claim of constructive discharge.  As this Court has noted, when "the allegation of constructive discharge is based on a collection of events that precipitated plaintiff's resignation … the Court does not interpret [the] plaintiff's references to constructive discharge as pleading an *independent* basis for Title VII liability."  Kalinoski v. Gutierrez, 435 F. Supp.2d at 73 (emphasis in original). "Rather, the Court considers the compound allegation to be an assertion ultimately relating to the scope of plaintiff's potential recovery in the event that she prevails on the claims of discrimination or retaliation."  Id. at 73-74 (citing Knabe v. Boury Corp., 114 F.3d 407, 407 n.1 (3d Cir. 1997)).  Given that FLSA constructive discharge claims are analyzed  so similarly to Title VII constructive discharge, the principle should apply in this case as well. Here, Plaintiff alleges no separate claim for constructive discharge; rather, she implies that a constructive discharge was the consequence of the other alleged retaliatory actions.  Therefore, with regard to any claims that may ultimately be successful in this action, Plaintiff's eligibility for back pay and benefits should be cut off as of the date of Plaintiff's retirement from the NTSB.

IV.    **The Agency is Entitled to Judgment as a Matter of Law Because The Challenged Personnel Actions Do Not Satisfy a *Prima Facie* Case of Retaliation, The Agency has Legitimate, Non-discriminatory Reasons for its Actions, and these Reasons Withstand a Claim of Pretext**

Plaintiff claims that her non-selection as the SES Director of the Office of Marine Safety of the NTSB, her detail and subsequent transfer to other offices within the Agency, and other

---

5. Defendant neither concedes nor admits any additional allegations beyond those conceded before the instant motion.

actions taken by Defendant were in retaliation for her EEO complaint of unequal pay and sexual

discrimination.  Plaintiff filed a formal EEO complaint on April 16, 2005.  See Ex. 1.

Accordingly, she has established the first prong of her *prima facie* case for the alleged adverse

actions that took place after this date.  However, Plaintiff fails to prove a *prima facie* case based

on any of her claims because she cannot establish that there was a causal connection between her

EEO activity and her non-selection, her detail, her transfer, or that she did not receive a few

performance evaluations, which constitute the third prong of the *prima facie* case.  Each of these

arguments will be addressed in detail below.[6]

### A.    Re-advertisement of SES Director Position After First Panel

Plaintiff alleges that in or about July, 2004, NTSB advertised the OMS Director position

as having SES status, Plaintiff applied for the OMS Director position, and NTSB cancelled the

advertisement and without granting her an interview.  Am. Compl. ¶¶ 16, 17.  In 2004, the NTSB

requested and received an additional SES slot from OPM, which was allocated to the position of

Director of OMS.  Ex. 11 at ¶ 18; Ex. 14.  Once the decision was made to allocate the SES slot to

the Director of OMS, the position was advertised in July 2004 as an SES position, and

applications for the position were accepted.  Exhibit 21, Vacancy Announcement, Director

Office of Marine Safety – Date opened 7/14/04, ("Ex. 21").  Plaintiff submitted an application

for the position. See Am. Compl. ¶ 17.  Nineteen other individuals also applied for the position

as well. Exhibit 22, Memorandum dated 12/2/04 to Dan Campbell from Ad-Hoc Rating Panel,

---

6. It is unclear whether, under Brady v. Office of the Sergeant at Arms, US House of Reps., 520 F.3d 490
(D.C. Cir. 2008), the District Court should decide whether the plaintiff actually made out a prima facie
case of retaliation under McDonnell Douglas, as this is a case of retaliation under the FLSA, not Title VII.
 The Defendant nonetheless maintains that not only has Plaintiff failed to make a prima facie case, but she
cannot show pretext.

("Ex. 22").  Ms. Collette Magwood, the former Assistant Director of the NTSB Human

Resources Division, reviewed the qualifications of the twenty applicants, and determined that ten

of the applicants, including Plaintiff, met the minimum qualifications required for the position.

Ex. 22; Ex. 11 at ¶ 18.

When an SES position is advertised, a panel composed of 3-5 SES members is appointed

by the Managing Director to rate the qualifications of those applicants that the Human Resources

Division determines to be minimally qualified for the position.  See Ex. 2 at 50:20, 57:19; Ex. 11

at ¶ 19.  Mr. Campbell appointed a three-person panel composed of the Directors of the Offices

of General Counsel; Safety Recommendations and Accomplishments; and Railroad, Pipeline,

and Hazardous Materials Investigations.  Ex. 22; Ex. 11 at ¶ 19.  The Human Resources Division

provided a rating schedule to the panel that identified the criteria the panel must use to rate the

qualifications of the applicants, and the panel used it to rate and rank the 10 applicants who Ms.

Magwood determined were minimally qualified.  Exhibit 23, SES Crediting Plan WA-TB-4-

0003, ("Ex. 23"); Ex. 3 at 53:20-54:12.  The panel compared the experience, education, and

training described by applicants to the criteria in the rating schedule, and applied subjective

judgment to arrive at a consensus rating on each of the criteria.  See Ex. 3 at 53:16-54:12.

The panel grouped the applicants into three broad categories of "best qualified,"

"qualified," and "not qualified."  Ex. 11 at ¶ 20; Ex. 22.  After completing its review, the panel

identified five best qualified applicants and referred them to Mr. Campbell to be considered for

selection.  Id.  Mr. Campbell decided not to make a selection from the list the panel provided.

Ex. 2 at 93:14-97:18; Ex. 22.  Mr. Campbell subsequently cancelled the July 2004 OMS position

advertisement prior to a selection being made.  See Am. Compl. ¶ 17; Ex. 2 at 93:14.  He

24

cancelled it because he believed that the pool of qualified applicants was too narrow and insufficiently robust. See Ex. 2 at 93:17, 96:13-97:18. According to Mr. Campbell, there was also a rumor among potential candidates for the position that the position had been "wired" for Plaintiff. See Ex. 2 at 93:20-94:1, 95:2-95:7, 123:14.

Here not only is there no direct evidence of retaliation, there is no reason to believe that Mr. Campbell was not sincere in his belief that the pool of qualified applicants was too narrow, and that there was a perception among one or more potential candidates that Plaintiff had been pre-selected for the SES Directorship of OMS. Mr. Campbell elaborated about his basis for believing this. See Ex. 2 at 93:17-97:18. It is Plaintiff's burden to prove that an employer's proffered explanation for an employment action was pretext for retaliation requires more than a showing that mistakes or poor decisions were made. See generally Perez v. Region 20 Educ. Service Center, 307 F. 3d 318 (5th Cir. 2002). The plaintiff must show that the defendant's reasons are pretextual and retaliation was a motive. See Alexander v. Gerhardt Enterprises, Inc., 40 F. 3d 187, 197 (7th Cir. 2004). "[M]ere unsubstantiated allegation… creates no 'genuine issue of fact' and will not withstand summary judgment." Harding, 9 F.3d at 154. Because Plaintiff cannot show that Mr. Campbell's stated reasons for his action in rescinding the vacancy announcement for the Director of the Office of Marine Safety here were false and that retaliation was a motivating factor, Defendant is entitled to summary judgment.

      B.    Non-selection for SES position / Failure to make "Highly Qualified" List

The Director of OMS position was readvertised as an SES position in early 2005. Ex. 24, Position Vacancy Announcement, January 11, 2005, Director of Office of Marine Safety, ("Ex. 24"). Plaintiff and nineteen other individuals submitted applications for the position. See Am.

25

Compl. ¶ 19; Ex. 16; Exhibit 25, Memorandum dated 3/28/2005 to Joseph Osterman from Ad-Hoc Rating Panel, ("Ex. 25"). Ms. Magwood reviewed the qualifications of the twenty applicants, and in this instance determined that fifteen of the applicants, including Plaintiff, met the minimum qualifications required for the position. See Ex. 11 at ¶ 24; Ex. 25. Mr. Campbell appointed a new five member rating panel to rate and rank the applicants, which was composed of all SES office directors involved in accident investigation or accident investigation support. See Ex. 2 at 120:5-120:15. This included the Directors of the Offices of Aviation Safety; Highway Safety; Railroad, Pipeline and Hazardous Materials Investigations; Safety Recommendations and Accomplishments; and Research and Engineering. Ex. 25.

As with the first panel in 2004, this second panel rated and ranked the 15 applicants who Ms. Magwood determined were minimally qualified using a rating schedule. Exhibit 26, Rating and Evaluation Plan, ("Ex. 26"); Exhibit 27, SES Rating Sheet, ("Ex. 27"). After completing their review, the second panel identified five best qualified candidates and referred them to Mr. Campbell to be considered for selection. Ex. 11 at ¶ 20; Ex. 3 at 105:5-16, Ex. 25. This panel determined that Ms. Cooke did not rank in the top five candidates. Ex. 3 at 95:20-95:22, 105:7, 108:7, and 134:2; Ex. 25. Shortly following the submission of the panel, Mr. Campbell moved from the position of Managing Director to Executive Director, and therefore he was not involved in the selection and did not interview any of the candidates who the panel recommended. Ex. 2 at 183:11-12; Ex. 3 at 133:17-18, 134:9-12.

Mr. Osterman became the Managing Director in March 2005. As the Managing Director, he became the selecting Official for the OMS Director position. As a result, he was removed from the first 2005 selection panel and the panel was reconstituted to rate the applicants again.

26

Ex. 3 at 134:9-13, 19-21.  The second 2005 review panel members remained the same except

Mr. Tom Haueter replaced Mr. Osterman.  Ex. 25; Ex. 3 at 138:3-4.  Mr. Osterman, as the

selecting official, received a list of five best qualified candidates from the reconstituted panel on

March 28, 2005, and Plaintiff was not on the list.  Ex. 25.  Mr. Osterman decided to interview

only the top five candidates , as had been the usual procedure, because he thought that it would

be improper to interview anyone, the incumbent of the position or otherwise, if that person were

not ranked by the panel in the top five.  Ex. 3 at 105:5-108:9, 138:7-17, 154:1-7. As of that time,

Mr. Osterman was unaware of any EEO Complaint filed by Plaintiff.   Ex. 3 at 150:17-18.

Following the interviews, the NTSB recommended John Spencer for this SES position to OPM,

and he was approved for an appointment to the SES.  Ex. 17.

> This Court has recognized that
>
> "'[i]f a factfinder can conclude that a reasonable employer would have found
> the plaintiff to be significantly better qualified for the job, but this employer
> did not, the factfinder can legitimately infer that the employer consciously
> selected a less-qualified candidate -- something that employers do not usually
> do, unless some other strong consideration, such as discrimination, enters into
> the picture.'"

Kalinoski, 435 F. Supp. 2d at 78 (citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294

(D.C. Cir.1998)).  However, this is not a situation in which the Plaintiff is significantly more

qualified than John Spencer, who was offered the SES position as Director of OMS.  "Mr.

Spencer had not only the requisite marine Bachelor's degree, he also had a Master's and a

doctorate," the latter two of which the Plaintiff lacks.  Ex. 3 at 131:5-7; Ex. 13 at 5:11-15.  In

addition, "Mr. Spencer had been through the Coast Guard in a variety of marine safety positions

and had retired as a [Coast Guard captain.]  He then went on to manage the technical

development program at the American Bureau of Shipping for a number of years.  He has

chaired a number of international committees on maritime safety.  He was well-known in the industry and very well respected."  Ex. 3 at 131:8-16.  On the other hand, among the 2005 selection panel members, "there was discussion about whether [Plaintiff] had any real time at sea or on ships.  And the general consensus was that if [Plaintiff] had time it was very minimal, very little time, actually, on vessels."  Ex. 3 at 101:7-11.

Here not only is there no direct evidence of retaliation, there is no reason to believe that Mr. Osterman was not sincere in his belief that it would be improper to interview anyone, the incumbent of the position or otherwise, if that person were not ranked by the panel in the top five.  Mr. Osterman elaborated at length about his basis for believing that, while serving on the first 2005 panel, Plaintiff's application did not belong in the top five.  See Ex. 3 at 100:22-105:8. He also explained why he believed it improper for the panel to recommend, and consequently for the Managing Director to interview, more than the top five candidates selected by a given panel.  Ex. 3 at 105:5-108:9, 138:7-17; 154:1-7.  It is Plaintiff's burden to prove that an employer's proffered explanation for an employment action was pretext for retaliation requires more than a showing that mistakes or poor decisions were made.  The question is not whether Mr. Osterman was correct in his assessments of Plaintiff's qualifications and whether the Managing Director should interview more than the top five candidates selected by a panel, or whether Plaintiff agrees with those assessments; it is whether those decisions were made with a retaliatory motive.  The plaintiff must show that the defendant's reasons are pretextual and that retaliation was a motive.  See Alexander, 40 F.3d at 197.  "[M]ere unsubstantiated allegation… creates no 'genuine issue of fact' and will not withstand summary judgment."  Harding, 9 F.3d at 154.  Because Plaintiff cannot show that Mr. Osterman's stated reasons for his action, in

choosing to interview only those candidates who were selected as the top five by the 2005 reconstituted panel, here were false and that retaliation was a motivating factor, Defendant is entitled to summary judgment.

C.     Refusal to Offer Plaintiff a Senior Level Position

When Mr. Osterman informed Plaintiff that she was not selected for the SES Director of OMS, she suggested that an international marine position at the Senior Level ("SL") be created within the Office of Management. Ex. 3 at 145:7-9, 149:2-4.  Mr. Osterman explained that there would have to be a justification for the need for such a position, and that the justification would have to satisfy OPM, from whom the SL slot would have to be requested.  Ex. 3 at 149:9-149:17. Upon receiving the SL allocation from OPM, the position would have to be competed. Ex. 3 at 149:18-150:1.  Mr. Osterman asked Ms. Cooke to write a proposal justifying the SL international marine position. Ex. 3 at 150:7-8.  Plaintiff had a subsequent meeting with Mr. Osterman where she presented her proposal, which was not extensive, but had several pages of bullet points. Ex. 3 at 157:18-19, 157:21-158:3, and 160:6-9.  Mr. Osterman reviewed the proposal, then met with the Acting Chairman Mark Rosenker, Executive Director Dan Campbell, and informed Chairman Designee Ellen Engleman Conners of the proposal and his evaluation of the need.  All agreed that there was not sufficient work to justify the position as proposed. Ex. 3 at 159:8-163:11.  Mr. Osterman met with Plaintiff and informed her that the decision was made that there was not adequate justification for a SL position in the international marine area.  Ex. 3 at 163:22-164:12.

Here not only is there no direct evidence of retaliation, there is no reason to believe that Mr. Osterman was not sincere in his belief that that there was not sufficient work to justify the

creation of an SL position for Plaintiff in the international marine area.  Mr. Osterman described

how he considered the proposal put forth by Plaintiff, and discussed the issue with the Executive

Director, as well as the Acting Chairman and Chairman Designee of the NTSB.  Ex. 3 at 159:8-

163:11.  Further, Plaintiff cannot show that the agency was required to create a SL position for

her, or that she was denied an SL position as a result of retaliation for exercising her rights under

the FLSA.  It is Plaintiff's burden to prove that an employer's proffered explanation for an

employment action was pretext for retaliation requires more than a showing that mistakes or

poor decisions were made.  The question is not whether Mr. Osterman was correct in his

assessment of Plaintiff's proposal and NTSB's need for an SL position in the international

marine area, or whether Plaintiff agrees with that assessment; it is whether that decision was

made with a retaliatory motive.[7]  See Wiley v. Glassman, 511 F.3d 151 (D.C. Cir.2007); see also

Perez v. Region 20 Educ. Service Center, 307 F. 3d 318 (5th Cir.2002).  The plaintiff must show

that the defendant's reasons are pretextual and that discrimination was a motive.  See Alexander,

40 F.3d at 197.  "[M]ere unsubstantiated allegation… creates no 'genuine issue of fact' and will

not withstand summary judgment."  Harding, 9 F.3d at 154.  Because Plaintiff cannot show that

Mr. Osterman's stated reasons for his actions here, in recommending to the Executive Director,

as well as the Acting Chairman and Chairman Designee of the NTSB, were false and that

retaliation was a motivating factor, Defendant is entitled to summary judgment.

       D.     Detail from OMS to SRA / Removal from OMS

Once Mr. Osterman informed Plaintiff that an SL position would not be possible, he and

---

7. Plaintiff has not shown that any similarly situation employee who had not engages in activity protected by the FLSA had a Senior Level position created for him/her.

Plaintiff discussed several options regarding new positions to which Plaintiff could go.  See Ex. 3 at 164:5-15.  Following the selection of a new SES Director of OMS, "[t]he supervisory billets in the Office of Marine Safety were filled already[,]" and so Osterman needed to find an appropriate position for Plaintiff.  See Ex. 3 at 166:1-3.  Osterman offered for Plaintiff to stay in OMS as a national resource specialist assigned marine engineering tasks for investigations, thus maintaining her GS-15 salary level without supervisory responsibilities.  See Ex. 3 at 164:15-16, 165:12-14, 166:3-8.  He also offered a planning manager position as a detail in the Office of Safety Recommendations and Communications ("SRC"), "because there was an immediate need for a 15-level manager in [that office] for a specific duration of time."  Ex. 3 at 164:18-21. Osterman went further to indicate that:

> There was a need to assist the director of the office in planning activities.  And I considered Ms. Murtagh a good planner and felt that that fit would be good for the agency … and also give me the opportunity to design a more permanent position for Ms. Murtagh outside the Office of Marine Safety.

Ex. 3 at 178:16-179:1.  Osterman informed Plaintiff that there "was not an endless need, but it was coincidental time need to go and help the Office of Safety Recommendations do some planning activity, and [Plaintiff] agreed to do that."  Ex. 3 at 164:21-165:2.  The positions in OMS and SRC "were the positions that [Osterman] had at that time." Ex. 3 at 167:22-168:1.  At that time Osterman "made it very clear that [the SRA position] was a temporary position, it was a detail, and while [Plaintiff] was on the detail I would work to create – work for a pathway for her to another position within the agency."  Ex. 3 at 168:3-7.

Effective June 6, 2005, Plaintiff was detailed to the SRC.  Ex. 18.  Plaintiff was assigned Unclassified Set of Duties for the SRC, which included responsibilities in policy and planning, human resource development, and liaise and communicate with those receiving safety

31

recommendations.  Exhibit 28, Unclassified Set of Duties in SRC, ("Ex. 28").  The detail in SRC was not to exceed October 3, 2005, but on October 14, 2005, it was extended by nearly two weeks until October 15, 2005.  Ex. 18; Exhibit 29, Notice of Personnel Action – Extension of Detail for Cooke, ("Ex. 29").  Throughout this detail, Plaintiff retained her previous pay level and benefits.  Id.  On October 15, 2005, Plaintiff's detail was terminated, and her position title returned to Supervisory Marine Accident Investigator.  Exhibit 30, Notice of Personnel Action – Termination of Detail for Cooke, ("Ex. 30").

    A reasonable fact finder could not reasonably conclude "from all of the evidence that the challenged reassignment was made for a retaliatory reason." Pardo-Kronemann v. Jackson, 2008 WL 836153, *11 (D.D.C. 2008) (Bates, J.) (citing Patterson v. Johnson, 505 F.3d 1296, 1299 (D.C.Cir.2007) (affirming summary judgment for the defendant and finding that the plaintiff's involuntary reassignment to a new position with a "sharp reduction in supervisory responsibilities" was not retaliatory)).  Here not only is there no direct evidence of retaliation, there is no reason to believe that Mr. Osterman was not sincere in his belief that that there was a need for Plaintiff in the Office of Safety Recommendations and Communications, and that Plaintiff serving a detail there would be a good fit for the agency. Mr. Osterman described how he considered the billets that were available for Plaintiff at the GS-15 level, and let Plaintiff choose the position that she wished to take.  Ex. 3 at 167:15-168:11.  It is Plaintiff's burden to prove that an employer's proffered explanation for an employment action was pretext for retaliation requires more than a showing that mistakes or poor decisions were made.  The question is not whether Mr. Osterman was correct in his assessments of Plaintiff's fitness for a position in SRC and SRC's need for an employee like Plaintiff, or whether Plaintiff agrees with

32

those assessments; it is whether those decisions were made with a retaliatory motive. <u>See</u> <u>generally</u> <u>Perez v. Region 20 Educ. Service Center</u>, 307 F. 3d 318 (5th Cir. 2002). The plaintiff must show that the defendant's reasons are pretextual and that discrimination was a motive. <u>See</u> <u>Alexander</u>, 40 F.3d at 197. "[M]ere unsubstantiated allegation… creates no 'genuine issue of fact' and will not withstand summary judgment." <u>Harding</u>, 9 F.3d at 154. Because Plaintiff cannot show that Mr. Osterman's stated reasons for his actions here, in offering position options to Plaintiff and then sending her on a detail to SRC, were false and that retaliation was a motivating factor, Defendant is entitled to summary judgment.

> E.     <u>Reassignment from SRC to OMD</u>

During Plaintiff's detail in SRC, Mr. Osterman had time to evaluate the needs of the agency, and particularly the Office of Management, wherein he needed a GS-15 level associate managing director for strategic management, or chief planning officer for the agency. Ex. 3 at 201:17-202:2. Osterman offered the position to Plaintiff when her detail ended in SRC. Ex. 3 at 201:21-202:7. Osterman told her "that [he] wouldn't make her do it, [Plaintiff] had the option of saying no, but that [he] thought that [Plaintiff's] planning and presentation, especially strategic planning skills, were good." Ex. 3 at 202:8-11. Plaintiff declined the position. Ex. 3 at 202:18-19. At the time, the only other position available in the Office of Management was a quality assurance position, which was responsible for the thoroughness of reports, and to organize the notation process throughout the Safety Board. Ex. 3 at 207:5-11. Mr. Osterman did not offer the position to Ms. Cooke because he decided her skills did not match the needs of the position. Ex. 3 at 207:14-208:3.

The only other vacant position in the Office of Management when Plaintiff completed her

work in SRC office was a Program Analyst position, to which Plaintiff was reassigned.  See Ex.

3 at 203:7-11; 207:2-7.  Osterman informed Plaintiff "that we would put [Plaintiff] in a program

management position, program analyst position until such time that we could determine what

other positions became available at the 15 level."  Ex. 3 at 203:7-11.  Plaintiff's pay level and

benefits remained the same. Ex. 19.  Ms. Cooke was asked to review all of the audits and formal

reviews conducted by the agency in the past ten years, and determine what, if any, response was

made to the recommendations offered by these audits. Ex. 3 at 203:11-21.  A position description

was established for this program analyst position. Exhibit 31, Position Description for Program

Analyst, ("Ex. 31").

     A jury could not reasonably conclude "from all of the evidence that the challenged

reassignment was made for a retaliatory reason." Pardo-Kronemann v. Jackson, 2008 WL 836153,

*11 (D.D.C. 2008) (Bates, J.) (citing Patterson v. Johnson, 505 F.3d 1296, 1299 (D.C.Cir.2007)

(affirming summary judgment for the defendant and finding that the plaintiff's involuntary

reassignment to a new position with a "sharp reduction in supervisory responsibilities" was not

retaliatory)).  Here not only is there no direct evidence of retaliation, there is no reason to believe

that Mr. Osterman was not sincere in his belief that Plaintiff was well suited for the associate

managing director for strategic management, and that he reassigned Plaintiff to the next most

appropriate position when Plaintiff declined Osterman's offer.  Mr. Osterman explained how he

had time to evaluate the needs of the agency, and thought that Plaintiff would make a good

associate managing director because he thought that Plaintiff's strategic planning skills were

good.  See Ex. 3 at 201:17-202:2, 202:8-11.  It is Plaintiff's burden to prove that an employer's

proffered explanation for an employment action was pretext for retaliation and requires more

than a showing that mistakes or poor decisions were made.  The question is not whether Mr.

Osterman was correct in his assessments of Plaintiff's fitness for a position as a program analyst

in the Office of Management, or whether Plaintiff agrees with that assessment; it is whether that

decision was made with a retaliatory motive.  See generally Perez v. Region 20 Educ. Service

Center, 307 F. 3d 318 (5th Cir. 2002).  The plaintiff must show that the defendant's reasons are

pretextual and that discrimination was a motive.  See Alexander, 40 F.3d at 197.  "[M]ere

unsubstantiated allegation… creates no 'genuine issue of fact' and will not withstand summary

judgment."  Harding, 9 F.3d at 154.  Because Plaintiff cannot show that Mr. Osterman's stated

reasons for his actions here, reassigning Plaintiff to the only remaining position in the Office of

Management that suited her after she declined a position Osterman recommended, were false and

that retaliation was a motivating factor, Defendant is entitled to summary judgment.

F.    Denial of Evaluations - 2004-05, 2005-06

Plaintiff claims that NTSB failed to give her an evaluation for the performance period

ending in 2005.  Am. Compl. ¶ 27.  However, in 2005, Plaintiff received comments from the

Managing Director on her work products, and likewise received feedback from her supervisors

in the Office of the Managing Director, once transferred to that position.  See Ex. 3 at 210:18-

211:3.  Office Directors were evaluated every time they had a substantive conversation with the

Managing Director.  Ex. 2 at 20:7-8.  MD Campbell commented that "[p]erformance was

evaluated in the context of in the way in which reports were brought to [him].  [His] direct

reports had really little doubt about whether or not they were doing a good job." Ex. 2 at 25:17-

19.

Plaintiff did not receive a performance evaluation for 2005-06 because she retired on July

35

3, 2006. Ex. 20.  The annual rating period for non-supervisors begins on June 1 and ends on May 31.  Exhibit 32, NTSB Board Order 1000, ("Ex. 32") at p. 7; <u>See</u> Ex. 3 at 252:12-13.  At the end of the annual rating period, supervisors have a designated period of time to complete the annual appraisal drafts, and have them reviewed and approved before presenting them to the employee.  Ex. 32 at pp. 10-11.  If Plaintiff did not retire, Ms. Czech would have completed an annual review of Plaintiff's performance upon her completion of at least 90 days under her performance standards.  Ex. 4 at ¶ 11.

Here not only is there no direct evidence of retaliation, there is no reason to believe that NTSB withheld a performance evaluation from Plaintiff on a retaliatory basis.  Mr. Campbell explained how he evaluated Plaintiff each time that he and she had a substantive conversation.  <u>See</u> Ex. 2 at 20:7-8.  Ms. Czech explained how Plaintiff retired from Federal service before she could receive a performance evaluation for 2006.  Ex. 4 at ¶ 10.  It is Plaintiff's burden to prove that an employer's proffered explanation for an employment action was pretext for retaliation requires more than a showing that mistakes or poor decisions were made.  The question is not whether Mr. Campbell was correct in, on occasion, limiting his assessments to the daily basis on which he dealt with Plaintiff; rather, it is whether that decision was made with a retaliatory motive.  <u>See generally</u> <u>Perez v. Region 20 Educ. Service Center</u>, 307 F. 3d 318 (5th Cir. 2002).  The plaintiff must show that the defendant's reasons are pretextual and that retaliation was a motive.  <u>See</u> <u>Alexander</u>, 40 F.3d at 197.  "[M]ere unsubstantiated allegation… creates no 'genuine issue of fact' and will not withstand summary judgment."  <u>Harding</u>, 9 F.3d at 154.  Because Plaintiff cannot show that Mr. Campbell's stated reasons for his actions here, in

evaluating Plaintiff each time they had a substantive conversation, were false and that retaliation was a motivating factor, Defendant is entitled to summary judgment.

G.     Denial of performance standards at OMD

Plaintiff alleges that NTSB refused to issue Plaintiff new performance standards for her position in the Office of the Managing Director. Am. Compl. ¶ 28. Ms. Barbara Czech was Ms. Cooke's supervisor in the Office of Management. Ex. 3 at 205:17-20; Ex. 4 at ¶ 4. With the assistance of the Human Resources Division, Ms. Czech was formulating performance standards for Ms. Cooke's new program analyst position. Ex. 4 at ¶ 8. Ms. Cooke retired before the performance standards were finalized. Id. at ¶ 10. If Ms. Cooke did not retire, Ms. Czech would have completed an annual review of her performance, and included in that review, would have considered Ms. Cooke for a performance award. Ex. 4 at ¶ 11.

Here not only is there no direct evidence of retaliation, there is no reason to believe that NTSB withheld performance standards from Plaintiff on a retaliatory basis. Ms. Czech explained how, with the assistance of the Human Resources Division, Ms. Czech was formulating performance standards for Ms. Cooke's new program analyst position. Ex. 4 at ¶ 8. Ms. Czech explained how Plaintiff retired from Federal service before she could complete Plaintiff's performance standards. Ex. 4 at ¶ 10. It is Plaintiff's burden to prove that an employer's proffered explanation for an employment action was pretext for retaliation requires more than a showing that mistakes or poor decisions were made. The question is not whether Ms. Czech gave Plaintiff performance standards quickly enough; rather, it is whether she withheld them with a retaliatory motive. See generally Perez v. Region 20 Educ. Service Center, 307 F. 3d 318 (5th Cir. 2002). The plaintiff must show that the defendant's reasons are pretextual

37

and that retaliation was a motive.  See Alexander, 40 F.3d at 197.  "[M]ere unsubstantiated

allegation… creates no 'genuine issue of fact' and will not withstand summary judgment."

Harding, 9 F.3d at 154.  Because Plaintiff cannot show that Ms. Czech's stated reasons for her

actions here, in not providing Plaintiff with performance standards before she could retire, were

false and that retaliation was a motivating factor, Defendant is entitled to summary judgment.

## V.    Plaintiff is not Entitled to a Jury Trial.

Plaintiff alleges that Defendant violated the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 215(a)(3), demands a jury trial, and legal and equitable relief as provided by 28 U.S.C.

§ 216(b).  Am. Comp. ¶ 33.  Defendant moves to strike the demand for jury trial, in accordance

with Fed. R. Civ. P. 39(a), as the right to a jury trial does not exist in an FLSA claim against the

Federal Government.

The law is well-settled that a Seventh Amendment right to trial by jury does not apply in

actions against the Federal Government, except when Congress has affirmatively and

unambiguously granted that right by statute.  Lehman v. Nakshian, 453 U.S. 156 (1981); Wise v.

Glickman, 257 F.Supp.2d 123, 132 (D.D.C. 2003); Nyman v. FDIC, 1997 WL 243222 (D.D.C.

1997) (unreported) (no entitlement to jury trial on Equal Pay Act Claim).[8]  Congress has not

affirmatively and unambiguously granted the right to jury trial to persons bringing suit against

---

8. In Nyman, Judge Urbina cited Doe v. Attorney Gen. of the United States, 941 F.2d 780, 789 (9th
Cir.1991) ("the courts have consistently refused ... to ignore a condition on a sovereign immunity waiver
when the statute and legislative history either were silent or indicated congressional intent not to grant the
right requested").  "The Equal Pay Act does not expressly and unambiguously provide for such a right.
Walker v. Thomas, Chairman of the U.S. E.E.O.C., 678 F.Supp. 164. 165 (E.D.Mich.1987). There is also
no indication of a congressional intent to grant such a right in the legislative history. Id. (citing 1974
U.S.Code Cong. and Admin. News 2811-2868; 120 Cong. Rec. 4688 (1974); 120 Cong. Rec. 7306
(1974))." Id. at 9.

the federal government under the retaliation provision of the FLSA.  See 29 U.S.C. § 215(a)(3)

*et seq*.

Plaintiff's demand for a jury to decide "all issues proper to be tried", Am. Comp at 8, is

fruitless, in that she has failed to identify a source for her claimed entitlement to a jury trial.[9]

Defendant asserts that no such source is identified because none exists. The FLSA makes it

unlawful for any person to discharge or in any other manner discriminate against any employee

because such employee has filed any complaint under or related to it.  29 U.S.C. ' 215(a)(3).

The enforcement provision for this subsection makes any employer who violates the provisions

of 29 U.S.C. ' 215(a)(3) liable for such "legal or equitable relief" as may be appropriate to

effectuate its purposes, including employment, reinstatement, promotion, and the payment of

wages lost and an additional equal amount as liquidated damages.  29 U.S.C. ' 216(b).

Conspicuously absent from the statutory language is any explicit provision granting the right to a

trial by jury to a plaintiff in an action against the federal government.

In Lehman, while reviewing the enforcement provision of §15(c) of the Age

Discrimination in Employment Act (ADEA), the Supreme Court held that the word "legal," as

used in the ADEA, does *not* incorporate a right to a trial by jury, concluding that "Congress did

not depart from its normal practice of not providing a right to trial by jury when it waived the

sovereign immunity of the United States."  Id., 453 U.S. at 168-69.  The Court further noted that

the Seventh Amendment does not afford a federal employee a right to a jury trial in an ADEA

action against the federal government.  Id. at 163 ("the Seventh Amendment has no application

---

9. See similarly, Shaffer v. Peake, 2008 WL 794470 (W.D. Pa.) at 14 (no right to jury trial against federal
government under ADEA).

in actions at law against the Government, as Congress and this Court have always recognized");

see also Galante v. Quigg, 696 F. Supp. 677, 678 (D.D.C. 1988) (Lamberth, J.).  Of significance,

the Court further stated: "for the same reason that the Seventh Amendment does not apply in

suits against the Federal Government, there would be no comparable right to trial by jury in

FLSA suits against the Federal Government under 29 U.S.C. § 216(b)."  Id. at 164 n.11.

Here, under the law, plaintiffs have no "right to trial by jury in FLSA suits against the

Federal Government under 29 U.S.C. § 216(b)."  Lehman, 453 U.S. at 164 n.11.   Even where

Congress waives sovereign immunity, "it does not simultaneously concede to a jury trial."  Id. at

160. See similarly, Steinhardt v. Potter, 326 F.Supp.2d 449, 451 (S.D.N.Y.2004) (discussing

FMLA).  Accordingly, Defendant's motion to strike jury demand should be granted.

## CONCLUSION

For all the foregoing reasons, the Agency is entitled to judgment as a matter of law and

Plaintiff's complaint should be dismissed with prejudice.


Dated: May 7, 2008.                         Respectfully Submitted,



                                            ___/s/_____
                                            JEFFREY A. TAYLOR, D.C. BAR # 498610
                                            United States Attorney



                                            ___/s/_____
                                            RUDOLPH CONTRERAS, D.C. BAR #434122
                                            Assistant United States Attorney

___/s/_____

BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0364


Attorneys for Defendant

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of May 2008, I caused the foregoing Motion for

Summary Judgment and Motion to Strike and attached documents to be served on Plaintiff's

counsel, David Scher, Esq., of The Employment Law Group, via the Court's ECF system.


     /s/                              
BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0364