**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK ROSENKER, Chairman, | ) | No. 1:06-cv-01928-JDB |
| National Transportation Safety Board, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**NOTICE OF FILING EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGEMENT AND MOTION TO STRIKE (CORRECTED VERSION)**</u>

Defendant Mark Rosenker, Chairman, National Transportation safety Board, by and

through undersigned counsel, hereby files the exhibits in support of Defendant's Motion for

Summary Judgment and Motion to Strike (Corrected Version).  <u>See</u> Dkt. Entry 24, Exhibit 1.

Dated May 8, 2008                                    Respectfully submitted,


                                                                     /s/
                                                     JEFFREY A. TAYLOR, D.C. BAR # 498610
                                                     United States Attorney


                                                                     /s/
                                                     RUDOLPH CONTRERAS, D.C. BAR #434122
                                                     Assistant United States Attorney


                                                                     /s/
                                                     BRANDON L. LOWY
                                                     Special Assistant United States Attorney
                                                     555 Fourth St., N.W.
                                                     Washington, D.C.  20530
                                                     Phone: (202) 307-0364
                                                     Fax: (202) 514-8780
                                                     Brandon.Lowy@usdoj.gov


                                                     Attorneys for Defendant

AUG. 17. 2005  4:38PM    NTSB TDA                    NO. 037    **EXHIBIT A1**

00001

FORMAL COMPLAINT OF DISCRIMINATION

## PRIVACY ACT STATEMENT (6 USC 552a)

**Authority:**        Public Law 92-261

**Principle Purpose:**    Format filing of allegation of discrimination because of race, color, religion, sex, handicap, age, national origin or reprisal.

**Routine:**        This form and the information on this form may be used: (a) as a data source for complaint information for production of summary descriptive statistics and analytical studies of complaints processing and resolution efforts and may also be used to respond to general requests for information under the Freedom of Information Act; (b) to respond to requests from legitimate outside individuals or agencies (e.g., Members of Congress, The White House, and the Equal Employment Opportunity Commission (EEOC) regarding the status of the complaint or appeal; and (c) to adjudicate complaint or appeal.

**Disclosure:**        Voluntary; however, failure to complete all appropriate portions of this form may lead to rejection of complaint on the basis of inadequate date on which to determine if complaint is acceptable.

| | |
|---|---|
| 1. NAME OF COMPLAINT (Last, First, Middle Initial)<br>MURTAGH, MARJORIE, M. | 4. ADDRESS (Include City, State, and ZIP Code)<br>8475 SYLVAN WAY,<br>CLIFTON, VA. 20124 |
| 2. SSN | |
| 3b. HOME TELEPHONE NO.    3a. WORK TELPEHONE NO.<br>(703)-266-0267    (202) 314-6451 | 5c. IF YES, NAME OF REPRESENTATIVE |
| 5. ARE YOU BEING REPRESENTED?<br>    a. Yes (Complete 5c)   X b. No | |
| 6a. NAME OF ORGANIZATION YOU BELIEVE DISCRIMINATED<br>AGAINST YOU<br>NATIONAL TRANSPORTATION SAFETY BOARD | 6b. ADDRESS OF ALLEGED DISCRIMINATION<br>ORGANIZATION (Include City, State, and Zip)<br>490 L'ENFANT PLAZA EAST, SW<br>WASHINGTON, D.C. 20594 |
| 7. NTSB OFFICE YOU BELIEVE<br>DISCRIMINATED AGAINST YOU<br><br>ACTING CHAIRMAN<br>MARK ROSENKER<br>(NAMED AS DIRECTED BY<br>COUNSELOR MEMO, APRIL 1, 2005) | 8. DATE ON WHICH MOST<br>RECENT ALLEGED<br><br>DISCRIMINATION OCCURRED<br><br>JANUARY 3, 2005 | 9. ARE YOU WORKING FOR<br>THE FEDERAL GOVT.?<br><br>X a. Yes<br><br>(Complete items 10,11,12)<br>b. No<br>(Skip to item 13) |
| 10. NAME OF AGENCY WHERE YOU ARE CURRENTLY<br>EMPLOYED<br>NATIONAL TRANSPORTATION SAFETY BOARD | 12a. TITLE OF YOUR CURRENT JOB<br>DIRECTOR, OFFICE OF MARINE SAFETY |
| 11. ADDRESS OF YOUR CURRENT EMPLOYER (Include City,<br>State, and ZIP Code) | 12b. GRADE: GS-15 |

NTSB FORM 2000-A-NOV 00

**GOVERNMENT EXHIBIT 1**
CARROLL 800-784-0399

000018

490 L'ENFANT PLAZA EAST, SW
WASHINGTON, DC 20594

**13. Reason you believe you were discriminated against (Check Below)**

| | | | |
|---|---|---|---|
| a. RACE (State your Race) | | e. HANDICAP | Mental    Physical |
| b. COLOR (State your Color) | | f. SEX X Female    Male | |
| c. RELIGION (State your Religion) | | g. AGE (Specify age) | |
| d. NATIONAL ORIGIN (State Natl. Origin) | | h. REPRISAL | |

| 14. I HAVE DISCUSSED MY COMPLAINT WITH AN EEO COUNSELOR (See Reverse) X a. Yes (Complete 14c)    b. No | 14c. IF YES, NAME OF COUNSELOR MR. CHESTER FISHER : | 15. DATE OF FINAL INTERVIEW APRIL 1, 2005 |
|---|---|---|

16. EXPLAIN SPECIFICALLY HOW YOU WERE DISCRIMINATED AGAINST (That is, treated differently from other employees or applicants, because of your race, color, religion, sex, national origin, age, mental or physical handicap, or reprisal.) If your complaint involves more than one basis for your dissatisfaction, list and number each such allegation separately and furnish specific, factual information in support of each.) (Use additional sheets, if necessary.)

Allegation No. 1: I HAVE BEEN DISCRIMINATED AGAINST, BASED UPON SEX, IN VIOLATION OF THE EQUAL PAY ACT AND TITLE VII, CIVIL RIGHTS ACT OF 1964, IN THAT FOR AT LEAST TWO YEARS PRIOR TO JANUARY 3, 2005, I HAVE RECEIVED LESS COMPENSATION THAN THAT RECEIVED BY MALE OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITIES TO MINE.

Allegation No. 2: I HAVE BEEN DISCRIMINATED AGAINST, BASED UPON SEX, IN THAT I HAVE BEEN DENIED THE SAME AUTHORITY TO FILL VACANCIES NECESSARY TO PERFORM MY JOB IN THE OFFICE OF MARINE SAFETY AS THE AUTHORITY GRANTED TO MALE OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES TO MINE.

17. LIST IN ITEM 20 THE NAMES OF YOUR WITNESSES AND WHAT FACTUAL INFORMATION EACH WILL BE EXPECTED TO CONTRIBUTE THROUGH HIS/HER TESTIMONY TO THE INVESTIGATION OF YOUR COMPLAINT.

SEE ITEM 20

18. WHAT SPECIFIC CORRECTIVE ACTION DO YOU WANT TAKEN ON YOUR COMPLAINT? ( If more than one allegation is being made, state overall corrective action desired and the specific corrective action desired for each separate allegation.)

I AM SEEKING MAXIMUM RELIEF AVILABLE UNDER THE EQUAL PAY ACT AND TITLE VII, INCLUDING BUT NOT LIMITED TO, TWO YEARS OF RETROACTIVE COMPENSATION THAT IS EQUAL TO THAT RECEIVED BY MALE OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITIES TO MINE.
ACKNOWLEDGEMENT THAT THE AGENCY DISCRIMINATED AGAINST ME WITH REGARD TO EQUAL PAY AND COMPENSATION.
ACKNOWLEDGEMENT THAT THE AGENCY DISCRIMINATED AGAINST ME WITH REGARD TO SELECTIVELY DENYING ME THE RESOURCES TO PERFORM MY JOB.

19. HAVE THE MATTERS LISTED IN ITEM 16 BEEN APPEALED TO THE MERIT SYSTEM PROTECTION BOARD OR FILED UNDER A NEGOTIATED GRIEVANCE PROCEDURE?
    a. Yes (Explain in item 20)    X b. No

NTSB FORM 2000-A-NOV 00

20.  REMARKS

WITNESSES:

1. MS. LISA LOVE, CHIEF OF HUMAN RESOURCES, NTSB; JOB DESCRIPTIONS OF OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES TO MINE; PAY AND COMPENSATION FOR ME AND THESE SAME OFFICE DIRECTORS; POSITIONS ADVERTISED AND FILLED FOR MYSELF AND THESE SAME OFFICE DIRECTORS. DISCUSSIONS I HAD WITH HER AND WITH THEN CHAIRMAN, ELLEN ENGLEMAN CONNERS, REGARDING EQUAL PAY AND THE CHAIRMAN'S REQUESTS REGARDING WHETHER SHE COULD PAY ME OVERTIME TO COMPENSATE FOR DIFFERENCES IN PAY AND COMPENSATION. ALSO MR. CAMPBELL'S STATED REASON FOR NOT GRANTING ME PERMISSION TO FILL POSITIONS WHICH HAD BEEN APPROPRIATELY ADVERTISED, PANELED AND A SELECTION MADE.

2. MR. DANIEL CAMPBELL, FORMER MANAGING DIRECTOR, NTSB; REGARDING WHY DIFFERENCES IN COMPENSATION EXIST BETWEEN MYSELF AND OTHER OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES ; WHY HE WOULD NOT GRANT ME PERMISSION TO FILL NECESSARY POSITIONS, E.G. THE CHIEF, REPORT DEVELOPMENT POSITION IN OMS IN NOVEMBER 2001 AND THE MARINE ACCIDENT INVESTIGATOR POSITION ON JANUARY 3, 2005, WHEN HE GRANTED AUTHORITY TO OTHER MALE OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES.

3. MS. ELLEN ENGLEMAN CONNERS, FORMER CHAIRMAN, NTSB; REGARDING WHY IN A MEETING WITH ME AND MR. DAVID CLARK SHE QUESTIONED THE DIFFERENCES IN PAY GRADE AND COMPENSATION BETWEEN MYSELF AND MALE OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES TO MINE AND, IN SOME CASES, EVEN MALE DEPUTY OFFICE DIRECTORS WHO DO NOT HAVE THE SAME LEVEL OF RESPONSIBILITY TO MINE AND YET ARE COMPENSATED MORE THAN ME AS SES EMPLOYEES.

4. MR. DAVID CLARK, SPECIAL ASSISTANT TO CHAIRMAN ELLEN ENGLEMAN CONNERS, NTSB; OUR MEETING WITH CHAIRMAN ENGLEMAN CONNERS REGARDING EQUAL PAY FOR ME AND HER COMMENTS REGARDING OTHER OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES AND, IN SOME CASES, DEPUTIES.

5. MR. RON BATTOCCHI, GENERAL COUNSEL, NTSB; NTSB AUTHORITY; AUTHORITIES OF OFFICE DIRECTORS;

6. MS. COLETTE MAGWOOD REGARDING THE MANAGING DIRECTOR'S STATED REASON FOR NOT ALLOWING ME TO FILL A POSITION WHICH HAD BEEN APPROPRIATELY ADVERTISED, PANELED AND A SELECTION MADE; DISCUSSION REAGARDING PAY AND COMPENSATION FOR ME AND MALE OFFICE DIRECTORS WITH COMPARABLE DUTIES AND RESPONSIBILITES.

7. MS. EMILY CARROLL REGARDING THE MANAGING DIRECTOR'S STATED REASON FOR NOT ALLOWING ME TO FILL A POSITION, WHICH HAD BEEN APPROPRIATELY ADVERTISED, PANELED AND A SELECTION MADE.

| 21.  SIGNATURE OF COMPLAINANT | 22.  DATE THIS COMPLAINT FORM WAS SIGNED BY THIS COMPLAINT (Month, day, year) |
|---|---|
| *[signature]* | *April 16, 2005* |

NTSB FORM 2000-A-NOV 00

**1**

1   IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3   - - - - - - - - - - - - - - X
4   MARJORIE MURTAGH COOKE,          :
5        Plaintiff,       :
6   vs.                 : Case No.:
7   MARK ROSENKER, Chairman,      : 1:06CV01928
8   NATIONAL TRANSPORTATION SAFETY :
9   BOARD,                :
10        Defendant.      :
11   - - - - - - - - - - - - - - X
12
13        Videotaped Deposition of DANIEL CAMPBELL
14             Washington, D.C.
15           Thursday, November 15, 2007
16                9:59 a.m.
17
18
19
20   Job No.: 1-115036
21   Pages:   1 - 200
22   Reported by:  Dana C. Ryan, RPR, CRR

**2**

1        Videotaped Deposition of DANIEL CAMPBELL, held
2   at the law offices of:
3        The Employment Law Group, P.C.
4        888 17th Street, Northwest
5        Suite 900
6        Washington, D.C. 20006
7        (202) 331-3911
8
9
10        Pursuant to agreement, before Dana C. Ryan,
11   Registered Professional Reporter, Certified Realtime
12   Reporter and Notary Public in and for the District of
13   Columbia.
14
15
16
17
18
19
20
21
22

**3**

1        A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4        R. SCOTT OSWALD, Esquire
5        DAVID SCHER, Esquire
6        BRIAN M. LOWINGER, Esquire
7        The Employment Law Group, P.C.
8        888 17th Street, Northwest
9        Suite 900
10        Washington, D.C. 20006
11        (202) 331-3911
12
13
14   ON BEHALF OF THE DEFENDANT THE UNITED STATES OF
15   AMERICA:
16        MEREDYTH D. COHEN, Esquire
17        United States Department of Justice
18        Commercial Litigation Branch
19        1100 L Street, Northwest
20        Washington, D.C. 20530
21        (202) 353-7978
22

**4**

1        A P P E A R A N C E S   C O N T I N U E D
2
3   ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION
4   SAFETY BOARD:
5        ANDREA MCBARNETTE, Esquire
6        U.S. Attorney's Office
7        501 3rd Street, Northwest, Rm 4218
8        Washington, D.C. 20530
9        (202) 514-7153
10
11
12   ALSO PRESENT:
13        Denise M. D'Avella, Esquire, NTSB Office of
14             General Counsel
15        Marjorie Murtagh Cooke, Plaintiff
16        Scott Forman, Videographer
17
18
19
20
21
22

GOVERNMENT
EXHIBIT
2

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 5 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

13 (Pages 49 to 52)

49

1 summary of how you believe each of the performance
2 evaluations should go for the modal directors, other
3 than Marjorie Murtagh Cooke, what other modal
4 directors did you recommend should be downgraded from
5 outstanding to excellent, if any?
6    A  I don't remember.  I don't remember.
7    Q  You don't remember how many you -- you --
8    A  No, I don't remember --
9    Q  -- recommended --
10    A  -- if there were any others.
11    Q  -- other than Marjorie Murtagh Cooke?
12    A  Yeah, I don't remember if there were any
13 others.
14    Q  Okay.  So after this meeting with -- with
15 Engle -- Ellen Engleman Conners, what was the next
16 time you talked to Ellen Engleman Conners about
17 Marjorie Murtagh Cooke's performance evaluation in
18 2004?
19    A  I don't recall any subsequent conversations.
20    Q  The -- between 2000 and 2005, how many times
21 were you involved in a selection process where there
22 was a employee selection board that was impanelled?

50

1          MS. COHEN:  Objection, assumes facts
2 not in evidence.
3 BY MR. OSWALD:
4    Q  You can answer the question.
5    A  An employee selection board?
6    Q  Uh-huh.
7    A  That's a term that I don't know.
8    Q  Well, it's called the employee resource
9 board.
10    A  You're losing me.
11    Q  Okay.  What familiarity, if any, do you have
12 at NTSB of impanelling a group of employees --
13    A  Uh-huh.
14    Q  -- to comment on and to recommend --
15    A  The panel?
16    Q  -- potential selectees for positions at
17 NTSB?
18    A  The panel?
19    Q  Yes.
20    A  All right.  We use a panel when we do an SES
21 selection, and I don't know that some others don't use
22 a panel for other selections.  I can't -- I didn't

51

1 involve myself much in the way in which employees
2 hired, but for an SES selection, there was a panel, if
3 that's what you mean by employee selection board.
4    Q  All right.  Well, let's assume -- it's --
5 it -- the official title is executive resource board.
6 Does that help you at all?
7    A  Yes, that's an SES group.
8    Q  All right.  Now, how many executive resource
9 boards were impanelled between the time that you
10 were -- from 2000 through 2005 when you were the
11 managing director or executive director?
12    A  I don't know.
13    Q  Approximately?
14    A  Oh, it's going to be way less than ten.
15 NTSB doesn't have a lot of SES, and we don't hire a
16 lot of SES.
17    Q  All right.  Was each of the -- the -- was it
18 more than five?
19    A  I would only be guessing.  If you want me to
20 guess on camera --
21    Q  Yes.
22    A  -- I'll guess on camera.  Was it more than

52

1 five?  Five sounds like a good number.  Let's --
2    Q  Okay.
3    A  Let's stay with five.
4    Q  All right.  So of the approximately five,
5 let -- let's talk about that process -- the
6 approximately five executive resource boards that were
7 impanelled, why were they impanelled and what was the
8 process by which they would go about their work?
9    A  Can -- I have to stop you here because the
10 executive resource board is something that I think we
11 even have like a board order on.  It -- it's not
12 created.  It's there.  There's an executive resource
13 board.  The executive resource board would not be the
14 panel that would be used for an SES selection as such.
15 It could be as a matter of coincidence that it would
16 be the same, but -- but not likely.
17    Q  Well, let's use our -- let's use, then, your
18 verbiage.
19    A  The panel.
20    Q  The panel, right.
21    A  So -- so if human resources told me that we
22 were making an SES selection, they would say what we

57

1    reannounced, if any, from 2000 and 2005 for the -- for
2    the --
3       A   One.
4       Q   -- positions that were -- were -- where
5    there was a -- converted from something else to SES
6    during the period of time that you were the managing
7    and executive director of NTSB?
8       A   One.
9       Q   And what position was that?
10      A   The director of the Office of Marine Safety.
11      Q   I understand.
12      A   The plaintiff's office.
13      Q   All right. The -- the -- the panels that --
14   ones that were impanelled to review the suitability of
15   the candidates that had been prescreened by HR to be
16   minimally qualified to perform the duties of the SES
17   positions that had been established at NTSB, who would
18   choose those panels?
19      A   Usually me.
20      Q   This is between 2000 and 2005 when you were
21   the managing director and executive director of --
22      A   Uh-huh.

58

1       Q   -- NTSB?
2       A   Uh-huh.
3       Q   Is that -- is that a yes?
4       A   Yes, that's a yes.
5       Q   Thank you.
6       A   Yes.
7       Q   All right. Now, between 2000 and 2005, of
8    the approximately five positions that were converted
9    from – from a GS schedule or some other position to
10   SES, how many of those were -- in how many of those
11   instances was the incumbent in the position at the
12   time that the position was converted to SES not
13   selected for the position of SES director, including
14   modal director?
15      A   How many times was an incumbent not selected
16   for the SES position?
17      Q   Yes.
18      A   I think the plaintiff was not selected. I
19   don't think there were any other occasions.
20      Q   Where do you live now?
21      A   Oakton, Virginia.
22      Q   I understand. How long have you been there?

59

1       A   Thirty-one years.
2       Q   In -- in Oakton, Virginia?
3       A   Uh-huh, I think so.
4       Q   I understand. All right. Now, what --
5    when, if ever, did you have a conversation with Ellen
6    Engleman Conners about converting a position from a
7    general schedule position to an SL position?
8       A   I don't remember any. I think at one point
9    I -- I can't remember. I -- I don't -- I'd have to
10   see the documents to figure out when the time came.
11   At one point we got approval from OPM that included
12   new SLs. I don't know whether that was in Marion
13   Blakely's tenure or in Ellen's tenure. I had a
14   meeting with my office directors, and when we -- when
15   we announced that we got the additional authority from
16   OPM, they were not hesitant to produce a list of -- of
17   their scientists, if you will, that they wanted to
18   encumber those.
19      Q   Uh-huh.
20      A   And, so, I would have had a discussion with
21   somebody about them, but I can't remember with whom
22   that discussion took place. If that -- if that was

60

1    during Ellen's tenure, that would have been a
2    discussion with Ellen.
3           I want to say, again, that the chairman's
4    seat was a -- was a -- was a revolving chair, so it's
5    very difficult for me to do this. There were six
6    different people sitting there from 2000 to 2005, so
7    it's kind of hard for me to figure out who -- who I'm
8    talking to at any given point when you're asking me a
9    cold date like that, a cold question like that. I'd
10   like to help you, but I can't.
11      Q   All right. And what is an SL position?
12      A   It's a scientific position and -- that,
13   without management responsibility, has a pay scale
14   that -- that is somewhat equivalent to the SES
15   position. I don't think it has the same bonus
16   opportunity that the SES has, but it is higher than a
17   GS-15 scale, and I think that the NTSB has three or
18   four of them. I'm not sure what the "S" stands for or
19   I might -- I might tell you what it is.
20      Q   And when, if ever, did you -- did you have a
21   conversation with Ellen Engleman Conners about who
22   would be an appropriate -- excuse me, the -- the kind

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 7 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

16 (Pages 61 to 64)

**61**

1  of position that would be an appropriate position for
2  an SL position?
3     A   As I just said, I don't know that I ever had
4  that conversation with Ellen.
5     Q   All right.  When was the first time you had
6  a conversation with Ellen Engleman Conners about how
7  the agency should allocate SES positions within the
8  agency?
9        MS. COHEN:  Objection, assumes facts
10 not in evidence.
11       THE WITNESS:  I don't know that I had
12 that conversation.
13 BY MR. OSWALD:
14    Q   Is it possible you had that conversation?
15    A   Well, it would have been more than possible
16 that we had a conversation about particular office
17 arrangements.  Let me say -- let me put this -- there
18 were two SES at one point out at our academy.  I was
19 not in favor of that and probably would have made that
20 point to the chairman.
21       Ellen Engleman Conners was in favor of
22 having an administrative office back at the level of

**62**

1  SES, and NTSB had had one.  When we moved to having an
2  independent controller, chief financial officer, that
3  SES was allocated to the chief financial officer, so
4  now human resources and contracting and acquisitions
5  and so forth was headed up by a series of GS-15s
6  reporting directly to the managing director, which was
7  not fun for the managing director, but -- but made
8  sense in -- in the sense that it avoided using an SES
9  in that area.
10       And until we had all the modal offices at
11 the SES level, I would have been opposed to putting an
12 SES back there.  But we got to the point where we had
13 the SES for that position, so Ellen and I would have
14 had a conversation about that.  I don't know that
15 Ellen and I ever had a conversation about
16 SES in modal offices because that was presumed.
17       I had written -- one of the first things I
18 did when I became managing director was written --
19 I -- I authored a letter to OPM indicating that the
20 modal offices, now that they were independent, ought
21 to be staffed at the SES level.  And we requested SES
22 to do that, and OPM denied it, and we -- I think

**63**

1  annual -- I think that was an annual -- you know, it
2  was sort of -- it was almost like a ritual.  I'll ask
3  OPM, and they'll say no.  And eventually they said yes
4  to one or two; I can't remember what, but we
5  eventually got it done by pulling an SES from here and
6  pulling an SES from there.  Sometimes the chairmen
7  were agreeable to that.  Other times the chairmen
8  would expend those SESs in ways that -- that I would
9  not have preferred, but --
10    Q   And why did you believe that all of the
11 modal offices, this would be the -- the highway
12 office, the marine office, the air office and the rail
13 and pipeline office, all should have SES designation?
14    A   Well, if you look at the federal pay scale,
15 you'll see that it's fairly well compacted, and it's
16 not uncommon for us to have highly graded
17 investigators because it's a -- it's a -- you know,
18 we're a skill-intensive agency, and, so, you can have
19 GS-15 investigators or GS-14 -- high step GS-14
20 investigators, and their compensation can be very,
21 very close to the compensation of their office
22 director, and if that makes sense to you, then you

**64**

1  look at business differently than I do.
2       So to me it was simply an issue of money.
3  It was simply an issue of, if you're going to run the
4  office, if you're going to take the responsibility for
5  it, if -- if -- if you're going to be at the top, I
6  want to put in an incentive.  I want to put a pyramid
7  there.  I want the right people to crawl up there.
8       It was not uncommon at NTSB for people to --
9  to -- to refuse to take, for instance, a division
10 chief job on the grounds that they were already doing
11 the work and they didn't need the hassle of management
12 and there wasn't another nickel in it for them.
13 That's government service.
14       So for me it was basically, all right, we
15 had gone from an office that had been run by two SES;
16 we were going to four offices.  I was not in favor of
17 that, but if that's what was going to happen, I -- I
18 was definitely in favor of going -- of putting in the
19 SES.  I've been in the SES myself since the day it was
20 created in 1978, so I'm -- I'm not going to -- I'm not
21 going to look at an office director and say, you
22 shouldn't be an SES.  I think that -- I think they

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 8 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

17 (Pages 65 to 68)

**65**

1  should, so that was -- that was a no-brainer for me.
2      Q   I understand.  When the SES came free from
3  the academy, who was it who made the decision to
4  allocate that SES position to the highway modal office
5  director position?
6      A   It would have been the chairman.  Which
7  chairman, I -- I'm going to be at a loss for again,
8  because there were -- I probably would not have
9  allowed -- let me -- let me back up a little bit.  I
10  probably would not have allowed that decision to go
11  forward too quickly if I had an acting chairman who I
12  knew was about to be replaced, and I was in that
13  position not infrequently where the -- the -- a
14  nomination had been sent up and I knew that an acting
15  chairman was, you know, months away from -- from going
16  back to board member status and I'd have a new
17  chairman in.  That's not sensible for a lot of
18  reasons, including the interpersonal relationships
19  that may then occur between a board member and a
20  chairman about who -- who decided what was going to be
21  an SES and who made the selection.  Presidential
22  appointees can be jealous about those kind of

**66**

1  prerogatives.
2      But it -- so assuming that it was the
3  academy that went to highway -- and I think you're
4  correct on that, but I'm not sure -- a chairman will
5  have made that decision; although, I will have
6  presented that as a -- as a given.  If -- if I -- if
7  the -- if the chairman is sitting in front of me and
8  said, well, what do we do with this, I would have
9  said, oh, we need to move this into the modes.
10      Q   And -- and who was it who made the decision
11  to assign the -- recommendation to assign the academy
12  SES position to highway as opposed to any other modal
13  office?
14      A   Well, I've been 100 percent behind that, so
15  if we're looking for a recommendation -- I'm not sure
16  there was a recommendation because I'm not sure that
17  there was ever any -- any -- any debate or
18  consideration about it, but if there -- if -- if you
19  want someone to have recommended it, I'll recommend
20  it, because it's -- from the institutional standpoint,
21  it's pretty much a no-brainer.
22      Q   Why is that?

**67**

1      A   Unfortunately there's 44,000 people who die
2  every year on the highways.  The -- as an institution,
3  NTSB is dependent upon aviation.  It -- it -- it began
4  in aviation.  It was actually part of the Civil
5  Aeronautics Board that I was a part of back in the
6  '70s.  Our budget is predicated on aviation.  I think,
7  in fact, when we do reauthorization, we go before the
8  aviation subcommittees of the -- of the commerce
9  committees on both sides.  I don't even think the full
10  committee is here.  I think it's all done in aviation.
11      And of course aviation have their -- there
12  are very important parts of the aviation that NTSB
13  needs to be involved in.  I don't want to downplay
14  that.  But if you were to ask yourself where NTSB can
15  have an impact, there's less than -- less than a
16  thousand people probably dying in aviation every year,
17  and most of that not in commercial aviation.  There's
18  less than just -- I think in an -- marine it's around
19  700 people a year.  In highway it's 44,000.  It's --
20  it's almost a million worldwide, and that's the --
21  that's the area, and we're -- and we're -- as a -- as
22  a result of that, we're sort of organized in that

**68**

1  fashion.  We have regional offices in highway.
2  It's -- it's -- it's a no-brainer from our standpoint
3  that that's where we can have the impact.  That's
4  where you want to do most of your business that is
5  discretion -- that is a discretionary call.
6      Q   And who was the incumbent at that time?
7      A   A fellow named Joe Osterman.
8      Q   And prior to your recommendation and Ellen
9  Engleman Conner's transfer of the SES slot from the
10  academy over to highway --
11      A   Again --
12      Q   -- to this --
13      A   -- you're --
14      Q   -- position --
15      A   -- assuming it's Ellen.  I -- I'm not sure
16  it is, but -- but I'll take your word for it for the
17  purposes of the discussion.
18      Q   All right.  In light of highway's -- the
19  modal directors importance to NTSB, how had you gone
20  about making sure that -- that Joe Osterman had
21  received more money in that position given all the
22  responsibilities that he had had?

Case 1:06-cv-01928-JDB   Document 25-2   Filed 05/08/2008   Page 9 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

24 (Pages 93 to 96)

**93**

1  having read it, and that would be my role.
2  BY MR. OSWALD:
3      Q   In its entirety?
4      A   I have no recollection of having done
5  anything else.
6      Q   I understand.
7      A   Well, apparently --
8      Q   Now, when did you -- who was responsible for
9  the decision to rescind the vacancy announcement for
10  the director of the Office of Marine Safety, a
11  position that was announced the first time in late
12  2004, for the director of marine safety at the
13  National Transportation Safety Board?
14      A   I was.
15      Q   And why did you rescind the first vacancy
16  announcement?
17      A   Well, that's a complicated question, but
18  there were two principal things that were on my mind.
19  One is I wasn't ready to have a selection made at
20  that moment, and, two, I thought that the pool of
21  candidates had been artificially narrowed by rumor
22  that the first announcement had been wired for an

**94**

1  internal candidate.
2      Q   Now, what factors made up your decision to
3  rescind the vacancy announcement for the director of
4  marine safety at the NTSB -- this is the 2004 first
5  vacancy announcement -- apart from your unwillingness
6  or not being ready to make a selection and your belief
7  that the pool of candidates was artificially narrowed
8  based upon a preconceived notion that there was a
9  preselection for the position; what other factors
10  other than those?
11      A   Well, I called -- when I got a list of who
12  was -- who the panel had recommended, I put the list
13  on the back of my desk and I didn't touch it very much
14  for a period of time because, as I say, I wasn't
15  really interested in seeing the selection process go
16  forward at that point in time.
17          I can't remember why I finally decided I had
18  to do something with it, but when I did, the first
19  name on the list was a captain from the Coast Guard
20  who I knew, and I called him and he told me that he
21  was now employed by Johns Hopkins and was no longer a
22  candidate, and I told him that I was kind of surprised

**95**

1  that there -- he was the only guy that was interested.
2  Captain Brusseau was the guy who told me that it was
3  understood it was kind of wired for the plaintiff and
4  that that may have limited it, and, so, that
5  conversation with one of the applicants would have
6  been the only additional factor that I -- that went
7  into it.
8      Q   Who were the other four candidates on the
9  list that was provided to you by the panel after the
10  first vacancy announcement --
11      A   I don't remember them by name, but there was
12  a -- there was a Coast Guard guy from the operational
13  side of the Coast Guard, and then there were two
14  people from the private sector, and I don't remember
15  their names.  I do remember that I was not impressed.
16      Q   And who else?
17      A   The plaintiff.
18      Q   Marjorie Murtagh was?
19      A   Yes.
20      Q   Why did you -- so what was it about the --
21  the five candidates that were sent to you by the first
22  panel of the selection committee that led you to

**96**

1  believe that it was -- it was artificially narrowed?
2  This is the same group that include, what, Captain
3  Prudo (sic), a Coast Guard captain and two private
4  sector folks and Marjorie Murtagh Cooke; how is it --
5      A   Could you repeat the -- I lost your question
6  and -- could you rephrase it?
7      Q   Well, what was it about the list that the
8  panel had supplied you, the list of five candidates,
9  which included Captain Prudo (sic), two private sector
10  employees, another captain in the Coast Guard and
11  Marjorie Murtagh Cooke, the incumbent in the position,
12  that led you to believe that the list was too narrow?
13      A   Well, it wasn't the list that led me to
14  believe that -- that -- that the -- it was too narrow.
15  I mean, the list -- the list didn't have any good
16  candidates in it except the first guy that I -- well,
17  I don't want to say it didn't have any good
18  candidates.  The two private sector guys I found
19  deficiencies with just looking at the -- the
20  applications.  I don't know that I -- if I had met
21  with them and talked to them that they might not have
22  been able to explain a lot of that, but I looked at it

Case 1:06-cv-01928-JDB Document 25-2 Filed 05/08/2008 Page 10 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

25 (Pages 97 to 100)

97

1 and I thought to myself, well, there's a couple of
2 glaring probabilities -- possibilities here that I'm
3 not -- I'm not very happy with.
4    The one guy that was on the top, the first
5 name there who I -- was somebody that I had dealt with
6 in Coast Guard and thought was an -- an estimable
7 person, I gave him a call and he was no longer a
8 candidate. So now I was left with an operational guy,
9 with Marjorie Murtagh and with the two private sector
10 types who -- who had credentials that both didn't
11 really speak to the job, but also had holes in them
12 that made me very -- very nervous; periods of time
13 where people had gone from a senior vice president,
14 170,000 or $180,000 a year to a GS-12. That's not the
15 kind of career advancement that -- that makes you
16 comfortable when you're thinking of turning someone
17 into an SES. So it wasn't -- it wasn't a very -- it
18 wasn't a pool that I was particularly delighted with.
19    Q    And why wasn't Marjorie Murtagh Cooke a good
20 candidate for the position?
21    A    Well, she might have been a good candidate,
22 but I would have had to take it to the chairman, and

98

1 she would not probably have been selected, and that's
2 one of the reasons I was not in a hurry to do this.
3 When I say I procrastinated, I procrastinated because
4 I believed that I was going to lose the office
5 director that was there; that was going to be the
6 outcome.
7    Q    What led you to believe that?
8    A    Well, I knew who the chairman was. I knew
9 what the -- what the -- the -- the -- as I say, I
10 allowed the modal directors to make their own
11 impressions on a chairman. I -- I gave them every
12 opportunity to prove themselves. If I had made a
13 suggestion that Marjorie Murtagh ought to be the
14 office director during the period of time that the
15 Barberi was in play -- that's the accident that --
16 that I have now been asked to undertake by the
17 chairman -- I believe the chairman would have looked
18 at me and said, Dan, have you lost your mind. I
19 think -- I think that that would not have been a
20 sensible thing for me to do.
21    Q    Why not?
22    A    Well, because to make somebody -- to pay

99

1 somebody at the SES level to do something that they
2 don't -- they are not necessarily doing to your
3 satisfaction at the GS-15 level is not -- just not
4 sensible. It's just -- it's not a sensible thing to
5 do.
6    Q    All right. Well, what were the other
7 factors that led you not to believe that Marjorie
8 Murtagh Cooke would be a good candidate for the
9 position other than the fact that you believe that if
10 the -- you went and took her name to the chairman
11 that -- that she would ask you whether or not you were
12 crazy?
13    A    Marjorie Murtagh and I have been known to
14 one another since probably 1995. So I've had a long
15 history to develop my view of whether or not she would
16 be the right candidate to run the office at the SES
17 level. And I could, if you like, spend all the time
18 from now to lunch describing to you the difficulties
19 that I have encountered over that period of time that
20 suggest to me that -- that it's not a good idea to
21 make somebody an SES for doing something that they're
22 only accomplishing, in my view, marginally at the

100

1 GS-15 level.
2    Q    What was your view about whether or not
3 Marjorie Murtagh Cooke would be a good candidate for
4 the director of marine safety at the NTSB?
5    A    I didn't think that that was sensible. I
6 didn't think that she should be made an SES.
7    Q    And therefore selected for the director of
8 marine safety position?
9    A    Yes, I had -- I had serious, serious
10 difficulties with Marjorie's performance as the
11 director over her -- her office, both in terms of the
12 way she managed the office and in the quality of the
13 product that came out of it.
14    Q    I understand. Now, in 1995 what was -- what
15 was your exposure to Marjorie Murtagh Cooke in 1995?
16    A    Well, I'm not really sure when it -- when it
17 first -- it might have been '97. The first time
18 that -- that -- that I had a direct role to play in a
19 Coast Guard matter was, I think, shortly after the
20 Office of the Secretary of Transportation had been
21 changed into the four modal offices, so I think it
22 would be very early in Marjorie's leadership in the

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 11 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

30 (Pages 117 to 120)

117

1    MS. MCBARNETTE: -- assumes facts not
2    in evidence.
3        THE WITNESS: After Mr. Spencer was
4    selected, he was in the hall one day and I was
5    introduced to him.
6    BY MR. OSWALD:
7    Q   When was that?
8    A   Probably just before I left. I think we
9    only overlapped for a period of a few weeks.
10       MR. OSWALD: I understand. Let's go
11   off the Record.
12       THE VIDEOGRAPHER: We are going off the
13   Record. The time is 12:34 p.m.
14       (Recess -- 12:34 p.m.)
15       (After recess -- 12:43 p.m.)
16       THE VIDEOGRAPHER: We are back on the
17   Record. The time is 12:43 p.m.
18   BY MR. OSWALD:
19   Q   After you decided to rescind the vacancy
20   announcement for the director of marine safety
21   position at NTSB, what conversations did you have with
22   Joe Osterman or -- in particular, but anybody else for

118

1    that matter, about your decision to rescind the
2    vacancy announcement?
3        MS. COHEN: Objection, assumes facts
4    not in evidence.
5        THE WITNESS: I don't remember any
6    conversations with Joe Osterman about that. I
7    remember a conversation with Ron Battocchi, and that
8    would be the only conversation I remember.
9    BY MR. OSWALD:
10   Q   And what did you and Ron Battocchi talk
11   about in relation to your decision to rescind the
12   first vacancy announcement for the position of
13   director of marine safety in or about late 2004?
14       MS. COHEN: Objection. Can we just
15   have a minute off the Record?
16       THE COURT REPORTER: And --
17   BY MR. OSWALD:
18   Q   You --
19       THE COURT REPORTER: -- I'm going to
20   want --
21   BY MR. OSWALD:
22   Q   -- may answer -- you may answer the

119

1    question.
2        MS. COHEN: Before answering the
3    question, I would like to consult with the witness,
4    please, concerning privilege.
5    BY MR. OSWALD:
6    Q   Was Ron — was Ron Battocchi counsel for the
7    NTSB?
8    A   Yes. So should I answer the question? I'm
9    hap -- perfectly happy to answer the question.
10       MS. COHEN: No.
11       MS. MCBARNETTE: No.
12   BY MR. OSWALD:
13   Q   Where was the -- where -- where did you have
14   the conversation with Ron Battocchi?
15   A   It might even have been in the hall.
16   Q   Okay. And --
17   A   May I say to my attorneys here, this was not
18   a legal conversation. It had nothing to do with the
19   law. He had been on the earlier panel, and I was
20   going to tell him that he wasn't going to be on the
21   new panel. That was the conv -- that was the A to Z
22   of that conversation.

120

1    Q   And how did he -- how did he respond?
2    A   He thought I had a good idea. You know,
3    he's -- he's a lawyer, and I -- I basically said, Ron,
4    I'm going to -- I'm going to readvertise it again and
5    I think what I'll do is I'll have all of the office
6    directors that are involved in accident investigation
7    or accident investigation support be the panel so that
8    the person that they decide ought to be the office
9    director for marine is someone that they believe works
10   at their level and -- and is acceptable to them,
11   because they will live with the person. I'm out of
12   here. I don't -- you know, it's not like it -- people
13   are going to be able to say, well, it was Dan's fault
14   or it was Dan's success. It will be their choice, and
15   that was the right way to go.
16       I think in the first panel that Ron
17   Battocchi, as the -- as the general counsel, sat on
18   the panel. The general counsel is only peripherally
19   involved in accident investigation, so I thought he
20   wouldn't sit on the panel. If he had said he wanted
21   to sit on the panel, I probably would have said, yes,
22   but my view was, I will get my office directors who do

Case 1:06-cv-01928-JDB Document 25-3 Filed 05/09/2008 Page 12 of 48
VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

46 (Pages 181 to 184)

**181**

BY MS. MCBARNETTE:

Q   He was an applicant?

A   Yes.

Q   Okay. Please continue.

MR. OSWALD: Can we -- we're going to run out of tape here. You have seconds.

MS. MCBARNETTE: Okay. So --

MR. OSWALD: Can we take a break here? Let's go off the Record and change the tape.

THE VIDEOGRAPHER: This marks the end of tape 2 in the deposition of Mr. Campbell. We're going off the Record. The time is 2:54 p.m.

(Recess -- 2:54 p.m.)

(After recess -- 2:56 p.m.)

THE VIDEOGRAPHER: This marks the beginning of tape 3 in the deposition of Mr. Campbell. We're back on the Record. The time is 2:56 p.m.

BY MS. MCBARNETTE:

Q   Okay. Let's back up a little bit. You mentioned that you had procrastinated. What did you mean by that?

A   I think that the first group was brought to

**182**

me and that it might have been a month, it might have been two months, it might have been three months before I actually turned my attention to it full-time and said, all right, I need to -- I need to move forward on this. So I'm not sure what the elapse was, but -- but like a lot of people, I procrastinate and I also know when I'm procrastinating, so at some point I said, you can't do this and you need to move forward.

Q   Why did you choose to procrastinate?

A   I wasn't anxious to -- to proceed to the selection of an SES that I didn't necessarily think was going to work satisfactorily. I didn't think that Marjorie Murtagh Cooke, the plaintiff here, was going to be selected. I would not have recommended her selection, but I also didn't think that the pool that -- that I looked at when I initially went through was attractive.

Q   After the position was readvertised, did you select a panel to review the incoming applications?

A   Yes.

Q   Do you know if that panel is -- was the final panel that actually selected the person who was

**183**

selected?

A   Panels themselves don't select --

Q   Right.

A   -- so the panel wouldn't have selected. I believe that the panel that I suggested was the panel that made the review of the applications, so that's a yes. Were they a selector, I think that that's probably going to be a no.

Q   Were you the selecting official for that particular position?

A   No, for two reasons. One, I think I was no longer the managing director; and, two, as a matter of reality, the selection of any SES is going to be the chairman. As I mentioned earlier, the managing director works on a delegation with the chairman's authority, but only on a delegation. And at the level of SES, a chairman will be the determining call.

Q   Did you have any input on who was ultimately selected?

A   No.

Q   Did you tell the panel members for the second panel who they should select or review?

**184**

A   No, I didn't communicate with them on the merits of the panel at all.

Q   Did -- did you give your opinion about who should be selected to the chairperson or to any other officer who had input into sel -- selecting?

A   No.

Q   Are you aware if Ms. Cooke was ranked within the top five for the second panel's selection in the applicant pool?

MR. OSWALD: Objection as to form, misleading.

THE WITNESS: I -- I'm not sure how many people the panel actually considered at the top. I'm not sure what they went forward with. I did hear at some point that Marjorie was not to be offered an interview, so she was not in their top group, but that's -- that's what I know about it. I was told -- I've forgotten who told me that the panel was making a -- a recommendation -- I don't know whether it was a recommendation of one person or five people, but they were making a recommendation -- and that Marjorie was not included in the group that would be interviewed.

1 (Pages 1 to 4)

**Page 1**

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2
---------------------------
3    MARJORIE MURTAGH COOKE, :
              :
4        Plaintiff,   :
              :
5      -vs-        :    Case No. 06-748C
              : Judge Thomas C. Wheeler
6    THE UNITED STATES,     :
              :
7        Defendant.  :
---------------------------
8
9
10        CORPORATE DEPOSITION OF
11    NATIONAL TRANSPORTATION SAFETY BOARD
12     by and through JOSEPH G. OSTERMAN
13        Washington, D.C.
14        Friday, July 6, 2007
15           9:48 a.m.
16
17
18
19
20    Job No.: 1 - 107102
21    Pages: 1 - 265
22    Reported by: Paula M. Flint

**Page 2**

1        Corporate Deposition of NATIONAL
2    TRANSPORTATION SAFETY BOARD, by and through
3    JOSEPH G. OSTERMAN, held at the law offices of:
4
5        THE EMPLOYMENT LAW GROUP, P.C.
6          888 17th Street, Northwest
7             Suite 900
8          Washington, D.C. 20006
9             (202) 331-2883
10
11
12
13
14        Pursuant to agreement, before Paula M.
15    Flint, Notary Public of the District of Columbia.
16
17
18
19
20
21
22

**Page 3**

1            A P P E A R A N C E S
2    On behalf of the Plaintiff:
3      BY: BRIAN M. LOWINGER, ESQUIRE
4         The Employment Law Group, P.C.
5         888 17th Street, Northwest
6         Suite 900
7         Washington, D.C. 20006
8         (202) 331-2883
9    On behalf of the Defendant:
10     BY: QUAN K. LUONG, ESQUIRE
11        U.S. Attorney's Office, Civil Division
12        501 Third Street, Northwest
13        Room 4218
14        Washington, D.C. 20530
15        (202) 514-9150
16        and
17     BY: KATHLEEN SILBAUGH, ESQUIRE
18        National Transportation Safety Board
19        Office of the General Counsel
20        490 L'Enfant Plaza, Southwest
21        Washington, D.C. 20594
22        (202) 314-6084

**Page 4**

1            C O N T E N T S
2    EXAMINATION OF JOSEPH G. OSTERMAN        PAGE:
3    Mr. Lowinger          6, 257
4    Mr. Luong          251
5          E X H I B I T S
6    OSTERMAN DEPOSITION EXHIBIT NO.         PAGE:
7      (Exhibits subsequently
8       attached to the deposition.)

9    1    Position Vacancy Announcement     88
10   2    Memorandum             91
11   3    Position Vacancy Announcement     92
12   4    Memorandum             93
13   5    Operations Bulletin          226
14   6    Operations Bulletin          227
15   7    Operations Bulletin          229
16   8    Order             232
17   9    Performance Appraisal Form       234
18   10   Performance Appraisal Form       234
19   11   Position Description         235
20   12   Position Description         237
21   13   Application             238
22   14   Qualifications Brief         238

GOVERNMENT
EXHIBIT
3

Case 1:06-cv-01928-JDB   Document 25-2   Filed 05/08/2008   Page 14 of 48
DEPOSITION OF JOSEPH OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

14 (Pages 53 to 56)

<table>
53

1   saying that -- is that a "yes" or a "no" or you just
2   don't remember?
3       A.   No, there were no substantive comments,
4   disagreements or agreements related to those
5   comments by Mr. Campbell.
6       Q.   I see.  Let's just kind of go back here
7   for a second.
8           The advertisement, first there's an
9   advertisement.  And we said that Ms. Magwood would
10  have done a draft and Mr. Campbell would have done
11  a -- would have made edits.
12          What other documents are involved in the
13  drafting of the, I guess, materials for the panel
14  members to use or for the selecting official to use
15  as part of the process?
16      A.   The material for the panel members would
17  constitute the advertisement, the applicants -- or
18  the applications from the applicants, a brief
19  procedural guide, generally a one-page process on
20  how to conduct the panel, and then the rating and
21  ranking sheets for each applicant.
22      Q.   This is -- does each panel member do his
</table>

<table>
55

1   Magwood, but it was collected by the human resource
2   office.
3       Q.   So it's collected.  And then what happens
4   to those documents?
5       A.   I'm not certain.
6       Q.   Are they stored somewhere?
7       A.   I believe that the rating and ranking
8   sheets are kept.
9       Q.   What about the notes of the panel members?
10      A.   If there are notes on the rating and
11  ranking sheets that the panel members took, they're
12  kept as well.
13      Q.   I'm sorry?
14      A.   There may be notes kept as well.
15      Q.   Notes separate from the rating and ranking
16  sheets?
17      A.   There may be, yes.
18      Q.   And those would be maintained also by
19  human resources?
20      A.   Yes.
21      Q.   Are any of these -- are these notes
22  generally handwritten notes or are they electronic
</table>

<table>
54

1   or her own individual ranking sheet for each
2   applicant as part of their review process?
3       A.   The general behavior of the panels that
4   occur at the NTSB is that the individual panel
5   members will review each of the applications prior
6   to the meeting and make some preliminary judgments
7   on the quality of the applications.  The panel will
8   then convene, they will discuss each of the
9   applicants and the qualifications against the rating
10  and ranking sheet and then the panel will complete
11  one rating and ranking sheet for each applicant
12  signed by all panel members.
13      Q.   Do the panel members come to the meeting
14  with their own notes about each applicant?
15      A.   Some do and some do not.
16      Q.   I see.
17      A.   Occasionally.
18      Q.   And what happens to those notes?
19      A.   I believe they're all collected by the HR
20  office at the end.  All of the applications at the
21  end of the panel and all of the materials collected
22  by -- in this case it would have been Colette
</table>

<table>
56

1   notes?
2       A.   They're -- I don't know of any instance
3   when they were ever electronic notes.  The ones that
4   I'm aware of in this particular circumstance are
5   handwritten notes.
6       Q.   NTSB doesn't have a policy of handing out
7   the applications in electronic format to all the
8   panel members so that they can review it
9   electronically in a paperless office type setting
10  and let them make their notes electronically?
11      A.   No.  There's a privacy issue with the
12  application so that the packets are delivered all in
13  paper.
14      Q.   And are the packets sealed in any way when
15  they receive them?
16      A.   Each of the panel members receive the
17  entire packet in an envelope sealed by the -- in
18  this particular circumstance, by Ms. Magwood.
19      Q.   And it just comes through interoffice
20  mail?
21      A.   No, it's personally delivered.
22      Q.   By Ms. Magwood?
</table>

97

1    A.   Well, the managing director wasn't trying
2    to send a message to the review panel.  The managing
3    director was readvertising the position because he
4    believed there was an insufficient pool of
5    applicants.
6    Q.   What do you think the message is that's
7    sent to the review panel when there is a second
8    posting like that?
9    A.   I think if is -- there's no hidden meaning
10   in there, it's very straightforward.  He believed
11   there were insufficient applicants, qualified
12   applicants for the position, and he wanted to cast a
13   broader net to try to capture more qualified
14   applicants so that the NTSB could consider a broader
15   group.
16   Q.   What does that say about the candidates
17   from the prior posting?
18   A.   It doesn't say anything specifically about
19   the candidates from the prior posting, what it says
20   is that the application process did not solicit
21   enough applicants.
22   Q.   So it's just a number of applicants?

98

1    A.   Number of applicants, qualified
2    applicants.  Unqualified applicants are meaningless.
3    If there is a significant amount of unqualified
4    applicants for a job, there's also potentially
5    something flawed with the process.  We shouldn't be
6    obtaining a whole host of applicants who are not
7    qualified.
8    Q.   In 2005, describe your views on Marjorie
9    Murtagh Cooke's application for the SES position.
10   A.   My personal view?
11   Q.   Yes.
12   A.   My --
13        MR. LUONG:  Objection, outside the scope
14   of the 30(b)(6) deposition.
15   A.   My view was that she was qualified for the
16   position along with -- I think that there were 15
17   applications that were forwarded to the panel.
18   Several of those applicants, in my opinion and the
19   panel's opinion, were unqualified and were
20   eliminated from our consideration.
21        Marjorie Murtagh was qualified, as were 10
22   or 12 others.  I think they even say so in here.

99

1    The relative ranking of credentials, of all of the
2    applicants, my personal opinion was that she was --
3    she ranked about number seven on that list.  The top
4    five applicants had significant and more diverse
5    experience.
6    Q.   What was Elaine Weinstein's position with
7    regard to Marjorie Murtagh Cooke's application in
8    2005?
9    A.   It's going to be very similar to the 2004
10   answers, because the panel agreed, a consensus, on
11   the ranking of the applicants.  Her position on
12   Ms. Murtagh Cooke was identical to mine.
13   Q.   Describe to me in detail what happened at
14   the meeting in 2005 that you were present at when it
15   came time to discuss Marjorie Murtagh Cooke's
16   application.  Who spoke first?
17   A.   At the meeting, first there was a briefing
18   by Colette Magwood on the procedure.
19   Q.   Anyone else?  Did anyone else brief the
20   group?
21   A.   No, just Colette Magwood.
22   Q.   Okay.

100

1    A.   And just a procedural briefing and then
2    she left.  And the five panel members were left to
3    conduct the review.
4         The first order of business was to ask the
5    panel members if there were unqualified if there
6    were applicants we believed not to be qualified, and
7    there were several, and the panel discussed that
8    group first.
9         Then the panel discussed, one at a time,
10   each of the remaining applicants.  Open discussion
11   about qualifications, strengths, weaknesses with the
12   applications.  And we went through the remaining
13   list of 12 or so applicants that we thought were
14   highly qualified.
15        We then went back and rated the applicants
16   based on a random selection of applications,
17   starting with this one first and that one next and
18   just completely random, and rated against each other
19   the qualifications.
20   Q.   What was discussed about Marjorie Murtagh
21   Cooke when the group discussed her application?
22   A.   She had significant NTSB experience.  She

105

1    the significant NTSB experience, the fire science
2    experience, the preparation and appearance of the
3    application and any -- and the time on ships, what
4    else was discussed about her and her application?
5        A.   At the end of the rating and ranking, at
6    least for the panel that I participated in, it was
7    obvious that Ms. Murtagh would not be in the top
8    five. And the panel discussed whether we should
9    recommend, that since she was in the position at the
10   15 level, that she be included regardless. And the
11   panel decided that it was more important to stay
12   true to the process and to recommend the top five no
13   matter who those top five were and not reach around
14   or reach down further regardless of where
15   Ms. Murtagh ended up on the ranking. That was
16   discussed.
17       Q.   Who spoke about that issue?
18       A.   All of the panel members spoke about that
19   issue and the concern about whether we should reach
20   to the person who holds the position at the 15 or
21   not.
22       Q.   So Elaine Weinstein discussed that issue?

106

1        A.   All five of the panel members discussed
2    that issue, I believe.
3        Q.   Specifically what did Ms. Elaine Weinstein
4    say about Ms. Murtagh Cooke's application?
5        A.   I'm not going to be able to recall the
6    specific comments from each of the panel. There was
7    concern from all the panel members about whether we
8    should, as a policy, as a panel, reach to the person
9    who was the incumbent at the 15 level or not. And
10   the panel decided collectively, and I agreed with
11   this, as did all the other panel members, that we
12   should not bend the process to do that. We should
13   stay with the top five no matter who they were.
14       Q.   What did Mr. Battocchi say about that
15   issue?
16       A.   I don't recall that Mr. Battocchi was
17   involved in that issue. Mr. Battocchi was not in
18   this panel. He was in the '04 panel.
19       Q.   Oh, excuse me. I apologize, sir.
20            What did John Clark say about that issue?
21       A.   Specifically all of the office directors
22   who were there, the five who were there, had the

107

1    same concern, should we reach down to the incumbent
2    at the 15 level or not. And by not doing that we
3    were essentially bending the practice, to reach down
4    and include the incumbent at the 15 level. And we
5    decided it was better for the system and better for
6    the agency not to bend those procedural rules but
7    rather stay true to the process.
8        Q.   Who introduced the topic?
9        A.   I think I did. I believe I did.
10       Q.   What was your position with regard to
11   Ms. Murtagh Cooke's application and possibly making
12   her higher than number seven?
13            MR. LUONG:  Objection, asked and answered.
14       A.   I wasn't interested in changing her
15   relative ranking, I guess, to the other applicants.
16   My concern was, as was -- the concerns were
17   relatively similar from all the panel members,
18   should we go beyond the five to suggest that the
19   managing director interview seven. Of course
20   knowing that it's a call that the managing director
21   gets to make anyway.
22            If we recommended that he interview five,

108

1    he doesn't have to interview five, he can interview
2    three. And the concern was do we, at the panel
3    level, suggest that the incumbent at the 15 level
4    not be interviewed.
5            And the panel, myself included, decided
6    that we should stay true to the ranking. And the
7    ranking was that she came out as number seven in --
8    number seven or eight in a list of 12 or so, and
9    that the top five would be forwarded for interview.
10       Q.   Did all the panel members speak or did
11   just one or two of them speak?
12       A.   No, it was an open discussion among all
13   the panel members.
14       Q.   Everyone spoke?
15       A.   Yeah. I cannot give you a transcript of
16   the conversation, but it was five members around the
17   table talking about each applicant, each -- the
18   ranking, and then finally this issue at the end.
19       Q.   So everyone agreed that Ms. Murtagh Cooke
20   was number seven and she should not be given an
21   application because of the process -- because of the
22   need to adhere to the procedure?

93

1    **mandatory technical qualifications in the 2004**
2    **announcement.**
3        Q.    And what are the mandatory technical
4    professional qualifications for the 2005 --
5        A.    **Do you mean the desirable technical --**
6        Q.    No.  First I did the mandatory core
7    qualifications.
8        A.    **The core qualifications are the five that**
9    **I mentioned previously.  Would you like me to repeat**
10   **them all?**
11       Q.    No.  But they don't change?
12       A.    **It does not appear that they've changed.**
13       Q.    And are the mandatory technical
14   professional qualifications and desirable
15   professional qualifications the same in 2004 and
16   2005?
17       A.    **Yes.**
18           MR. LOWINGER:  Exhibit Number 3 is Bates
19   numbers 825 through 832.
20           Exhibit Number 4.
21           (Document marked Deposition Exhibit
22   Number 4 for identification and subsequently

94

1    attached to the deposition.)
2    BY MR. LOWINGER:
3        Q.    Sir, this Exhibit Number 4, Bates numbers
4    833 and 834, is this the rating of applicants by the
5    ad hoc rating panel for 2005?
6        A.    **This is the second panel in 2005, because**
7    **it is directed to me as managing director.**
8        Q.    Are there -- are you aware if there's
9    another rating of applicants for the first panel?
10   Do you remember signing one?
11       A.    **I did sign -- as a panel member, I did**
12   **sign the ranking and rating sheets.  I can't recall**
13   **whether I signed a memo directing the list -- the**
14   **rating and ranking list to Mr. Campbell.**
15       Q.    Do you remember there being a
16   recommendation from the panel to Mr. Campbell from
17   the panel that you sat on?
18       A.    **The panel concluded.  The first panel in**
19   **2005 concluded their work and ranked the top five of**
20   **the 15 applicants.**
21       Q.    Now, sir, what about Marjorie Murtagh
22   Cooke's qualifications in 2004 made her qualify for

95

1    an interview?
2        A.    **She had the requisite qualifications that**
3    **are described in the position vacancy announcement,**
4    **the core qualifications, the desirable**
5    **qualifications and also the mandatory ones.**
6        Q.    And --
7        A.    **And in comparison with the other**
8    **candidates at that time, she ranked in the top five.**
9        Q.    I see.  In 2005 what are the factors that
10   Marjorie Murtagh Cooke did not possess to make it to
11   the interview round in comparison to 2004?
12       A.    **She had exactly the same qualifications as**
13   **she did in 2004.  The difference was that there were**
14   **more qualified applicants in the 2005 ranking than**
15   **there had been in the 2004 ranking.  Therefore,**
16   **based on a relative comparison with the other**
17   **applicants, she placed lower on the ranking list.**
18       Q.    Did you -- did your panel determine that
19   she did not qualify for an interview in 2005?
20       A.    **The panel determined that she did not rank**
21   **in the top five candidates submitted to the managing**
22   **director for probable interview.**

96

1        Q.    Could the managing director have taken the
2    list and still determined that Marjorie Murtagh
3    Cooke merited an interview?
4        A.    **Could have.**
5        Q.    Has that ever happened before?
6        A.    **The managing director, or the selecting**
7    **official in this case, is not obligated to stay with**
8    **five or three or seven.  The number is completely up**
9    **to the selecting official on how many individuals**
10   **they wish to interview.**
11           **It is a time-consuming exercise, so the**
12   **panel recommends the top five be interviewed,**
13   **rating.  It is possible but not advisable for the**
14   **selecting official to reach beyond the list, to**
15   **capture candidates further down on the list.  If the**
16   **selecting official is going to interview the number**
17   **10 candidate, for example, they should also**
18   **interview one through nine, otherwise the work of**
19   **the panel is not nearly as useful.**
20       Q.    What was the message that the selecting
21   official or the managing director was trying to send
22   to the review panel in readvertising the position?

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 18 of 48
DEPOSITION OF JOSEPH C. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

34 (Pages 133 to 136)

133

1    Q.   But it doesn't necessarily limit it to
2  being at sea.  You could be on a navigable water and
3  it would be just as good as long as you have the
4  applicable experience?
5    A.   Sure.
6    Q.   Who conducted the interviews?
7    A.   The interviews for?
8    Q.   The applicants in 2005.
9    A.   For the applicants in 2005.  It was
10 myself, Elaine Weinstein, Vern Ellingstad and I
11 think Robert Chipkevich.
12   Q.   At what point did Dan Campbell say -- at
13 what point did Dan Campbell learn that Marjorie
14 Murtagh Cooke was not going to be interviewed?
15   A.   When I received the memorandum from
16 March 28 from the panel, the second panel in 2005.
17 I believe I notified Mr. Campbell, who was then the
18 executive director, that I was going to interview
19 the five -- top five applicants and that Ms. Cooke
20 was not one of them.
21   Q.   Did he learn about it from the first 2005
22 panel?

134

1    A.   He would have, yes.  He would have learned
2  it in that panel, she was not one of the top five
3  applicants.
4    Q.   What was his response from the first 2005
5  panel?
6    A.   He never -- he never got to the point of
7  actually conducting interviews from that panel.
8    Q.   I see.
9    A.   Because I was the managing director
10 shortly after that panel concluded its work and
11 before Mr. Campbell had the opportunity to interview
12 anyone.  So we reconstituted the panel to review the
13 applications all over again.
14   Q.   Did you discuss -- when you reconstituted
15 the panel, did you discuss with Dan Campbell
16 anything related to Marjorie Murtagh Cooke's
17 candidacy?
18   A.   No, not particularly.  It was a very
19 procedural matter.  The panel needed to be
20 reconstituted because I was a panel member
21 originally and now I was the selecting official.
22   Q.   Did the panel go through all the same

135

1  steps as before?
2    A.   Yes.
3    Q.   Did it take as long the second time as it
4  did the first time?
5    A.   It took a substantial period of time, yes.
6    Q.   And when you say substantial period of
7  time, how much more or less time did it take for the
8  second panel than it did the first panel?
9    A.   I don't know that there was a significant
10 difference.  I know that the first panel took
11 probably four hours, a rough estimate.  And I
12 believe the second panel, although I wasn't part of
13 the second panel, I believe that took roughly the
14 same period of time.
15   Q.   And what communications did the panel
16 members have with anyone outside of the panel in
17 between the first and the second panel regarding the
18 applicants?
19   A.   With the exception of Ms. Magwood, none
20 that I'm aware of.
21   Q.   When you say with the exception of
22 Ms. Magwood, can you describe what you mean by that?

136

1    A.   Well, Ms. Magwood, as with the first panel
2  and the panel in 2004, was the administrative
3  organizer of the panel.  So she delivered the
4  applications, she briefed the panel in advance of --
5  at the beginning of the meeting, she received all
6  the applications back and the final information and
7  prepared essentially the memo for the panel members'
8  signature.
9    Q.   And how much time did the panel members
10 have to review the applicants the second time
11 around?
12   A.   I think about a week.
13   Q.   When you say about a week, was it a
14 workweek?
15   A.   A regular workweek.  I don't know if there
16 was a weekend involved in it, but I believe there
17 was.  Usually when we're provided a significant
18 amount of reading material we usually were provided
19 it in one week and conduct the meeting the following
20 week.
21   Q.   And do you remember which day the meeting
22 took place?

137

1    A.  Without referring to the document I can't
2  tell you exactly the date.
3    Q.  And what -- who gave the procedural
4  discussion this time?
5    A.  It would have been Ms. Magwood.
6    Q.  And the second time around, what was the
7  discussion with regard to Marjorie Murtagh Cooke's
8  application? Can you describe the conversation?
9    A.  I don't know the conversation that
10  occurred within the panel. I wasn't part of that.
11  And I don't know if they discussed -- had the same
12  conversation that we had in the first panel of '05
13  regarding her position and whether she ought to be
14  interviewed or not. I don't know.
15    Q.  Was there a ranking sheet the second time
16  around?
17    A.  Yes.
18    Q.  And how did Ms. Murtagh Cooke rank the
19  second time around as opposed to the first time
20  around in 2005?
21    A.  I think in the same position. I think she
22  was number 7 out of 12 or 13.

138

1    Q.  The only distinction being that Tom
2  Haueter was involved the second time around?
3    A.  Tom Haueter took my place and otherwise
4  the panel was the same.
5    Q.  And what was Tom Haueter's position with
6  regard to Marjorie Murtagh Cooke's application?
7    A.  All I can tell you is that he signed,
8  along with the other panel members, the
9  recommendation to me, the managing director, for the
10  top five people.
11    Q.  Did you have any conversations with him
12  about this?
13    A.  Mr. Haueter, no.
14    Q.  Did you have any conversations with any of
15  the other members of the second 2005 panel?
16    A.  I did not until the interviews. And
17  during the interviews, as we interviewed the top
18  five members, Mr. -- or Dr. Ellingstad and
19  Ms. Weinstein and Mr. Chipkevich knew the
20  applications from their review on the panel and had
21  conversations about those five individuals during
22  the interviews.

139

1    Q.  But what about regarding Marjorie Murtagh
2  Cooke?
3    A.  No, I didn't have conversation with the
4  panel members.
5    Q.  What about -- the interviewers were
6  basically the same. Was there any discussion
7  amongst the interviewers that Marjorie Murtagh Cooke
8  was not selected for an interview?
9    A.  No, no. The interviews were specific to
10  the applicant that was being interviewed at that
11  time.
12    Q.  Did you participate in that re-interview?
13    A.  I did.
14    Q.  After the interviews were completed,
15  what -- were you going to say something, sir?
16    A.  Yeah, I'm trying to -- no, never mind.
17    Q.  Are you sure?
18    A.  I'm trying to make sure that I give you
19  the right people on the interview. And I think that
20  I've done that.
21    Q.  Who gave Marjorie Murtagh Cooke notice
22  that she wasn't going to be granted an interview?

140

1    A.  I did.
2    Q.  Describe to me the conversation.
3    A.  I brought her in and I told her that she
4  was -- that we had conducted five interviews of five
5  applicants and we're prepared to make a selection.
6  I did not bring her in and say she was not going to
7  be interviewed. And the reason for that is had the
8  five top applicants not worked out during the
9  interviews, I had the option of moving further down
10  the list.
11    So I was not going to advertise that she
12  wasn't in the top five until such a point that we
13  had conducted those interviews and decided whether
14  we could make a selection from that crew, which I
15  could.
16    Q.  So after you told her that you conducted
17  interviews and that you were in the position to make
18  a selection, what was the next thing said?
19    A.  Well, I talked to her about the fact that
20  she was going to no longer be the director of the
21  Office of Marine Safety, that a new SES employee was
22  going to come in sometime in the summer and take

Case 1:06-cv-01928-JDB    Document 25-3    Filed 05/08/2008    Page 20 of 48
DEPOSITION OF JOSEPH A. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

37 (Pages 145 to 148)

**145**

1  to the SES.
2      Q.   Okay.  Was there any discussion after she
3  said that -- after she said that, what was said
4  next?
5      A.   Well, then the discussion was about what
6  kind of positions she would potentially want to do.
7  In the agent one-on-one -- execute the agency, she
8  brought forward this idea of the international
9  liaison.  We talked about it.  It was a discussion.
10  And I thought it was an interesting concept.  And I
11  told her to develop it further and come back with
12  her thoughts on what she felt she could do with this
13  position.
14      Q.   What office would that SL international
15  position, liaison position be in?
16      A.   As we were discussing it we were
17  discussing it in the Office of Managing Director, my
18  office.
19      Q.   I see.  Why would it be in the Office of
20  the Managing Director?
21      A.   At the moment the agency has an SL
22  position for international aviation functions, which

**146**

1  is the majority of the international work that goes
2  on within the NTSB.  But there are other
3  international aspects of the agency that are not
4  represented by that SL position.
5      The person that currently occupies it,
6  that position, Mr. MacIntosh, deals almost
7  exclusively with aviation issues, while there are
8  some marine, a few highway and some rail and
9  pipeline issues that are international issues, and
10  there was no, at that time, liaison in the agency to
11  manage that activity, that international activity.
12      Q.   Is the international aviation SL position,
13  is that in the Office of the Managing Director as
14  well?
15      A.   No, that's in the Office of Aviation
16  Safety.
17      Q.   After you discussed the aviation -- the
18  international position and interest in equal pay,
19  what else was discussed during that first meeting?
20      A.   The only other topic that was discussed
21  was she thanked me and thanked me for being frank
22  and clear in the conversation with her and indicated

**147**

1  that she had not always understood or been -- in her
2  opinion things had not been communicated well to her
3  in the past.  That pretty much covers the content of
4  that meeting.
5      Q.   Was there anything discussed with regard
6  to the meeting with Ellen Engleman Conners?
7      A.   I don't believe so.
8      Q.   Did she mention communications with Ellen
9  Engleman Conners regarding equal pay and her efforts
10  to try to get equal pay?
11      A.   At some point in one of the meetings
12  Ms. Murtagh indicated that she had met with Member
13  Conners -- Engleman Conners and had tried to meet
14  with her again but could not.
15      Q.   And what was -- was that the first or
16  second meeting?
17      A.   I don't recall.  It was in one of those
18  meetings.
19      Q.   Either the first one or the second?
20      A.   Where she mentioned -- and I suspect it
21  was the first, because she was talking about
22  communication, her concern about not --

**148**

1  communication flow not going very well for her.
2      Q.   And what about -- what did she say about
3  the meeting other than the communication?  Did she
4  mention the fact that she was seeking equal pay and
5  had sought equal pay because she was the only woman
6  doing equal work and was not being paid at the same
7  level as the men?
8      A.   Yeah, I believe she did.  I believe she
9  did.  I think that I testified earlier that -- or at
10  least I mentioned earlier that I learned of her
11  concern about equal pay through the deposition, or
12  maybe that was the EEO.  I think that was the EEO.
13  No, I think she did mention it.  Much of that topic
14  was about equal pay in that first meeting.
15      Q.   I see.  And what did you respond when you
16  discussed equal pay besides the SL position?
17      A.   Well, I told her that the SES position
18  that she had applied for was a competitive position,
19  that she was not selected.  I could not legally just
20  arbitrarily improve her salary.  I don't have that
21  ability and couldn't do it.  That if she was
22  interested in making more salary we would need to

Case 1:06-cv-01928-JDB    Document 25-3    Filed 05/08/2008    Page 21 of 48
DEPOSITION OF JOSEPH C. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

38 (Pages 149 to 152)

149

1  find a rational and justifiable mechanism for doing
2  that. And this is when we talked about the
3  potential for her developing an SL position within
4  the Office of Management.
5      Q.  What was your understanding as to what
6  would -- what Ms. Murtagh Cooke would need to do in
7  order to obtain the SL position when you discussed
8  that during your first meeting?
9      A.  I did discuss it. I said first we would
10  have to have a justifiable need. We would have to
11  identify the position and craft a position
12  description.
13      Secondly, we would have to obtain the
14  billet from OPM. SES and SL billets are allocated
15  from OPM. I just can't create a billet. I have to
16  request it from the Office of Personnel Management
17  with a justification and a rationale behind it.
18      Once granted that billet it then becomes a
19  competitive billet, because it is a promotion. All
20  promotions have to be done competitively. So there
21  would be an announcement. She would have to
22  compete. She would have to be selected and then --

150

1  that's the process. And we discussed that as well.
2      Q.  And how long -- the duration of the
3  process, did you discuss that at all?
4      A.  How long that would take?
5      Q.  Yes.
6      A.  Not likely. I don't think that I
7  discussed that, but I sent her off on the first
8  step, which was to create essentially a concept.
9      Q.  And a week later you had a meeting -- let
10  me just ask this question.
11      Before the meeting ended, what else was
12  discussed with regard to equal pay? Did you discuss
13  the equal -- the EEO complaints at all during the
14  first meeting?
15      A.  No, I don't recall that.
16      Q.  Were you aware of it at that point?
17      A.  I don't think so. I don't think I was
18  aware of the EEO complaint. I think I was aware
19  that she had met with Chairman Engleman Conners, but
20  I don't think I was aware of the EEO complaint.
21      Q.  When you took over -- when you took over
22  for Mr. Campbell, did you have any discussions with

151

1  regard to Marjorie Murtagh Cooke and her tenure
2  given that she was at that point not likely to be
3  selected for the SES position?
4      A.  When the sheet came from the panel, after
5  I reconstituted the panel, had them redo their work
6  and the sheet came back to me, it was clear that she
7  was not in the top five. And I mentioned to
8  Mr. Campbell that she was not in the top five.
9      At that stage he wanted essentially to be
10  an arm's length from the process because I was the
11  selecting official.
12      Q.  What did he say about Marjorie Murtagh
13  Cooke, about her not being in the top five?
14      A.  I don't believe he had any comment at all.
15  I informed him and he made note of it and that was
16  the end of the conversation.
17      Q.  How did he make note of it?
18      A.  He acknowledged that I gave him the
19  information.
20      Q.  And how did you give him the information?
21      A.  Verbally. I told him that I was going to
22  prepare for five interviews for the position, that

152

1  Marjorie was not in the top five and that he needed
2  to be aware of that.
3      Q.  Why would he need to be aware of that?
4      A.  Because she was the incumbent at the 15th
5  level.
6      Q.  And how would that impact him?
7      A.  It is -- as the executive director, he had
8  overall direction at that time for the activities of
9  the agency. The activities that go on with hiring
10  and so on with staff concern not only the managing
11  director but the executive director as well.
12      Q.  Was he surprised that she wasn't selected
13  for an interview?
14      A.  I don't believe so because I believe that
15  he knew from the previous panel that she had not
16  made the top five as well.
17      Q.  And did he speak to you about that, that
18  he had not -- that she had not been selected the
19  first time, in 2005?
20      A.  I don't think so. I know that
21  Mr. Campbell, through conversations with me,
22  believed that if it was plausible that the incumbent

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 22 of 48
DEPOSITION OF JOSEPH OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

39 (Pages 153 to 156)

153

1  should be interviewed, but if she didn't make the
2  top five she didn't make the top five.
3      Q.  Did Mr. Campbell express an opinion about
4  the other candidates and their qualifications being
5  greater than Ms. Murtagh Cooke's?
6      A.  As far as I know, he never looked at the
7  applicants in any detail from either the second
8  panel or the third panel, the 2005 panels.
9      Q.  Was there ever any discussion with him
10 about the scope and the breadth of the panel -- of
11 the pool of candidates?
12     A.  No. I know that his intention in December
13 of 2004 was to get more qualified applicants. And I
14 know that we had 15 applicants forwarded to the
15 panel, for the first panel in 2005, wherein 2004
16 there had only been 10. That's all that I'm aware
17 of as far as his comments about that.
18     Q.  What did he specifically say about the
19 fact that it is at all plausible that the incumbent
20 be interviewed, that the incumbent should be
21 interviewed? What specifically did he say about
22 that?

154

1      A.  Well, I know that in his practice from
2  those positions in the agency, and my recommendation
3  and the panel's recommendation were concurrent, and
4  that was that we should stay as close to the rules
5  on all of the job applications that we are
6  advertising, and whoever comes out in the top five
7  comes out in the top five.
8      Q.  It's always the top five at NTSB?
9      A.  For SES it's usually the top five, because
10 it's such a work force -- workload to interview and
11 manage those applications.
12     Q.  What did Mr. Campbell say about
13 Ms. Murtagh Cooke other than her application with
14 regard to her candidacy for the SES position?
15     A.  Well, that's a broad question. In the
16 interview that I conducted we talked about the
17 sequencing of the SES billets, which we had spoken
18 about in the previous deposition. And other than
19 what I've mentioned here, I think that's probably
20 it.
21     Q.  Did Mr. Campbell ever express an opinion
22 about Ms. Murtagh Cooke's claims that she deserved

155

1  equal pay?
2      A.  Yes.
3      Q.  Describe those -- the conversation about
4  that.
5      A.  Well, he thought that, one, there was of
6  course a procedural difficulty with that. You can't
7  just promote people without the proper process. And
8  two, he was not comfortable with her performance and
9  did not believe that she was performing at the same
10 level as the other office directors, and therefore
11 he thought that a request for equal pay was bold on
12 her part.
13     Q.  When did you have this conversation with
14 Mr. Campbell?
15     A.  This is in my preparation for the first
16 deposition in May of this year.
17     Q.  For the Court of Federal Claims' action?
18     A.  Yes.
19     Q.  Did you have any conversations with
20 Mr. Campbell about the issues that we've just
21 discussed in the prior question while you were
22 switching from the Office of Highway Safety to

156

1  managing director and Mr. Campbell was switching
2  from the Office of Managing Director to the Office
3  of Executive Director?
4      A.  No, very little. Mr. Campbell made it
5  very clear that he wanted to stay at arm's length
6  from these hiring activities for several reasons,
7  and not just Ms. Murtagh's position or the director
8  of OMS position, but all of them because he was
9  assuming a different role as an executive director
10 and liaison with the board members.
11         His focus was going to be, during his last
12 six months with the board, attention to the board
13 members and their issues. And so he immediately,
14 the day of my assignment to the managing director,
15 essentially said it's all yours, and other than
16 information let me know what's going on in the end,
17 it's yours to manage.
18     Q.  And you said he said that he wasn't
19 interested in hearing about Marjorie Murtagh Cooke
20 or the application process. Specifically what did
21 he say about Marjorie Murtagh Cooke?
22     A.  I didn't say he wasn't interested.

157

1    MR. LUONG: Yeah. Objection, I think that
2 mischaracterizes his testimony.
3    A.   Yeah, I didn't say he wasn't interested in
4 hearing about it, he wasn't interested in being
5 involved with it. Other than the final stage
6 information that I would normally provide to my
7 superior about the process.
8    And he was at that time fully engaged in
9 the new assignments. Our chairman's term had ended.
10 We had an acting chairman and a potential incumbent
11 chairman who were two different people, and we had
12 board members coming in and leaving, and there was
13 lots of activity surrounding those board members.
14 He was fully engaged with that.
15    Q.   Tell me about the second meeting with
16 Marjorie Murtagh Cooke when she came to you with the
17 bullet points.
18    A.   The second meeting was a transmittal of
19 the information from her to me.
20    Q.   How long did the meeting last?
21    A.   It wasn't very long. Maybe 30 minutes,
22 where she discussed the points of what she thought

158

1 the position could do. And I told her I would
2 consider it and talk to the executive director and
3 the chairman about it and I would get back with her.
4    Q.   What else was discussed? Was the whole
5 meeting just about the SL position?
6    A.   Pretty much. She also, I think, restated
7 her position about wanting to not be focused on
8 status or title but rather pay. She was interested
9 in increasing her salary and the pay.
10    Q.   Going forward or for past actions?
11    A.   No, going forward.
12    Q.   What was discussed about her meeting with
13 Ellen Engleman Conners at your second meeting?
14    MR. LUONG: Objection, assumes facts not
15 in evidence.
16    A.   I don't believe that was discussed at the
17 second meeting.
18    Q.   What was discussed about the EEO complaint
19 at the second meeting?
20    MR. LUONG: Objection, assumes facts not
21 in evidence.
22    A.   I don't believe that was discussed at the

159

1 second meeting.
2    Q.   Other than the SL position, what else was
3 discussed during the second meeting?
4    MR. LUONG: Objection, that's been asked
5 and answered already.
6    A.   The SL position was really the only
7 context of that second meeting.
8    Q.   Tell me about your meeting or when you
9 actually discussed the SL position with the
10 executive director and the chairman.
11    A.   Shortly after the second meeting with
12 Ms. Murtagh, I brought to the executive director and
13 both the acting chairman and the incumbent chairman
14 the suggestion that an SL position -- her suggestion
15 of an SL position. I was asked what I thought and
16 my opinion was that there was not sufficient work to
17 justify another SL position for international work.
18    Although there is international work at
19 the agency that is not aviation, at least 80 percent
20 of it is aviation. The majority of it is aviation.
21 And we already had an SL billet handling that work,
22 a person at the SL level. I did not believe that

160

1 there was justification for the SL grade for what
2 was left in the international work.
3    Q.   When did you form that opinion?
4    A.   I formed that opinion after I reviewed
5 Ms. Murtagh's proposal and after our second meeting.
6    Q.   And do you remember what -- how long the
7 proposal was?
8    A.   It wasn't very extensive. Several pages
9 maybe, maybe bullet points.
10    Q.   And was there any -- was it that the
11 presentation wasn't extensive enough or was it that
12 there just wasn't enough space, enough international
13 work other than aviation?
14    A.   I just didn't think that there was
15 sufficient -- and the executive director and both
16 the chairmen agreed that I didn't think that there
17 was sufficient work to justify that level of
18 position.
19    Q.   And the executive director was Dan
20 Campbell?
21    A.   Yes.
22    Q.   And who was the chairman at that time?

161

1    A.    The acting chairman was Mark Rosenker, and
2  the incumbent chairman or chairman designee was
3  Ellen Engleman Conners.
4    Q.    Did you meet with both chairpersons?
5    A.    I did.
6    Q.    And both of them agreed, or was there any
7  disagreement?
8    A.    No, no disagreement.
9    Q.    How long was the meeting with Mr. Rosenker
10  and Ms. Ellen Engleman Conners?
11    A.    They were not together, they were
12  different.  Probably no more than about 15 minutes.
13    Q.    Which one actually had authority to grant
14  the opening of a position for the SL position?
15    A.    None of them.  The authority has to come
16  from OPM.
17    Q.    Which one would have authority to let you
18  seek authority from OPM?
19    A.    At that time it would have been the acting
20  chair, Rosenker.
21    Q.    So what was Ellen Engleman Conners' input
22  worth?

162

1    A.    She was the chairman designee, which meant
2  that the president had already designated her to be
3  the next chairman, although her term had expired.
4  His intention was to nominate her to be the chairman
5  again.  And because of that there was, at a minimum,
6  a courtesy factor to include her in the decision
7  that affected the agency.
8    Q.    And after meeting -- how long was your
9  meeting with Mr. Campbell regarding the SL position?
10    A.    Probably about 15 minutes.
11    Q.    And was there any thought of a way by any
12  of the people with whom you met, Mr. Campbell,
13  Mr. Rosenker and Ms. Engleman Conners, as to a way
14  that Ms. Murtagh Cooke could be accommodated with an
15  SL position or a position -- some sort of position
16  that she envisioned that would encompass the
17  international aspect that she was seeking?
18    A.    I'm a little confused by the question.
19    Q.    Was there -- was it just a yes or no
20  decision or was there any other discussion about a
21  way to accommodate her -- her next step after
22  being --

163

1    A.    All three meetings were nearly identical
2  in which I presented the situation, that because we
3  were selecting another candidate, she -- we would
4  need to find a new role for her, and she had
5  proposed an SL position for this international
6  billet.  And this was her ideas on that -- these
7  were her ideas.  And all three individually asked me
8  what I thought about it and I told them exactly what
9  I said here, that I did not think there was
10  sufficient work to justify that level billet for
11  that particular aspect of the work.
12    Q.    Was there any other way to make a position
13  available to her at the SL level or at a higher
14  level than what she eventually was transferred into?
15  For example, at the Office of Safety
16  Recommendations.
17    A.    The basic test that has to occur is that
18  there has to be sufficient justification and need
19  for the agency to request from OPM an additional SL
20  billet.  And then OPM has to agree with the agency
21  and grant the billet.
22    Q.    When did you discuss the issue with

164

1  Ms. Murtagh Cooke that the agency was not in a
2  position to create an SL position for her?
3    A.    About a week or two later maybe.
4    Q.    And describe the conversation for me.
5    A.    I indicated that I had discussed it with
6  the executive director and the chairman and we did
7  not believe there was sufficient work to justify an
8  SL billet for this international work that she had
9  been seeking.
10    Q.    And what was her response?
11    A.    She was unhappy with that.  She believed
12  otherwise.  And the conversation then moved into
13  where would you like to work, what would you like to
14  do.
15         We discussed several options.  She could
16  stay in the Office of Marine Safety, which she
17  decided was not what she wanted to do.  She didn't
18  want to stay there.  And I indicated that we had an
19  immediate need for a 15-level manager, planning
20  manager in the Office of Safety Recommendations for
21  a specific duration of time.  It was not an endless
22  need, but it was a coincidental time need to go and

Case 1:06-cv-01928-JDB    Document 25-2    Filed 05/08/2008    Page 25 of 48
DEPOSITION OF JOSEPH OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

42 (Pages 165 to 168)

165

1  help the Office of Safety Recommendations do some
2  planning activity, and she agreed to do that. And
3  then for us to consider what other position may be
4  appropriate for her at the 15 level. And so we
5  detailed her to the Office of Safety
6  Recommendations.
7      Q.  What was discussed with regard to her
8  staying in OMS?
9      A.  I asked her very clearly, what would you
10 like to do. Would you like to stay in the Office of
11 Marine Safety.
12      I told her that we could create a national
13 resource billet for her there, which is a 15 level
14 position. And I also told her my personal opinion
15 was I didn't think it was necessarily the best idea
16 coming from the director's billet to a lesser
17 position and working for a new director, but that I
18 would leave it up to her on how she wanted to do it.
19 And she didn't want to stay in the Office of Marine
20 Safety.
21      Q.  What is the national resource?
22      A.  Fifteen level employees at the NTSB for

166

1  the most part are supervisory employees. The
2  supervisory billets in the Office of Marine Safety
3  were filled already. So to keep her grade, I could
4  give her -- create a national resource specialist
5  billet in the Office of Marine Safety, which is a
6  nonsupervisory technical 15. And we would
7  provide -- we would essentially assign her marine
8  engineering tasks for investigations.
9      Q.  And what was her view on that position?
10     A.  The position was not unattractive, but I
11 think that she didn't want to stay in this -- the
12 office structure, the Office of Marine Safety.
13     Q.  What was her reason for not wanting to
14 stay in the Office of Marine Safety?
15     A.  Comfort or discomfort. A new director
16 coming in, essentially taking her place at the SES
17 level. She thought it would be awkward, and I agree
18 it would have been awkward for her.
19     Q.  Did she offer to stay and help acclimate
20 Mr. Spencer?
21     A.  She did not. She actually wanted to be
22 out of it at that point. She made it very clear

167

1  that she'd wrap up some of the work that she was
2  doing, but she wanted to be extracted as quickly as
3  possible. She didn't want to be in place as the
4  last marine director waiting for the new marine
5  director to come in.
6      Q.  So how much time was there between her
7  leaving OMS and Mr. Spencer taking over?
8      A.  There was -- Mr. Spencer took over in
9  August. She left, I believe, in May or very early
10 June. And in the interim I put in place another
11 employee as the acting director.
12      Q.  So what was discussed with regard to other
13 options besides the national resource specialist in
14 the Office of Safety Recommendations?
15     A.  Well, I looked through the agency, what
16 other billets were available, and I essentially told
17 Marjorie that the two that were available that I had
18 at the moment were this national resource specialist
19 in the Office of Marine Safety or a detail to the
20 Office of Safety Recommendations to help with
21 advocacy planning and recommendation planning.
22     And those were the positions that I had at

168

1  that time. And that if she wanted -- in which she
2  indicated she wanted to go to Safety
3  Recommendations. If she did, I made it very clear
4  that was a temporary position, it was a detail, and
5  while she was on the detail I would work to
6  create -- work for a pathway for her to another
7  position within the agency.
8      At that time I'd only been in charge for a
9  little less than two months and hadn't really put
10 the whole plan of action in place yet of what I was
11 going to do.
12     Q.  Excuse me for interrupting. Did you
13 finish? I didn't hear the last part of it. You
14 said --
15     A.  I hadn't had much opportunity to think
16 through an organizational development process,
17 wearability and debate.
18     Q.  During that third meeting when you
19 discussed the national resource specialist and the
20 advocacy planning position at Office of National --
21 of Safety Recommendations, what was discussed with
22 regard to dispira pay and/or the EEO complaint?

177

1          MR. LOWINGER: Mr. Battocchi.
2          MR. LUONG: Can we go off the record for
3    just a moment? I want to speak with agency counsel
4    about this.
5          MR. LOWINGER: Okay.
6          (A recess was taken.)
7    BY MR. LOWINGER:
8      Q.   Can you describe Mr. Ron Battocchi's
9    efforts to resolve the EEO complaint on behalf of
10   NTSB with Ms. Marjorie Murtagh Cooke?
11         MR. LUONG: I'm going to object to that
12   question on the basis of attorney/client privilege
13   and instruct the deponent not to answer that
14   question.
15   BY MR. LOWINGER:
16     Q.   Can you describe Gary Halbert's efforts to
17   resolve the complaint, Ms. Murtagh Cooke's
18   complaints -- EEO complaint?
19         MR. LUONG: I'm also going to object to
20   that question on basis of attorney/client privilege
21   and instruct the witness not to answer that
22   question.

178

1    BY MR. LOWINGER:
2      Q.   Mr. Osterman, I understand you're not
3    going to answer the question?
4      A.   Say it again.
5      Q.   You're not going to answer the question?
6      A.   No, I'm not going to answer the question.
7      Q.   When you spoke with Ms. Murtagh Cooke with
8    regard to the Office of Safety Recommendations and
9    Communication and her work there, can you describe
10   whether or not that was — can you describe the --
11   describe to me the position that she was going to be
12   transferred to?
13     A.   Certainly. I told her the one was a
14   temporary position, term appointment, detail if you
15   will. It was not intended to be a permanent
16   position. There was a need to assist the director
17   of that office in planning activities. And I
18   considered Ms. Murtagh a good planner and felt that
19   that fit would be good for the agency and would give
20   her the opportunity to move out of the Office of
21   Marine Safety, as she wished, and also give me the
22   opportunity to design a more permanent position for

179

1    Ms. Murtagh outside of the Office of Marine Safety.
2      Q.   Describe to me your conversation with
3    regard to the temporary nature of the position that
4    you assert.
5      A.   Oh, I told her that it was for -- probably
6    through the summer and early fall and it was
7    intended to work on planning activity within the
8    Office of Safety Recommendations, and that once that
9    was complete that she would return back to the
10   Office of Management. And at that time I would
11   have -- have the opportunity to create and design a
12   job based on an organizational development model, a
13   legitimate position with substantive work in the
14   Office of Management for her.
15     Q.   What did Ms. Murtagh Cooke — what was her
16   response to your statement with regard to the
17   temporary nature of the transfer?
18     A.   She understood it as a detail. She
19   understood that she would be returning most likely
20   to the Office of Management when the detail was
21   complete.
22     Q.   And describe the planning activities.

180

1    Actually, what was discussed with regard to the
2    return to the Office of Management? I mean how did
3    we ever get to a position at the Office of
4    Management from Office of Marine Safety? How did we
5    ever get that far in the process of planning her
6    next stops?
7      A.   Quite frankly, thinking a little bit
8    ahead. At the time we had the discussion about her
9    going to the detail in Safety Recommendations, there
10   was not another 15 billet open and available to
11   place her in that was appropriate for her -- for her
12   background. And in taking over the Office of
13   Management, I knew that there was an organizational
14   development, a redesign of that office that was
15   necessary. I knew that we needed to have a planning
16   functionary within that office that didn't
17   previously exist, and I thought that Ms. Murtagh
18   would be a good candidate for such a position.
19   However, I hadn't worked all that out yet. I had
20   only been in the job a couple of months.
21     Q.   Who did you all speak with in the Office
22   of Safety Recommendations and Communications with

Case 1:06-cv-01928-JDB   Document 25-2   Filed 05/08/2008   Page 27 of 48
DEPOSITION OF JOSEPH OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

51 (Pages 201 to 204)

201

1  asked to terminate the detail and go back to the
2  Office of Marine Safety.
3      Q.   Was there any communication between you
4  and her that would let her know that she could get
5  out of the detail, as you call it, the detail, and
6  go back to Marine Safety?
7      A.   It's sort of an awkward way of putting it.
8  She was aware that it was a detail. She didn't want
9  to return to Marine Safety, and she never indicated
10  that, one, she was unhappy with the detail or, two,
11  that she ever wanted to return to Marine Safety. If
12  she had these thoughts she kept them to herself and
13  didn't tell anybody.
14      Q.   So how did the detail end?
15      A.   The work was over. The work that
16  Ms. Weinstein had needed to be done was
17  substantially complete. And at that time I had an
18  opportunity to design a new position within the
19  Office of Management to essentially redesign the
20  organizational structure of the Office of
21  Management. And I brought her in and spoke to her
22  and told her that I had a very credible GS-15 level

202

1  position as the associate managing director for
2  strategic management, and -- although I'm not sure I
3  had titled it that at that time, but it was the
4  chief planning officer for the agency, a position
5  that did not previously exist in the administration
6  that preceded my tenure. And I asked her if she
7  would do it.
8      I told her that I wouldn't make her do it,
9  she had the option of saying no, but that I thought
10  that her planning and presentation, especially
11  strategic planning skills, were good. I had seen,
12  as the office director for Highway Safety, her
13  planning activity as a counterpart, as a colleague
14  when I was in that position, and she was good at
15  process flow and strategic process and
16  organizational development, and I thought she would
17  be quite good for the position.
18      She thought about it and decided that she
19  did not wish to embark on that kind of position.
20  She didn't want to do it. And I asked her why. And
21  she indicated that it was just too much work. She
22  didn't want to get that heavily engaged again. And

203

1  it was a lot of work. It was a new position,
2  creating a new process and a new, essentially,
3  function for the agency, one that maybe should have
4  existed for a long time, it hadn't, and that is a
5  permanent planning function. So I offered that to
6  her and she declined.
7      So I told her that we would put her in a
8  program management position, program analyst
9  position until such time that we could determine
10  what other positions became available at the 15
11  level. And we gave her the assignment of doing
12  essentially an archeology task, which was to
13  identify, one, all of the reviews and audits that
14  the agency had incurred in the last 10 years and
15  then archive the responses that the agency had
16  against all of those reviews and audits, which we
17  had not done previously. The agency hadn't done
18  that previously. And to do that she had to go
19  around and talk to all the office directors, find
20  out all the information, collect it, collate it and
21  put it into essentially an archive.
22      Q.   What written documentation do you have

204

1  with regard to the position of -- the associate
2  strategic management position?
3      A.   Associate managing director for strategic
4  management is what it is titled now. I think at the
5  time that I spoke to Ms. Murtagh about it, I'm not
6  sure that that was exactly the title. It may have
7  been chief strategic planning or -- we modified the
8  title a couple of times.
9      I have a position description and a
10  performance standard and I have a new employee in
11  that position at the moment.
12      Q.   Was there a position description provided
13  to Ms. Murtagh Cooke to consider the position?
14      A.   No, because -- and I recall this
15  conversation. I had a draft and I wanted her to
16  consider that. And part of the duty of the -- I was
17  intending for her to do was to complete that
18  position description by refining it and finalizing
19  it as she came into it.
20      Q.   What part of planning was Ms. Murtagh
21  Cooke good at in the Office of Marine Safety?
22      A.   Process flow.

Case 1:06-cv-01928-JDB    Document 25-3    Filed 05/08/2008    Page 28 of 48
DEPOSITION OF JOSEPH OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

52 (Pages 205 to 208)

205

1    Q.    What is process flow, sir?
2    A.    How one identifying the elements of --
3    it's really an industrial engineering kind of
4    aspect.  Identifying all of the elements of a
5    particular process, breaking them down, looking for
6    weaknesses within the process and suggesting
7    corrections for that.  She is methodical in her
8    assessment of -- especially process, and I thought
9    that that was a good fit.
10    Q.    At what level would she have served in the
11    chief strategic planning position?
12    A.    It's a 15 position, 15 billet.  The
13    current person, incumbent is a 15.
14    Q.    Has it ever been higher?
15    A.    It's never existed before and it's never
16    been higher.
17    Q.    Who did Ms. Murtagh Cooke work for doing
18    this archival work with regard to audits and
19    reviews?
20    A.    Ms. Czech.
21    Q.    And what did Ms. Czech -- did you speak
22    with Ms. Czech about Ms. Murtagh Cooke's performance

206

1    in that position?
2    A.    I did.
3    Q.    And what was her statement?
4    A.    She thought her performance was good.  She
5    was moving forward with little supervision,
6    gathering the information she needed from the
7    variety of sources that she needed to get it from
8    and creating a matrix and an archive for all of this
9    data.  She also reviewed that with me two or three
10    times between January and her ultimate retirement in
11    June.
12    Q.    Other than just good, what did Ms. Czech
13    say about the quality of the work that Ms. Murtagh
14    Cooke was providing?
15    A.    It was thorough.  I know that.  That was
16    my assessment as well, from what I was looking at.
17    Her matrix that she was creating was a little
18    confusing, but not something -- not anything that
19    was a problem.  And she had identified a few audits
20    that we didn't even know about, that she had,
21    through her resources, come up with.  So she was
22    doing a good job and she completed that before she

207

1    retired.
2    Q.    And aside from the chief strategic
3    planning position, what other positions were
4    available to her besides this archival position?
5    A.    At that time the only other position that
6    was available in the Office of Management was a
7    quality assurance position, also a new position,
8    intended to ensure the credibility of -- or the
9    thoroughness of the reports and organize the entire
10    notation correspondence of flow among the board
11    members and the office directors.
12    Q.    And what level position would that be?
13    A.    15.
14    Q.    And was that offered to Ms. Murtagh Cooke?
15    A.    It was not.
16    Q.    It was not.  Why was it not?
17    A.    My assessment?
18    Q.    Yes.
19    A.    My assessment alone is that position
20    requires significant coordination and collaboration
21    with board members and the officer directors and a
22    variety of individuals.  And Ms. Cooke's approach,

208

1    although methodical, is somewhat rough at times and
2    directed.  I did not think that was particularly a
3    good blend.
4    Q.    When you say it's rough at times, can you
5    describe what you mean by that?
6        MR. LUONG:  Brian, I'm going to object to
7    this line of questioning regarding this quality
8    assurance position to the extent it's outside the
9    scope of the 30(b)(6) deposition.
10    A.    I'm not quite sure how else to describe
11    it.  Ms. Cooke is an effective employee but
12    sometimes does not always get along with everyone
13    that she's working with, and doesn't always
14    negotiate well or resolve problems well with
15    counterparts.
16    Q.    Is the quality assurance position, is it a
17    more prominent position than the chief strategic
18    planning position?
19    A.    No, they're equal.
20    Q.    And when you say that she doesn't get
21    along with people at times, what do you mean by
22    that?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:06CV01928 |
| | ) | (Judge Bates) |
| MARK ROSENKER, Chairman, | ) | |
| NATIONAL TRANSPORTATION | ) | |
| SAFETY BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BARBARA CZECH

Pursuant to 28 U.S.C. § 1746, I, Barbara Czech, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Deputy Director, Investigations, Office of Highway Safety (OHS) of the National Transportation Safety Board. I have held this position since February 2007. Prior to becoming the Deputy Director of Investigations for OHS, I served as the Associate Managing Director in the Office of Management, for approximately six years. Prior to assuming the position of Associate Managing Director, I served as a Project Manager and a Survival Factors Investigator in OHS. I have been on staff at the NTSB since 1996.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto

3. In October 2005, Ms. Marjorie Murtagh Cooke was reassigned to the Office of Management.

GOVERNMENT
EXHIBIT
4

4.    I was Ms. Cooke's supervisor while she served in the Office of Management.

5.    I told Mr. Osterman that Ms. Cooke was performing well; requiring little supervision and she was acquiring the information requested.

6.    The only complaint Ms. Cooke lodged with me while working in the Office of Management was that her work assignment was outside of the skills she previously used when working in the Office of Marine Safety of the Safety Board. Ms. Cooke expressed this complaint only once.

7.    While in the Office of Management, Ms. Cooke requested permission to travel to an international marine conference, which she had attended on behalf of the agency in years past. I inquired, and received approval for Ms. Cooke to attend the conference. Ms. Cooke retired before the date of the conference.

8.    With the assistance of Human Resources Division, I was formulating performance standards for Ms. Cooke's new program analyst position.

9.    The drafting of these performance standards was delayed because I was evaluating whether Ms. Cooke's skills were best utilized in the Office of Management or elsewhere within the agency.

10.   Ms. Cooke retired before the performance standards were finalized.

11.   If Ms. Cooke did not retire, I would have completed an annual review of her performance, upon her completion of at least ninety days under her performance standards. As a part of that review, I would have considered Ms. Cooke for a performance award.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this _____7_____ day of May 2008, in Washington, D.C.

Barbara Czech
Deputy Director of Investigations
Office of Highway Safety
National Transportation Safety Board

3

000652

2005 Annual Report

# Foreword

The National Transportation Safety Board (NTSB) is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety. The Safety Board investigates accidents, conducts safety studies, evaluates the effectiveness of other government agencies' programs for preventing transportation accidents, and reviews the appeals of enforcement actions involving aviation and seaman certificates issued by the Federal Aviation Administration (FAA) and the U.S. Coast Guard and civil penalty actions taken by the FAA.

To help prevent accidents, the NTSB develops safety recommendations based on its investigations and studies. These are issued to Federal, State, and local government agencies and to industry and other organizations in a position to improve transportation safety. Recommendations are the focal point of the NTSB's efforts to improve the safety of the nation's transportation system.

The NTSB's origins can be found in the Air Commerce Act of 1926, in which Congress charged the Department of Commerce with investigating the causes of aircraft accidents. Later, that responsibility was given to the Civil Aeronautics Board's Bureau of Aviation Safety.

In 1967, Congress consolidated all transportation agencies into a new Department of Transportation (DOT) and established the NTSB as an independent agency, placed within the DOT for administrative purposes. In creating the Safety Board, Congress envisioned that a single organization with a clearly defined mission could more effectively promote a higher level of safety in the transportation system than the individual modal agencies working separately. Since 1967, the Board has investigated accidents in the aviation, highway, marine, pipeline, and railroad modes, as well as accidents related to the transportation of hazardous materials.

In 1974, Congress reestablished the NTSB as a completely separate entity, outside the DOT, reasoning that "...No federal agency can properly perform such (investigatory) functions unless it is totally separate and independent from any other...agency of the United States." Because the DOT is responsible for both the regulation and promotion of transportation within the United States and accidents may suggest deficiencies in the transportation system, the Board's independence was deemed necessary for proper oversight. The NTSB, which has no authority to regulate, fund, or be directly involved in the operation of any mode of transportation, seeks to conduct investigations and to make recommendations from a totally objective viewpoint.

In 1996, Congress assigned the Safety Board the additional responsibility of coordinating Federal assistance to the families of aviation accident victims. In 2000, the Board embarked on a major initiative to increase employee technical skills and make its investigative expertise more widely available to the transportation community by establishing the NTSB Academy. The George Washington University Virginia campus was selected as the Academy's home. The NTSB took occupancy of its new facility in August 2003. Beginning October 1, 2006, the name of the Academy will change to the NTSB Training Center to better reflect the internal training aspects of the facility.

Since its inception, the Safety Board has investigated more than 124,000 aviation accidents and over 10,000 surface transportation accidents. To date the Board has issued about 12,350 safety recommendations pertaining to the various transportation modes to more than 2,200 recipients.

GOVERNMENT EXHIBIT
5



Since its inception, the NTSB has investigated more than 124,000 aviation accidents and over 10,000 surface transportation accidents. On call 24 hours a day, 365 days a year, NTSB investigators travel throughout the country and to every corner of the world to investigate significant accidents and develop factual records and safety recommendations with one aim—to ensure that such accidents never happen again.

To date, the NTSB has issued about 12,350 safety recommendations pertaining to the various transportation modes to more than 2,200 recipients. Because the Safety Board has no authority to regulate the transportation industry, its effectiveness depends on its reputation for conducting thorough and accurate investigations and for producing timely, well-considered recommendations to enhance transportation safety.

In 2005, the Safety Board issued 84 safety recommendations and closed 142 recommendations, 111 of which were based on actions classified as "acceptable." In aviation, 29 were closed "acceptable"; 37 in highway; 8 in pipeline and hazardous materials; 10 in marine, and 27 in rail. The Board also updated its Most Wanted list of vital safety recommendations targeted to Federal regulators and the States.

NTSB investigators generated an additional 49 safety improvements through the Safety Proposal Review Board, a program that recognizes direct interaction between NTSB technical staff and industry representatives without requiring formal NTSB recommendations.

The NTSB's role in fostering advances in transportation safety has been significant—more than 82 percent of its recommendations have been adopted by the regulatory community and the transportation industry.



Since its inception, the NTSB has investigated more than 124,000 aviation accidents and over 10,000 surface transportation accidents. On call 24 hours a day, 365 days a year, NTSB investigators travel throughout the country and to every corner of the world to investigate significant accidents and develop factual records and safety recommendations with one aim—to ensure that such accidents never happen again.

To date, the NTSB has issued about 12,350 safety recommendations pertaining to the various transportation modes to more than 2,200 recipients. Because the Safety Board has no authority to regulate the transportation industry, its effectiveness depends on its reputation for conducting thorough and accurate investigations and for producing timely, well-considered recommendations to enhance transportation safety.

In 2005, the Safety Board issued 84 safety recommendations and closed 142 recommendations, 111 of which were based on actions classified as "acceptable." In aviation, 29 were closed "acceptable"; 37 in highway; 8 in pipeline and hazardous materials; 10 in marine, and 27 in rail. The Board also updated its Most Wanted list of vital safety recommendations targeted to Federal regulators and the States.

NTSB investigators generated an additional 49 safety improvements through the Safety Proposal Review Board, a program that recognizes direct interaction between NTSB technical staff and industry representatives without requiring formal NTSB recommendations.

The NTSB's role in fostering advances in transportation safety has been significant—more than 82 percent of its recommendations have been adopted by the regulatory community and the transportation industry.

2

National Transportation Safety Board

00137

## AFFIDAVIT OF DAN CAMPBELL

City:  Washington

State:  District of Columbia.

I, **Dan Campbell**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

    1.    Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

    2.    Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

**1.    Please identify your position with the NTSB, including your position title, series, grade, and organizational units (from smallest to largest)?**

I currently am the NTSB Executive Director, an SES position. I have been in this position since January 2005. Between 2000 and the beginning of 2005, I was the NTSB's Managing Director. Before that, I was the NTSB's General Counsel.

The Managing Director is a career SES position, and has delegated authority over personnel issues. Historically, the Executive Director's position has been a Schedule C appointment and has been more concerned with policy issues. I assumed the Executive Director position for a few months in anticipation of my upcoming retirement so that I could mentor my successor as Managing Director, Joe Osterman.

**2.    Who currently are your first and second-level supervisors, by name and position title? Who were your supervisors in January 2005?**

I report to the NSTB Chairman. Since March 2005, this has been Acting Chairman Mark Rosenker. Prior to that time, I reported to then-Chairman Ellen Engleman Conners.

Page 1 of 8

Initials



000138

3.    Please identify your gender.

Male.

4.    Who determines the pay classifications for Office Directors at NTSB?

With specific regard to the assignment of SES positions, I have not been a decision
maker. There are a limited number of SES slots allocated to the Agency, and the
Chairman makes the decision where they will be assigned. As the Managing Director, I
was consulted about the assignments, but the decision was the Chairman's. We are a
relatively small agency with only 400 employees.

By way of background, at one time NTSB had a single Office of Surface Transportation
(OST), and a separate Office of Aviation Safety. The OST Director was an SES position,
and there may have been one other SES position within OST. During the period when
James Hall was NTSB Chairman, the Office of Surface Transportation was divided into
four Offices: Marine Safety, Highway Safety, Railroad Safety and Pipeline & Hazardous
Materials Safety. The thinking at that time was that the Agency would have a higher
profile if there were individual Offices dedicated to each of the four surface transportation
modes. However, when OST was split into four separate Modal Offices, we did not have
enough SES slots to raise each Director job to the SES level. This was around 1999,
during a period when I still was serving as General Counsel and did not follow the SES
issue closely.

In June 1999, around the time I was promoted from General Counsel to Managing
Director, we made a request to OPM to authorize SES slots for all of the Modal Office
Directors. I do not believe OPM granted any part of this request. As a result, all four of
the Office Directors – Joe Osterman (Highway Safety), Bob Lauby (Railroad Safety), Bob
Chipkevich (Pipeline & Hazardous Materials Safety), and Marjorie Murtagh (Marine
Safety) were classified and paid as GS-15 employees.

Because we had issues with productivity within the Railroad Safety Office, we decided to
replace its first director. I felt that Bob Chipkevich was highly qualified and
underutilized in the Pipeline & Hazardous Materials Safety Office, so we merged his unit
with the Railroad Safety Office. The resulting Office of Railroad, Pipeline and
Hazardous Materials Safety was the largest and most complex of the surface
transportation Modal Offices.

When one of our SES employees at NTSB retired, in about 2000, and an SES slot
therefore became available, I recommended that Mr. Chipkevich's position be
redesignated as an SES position because he was the most senior of the Modal Office
Directors and ran the most complex group. Chairman Hall's initial preference was for

Initials _DL_

1

1  IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3  ----------------------------X

4  MARJORIE MURTAGH COOKE          :

5              Plaintiff          :

6      v.                          :  Case No. 06-748C

7  THE UNITED STATES              :  Judge Thomas C. Wheeler

8          Defendant              :

9  ----------------------------X

COPY

10

11  Videotaped Deposition of

12  ELLEN ENGLEMAN CONNERS

13

14  Washington, D.C.

15  Thursday, October 25, 2007

16  9:30 a.m.

17

18

19

20  Job No.:  1-115016

21  Pages 1 - 169

22  Reported by:  Ellen L. Ford, RPR

RECEIVED 2007 NOV 13 P 4 07

GOVERNMENT
EXHIBIT
7


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

31

1   accident, a major airline accident, TWA 800 or

2   American 587, which is -- people usually recognize

3   because of all the media attention and, of course, the

4   great trauma and horrible loss of life that

5   accompanies those, those would take a lot of resources

6   and many years, et cetera and so forth.

7       So there's nothing wrong about the NTSB being

8   aviation centric because that's what it is by its very

9   reason to exist.

10      But that being said, because we have

11  responsibility for the other modes, and because my

12  personal and professional belief was that all safety

13  mattered in all modes, I wanted to raise the

14  attention, raise the bar, raise the resources on all

15  the other modes.

16      It would never be the same, but just to that

17  awareness itself was a major change for the Agency.

18      Q    And how did you feel that the -- was the

19  most appropriate way to go about doing that, raising

20  the bar for each one of the modes?

21      A    Well, it was a combination of a desire to

22  raise the bar, implement the President's Management

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

33

1     Everybody tell us your needs.

2          And we came up with, I think it was about 93

3     positions, if memory serves.  I want to say 93 because

4     I used it in speeches, so I'm hoping it's 93.  But it

5     was a significant number, it was a little less than

6     100, but it was a significant number of positions.

7          And what we said to everybody is don't tell me

8     you need six more people.  That doesn't help me to go

9     to Congress and sell that for you.  Because obviously

10    we couldn't do anything about an appropriation.

11         Tell me what you need and why.  So it was by

12    title, kind of a mini job description, and by grade.

13    You know.

14         I need a -- I need a materials expert.  I need a

15    Navy architect.  I need a pipeline specialist in flow

16    design XYZ.  That would be GS14 probably.  And this

17    would be, you know, probably the title -- you know,

18    kind of a job description and title versus just I need

19    the blank check.

20         So we put that together.  And along with that was

21    my desire to ensure that each of the divisions -- my

22    goal was to have each of the department heads be an

000139

highway safety, as the responsibility of that office is so visible, with 40,000 deaths on the road annually. Ultimately Chairman Hall accepted my recommendation and the RPH Office Director position was raised to the SES level.

Around 2003, we eliminated on SES from the personnel structure at the NTSB Academy by abolishing the office of President of the Academy. (The incumbent separated voluntarily.) We assigned the recovered SES slot to the Director of Office of Highway Safety position. Like Ms. Murtagh's job at OMS, the OHS Director until this time had continued to be a GS-15 position. Keep in mind that NTSB at the outset had requested SES slots to elevate all the Modal Transportation Office Directors; if we had received authorization from OPM, we would have advertised all the Director positions as SES jobs and filled them at the SES level. However, we acquired the needed slots only gradually, both by gaining new slots from OPM and by reassigning one slot from elsewhere within the Agency.

In 2004, we received authorization for another SES slot from OPM, and we assigned it to the OMS Director job. The position was filled at the SES level earlier this year.

5.     **Do some NTSB Offices have Deputy Directors who are classified as SES employees? If so, why would these Deputy Directors be SES members, while the Director of OMS would be paid on the GS scale?**

The NTSB has two offices that have SES-level Deputy Directors: the Office of Aviation Safety, and the Office of Research and Engineering. This practice goes back decades. The reasons for the SES Deputy Director positions in the two offices are slightly different.

For Research and Engineering, it is important to understand that ORE is staffed with a relatively large number of higher-level engineers who have advanced degrees such as a Ph.D. It is sophisticated, technical work, and both the Director and the Deputy Director historically have been SES employees.

Aviation Safety has long been viewed as central to the NTSB's work. It is by far our largest Office. OAS has about 140 staff members, while the other Offices have about 20 to 40 staff members. In addition, Aviation Safety is a very high visibility function. Given the size and importance of OAS to the NTSB's mission, it is understandable the Deputy Director traditionally has been paid at the SES level.

6.     **Why would the OMS Director be paid on the GS scale while the other Modal Office Directors would be classified as SES employees?**

There are several reasons why it was justifiable to elevate the classification for the ORPH

Initials DC



GOVERNMENT EXHIBIT
6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARJORIE MURTAGH COOKE,            )
                                   )
              Plaintiff,            )
                                   )
       v.                          )        No. **1:06CV01928**
                                   )        (Judge Bates)
MARK ROSENKER, Chairman,           )
NATIONAL TRANSPORTATION            )
SAFETY BOARD,                      )
                                   )
              Defendant.           )

### DECLARATION OF JOSEPH G. OSTERMAN

Pursuant to 28 U.S.C. § 1746, I, Joseph G. Osterman, declare that the following is true

and correct and based upon my personal knowledge, my review of National Transportation

Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and

information I acquired from others in the course of my performance of my official duties, and

that I am competent to testify to the matters contained herein.

1.    I currently serve as the Managing Director of the National Transportation Safety

      Board.  I have held this position since March 17, 2005.  Prior to becoming the

      Managing Director of the NTSB, I served as Director of the Office of Highway

      Safety ("OHS") for approximately eight years.  Prior to assuming the position of

      Director of OHS, I served as Highway Division Chief, Major Investigations Branch

      Chief, Highway Investigator-In-Charge, and Highway Field Investigator at the NTSB.

      I have been on staff at the NTSB since 1986.

2.    I am over the age of 18 and have personal knowledge of the matters set forth herein

      and if called as a witness could competently testify thereto.

3.    Each modal office is responsible for preparing reports setting forth the factual

      findings of an investigation, analyzing the probable cause of an investigation, and


GOVERNMENT
EXHIBIT
9

usually offering safety recommendations based upon those findings. Once the modal office has prepared its draft of the report, that draft goes through a process called directors' review. During the directors' review, the modal office presents the report to the other modal office directors and other key staff, the Managing Director, the Director of the Office of Research and Engineering ("RE "), the Director of the Office of Safety Recommendations, and the General Counsel. The directors may request that changes be made to the report. After the office directors sign off on the report, the notation process occurs.

4.  In the notation process, the report is sent to all five members of the Board simultaneously for them to consider it prior to the report being presented to them formally in public in a "Sunshine Meeting."

5.  At the Sunshine Meeting, the appropriate office director and investigators present the report to the Board. The Board may adopt the report as is, or may make changes to it. The appropriate office is then responsible to get final changes of the Board incorporated into the final report.

6.  The recommendations that follow from accident investigations are the enduring products of the Safety Board. The recommendations are the Board's means for suggesting change that will make transportation safer.

7.  Pursuant to the International Maritime Organization ("IMO") treaty, the Coast Guard and NTSB have shared jurisdiction to investigate any international marine accidents involving United States flagged vessels or in which the United States has a substantial interest.

8.  Between 2000 and 2005, the NTSB never took the lead on a marine investigation outside of the territorial seas of the United States and not involving a United States

07-MAY.'08(WED) 20:50                          FAX:01719028038           P.004
                                               To:9211442874634116    P.4/4

MAY-07-2008 13:34 From:

flagged vessel. Between 1999 and 2005, OMS launched to approximately one international accident per year.

9.  Pursuant to the International Civil Aviation Organization ("ICAO") treaty, NTSB, specifically OAS, has primary responsibility to investigate international aviation accidents involving United States registered, manufactured, or operated aircraft. Many major international aviation accidents involve one or more of these, so NTSB is involved in many major international aviation accidents. Through the treaty, the NTSB provides accredited representatives for many foreign investigations, and also assists developing nations in the persecution of their accident investigation activity.

10. When Mr. Spencer began his tenure as the SES Director of OMS, I asked him to work to: reduce the backlog of reports in OMS, as it had been taking too long for reports to be completed; repair the adversarial relationship with the Coast Guard; increase the NTSB's activity in the international marine community; and use his industry contacts to gain more visibility and credibility for the NTSB, in order to give NTSB a greater presence in the marine industry.

11. During her tenure as Director of OMS, Ms. Cooke never requested a retention allowance.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this ____7____ day of May 2008, in London, England

Joseph G. Osterman
Managing Director
National Transportation Safety Board

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARJORIE MURTAGH COOKE,          )
                                 )
          Plaintiff,             )
                                 )
     v.                          )          No. **1:06CV01928**
                                 )          (Judge Bates)
MARK ROSENKER, Chairman,         )
NATIONAL TRANSPORTATION          )
SAFETY BOARD,                    )
                                 )
          Defendant.             )

## DECLARATION OF BARBARA CZECH

Pursuant to 28 U.S.C. § 1746, I, Barbara Czech, declare that the following is true and

correct and based upon my personal knowledge, my review of National Transportation Safety

Board ("NTSB") files and records, my review of the records at issue in this litigation, and

information I acquired from others in the course of my performance of my official duties, and

that I am competent to testify to the matters contained herein.

1.     I currently serve as the Deputy Director, Investigations, Office of Highway Safety

       (OHS) of the National Transportation Safety Board. I have held this position since

       February 2007. Prior to becoming the Deputy Director of Investigations for OHS, I

       served as the Associate Managing Director in the Office of Management, for

       approximately six years. Prior to assuming the position of Associate Managing

       Director, I served as a Project Manager and a Survival Factors Investigator in OHS.

       I have been on staff at the NTSB since 1996.

2.     I am over the age of 18 and have personal knowledge of the matters set forth herein

       and if called as a witness could competently testify thereto

3.     In October 2005, Ms. Marjorie Murtagh Cooke was reassigned to the Office of

       Management.

4.    I was Ms. Cooke's supervisor while she served in the Office of Management.

5.    I told Mr. Osterman that Ms. Cooke was performing well; requiring little supervision and she was acquiring the information requested.

6.    The only complaint Ms. Cooke lodged with me while working in the Office of Management was that her work assignment was outside of the skills she previously used when working in the Office of Marine Safety of the Safety Board.  Ms. Cooke expressed this complaint only once.

7.    While in the Office of Management, Ms. Cooke requested permission to travel to an international marine conference, which she had attended on behalf of the agency in years past.  I inquired, and received approval for Ms. Cooke to attend the conference.  Ms. Cooke retired before the date of the conference.

8.    With the assistance of Human Resources Division, I was formulating performance standards for Ms. Cooke's new program analyst position.

9.    The drafting of these performance standards was delayed because I was evaluating whether Ms. Cooke's skills were best utilized in the Office of Management or elsewhere within the agency.

10.   Ms. Cooke retired before the performance standards were finalized.

11.   If Ms. Cooke did not retire, I would have completed an annual review of her performance, upon her completion of at least ninety days under her performance standards.  As a part of that review, I would have considered Ms. Cooke for a performance award.

2

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this _____7_____ day of May 2008, in Washington, D.C.

_Barbara Czech_
Barbara Czech
Deputy Director of Investigations
Office of Highway Safety
National Transportation Safety Board

000160

**EXHIBIT F4**

## AFFIDAVIT OF ELLEN ENGLEMAN CONNERS

City:   Washington

State:  District of Columbia

I, **Ellen Engleman Conners,** make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board·(NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1.      Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2.      Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated male Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1.      **Please identify your position with the NTSB?**

I am a Board member, and I am the Chairman-designate.

2.      **How long have you held this position?**

I became a Board member in March 2003, and served as Board member and Chairman. My term as Chairman ended in March 2005. I have been re-nominated to serve as Chairman, and am serving as a Board member while awaiting confirmation.

3.      **Please identify your gender.**

Female.

4.      **Describe your role in setting pay classifications and rates for Office Directors at NTSB. If you did not play a role in setting pay rates for Office Directors, please identify who did.**

I do not have a role. With regard to the number of SES positions that we have, this is handled through Human Resources through a request process to the Office of Personnel

Initials



000161

Management.

The agency is allocated a certain number of SES positions, and we have the ability to request additional slots. The NTSB has made such requests, and OPM's responses come back to Human Resources, the Managing Director and the Chairman. When a new SES position is available, we have discussions about where it should be assigned. The Chairman's office has a role in this, but it is a relatively rare event. I believe we have had SES positions to assign only twice since 2003: once when we were allocated an additional SES position by OPM and once when a position which previously had been designated as an SES was shifted to an SL position.

The Chairman is designated by statute as the chief executive officer of the agency, so technically I have been involved in making these assignments. However, this is done with the advice of Human Resources and the Managing Director.

5.    **Are you aware of disparities in pay classifications among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

I was aware that not all Office Directors were SES employees, particularly the Directors of the Office of Highway Safety and the Office of Marine Safety. The reason they were not classified as SES positions is very simple: we did not have enough SES positions within the agency. This was the situation when I came to the NTSB in 2003.

6.    **The Complainant has asserted the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond.**

I agree, although the differentiating factor is the workload.

Of course, we cannot forecast when there will be accidents. By law, all civil aviation accidents must be investigated, and there are more than 1700 such accidents each year, so the Office of Aviation Safety always has a large workload. But the situation with the other modes is different, because investigations are performed at the discretion of the agency. As a result, the number of investigations is variable. Generally, we determine whether to conduct an investigation based upon the number of deaths or the amount of property damage involved and the safety issues involved.

So the workload in the other modes varies, and is largely controlled by the Office Directors. The Directors make preliminary recommendations whether to investigate to the Managing Director and NTS Board member on duty, and a decision to proceed is made based on the established criteria and the availability of agency resources.

7.    **When were the other Office Director positions converted to SES positions? Did the Complainant ever speak with you about her classification or compensation level? Please describe the conversation.**

Initials

000162

The position of Director, Office of Highway Safety, was converted to an SES position during my tenure as Chairman when an SES slot became available. I do not know when the other Office Director positions were converted.

When I came to the NTSB as Chairman, it was my goal to make all the Office Directors SES positions either through requesting new slots from OPM or by shifting existing slots within the agency. We converted the OHS Director position first, before the OMS Director job. There are 43,000 highway deaths each year, in contrast to several hundred marine deaths. OHS is a bigger office, so we moved first with OHS and then planned to elevate the OMS position when an SES slot was available. In both situations, however, it was always understood that when the job classification was changed the incumbent Director would have to apply competitively for the new SES position.

Ms. Murtagh did speak with me once about being paid overtime. Frankly, I thought the conversation was slightly bizarre. She asked me whether I was aware she was not a member of the SES, and suggested that because she was not in an SES position the agency should pay her overtime to make up for that. I explained that the agency was looking for an additional SES slot so that the status of the OMS Director position could be raised, at which point she could apply for the job.

Ms. Murtagh was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors. I promised I would look into the situation. I discussed this with someone within the agency, either Dan Campbell or Lisa Love.

I thought the request was very bizarre. Ms. Murtagh knew we were looking for the additional SES slot, and I was encouraging her to apply for the position at the SES level when it became available.

I worked as a CEO in the private sector before coming to the NTSB, and I am accustomed to the proposition that an employee might argue for more pay based on additional performance. But Ms. Murtagh's argument was devoid of such reasoning, it was simply "Even though I am not classified as an SES employee, I'm entitled to the same pay."

8.    **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

I know there are Deputy Directors at the SES level, for example, in the Office of Aviation Safety.

The reason the OMS Director position was not classified as an SES position was that we did not have an available slot, and OMS is the smallest of the Modal Offices. Ironically,

Initials _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARJORIE MURTAGH COOKE,    )
                          )
        Plaintiff,        )
                          )
    v.                    )        No. **1:06CV01928**
                          )        (Judge Bates)
MARK ROSENKER, Chairman,  )
NATIONAL TRANSPORTATION   )
SAFETY BOARD,             )
                          )
        Defendant.        )

## DECLARATION OF EMILY CARROLL

Pursuant to 28 U.S.C. § 1746, I, Emily Carroll, declare that the following is true and

correct and based upon my personal knowledge, my review of National Transportation Safety

Board ("NTSB") files and records, my review of the records at issue in this litigation, and

information I acquired from others in the course of my performance of my official duties, and

that I am competent to testify to the matters contained herein.

1.      I currently serve as a Personnel Management Specialist in the Human Resources Division

of the Office of Administration at the NTSB.  I have held this position since February 2000.

Since April 1980, I have served in the Human Resources Division in various positions, such as

Personnel Assistant and Human Resources Specialist.

2.      I am over the age of 18 and have personal knowledge of the matters set forth herein and if

called as a witness could competently testify thereto.

3.      Senior Executive Service ("SES") slots are allocated to the NTSB from the Office of

Personnel Management ("OPM").   The NTSB cannot create new SES slots without OPM

authorization.



4.     Once the NTSB is allocated an SES slot by OPM, it can be used to create a new SES-level position or to change an existing non-SES-level position to an SES-level position.

5.     When a vacancy occurs in one of the already allotted SES slots, the NTSB can fill that slot or reallocate that slot to another position within the agency.

6.  An SES-level position can be filled by reassignment of a current SES-level employee to the position, or by a competitive recruitment process.

7.  For a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale.

8.  Historically and during all relevant time periods (2003- July 2006), NTSB's Office of Aviation Safety ("OAS ") existed as a separate unit and its director was paid at the SES level. From 2001 to 2007, John Clark was the Director of OAS.

9.  During the relevant time period, the Director and Deputy Director of the Office of Aviation Safety ("OAS") was paid at the SES level.  From 2000 into 2007, the Deputy Director of OAS was Thomas Haueter.

10. Effective November 5, 2000, ORS and OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"). Mr. Chipkevich became the Acting Director of ORPH.

11. In 2001, a SES-level employee, retired and therefore an SES slot became available. Senior officials at the NTSB determined that the position of Director of the newly created Office of Railroad, Pipeline, and Hazardous Materials Safety ("ORPH") would be assigned the available SES slot.

2

12. Pursuant to OPM regulations, NTSB is required to advertise and compete all SES vacancies that will be filled by initial career appointment. An employee who encumbers a GS-level position that is reclassified to the SES level, may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. See OPM Guide to the Senior Executive Service at 11. Mrs. Cooke has never held a career SES appointment.

13. Once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position.

14. Mr. Robert Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES.

15. In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, those requests were denied by OPM.

16. In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. Senior officials at the NTSB determined that the position of Director of the Office of Highway Safety ("OHS") would be assigned the available SES slot. The position was advertised as an SES position.

17. Mr. Joseph Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES in June 2004.

3

18.     In 2004, the NTSB requested and received an additional SES slot from OPM. Senior officials at the NTSB allocated this slot to the position of Director of the Office of Marine Safety ("OMS").   The position was advertised as an SES position.  A total of 20 individuals including Ms. Cooke submitted applications for the position.  Ms. Collette Magwood, the former Assistant Director of the NTSB Human Resources Division reviewed the qualifications of the twenty applicants and determined that ten of the applicants including Ms. Cooke met the minimum qualifications required for the position.

19.     When an SES position is advertised the NTSB Managing Director appoints a panel composed of 3-5 SES members to rate the qualifications of those applicants that the Human Resources Division determines to be minimally qualified for the position.  In this instance Mr. Daniel Campbell former NTSB Managing Director, appointed a three-person panel composed of the Directors of the Offices of General Counsel, Safety Recommendations and Accomplishments, and Railroad and Hazardous Materials Investigations.

20.     The Human Resources Division provides a rating schedule to the panel that is used to determine the best qualified candidates.  The rating schedule identifies the criteria the panel must use to rate the qualifications of the applicants.  The panel compares the experience, education, and training described by applicants to the criteria in the rating plan, and applies subjective judgment to arrive at a consensus rating on each of criteria.  The panel groups the applicants in broad categories of best qualified, qualified, and not qualified. The panel rated and ranked the ten applicants who Ms. Magwood determined

4

were minimally qualified.  After completing their review, the panel identified the five best qualified applicants and referred them to Mr. Campbell to be considered for selection.  Mr. Campbell did not make a selection from the applicants referred to him by the panel and subsequently cancelled the vacancy announcement.

21.    The advertisement was subsequently cancelled prior to a selection being made.

22. The NTSB readvertised the Director of OMS position as an SES position in early 2005.

23. Ms. Cooke submitted an application under both announcements.

24. A total of twenty applicants were accepted.  Ms. Magwood reviewed the qualifications of the twenty applicants, and in this instance determined that fifteen of the applicants including Ms. Cooke met the minimum qualifications required for the position.  Mr. Campbell appointed a new five member SES panel to rate the qualifications of the applicants. This panel was composed of the Directors of the Offices of Aviation Safety; Highway Safety; Railroad, Pipeline and Hazardous Materials Investigations; Safety Recommendations and Accomplishments; and, Research and Engineering.   The panel rated and ranked the 15 applicants who Ms. Magwood determined were minimally qualified.  After completing their review, the panel identified the five best-qualified applicants and referred them to Mr. Campbell to be considered for selection.  The panel did not rank Ms. Cooke among these five and she was not referred to Mr. Campbell.

25. The NTSB recommended Mr. John Spencer for this SES position to OPM, and he was approved for an appointment to the SES

5

26. Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005 until the date of her retirement, on July 3, 2006.

27. GS-15 employees are eligible for overtime pay within the federal system. However, there is a limit on the amount of overtime pay that GS employees may receive. Ms. Cooke was eligible to receive overtime pay to the extent that her total salary did not exceed the greater of GS-15, step 10 or level V of the Executive Schedule, as set by Congress. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, she was only eligible to receive in overtime pay an amount equal to the difference between her salary and the pay limitation.

28.    Overtime is defined as hours of work outside of the employee's normal tour of duty that are officially ordered or approved in advance by a supervisor before the hours are worked. Overtime incurred in connection with an accident investigation does not necessarily require prior approval, but may be discussed with a supervisor during the investigation and followed up with documentation requesting approval.

29.    Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301, an agency may pay a retention allowance

> [W]hen an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301 (2006).

30.    NTSB employees who hold Senior Level ("SL") positions must demonstrate technical competencies.

6

31.    An SL designation is not appropriate for a position that requires the employee to perform supervisory duties more than 25 percent of the time.

32.    Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase.

33.    Performance awards are based upon performance and are not intended to augment one's salary.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this _____ 7th _____ day of May 2008, in Washington, D.C.


_Emily Carroll_

Emily Carroll
Human Resources Specialist
National Transportation Safety Board

7

000140

and OHS Directors first, given the limitations on the number of SES positions available to the Agency.

An important factor is the significance of the undertaking within the respective offices. The RPH Director runs a larger organization than OMS, and also must be conversant in multiple disciplines. The OHS Director also runs a larger organization than OMS and has a much higher public profile because highway safety is a very visible matter of public concern.

By comparison, the role of OMS is not as large. Accident investigation jurisdiction over commercial maritime activities is a shared responsibility of NTSB and the Coast Guard. This is the only mode where NTSB is not the primary federal investigative authority for major transport accidents. Consequently, NTSB has a reduced ability to have a significant effect in the area of marine safety, except for promoting better safety practices in the recreational boating area.

7.  **The Complainant has commented that the responsibilities of the OMS Director are virtually identical to the responsibilities of the other Office Directors, and require the same skill set. If this is the case, shouldn't the Office Directors receive the same compensation?**

Ms. Murtagh's argument about the comparability of skills is largely correct, but doesn't tell the whole story.

As I mentioned, the Railroad, Pipeline and Hazardous Materials Director needs to have a strong understanding of a broader range of transportation categories than the OMS Director. In addition, the Director needs to run the office, master the subject and be able to handle both external and internal responsibilities.

The skill set for the Aviation Safety Director may look similar on paper, but the number of times the Aviation Safety Director is called upon to perform investigations is dramatically higher than the Marine Safety Director. In truth, although all the Offices are important in their work, Aviation Safety is at the core of the NTSB's federal presence, from a budgetary standpoint, as well as from the standpoint of public recognition.

But I do believe OMS warrants an SES director. The issue for NTSB was always that of the allocation of a scarce resource. Of the modal offices, it was quite sensible to reach OMS last.

8.  **Did the Complainant speak with you about her concerns regarding compensation? Please describe the conversation.**

I do not recall Ms. Murtagh complaining to me about when the OMS Director's position

Initials



GOVERNMENT
EXHIBIT

12

000141

would be reclassified as an SES job. Nor did she ever raise compensation with me. Generally, it was understood that all the Office Director positions would be converted to SES jobs as SES slots were made available to the Agency.

9.  Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?

See #5, above.

10.  Did any SES positions open in lower-tiered levels of the Agency that could have been transferred to the OMS Director's position?

No. One that came open was used for Highway Safety.

I want to note that the Agency has senior female employees who are in the SES. For example, during the time period when we were creating the separate Modal Offices and trying to get SES slots for the Office Directors, we created the NTSB Academy. At one point, there were two SES employees at the Academy, although there is now only one SES employee, Director Julie Beal, who is female.

The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female and occupies an SES position. Also, the Director of our Office of Administration, Lola Ward, is female and a member of the SES. In fact, three of the last four persons selected by the NTSB for SES positions have been female.

I want to add that we were having chronic problems with the pace and quality of work coming from the Office of Marine Safety, and as a result I have needed to have more interaction with OMS than would normally be the case. I am providing the EEO Investigator with a copy of an employee exit interview that was conducted by the Assistant Managing Director, Barbara Czech, in August 2002. I had conducted several exit interviews with departing OMS employees, as turnover seemed high in the office. In this instance I asked Barbara to do the interview with Jamie Estock. The departing employee, Ms. Estock, had worked in OMS for over a year on a cooperative program and, I believe, had converted at Ms. Murtagh's request to full-time federal service. She had been a good performer. She left for a private sector job. When explaining why she left, she commented that the "progress of work products [in OMS] was too slow and she was afraid it would affect her work ethic." This was typical of the feedback that I was receiving from employees in OMS.

11.  The Complainant alleges she was not allowed by senior management to fill key

Initials

000142

vacant positions in the Office of Marine Safety. If so, what was your role in this decision? If you did not have a role, who did? What is your understanding of the reason (if any) that Complainant was not allowed to fill vacancies in her unit?

It is true that I stopped Ms. Murtagh from hiring several employees during my tenure as Managing Director.

With regard to the Marine Accident Investigator position, this job was being filled earlier this year around the time we had begun to advertise the OMS Director job as an SES position. Because there was a possibility there would be a change in the leadership of the Marine Safety Office, I became more interested in the staffing of the unit. With regard to the particular individual whom Ms. Murtagh selected for the Investigator position, I noted that the person also had applied for the OMS Director job. Frankly, I thought it was strange that a person applying for a mid level investigator position also felt qualified to run the office. I also thought that it was only fair that if a new person was hired as the OMS Director, the Director should have a chance to hire his or her own person into the Investigator position.

With regard to the Chief of Report Development, Ms. Murtagh wanted to fill the position with an employee who already was working for her within OMS. This individual informed me that she had applied for the position because she wanted to block another staff member from getting the job because they were incompatible. I knew the selectee, and although I felt she was a good editor, I did not feel she would be able to manage the investigators who are a key part of the report-generating process. I already had experienced problems getting good reports completed from the OMS unit, and I cite as one example the OMS investigation of the accident involving the Staten Island ferry crash, the Barberi. The investigator responsible for the investigation wanted to quit the Office before he completed the report. I personally had to plead with him to stay on to complete the work. He complained that the problem was the manner in which OMS and Ms. Murtagh were handling him and the investigation. In order to get the report finished, I ultimately lifted the investigation out of OMS and supervised the project myself from the Managing Director's office.

With regard to the Deputy Director position within OMS, this once had been occupied by Don Tyrell. Ms. Murtagh at one point was allowed to hire a Deputy Director, Paul Voorhees, who subsequently left the NTSB and went to the courts. He did not have a marine safety background. Personally, I do not recall a request to fill the Deputy Director position after Mr. Voorhees left.

Normally, I did not view it as my role to tell an Office Director like Ms. Murtagh that she could not hire the employees of their choice. However, I felt Ms. Murtagh did not have good judgment with selections. I recall that I once received a visit from the Agency's ethics office concerning an applicant for an OMS job who had a background with cruise

000143

ships. He was hired, and subsequently quit under a cloud. I became involved with this employee again through the exit interview process. I had been concerned about the initial hire; ultimately, I felt the experience showed that my instincts on this were right, and Ms. Murtagh's wrong.

Finally, although I am not sure it is relevant to Ms. Murtagh's complaint, I want to state that I was not involved in any way with the selection for the OMS Director position when it was posted as an SES job earlier this year.

12.  **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill, and why?**

First, I want to note that Ms. Murtagh was allowed to fill many vacancies in OMS during the period encompassed by her complaint, including some selectees who ultimately didn't work out.

Second, Ms. Murtagh was not treated differently from the male Office Directors. Generally, everyone's staffing level is down. In fact, relative to the size of her agency compared with the other Modal Offices, I think Ms. Murtagh actually has been allowed to hire more employees than the other Directors, in part because she had a relatively high turnover rate in OMS.

13.  **What other witnesses do you believe have information that would be relevant to this discrimination claim?**

The Investigator might consider speaking with Bob Chipkevich and Joe Osterman with regard to the pay issue and the SES slots. Mr. Osterman might be asked whether he felt discriminated against when Mr. Chipkevich was given an SES slot, and Mr. Osterman was not.

14.  **Do you have any documents that are relevant to the Complainant's allegation of sex and pay discrimination? If so, please provide them.**

I have attached three letters regarding the requests for new SES at OPM. They will show (1) that the agency allotment was 14 at the time we first requested new SES for each of the modal offices. (2) The request was denied in whole. (3) In 2004 we finally received an increase of one SES which was then allocated to the Office of Marine safety.

15.  **To the extent other Office Directors were paid a higher salary than the Complainant, or were allowed to fill vacancies when the Complainant was not, was**

Initials

000144

the different treatment accorded to the Complainant prompted by her sex?

No, the determination which Office Director position would be classified as an SES position was not made based upon sex, and Ms. Murtagh was not discriminated against when we made these choices. With regard to the allegation she was denied opportunities to fill vacant positions, I do not believe this is true or that she was treated differently from her male counterparts. Moreover, even if this had occurred, it was not because of her sex.

16.    Is there anything else you would like to add?

I want to add that I find it remarkable Ms. Murtagh never had a conversation with me about her feeling that the job classification for the OMS Director was discriminatory. She was fully aware I was seeking SES slots for all the Office Director jobs.

I have read the above statement consisting of 8 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10/17/06
Date

Dan Campbell

Witness

Page 8 of 8                                                              Initials DC

1            IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF COLUMBIA

3   - - - - - - - - - - - - - x

4   MARJORIE MURTAGH COOKE

5                Plaintiff        :

6   vs.                          :    Civil Action No.:

7   MARK ROSENKER, CHAIRMAN      :    06-7480
    NATIONAL TRANSPORTATION
8   SAFETY BOARD                 :

9                Defendant       :

10  - - - - - - - - - - - - - x

11

12

13                          Washington, D.C.

14                          Wednesday, November 28, 2007

15

16

17  Deposition of:

18                  MARJORIE M. COOKE

19  the Deponent, called for examination by counsel for the

20  Defendant, pursuant to notice and agreement as to time

21  and place, at 501 3rd Street, N.W., Washington, D.C.,

22  before Sean Williams, a Notary Public in and for the

23  State of Maryland.

24

25

GOVERNMENT
EXHIBIT
13

1      A.   No.

2      Q.   All right.  So let's start.  Can you tell me

3    about your educational background briefly after high

4    school?

5      A.   I went to the Bellevue School of Nursing in New

6    York for a year and decided then to not pursue nursing,

7    went to the -- I went to two community colleges in New

8    York, one at Orange County and the other at Rockland

9    County.  Rockland County Community College, I finished my

10   associates degree in -- I think it was science and

11   engineering.  And then I graduated -- I went to the State

12   University of New York Maritime College and graduated

13   from there with a bachelor of engineering degree in 1974.

14     Q.   Any other degrees?

15     A.   Other than the associates degree, no.

16     Q.   And did you have a field of special admission?

17     A.   At Maritime College?

18     Q.   Um-hum.

19     A.   Yes, marine engineering and Naval architecture.

20     Q.   Let's talk about your employment.  After you

21   graduated from the Maritime Academy, can you tell me

22   about your work history?

23     A.   Yes.

24     Q.   Okay.  I know that goes back to, what is it,

25   the 1970s, but if you can keep it brief.

1  anything.

2          I think I've covered it all.  No awards.  I

3  wasn't given any opportunity even to even review how well

4  I was doing, how well I was not doing, if that were the

5  case, in the latter two positions, as well as the latter

6  part of -- after April of 2004, after I had spoken to the

7  Chairman, from that point on I was treated very, very

8  poorly.

9      Q.    Okay.  You have listed now a number of actions.

10  Specifically, who do you claim retaliated against you?

11     A.    The Chairman of the Safety Board.

12     Q.    Who would be?

13     A.    Ellen Engleman-Connors.  The Managing Director,

14  Daniel Campbell, the new Managing Director, Joseph

15  Osterman, the members of the panel for the 2005

16  readvertised SES position, the now Chairman, Mark

17  Rosenker, the former General Counsel, Ron Batachi

18  (phonetic sp.).  Would you like me to -- you held up your

19  hand.  Do you want me to stop or --

20     A.    I'm writing as fast as I can.  I was just

21  hoping you'd slightly slow down so I can get the names.

22     Q.    Oh, certainly.  If you'd asked me to slow down,

23  I'd be happy to do that.  I just didn't understand your

24  signal.

25     A.    Sure.  I didn't want to completely interrupt

```
 1    your flow.  I'm sorry.  You said Mark Rosenker and then

 2    you said --

 3         A.   The former General Counsel, Ron Batachi.

 4         Q.   Okay.

 5         A.   My supervisors, Elaine Weinstein when I was in

 6    the Office of Safety Recommendations and Accomplishments,

 7    and my -- it's still not clear to me who my supervisor

 8    was when I was in the Office of the Managing Director, so

 9    it was either Joseph Osterman or, by default, one of his

10    deputies, whoever it was that was responsible for giving

11    me and making sure that I had them.  I assume it's Joe

12    Osterman actually who was responsible to make sure that I

13    had performing standards and give me an opportunity to

14    not just to perform, but to -- and, of course, Mr.

15    Osterman in particular because he denied me the

16    opportunity to continue to pursue my marine career.

17         Q.   Okay.  Anyone else?

18         A.   I think that's everybody.

19         Q.   Let's start with Ms. Connors.  Can you tell me

20    what she did that you claim was retaliatory?

21              MR. SCHER:  Well, just one second, okay?  I'm

22    going to let her answer.  I'm objecting to this line of

23    questioning as misleading and possibly a

24    mischaracterization, so the -- Ms. Murtagh Cooke's

25    obviously not a lawyer.  The details of her allegations
```

1    of discrimination are as outlined in her complaint and

2    various motion practice and discovery that's already been

3    submitted.  Having said that, she can answer all the

4    questions you want to ask.  I just don't want it to be

5    interpreted that her testimony is in any way limiting

6    those claims.  Go ahead.

7            WITNESS:  Thank you.

8            MS. McBARNETTE:  Okay.  In general objections

9    shouldn't be speaking objections, so any grounds for

10   objections, I'd prefer if we could keep them short.  But,

11   in any event --

12           MR. SCHER:  Okay.

13           BY MS. McBARNETTE:

14       Q.   -- I was asking you about your retaliation

15   claim and you said earlier that you believe that Ms.

16   Connors retaliated against you.  Could you please tell me

17   what she did that you believe was retaliatory?

18       A.   When I spoke with Ms. Connors in 2004 I was

19   asking her for some way to make my pay comparable to my

20   male counterparts, the other modal directors, and after

21   that meeting Ms. Connors refused to meet with me again

22   and I believe retaliated in her role with regard to the

23   advertisement and decision to readvertise the position in

24   2004.

25       Q.   Are you saying that she had a role in

 1   advertising that position again?

 2        A.   Yes, she did.   She had a role in advertising

 3   and in the readvertisement of that position.   The lack of

 4   equal pay, of course, is a separate issue, I think.

 5   Again, I'm not the lawyer.   So she, along with Dan

 6   Campbell, denied me the opportunity even to be

 7   interviewed for that position.

 8             She denied me an evaluation.   The evaluation

 9   that I received for 2004 -- 2003/2004 was signed by Ms.

10   Engleman-Connors, but it was never given to me by Ms.

11   Engleman-Connors.   She had given me my evaluation in 2003

12   for the 2002/2003 evaluation.   I had had a personal

13   meeting with her.   She told me how wonderful a job I was

14   doing.   It was absolutely outstanding.   And she had me

15   sign the paperwork and she signed the paperwork at the

16   same time.

17        Q.   What year was this?

18        A.   This was in November, I believe, of 2003.   Yes,

19   November of 2003, so that was my 2002/2003 evaluation.

20   Okay.

21        Q.   Do you recall when Ms. Connors became or

22   entered her position?

23        A.   In 2002, I believe.

24        Q.   Could you give me the beginning of the year,

25   the middle of the year, the end of the year?

1      A.    Yeah.   I'm sorry because we had Marian Blakey

2    before that and Marian Blakey was moved over to the FAA.

3    I'm trying to remember even in terms of accidents if I

4    can recall when she became Chairman, but I know that

5    throughout 2003 we had had -- virtually every major

6    accident was marine and Ellen Engleman-Connors had been

7    on scene for a number of them.   I think she was in

8    training for the Norway.   Again, I don't have the exact

9    dates that Ellen Engleman-Connors became Chairman.   I'm

10   sure the Board can provide you with that information.

11     Q.    So let me get back to my original question.

12   You were telling me the ways that Ms. Connors retaliated

13   against you and you began to talk about getting an

14   evaluation or the failure to get an evaluation.   Can you

15   elaborate on that, please?

16     A.    Yes.   I received an evaluation in 2003 from Ms.

17   Engleman-Connors.   In 2004 I did not receive an

18   evaluation from Ms. Engleman-Connors.   The evaluation

19   paperwork was placed in -- the first time I saw it was

20   when it was given to me at the end of the informal

21   investigation that was conducted by Paul Greenberg

22   (phonetic sp.) who was a contract investigator for the

23   Safety Board on this -- on my EEO suit.   So the first

24   time I saw that paperwork was in, I don't know, December

25   of 2005, I think.   I never saw the evaluation that was

1    apparently signed by Ms. Engleman-Connors sometime in

2    2004 or early 2005. I don't know which. So that's -- I

3    had no opportunity to review the evaluation. I had no

4    opportunity to appeal the evaluation since apparently it

5    was a downgrade from outstanding to exceeds fully

6    successful. I had no opportunity to do anything about

7    it.

8         Q.    Why not?

9         A.    I didn't get it. I did not get an evaluation.

10   Without a written evaluation there's nothing to appeal.

11        Q.    Did you ask for an evaluation?

12        A.    I did.

13        Q.    Do you recall when you asked for it?

14        A.    I asked for my evaluation from Dan Campbell on

15   -- I believe it's either January 3rd or January 4th of

16   2005 or a copy of it. And, excuse me, I followed up

17   asking to meet with Ellen Engleman-Connors several times

18   after that, but she refused to meet with me.

19        Q.    And when you asked to meet with her, did you

20   specifically say it was for your evaluation?

21        A.    I did on one occasion. That's correct.

22        Q.    Okay. I didn't want to stop you. If you can

23   continue with other actions that you think was

24   retaliatory on the part of Ms. Connors.

25        A.    Okay. The 2005 readvertisement of the position

1  -- Ms. Engleman-Connors was Chairman, I believe, up

2  until March of 2005, and then she became Chairman in

3  Waiting or something, Chairman Designate -- sorry,

4  Chairman Designate.  So from -- so during that time

5  period she was involved in the recruitment, the secondary

6  advertisement -- the second advertisement for the

7  position and the recruitment.  She was also involved in

8  the -- according to Joe Osterman, she was also involved

9  in the decision --after he had told me he wanted me to

10 submit bullets for an SL position, he indicated that she

11 was the -- one of the members of the group that had said

12 no, they would not even consider me for an SL position.

13 And my removal from the Office of Marine Safety.

14      Q.   Okay.  You also mentioned that Dan Campbell

15 retaliated against you.  Can you tell me how you believe

16 he retaliated against you?

17      A.   Dan Campbell was the person who signed the

18 piece of paper that said readvertise.  He refused to

19 interview me for the position even though I was

20 considered one of the highly qualified candidates for the

21 position.  He retaliated in downgrading me without giving

22 me any opportunity to review my evaluation, did not give

23 me an evaluation.

24      Q.   He retaliated by downgrading you or he

25 retaliated by not giving you an opportunity to appeal his

1    decision?

2        A.    Both.    He retaliated by speaking to the group

3    that were evaluating the recruitment in 2005.

4        Q.    I'm sorry.    I'm not following you.

5        A.    When he readvertised -- when he chose to

6    readvertise the position, he told me that the executives

7    had decided to readvertise for one reason.    Others have

8    testified that he told them that he was readvertising, so

9    I don't know what went on in the conversations, but I do

10   know that there were conflicting conversations.

11       Q.    So what did he do that was retaliatory?

12       A.    By refusing to give me an interview, by

13   readvertising the position with directions, I believe, to

14   the group who were evaluating, who were paneling the

15   position when it was readvertised.

16       Q.    What directions?

17       A.    Not to include me on the list, and that is -- I

18   can't tell you what he specifically said because I was

19   not there.    I can tell you that based on my analysis of

20   the facts, that's what I believe occurred.

21       Q.    Okay.    Let me talk about this for a second.

22   You alleged that Dan Campbell told the panel members for

23   the second advertisement not to include you on a list.

24   Which list is this?

25       A.    The list for interview for the position.

1      Q.   And you believe this because someone told you

2  that's what he did?

3      A.   I believe -- based on the facts of what I have

4  read, reviewed, so far in this case, I believe that.

5      Q.   But you don't come to this conclusion because

6  someone on the panel told you that Dan said that to them?

7      A.   I came to that conclusion based on a whole

8  series of facts, and some of that is based on testimony

9  from members of the panel at different times.

10     Q.   But I'm just trying to be really clear.  Did

11  anyone on the panel come to you and say Dan Campbell told

12  us not to place you on the interview list?

13     A.   No.

14     Q.   Did anyone outside the panel come to you and

15  say Dan Campbell told the panel not to put you on the

16  interview list?

17     A.   Repeat that question, please.

18     Q.   Did anyone outside the panel come to you and

19  say Dan Campbell told the panel not to put you on the

20  interview list?

21     A.   No.

22     Q.   And Dan Campbell never told you that he told

23  the panel not to put you on the interview list?

24     A.   No, he told me something completely different.

25     Q.   How is it that you come to the conclusion that

1    Dan Campbell told the panel not to put you on the

2    interview list?

3        A.    Because Mr. Campbell has made conflicting

4    statements about what he -- what the outcome of that

5    decision was with the readvertisement and his statements

6    conflict with what others have stated, and he made it

7    perfectly clear that -- in his deposition that he would

8    not consider it.  So I don't think that he would have

9    held back.  If he were willing to state it in a

10   deposition, I doubt he would have been reluctant to state

11   it to the members of the Executive Review Board.

12       Q.    So this is just a theory of yours?

13             MR. SCHER:  Objection, misleading.  Go ahead,

14   you can answer.

15             WITNESS:  Yeah, it's my analysis of the facts.

16             BY MS. McBARNETTE:

17       Q.    Your conclusion to what must have occurred?

18       A.    It's my analysis of the facts.

19       Q.    Your interpretation of the facts?

20             MR. SCHER:  Objection, asked and answered,

21   argumentative.  You can answer.

22             WITNESS:  My analysis of the facts.

23             BY MS. McBARNETTE:

24       Q.    And, again, you facts -- your analysis of the

25   facts is not based on anybody's actual testimony to you

```
 1    of a conversation that they had with Dan Campbell

 2    informing that he said that you shouldn't be included on

 3    the interview list?

 4        A.    No, that's correct.

 5        Q.    All right.  So you were listing the ways in

 6    which Dan Campbell retaliated against you.  Can you

 7    repeat to me what I've --

 8        A.    Sure.

 9        Q.    -- already listed so -- okay.  What I have is

10    you discussed the readvertisement of the SES position.

11        A.    I'm sorry.  He?

12        Q.    You discussed the readvertisement of the SES

13    position.  You discussed a refusal to interview you for

14    the position.  You discussed the downgrading of your

15    evaluation, I believe, in the 2003 to 2004 time period.

16        A.    Correct.

17        Q.    You discussed not getting that evaluation --

18        A.    Not receiving it, that's correct.

19        Q.    -- until a later date.

20        A.    Or seeing it the first time, so it was never

21    handed to me by anybody in my chain of command.

22        Q.    And you discussed an assumption that Dan

23    Campbell told the panel not to include you on the list.

24            MR. SCHER:  Objection, mischaracterization.

25            BY MS. McBARNETTE:
```

1    Q.    That is what I have.  Is there anything else

2    that you'd like to add to what you believe Dan Campbell

3    did to retaliate against you?

4    A.    He did not give me an interim evaluation either

5    in -- well, 2005 is when he moved on from -- and he did

6    not give me a final evaluation for 2004/2005.

7    Q.    Okay.  Let me back up.  No interim evaluation

8    from what time period?

9    A.    2004/2005.

10    Q.    Okay.  And no evaluation for what other time

11    frame?

12    A.    2004/2005.

13    Q.    No.  You said an interim evaluation for 2004 to

14    2005, and then you also said an evaluation -- a different

15    evaluation?

16    A.    By law you're required to give two evaluations

17    to personnel.  One is an interim and the second one is a

18    final.  Now Mr. Campbell claims that in January of 2005

19    he moved from the Managing Director position to the

20    Executive Director position.  I don't have any firsthand

21    knowledge of that other than what he says.  The

22    announcement of that change was not made until March of

23    2005 so, again, I don't know -- I don't have access to

24    his personnel folder to know precisely when it is he

25    moved from one position to the other, and Joe Osterman

 1 would have then become my immediate supervisor.  But Mr.

 2 Osterman or Mr. Campbell, one of those two people as the

 3 Managing Director, was required to give me an evaluation

 4 for 2004/2005 and I never received one.

 5     Q.    Okay.  Is that it for Dan Campbell?

 6     A.    Dan Campbell was also involved in, as I

 7 understand it from Joe Osterman, the decision not to

 8 consider an SL position that he had asked me to provide

 9 bullets for, that he had offered and asked me to provide

10 bullets for.  He claims that he had political management,

11 indicating Dan Campbell, Ellen Engleman-Connors and Mark

12 Rosenker, as the people who would not permit that to

13 occur.  And there may be other things that I'm

14 overlooking at this moment, but I believe that captures

15 most of it from Dan Campbell.

16     Q.    Okay.  Let's talk about Mr. Osterman.  Can you

17 give me a list of what you believe he did to retaliate

18 against you?

19     A.    Yeah.  Mr. Osterman was on the first panel in

20 2005 in which he claimed my name was not put forward for

21 -- or was not going to be put forward for an interview,

22 but in March he recused himself from that panel and they

23 held a second panel.  The --

24     Q.    So -- I'm sorry.  Please go ahead.

25     A.    No.  Please go ahead.

1     Q.  I just wasn't understanding.  What did he do?

2  What was retaliatory?

3     A.  In the evaluation for an interview, the

4  evaluation of the -- yeah, an evaluation to determine if

5  I should be considered for an interview for the position

6  I'd held for the last ten years, Mr. Osterman testified

7  that he was part of the first panel that decided not to

8  include my name on the list, so I believe he retaliated

9  then.

10        He retaliated in May of 2005 when he absolutely

11  refused to let me remain in the Office of Marine Safety

12  when he replaced me with a person from Highway Safety who

13  was in charge of administrative work, gathering uniforms

14  for personnel, that type of thing.  He replaced me with

15  him.  He had him present a report that I had completed.

16     Q.  I'm sorry.  Could you tell me who you're

17  talking about?

18     A.  Bob Barlett is the gentleman's name who was put

19  in my position in June of 2005.

20     Q.  And what position was that?

21     A.  Director of the Office of Marine Safety.  Mr.

22  Barlett has absolutely no marine background.  Mr.

23  Barlett, as I said, was known throughout the Agency as

24  the chief of stuff.  He was asked to -- he was assigned

25  to that position.  He presented a report, the Tacky 2

1    (phonetic sp.) which I had completed in early June of

2    2005.  He presented it to the Board as his report.  He

3    was in that position until the fall of 2005, and I was

4    removed and placed in the Office of Safety

5    Recommendations and Accomplishments.

6         Q.    When were you removed?

7         A.    June of 2005.

8         Q.    And were you removed after you did not receive

9    the SES position?

10        A.    Yes.

11        Q.    Were you removed after someone, excuse me, was

12   selected for the SES position?

13        A.    Yes.  Again, this is only information that I

14   have based on what people told me, so I don't have the

15   exact dates of things occurring.  I take that back.

16   Based on what they have told me, they had selected

17   someone for the Director position, Jack Spencer, and they

18   were going to make the announcement and I was being

19   removed.

20        Q.    So what was retaliatory then was that Bob

21   Barlett was put in what was your position?

22        A.    Director of the Office of Marine Safety.

23        Q.    And then what else was retaliatory?

24        A.    I was removed from the office.  That was the

25   main issue.  I was removed from my career position, my

1  marine career position.  I was not even allowed to

2  remain in the Office of Marine Safety.  I offered to

3  assist with the transition to make it as easy on my staff

4  as possible, that I would work for Jack when he came in

5  to help make him successful, and I was told hell, no, you

6  are out of here by Joe Osterman.

7      Q.    Is there anything else that Mr. Osterman did

8  that you believe was retaliatory?

9      A.    Yeah.  Mr. Osterman also denied me equal pay

10  during the time period that he was Managing Director.

11      Q.    During the time period that he was Managing

12  Director he denied you equal pay.  What position were you

13  holding at the time?

14      A.    Director of the Office of Marine Safety.  The

15  announcement that he was made the new Managing Director

16  came out, I believe, in March, so between March and June

17  I was still the Director of the Office of Marine Safety.

18  Mr. Osterman was aware that I was involved in an equal

19  pay complaint and he also did not do anything to equalize

20  my pay.

21      Q.    And what would that have involved in order to

22  equalize your pay?

23      A.    That would have been a number of options.  I

24  think I've already talked about those in my Equal Pay Act

25  suit.  But he could have used whatever system was allowed

1  by OPM and certainly within NTSB.  NTSB had used a

2  number of procedures that -- their interpretation of the

3  regulations had apparently allowed them to use an SL

4  position in the past for an increase in pay and they had

5  done that.  They had used an SL position.

6      Q.    Okay.  I would like to know if there is

7  anything else that you'd like to include in the

8  retaliatory acts for Mr. Osterman.

9      A.    Let's see, we've gotten up through June of

10 2005.  When he moved me to the Office of Safety

11 Recommendations and Accomplishments, in October 2005 he

12 moved me to the Office of the Managing Director, and

13 throughout that time period he refused to let me work on

14 anything marine right through to my retirement in July of

15 2006.

16         He did not give me any performance standards.

17 He did not give me any interim evaluations, any final

18 evaluations, any opportunities to achieve awards even in

19 the administrative position he had placed me in or

20 positions he had placed me in.  And, again, I think that

21 covers everything, but I'm not positive.

22     Q.    You mentioned that you thought the 2005 panel,

23 which is the panel comprising -- well, I should back up.

24 For the 2005 panel, the panel that existed after the SES

25 position was readvertised, you mentioned you thought that

1    panel retaliated against you and I wanted to find out

2    which members of the panel are you alleging retaliated

3    against you.

4        A.    I'm going to say all of them because the

5    summary evaluation for my assessment based on the

6    recruitment action had technical requirements for the

7    position, and one of the technical requirements was sea

8    time.  I say that because that's what Mr. Osterman

9    testified to.  They were specifically looking for people

10   who had time at sea aboard ships.  Clearly, I had time

11   aboard ships at sea and I was deemed not qualified.  In

12   2004 -- my credentials hadn't changed in that time period

13   -- I was deemed qualified in that same element.

14       Q.    Do you recall if the sea time category was a

15   requirement or was just deemed desirable?

16       A.    In the 2004 panel, in order to be qualified you

17   had to have both the mandatory and desirable

18   qualifications.  In the 2005 panel, I believe that was

19   changed, but --

20       Q.    So in 2005 --

21       A.    -- I'm basing that on memory, not having a

22   piece of paper in front of me, so I don't know.

23       Q.    That's fine.  But in 2005, was it a mandatory

24   requirement or desirable category?

25       A.    It was a desirable, is what it was listed as.

1    Q.    Okay.  Who were the members of the panel for

2    2005?

3    A.    I'm going to have to go on other people's

4    testimony here because I was not part of the panel, so

5    all I can do is tell you what I have heard were the

6    members of the panel, but I don't actually have firsthand

7    knowledge of it.  If you'd like me to speculate on that,

8    I'll do that, but I believe that there were -- again, I'm

9    going to ask you if that's what you'd like me to do, to

10   give you my secondhand information as to who was on the

11   panel.

12   Q.    Well, when did you get the secondhand

13   information?  How did you come to understand who was on

14   the panel and when?

15   A.    Some of it was from testimony.  Some of it was

16   from, I think, pieces of paper.

17   Q.    Testimony during the course of this litigation?

18   A.    Correct.

19   Q.    But when you were working for the Agency, you

20   weren't aware of who was on the second panel?

21   A.    That's correct.

22   Q.    So even though you don't know who was on the

23   panel, you believe they retaliated against you anyway, is

24   that correct?

25   A.    Even though I don't know everybody who was on

1    the panel, do I believe they retaliated against me?

2        Q.    Right.

3        A.    Yes.

4        Q.    So you aren't claiming that specific

5    individuals retaliated against you, I guess, then on the

6    panel?  Is it the panel at large or specific individuals

7    that retaliated against you?

8        A.    Well, the panel's made up of specific

9    individuals.

10        Q.    And each one retaliated against you?

11        A.    All I have is the summary of what their

12    assessment was, so I don't have any of the discussion

13    that went on.  I do know that there were two members of

14    the panel in 2004 who were also on the 2005 panel.

15        Q.    Who were they?  Did you know that at the time

16    when you were working for the Agency?

17        A.    No.

18        Q.    Okay, but you know it now?

19        A.    But I -- yes, I believe I know it now.

20        Q.    Okay.  Tell me who --

21        A.    One was Bob Chipkevitch (phonetic sp.) and the

22    other one was Elaine Weinstein (phonetic sp.).  The third

23    one I definitely knew at the time and that was the

24    General Counsel, Ron Batachi.

25        Q.    And you believe he was on the second panel?

1      A.    No, he was not on the second panel.  He was on

2   the first panel only.

3      Q.    And you believe the first panel discriminated

4   against you?

5      A.    No.  The first panel determined that I was

6   highly qualified.

7      Q.    So I'm just trying to be clear.  Do you believe

8   that Ron Bartowski [sic] retaliated against you?  You

9   mentioned his name, so I'm trying to --

10      A.    Oh, you're talking about when he was on the

11   first panel?  No, that is not part of the retaliation.

12      Q.    Okay.

13            REPORTER:  Sorry, counselor.  You guys are

14   talking over each other.  Try not to.  Thanks.

15            BY MS. McBARNETTE:

16      Q.    Do you have any reason to believe why Bob

17   Chipkevitch would retaliate against you?

18      A.    Only his conversations with Dan Campbell.

19      Q.    That he told you about?

20      A.    No.

21      Q.    Okay.  So explain to me the reasons that you

22   have to believe that he would retaliate against you.

23      A.    Again, it's my analysis of the facts, that Mr.

24   Chipkevitch at some point became aware of either my

25   protected activity directly or indirectly --

1        Q.    What I had --

2        A.    -- via Dan Campbell.

3        Q.    And the same question then for Elaine

4   Weinstein, do you believe -- how is it that you believe

5   she would retaliate against you?  Why?

6        A.    Why do I believe she would retaliate against me

7   if she had known that I was involved in protected

8   activity?  Ms. Weinstein had shared information with me

9   in the past about her involvement in a prior case.  I

10  believe Ms. Weinstein would be -- you asked for why I

11  believed that she would be a person who would retaliate

12  against me.

13       Q.    You mentioned Mark Rosenker was also someone

14  who had retaliated against you.  Can you explain to me

15  what he did to make you say that he retaliated against

16  you?

17       A.    The decision to not consider an SL position was

18  what Mr. Osterman told me.  His -- Mark Rosenker was one

19  of the political managers.  He was the Acting Chairman, I

20  believe, at the time, and so the -- and Mr. Osterman told

21  me that I had two choices in May of 2005.  One was to

22  move from the Office of Marine Safety to a space in

23  Research and Engineering and I would work in the Office

24  of Safety Recommendations and Accomplishments or to

25  retire, and he had had that discussion, he said, with

 1  Mark Rosenker, Ellen Engleman-Connors, Dan Campbell and

 2  Ron Batachi.

 3      Q.   The two choices were what?

 4      A.   I had two choices.  One was to -- excuse me.

 5  They were removing me from the Office of Marine Safety,

 6  so it was to move to the Office of Safety Recommendations

 7  and Accomplishments or to retire.  Those were my two

 8  options.

 9      Q.   And Mark Rosenker retaliated against you by how

10  again?

11      A.   Removing me from the Office of Marine Safety,

12  removing me from my career.

13      Q.   Mark Rosenker did?

14      A.   Joe Osterman told me that Mark Rosenker was one

15  of the people who made that decision, that's correct.

16      Q.   To move you from OMS to a different office?

17      A.   To a different office or to retire.  I had two

18  choices.  I wasn't even eligible to retire at that point,

19  so I had one choice.

20      Q.   Anything else?

21      A.   He continued as Chairman, as the second line

22  supervisor, up until -- again, it wasn't clear to me who

23  my supervisor and second line supervisor were after June

24  of 2005, but through June of 2005 he was my second line

25  supervisor so, therefore, if Joe Osterman were my first

1  line supervisor, then Mark Rosenker was my second line

2  supervisor and he, too, failed to give me an evaluation

3  for 2004/2005 --

4      Q.   Anything else?

5      A.   -- which, of course, precluded me from not just

6  the evaluations but, again, from any award money.

7      Q.   Okay.  Anything else?

8      A.   That's all that comes to mind right now.  Of

9  course, he was the Chairman right through my retirement,

10  so any -- yeah, that's all that comes to mind right now.

11      Q.   And you also mentioned a General Counsel

12  discriminated against you.

13      A.   Ron Batachi.

14      Q.   How so?

15      A.   Ron, according to Joe, was one of the people

16  who participated in that group decision to remove me from

17  the Office of Marine Safety.  So when you say

18  discriminated, it was retaliation.

19      Q.   Yes.  Any other way that he retaliated against

20  you?

21      A.   I would say that was the major one.

22      Q.   You also mentioned that Elaine Weinstein

23  retaliated against you.  Can you tell me how?

24      A.   Elaine was a member of the 2005 panel and

25  changed my evaluation for the technical sea time from

1  qualified to not qualified, so her participation in that

2  panel -- one, for the second courses, she did not give me

3  any performance standards during the time period that I

4  worked for her.  In fact, she didn't even give me any  --

5  I didn't have any marine work, but I didn't even have

6  work that would qualified in any way, shape or form as

7  being work that an executive or a professional would be

8  involved in.  I was doing administrative work for Ms.

9  Weinstein when I was in the Office of Safety

10  Recommendations and Accomplishments.

11      Q.   So she retaliated against you by giving you

12  work?

13      A.   Giving me administrative work.  There were no

14  performance standards.  There was no evaluation from Ms.

15  Weinstein during the time period that I worked for her.

16      Q.   How long did you work for her?

17      A.   From June of 2005 through October of 2005.

18      Q.   Anything else?

19      A.   That's all that comes to mind right now.

20          REPORTER:  Counselor, I'd like to switch tapes.

21                  (OFF THE RECORD)

22                  (ON THE RECORD)

23          BY MS. McBARNETTE:

24      Q.   Do you recall who your supervisor was after

25  Elaine Weinstein?

1      A.    Joe Osterman, I believe.

2      Q.    Anyone else?

3      A.    It was difficult to tell, but I think either --

4  one of his deputies may have by default served as my

5  supervisor, either Barbara Check (phonetic sp.) or David

6  Myer.

7      Q.    Are you alleging that either Barbara Check or

8  David Myer retaliated against you?

9      A.    If they were the supervisors of record, then

10 they did not provide me with performance standards, gave

11 me no interim evaluation, gave me no final evaluation.

12     Q.    Okay.  We just went through a very long list.

13 Is there anything else that you can think of that

14 comprises your retaliation claim?

15     A.    Essentially forcing me to retire I would

16 consider as an overall outcome of the retaliation.

17     Q.    And who forced you to retire?

18     A.    The decision makers at the Agency who removed

19 me from my career work in marine safety.

20     Q.    Can you be specific and name them?

21     A.    Okay.  Let me see if we can go back through the

22 people who started the process.  I think I've already

23 answered this, but I'll try again.  The people that Mr.

24 Osterman told me he had discussed it with were -- so it

25 would be Joseph Osterman.

1      Q.    Discussed what with?

2      A.    The removal from the Office of Marine Safety.

3   So the first one would be Mr. Osterman.  The second one

4   would be -- well, let me just go down the list, Daniel

5   Campbell, Ellen Engleman-Connors, Mark Rosenker and Ron

6   Batachi.

7      Q.    And what did these individuals do to force you

8   to retire?

9      A.    They removed me from my career.  I was doing

10  administrative work after I was removed from the Office

11  of Marine Safety.  I was not permitted to stay in my

12  career field.

13     Q.    Anything else?

14     A.    Other than not being permitted to remain in my

15  career field?  That was, in fact, the major reason why

16  I was forced to retire, yes.

17     Q.    That was, in fact, one of the major reasons?

18  Is there another major reason?

19     A.    I said that was the major reason why I was

20  forced to retire.

21     Q.    I'm trying to find out all the reasons that you

22  claim that you were forced to retire, so if you can list

23  them for me I'd appreciate it.

24     A.    Well, that is essentially the reason why I

25  retired.  I was not working in marine.  I had absolutely

1   no hope of ever getting back to marine at the Safety

2   Board.  I had a 30 year career at risk that was -- that I

3   was deprived of.  I had to find a way somehow to get back

4   into marine work, and so the only way I could do that was

5   to find outside employment.

6       Q.    Is that it?

7       A.    That's it.

8       Q.    Okay.  So if you can just take one more moment

9   and think if there's any other claim that you're making

10  for retaliatory acts and then let me know.

11          MR. SCHER:  Objection, asked and answered.

12          MS. McBARNETTE:  Well, the last time I asked

13  she came up with a new one, so I'm asking again just in

14  case there's something else that you may have missed.

15          MR. SCHER:  That's fine.  You can answer.

16          WITNESS:  Okay.  No, I don't think that I can

17  think of anything else right now, but I don't know that

18  was a new one.  I think that was --

19          BY MS. McBARNETTE:

20      Q.    Or at least one that you hadn't mentioned

21  before.

22      A.    Okay.

23      Q.    So in your complaint you mentioned that you had

24  a conversation with Ms. Connors in April of 2004.  Could

25  you explain how it came that you were talking with Ms.

1    Q.    I'm asking you what it is that you said.  I

2  don't know what it is that you said, so --

3    A.    I just asked for a meeting with her.

4    Q.    Okay.

5    A.    Could we take --

6    Q.    And then you --

7    A.    Sorry.  Could we take a break?

8    Q.    Absolutely.

9                        (OFF THE RECORD)

10                       (ON THE RECORD)

11       BY MS. McBARNETTE:

12    Q.    Okay.  So now that we're back if we can go back

13  to your conversation that you had with Ms. Connors, and

14  when you had your meeting with her, what is it that you

15  discussed?

16    A.    I discussed the fact that I was not being paid

17  the same as my male counterparts.

18    Q.    Anything else?

19    A.    Well, the conversation began with that

20  discussion.  She said something like tell me about it,

21  there are deputies around here who are SES and the --

22  yeah, tell me about it, there are deputies around here

23  who are SES.

24    Q.    I'm not -- I'm afraid I don't understand the

25  context of that.  What did you take that to mean?

1    Q.    Okay.

2    A.    -- and I was just jotting down notes as he said

3  it.

4    Q.    Did he, in fact, ever offer you a position

5  regarding strategic planning?

6    A.    As I said, I think the strategic planning -- in

7  terms of offering me a position, I was never "offered a

8  position."  He, I think, included the strategic planning

9  work that he needed done in the work that I ultimately

10  ended up doing at -- when I was transferred from Safety

11  Recommendations to the Office of the Managing Director.

12    Q.    Okay.  Before you began to work for the

13  Managing Director's office, did you have a detail over in

14  the Office of Safety Recommendations?

15    A.    When I was removed from the Office of Marine

16  Safety, I was transferred over to work for Elaine

17  Weinstein in the Office of Safety Recommendations and

18  Accomplishments.

19    Q.    And what were you told that you'd be doing

20  there?

21    A.    There was some work over there that she had.

22  It was -- once a year the office directors were required

23  by law to go through an accounting of if we had

24  procedures and protocols in place, if we were using those

25  procedures and protocols.  Every office in the government

1    particular job?

2         A.    No.

3         Q.    How did you know what responsibilities and

4    duties you had?

5         A.    I didn't.

6         Q.    Was Ms. Weinstein responsible for giving you a

7    performance appraisal?

8         A.    She should have, yes.

9         Q.    And did she?

10        A.    No.

11        Q.    Where did you go after you stopped working for

12   Ms. Weinstein?

13        A.    To the Office of the Managing Director.

14        Q.    How did that come about?

15        A.    I was told I was being moved to the Office of

16   the Managing Director.  Elaine had apparently -- she said

17   she had no marine work for me again, and she had talked

18   to Joe Osterman and I was being transferred to the Office

19   of the Managing Director.

20        Q.    Did you understand that you'd be doing marine

21   work over at the Office of the Managing Director?

22        A.    No.

23        Q.    Who was your supervisor during that time?

24             MR. SCHER:  Objection, asked and answered three

25   times.  Go ahead.

1           WITNESS:  Yeah.  I believe it was Joe

2   Osterman.

3           BY MS. McBARNETTE:

4       Q.   Was he your first line supervisor?

5       A.   I believe so.

6       Q.   Did you get work from Joe Osterman?

7       A.   Yes.

8       Q.   You would go to his office and he would provide

9   work for you?

10      A.   I talked to -- yes, I would go to his office

11  and he would provide -- he gave me work assignments, um-

12  hum.

13      Q.   Did you ever ask anyone for a position

14  description?

15      A.   Yes, I believe I did, but I believe that was

16  not -- yes, I --

17      Q.   How long were you in that position?

18      A.   From June of 2005 through October of 2005 I was

19  in the Office of Safety Recommendations and

20  Accomplishment, so in October of 2005 I was transferred

21  from SR over to the MD's office and I was in a position

22  from that time until I retired in July of 2006.

23      Q.   Did you discuss being discontented with the

24  work that you were doing with anyone in the Managing

25  Director's office?

```
 1        A.    Did I discuss?  When I went over to the
 2   Managing Director's office, Joe knew that I wanted to go
 3   back to OMS and he said something like you have terrific
 4   management skills.  You can do this job which is
 5   whatever, but he was not going to transfer me back to
 6   OMS.
 7        Q.    Did you have any other complaints about your
 8   working conditions?
 9        A.    My working conditions?  My working conditions
10   were working in an office environment, so working in an
11   office environment was still working in an office
12   environment.
13        Q.    Did you express any unhappiness with that?
14        A.    Working in an office environment?
15        Q.    Um-hum.
16        A.    No.
17        Q.    What about when you were working for Ms.
18   Weinstein?
19        A.    I beg your pardon.  Could you repeat that?
20        Q.    What about when you were working for Ms.
21   Weinstein, did you complain about the working
22   environment?
23        A.    The working conditions -- I was in the same
24   office when I was working for -- I didn't move my office
25   around.  Other than the initial move from OMS I stayed in
```

 1  the same office space.

 2      Q.   All right.  Let me show you another exhibit.

 3           MS. McBARNETTE:  Can you mark this as Exhibit

 4  2?

 5           WITNESS:  Do you want me to hold onto this one

 6  or pass this off or --

 7           BY MS. McBARNETTE:

 8      Q.   You might as well just collect them there --

 9      A.   Okay.

10      Q.   -- and then when we're all done we'll collect

11  them.

12      A.   Okay.

13                          (Whereupon, the document that

14                          was referred to as Exhibit

15                          Number 2 was marked for

16                          identification.)

17           BY MS. McBARNETTE:

18      Q.   This is Exhibit 2.  Can you take a look at that

19  and then tell me if you've seen it before.

20      A.   It appears as if these are two separate

21  documents, so are you asking me if I saw each of these

22  three pages before?

23      Q.   Yes.

24      A.   Okay.  I've seen the -- I think I've seen this

25  first page before, but I'm not positive, so -- yeah, I'm

1    Agency?

2        A.    Probably.

3        Q.    So you saw the position description for your

4    reassignment effective October 16th, 2005?

5        A.    Repeat that again.

6        Q.    So you saw the position description for your

7    assignment that was effective October 16th, 2005?

8        A.    No.

9        Q.    But you saw these pages when you worked for the

10    Agency?

11        A.    Well, these pages aren't signed until December

12    12th of 2005, so if I had seen them, it would have been

13    after that time.

14        Q.    After October?

15        A.    After December.

16        Q.    After December.  Do you recall when you retired

17    from the NTSB?

18        A.    Yes.

19        Q.    When?

20        A.    July 4th, 2006.

21        Q.    Were you eligible for retirement at that time?

22        A.    Yes.

23        Q.    When did you become eligible?

24        A.    In October of 2005.

25        Q.    Why did you retire?

000139 05/27/04  09:56 FAX 202 606 1637        ASSOCIATE DIRECTORS                                     ☑001/001

**MAY 2 7 REC'D**

*MC2040249*



**UNITED STATES**
**OFFICE OF PERSONNEL MANAGEMENT**
**WASHINGTON, DC 20415-0001**

OFFICE OF THE DIRECTOR

**MAY 26 2004**

The Honorable Carol Jones Carmody
Acting Chairman
National Transportation Safety Board
490 L'Enfant Plaza East, SW
Washington, DC 20594

*1 NEW SES*
*2 or 3 NEW SL ?*

Dear Ms. Carmody:

The Office of Personnel Management (OPM), in consultation with the Office of Management and Budget, has completed its review of executive resource allocations for the remainder of the Fiscal Year 2004-2005 biennial cycle. The final Fiscal Year 2004-2005 allocations authorized for your agency are:

- Senior Executive Service (SES) allocation           15
  SES career reserved floor                           9

- Senior Level (SL) allocation                        8

- Scientific and Professional (ST) allocation         0

The SES allocation covers all SES positions, regardless of how they are filled, e.g., by career, noncareer, or limited appointment. Each agency is responsible for making sure that the established number of career reserved positions equals or exceeds the floor as listed above.

The next biennial cycle will cover Fiscal Years 2006 and 2007. Under the statutory provisions at 5 U.S.C. 3133, agencies must submit a request for allocations for the next biennial cycle to OPM by December 31, 2004. To facilitate this process, we will assume that your agency will accept continuation of the allocations authorized above for Fiscal Years 2006 and 2007, or give an alternate request to OPM. In early 2005, we will ask agencies requesting additional executive resources to provide a detailed justification for those increases.

If there are any questions about final allocations, your staff may contact Mr. Hughes Turner, Deputy Associate Director for Leadership and Executive Resources Policy on (202) 606-1811.

Sincerely,

Kay Coles James
Director


GOVERNMENT EXHIBIT
14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARJORIE MURTAGH COOKE,    )
    )
    Plaintiff,    )
    )
    v.    )    No. **1:06CV01928**
    )    (Judge Bates)
MARK ROSENKER, Chairman,    )
NATIONAL TRANSPORTATION    )
SAFETY BOARD,    )
    )
    Defendant.    )

## DECLARATION OF ELAINE WEINSTEIN

Pursuant to 28 U.S.C. § 1746, I, Elaine Weinstein, declare that the following is true and

correct and based upon my personal knowledge, my review of National Transportation

Safety Board ("NTSB") files and records, my review of the records at issue in this litigation,

and information I acquired from others in the course of my performance of my official duties,

and that I am competent to testify to the matters contained herein.

1.    I currently serve as the Director of the Office of Safety Recommendations and

Advocacy[1] (SRA) at the NTSB. I have held this position since February

2001. Prior to my current position, I served as the Deputy Director of the

Office of Safety Recommendations and Accomplishments. I have been on

staff at the NTSB since June 1990.

2.    I am over the age of 18 and have personal knowledge of the matters set forth

herein and if called as a witness could competently testify thereto.

3.    SRA works with all the modal offices and the Office of Research and

Engineering. It is responsible for designing and coordinating strategies to

---

[1] The name of the division has changed several times since 2000. However, the primary purpose of the division is to draft and advocate for the Safety Recommendations issued by the Safety Board.


GOVERNMENT
EXHIBIT
15

implement safety recommendations, supporting victims of transportation

disasters, and ensuring that Federal and State leaders are provided with timely

and accurate information.

4.    Safety Recommendations are issued by the NTSB as a result of the

investigation of transportation accidents and other safety problems.

Recommendations usually identify a specific problem uncovered during an

investigation or study and specify how to correct the situation. Letters

containing the recommendations are directed to the organization best able to

act on the problem, whether it be public or private.

5.    The recipient of a Safety Recommendation should respond to the

Recommendation with its comments and proposed action.  At times, however,

such responses are not forthcoming, and follow-up contact is necessary.

6.    The Safety Board's Recommendations may not be favored by the recipient,

and thus they may be ignored or alternative means of compliance may be

offered.

7.    As of May 2008, over 12,800 Safety Recommendations have been issued.  At

any given time during the past 5 years, hundreds of Safety Recommendations

have been open and awaiting action either by the NTSB or the recipient.

8.    SRA coordinates the advocacy of the Safety Board's Recommendations

before Congress, Federal agencies, State governments, and industry and

community representatives.

2

9.   As part of my duties as Director of SRA, I supervise staff and allocate my resources to issue Recommendations and promote them to achieve the best outcome for safety.

10.  I sat on the application review panel for the selection of a candidate for the SES Director of the Office of Marine Safety (OMS). The first application review panel convened in the fall of 2004. The 2004 position advertisement for the SES Director of OMS was subsequently cancelled prior to a final selection being made. No interviews were conducted.

11.  Between June and October 2005, I was Ms. Cooke's supervisor and assigned her work throughout her detail in SRA.

12.  I was satisfied with Ms. Cooke's work. She completed her assigned tasks in an at least satisfactory, if not excellent, manner.

13.  Ms. Cooke did not complain to me about the tasks she was assigned, she did not state that the tasks were below her grade level, or that she was concerned about her performance review and potential for a performance award.

14.  Ms. Cooke did not complain to me that her work was too far removed from the marine area.

15.  Ms. Cooke did not request that her detail be terminated and that she return to OMS.

16.  As Director of SRA, I must interact with the Chairman of the NTSB. I was the Director of SRA during the tenure of Chairman Ellen Engleman Conners.

17.  I did not have difficulty scheduling meetings with Chairman Engleman Conners. Meetings were rescheduled because of conflicts. Nonetheless, Chairman Engleman Conners was accessible to me.

3

18.    I always was able to contact Chairman Engleman Conners with an important

issue.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this ___7th___ day of May 2008, in Washington, D.C.




*Elaine B. Weinstein*
Elaine Weinstein
Director, Office of Safety Recommendations and Advocacy
National Transportation Safety Board

4

000838

RECEIVED
HUMAN RESOURCES OFFICE

2005 FEB 14  AM 12: 34

# QUALIFICATIONS BRIEF

## Marjorie M. Murtagh

**NTSB Vacancy Announcement**
**WA-TB-5-009**

**Director, Office of Marine Safety**
**ES-340-00**

**Submitted by:**

Marjorie M. Murtagh

GOVERNMENT
EXHIBIT
16

00839    Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## WORK EXPERIENCE SUMMARY

As the National Transportation Safety Board's Director, Office of Marine Safety at the Board's Headquarters in Washington, D.C., I oversee the Safety Board's marine program for national and international accident investigations, analysis, report preparation, and proposed determination of probable cause and recommendations to prevent future marine accidents. I also serve as the Safety Board's representative at the International Maritime Organization's World Maritime University in Malmo, Sweden where I teach a marine accident investigation class to international graduate students. Previously I served as the Chief, Marine Division and as an investigator-in-charge. I came to the Safety Board after serving as Chief, Fire Protection Section for the United States Coast Guard's Office of Marine Safety, Security and Environmental Protection at Coast Guard Headquarters. I am a Naval Architect and Marine Engineer. I received my Bachelor of Engineering degree and my U.S. Coast Guard marine engineering license in 1974 from the State University of New York Maritime College, located at Fort Schuyler, New York. After graduation I spent two years establishing the women's program at the college and serving as a consultant to federal academies that were then planning similar programs. I subsequently spent time at sea serving as a marine engineer aboard bulk carriers for the Ford Motor Company. I came ashore in 1979 and went to work for Santa Fe Corporation where I co-authored a computer based hull performance assessment program (designed to optimize maintenance for fuel reduction). In 1982 I went to work for the Department of the Navy's Military Sealift Command as a type desk engineer responsible for the engineering operation, maintenance, overhaul, and alteration of their fleet oilers and range instrumentation ships. In 1984 I accepted a civilian position with the U.S. Coast Guard as a marine engineer in their commercial vessel Ship Design Branch and later in their Engineering Branch. I served as the Chief of Fire Protection Section, as the Chairman of the U.S. Safety of Life at Sea (SOLAS) Working Group on Fire Protection, and the U.S. representative and Head of Delegation to the International Maritime Organization's (IMO) Subcommittee on Fire Protection from 1986 to 1994. I was elected Vice-Chairman of the Subcommittee in 1988 and served in that capacity until 1992 when I was elected as the Chairman of the IMO Subcommittee on Fire Protection. In 1992 I received the U. S. Department of Transportation's Silver Medal for "her initiative and leadership at IMO in negotiating unprecedented fire safety requirements to upgrade passenger ships worldwide".

I am a member of the Leadership Washington Class of 2000. Leadership Washington is a community service organization for the Washington metropolitan area. I have given of my time and energy to organizations such as the Boy Scouts of America, Odyssey of the Mind and as a member of the Board of the Robinson Secondary School Drama Boosters.

00840  Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement  No. WA-TB-5-009

## WORK EXPERIENCE

*Current Position:*
Director, Office of Marine Safety; GS-1801-15
National Transportation Safety Board
490 L'Enfant Plaza East,
SW Washington, DC 20594

*Supervisor's Name and Phone Number:*
Daniel Campbell, Managing Director, 202-314-6010
*Start/End Dates:*
February 1994 to Present; Duty hours: 24/7
*Start/End Salary:*
$ 74,054/$126,963

*Duties and Accomplishments:*

I am the senior manager in the Safety Board's marine modal office and have served in that
capacity for the past eleven years. The Office of Marine Safety (OMS) manages the major
marine transportation investigations for which go-teams are sent to the accident site. The Office
investigates selected marine accidents and incidents; develops proposed probable cause(s) of
accidents; formulates recommendations to minimize recurrence of similar accidents; prepares
detailed reports for use by other international and domestic government agencies, Congress, the
transportation community and the traveling public; and improves public safety by advocating
changes to international and domestic marine transportation regulations, requirements, policies,
practices and systems in government and industry. As the Director, OMS, I am responsible for
providing staff supervision and resource management, as well as overall management and
direction of international and domestic marine accident investigations and reporting processes,
recommendation development and marine safety program advocacy and oversight. I plan,
manage, direct and evaluate the work of OMS and exercise policy-making and policy
determining decisions impacting marine safety at the Board, at international maritime
organizations, other Federal agencies and the international and domestic industry. I provide for
the overall direction and technical accuracy of the investigation and reporting processes for
marine accidents.

In the performance of each of these duties, I have been consistently awarded and received
superior evaluations throughout my career at the Safety Board.

1841

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## WORK EXPERIENCE

*Position:*
Chief, Fire Protection Section; GM-804-14
United States Coast Guard
2100 Second Street SW
Washington, DC

*Supervisor's Name and Phone Number:*
Captain G. Marsh, USCG, Ret; 202-267-2100

*Start/End Dates:*
July 1986 to February 1994; 40+ Hrs/week

*Start/End Salary:*
$47,000 to $67,800 per year

*Duties and Accomplishments:*

I served as the senior technical advisor and principal USCG spokesman on marine fire protection and fire safety of merchant vessels. I acted as Branch Chief in the absence of the Chief, and assisted in supervising 10 military and civilian mechanical, fire protection, and marine engineers and naval architects to assure programs and projects were technically sound, consistent with Coast Guard goals and Congressional intent and that enforcement and compliance with marine safety standards were carried out uniformly and equitably. I developed and directed work projects to assure technical accuracy and developed priorities to assure responses were completed in a timely fashion. I also served as the Chairman of the U.S. Safety of Life at Sea (SOLAS) Working Group on Fire Protection responsible for developing and presenting U.S. positions through research, analysis, technical discussions, and informal and formal communications and meetings with the U.S. maritime community. As the Department of State's U.S. representative to the International Maritime Organization's Subcommittee on Fire Protection I was responsible for negotiating U.S. interests with other international heads of delegation. In that capacity, I was elected to serve as the Vice Chairman and ultimately as the Chairman of the Subcommittee.

In the performance of each of these duties, I was consistently commended and received superior evaluations. I was the recipient of the Department of Transportation's Silver Medal for negotiating unprecedented improvements in marine transportation safety.

00842

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## WORK EXPERIENCE

*Position:*
Marine Engineer, GM-830-13
United States Coast Guard
2100 Second Street SW
Washington, DC

*Supervisor's Name and Phone Number:*
CDR P. Pluta (Admiral Paul Pluta, USCG, Ret.);
LCDR D. Crede, USCG, Ret.; 202-267-2997
*Start/End Dates:*
November 1984 to July 1986; 40 Hrs/week
*Start/End Salary:*
$42,000 to $45,500

*Duties and Accomplishments:*

I served as a staff engineer in two different branches of the Marine Technical and Hazardous
Materials Division of the USCG Office of Marine Safety, Security and Environmental
Protection. As staff engineer in the Marine Section of the Engineering Branch, I was responsible
for evaluating proposed new and unique design features and construction methods for marine
applications, which involved state of the art methods for their effect on safety. I developed
criteria for new regulations based upon marine engineering principles for evaluating materials,
systems, and components proposed as substitutes to existing requirements to establish equivalent
protection. I was responsible for the development, preparation and successful completion of the
USCG's Guidelines Governing the Use of Fiberglass Pipe (FGP) on Coast Guard inspected
vessels. As staff engineer in the Safety and Oversight Section of the Ship Design Branch, I
prepared and coordinated review of a plant ship design to produce methanol on offshore
production vessels. I served as the project manager and technical advisor on a contract assessing
the safety of a Concrete Island Drilling Structure (CIDS) and successfully negotiated the contract
completion of the Classification Society Comparison Project. I was responsible for preparing
field guidance and a policy letter on the acceptance of fire stop materials aboard merchant
vessels. I chaired a working group under ASTM F.25 to develop a standard for the testing and
approval of shipboard fire stop systems. I served as the project manager of the Code of Federal
Regulations (CFR) Classification Society responsibility assessment project and reviewed
American Bureau of Shipping (ABS) plan review correspondence for compliance with U.S.
Coast Guard regulations. In this position I conducted casualty reviews and evaluations of NTSB
recommendations and prepared U.S. position papers presenting U.S. positions at the IMO.

In the performance of each of these duties, I was consistently commended and received superior
evaluations throughout my career at the U.S. Coast Guard.

00843

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## WORK EXPERIENCE

*Position:*
Type Desk Engineer GS-830-12
U. S. security clearance required: Secret

United States Navy
Military Sealift Command
Washington, DC

*Supervisor's Name and Phone Number:*
Mr. John Rehme (retired);
*Start/End Dates:*
July 1983 to November 1984; 40 Hrs/week
*Start/End Salary:*
$38,000 to $39,700 per year

*Duties and Accomplishments:*

I served as the Engineering Operations Code 4E as the ship 'type desk' engineer for the U.S. Navy's Military Sealift Command (MSC) Naval Fleet Auxiliary Force tankers and the Range Instrumentation ships. I planned and executed policy and procedures for general engineering operations and practices for the effective maintenance, repair, and overhaul of 10 ships. I administered the ships' budgets. I was responsible for assuring the ships' maintained their scheduled operations and assuring that upper management was aware of their operating status at all times. I served as the technical liaison with MSC internal management, other codes, field commands, port engineers, as well as their external customers, including the ships' sponsors (U.S. Army, Navy and Air Force), operators and ship yards. I developed reliability alteration plans for the ship life extension program for two Range Instrumentation ships. I reviewed and analyzed casualty reports, shipyard specifications and cost data. I was responsible for reviewing ships' proposed modifications, maintenance and repair for compliance with U.S. Coast Guard regulations. I participated in a major project developing A-76 Contracts for the MSC Scientific Support fleet operations.

In the performance of each of these duties, I was consistently commended and received superior evaluations throughout my career at the Military Sealift Command.

10844

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## WORK EXPERIENCE

*Position:*
Marine Operations Analyst
U.S. security clearance required: Classified

Santa Fe Corporation
Alexandria, VA 22304

*Supervisor's Name and Phone Number:*
Mrs. Barbara Preston; (retired)

*Start/End Dates:*
May, 1979 to July, 1983; 40+ Hrs/week

*Start/End Salary:*
$24,000 - $38,000 per year

*Duties and Accomplishments:*

I served as the project manager for a performance assessment program aimed at segregating the machinery from the hull and propeller performance for two commercial ships. I also served as the program manager for multiple in-situ hull and propeller surveys of commercial and military vessels. I was the prime technical participant in several federally sponsored projects aimed at energy conservation and alternative fuel aboard ships. These latter projects were sponsored by the Department of Transportation's U. S. Maritime Administration (MARAD). I gained diverse experience in technical research, project management, technical liaison and report preparation. I was the principal participant to assess technical and economic analysis of ship roughness measurement and hull and propeller surface management techniques and the principal participant in developing maintenance and repair data for modern coal-fired ships propulsion proponents. I also was the principal participant in military and commercial sponsored projects assessing ship performance monitoring techniques, hull surface management techniques and long range research planning.

In the performance of each of these duties, I was consistently commended and received superior evaluations throughout my career at the Santa Fe Corporation.

000845

**Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement  No. WA-TB-5-009**

## WORK EXPERIENCE

*Position:*
Marine Engineer;
U.S.C.G. Marine Engineer license required

Ford Motor Company
Dearborn, Michigan

*Supervisor's Name and Phone Number:*
Chief Engineer Carl Swanson (retired)

*Start/End Dates:*
May, 1977 to March, 1979; 56 Hrs/week

*Start/End Salary:*
$32,000 to $36,000

*Duties and Accomplishments:*

I served as a U.S. Coast Guard licensed operating marine engineer for a steam main engine propulsion plant aboard a Great Lakes ore carrier.  I was responsible for the operation, troubleshooting, maintenance and repair of main engine room equipment including boilers, turbines, main propulsion gear, generators, lube oil systems and other auxiliary equipment.  I supervised unlicensed personnel during lay-up, fit out and winter work, which included dismantling, inspecting, repairing and reassembling main and auxiliary equipment.  I also substituted for the second assistant engineer for seven months.

In the performance of each of these duties, I was consistently commended and received superior evaluations throughout my career at Ford Motor Company.

100846

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## WORK EXPERIENCE

*Position:*
Assistant Dean of Students; Dean of Women
State University of New York Maritime College
Fort Schuyler, Bronx, New York

*Supervisor's Name and Phone Number:*
Capt. Gary Russell; USCG (ret)
Captain Russell has since departed the University

*Start/End Dates:*
May 1974 to May 1977; 40 Hrs/week

*Start/End Salary:*
$10,000 - $12,000

*Duties and Accomplishments:*

I developed and implemented programs for logistics management and prepared specifications for contracts, analysis and evaluation of contractor bids. I established the women's program at SUNY Maritime College and served as a student counselor. SUNY Maritime was the first college to accept women and my duties required evaluating every aspect, except academics, of their enrollment at a full time accredited institution, which included living arrangements, summer sea terms and military training. This required extensive research to establish the college's female student policies, procedures and arrangements for housing, health and well being, uniforms etc. I was also responsible for writing and executing contracts to purchase all items deemed specific and necessary for the female students' program. The results of my research on behalf of SUNY Maritime College were shared with, and used by, all the other federal maritime and military institutions that were initiating their own female student programs at that time.

In the performance of each of these duties, I was consistently commended and received superior evaluations at SUNY Maritime College.

)00847

**Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement  No. WA-TB-5-009**

## PERSONAL INFORMATION

Marjorie M. Murtagh
8475 Sylvan Way
Clifton, VA 20124

Day:  (202) 314-6451

U.S. Citizen

GS-1801-15; February, 1994 to present

Ridgefield Park High School
Ridgefield Park, New Jersey 07660
June, 1963

State University of New York
Maritime College
Fort Schuyler
New York, New York 10465
Naval Architecture/Marine Engineering
Bachelor of Engineering
May, 1974

## OTHER QUALIFICATIONS

Training:

In addition to annual ethics, EEO, FMFIA, government credit card (purchase and travel card), ergonomics, and IT security awareness training, the following represents the most applicable job related training I have received in the past 3 years:

| | | |
|---|---|---|
| Performance Management for Supervisors | 16 Hrs | Jan, 2005 |
| Principles of Effective Leadership | 32 Hrs | July, 2004 |
| EEO Overview for Supervisors | 4 Hrs | May, 2004 |
| Labor/Management Relations & Grievances | 4 Hrs | May, 2003 |
| Introduction to Legal Analysis and Reasoning | 40 Hrs | March, 2002 |

000848

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

**Job related honors, awards and special accomplishments received in the last 3 years:**

I have consistently received superior evaluations and monetary awards for my exemplary performance throughout my 11 year career at the Safety Board and throughout the rest of my 31 year career in the maritime industry.

I am a graduate of the Leadership Washington program, a member of the engineering advisory board for the American Bureau of Shipping, a member of the engineering advisory board for the State University of New York Maritime College, selected for member of World Maritime University Journal advisory board and the 2002 recipient of the State University of New York Maritime College's Engineer of the Year award.

I personally authored and presented numerous articles and papers on marine accident investigations, marine safety recommendations the procedures used for marine accident investigation. I also authored numerous papers presented by virtually every Chairman, Vice-Chairman, or Member of the Safety Board in the past 11 years. Audiences have included a broad range of national and international maritime organizations: owners, operators, managers and staff of commercial and public (e.g. U.S. Navy, U.S. Coast Guard, etc.) fleets, ports and waterway management organizations.

00849

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

MANDATORY EXECUTIVE CORE QUALIFICATION: LEADING CHANGE

*1. The ability to develop and implement an organizational vision, which integrates key national and program goals, priorities, values, and other factors.*

Since assuming my duties at the National Transportation Safety Board (Safety Board), I have served as the program manager leading change in the way we investigate marine accidents. The ultimate goal of this endeavor was to reach agreement on a revised Memorandum of Understanding (MOU) with another highly visible and effective organization that preferred to maintain the status quo. Thus, the changes I led in my organization directly affected the way another federal agency conducted their business as well. It required leadership on many levels and my ability to lead my office through this change was essential to a successful outcome.

CONTEXT AND CHALLENGE:

Since 1974 when Congress passed the Independent Safety Board Act, the agency has been independent of the Department of Transportation to assure that accident investigation was not subject to self-investigation. However, the Act did not clearly grant independence I marine and the Safety Board investigated marine accidents jointly with the U.S. Coast Guard (Coast Guard). Neither agency had clear authority to lead the investigations, i.e. primacy. Problems were apparent from the beginning and the implementation of a 1982 Memorandum of Understanding (MOU) unfortunately did not lessen the ambiguity. For the Safety Board to take the lead, i.e. conduct the investigation in accordance with Safety Board rules vice Coast Guard enforcement rules, required the concurrence of the Commandant of the Coast Guard and the Chairman of the Safety Board. Negotiations between the Commandant and the Chairman took place in the immediate aftermath of a major marine accident, typically in off duty hours and under the stresses of a major media event when neither is best able to reach the most effective or efficient decision. Over time, the decision making process had been overtaken by the natural order of events, i.e. the Coast Guard routinely arrived first at the accident site (federal law mandates they be notified immediately and their field offices are located in ports throughout the United States) and the Coast Guard process was well underway in the field before notification to the Board had even begun. In order to gather any accident investigation factual material, the Safety Board investigators would join the Coast Guard's investigation, already well underway. Routinely, Safety Board investigators participated in Coast Guard public hearings, a legal proceeding predominately used for factual discovery. Thus, when I joined the Safety Board, marine accident investigations were routinely conducted under Coast Guard rules and the Safety Board's marine accident reports were based primarily upon the accident record developed by the Coast Guard. Several unsuccessful attempts had been made to renegotiate the MOU prior to my joining the Board. Each time the Safety Board thought they had verbal agreement it would fall apart in the wake of a high profile accident.

The Chairman of the Safety Board recognized that the independence of the Safety Board had been established by Congress to specifically assure that the federal transportation regulator was not investigating itself. Conducting only joint investigations under Coast Guard rules was not

00085.0

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

achieving this goal. Recognizing that being "right" would not necessarily define whether the
national policymakers would view it similarly, the Chairman needed factual information
regarding the differences in our investigations and their effects on safety. I needed to lead my
office through a major change to provide real data and to make it clear to the Coast Guard and
the Congress how the public was not being served by this arrangement.

**ACTION:**

Starting in 1994 I led my office in making the conversion from conducting only joint
investigations with the Coast Guard to conducting completely independent investigations.

Over an eight year period, my office went from consistently conducting accident investigations
under Coast Guard rules through a period of conducting completely independent investigations
separate and apart from the Coast Guard, and ultimately to conducting accident investigations
under Safety Board rules. In one year alone we launched on 17 accidents, which, with a very
small staff, required immense effort on all our parts to successfully manage the on-scene portion
of each and every accident. It took years of revolutionary change in the way we conducted
business on scene, and it took a major change in the way marine accident investigators were
trained to meet the needs of the office, the agency and ultimately the public. Most importantly, in
each case I documented and reported the details of the investigation process itself, highlighting
when and how it was negatively affecting safety investigations and identifying instances when
potential conflict of interest, i.e. an agency investigating itself, were being violated. Throughout
this time period, negotiations were being held with the Coast Guard to reach agreement and we
held discussions with Congress on the need to improve marine safety through independent
investigations.

In 1996 the first draft MOU was generated by me and my Coast Guard counterpart; however it
was rejected by his superiors and we began again. In 1997, at the request of Congress, my office
conducted an investigation into a marine accident that involved Coast Guard safety functions;
four members of the same family, died as a result of the accident. One of the central issues was
the role of the Coast Guard in providing factual information for safety investigations. The report
when completed in 1999 was lauded by the Congress for its quality and balance. Its successful
completion helped the Safety Board make a case for independent investigation. In that same
year, the Safety Board proposed an amendment to the Independent Safety Board Act and I
supported the Managing Director and the General Counsel in preparing a statement of
justification which was submitted to the Congress. Neither Congress nor the Coast Guard were
ready to accept this major shift in marine accident scene primacy and the amendment was
rejected; however Congress asked that we and the Coast Guard work together to effectively
determine when each agency would lead a marine investigation. In response the Coast Guard
issued a request for comments on a proposal that 'Would Require a Revision of the Joint
Regulations on Marine Casualty Investigations'. At the risk of alienating their regulator,
commercial maritime organizations wrote in support of the NTSB position, simply because they
were familiar with our investigations and commended our balanced assessment of accidents. In

00851

**Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement No. WA-TB-5-009**

November, 2000, Congress, having listened to Coast Guard objections for 6 years, decided to enact into law a requirement that NTSB and the Coast Guard develop a new MOU. Celebration, however, would have been premature. It took another two years of negotiation and comparisons of our NTSB investigations to those of the Coast Guard before NTSB Chairmen would finally successfully manage to bring the Coast Guard to the table to reach agreement.

By consistently and determinedly leading my office through this change, I assured that each new Safety Board Chairman was provided the necessary information to bring this inconsistency in public transportation safety to the attention of the Commandants of the Coast Guard, Department of Transportation administrators, and to the Congress.

**RESULTS:**

A new MOU between the U.S. Coast Guard and the National Transportation Safety Board was agreed to and signed in 2002. It permits the Safety Board to select to lead marine accident investigations that would best serve the safety of the traveling public, the Coast Guard to identify the accidents which could leave them most vulnerable to public criticism; and it lets the Coast Guard know in advance which accidents they will be leading.

I am extremely proud of being an essential part of the Safety Board team that accomplished this monumental goal.

00085 2 Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## MANDATORY EXECUTIVE CORE QUALIFICATION: LEADING PEOPLE

*2. The ability to design and implement strategies which maximize employee potential and foster high ethical standards in meeting the organizations vision, mission and goals.*

Throughout my career I have successfully led and managed a diverse group of people: professional, support staff, civilian, military, male, female, undergraduate and graduate students and physically challenged individuals to achieve exceptional success on behalf of each of the organizations I have worked in.

### CONTEXT AND CHALLENGE:
Although I shared the Chairman's vision for conducting independent Safety Board investigations, this was not immediately embraced by the Safety Board marine investigative staff. Over the intervening years from the start of the Safety Board, through the initial MOU in the early 1980's, the Safety Board marine staff had developed and reached a comfortable way of working within the Coast Guard investigative process. They had become well versed and proficient at conducting Coast Guard led investigations, they had established long term relationships with their Coast Guard counterparts, and they had complete autonomy in preparing the accident report because only one investigator would usually be assigned to each project. The benefits of change were not immediately obvious to them; change would involve learning new ways of conducting business and sometimes uncomfortable situations and relationships on-scene with their Coast Guard counterparts.

### ACTION:
I was new to the Safety Board and although experienced with the Coast Guard process and with the Safety Board's role on-scene, I recognized I first needed to understand how the Safety Board marine accident investigations differed even from those in other modes. So I launched myself to marine and other transportation mode accidents, initially with experienced investigators-in-charge (IIC) and team members from other offices and eventually as an IIC on a marine accident. I listened and queried investigators to understand their procedural needs, and I ultimately worked closely with successful experienced staff who demonstrated their willingness to consider doing business a different way. This process of change required my leadership in revising every aspect of the way we conduct business, including the development of new policies and procedures for both on-scene and follow up investigations and the development of a new training program for marine accident investigators.

### RESULTS:
Today all Safety Board selected investigations are conducted under NTSB rules. Teams of investigators are sent to the accident site and generally consist of an investigator in charge (IIC) and several group chairmen specializing in investigating different aspects of the accident including deck operations, engineering operations and maintenance, human performance and survival factors. Each of these investigators has been well trained and versed in conducting on-scene investigations with the Coast Guard as a party to the investigations.

00085 Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

**CONTEXT AND CHALLENGE:**
The Office of Marine Safety has a very small staff and limited resources. Due to our size, the opportunities for staff to go beyond the day to day crises management that is involved in responding to accidents, which by their nature are unscheduled and inconvenient, can be limited. I needed to offer others the opportunity to grow, take ownership, demonstrate leadership potential, feel empowered to take responsibility for decision making regarding some aspect of the marine program that they could consider theirs.

**ACTION and RESULTS:** I found a way to do this which also proved to be an additional win-win strategy for the office. I challenged each individual to participate in our Academy program for Marine accident investigation which covers every aspect of investigation from the on-scene activities through the report production process and presentation in the Board room. Working from the premise that you cannot teach what you don't know and understand, I have offered each person the opportunity to gain public recognition for their professional abilities as investigators, report writers, or supervisors and managers, as well as honing their skills when challenged with different situations. I also initiated a program for mentoring. Each new employee is assigned an individual who serves as their mentor both on-scene and in the office, to learn how to conduct accident investigations on the job, and from whom they may seek peer assistance when they are uncertain of how to proceed.

**CONTEXT AND CHALLENGE:**
As the U.S. representative to the International Maritime Organization's Subcommittee on Fire Protection, I led and negotiated at an international level to assure the U.S. position was properly accounted for and that the solution was equitable to all concerned. This was no small task; as many as 120 differing Administrations participate in the process and their differing positions must be taken into account when addressing technical issues and new initiatives. English is a second language for most and the communications must be on many levels: it must be clear, succinct, technically concise and correct, and non-confrontational, i.e. amenable to gaining support for U.S. positions. An average of thirty (30) topics is normally covered within five days. Recognizing when not to speak is as important as being confident in what you say when you speak. As the Head of Delegation, I was also responsible for leading a diverse work group to successful completion of our work. Members of the delegation have included senior U.S. Coast Guard officers, members of the maritime industry, nationally and internationally recognized senior technical experts, research managers, and government officials.

**ACTIONS and RESULTS:** Despite sometimes conflicting views on specific subjects, each delegation I was responsible for successfully accomplished their U.S. mission at IMO. When disagreement existed either within or outside of the delegation, I effectively resolved the situation to achieve consensus. Each delegation I have headed has accomplished the U. S. mission without controversy or confrontation with representatives of foreign delegations.

000850

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

MANDATORY EXECUTIVE CORE QUALIFICATION: RESULTS DRIVEN

*3. Accountability and continuous improvement; Ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies.*

CONTEXT AND CHALLENGE:  Marine accident investigators are highly trained and experienced technical personnel (Master Mariners, Marine Engineers and Naval Architects), with both advanced education and vast experience in various aspects of commercial ship operations. Despite this exceptional background and knowledge, all technical personnel are not necessarily adept at expressing their understanding and analysis of the accident succinctly. The talents of the investigators are to collect the factual material related to the accident, understanding the marine context in which it occurs, analyzing the information and arriving at conclusions and recommendations to prevent the accident from happening again. This talent, however, does not necessarily translate to the ability to present this information in writing. Some of the investigators struggle with preparing their report information and find it frustrating when what seems so obvious to them is not understood by those reading their work. Given that the Safety Board can only effect safety changes by convincing others of the need to take action, the written word becomes the major tool in that effort. Thus we employ report writers and editors to convert their work into completed reports. However, these highly skilled, but non-marine, personnel don't always understand what the technical personnel are endeavoring to say and the lack of communication between them can create lost time in production of the final reports. The review process is an iterative multi layer review; the consideration of a major report can be most painful for the investigators who can sometimes view a critique of their work as an affront to their intelligence. I recognized that if investigators could clearly explain their rationale for arriving at a conclusion, which provided their evidentiary support and the source of their evidence in a less confrontational way it might reduce the time to completion. Although all accidents are not equal, analysis of the time across the Board it takes for the average investigation, which includes a multiple series of steps, usually is about a year and a half for completion if accident investigators are not continually launched. I realized we needed to find a better way for investigators to present their findings in a neutral way, i.e. assure the technical content is being reviewed rather than the sentence structure and it could head off communication problems between presenters and the reviewers. It could also shorten the time from accident to agreement on the causes and conclusions. However, it would require changing the way investigators traditionally presented their findings and it would need the commitment of each member of the investigative team.

ACTION:  I challenged one of the most experienced investigators, who also had exceptional writing skills, to help solve this problem. He researched the methods and methodologies that have been successfully used by criminal and accident investigators for decades. One methodology emerged for presenting the investigative findings with all of the facts that supported the finding and, most importantly, the facts that did not support the findings in a

00855 **Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement No. WA-TB-5-009**

spreadsheet format. The evidence matrix format provided the draft conclusions to be agreed upon as well as the facts of the case related to the subject area and the source of the evidence in non-paragraph form. As with all new ways to do things there was reluctance on the part of some to work this way rather than with the traditional paragraph format. So we produced an office policy that outlined the methodology and presented examples so that all could understand the concept. This was combined with classes to assure that all not only understood what was required of them, but also to offer the opportunity to query the process. Finally, the policy was put into effect and each accident investigator was held accountable for presenting their evidence this way.

**RESULTS:** The process was recently applied to several major accident investigations with outstanding results. One such accident was conducted by a team of predominantly inexperienced marine accident investigators. Despite having some of these same investigators, who were central to the accident investigation, launched to other major accidents, the majority of conclusions were drafted and generally agreed upon within 9 months from the accident date. The draft conclusions were presented to other critical Office Directors in the matrix format and major issues and draft conclusions were appropriately discussed and agreed upon in an effective and timely manner. All investigators are held accountable in their performance evaluations for fulfilling their obligations under the policy and in meeting the goals and objectives of the office.

**CONTEXT AND CHALLENGE:** One of the key strategic goals of the Coast Guard's Office of Marine Safety, Security and Environmental Protection was to assure U.S. passenger safety aboard foreign flag vessels by finding an international solution to an international problem.

**ACTION:** I successfully planned and negotiated (despite considerable initial opposition), an unprecedented 'win-win' agreement at the International Maritime Organization (IMO) that will continue to affect the design, construction and, most importantly, the fire safety of passenger ships worldwide. I recognized the potential to save lives by the installation of modern sprinkler systems and negotiated that requirement as the keystone for acceptable fire safety aboard passenger ships.

**RESULTS:** The unanimous adoption of fire safety amendments to the International Convention for Safety at Life at Sea (SOLAS) 1974, as amended and fulfillment of one of the Coast Guard's major goals in accordance with the Commandant's strategic plan.

0 0 8 5 b

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## MANDATORY EXECUTIVE CORE QUALIFICATION: BUSINESS ACUMEN

*4. The ability to acquire and administer human, financial, material and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making.*

### CONTEXT AND CHALLENGE:

The Office of Marine Safety is the smallest office at the Safety Board directly tasked with the agency's mission and statutory authority to investigate accidents. Regardless of its size, the office needed a performance plan that supported the Safety Board's mission and the Chairman's approved strategic plan for the organization. This included major product commitments, support of the Safety Board's Academy, and improvement in the technical quality and professional standing of the organization, both domestically and internationally. Since we can't predict when an accident will occur, and knowing that a team routinely will have to set aside one or more accident investigations to launch to another accident site, we needed ways to deal with this unpredictability and a way to account for our limited size, while still assuring we would fulfill our mandate.

### ACTION:

Using the strategic plan I developed a set of goals that would take into account the number of people within our organization and their number of hours available to do work. First, I sought to identify any predictable times. I had the managers embark on a review of average hours available in the 365 day year; taking into account holidays, weekends, training time, annual, sick and military leave. We reviewed all the time and attendance records for the office over a period of three years and evaluated the averages. Using this available work time, we then used the average number of hours required to conduct certain activities (e.g. writing reports, conducting investigations, preparing for public hearings, etc.), which fortunately had been produced by another modal office. Meetings were held with office staff to review the plan and acceptable production time frames were established for our modal specific tasks. All tasks are not equal; however, with the average number of hours expected for each accomplishment, e.g. a factual report or developing a technical standard for data recorders, we could assign a value to each task. By normalizing a product as the number of average hours it takes to produce an accident report, we then could predict for the Chairman how many work products could be reasonably expected **per person** within any year from our office.

### RESULTS: The office has produced an even higher number of products than predicted. Our staff has not increased (in fact it decreased due to retirements without replacements) yet our status report to the Chairman was exceptional and demonstrated that the office consistently achieved superior performance.

0857

**Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement No. WA-TB-5-009**

For example: one goal was to find ways to do things faster, cheaper, and better. Success with this strategy has been extraordinary. For example, I led the way to support the US delegation at IMO to finalize the requirement for Voyage Data Recorders on existing cargo vessel on international voyages. This will give marine accident investigators the same capability as aviation accident investigators have with the availability of "black boxes" and will improve the availability of critical data efficiently obtained at a minimum cost compared to the traditional means of gathering vessel information following a marine accident. I also successfully initiated a proposal to provide state-of-the-art computer software, electronic charts and hardware to allow marine navigation data to be retrieved for playback and analysis by Safety Board marine accident investigators following a marine accident. This will save time and eliminate expensive contracting to replicate the information that can be efficiently downloaded from the vessel with a laptop.

858

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## MANDATORY EXECUTIVE CORE QUALIFICATION:  BUILDING COALITIONS and COMMUNICATION

*5. The ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally; the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization.*

Throughout my career as a federal manager I have managed to get results by building coalitions with the right group of individuals and groups to achieve the organization's goals.  For example, as the senior manager for the marine program at the Safety Board I executed a plan that included a coalition of federal managers and staff that has successfully improved a critical aspect of marine accident investigations that seemed to be beyond our direct control.  Only by developing and executing a plan with support from both inside and outside the organization, including Congress, could we achieve success.

## CONTEXT AND CHALLENGE:

Safety Board investigations identify root causes of accidents so we may make recommendations to prevent them from happening again.  Much of the literature has identified human factors as the predominant root cause of transportation accidents; usually quoted as greater than 80%.   The identification of underlying human factors requires the effective elimination of the obvious, most notably drug and alcohol related human errors, so we needed to determine if the use of drugs and alcohol were causal elements in the accident.  The most effective way is to use the results of drug and alcohol tests conducted immediately after the accident.  However, the timing of drug and alcohol tests taken after an accident is beyond our direct control.  The Safety Board has no authority to require testing after the accident; it is the regulatory responsibility of the owner to make arrangements for the tests as soon as practicable.  As can be expected, in the immediate aftermath of an accident the owner is preoccupied with a number of other activities and the root cause of the accidents is not the owner's highest priority.  It is usually several hours after a marine accident that we are notified and it then takes additional time to identify the vessel's owner.  Although we have procedures for immediately contacting the owner, the opportunity to definitely assess whether drugs or alcohol may have played a role is too time critical for our procedures to be effective.  Individual owners could only be reached through the federal regulatory process and enforcement was difficult under the existing regulatory scheme.  We needed to have these tests completed routinely after every marine accident and the existing federal regulations were not effective in achieving this goal.

Despite some very high profile accidents in which timely testing wasn't done, including the grounding of the Exxon Valdez, with subsequent devastating pollution, in 1989, there had been little change in testing in the ten years following that accident.  Although our reports had routinely cited this lack of testing as troublesome and in need of improvement, we were not making progress.  The individual accidents were not particularly high profile and without test results, none could be linked to the use of drugs or alcohol; and conversely, neither could we completely eliminate the possibility that the accident errors were linked to one of these factors.

000859

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

**ACTION:**
So in 1998, when another high profile marine accident occurred in which drug and alcohol testing had not been completed and the operator had a history of driving under the influence of alcohol, I decided to develop a strategy to finally achieve this important goal. The most important aspect of this plan was to convince the marine regulator of the need to make this a high priority and to specify the problems in the existing program. In this regard, our usual ways of presenting the results of our accident investigations was to prepare a report highlighting the single accident under investigation and prepare an accident investigation report for Board adoption. I decided to present the facts in a different way; I proposed combining them with all the other accidents in which we had identified the need for testing and presenting them as a Special Investigation Report on Drug and Alcohol Testing in the marine industry. The report outlined the accidents that had been investigated in the ten years since the Exxon Valdez, the most likely reasons why tests weren't being done and the details of the regulations related to these issues. A coalition of Office Directors at the Board identified exactly what needed to be done to correct these deficiencies and by incorporating these ideas into the report it convinced the Safety Board of the need to adopt recommendations for improvement. I next worked with this same critical coalition of staff, managers and Office Directors to build a coalition of support to warrant inclusion on the Safety Board's "Most Wanted" list. The Safety Board selects a limited number of issues, usually ten, which they highlight for the public, the Congress and the recipients as issues that can make major improvements in transportation safety if they will only be implemented. The issue was presented and adopted by the Board as a 'Most Wanted' item.

**RESULTS:** The Special Investigation Report and its inclusion of post-accident marine drug and alcohol testing on the Safety Boards' list of Most Wanted items gained the attention and interest of the regulator and the Congress; it has resulted in Congressional legislation and the issuance of a new set of draft regulations detailing almost every change the Board requested.

**CONTEXT AND CHALLENGE:** More than 95% of the large cruise ships operating from U.S. ports are foreign flag vessels; they each carry an average of thousands of passengers and these are predominantly U. S. citizens. Accident investigations aboard these ships are essentially conducted on foreign soil. When an accident happens, it is necessary to immediately communicate the Safety Board's responsibilities and to gain cooperation from the owner's Flag Administration to be able to conduct an investigation. Thus it is extremely important to network with these Administration representatives in advance so that relationships and trust are established and facilitate a cooperative accident investigation.

**ACTION:** I established an effective network of communication with the majority of Flag Administrations for ships operating from U.S. ports via participation at various international conferences.

**RESULTS:** In every accident involving a foreign flag ship in which the Safety Board is the lead investigative body for the United States, I have successfully contacted my counterpart at the Flag Administration and gained their full cooperation in our accident investigations.

00860

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

**MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATIONS**

*1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.*

I have been an active member of the maritime community dealing with marine transportation and water safety for more than 30 years.

I graduated from the State University of New York Maritime College in 1974 with a Bachelor of Engineering degree, with a specialty in Naval Architecture. I earned the appropriate sea time, in conjunction with requisite academics necessary to acquire my U.S. Coast guard license as a marine engineer, by working in the engine room aboard the *SS Empire State* the school's U.S. Coast guard inspected school ship, during summer sea terms. Upon graduation, I was asked by the college to remain and establish the women's program, the first in the nations, which I did while continuing to expand my knowledge of marine transportation systems. In 1977 I chose to continue my maritime career by accepting an offer to sail as a marine engineer for the ford Motor Company aboard their bulk carriers, operating on the Great Lakes. As an operating engineer I was responsible for all watchstanding duties, including maintaining the operating main propulsion power plant and machinery, and auxiliary systems such as the electrical generators, shipboard water systems, fuel oil, lube oil, and piping and filter systems, and for dealing with any engineering anomalies that might result in an engineering 'casualty' i.e. loss of machinery function, during my watch. During my off-duty hours, I chose to learn more about shipboard systems and responsibilities, including navigation principles and practices, which although not one of my responsibilities, was an aspect of commercial shipping I wished to expand my knowledge of, and successfully did so with the support of both the chip's captain and the chief engineer.

I specifically chose a Great Lakes maritime career due to an exceptional opportunity for diverse experience aboard their vessels. Unlike deep sea fleets, the Great Lakes fleet owners required their engineers to not only serve as watchstanders, but also to perform shipyard maintenance work aboard their vessels. During the winter 'lay-up' period, I was a member of the shipboard engineering team responsible for all machinery preventive and corrective maintenance. All main engine and auxiliary systems were taken apart and rebuilt to assure continued safe and seaworthy operation during the shipping season. This latter responsibility required detailed knowledge of the U.S. Coast Guard and the American Bureau of Shipping (ABS) regulations and requirements for inspected machinery and other systems.

My experience with marine accident investigation has offered me the opportunity to continue to use and expand this knowledge base. As a staff engineer at the Military Sealift Command (MSC) I reviewed, evaluated and recommended actions in response to U.S. Navy accident investigations. At the U.S. Coast Guard I similarly reviewed, evaluated and recommended

000861

**Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement No. WA-TB-5-009**

Commandant Action based upon USCG accident investigations. I was also responsible for evaluating recommendations made to the Coast Guard by NTSB, which were based upon accident investigations addressing issues in my area of expertise. As the Coast Guard's chief technical expert in fire protection I drafted marine regulations and requirements for improved marine fire safety both nationally and internationally. I served as the Coast Guard's on-scene representative for USCG accident investigation and as an investigator-in-charge for the Safety Board. I managed the Safety Board's marine accident investigation program for the past 11 years and during that time I managed go-team launches, accident investigations, public hearings, report preparation, recommendation development and Board presentations for all marine accident investigations. Each of these investigations and reports required broad and detailed familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, Naval Architecture and watchstanding requirements, as well as the formulation of improved safety practices.

000862

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATIONS

*2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.*

Over the past thirty years I have been involved with virtually every aspect of marine transportation and its regulation, including ship construction, operation, maintenance, inspection and regulations. I am recognized both nationally and internationally as an expert in commercial ship design, shipboard operations and marine accident investigation and I have routinely served as a spokesperson, advocate and instructor in each of these areas.

I taught marine accident investigation to the marine industry, foreign accident investigation representative, and the U.S. Coast Guard and Safety Board employees for the Safety Board both at their headquarters and their new Academy. I served as the Safety Board's representative at the International Maritime Organization's World Maritime University in Malmo, Sweden where I taught marine accident investigation classes to international graduate students. I served as an authoritative technical expert and have prepared papers and given presentations and speeches in literally dozens of venues, including technical journals, national and international maritime conferences, and workshops. These include the Royal Institute of Naval Architects, Society of Naval Architects and Marine Engineers, Marine Accident Investigators International Forum, American Pilots Association and the Propellor Club, to name a few. While at U.S. Coast Guard, I served as the Chief, Fire Protection Section and concurrently as the chairman of the U.S. Safety of Life at Sea (SOLAS) Working Group on Fire Protection and the U.S. representative and Head of Delegation to the International Maritime Organization's Subcommittee on Fire Protection from 1986 to 1994. IMO is the United Nations agency headquartered in London, England. I was elected Vice-Chairman of the Subcommittee in 1988 and served in that capacity until 1992 when I was elected as the Chairman of the Subcommittee on Fire Protection by the international marine community.

As the U.S. Representative at IMO, I routinely used both oral and written skills necessary to explain the U.S. position on broad and complex marine issues and technical details to senior representatives of foreign governments. English is a second language for most and communication took place on many levels. It was critical for me to be clear, succinct, technically correct and amenable to differing views in order to gain support for U.S. positions. Thirty detailed and distinct topics were normally covered within the subcommittee's five day meeting. My ability to speak on my feet and conduct my work with integrity was critical to the U.S. success at these meetings.

I have represented the Coast Guard and Safety Board at different times in my career in discussions with, and in presentations made to, Congressional representatives. In each of these situations it was critical for me to have extensive knowledge of the topic and be able to present the information in a clear and succinct manner.

00863    **Marjorie M. Murtagh**
**Director, Office of Marine Safety**
**ES-340-00**
**NTSB Vacancy Announcement No. WA-TB-5-009**

## DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATIONS

*1.  General knowledge and understanding of NTSB's operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.*

I have served as the Safety Board's senior manager in the marine accident investigation office for eleven years. As the Director, Office of Marine Safety, I have full knowledge and understanding of the internal operations of NTSB and have successfully worked within that system throughout my tenure at NTSB. I served as a staff member at the Department of Transportation's United States Coast Guard for 10 years during which time I served as a recognized marine technical expert on behalf of both the Department and the Coast Guard at domestic and international fora.

USCG has recently become part of the Department of Homeland Security, and although this integration into a new organization may shift their focus, they have always had security as an integral part of their responsibilities. Although the current USCG Office of Marine Safety, Security and Environmental Protection has gone through a series of reorganizations over the years, security was not then, nor is it now, viewed as being completely independent from safety. My own experience with this issue is that security of the ship can be threatened by virtue of its lack of safety features, regardless of whether they are initiated by an accident or a deliberate act.

Given my expertise I was invited, and agreed, to serve as the Safety Board's representative at a Marine Salvage Response Capability Workshop; the primary purpose of which was to consider the consequences of potential terrorist incidents in U.S. ports and waterways that could affect operations in these areas. I worked with members of the USCG, U. S. Navy's Supervisor of Salvage (SupSalv) Department of Homeland Security's Transportation Security Agency, the FBI, the U. S. Army Corps of Engineers, and the marine salvage community. We jointly initiated and prepared a plan for organizational and interagency coordination, recognizing that ports and waterways must remain operational and open on a continuous and uninterrupted basis in the aftermath of a major marine casualty, irrespective of whether it's an accident or a terrorist attack.

Marjorie M. Murtagh
Director, Office of Marine Safety
ES-340-00
NTSB Vacancy Announcement No. WA-TB-5-009

## DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATIONS

### 2. A demonstrated command and/or responsibility of, or for, seagoing operations

I served as an operating engineer for the Ford Motor Company aboard an ore carrier on the U.S.Great Lakes.  Ford Motor Company operated its own fleet of ships to supply its Dearborn, Michigan steel production plant with the necessary raw materials: iron ore, coal and limestone. The ships operate between Detroit and ports throughout the Great Lakes and St. Lawrence Seaway for about 8 months of the year.  During another two months of the year, I served as a maintenance and repair engineer while the ship was layed up for the winter.  As a U.S. Coast Guard licensed operating engineer I was responsible for operating the ship's propulsion plant and for supervision of the non-licensed engineering staff during my watch.   During winter work I was responsible for performing maintenance and repair of all shipboard systems, including the ship's boilers and all support systems and equipment.

I served as the U.S. Navy's Military Sealift Command (MSC) 'type desk' engineer for ten ships: six of the fleet oilers and four range instrumentation ships: the USNS Observation Island, USNS Vanguard, USNS Redstone and the USNS Range Sentinel.  The fleet oilers are the ships that supply and other supplies to the U>S. Navy combatants and support vessels by underway replenishment, i.e. supplying fuel in-situ to operating ships at sea and underway. The Range Instrumentations Ships were operated by MSC as platforms for the U.S. Navy, Air Force and Army.  These ships were missile and satellite trackers and their continued operations were directly linked to our national security.  My responsibilities included developing schedules for, and supporting budgets for, maintenance and repair, which required familiarity with the U.S. Coast Guard and the American Bureau of Shipping inspection requirements, both the details and timing of which were essential to continued operation.  In addition, I also was responsible for developing and reviewing proposed alterations, which could range from anything between, and including, the keel plates to the radar mast, e.g. all engine room machinery and bridge equipment, accommodations, tank internals, deck machinery and equipment etc. reviewing civilian mariner crew sizes, reviewing daily casualty reports. In this instance 'casualty' refers to any mission degrading incident aboard ship, which could include loss the air-conditioning plant up to the loss of the entire propulsion plant.

000865

NTSB PERFORMANCE APPRAISAL FORM

SES [  ]  PMB [ X ]  SCH C [  ]

NAME : Marjorie Murtaugh
TITLE : Director
OFFICE: Office of Marine Safety
PERFORMANCE APPRAISAL PERIOD : FROM:   August 1, 2002   TO:   July 31, 2003

INSTRUCTIONS :  Complete this page, and for each rating element complete the second page.  All remarks should be made on a separate page and attached to this form or made on the individual rating element pages.

Individual Rating Elements

| Element (C or NC) | Weighted Factor | Rating |
|---|---|---|
| 1.  _C_ | 2 | Outstanding |
| 2.  _C_ | 3 | Outstanding |
| 3.  _C_ | 2 | Excellent |
| 4.  _C_ | 2 | Outstanding |
| 5.  _C_ | 1 | Outstanding |

TOTAL 10

SUMMARY PERFORMANCE RATING Outstanding

Total of weight of Rating Elements must equal 10 and no element can have a weighted value of less than 0.5.

CONVERSION TABLE

Outstanding -  In the individual element ratings the employee must meet the standard for Outstanding level in 75% of the total weight of all elements, and no element can be rated below Excellent.

Excellent -  In the individual element ratings the employee must meet the standards for the Outstanding and Excellent levels combined in 75% of the total weight of all the rating elements, and no element can be rated below Fully Successful.

Fully Successful -  Only one critical element may be rated at the Minimally Satisfactory level and all others must be Fully Successful or higher.  Non-critical elements must be Minimally Satisfactory or higher.

Minimally Satisfactory - Performs in a manner which falls below Fully Successful.  Two or more critical elements rated Minimally Satisfactory must result in an overall Minimally Satisfactory rating.

Unacceptable (GS)  Unsatisfactory (SES) - Performs in a manner which falls below the Minimally Satisfactory level.  In the individual element ratings, one or more critical elements rated as Unacceptable/Unsatisfactory must result in an overall Unacceptable/Unsatisfactory rating.

0008bb

RATING ELEMENT #1    CRITICAL [ X ]    NON-CRITICAL [  ]    WEIGHT OF ELEMENT [ ? ]

PERFORMANCE STANDARD: Manage investigations (see note)

**Outstanding:** Launches and notifications go smoothly, follow established requirements, and are handled in an exceptional manner. All significant issues are identified and thoroughly investigated. Investigation is closely managed so that all needed work is identified, scheduled, and promptly completed. Necessary factual information is gathered within 6-9 months of accident launch. Factual reports are completed and placed in the docket no later than 12 months of accident (addenda may later be added). Board Order 300, especially with regard to staff coordination and meetings, is always followed and all affected Offices are consulted and participate throughout the process, as appropriate. Public hearing memos are circulated timely, and hearings are complete and run smoothly.

**Fully Successful:** Launches and notifications go smoothly, follow established requirements, and are handled in a reasonable manner. In all but the rare case, all significant issues are identified and investigated reasonably thoroughly. Investigation is closely managed so that most needed work is identified, scheduled, and promptly completed. Necessary factual information is gathered within 10-12 months of accident launch. Factual reports are completed and placed in the docket within 12-14 months of accident (addenda may later be added). Board Order 300, especially with regard to staff coordination and meetings, is always followed and all affected Offices are consulted. Public hearing memos are circulated timely, and hearings are reasonably complete and run smoothly.

**Minimally Satisfactory:** The standards for a fully successful rating are not uniformly met. Deviations from the fully successful standard are significant enough to warrant corrective action and result in direct involvement of higher management to complete various aspects of investigations properly.

NOTE: The Managing Director may extend any of these time frames for a particular investigation if the Office Director demonstrates to the MD's satisfaction that delays were caused by unforeseeable and unavoidable workload.

END OF RATING PERIOD EVALUATION

During the rating period, Ms Murtaugh's office launched on five accidents, two of which were major accident that occurred within two weeks of each other. During the rating period, Ms. Murtaugh also consulted with the U.S. Coast Guard concerning NTSB leadership of two passenger ship accident investigations. These negotiations proceeded successfully without introducing launch delays.

ELEMENT RATING (Circle One)          (O)    E    FS    MS    U

000867

RATING ELEMENT #2    CRITICAL [ X ]    NON-CRITICAL [ ]    WEIGHT OF ELEMENT [ 3 ]

**PERFORMANCE STANDARDS:** Produce reports, safety recommendations and accomplishments (see note)

**Outstanding:** Practical, valuable safety recommendations are identified, processed, and issued (urgently, if necessary) in a timeframe that ensures relevance. Office drafts identify and address all important issues, and in a thorough, accurate, and exceptionally well presented manner. Coordination, negotiation, and discussion with necessary offices occurs throughout the development process, including compliance with Managing Director's Report Preparation Memo of 8/99, so that no unexpected disagreement arises, for example in the case of reports, at the Director's review. Disagreements are resolved timely and cordially. Every accident investigation will be completed, either by close out, brief, major or summary report within 20 months of the accident date. Reasonable target dates for other reports, special projects and other work product will be set and met. Safety accomplishments are of exceptionally high quality and reflect Board policy.

**Fully Successful:** Practical, valuable safety recommendations are as a general rule identified, processed, and issued (urgently, if necessary) in a timeframe that ensures relevance. Office drafts generally identify and address all important issues, and in a reasonably thorough, accurate, and well written manner. Coordination, negotiation, and discussion with necessary offices occurs throughout the development process, including compliance with Managing Director's Report Preparation Memo of 8/99, so that unexpected disagreement rarely arises, for example in the case of reports, at the Director's review. Disagreements are resolved timely and cordially. Most accident investigations will be completed, either by close out, brief, major or summary report within 20 months of the accident date. Reasonable target dates for other reports, special projects and other work product will be set and met. Safety accomplishments are of reasonable quality and reflect Board policy.

**Minimally Satisfactory:** The standards for a fully successful rating are not uniformly met. Deviations from the fully successful standard are significant enough to warrant corrective action and results in direct involvement of higher management to complete work products properly.

NOTE: The Managing Director may extend any of these time frames for a particular investigation if the Office Director demonstrates to the MD's satisfaction that delays were caused by unforeseeable and unavoidable workload.

**END OF RATING PERIOD EVALUATION**

During the rating period, Ms. Murtagh was confronted with many challenges in the management of the Office of Marine Safety (OMS): a demanding workload, vacant positions that were filled late in the year, new employees to get acclimated to the work processes and launches for major accidents. In spite of this, she provided oversight to an investigation that was completed and adopted by the Board within 11 months. The OMS investigation of the collision between the U.S. Coast Guard Patrol Boat CG242513 and the U.S. Small Passenger Vessel Bayside Blaster, in Biscayne Bay, Florida, January 12, 2002 was adopted by the Board on December 17, 2002. Seven recommendations were issued that addressed the Board's long-standing concern for the need for improvements in the oversight of nonstandard boat operations. Another example of how the work of the Office contributes to safety improvements in marine transportation.

ELEMENT RATING (Circle One)        (O)    E    FS    MS    U

000868

**RATING ELEMENT #3    CRITICAL [ X ]    NON-CRITICAL [ ]    WEIGHT OF ELEMENT [ 2 ]**

**PERFORMANCE STANDARD:** Manage resources, coordinate with other offices, and implement Board policies

**Outstanding:** New work undertaken will normally not compromise timely completion of existing projects. Works exceptionally well with subordinates, peers, and superiors to set objectives and action plans, which are routinely met. Encourages and coaches employees and provides or assists in obtaining assignments and training to increase staff competencies. Leadership promotes teamwork and good morale at all levels. Aggressively addresses all performance and/or conduct related problems before they adversely affect work and morale. Actively and creatively works to promote all Board orders, through on the job and special training, especially those relating to EEO/diversity, OSHA, Human Resources, and use of the travel and purchase cards. All employees have accurate PDs and current performance standards. Midpoint and final ratings, and award recommendations are timely prepared and thoroughly documented.

**Fully Successful:** New work undertaken will not seriously alter schedules for completion of existing projects. Works effectively with subordinates, peers, and superiors to set objectives and action plans, which are typically met. Provides or assists in obtaining assignments and training to increase staff competencies. Leadership promotes teamwork and good morale at all levels. Addresses all performance and/or conduct related problems, usually before they adversely affect work and morale. Works to ensure that staff understands and complies with all Board orders, especially those relating to EEO/diversity, OSHA, Human Resources, and use of the travel and purchase cards. All employees have accurate PDs and current performance standards. Midpoint and final ratings, and award recommendations are timely prepared and adequately documented.

**Minimally Satisfactory:** The standards for a fully successful rating are not uniformly met. Deviations from the fully successful standard are significant enough to warrant corrective action and result in direct involvement of higher management to complete tasks properly.

**END OF RATING PERIOD EVALUATION**

During the rating period, Ms. Murtaugh hired five new employees. She also conducted a two day on-the-job course on events and causal factors analysis for new employees in her office.

**ELEMENT RATING (Circle One)**        O        E        FS        MS        U

000069

RATING ELEMENT #4    CRITICAL [ X ]    NON-CRITICAL [  ]    WEIGHT OF ELEMENT [ 2 ]

PERFORMANCE STANDARD: Develop budget for office and participate in agency-wide budget development and Budget and Finance Council activities. Exercise responsibility and leadership in all financial matters.

**Outstanding:** Proposed budgets reflect past experience and realistic future expectations and plans. Budgets are followed, and carefully monitored; projections are made so that difficulties can be foreseen (to the extent possible), and are timely brought to the attention of senior managers. Works effectively and creatively, independently and with other managers, to promote efficient use of funds and prevent waste, fraud, and abuse.   Aggressively works to ensure office compliance with NTSB fiscal standards and policies, especially in areas of purchase and credit cards, and convenience checks, procurement and reimbursement, and asset management.  Staff is fully trained and exceptionally familiar with all rules and procedures and rarely if ever do problems arise. Demonstrates leadership in the area of fiscal responsibility. Staff works constantly and effectively with agency inventory manager and senior contract specialist. Stays abreast of new information related to budget and financial issues, and is always a useful contributor and effective member of the Budget and Finance Council.

**Fully Successful:** Proposed budgets reflect past experience and realistic future expectations and plans. Budgets are followed, and carefully monitored; projections are made so that difficulties can be foreseen (to the extent possible), and are timely brought to the attention of senior managers. Works effectively, independently and with other managers, to promote efficient use of funds and prevent waste, fraud, and abuse. Works to ensure compliance with NTSB fiscal standards and policies, especially in areas of purchase and credit cards and convenience checks, procurement and reimbursement, and asset management. Staff is fully trained and familiar with all rules and procedures. Problems of noncompliance are rare. Demonstrates leadership in the area of fiscal responsibility. Staff generally works effectively with agency inventory manager and senior contract specialist. Stays abreast of new information related to budget and financial issues, and is often a useful contributor and member of the Budget and Finance Council.

**Minimally Satisfactory:** The standards for a fully successful rating are not uniformly met. Deviations from the fully successful standard are significant enough to warrant corrective action and result in direct involvement of higher management in the running of the office. Is rarely a useful contributor and effective member of the Budget and Finance Council.

END OF RATING PERIOD EVALUATION

ELEMENT RATING (Circle One)        (O)    F    FS    MS    U

000870

RATING ELEMENT #5   CRITICAL [ X ]   NON-CRITICAL [   ]   WEIGHT OF ELEMENT [ ? ]

**PERFORMANCE STANDARD:**  Perform other assignments, including safety outreach

_Outstanding:_  Develops and implements an exceptional advocacy plan that includes staff presentation of speeches and papers to promote safety issues, and actively participates in it. Coordinates the plan with other appropriate offices. Ensures that staff stays current on all technical issues so that Board can act and react promptly to outside developments.  Provides timely, thorough, and accurate technical support and advice to other offices.  Written products (testimony, speeches, letters, administrative reports, budget documents, annual reports, etc.) are timely, thorough, accurate, and so well written that few if any changes are required.  Staff understands advance approval requirements, and any advance approvals are properly and timely obtained.  Places the good of the agency above the good of the office by way of, for example, coordinating and sharing personnel and physical resources, and often volunteering to do so, to assist colleagues.  Is an exceptional team player.

_Fully Successful:_  Develops and implements an advocacy plan that includes staff presentation of speeches and papers to promote safety issues, and actively participates in it.  Coordinates the plan with other appropriate offices.  Ensures that staff stays current on all technical issues so that Board can act and react promptly to outside developments.  When asked, provides timely, thorough, and accurate technical support and advice to other offices.  Written products (testimony, speeches, letters, administrative reports, budget documents, annual reports, etc.) are timely, thorough, accurate, and effectively communicate to the intended audience.  Staff understands advance approval requirements, and any advance approvals are properly and timely obtained.  Places the good of the agency above the good of the office by way of, for example, coordinating and sharing personnel and physical resources to assist colleagues.

_Minimally Satisfactory:_  The standards for a fully successful rating are not uniformly met. Deviations from the fully successful standard are significant enough to warrant corrective action and result in direct involvement of higher management in the running of the office.  Is rarely a useful contributor and effective member of the Budget and Finance Council.

END OF RATING PERIOD EVALUATION

During the rating period Ms. Murtaugh served as a member of the team that negotiated a memorandum of understanding with the U.S. Coast Guard.  Also during the period, Ms. Murtaugh represented the Safety Board at the World Maritime University by teaching an accident investigation course.

Ms. Murtaugh also coordinated with the NTSB Academy to teach 2 new courses: (1) a two-week course on basic marine accident investigation (for new employees), and (2) a two-day course for the marine industry representatives who might serve as parties to future NTSB investigations.

ELEMENT RATING (Circle One)        ( O )        E        FS        MS        U

000871

## SIGNATURES AND CERTIFICATIONS

RATING ELEMENTS AND PERFORMANCE STANDARDS

(To be completed at the beginning of the performance appraisal period if the rating elements/performance standards change; when an employee is assigned to a new position; or when a new employee enters on duty.)

Rating Official: _____    Date _____

Reviewing Official: _____   ____   _____    Date _____

Employee: _____    Date   ____ ___


END OF YEAR RATING PERIOD EVALUATION
(To be completed at the end of the appraisal period.)

Rating Official: _____    Date 10/15/03

Reviewing Official: _____    Date 11-13-03

Employee: _____    Date 11-15-03

**[The rating and reviewing officials must finalize their rating BEFORE the rating official discusses the rating with the employee).**

000872

**APPROVING OFFICIAL**

_____ APPROVED AS RECOMMENDED

_____ APPROVED AS REVISED

_____ DISAPPROVED

COMMENTS:

_____  _____  11-13-03
Signature           Title            Date

002001

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)*

| 1. Actions Requested | 2. Request Number |
|---|---|
| Appointment to the SES | |

| 3. For Additional Information Call *(Name and Telephone Number)* | 4. Proposed Effective Date |
|---|---|
| Joseph G. Osterman Jr.,Managing Director, 314.6060 | |

| 5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* | 6. Action Authorized by *(Typed Name, Title, Signature, and Concurrence Date)* |
|---|---|
| Joseph G. Osterman Jr.,Managing Dir   7-25-05 | Mark Rosenker, Acting Chairman   25/5-1/05 |

**PART B - For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

| 1. Name *(Last, First, Middle)* | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Spencer, John S. | | | 08/01/05 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| | |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| | |

| 5-E. Code | 5-F. Legal Authority |
|---|---|
| | |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| | |

| 6-E. Code | 6-F. Legal Authority |
|---|---|
| | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | Director, Office of Marine Safety |

| 8. Pay Plan | 9.Occ. Code | 10.Grade or Level | 11.Step or Rate | 12. Total Salary | 13.Pay Basis | 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ES | 340 | 00 | 0 | | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | Office of Marine Safety |

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|
| 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other<br>2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | 0 - None   2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES ☐   NO ☐ |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| | | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| | | | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career | E - Exempt<br>N - Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station *(City - County - State or Overseas Location)* |
|---|---|
| | |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other | | |

**PART C - Reviews and Approvals** *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature

GOVERNMENT
EXHIBIT
17

000354

dard Form 50-B
. 7/91
. Office of Personnel Management
l Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| MURTAGH, MARJORIE M | | | 06/06/05 |

**FIRST ACTION** / **SECOND ACTION**

| . Code | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 919 | DETAIL NTE 10-03-05 | | |
| . Code | 5-D. Legal Authority | 6-C Code | 6-D. Legal Authority |
| | | | |
| . Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SUPV MARINE ACCIDENT INVESTIGATOR | UNCLASSIFIED DUTIES |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3501 | 0321519 | | | | 7001 | 0321519 | | | | |
| Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
| GS | 1801 | 15 | 10 | $135136 | PA | | | | | | PA |
| A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
| $116517 | $ 18619 | $135136 | $ 0. | | | | | | |

| . Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF MARINE SAFETY<br>OFFICE OF THE DIRECTOR | OFC OF SAF REC & COMMUNICATIONS<br>OFFICE OF THE DIRECTOR |
| WASHINGTON, DC | WASHINGTON, DC |

## EMPLOYEE DATA

| l. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 1 | 1 - None  3 - 10-Point/Disability  5 - 10-Point Other | | 1 | 0 - None  2 - Conditional | | YES ☐  NO ☒ |
| | 2 - 5-Point  4 - 10-Point Compensable  6 - 10-Point/Compensable/30% | | | 1 - Permanent  3 - Indefinite | | |

| . FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| CO | BASIC ONLY | 9  NOT APPLICABLE | 0. |

| ). Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1  CSRS | 07/11/83 | F  FULL-TIME | |

## POSITION DATA

| 4. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1  1 - Competitive Service  3 - SES General | E  E - Exempt  N - Nonexempt | 9530.310 | 8888 |
| 2 - Excepted Service  4 - SES Career Reserved | | | |

| 8. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 0. Agency Data | 41. VET-STAT | 42. EDUC LVL | 43. SUPV LVL | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS  00 | X | 14 | 2 | NONCRITICAL-SENSITI |

5. Remarks

GOVERNMENT EXHIBIT
18
CAPITOL REPORTING 800-732-3309



| 5. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| TB - NATL TRANS SAFETY BOARD | LISA P. LOVE<br>DIRECTOR OF HUMAN RESOURCES |

000350

Form 50-B
91
Office of Personnel Management
Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

Name (Last, First, Middle)

MURTAGH, MARJORIE M

| | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| | | | 10/16/05 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 5-B. Nature Of Action | | 6-A. Code 6-B. Nature of Action | |
| 721 REASSIGNMENT | | | |
| 5-C. Code 5-D. Legal Authority | | 6-C Code 6-D. Legal Authority | |
| N2M REG 335.102 | | | |
| 5-E. Code 5-F. Legal Authority | | 6-E. Code 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SUPV MARINE ACCIDENT INVESTIGATOR | PROGRAM ANALYST<br>SENIOR PROGRAM ANALYST |
| 3501       0321519 | 1201       6121541 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 1801 | 15 | 10 | $135136 | PA | GS | 0343 | 15 | 10 | $135136 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $116517 | $ 18619 | $135136 | $ 0 | $116517 | $ 18619 | $135136 | $ 0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF MARINE SAFETY<br>OFFICE OF THE DIRECTOR<br><br><br>WASHINGTON,DC | OFFICE OF MANAGEMENT<br><br><br><br>WASHINGTON,DC |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1     1 - None     3 - 10-Point/Disability     5 - 10-Point Other<br>      2 - 5-Point     4 - 10-Point Compensable     6 - 10-Point/Compensable/30% | 1     0 - None     2 - Conditional<br>      1 - Permanent     3 - Indefinite | | YES  [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0 BASIC ONLY | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1 CSRS | 07/11/83 | F FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1   1 - Competitive Service   3 - SES General<br>    2 - Excepted Service   4 - SES Career Reserved | E   E - Exempt<br>    N - Nonexempt | 9530.310 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON,DISTRICT OF COLUMBIA |

| 40. Agency Data NC | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS    00 | X | 14 | 5 | NONCRITICAL-SENSITI |

45. Remarks

POSITION IS AT THE FULL PERFORMANCE LEVEL.

GOVERNMENT
EXHIBIT
19

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| TB - NATL TRANS SAFETY BOARD | LISA P. LOVE |
| 47. Agency Code     48. Personnel Office ID     49. Approval Date | DIRECTOR OF HUMAN RESOURCES |
| TB00     4707     12/12/05 | 051598945 |

000311

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|
| COOKE, MARJORIE MURTAGH | | | | | 07/03/06 |

| FIRST ACTION | | | SECOND ACTION | | |
|---|---|---|---|---|---|
| 5-A. Code | 5-B. Nature Of Action | | 6-A. Code | 6-B. Nature of Action | |
| 302 | RETIREMENT-VOLUNTARY | | | | |
| 5-C. Code | 5-D. Legal Authority | | 6-C. Code | 6-D. Legal Authority | |
| SQM | 5 U.S.C. 8336 | | | | |
| 5-E. Code | 5-F. Legal Authority | | 6-E. Code | 6-F. Legal Authority | |

| 7. FROM: Position Title and Number | | | | | 15. TO: Position Title and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|
| PROGRAM ANALYST | | | | | | | | | |
| SENIOR PROGRAM ANALYST | | | | | | | | | |
| 1201        6121541 | | | | | | | | | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0343 | 15 | 10 | $139774 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $118957 | $ 20817 | $139774 | $    0 | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFFICE OF MANAGEMENT<br><br><br>WASHINGTON, DC | |

## EMPLOYEE DATA

| 23. Veterans Preference | | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|---|
| 1 | 1 - None<br>2 - 5-Point | 3 - 10-Point/Disability<br>4 - 10-Point/Compensable | 5 - 10-Point Other<br>6 - 10-Point/Compensable/30% | 1 | 0 - None     2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES [X] NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| C0 | BASIC ONLY | 9 | NOT APPLICABLE | 0 |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|
| 1 | CSRS | 07/11/83 | F | FULL-TIME | |

## POSITION DATA

| 34. Position Occupied | | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 | 1 - Competitive Service  3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | | E  E - Exempt<br>N - Nonexempt | 9530.310 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data NC | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS    00 | X | 14 | 5 | NONCRITICAL-SENSITI |

| 45. Remarks |
|---|
| FORWARDING ADDRESS: 8475 SYLVAN WAY CLIFTON VA 20124<br>REASON FOR RETIREMENT: MEETS AGE AND SERVICE REQUIREMENTS.<br>LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE. |

GOVERNMENT
EXHIBIT
20

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| TB - NATL TRANS SAFETY BOARD | AUTHORIZING OFFICIAL |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | 063506256 |
| TB00 | 4107 | 06/29/06 | |

Long-Term Record - DO NOT DESTROY



**AN EQUAL OPPORTUNITY EMPLOYER**
**NATIONAL TRANSPORTATION SAFETY BOARD**

*SENIOR EXECUTIVE SERVICE*
*POSITION VACANCY ANNOUNCEMENT*

**NUMBER:**   WA-TB-4-033

**DATE OPENED:**  07-14-04

**DATE CLOSED:**  08-11-04

**NO. OF VACANCIES: 1**

**AGENCY CONTACT:**     Human Resources Division 1-800-573-0937 or 202 314-6238
World Wide Web Address: http://www.ntsb.gov

**POSITION TITLE, PAY PLAN, AND SERIES:  Director, Office of Marine Safety**
**ES-340-00**

**LOCATION:**                                                           **Office of Marine Safety**
**Washington, D.C.**

**SALARY RANGES:**                                          $104,927 to $145,600*
*Rate is limited to the rate for Level III of the
Executive Schedule.

**AREA OF CONSIDERATION:**    Nationwide; all groups of qualified individuals.  This is a
Career Reserved Position.  **NTSB may or may not pay relocation (PCS) expenses.**

**NONCOMPETITIVE CONSIDERATION:**    Current career Senior Executives, QRB
certified graduates of SES candidate development programs and individuals with SES
reinstatement eligibility may be considered non-competitively for appointment to this position if
they meet the mandatory qualifications requirements.  Proof of noncompetitive eligibility is
required.

**REGULATIONS:**    Financial interest in certain transportation enterprises is prohibited.  The
proposed appointee will be required to file a Public Financial Disclosure Report, SF-278.
Security clearance is required.  US Citizenship is required.

**DUTIES:** The incumbent serves as Director of the Office of Marine Safety with primary
responsibility for implementing and monitoring operational policy and programs for the Office.
Oversees the investigation, analysis, development and preparation of detailed reports and
proposed probable cause determinations of major and field accidents and incidents.  Assures that
all factors, both actual and potential, which may have led to the accident/incident are identified,
thoroughly and objectively examined and reported.  Also develops safety recommendations to
minimize their recurrence, special investigations, responses to proposed marine safety
rulemaking, and requests for technical support.  Manages an Office of employees in occupations

**PRIVACY ACT REQUIREMENTS (P.L.93-579):**  The referenced forms are used to determine qualifications for promotion or
employment and are authorized under Title 5 of the U.S. Code, Sections 3302 and 3361.  Each form must be submitted to consider you
for the position noted.  The social security number is not required for this purpose and may be deleted.

**EVALUATION METHODS:** Review or evaluation of applications or personnel folders, performance appraisals, training, awards, and
if necessary, personnel inquires, pre-employment reference checks, interviews, written tests, potential appraisals, and personnel
investigations.

GOVERNMENT
EXHIBIT
21

000813

including Master Mariner, Marine Accident Investigation, Engineering, Naval Architecture, and Survival and Human Factors.

**QUALIFICATIONS:** There are five mandatory Executive Core qualifications that are common to all positions in the Senior Executive Service. There are also four professional/technical qualifications that are unique to this position. Two are mandatory and the other two are desirable. Applicants must demonstrate possession of the two mandatory professional/technical qualification requirement AND all the executive core qualification requirements in order to be considered basically qualified for this position. Applicants must provide detailed evidence that their knowledge, skills, and abilities meet the mandatory Executive Core qualifications listed below, and reflect the ability to perform the duties of the position.

## MANDATORY EXECUTIVE CORE QUALIFICATIONS (5):

**1. Leading Change** This core qualification encompasses the ability to develop and implement an organizational vision, which integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance change and continuity—to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. Key Characteristics of this qualification are as follows: (a) Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes; (b) Identifying and integrating key issues affecting the organization, including political, economic, social, technological, and administrative factors; (c) Understanding the roles and relationships of the components of the national policy making and implementation process, including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization; (d) Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution; (e) Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self-motivated; pursuing self-development; seeking feedback from others and opportunities to master new knowledge; (f) Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.

**2. Leading People** This core qualification involves the ability to design and implement strategies, which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. Key characteristics of this qualification are as follows: (a) Providing leadership in setting the workforce's expected performance levels commensurate with the organization's strategic objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority; (b) Promoting quality through effective use of the organization's performance management system (e.g., establishing

000814

performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees as appropriate); (c) Valuing cultural diversity and other differences; fostering an environment where people who are culturally diverse can work together cooperatively and effectively in achieving organizational goals; (d) Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring; (e) Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations; (f) Resolving conflicts in a positive and constructive manner; this includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.

**3. Results Driven** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. Key Characteristics of this core qualification are as follows: (a) Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas; (b) Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives; (c) Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands; (d) Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans; (e) Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies; (f) Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.

**4. Business Acumen** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. Key Characteristics of this core qualification are as follows: (a) Assessing current and future staffing needs based on organizational goals and budget realities. Applying merit principles to develop, select, and manage a diverse workforce; (b) Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems; (c) Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels; (d) Overseeing procurement and contracting procedures and processes; (e) Integrating and

000815

coordinating logistical operations; (f) Ensuring the efficient and cost-effective development and utilization of management information systems and other technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.

**5. Building Coalitions/Communication** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization. Key Characteristics of this core qualification are as follows: (a) Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas; (b) Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management; (c) Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders; (d) Working in groups and teams; conducting briefings and other meetings; gaining cooperation from others to obtain information and accomplish goals; facilitating 'win-win' situations; (e) Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect; (f) Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.

## MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION:

1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.

2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.

## DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATIONS:

000816

1. General knowledge and understanding of the NTSB's operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.

2. Demonstrated command and/or responsibility of or for sea-going operations.

## EVALUATION OF CANDIDATES:

1. The Human Resources representative will review all applications to determine whether basic eligibility has been met. To meet basic eligibility, applicants must possess the mandatory Executive Core Qualifications and the mandatory technical/professional qualifications.

2. All basically qualified candidates will be referred to the NTSB Executive Resources Board (ERB) for further consideration. The ERB will group the candidates into broad categories of best qualified, qualified and not qualified. The best qualified candidates will be forwarded to the selecting official for selection.

3. The selecting official may interview any or all of the best qualified candidates and will forward a recommendation to the Chairman or her designee for final approval. The Chief, Human Resources Division will forward the selection to the Office of Personnel Management for qualifications approval, if required.

4. Applicants with career appointments in the SES, SES reinstatement eligibles and certified SES Candidate Development Program Graduates need only address the professional/technical qualification requirements as their overall executive qualifications have already been certified.

## OTHER SIGNIFICANT FACTS:

- The NTSB is an equal opportunity employer. Non-merit factors such as sex, race, age, color, national origin, religion, etc., will not be considered. Interviews and qualification inquiries will be required.

- The law authorizes the granting of special recognition, awards, and incentive payment to members of the SES to help retain, recognize, reward, and motivate highly competent executives. Specifically, these payments and forms of recognition include: Presidential Distinguished and Meritorious rank awards; Senior Executive Service bonuses and superior accomplishment awards.

- Appointees newly selected for appointment to the SES must have their executive core qualifications approved by the Office of Personnel Management and will be subject to a one year probationary period.

- Veterans preference does not apply in the SES.

000817

- All eligibility requirements must be met by the closing date of this announcement.

- Applications must be postmarked by the closing date of the announcement.

**HOW TO APPLY:**

All applicants must submit an application for consideration. The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format. Be brief and concise, but inclusive in the description of your work experience. Forward application to:

National Transportation Safety Board,

Human Resources Division (MD-30),

490 L'Enfant Plaza, East, S.W.,

Washington, D.C. 20594.

1. Submit three (3) copies of the application with original signature on each.

2. Submit three (3) copies of a Qualifications Brief, which is a statement indicating how your experience, education, training, awards, and/or self-development activities meet the qualifications requirements listed above. The Qualifications Brief must cover the five Executive Core Qualifications and the four technical/professional qualifications. Format the brief so that each requirement is individually addressed. It must provide sufficient information for evaluation. Do not repeat entries from your narrative work history. Instead, highlight your training, experience and accomplishments, (including examples of work assignments, projects, etc.) that directly relate to the position being filled.

3. Submit three (3) copies of your most recent performance appraisal.

4. Include the following information in your application package:

**JOB INFORMATION:** Announcement number, job title and grade level of the position for which you are applying.

**PERSONAL INFORMATION:**

- Full Name, mailing address (with zip code) and day and evening telephone numbers (with area code).

- Social Security Number.

000820 

**National Transportation
Safety Board**

Memorandum

DATE:        December 2, 2004

TO:          Dan Campbell
             Managing Director

FROM:        NTSB Executive Resource Board (ERB) Ad-Hoc Rating Panel

SUBJECT:     Rating of Applicants for the position of Director, Office of Marine Safety

Twenty applications were received in response to the announcement (WA-TB-4-083) for the position of Director, Office of Marine Safety. The HR Division conducted a minimum qualifications review of each application. As a result of this review, ten applications were forwarded to the NTSB Ad-Hoc panel of the ERB. This group of candidates includes two current employees of the Safety Board: Marjorie Murtaugh and Theodore White.

The panel members have met to discuss the candidates and to arrive at a recommendation. Five of the ten candidates are rated as Qualified (Q) or Highly Qualified (HQ) in the following areas: Executive Qualifications, Mandatory Professional/Technical Qualifications and Desirable Professional/Technical Qualifications.

Applications are forwarded for your consideration. The Human Resources Division will forward the selection to the Office of Personnel Management for certification of the executive/managerial qualifications.



GOVERNMENT
EXHIBIT
22

000821                          2


Elaine Weinstein
Director, Office of Safety
Recommendations & Accomplishments

Robert J. Chipkevich
Director, Office of Railroad, Pipeline &
Hazardous Materials Investigations

Ron Battocchi
General Counsel

000822

3



## NATIONAL TRANSPORTATION SAFETY BOARD
### Referral and Selection Certificate

Position to be filled:          Director, Office of Marine Safety

Vacancy Announcement Number:    WA-TB-4-003

Grade Level and Series of this Certificate: ES-340

The Selecting Official:         Daniel Campbell, Managing Director

Certificate Numbers:            WA-TB-4-003

Date of Certificate:            December 2, 2004

The persons listed below are best qualified among all the eligible candidates for the position shown above.   This group was identified after thorough evaluation and comparison of candidates' qualifications against Office of Personnel Management standards and any special position requirements.   You are requested to consider the attached data and arrange for interviews regarding the candidates of interest. When a selection is determined, please indicate the name of the person selected in the space provided below.

CANDIDATES FOR CONSIDERATION:

See Attachment.

CANDIDATE SELECTED:   *Re-advertize*

Signature of Managing Director:   *C. Campbell*

Date of Selection:   *12/10/04*

000823

4

WA-TB-4-003
Director, Office of
Marine Safety

Current or Former SES Member

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |

SES Eligible: Qualified

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|---|---|---|---|
| Joseph Brusseau | | Director of Field Activities for Marine Safety, Security and Environment Protection, Captain, USCG, Grade 6, Washington, D.C. | |
| Dana Goward | | Chief, Office of Programs and Architecture, Maritime, GS-301-15, Washington, D.C. | |
| Marjorie Murtaugh | | Director, Office of Marine Safety, GS-1801-15, NTSB, Washington, D.C. | |
| Vassilios Livanoa | | President, Marquest Inc. New York, N.Y. Non-Federal Applicant | |
| Pradeep Nayyar | | Senior Engineer, Military Sealift Command, Washington Navy Yard GS-0830-13, Washington, D.C. | |

Certificate audited on _____ by _____.

[ ] This certificate was used for selection.

000824

5

[ ] This certificate was not used; selection made from _____.

SES Crediting Plan WA-TB-4-003

# Rating and Evaluation Plan
## Director
## Office of Marine Safety
## National Transportation Safety Board, Washington, D.C.

**I.  Individual Qualification Rating Elements:**  The qualifications described in the Vacancy Announcement are recast for rating purposes as follows:

> ➤  **5 Mandatory Executive Core Qualifications**
> ➤  **2 Mandatory Professional/Technical Qualifications**
> ➤  **2 Desirable Professional/Technical Qualifications**

Ratings for each element are as follows:  HQ (Highly Qualified); Q (Qualified); NQ (Not Qualified)

### Executive Core Qualifications

#### 1.  Leading Change

The ability to develop and implement an organizational vision which integrates key national and program goals, priorities, values, and other factors.  Inherent to it is the ability to balance change and continuity — to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. Key characteristics include:

1. *Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes.*
2. *Identifying and integrating key issues affecting the organization, including political, economic, social, technological and administrative factors.*
3. *Understanding the roles and relationships of the components of the national policy making and implementation process including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization.*
4. *Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution.*
5. *Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self motivated; pursuing self-development; seeking feedback from others and opportunities to master new knowledge.*
6. *Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.*

| Rating Achieved | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below:<br><br>Experience in the integration of internal and external program/policy issues as evidenced by leadership of a complex and changing organization which is responsive to a broad sector of the general public and client groups where relationships may at times be controversial and are maintained under adverse circumstances. The program is dynamic and non-static requiring the applicant to ensure current knowledge of all relevant issues as well as remain open to new factors and changing components.  The position held requires the development of effective organizational relationships that drive change and are often characterized by competing and conflicting interests both within and outside the agency.  Despite these complexities, the applicant has utilized innovative and creative ideas to inspire and guide others to achieve the organization's vision.  Or comparable experience. |
| NQ | At this level, the applicant has experience <u>below</u> the qualifications for "Q." |



GOVERNMENT EXHIBIT 23

005011

## 2  Leading People

The ability to design and implement strategies which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. Key characteristics include:

1. *Providing leadership in setting the work force's expected performance levels commensurate with the organization's strategic plan objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority.*
2. *Promoting quality through effective use of the organization's performance management system (e.g., establishing performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees, as appropriate).*
3. *Valuing diversity and other differences; fostering an environment where people who are diverse can work together cooperatively and effectively in achieving organizational goals.*
4. *Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring.*
5. *Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations.*
6. *Resolving conflicts in a positive and constructive manner; this includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below:<br><br>Experience leading and directing a complex and occupationally diverse multi-functional organization including responsibility for staff allocation and utilization. The applicant will have demonstrated responsibility for: managing the assignment of work through the reallocation of staff and assignments; delegating and empowering employees, thereby, utilizing the intelligence and spirit of people at all levels to meet changes in priorities, goals or mission; adjusting the organizational structure to accomplish objectives; hiring a diverse staff; coaching, mentoring and appraising staff; and, making the appropriate decisions relative to retention, discipline, rewards or promotion. The applicant will have demonstrated the ability to energize and inspire people to overcome barriers, and align employees, through his/her words and deeds, around the organization's vision. The successful applicant will have helped others navigate through change, and ensured the growth of other leaders throughout the organization. Affirmative action and EEO requirements are exceeded and career enhancement opportunities/assignments are provided. Or comparable experience. |
| NQ | At this level, the applicant has experience <u>below</u> the qualifications for "Q." |

## 3    Results Driven

This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. Key characteristics include:

1. *Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas.*
2. *Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives.*
3. *Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands.*
4. *Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans.*
5. *Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies.*
6. *Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below: <br><br> Experience that has required him/her to lead/direct the programs of a highly complex organization and to establish long- and short-range planning goals and objectives. Achievement of these objectives would have required establishing direction through visioning and strategies to reach these goals as well as the application and use of creative and innovative management practices/techniques that will raise expectations and manifest high performance. This experience demonstrates to a high degree the ability to assess the context of a situation/issue, then formulate and prepare program/project plans which drive productivity and efficiency/effectiveness standards while taking into consideration external constraints. The applicant would also have had the responsibility to implement these plans, the authority to organize the structure and work of the organization, and be held fully accountable to effectively accomplish these objectives. Or comparable experience. Specific examples of relevant experience would include: 1) Business process reengineering to increase customer service and program timeliness; and, 2) Modernizing a major program and effectively dealing with all related change management issues. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q." |

005013

## 4  Business Acumen

The ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making.

Key characteristics include:

1. *Assessing current and future staffing needs based on organizational goals and budget realities.  Applying merit principles to develop, select, and manage a diverse workforce.*
2. *Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems.*
3. *Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels.*
4. *Overseeing procurement and contracting procedures and processes.*
5. *Integrating and coordinating logistical operations.*
6. *Ensuring the efficient and cost-effective development and utilization of management information systems and other technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below:<br><br>Experience in the effective implementation of procedures and activities related to obtaining and allocating the resources necessary to support policies/programs within a complex organization to include such areas of the budgetary process as budget development, allocation, reallocation; overseeing the procurement and contracting process; directing/ coordinating logistical operations such as space, furniture, etc.  The applicant, at this level, is able to: demonstrate successful cost savings in support of the organization's mission; drive cost competitiveness and alternatives for service delivery; utilize an innovative approach to cost savings thereby ensuring trust in the ability to exercise fiscal restraint at all times; and, make appropriate adjustments based on his/her evaluation of changing circumstances.  Or comparable experience.  Specific examples of relevant experience would include: 1) Leading organizations in a constrained budget environment, and, 2) Acquiring/deploying/effectively managing large information technology systems. |
| NQ | At this level, the applicant has experience <u>below</u> the qualifications for "Q." |

005014

**5.    Building Coalitions/Communication**

The ability to explain, advocate, and express facts and ideas in a convincing manner and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expensive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization.

Key characteristics include:

1. *Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas.*
2. *Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management.*
3. *Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders.*
4. *Working in groups and teams; conducting briefings and other meetings; gaining cooperation from others to obtain information and accomplish goals; facilitating "win-win" situations.*
5. *Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect.*
6. *Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the key characteristics as cited above.<br><br>Experience in representing the agency to Congress, other Federal agencies, and/or representatives for the private sector. This experience may be demonstrated by the applicant having served as the Administrator's key representative forging partnerships with and between former adversaries; providing convincing briefings, speeches, or Congressional testimony which sways the audience and gains cooperation for the organization; or, effectively facilitating inter-agency meetings, media interviews, negotiations, or comparable situations. Or comparable experience. |
| NQ | At this level, the applicant has experience <u>below</u> the qualifications for "Q." |

005015

## Mandatory Professional/Technical Qualifications

**1.** Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices..

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant has broad familiarity with water safety and marine transportation. Work experience is in the areas of navigation, marine engineering, marine regulation and marine accident investigation, naval architecture and watchstanding. Examples should demonstrate knowledge and understanding of the underlying principles and practices of the industry sufficient to support technical leadership, program/project management, advisory and/or consultative services and the accomplishment of goals or the development of strategies. |
| NQ | At this level, the applicant has experience below the qualifications for "Q." |

**2.** Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level the candidate's experience demonstrates skill in oral and written communication sufficient to support executive level presentations that influence, gain approval or negotiate change. Examples document experience with internal and external partners and stakeholders where knowledge of the organizations goals and objectives and the understanding of the political reality of situations are used to impact the ultimate results. |
| NQ | At this level, the applicant has experience below the qualifications for "Q." |

005016

| Desirable Professional/Technical Qualifications | |
|---|---|

1. General knowledge and understanding of the National Transportation Safety Board's (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard and the relationship of National Security organizations to coastwise and inter-coastal security.

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level, the applicant's work experience demonstrates a knowledge and understanding of the mission, authority and processes of the NTSB, and its relationship and interrelationships within the transportation community. This also includes an understanding of the nature and overlapping jurisdictional demands of affiliated agencies and organizations responsible for national security and emergency preparedness plans and functions. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q". |

2. Demonstrated command and/or responsibility of or for sea-going operations.

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level the candidates provides examples of serving in a leadership role for the sea going operations of a vessel. This includes but is not limited to having responsibility for ship, deck, crew operations. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q". |

005017

**Final Rating:**    You will assign one of the following final ratings based upon a detailed review of the individual qualification elements listed under section I of this plan:

**To Receive a "HQ" (Highly Qualified) Rating:**

1. Experience is rated "HQ" on 4 of the 5 Mandatory Executive Core Qualifications; and,
2. Experience is rated "HQ" on both of the Mandatory Professional/Technical Qualifications.
3. Experience is rated "HQ" on both of the Desirable Professional/Technical Qualifications

**NOTE:**    If not rated "HQ" on the Mandatory Executive Core Qualifications or Mandatory Professional/Technical Qualifications criteria, the candidate must have at least a "Q" rating.

**To Receive a "Q" (Qualified) Rating:**

1. Experience is rated at least "HQ" or higher on 3 of the 5 Mandatory Executive Core Qualifications;
2. Experience is rated "Q" or higher on both of the Mandatory Professional/Technical Qualifications; and,
3. Experience is rated "Q" or higher on both of the Desirable Professional/Technical Qualifications.

**To Receive a "NQ" (Qualified) Rating:**

Applicants rated "NQ" on any of the Mandatory Executive Core Qualifications or on any of the Mandatory Professional/Technical Qualifications automatically receive a final overall rating of "NQ."

000825

AN EQUAL OPPORTUNITY EMPLOYER
**NATIONAL TRANSPORTATION SAFETY BOARD**

*SENIOR EXECUTIVE SERVICE*
*POSITION VACANCY ANNOUNCEMENT*

**NUMBER:   WA-TB-5-009**

**DATE OPENED: 01/11/05**

**DATE CLOSED: 02/11/05**

**NO. OF VACANCIES: 1**

**AGENCY CONTACT:**    Human Resources Division 1-800-573-0937 or 202 314-6238
World Wide Web Address: http://www.ntsb.gov

**POSITION TITLE, PAY PLAN, AND SERIES:** Director, Office of Marine Safety
ES-340-00

**LOCATION:**

**Office of Marine Safety**
**Washington, D.C.**

**SALARY RANGES:**

$107,550 to $149,200*
*Rate is limited to the rate for Level III of the
Executive Schedule.

**AREA OF CONSIDERATION:**    Nationwide; all groups of qualified individuals. This is a
Career Reserved Position. NTSB may or may not pay relocation (PCS) expenses.

**NONCOMPETITIVE CONSIDERATION:**    Current career Senior Executives, QRB
certified graduates of SES candidate development programs and individuals with SES
reinstatement eligibility may be considered non-competitively for appointment to this position if
they meet the mandatory qualifications requirements. Proof of noncompetitive eligibility is
required.

**REGULATIONS:**    Financial interest in certain transportation enterprises is prohibited. The
proposed appointee will be required to file a Public Financial Disclosure Report, SF-278.
Security clearance is required. US Citizenship is required.

**DUTIES:** The incumbent serves as Director of the Office of Marine Safety with primary
responsibility for implementing and monitoring operational policy and programs for the Office.
Oversees the investigation, analysis, development and preparation of detailed reports and
proposed probable cause determinations of major and field accidents and incidents. Assures that
all factors, both actual and potential, which may have led to the accident/incident are identified,
thoroughly and objectively examined and reported. Also develops safety recommendations to
minimize their recurrence, special investigations, responses to proposed marine safety
rulemaking, and requests for technical support. Manages an Office of employees in occupations
including Master Mariner, Marine Accident Investigation, Engineering, Naval Architecture, and
Survival and Human Factors.

**QUALIFICATIONS:** There are five mandatory Executive Core qualifications that are common
to all positions in the Senior Executive Service. There are also four professional/technical

**PRIVACY ACT REQUIREMENTS (P.L.93-579):** The referenced forms are used to determine qualifications for promotion or
employment and are authorized under Title 5 of the U.S. Code, Sections 3302 and 3361. Each form must be submitted to consider you
for the position noted. The social security number is not required for this purpose and may be deleted.

**EVALUATION METHODS:** Review or evaluation of applications or personnel folders, performance appraisals, training,
if necessary, personnel inquires, pre-employment reference checks, interviews, written tests, potential appraisals, and
investigations.



GOVERNMENT
EXHIBIT

000826

qualifications that are unique to this position.  Two are mandatory and the other two are desirable.  Applicants must demonstrate possession of the two mandatory professional/technical qualification requirement AND all the executive core qualification requirements in order to be considered basically qualified for this position.  Applicants must provide detailed evidence that their knowledge, skills, and abilities meet the mandatory Executive Core qualifications listed below, and reflect the ability to perform the duties of the position.

## MANDATORY EXECUTIVE CORE QUALIFICATIONS (5):

**1.  Leading Change** This core qualification encompasses the ability to develop and implement an organizational vision, which integrates key national and program goals, priorities, values, and other factors.  Inherent to it is the ability to balance change and continuity--to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity.  Key Characteristics of this qualification are as follows: (a) Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes;  (b) Identifying and integrating key issues affecting the organization, including political, economic, social, technological, and administrative   factors; (c) Understanding the roles and relationships of the components of the national policy making and implementation process, including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization; (d) Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution; (e) Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self-motivated; pursuing self-development; seeking feedback from others and opportunities to master new knowledge; (f) Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.

**2.  Leading People** This core qualification involves the ability to design and implement strategies, which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals.  Key characteristics of this qualification are as follows: (a) Providing leadership in setting the workforce's expected performance levels commensurate with the organization's strategic objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority; (b) Promoting quality through effective use of the organization's performance management system (e.g., establishing performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees as appropriate); (c) Valuing cultural diversity and other differences; fostering an environment where people who are culturally diverse can work together cooperatively and effectively in achieving organizational goals; (d) Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring; (e) Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations; (f) Resolving conflicts in a positive and constructive manner; this

000827

includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.

**3.  Results Driven** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies.  Key Characteristics of this core qualification are as follows: (a) Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas; (b) Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives;  (c) Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands; (d) Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans; (e) Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies; (f) Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.

**4.  Business Acumen** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. Key Characteristics of this core qualification are as follows: (a) Assessing current and future staffing needs based on organizational goals and budget realities. Applying merit principles to develop, select, and manage a diverse workforce; (b) Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems; (c) Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels; (d) Overseeing procurement and contracting procedures and processes; (e) Integrating and coordinating logistical operations; (f) Ensuring the efficient and cost-effective development and utilization of management information systems and other technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.

**5.  Building Coalitions/Communication** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally.  It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization.  Key Characteristics of this core qualification are as follows: (a) Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional

000828

groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas; (b) Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management; (c) Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders; (d) Working in groups and teams; conducting briefings and other meetings; gaining cooperation from others to obtain information and accomplish goals; facilitating 'win-win' situations; (e) Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect; (f) Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.

## MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION:

1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.

2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.

## DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATIONS:

1. General knowledge and understanding of the NTSB's operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.

2. Demonstrated command and/or responsibility of or for sea-going operations.

## EVALUATION OF CANDIDATES:

1. The Human Resources representative will review all applications to determine whether basic eligibility has been met. To meet basic eligibility, applicants must possess the mandatory Executive Core Qualifications and the mandatory technical/professional qualifications.

2. All basically qualified candidates will be referred to the NTSB Executive Resources Board (ERB) for further consideration. The ERB will group the candidates into broad categories of best qualified, qualified and not qualified. The best qualified candidates will be forwarded to the selecting official for selection.

3. The selecting official may interview any or all of the best qualified candidates and will forward a recommendation to the Chairman or her designee for final approval. The Chief,

000829

Human Resources Division will forward the selection to the Office of Personnel Management for qualifications approval, if required.

4. Applicants with career appointments in the SES, SES reinstatement eligibles and certified SES Candidate Development Program Graduates need only address the professional/technical qualification requirements as their overall executive qualifications have already been certified.

## OTHER SIGNIFICANT FACTS:

- The NTSB is an equal opportunity employer. Non-merit factors such as sex, race, age, color, national origin, religion, etc., will not be considered. Interviews and qualification inquiries will be required.

- The law authorizes the granting of special recognition, awards, and incentive payment to members of the SES to help retain, recognize, reward, and motivate highly competent executives. Specifically, these payments and forms of recognition include: Presidential Distinguished and Meritorious rank awards; Senior Executive Service bonuses and superior accomplishment awards.

- Appointees newly selected for appointment to the SES must have their executive core qualifications approved by the Office of Personnel Management and will be subject to a one year probationary period.

- Veterans preference does not apply in the SES.

- **All eligibility requirements must be met by the closing date of this announcement.**

- **Applications must be postmarked by the closing date of the announcement.**

## HOW TO APPLY:

All applicants must submit an application for consideration. The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format. Be brief and concise, but inclusive in the description of your work experience. Forward application to:

National Transportation Safety Board
Human Resources Division (MD-30)
490 L'Enfant Plaza, East, S.W.,
Washington, D.C. 20594.

1. Submit three (3) copies of the application with original signature on each.

2. Submit three (3) copies of a Qualifications Brief, which is a statement indicating how your experience, education, training, awards, and/or self-development activities meet the qualifications requirements listed above. The Qualifications Brief must cover the five

000830

Executive Core Qualifications and the four technical/professional qualifications. Format the brief so that each requirement is individually addressed. It must provide sufficient information for evaluation. Do not repeat entries from your narrative work history. Instead, highlight your training, experience and accomplishments, (including examples of work assignments, projects, etc.) that directly relate to the position being filled.

3.  Submit three (3) copies of your most recent performance appraisal.

4.  Include the following information in your application package:

**JOB INFORMATION:** Announcement number, job title and grade level of the position for which you are applying.

**PERSONAL INFORMATION:**

*   Full Name, mailing address (with zip code) and day and evening telephone numbers (with area code).

*   Social Security Number.

*   Country of Citizenship.

*   Your highest Federal civilian grade, job series and the dates held, if applicable.

*   Eligibility under special hiring authority. (Indicate the basis for any eligibility and attach appropriate documentation).

**EDUCATION:**

*   High School information - Name of School, City, State, (Zip Code, if known) and date of diploma or GED.

*   College/University information - Name of School(s), City, State, (Zip Code, if known), majors, type of degree(s) received (if no degree, show total credits earned and indicate whether semester or credit hours).

*   If you qualify based on education, submit a transcript or list of courses (with credit hours), majors and grade-point average or class rank.

**WORK EXPERIENCE:**

Describe your paid and non-paid work related to the position for which you are applying, including the knowledge, skills, abilities identified for this position and how you meet them. The qualification requirements must be evident in experience and/or training. For each position, include the following information:

*   Your Position title (including job series and grade, if a Federal job).

000831

- Employer's name and address.

- Supervisor's name and telephone number. (Indicate whether we may contact your current supervisor for reference purposes).

- Dates you started and ended each job.

- The number of hours worked per week.

- Your starting and ending salaries.

- Duties and accomplishments.

## OTHER QUALIFICATIONS:

- Job-related training courses completed within the last 3 years (list title, hours and date completed).

- Job-related skills (other languages, computer software/hardware skills, etc.).

- Job-related honors, awards and special accomplishments received within the last 3 years. For example: publications, memberships in professional or honor societies, leadership activities, public speaking and performance awards (give dates but do not send documents unless requested).

## CONDITIONS OF EMPLOYMENT:

- Job finalists will be asked to sign and certify the accuracy of all information they provide and to authorize a background investigation. A false statement in a part of your application may be grounds for not hiring you, or for firing you after you begin work, and may be punishable by law.

- Males born after December 31, 1959, must be registered with the Selective Service System or have a valid exemption to be eligible for Federal employment. If you receive a military or civilian annuity from the Federal government, your salary or annuity may be reduced if you take a Federal job.

- If you have any delinquent debts, you must repay those debts or face garnishment of your salary.

- Subject to satisfactory completion of a background investigation.

**The NTSB is an Equal Opportunity and Reasonable Accommodation Employer:**
**Except where otherwise provided by law, all candidates will be considered without**
**discrimination for any non-merit reason such as race, color, religion, gender,**

Q00832

sexual orientation, age, national origin, political affiliation, marital status, disability, or membership or non-membership in an employee organization.

* * *

000833



**National Transportation
Safety Board**

**Memorandum**

DATE:     March 28, 2005

TO:       Joseph Osterman,
          Managing Director

FROM:     NTSB Executive Resource Board (ERB) Ad-Hoc Rating Panel

SUBJECT:  Rating of Applicants for the Position of Director, Office of Marine Safety

Twenty applications were received in response to the announcement (WA-TB-5-009) for the position of Director, Office of Marine Safety. The HR Division conducted a minimum qualifications review of each application. As a result of this review, 15 applications were forwarded to the NTSB Ad-Hoc panel of the ERB. This group of candidates includes three current employees of the Safety Board: Marjorie Murtaugh, James Scheffer, and Barry Strauch.

The panel determined that 6 of these 15 candidates failed to meet the standards for qualifications on either Executive Core Qualifications or Mandatory Professional/Technical Qualifications. Of the remaining candidates, it is the panel's consensus judgment that the following 5 candidates are best qualified and should be interviewed: John Spencer, Jonathan Sarubbi, Robert Butterworth, Edward Blackwood, Clyde Marsh.

These applications are forwarded for your consideration. The Human Resources Division will forward the selection to the Office of Personnel Management for certification of the executive/managerial qualifications if required.

_____
John C. Clark, Director
Office of Aviation Safety

_____
Robert J. Chipkevich, Director
Office of Railroad, Pipeline and Hazardous
Materials Investigations

_____
Dr. Vernon Ellingstad, Director
Office of Research and Engineering

_____
Tom Haueter, Deputy Director
Office of Aviation Safety



GOVERNMENT
EXHIBIT
25

000834

2

Elaine Weinstein, Director
Office of Safety Recommendations and
Communications

000833



**National Transportation
Safety Board**

**Memorandum**

DATE:    March 28, 2005

TO:    Joseph Osterman,
Managing Director

FROM:    NTSB Executive Resource Board (ERB) Ad-Hoc Rating Panel

SUBJECT:    Rating of Applicants for the Position of Director, Office of Marine Safety

Twenty applications were received in response to the announcement (WA-TB-5-009) for the position of Director, Office of Marine Safety. The HR Division conducted a minimum qualifications review of each application. As a result of this review, 15 applications were forwarded to the NTSB Ad-Hoc panel of the ERB. This group of candidates includes three current employees of the Safety Board: Marjorie Murtaugh, James Scheffer, and Barry Strauch.

The panel determined that 6 of these 15 candidates failed to meet the standards for qualifications on either Executive Core Qualifications or Mandatory Professional/Technical Qualifications. Of the remaining candidates, it is the panel's consensus judgment that the following 5 candidates are best qualified and should be interviewed: John Spencer, Jonathan Sarubbi, Robert Butterworth, Edward Blackwood, Clyde Marsh.

These applications are forwarded for your consideration. The Human Resources Division will forward the selection to the Office of Personnel Management for certification of the executive/managerial qualifications if required.


John C. Clark, Director
Office of Aviation Safety

Robert J. Chipkevich, Director
Office of Railroad, Pipeline and Hazardous
Materials Investigations

Dr. Vernon Ellingstad, Director
Office of Research and Engineering

Tom Haueter, Deputy Director
Office of Aviation Safety

000834

2

Elaine Weinstein, Director
Office of Safety Recommendations and
Communications

000835

3



## NATIONAL TRANSPORTATION SAFETY BOARD
### Referral and Selection Certificate

Position to be filled:    Director, Office of Marine Safety

Vacancy Announcement Number:  WA-TB-5-009

Grade Level and Series of this Certificate: ES-340

The Selecting Official:    Joseph Osterman, Managing Director

Certificate Numbers:    WA-TB-5-009

Date of Certificate:    March 28, 2005

The persons listed below are best qualified among all the eligible candidates for the position shown above. This group was identified after thorough evaluation and comparison of candidates' qualifications against Office of Personnel Management standards and any special position requirements. You are requested to consider the attached data and arrange for interviews regarding the candidates of interest. When a selection is determined, please indicate the name of the person selected in the space provided below.

**CANDIDATES FOR CONSIDERATION:**  See Attachment

Human Resources Specialist: _____  Date: _____
     Colette Magwood

---

**CANDIDATE SELECTED:** _____

Selecting Official: _____

Date of Selection: _____

Approval:  Managing Director: _____  Date: _____

000836

5

WA-TB-5-009
Director, Office of
Marine Safety

Current or Former SES Member

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|------|-----|------------------|--------------|
| BLACKWOOD, E B | 8345 | Director<br>Office of Regulatory Liaison<br>GS-340<br>Washington. D.C. | |
| | | | |

SES Eligible: Qualified

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|------|-----|------------------|--------------|
| BUTTERWORTH, R M | 8590 | Operations Analyst, GS-1515-15<br>Director Operational Test & Evaluation<br>Dept of Defense<br>Washington, DC | |
| MARSH, W C | 7451 | Commander, Amphibious Group Three<br>San Diego, CA | |
| SPENCER, J S | 2675 | Vice President, Technology<br>American Bureau of Shipping<br>Houston, TX | |
| SARUBBI, JD | 5740 | Commanding Officer, Marine Safety Office<br>US Coast Guard<br>Philadelphia, PA | |
| | | | |
| | | | |

Certificate audited on _____ by _____.

[ ] This certificate was used for selection.

0.0.0.8 3 7

6

[ ] This certificate was not used; selection made from _____ •

891000

SES Crediting Plan WA-TB-5-009

## Rating and Evaluation Plan
### Director
### Office of Marine Safety
### National Transportation Safety Board, Washington, D.C.

I. **Individual Qualification Rating Elements:** The qualifications described in the Vacancy Announcement are recast for rating purposes as follows:

> 5 Mandatory Executive Core Qualifications
> 2 Mandatory Professional/Technical Qualifications
> 2 Desirable Professional/Technical Qualifications

Ratings for each element are as follows:  **HQ (Highly Qualified); Q (Qualified); NQ (Not Qualified)**

### Executive Core Qualifications

### 1. Leading Change

The ability to develop and implement an organizational vision which integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance change and continuity — to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. Key characteristics include:

1. *Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes.*
2. *Identifying and integrating key issues affecting the organization, including political, economic, social, technological and administrative factors.*
3. *Understanding the roles and relationships of the components of the national policy making and implementation process including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization.*
4. *Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution.*
5. *Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self motivated; pursuing self-development; seeking feedback from others and opportunities to master new knowledge.*
6. *Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below:<br><br>Experience in the integration of internal and external program/policy issues as evidenced by leadership of a complex and changing organization which is responsive to a broad sector of the general public and client groups where relationships may at times be controversial and are maintained under adverse circumstances. The program is dynamic and non-static requiring the applicant to ensure current knowledge of all relevant issues as well as remain open to new factors and changing components. The position held requires the development of effective organizational relationships that drive change and are often characterized by competing and conflicting interests both within and outside the agency. Despite these complexities, the applicant has utilized innovative and creative ideas to inspire and guide others to achieve the organization's vision. Or comparable experience. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q." |

GOVERNMENT EXHIBIT

001001

| 2 | **Leading People** |

The ability to design and implement strategies which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. Key characteristics include:

1. *Providing leadership in setting the work force's expected performance levels commensurate with the organization's strategic plan objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority.*
2. *Promoting quality through effective use of the organization's performance management system (e.g., establishing performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees, as appropriate).*
3. *Valuing diversity and other differences; fostering an environment where people who are diverse can work together cooperatively and effectively in achieving organizational goals.*
4. *Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring.*
5. *Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations.*
6. *Resolving conflicts in a positive and constructive manner; this includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below:<br><br>Experience leading and directing a complex and occupationally diverse multi-functional organization including responsibility for staff allocation and utilization. The applicant will have demonstrated responsibility for: managing the assignment of work through the reallocation of staff and assignments; delegating and empowering employees, thereby, utilizing the intelligence and spirit of people at all levels to meet changes in priorities, goals or mission; adjusting the organizational structure to accomplish objectives; hiring a diverse staff; coaching, mentoring and appraising staff; and, making the appropriate decisions relative to retention, discipline, rewards or promotion. The applicant will have demonstrated the ability to energize and inspire people to overcome barriers, and align employees, through his/her words and deeds, around the organization's vision. The successful applicant will have helped others navigate through change, and ensured the growth of other leaders throughout the organization. Affirmative action and EEO requirements are exceeded and career enhancement opportunities/assignments are provided. Or comparable experience. |
| NQ | At this level, the applicant has experience <u>below</u> the qualifications for "Q." |

001002

| 3 | **Results Driven** |

This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. Key characteristics include:

1. *Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas.*
2. *Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives.*
3. *Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands.*
4. *Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans.*
5. *Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies.*
6. *Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.*

| Rating Assigned | Definition of Experience Level |
| --- | --- |
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below:<br><br>Experience that has required him/her to lead/direct the programs of a highly complex organization and to establish long- and short-range planning goals and objectives. Achievement of these objectives would have required establishing direction through visioning and strategies to reach these goals as well as the application and use of creative and innovative management practices/techniques that will raise expectations and manifest high performance. This experience demonstrates to a high degree the ability to assess the context of a situation/issue, then formulate and prepare program/project plans which drive productivity and efficiency/effectiveness standards while taking into consideration external constraints. The applicant would also have had the responsibility to implement these plans, the authority to organize the structure and work of the organization, and be held fully accountable to effectively accomplish these objectives. Or comparable experience. Specific examples of relevant experience would include: 1) Business process reengineering to increase customer service and program timeliness; and, 2) Modernizing a major program and effectively dealing with all related change management issues. |
| NQ | At this level, the applicant has experience <u>below</u> the qualifications for "Q." |

901003

## 4  Business Acumen

The ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making.

Key characteristics include:

1. *Assessing current and future staffing needs based on organizational goals and budget realities.  Applying merit principles to develop, select, and manage a diverse workforce.*
2. *Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems.*
3. *Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels.*
4. *Overseeing procurement and contracting procedures and processes.*
5. *Integrating and coordinating logistical operations.*
6. *Ensuring the efficient and cost-effective development and utilization of management information systems and other technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the characteristics cited below: <br><br> Experience in the effective implementation of procedures and activities related to obtaining and allocating the resources necessary to support policies/programs within a complex organization to include such areas of the budgetary process as budget development, allocation, reallocation; overseeing the procurement and contracting process; directing/ coordinating logistical operations such as space, furniture, etc.  The applicant, at this level, is able to: demonstrate successful cost savings in support of the organization's mission; drive cost competitiveness and alternatives for service delivery; utilize an innovative approach to cost savings thereby ensuring trust in the ability to exercise fiscal restraint at all times; and, make appropriate adjustments based on his/her evaluation of changing circumstances.  Or comparable experience.  Specific examples of relevant experience would include: 1) Leading organizations in a constrained budget environment, and, 2) Acquiring/deploying/effectively managing large information technology systems. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q." |

November 9, 2004                    Page 4 of 8

001004

## 5. Building Coalitions/Communication

The ability to explain, advocate, and express facts and ideas in a convincing manner and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization.

Key characteristics include:

*1. Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas.*

*2. Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management.*

*3. Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders.*

*4. Working in groups and teams; conducting briefings and other meetings; gaining cooperation from others to obtain information and accomplish goals; facilitating "win-win" situations.*

*5. Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect.*

*6. Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.*

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level, the applicant must have experience reflecting a majority of the key characteristics as cited above.<br><br>Experience in representing the agency to Congress, other Federal agencies, and/or representatives for the private sector. This experience may be demonstrated by the applicant having served as the Administrator's key representative forging partnerships with and between former adversaries; providing convincing briefings, speeches, or Congressional testimony which sways the audience and gains cooperation for the organization; or, effectively facilitating inter-agency meetings, media interviews, negotiations, or comparable situations. Or comparable experience. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q." |

. 801005

| Mandatory Professional/Technical Qualifications |
|---|

**1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices..**

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level, the applicant has broad familiarity with water safety and marine transportation. Work experience is in the areas of navigation, marine engineering, marine regulation and marine accident investigation, naval architecture and watchstanding. Examples should demonstrate knowledge and understanding of the underlying principles and practices of the industry sufficient to support technical leadership, program/project management, advisory and/or consultative services and the accomplishment of goals or the development of strategies. |
| NQ | At this level, the applicant has experience below the qualifications for "Q." |

**2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.**

| Rating Assigned | Definition of Experience Level |
|---|---|
| HQ | At this level, the applicant has <u>exceeded</u> the qualifications for "Q." |
| Q | At this level the candidate's experience demonstrates skill in oral and written communication sufficient to support executive level presentations that influence, gain approval or negotiate change. Examples document experience with internal and external partners and stakeholders where knowledge of the organizations goals and objectives and the understanding of the political reality of situations are used to impact the ultimate results. |
| NQ | At this level, the applicant has experience below the qualifications for "Q." |

901006

| Desirable Professional/Technical Qualifications | |
|---|---|
| 1. General knowledge and understanding of the National Transportation Safety Board's (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard and the relationship of National Security organizations to coastwise and inter-coastal security. | |
| **Rating Assigned** | **Definition of Experience Level** |
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level, the applicant's work experience demonstrates a knowledge and understanding of the mission, authority and processes of the NTSB, and its relationship and interrelationships within the transportation community. This also includes an understanding of the nature and overlapping jurisdictional demands of affiliated agencies and organizations responsible for national security and emergency preparedness plans and functions. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q". |

| 2. Demonstrated command and/or responsibility of or for sea-going operations. | |
|---|---|
| **Rating Assigned** | **Definition of Experience Level** |
| HQ | At this level, the applicant has **exceeded** the qualifications for "Q." |
| Q | At this level the candidates provides examples of serving in a leadership role for the sea going operations of a vessel. This includes but is not limited to having responsibility for ship, deck, crew operations. |
| NQ | At this level, the applicant has experience **below** the qualifications for "Q". |

November 9, 2004          Page 7 of 8

901007

| | |
|---|---|
| **Final Rating:** | You will assign one of the following final ratings based upon a detailed review of the individual qualification elements listed under section I of this plan: |

**To Receive a "HQ" (Highly Qualified) Rating:**

1. Experience is rated "HQ" on 4 of the 5 Mandatory Executive Core Qualifications; and,
2. Experience is rated "HQ" on both of the Mandatory Professional/Technical Qualifications.
3. Experience is rated "HQ" on both of the Desirable Professional/Technical Qualifications

**NOTE:** If not rated "HQ" on the Mandatory Executive Core Qualifications or Mandatory Professional/Technical Qualifications criteria, the candidate must have at least a "Q" rating.

**To Receive a "Q" (Qualified) Rating:**

1. Experience is rated at least "HQ" or higher on 3 of the 5 Mandatory Executive Core Qualifications;
2. Experience is rated "Q" or higher on both of the Mandatory Professional/Technical Qualifications; and,
3. Experience is rated "Q" or higher on both of the Desirable Professional/Technical Qualifications.

**To Receive a "NQ" (Qualified) Rating:**

Applicants rated "NQ" on any of the Mandatory Executive Core Qualifications or on any of the Mandatory Professional/Technical Qualifications automatically receive a final overall rating of "NQ."

000895

# SES RATING SHEET
## NTSB #WA-TB-5-009,
### Director,
### Office of Marine Safety

| APPLICANT'S NAME: | Marjorie Murtagh |
| --- | --- |

| Executive Core Qualifications | Rating |
| --- | --- |
| **Leading Change:** This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity – to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ (Q) HQ |
| **Leading People:** This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ (Q) HQ |
| **Results Driven:** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ (Q) HQ |
| **Business Acumen:** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ (Q) HQ |
| **Building Coalitions/Communications:** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ (Q) HQ |

NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs.

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified    _____  No further rating required.

Qualified        \_\_✓\_\_\_  Proceed with the rest of the rating.



**GOVERNMENT EXHIBIT**
27

2

00089b

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications** | |
| 1.  Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices. | NQ   Q   (HQ) |
| 2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities. | NQ   Q   (HQ) |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications.  Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position.  If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration. <br><br> Not Qualified _____ No further rating required. <br><br> Qualified ___✓___ Proceed with the rest of the rating. | |
| **Desirable Professional/Technical Qualifications** <br><br> 1.  General knowledge and understanding of the National Transportation Safety Board's  (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security. | NQ   Q   (HQ) |
| 2.  Demonstrated command and/or responsibility of or for sea-going operations. | (NQ)  Q   HQ |

| SES Panel Member(s): | Date: 3-4-05 |
|---|---|

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SESer | FORMER SESer |
|---|---|---|---|---|
| | | | | |

000891

# SES RATING SHEET
## NTSB #WA-TB-5-009,
## Director,
## Office of Marine Safety

| APPLICANT'S NAME: | John Spencer |
| --- | --- |

| *Executive Core Qualifications* | Rating | | |
| --- | --- | --- | --- |
| **Leading Change:** This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity — to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ | Q | (HQ) |
| **Leading People:** This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ | Q | (HQ) |
| **Results Driven:** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ | Q | (HQ) |
| **Business Acumen:** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ | Q | (HQ) |
| **Building Coalitions/Communications:** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ | Q | (HQ) |

NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs.

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified _____ No further rating required.

Qualified _____ Proceed with the rest of the rating.

2

| Professional/Technical Qualifications | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications** | |
| **1.  Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.** | NQ  Q  HQ |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ  Q  HQ |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications. Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position.  If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration.<br><br>Not Qualified  _____  No further rating required.<br><br>Qualified  ___✓___  Proceed with the rest of the rating. | |
| **Desirable Professional/Technical Qualifications** | |
| 1.  General knowledge and understanding of the National Transportation Safety Board's  (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security. | NQ  Q  HQ |
| 2.  Demonstrated command and/or responsibility of or for sea-going operations. | NQ  Q  HQ |

SES Panel Member(s): _____  Date: 3-4-05

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SES | FORMER SES |
|---|---|---|---|---|
| | | | | |

000848

001193

Unclassified Set of Duties
Office of Safety Recommendations and Communications

Incumbent: Marjorie Murtagh

Primary Purpose:  The primary purpose of this position is to assist the Director, Office of Safety Recommendations and Communications (SRC) with development and implementation of plans and programs, policies, and procedures and other functions of the Office.

## Policy and Planning

Incumbent has the lead responsibility for development of the FY 06 office operating plan and FY 06 goals & objectives.  Incumbent is also responsible for development of budget and annual report submissions and the FY05 accomplishments summary.

Identifies and collects necessary data including recommendation statistics, legislative histories, family assistance issues, and program data and material from SRC Office managers; assesses and summarizes information gathered; formulates findings, conclusions, and recommendations where necessary; presents results in written and/or oral form, which are well-organized, supportable and clearly expressed.

## Human Resources Development

Incumbent has the lead responsibility for development of the FY 06 office training plan and IDPs for all SRC staff.  Incumbent also assists the Director with processing of recruitments, promotions, and employee evaluations, and awards.  Also provides oversight of and guidance for the SRC Administrative Officer (AO).

Identifies, in conjunction with SRC managers and staff, training goals and objectives, and writes or updates IDPs for all SRC employees. Assists employees in identifying relevant training courses for FY 06. Provides first line of guidance and direction to the SRC AO on budgetary and office management issues.

GOVERNMENT EXHIBIT
28

001194

**Performs Liaison, Communication**

Participates in international maritime safety activities as approved by the Director, Office of Marine Safety

Identifies issues of international concern and opportunities to promote NTSB safety recommendations and independent accident investigation.

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

000352

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| MURTAGH, MARJORIE M | | | 10/04/05 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
| 920 | EXTENSION OF DETAIL NTE 10-15-05 | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| | | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | | | | | 15. TO: Position Title and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|
| UNCLASSIFIED DUTIES | | | | | UNCLASSIFIED DUTIES | | | | |
| 7001 | 0321519 | | | | 7001 | 0321519 | | | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PA | | | | | | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFC OF SAF REC & COMMUNICATIONS<br>OFFICE OF THE DIRECTOR<br><br><br>WASHINGTON, DC | OFC OF SAF REC & COMMUNICATIONS<br>OFFICE OF THE DIRECTOR<br><br><br>WASHINGTON, DC |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 - None   3 - 10-Point/Disability   5 - 10-Point Other<br>2 - 5-Point   4 - 10-Point Compensable   6 - 10-Point/Compensable/30% | 1 | D - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | | YES  X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   BASIC ONLY | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1   CSRS | 07/11/83 | F   FULL-TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1   1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | E   E - Exempt<br>N - Nonexempt | 9530.310 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| 40. Agency Data | | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|---|
| CLS | 00 | X | 14 | 2 | NONCRITICAL-SENSITI |

45. Remarks

GOVERNMENT
EXHIBIT
29

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| TB - NATL TRANS SAFETY BOARD | LISA P. LOVE<br>DIRECTOR OF HUMAN RESOURCES |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| TB00 | 4107 | 10/13/05 | 051525636 |

Standard Form 50-B
7/91
5. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

**000351**

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| MURTAGH, MARJORIE M | | | 10/15/05 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
| 921 | TERMINATION OF DETAIL | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| | | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| UNCLASSIFIED DUTIES | SUPV MARINE ACCIDENT INVESTIGATOR |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7001 | | 0321519 | | | PA | 3501 | | 0321519 | | | PA |
| | | | | | | GS | 1801 | 15 | 10 | $135136 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $116517 | $ 18619 | $135136 | $ 0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OFC OF SAF REC & COMMUNICATIONS OFFICE OF THE DIRECTOR WASHINGTON,DC | OFFICE OF MARINE SAFETY OFFICE OF THE DIRECTOR WASHINGTON,DC |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 - None  3 - 10-Point/Disability  5 - 10-Point Other / 2 - 5-Point  4 - 10-Point Compensable  6 - 10-Point/Compensable/30% | 1 — 0 - None  2 - Conditional / 1 - Permanent  3 - Indefinite | | YES [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| CO   BASIC ONLY | 9   NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1   CSRS | 07/11/83 | F   FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 — 1 - Competitive Service  3 - SES General  2 - Excepted Service  4 - SES Career Reserved | E — E - Exempt  N - Nonexempt | 9530.310 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON,DISTRICT OF COLUMBIA |

| 40. Agency Data NC | 41. VET-STAT | 42. EDUC LVL | 43. SUPV STAT | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| CLS   00 | X | 14 | 2 | NONCRITICAL-SENSITI |

45. Remarks

GOVERNMENT EXHIBIT 30

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| TB - NATL TRANS SAFETY BOARD | LISA P. LOVE |
| | DIRECTOR OF HUMAN RESOURCES |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| TB00 | 4107 | 12/09/05 | 051612629 |

**POSITION DESCRIPTION** (Please Read Instructions on the Back)

| 1. Agency Position No. 6 121541 | | |
|---|---|---|

6. OPM Certification No.

| 2. Reason for Submission | 3. Service | 4. Employing Office Location Washington, DC | 5. Duty Station Washington, DC |
|---|---|---|---|

Re-description  X New    X Headquarters

☐ Reestablishment  ☐ Other  ☐ Field

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| ☒ Exempt  ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interests | ☐ Yes  X No |

Explanation (Show any positions replaced)

INCUMBENCY ONLY

| 10. Position Status | 11. Position Is: | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| X Competitive | Supervisory | ☐ 1-Nonsensitive | |
| ☐ Excepted (Specify in remarks) | ☒ Managerial | ☒ 2-Noncritical Sensitive | 14.  Agency Use |
| ☐ SES (Gen.) | ☐ Neither | ☐ 3-Critical Sensitive | |
| ☐ SES (CR) | | ☐ 4-Special Sensitive | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational | Gr | Initial | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | GS | 0343 | 15 | | |
| b. Department, Agency or Establishment | Program Analyst | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | | GS | 0343 | 15 | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

16.  Organization Title of Position (If different from the official title)

Senior Program Analyst

17. Name of Employee (if vacant, specify)
Marjorie Murtagh

18. Department, Agency, or Establishment

National Transportation Safety Board

a. First Subdivision

Office of Management

b. Second Subdivision

c. Third Subdivision

d. Fourth Subdivision

e. Fifth Subdivision

Signature of Employee (optional)

19  Employee Review— This is an accurate description of the major duties and responsibilities of my position.

Employee Review—This is an accurate description of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

20  Supervisory Certification. I certify that this is an accurate statement of the major duties and responsibilities of this

Barbara Czech

Assistant Managing Director, Office of Management

a. Typed Name and Title of Immediate Supervisor

David Mayer

Deputy Managing Director, Office of Management

b. Typed Name and Title of Higher-Level Supervisor or Manager (optional)

Signature  [signature]  Date 12/12/05

Signature  [signature]  Date 12/12/05

21.  Classification/Job Grading Certification. I certify that this position has been classified/graded as required by Title 5, U.S. Code in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

Kim L. BUTLER-BAYLOR, Human Resources Specialist

Typed Name and Title of Official Taking Action

Signature  [signature]  Date 12/12/05

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaint on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initial | Date | Initial | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks
Position is at the full performance level.
BUS Code: 8888
INCUMBENCY ONLY

25. Description of Major Duties and Responsibilities (See Attached)

GOVERNMENT EXHIBIT 31

W  001187

Senior Program Analyst, GS-343-15

I. Introduction
This position is located in the Office of Management at the National Transportation Safety Board.

II. Duties and Responsibilities
- Analyzing and evaluating (on a quantitative or qualitative basis) the effectiveness of line program operations in meeting established goals and objectives

- Researching and investigating new or improved business and management practices for application to agency programs or operations

- Analyzing management information requirements to develop program or administrative reporting systems including system specifications, data gathering and analytical techniques, and systems evaluation methodology

- Analyzing new or proposed legislation or regulations to determine impact on program operations and management

- Developing new or modified administrative program policies, regulations, goals, or objectives

- Identifying data required for use in the management and direction of programs

- Developing management and/or program evaluation plans, procedures, and methodology

- Conducting studies of employee/organizational efficiency and productivity and recommending changes or improvements in organization, staffing, work methods, and procedures

- Performing management surveys to determine compliance with agency regulations, procedures, sound management practices, and effective utilization of staff

- Developing procedures and systems for establishing, operating, and assessing the effectiveness of administrative control systems such as those designed to prevent waste, loss, unauthorized use, or misappropriation of assets

- Reviewing administrative audit and investigative reports to determine appropriate changes or corrective action required

- Assists with agency-wide planning initiatives

- Performs other duties as assigned.

001188

## III. FACTORS

### FACTOR 1 KNOWLEDGE REQUIRED Level 1-9 1850 points

-- Knowledge at a level to serve as an expert in the application of a wide range of qualitative and/or quantitative methods for the assessment and improvement of program effectiveness or the improvement of complex management processes and systems.

-- Knowledge of a comprehensive range of administrative laws, policies, regulations, and precedents applicable to the administration of one or more important public programs.

-- Knowledge of bureau program goals and objectives, the sequence and timing of key program events and milestones, and methods of evaluating the worth of program accomplishments.

-- Knowledge of relationships with other programs and key administrative support functions within the employing bureau or other agencies.

-- Skill to plan, organize, and direct team study work and to negotiate effectively with management to accept and implement recommendations, where the proposals involve substantial bureau resources, require extensive changes in established procedures, or may be in conflict with the desires of the activity studied.

### FACTOR 2 SUPERVISORY CONTROLS Level 2-5 650 points

The employee is subject only to administrative and policy direction concerning overall project priorities and objectives. The employee is typically delegated complete responsibility and authority to plan, schedule, and carry out major projects concerned with the analysis and evaluation of programs and organizational effectiveness. Analyses, evaluations, and recommendations developed by the employee are normally reviewed by management officials only for potential influence on broad agency policy objectives and program goals.

### FACTOR 3 GUIDELINES Level 3-5 650 points

Guidelines consist of basic administrative policy statements concerning the issue or problem being studied. The employee uses judgment and discretion in interpreting and revising existing policy/regulatory guidance for use by others. Some employees review proposed regulations which would significantly change the basic character of bureau programs, the way the bureau conducts its business with the public or with private industry. Develops study formats for use by others on a project team or at subordinate echelons in the organization.

### FACTOR 4 COMPLEXITY Level 4-6 350 points

24.

080048

# National Transportation Safety Board
# ORDER
**Office of the Managing Director**
**Washington, D.C.**

| NTSB 1000 |
| --- |

8/21/96

**SUBJECT:**   PERFORMANCE MANAGEMENT SYSTEM

## TABLE OF CONTENTS

### PART I
### GENERAL

Title                                             Page

1.   PURPOSE ................................................................................ 1
2.   CANCELLATION ...................................................................... 1
3.   REFERENCES .......................................................................... 1
4.   DESCRIPTION OF PERFORMANCE MANAGEMENT ................... 1
5.   SCOPE ..................................................................................... 2
6.   DEFINITIONS ........................................................................... 2
7.   RESPONSIBILITIES ................................................................. 4

### PART II
### RATING PERIODS

8.   RATING PERIOD DATES ........................................................... 7
9.   EXCEPTIONS ........................................................................... 7

### PART III
### APPRAISING PERFORMANCE

10.   THE PERFORMANCE APPRAISAL PROCESS ............................ 8

### PART IV
### EMPLOYEE RECOGNITION

11.   QUALITY STEP INCREASES (QSIs) ........................................ 11
12.   PERFORMANCE AWARDS ..................................................... 11
13.   SPECIAL ACT/SERVICE AWARDS ......................................... 12
14.   SES AWARDS ....................................................................... 12

DISTRIBUTION:           Chairman                                     OPI: AD
                     Vice Chairman
                     Members
                     All Employees



GOVERNMENT
EXHIBIT
32

080049

NTSB 1000
8/21/96

15.  WITHIN-GRADE INCREASES (WGIs) ........................................................ 12

## PART V
### ACTIONS BASED ON PERFORMANCE BELOW FULLY SUCCESSFUL

16.  APPLICATION ........................................................................... 12
17.  ASSISTING EMPLOYEES IN IMPROVING PERFORMANCE ....................... 12
18.  PERFORMANCE IMPROVEMENT PLAN NOTIFICATION AND
     EMPLOYEE COUNSELING ...................................................... 13
19.  MONITORING PERFORMANCE ................................................. 13
20.  PROVIDING FEEDBACK ......................................................... 13
21.  ADDRESSING UNACCEPTABLE PERFORMANCE........................... 14
22.  PROPOSING AND TAKING ACTION BASED ON
     UNACCEPTABLE PERFORMANCE ........................................... 14
23.  GENERAL ........................................................................ 14
24.  ADVANCE WRITTEN NOTICE ................................................. 15
25.  DECIDING OFFICIAL'S FUNCTIONS ......................................... 16
26.  FINAL WRITTEN DECISION.................................................... 17
27.  CONCURRING OFFICIAL'S FUNCTIONS ..................................... 18
28.  ALLEGATIONS OF DISCRIMINATION ........................................ 18
29.  REMOVAL/REASSIGNMENT FROM SES POSITIONS ..................... 18
30.  DENYING A WITHIN-GRADE INCREASE (WGI) BASED
     ON PERFORMANCE............................................................. 18
31.  REASONABLE ACCOMMODATION ............................................ 18
32.  ALCOHOL AND/OR DRUG ABUSE ........................................... 18
33.  PHYSICAL AND MENTAL CONDITIONS ...................................... 19
34.  DISABILITY RETIREMENT...................................................... 19

## PART VI
### DISAGREEMENTS, APPEALS, AND RECORDS

35.  PERFORMANCE DISAGREEMENTS ........................................... 20
36.  CANCELING A DISAGREEMENT ............................................... 20
37.  MATTERS THAT MAY NOT BE DISPUTED
     OR APPEALED .................................................................. 20
38.  APPEALS......................................................................... 20
39.  OFFICIAL RECORDS ........................................................... 21

080050

**NTSB 1000**                                                                **Page 1**
**8/21/96**

## PART I
## GENERAL

1. <u>PURPOSE</u>.  This Order describes the performance management system (PMS) at the National Transportation Safety Board (NTSB).

2. <u>CANCELLATION</u>.  This Order cancels NTSB Order 10-A, dated 11/9/88.

3. <u>REFERENCES</u>.

   a.  5 C.F.R. Parts 293, 339, 351, 359, 430,  432, 451, 531, and 792.

   b.  Board Order Nos. 1220, Disciplinary and Adverse Actions, and Grievances and Appeals, and 1230, Equal Employment Opportunity and Complaints of Discrimination in Safety Board Employment Practices.

4. <u>DESCRIPTION OF PERFORMANCE MANAGEMENT</u>.

   a.  Performance management is the systematic process by which the NTSB involves its employees, as individuals and members of a group, in improving organizational effectiveness in the accomplishment of its mission and goals.

   b.  Performance management should:

   (1) Communicate and clarify organizational goals to employees;

   (2) Identify individual and, where applicable, team accountability for accomplishing organizational goals;

   (3) Identify and address developmental needs for individuals and, where applicable, teams;

   (4) Assess and improve individual, team, and organizational performance;

   (5) Use appropriate measures of performance as the basis for recognizing and rewarding accomplishments; and

   (6) Use the results of performance appraisal as a basis for appropriate personnel actions.

080051

5. SCOPE.

a. The provisions of this Order do not apply to performance-based actions taken under Order 1220, Disciplinary and Adverse Actions, and Grievances and Appeals.

b. The performance management system includes senior executives (employees in the Senior Executive Service (SES)), supervisory, and nonsupervisory employees. The appraisal systems for these employees are used to recognize differences in the quality of performance, and as a basis for adjusting base pay, training, rewarding, reassigning, promoting, demoting, removing, or retaining employees.

c. The provisions of this Order do not apply to Presidential appointees, Administrative Law Judges, or non-SES positions in the excepted service in which employment is not reasonably expected to exceed 120 calendar days in a consecutive 12-month period.

6. DEFINITIONS.

a. Acceptable Performance. Performance that meets the written performance requirement(s) or standard(s) above the Unacceptable (PMS) or Unsatisfactory (SES) level for the critical element(s) at issue.

b. Appraisal. The act or process of reviewing and evaluating the performance of an employee against the described performance standard(s).

c. Critical Element. A written component of a position consisting of one or more duties and responsibilities that contributes toward accomplishing organizational goals and objectives, and that is of such importance that Unacceptable or Unsatisfactory performance on the element results in Unacceptable or Unsatisfactory performance in the position.

d. Executive Resources Board (ERB). A panel chaired by the Managing Director and including the Deputy Managing Director, all SES career office directors, and advisors (non-members) responsible for various SES and supervisory management policy and planning. Three members are required for a quorum.

e. Non-critical element. A component of an employee's position that does not meet the definition of a critical element, but is of sufficient importance to warrant written appraisal.

f. Performance Review Boards (PRB). Panels composed of at least three employees that are established by an office director, the Deputy Managing Director, Managing Director, or Chairman to review performance-related matters, and make

080052

recommendations to the office director, Deputy Managing Director, Managing Director, or Chairman. Three members are required for a quorum.

g. <u>Performance Standards</u>. The expressed measure of level of achievement, including quantity, quality, and timeliness, established for the duties and responsibilities of a position or a group of positions.

h. <u>Progress Review(s)</u>. Interim review(s) of the employee's progress towards achieving the performance standards. In accordance with OPM regulations, at a minimum, these reviews should take place at least once during the rating period. (The Human Resources Division annually issues a memorandum to rating and reviewing officials to remind them to prepare progress reviews at least 90 days prior to the end of the rating period.) Progress reviews are not summary ratings.

i. <u>Rating Levels</u>. The levels of performance for critical elements: Outstanding, Excellent, Fully Successful, Minimally Satisfactory, and Unacceptable (for SES, Unsatisfactory). These levels may also be used for non-critical elements.

j. <u>Rating Official</u>. Establishes critical elements and noncritical elements and performance standards at the beginning of the appraisal period, determining and communicating to the employee the performance requirements for the position. Assigns work, assists in developing employees' capabilities in the job, and evaluates the employee's performance (interim and final). Prepares Performance Improvement Plans (PIPs). Recommends rating/award determinations and other performance-based actions.

k. <u>Rating of Record</u>. The summary rating required at the end of the appraisal period or at such other times for special circumstances, i.e., an employee's rating has fallen since the last rating period, and the rating official must prepare a rating of record in making a determination of within-grade increase eligibility.

l. <u>Reviewing Official</u>. Reviews, revises, and approves the rating official's assessment of the employee's performance, and reviews and approves rating elements and performance standards at the beginning of the rating period, and when they change. Reviews PIPs, rating/award determinations, and other performance-based actions. Determines and provides appropriate assistance in improving performance for senior executives rated Unsatisfactory.

m. <u>Summary Rating</u>. The written record of the appraisal of each critical and non-critical element and the assignment of an overall summary rating, normally given at the end of the rating period. (All elements should be defined as critical). It may also be given throughout the rating period after completion of the minimum 90-day appraisal period. An employee may receive a summary rating for a 90-day period served on a detail, temporary promotion, or for work accomplished in a position from which the employee

080053

is being reassigned. Interim summary rating(s) will be considered when deriving the
annual rating of record, i.e., at the end of the rating period.

n. Underline{Unacceptable/Unsatisfactory Performance}. Performance that fails to meet established
performance standards in one or more critical elements of the employee's position.

7. <u>RESPONSIBILITIES</u>.

a. <u>Chairman</u>. In addition to serving as the rating official for employees directly
supervised and as the reviewing official for certain other employees, approves SES
ranks and bonuses, SES awards, and SES performance pay decisions to assure overall
agency performance appraisal consistency, and to assure that SES performance-related
awards are within funding availability. Final approved actions are forwarded to the
servicing human resources representative for processing.

b. <u>Managing Director</u>.

(1) Prepares progress reviews and performance appraisals of employees directly
supervised and serves as reviewing official for other employees. Reviews each
organization's listing of progress reviews and performance appraisals for all
employees to ensure equity and compliance with agency and administration goals.

(2) Directs revisions of ratings for supervisory and nonsupervisory employees, when
necessary, providing the rationale for any revisions in writing. For SES members,
provides higher level review of an initial rating, documents conclusions and
recommendations without altering the initial rating, and forwards to the SES
Performance Review Board (SES PRB) for review and comment.

(3) Approves non-SES supervisory and nonsupervisory employees' performance
appraisals, awards, promotions, pay decisions, etc., based on performance.

(4) Ensures that organizational objectives are included in each SES member's rating
elements and performance standards.

c. <u>Chief, Human Resources Division, and Staff</u>. Provide guidance to managers,
supervisors, employees, and members of PRBs on all aspects of the performance
management system. Monitor and evaluate the systems, as appropriate.

d. <u>Employees</u>. Review, evaluate, and discuss position descriptions, rating elements,
performance standards, progress reviews, and final ratings and provide feedback for
corrections, at least annually. Provide written comments whenever applicable.
Communicate to the rating official resources and managerial support needed to meet
performance expectations. Recommend changes to or propose potential critical

080054

elements for the upcoming performance appraisal period. Should assist in establishing or revising standards, elements, and element weights. Initiate progress reviews, as appropriate.

e. <u>Executive Resources Board (ERB)</u>. The Chief, Human Resources Division, and the EEO Director, or their designees, are advisors to the ERB. The ERB's responsibilities are:

(1) Merit staffing for career appointment to the SES.

(2) Advising the Managing Director, who advises the Chairman, as to the number of SES and non-SES positions needed, distribution of allocated authorities, development of executive staffing plans, forecasting of executive requirements, determination of how these needs will be met, and determination of executive development program objectives.

(3) Staffing of supervisory General Schedule positions, including conduct of the merit staffing process, selections, promotions, reassignments, and details.

(4) Career SES executive development, including selection of candidates for programs to develop executive qualifications, the planning and conduct of development programs, programs for the continuing development   of senior executives, and evaluation of performance during development programs.

(5) Position management, including proper use of SES and other positions, and redistribution of functions to maximize the effectiveness of NTSB SESers.

(6) Pay management, including advising on the most effective use of pay flexibility provided by the SES.

(7) Development of policy on performance awards for the SES and their use to enhance employee effectiveness, and agency-wide coordination of performance awards with statutory requirements and central oversight of performance awards.

(8) Development of policy on discipline and removal of SESers for cause.

(9) Development of policy on removal from SES based on performance or during probation, and oversight of removal and fallback procedures.

(10) Nominations for the awarding of honorary rank to senior executives.

080055

Page 6 NTSB 1000
8/21/96

f.  Performance Review Boards (PRBs).

(1)  SES Career PRB.  A panel composed of the Deputy Managing Director as SES PRB Chair, SES career office directors, with the Chief, Human Resources Division, and EEO Director as advisors.  The SES career PRB's responsibilities are to:

(a)  Monitor the SES performance review process, and recommend ways to improve and strengthen the SES performance appraisal system.

(b)  Review and approve or recommend to the Chairman changes to the critical and non-critical elements, weights, and performance standards for all SES employees.

(c)  Make written recommendations to the Chairman concerning the performance of each senior executive and the level of basic pay and bonuses to be granted to Fully Successful or above senior executives.  The Chairman approves or revises appraisals only after considering the recommendations of the SES PRB.

(d)  When recommending a less than Fully Successful rating, refer the senior executive's appraisal to the ERB for additional recommendation or action prior to the Chairman's final review and decision.

The Chairman may not be a member of the PRB.  Notices of appointment are published in the Federal Register.  In reaching a decision, the PRB may obtain additional information, either orally or in writing.  Members shall have at least Fully Successful, or equivalent, performance ratings, consistently have applied NTSB appraisal systems effectively in their own organization, be objective and possess a thorough knowledge and understanding of the NTSB appraisal system gained through experience and training, will not be an executive whose performance appraisal was initially prepared by the incumbent under review, and will not be the supervisory official who made the initial appraisal of the employee. SES supervisory officials may be asked to appear before the PRB, and the SESer whose evaluation is being discussed will not participate in the discussions.

(2)  SES Non-Career PRB.  A panel composed of the Vice Chairman as PRB Chair, the Special Assistant to the Chairman, and the Chief, Human Resources Division.  The SES-non-career PRB's responsibilities are to:

(a)  Review and approve or recommend changes to the Chairman regarding any non-career executive's critical and non-critical elements, element weights, and performance standards.

(b) Make written recommendations to the Chairman concerning the performance of any non-career executive and the level of basic pay and award to be granted.

(3) <u>Supervisory and Nonsupervisory Employees' PRB</u>. An ad hoc panel composed of three members appointed by the Office Director or Deputy Managing Director to review performance disagreements.

## PART II
## RATING PERIODS

8. <u>RATING PERIOD DATES</u>. The annual appraisal period for SES senior executives begins on September 1 and ends August 31; for supervisory employees it begins on August 1 and ends on July 31; for nonsupervisory employees it begins on June 1 and ends on May 31.

9. <u>EXCEPTIONS</u>.

   a. <u>The Minimum Appraisal Period for All Employees</u>. All employees must have been given rating elements and performance standards 90 calendar days before an actual performance rating can be given. If an employee has less than 90 calendar days total service in the NTSB appraisal system, the rating period must be extended until the minimum appraisal period is met.

   b. <u>Minimum Appraisal Period Under New Supervisor</u>. No performance rating will be given by a rating official until he/she has directly supervised an employee for 90 calendar days. Examples of options:

      (1) Division chief is newly appointed to position at the time the annual ratings are due and has not supervised employees for 90 calendar days. The Deputy Office Director, or any other next higher official in the chain of command, may complete division employees' annual ratings.

      (2) Division chief is newly appointed to position at the time the annual ratings are due and has not supervised employees for 90 calendar days. The division chief may extend the rating due date until she/he has supervised employees for 90 calendar days.

      (3) Division chief leaves position 5 months into the rating period. New division chief may complete annual ratings. (Departing division chief should complete summary ratings for incorporation in the final ratings.)

   c. <u>Rating Period Procedures for All Employees Who Have Completed a Minimum Appraisal Period and Change Positions</u>. If an employee has served in a position for the minimum appraisal period and changes positions during that rating period, his/her

080057

performance shall be evaluated and an element rating assigned to each performance element on which the employee had an opportunity to demonstrate performance prior to his/her departure and a summary rating shall be given. This summary rating must be taken into consideration in deriving the next rating of record.

d. <u>Rating Period Procedures for All Employees While on Detail or Temporary Promotion</u>. Employees who are detailed or temporarily promoted within the NTSB for more than 90 days will receive written elements and standards no later than 30 calendar days after the detail/temporary promotion begins. Critical elements are established by the rating official in consultation with the employee. Ratings on the elements must be prepared for these details and temporary assignments and must be considered in deriving a final rating at the end of the performance appraisal period. When an NTSB employee is detailed outside NTSB at any time during the rating period, NTSB will make a reasonable effort to obtain appraisal information from the borrowing organization and consider that information in deriving the employee's next rating of record. If such an employee has served in NTSB for the minimum appraisal period, the employee must be rated at the end of the appraisal period. If the employee has served 90 calendar days or more outside the NTSB, but has not met the minimum appraisal period within the NTSB, NTSB will make a reasonable effort to prepare a rating using appraisal information obtained form the borrowing organization. A rating of record will then be derived following the normal NTSB appraisal procedures.

e. <u>Rating Period Procedures for Employees Transferring to Another Federal Agency During the Rating Period</u>. All employees who have served at least the 90-day appraisal period will be evaluated and given a summary rating when they transfer to another agency. This rating, along with the performance appraisal, will be transferred with the employee's Official Personnel Folder (OPF).

PART III
APPRAISING PERFORMANCE

10. <u>THE PERFORMANCE APPRAISAL PROCESS</u>.

a. <u>A Step-by-Step Approach to Performance Determinations for Rating Officials</u>.

(1) Establish/review/define position descriptions, elements, element weights, and performance standards, using employee input.

(2) Conduct progress review(s).

(3) Obtain employee feedback.

(4) Appraise end-of-year performance, and make a performance rating determination. (Do not release rating to employee until authorized.)

(5) Obtain employee feedback.

(6) Make personnel decisions based on the appraisal.

b. <u>Beginning of the Appraisal Process</u>. Rating officials are required to inform new employees of performance expectations in writing, and ensure that performance expectations for current employees are updated annually, as needed. Rating officials should have completed the following steps normally within 30 days after the appraisal period begins.

(1) Review the position description, and elements and standards in performance plans for employees.

(2) Make necessary corrections to position descriptions, and to elements, element weights, and performance standards.

(3) Ask for input from employees.

(4) Finalize elements/standards and provide them to employees.

Note: If the review determines that changes are not necessary, standards should still be given in writing to an employee at the beginning of each appraisal process.

c. <u>Progress Reviews</u>. By law, a progress review shall be held for each employee at least once during the appraisal period. Reviewing officials and employees are all involved in the performance review process with the rating officials being responsible for initiating and conducting the reviews. Progress reviews are important to let employees know how they are performing in relation to their performance appraisal so they are not surprised by their end-of-year rating. If deficiencies are prevalent, it also satisfies the legal requirement to inform the employee of below Fully Successful performance. Also, the Human Resources Division will provide additional progress review guidance annually. Rating officials should take the following steps to ensure that a proper progress review is completed.

(1) Ask employee for a list of accomplishments to date.

(2) Ask reviewing official for feedback.

(3) Determine performance to date of each element, and assign an overall summary rating.

080059

(4) If performance is below Fully Successful on any element, contact the human resources representative for guidance on completing a Performance Improvement Plan (PIP). (See Part V for a discussion on PIPs.)

(5) Discuss performance to date with employee, and if a PIP is required, indicate any significant accomplishments or areas in which improvement is needed.

(6) Sign the form, get the reviewing official's signature and then the employee's signature. (If employee refuses to sign, so indicate on the form and notify employee that he/she may attach any comments.)

(7) Give a copy of the progress review to the employee, retain a copy, and forward the originals of the reviews for all your employees through supervisory channels to your servicing human resources representative.

d. **End of the Appraisal Process for Non-SES Employees.** End-of-year appraisal information is important to employees because they need to know their performance levels. Awards, bonuses, promotions, training and career development, and performance-based actions are based on this information. Rating officials should take the following steps within the timeframes established in the Human Resources Division's annual end of the appraisal process guidance.

(1) Ask employees for a list of accomplishments that have occurred since the progress review.

(2) Ask reviewing official for feedback.

(3) Determine performance of each element, and assign an overall summary rating.

(4) Prepare a tentative ratings/awards list for all employees and forward through supervisory channels to the Human Resources Division.

(5) If performance is below Fully Successful on any element, contact the servicing human resources representative for guidance on completing a Performance Improvement Plan (PIP).

(6) Once the Managing Director has approved the tentative ratings/awards list, finalize the performance appraisal, and the PIP, if applicable.

(7) Discuss performance with employee, and the PIP, if required, indicating any significant accomplishments or areas in which improvement is needed.

080060

(8) Sign the form, get the reviewing official's signature and then the employee's
signature. (If employee refuses to sign, so indicate on the form and notify
employee that he/she may attach any comments.)

(9) Inform the employee of the assistance and counseling to be provided throughout the
PIP, if one is required.

(10) Forward the appraisal, the PIP, if one was accomplished, and any applicable awards
through the Office Director to the human resources representative for processing
and retention. Give the employee a copy.

Note: If performance is at Minimally Satisfactory or Unacceptable level, contact the
servicing human resources representative for guidance.

e. End of the Appraisal Process for SES Employees. For SES employees, rating officials
discuss the proposed rating of record (initial rating) with the executive and give the
executive an opportunity to respond in writing and an opportunity for review by
someone other than the rating official who is in a higher executive level, unless there is
no higher level executive. Forward the initial rating and any comments from the
executive to the reviewing official. The reviewing official does not give prior approval
to or revise an initial rating, but provides comments and recommendations on the
completed initial rating to the SES PRB, the initial rater, and the SES member. (Most
of the same steps under d. above should be followed for SES employees, as
appropriate.)

f. The Upcoming Rating Period for All Employees. If needed, hold a separate meeting
about a week after the appraisal conference to review the elements, element weights,
performance standards and employee training needs for the upcoming rating period.
(See paragraph 10.b. above.) Even if the elements and standards don't change
frequently or significantly, a separate discussion is still suggested to allow for employee
communication and update.

PART IV
EMPLOYEE RECOGNITION

11. QUALITY STEP INCREASES (QSIs). Initiated by rating officials with the reviewing
official's concurrence for employees who have received an overall summary rating of
record of Outstanding. QSI's may not be granted to an employee who has received an
overall summary rating of record below Outstanding. QSIs may not be granted to an
employee who has received a QSI within the preceding 52 consecutive calendar weeks.

12. PERFORMANCE AWARDS. A performance award shall be based on the employee's
rating of record for the current appraisal period for which performance awards are being

0 8 0 0 6 1

**Page 12**

paid. Each decision to grant a performance award must be approved by a higher level supervisor, except in cases where the employee reports directly to the Chairman. These reviewing officials should be the same ones as those responsible for making the performance appraisal decisions. The Human Resources Division will issue guidance on performance award criteria and amounts annually in conjunction with the provision of instructions on completing end-of-year ratings.

13. SPECIAL ACT/SERVICE AWARDS. These awards are described in Order 1002, Incentive Awards. The Human Resources Division will issue guidance on Special Act/Service award criteria and amounts annually in conjunction with the provision of instructions on completing end-of-year ratings.

14. SES AWARDS. SES employees are eligible for SES Performance and Rank awards in accordance with OPM policies. They are also eligible for Special Act Awards in accordance with Order 1002.

15. WITHIN-GRADE INCREASES (WGIs). WGIs recognize employees in the General Schedule who are performing at an acceptable level of competence. WGIs are effective the first pay period following completion of the WGI waiting period. WGIs are an increase to basic pay equivalent to the next higher step in the grade. A waiting period must have been completed and the employee may not have received an equivalent increase during the waiting period. Employees already at the maximum step of their grade may not receive a WGI. WGIs are processed automatically by the Human Resources Division once the human resources representative has received a supervisory certification that the employee is performing at an acceptable level of competence.

PART V
ACTIONS BASED ON PERFORMANCE BELOW FULLY SUCCESSFUL LEVEL

16. APPLICATION. This part applies to supervisory and nonsupervisory employees (non-Schedule "C" positions) who are being rated under the performance appraisal system.

17. ASSISTING EMPLOYEES IN IMPROVING PERFORMANCE. Performance evaluation is more than the process of assigning performance ratings. When a supervisor determines that an employee has a performance deficiency at any point during the rating period, the supervisor should initiate appropriate corrective action. The supervisor should not wait until the end of the rating period to address the problem. Corrective action includes identifying the critical element(s) for which performance is less than Fully Successful, and structuring assignments that will provide the employee with an opportunity to improve performance to a Fully Successful level. Paragraphs 18, 19, and 20 below are the recommended approaches for the supervisor to take when performance has fallen below Fully Successful, but has not been determined to be at the Unacceptable level.

080062

18. <u>PERFORMANCE IMPROVEMENT PLAN NOTIFICATION AND EMPLOYEE</u> <u>COUNSELING</u>. At any time during the performance appraisal cycle that an employee's performance is determined to be Unacceptable in one or more critical elements, the supervisor shall notify the employee of the element(s) for which performance is Unacceptable. Additionally, the supervisor shall inform the employee of the performance standard(s) that must be attained in order to demonstrate acceptable performance, and provide a reasonable opportunity to improve performance. The notification shall be in the form of a memorandum or letter to the employee and a PIP that identifies the element(s) and performance standard(s) for which the employee has failed to meet the Fully Successful level. The PIP shall be discussed with the employee and the instances of less than Fully Successful performance relevant to each element and performance standard. Additionally, the supervisor shall describe what steps the employee must take to improve performance to the Fully Successful level for each element, and the specific assistance that will be offered to improve performance. Assistance may include, to the extent appropriate, structured job assignments, training, scheduled meetings with the supervisor for guidance and advice on how to improve work performance, and referral to the Employee Assistance Program Coordinator for assistance with resolving personal problems.

19. <u>MONITORING PERFORMANCE</u>. After the employee has been made aware of the performance problems and necessary correction action, the supervisor should continue to monitor the employee's work performance to ensure that the necessary corrective action has been taken. Monitoring performance means observing and gathering evidence of progress or lack of progress. It enables the supervisor to reinforce positive performance and to deal promptly with any instances of negative performance as soon as they occur. While it is at the supervisor's discretion to decide how closely to monitor the employee's performance, the supervisor should not limit monitoring to sporadic incidents of exceptionally good or poor performance.

20. <u>PROVIDING FEEDBACK</u>. The supervisor should keep the employee informed orally and/or in writing of progress toward correcting the performance problem. If the employee's performance is deficient after a reasonable amount of time, the supervisor must determine if the employee is performing at the Unacceptable level based on consultation with the servicing human resources representative. If so, the employee must be given a formal opportunity to demonstrate at least Minimally Satisfactory performance. Reasonable time means an amount of time commensurate with the employee's duties and responsibilities which is sufficient to allow the employee to show whether he or she can meet minimum performance standards. If the employee alleges or the supervisor suspects that a handicapping condition (including drugs and/or alcohol use) is causing performance deficiencies, the supervisor shall follow the guidance provided in paragraphs 30 and 31 below. If the employee fails to improve to at least a Minimally Satisfactory level, a performance-based personnel action may be taken. See paragraph 22.

080063

NTSB 1000
8/21/96

21. <u>ADDRESSING UNACCEPTABLE PERFORMANCE</u>.  At any time during the performance appraisal period that an employee's performance is determined to be Unacceptable in one or more elements (and a PIP has already been attempted), the supervisor shall notify the employee of the element(s) for which performance is Unacceptable, and inform the employee of the performance standards that must be met in order to demonstrate acceptable performance.  The supervisor shall also inform the employee that unless his or her performance in the critical element(s) improves to **and is sustained at an acceptable level, the employee may be reduced in grade or removed.** For each element in which the employee's performance is Unacceptable, the supervisor shall afford the employee a reasonable opportunity to demonstrate acceptable performance, commensurate with the employee's duties and responsibilities.  As part of the employee's opportunity to demonstrate acceptable performance, the supervisor shall offer assistance to the employee in improving Unacceptable performance. (See paragraphs 17 - 20 above.)

22. <u>PROPOSING AND TAKING ACTION BASED ON UNACCEPTABLE PERFORMANCE</u>.

   a. Once an employee has been afforded a reasonable opportunity to demonstrate acceptable performance but fails to do so, the supervisor may propose a reduction in grade or removal action.  The action may only be proposed if the employee's performance during or following the opportunity to demonstrate acceptable performance is Unacceptable in one or more of the critical elements for which the employee was afforded an opportunity to demonstrate acceptable performance.

   b. If an employee has performed acceptably for 1 year from the beginning of an opportunity to demonstrate acceptable performance, and the performance again becomes Unacceptable, the supervisor shall afford the employee an additional opportunity to demonstrate acceptable performance (by again beginning the paragraph 17 - 20 procedures) before determining whether to propose a reduction in grade or removal action.

   c. A proposed action may be based on instances of Unacceptable performance that occur within a 1 year period ending on the date of advance written notice of proposed action.

23. <u>GENERAL</u>.  An employee against whom a reduction in grade or removal action is proposed is entitled to:

   a. A 30-day advance written notice of the proposed action.  This time may be extended for a period not to exceed 30 days for the following reasons:

      (1) Obtain and/or evaluate medical information when the employee has raised a medical issue in the answer to a proposed reduction in grade or removal;

080064

(2) Arrange for the employee's travel to make an oral reply to the deciding official, or the travel of the deciding official to hear the employee's oral reply;

(3) Consider the employee's answer, if an extension to the period for answer has been granted (e.g., because of the employee's illness or incapacitation);

(4) Consider reasonable accommodation of a handicapping condition;

(5) Consider positions to which the employee might be reassigned or reduced in grade; or

(6) Comply with a stay ordered by the Merit Systems Protection Board (MSPB).

If the supervisor believes that an extension of the advance written notice is necessary for other than a reason described above, he/she may request prior approval for extension from OPM through the human resources representative.

b. Time to answer, but not less than 24 hours, orally and in writing and to furnish affidavits and other documentary evidence in support of the answer.

c. Representation by an attorney or other representative.

d. A written decision and the specific reasons for the action at the earliest practicable date.

24. ADVANCE WRITTEN NOTICE. The notice must:

a. Identify both the specific instances of Unacceptable performance and the critical element(s) involved in each instance of Unacceptable performance.

b. State that the employee has a right to respond to the action within 15 calendar days, and that no decision will be made until after the response has been received and considered, or until the response time has passed, and that any action to be taken, if adverse to the employee, shall be taken usually within 60 calendar days from delivery of the notice. The notice shall indicate that, if an extension of time is needed, a written request should be made by the employee to the deciding official specifying the need for the extension.

c. Advise the employee of the right to answer orally and/or in writing, and to furnish affidavits and other documentary evidence in support of an answer within 15 calendar days from receipt of the advance written notice. If the employee wishes the NTSB to consider any medical condition which may contribute to the problem, the employee shall be given a reasonable additional time, if needed, to furnish medical documentation of the condition. Whenever possible, the employee shall supply such documentation

080065

within the time limits allowed for an answer. The deciding official will summarize an oral response of the employee, if one is provided, and will include it in the file.

e. Advise the employee of the right to representation by an attorney or another representative. The General Counsel may disallow as the employee's representative an individual whose activities as a representative could cause a conflict of interest or position, an NTSB employee whose release from his or her position could give rise to unreasonable costs to the Government, or an employee whose priority work assignment precludes his or her release.

f. Advise the employee of the right and the right of his/her representative to review the material relied on to support the reasons for the proposed action. Material that may not be disclosed to the employee, the employee's representative, or a designated physician, may not be used.

g. Advise the employee and his/her representative of their right to have up to 8 hours of official time to prepare the answer.

h. Identify the management official who will receive the written and/or oral answer (usually the management official at the next higher level than the official who proposed the action) and how to make contact.

i. Identify the name of the person to be contacted for information about the notice.

j. **Be reviewed by the Human Resources Division and Office of the General Counsel before issuance.**

k. If the employee is in a duty status, the notice shall be hand delivered at least 30 calendar days before the proposed action becomes effective, and documented by management that it was received. If the employee is in a non-duty status, the notice may be hand delivered and witnessed, or sent by registered mail to the employee's home address -- Return Receipt Requested, and it is presumed that the employee received the notice. (Management will document for the file that, based on the method used to mail the advance notice, it is presumed that it was received by the employee.)

25. <u>DECIDING OFFICIAL'S FUNCTIONS</u>. The deciding official:

a. Has the option to affirm the action as proposed, reduce it to a lesser action, or cancel it, if he or she believes the proposed action is not fully supported.

b. May grant an extension of time.

0800bb

    c. Makes a final decision within 30 days after expiration of the advance notice period. (A decision to reduce in grade or remove an employee for Unacceptable performance may be based only on those instances of Unacceptable performance that occurred during the 1 year period ending on the date of issuance of the advance notice of proposed action.)

26. <u>FINAL WRITTEN DECISION</u>. The management official who has been designated to receive the written and/or oral response will serve as the deciding official. The deciding official will consider only those reasons stated in the advance written notice,    and will consider any answer of the employee or his or her representative in making a decision. If the employee provides an oral response, the deciding official will prepare a summary of the oral response and include it in the file and provide the employee with a copy. The decision must:

    a. Be in writing and addressed to the employee.

    b. State the nature of action to be taken against the employee and its effective date. **(The day the notice was issued does not count towards the 30-day requirement.)**

    c. Refer to the advance notice by date and any amendments or additions.

    d. State that the notice is withdrawn (along with amendments and additions) and the reason(s) for withdrawing the notice, if no action is to be taken against the employee.

    e. Specify the instances of Unacceptable performance on which the action is based.

    f. Indicate that the decision is supported by substantial evidence.

    g. State that the employee and/or his or her representative's oral and/or written answer, if one was provided, was given full consideration in making the decision.

    h. Inform the employee of any applicable appeal and/or grievance rights.

    j. **Be reviewed by the Human Resources Division and Office of General Counsel before issuance.**

    k. Be signed by the deciding official.

    l. If the employee is in a duty status, the notice shall be hand delivered at least 3 calendar days before the proposed action becomes effective. If the employee is in a non-duty status, the notice may be hand delivered and witnessed, or sent by registered mail to the employee's home address -- Return Receipt Requested, and it is presumed that the employee received the notice. (Management will document for the file that, based on

080067

the method used to mail the written decision, it is presumed that it was received by the employee.)

27. <u>CONCURRING OFFICIAL'S FUNCTIONS</u>. The written decision shall be concurred in by the Managing Director, except in those cases where the Managing Director is the deciding or proposing official (in which case the Chairman will serve as the concurring official). The action may not be effected without the concurring official's signature.

28. <u>ALLEGATIONS OF DISCRIMINATION</u>. When an allegation of discrimination is made in connection with a performance management system action, any information or evidence submitted by the employee or the employee's representative orally or in writing shall be made part of the employee's answer to the advance notice. Such information shall be given consideration, by the deciding official, along with other supporting and rebuttal information in the file, in reaching a decision. If the decision is to reduce in grade or remove the employee, no action is to be taken without prior consultation with the EEO Director or designee.

29. <u>REMOVAL/REASSIGNMENT FROM SES POSITIONS</u>. Any career SES employee will be removed/reassigned from a position in the following instances:  (1) reassignment or transfer within SES or removal from SES for an Unsatisfactory rating; (2) removal from SES for two Unsatisfactory ratings in a consecutive 5-year period; and (3) removal from SES for two less than Fully Successful ratings in a consecutive 3-year period.

30. <u>DENYING A WITHIN-GRADE INCREASE (WGI) BASED ON PERFORMANCE</u>. Performance below Fully Successful can result in a denial of a Within-Grade-Increase. A human resources representative must be contacted before actions to deny or withhold a WGI are initiated.

31. <u>REASONABLE ACCOMMODATION</u>. The Vocational Rehabilitation Act places an obligation on Federal employers to accommodate handicapping conditions of their employees. Accommodation refers to the alteration of the work environment and/or job in order to meet the individual needs of the employee. Generally, the balance between an accommodation that is reasonable as compared to one that imposes an undue hardship on the agency depends on the resources available to the agency.

32. <u>ALCOHOL AND/OR DRUG ABUSE</u>. If the supervisor suspects that an employee's misconduct and/or performance problem is caused by alcohol or drug abuse, he/she shall:

a. Consult a human resources representative.

b. Together with the servicing human resources representative, meet with a staff member of the Office of General Counsel to discuss the legal aspects of the case.

080068

c. Meet with the Employee Assistance Program Coordinator (designated by the Chief, Human Resources Division) who will provide guidance on how to confront/refer the employee for assistance.

d. Meet with the employee to discuss misconduct and/or performance deficiencies and the possibility of a future disciplinary or adverse action if the action(s) persists.

e. Refer the employee to a specific counseling program as identified by the representative.

f. Inform the employee that information that he or she provides during sessions with the counselor is confidential. If the employee claims that alcoholism and/or drug abuse caused the misconduct and/or performance deficiency, the supervisor must allow the employee the opportunity to enter a program and the opportunity to demonstrate successful rehabilitation.

If there is an alcohol and/or drug problem, an employee should admit the problem, accept any offer of rehabilitative assistance or elect to participate in a program of choice. If such is the case, the employee should provide to the supervisor a report from the treatment facility. The report should outline the nature of the program and its expected duration. If no report is provided or the employee refuses to go for treatment, the supervisor may proceed with appropriate action against the employee.

33. PHYSICAL AND MENTAL CONDITIONS. When an employee alleges that a physical or mental handicap is causing a misconduct and/or performance problem, the supervisor should request that the employee submit medical documentation from a licensed medical practitioner to substantiate the existence of the condition and its effect on job conduct. The medical documentation will be used by the supervisor in consultation with the servicing human resources representative to determine whether the employee is handicapped, if reasonable accommodation is warranted, and what accommodations are appropriate. The supervisor must allow the employee a reasonable amount of time to submit the medical documentation. If the employee requests an accommodation not indicated by his or her practitioner, the supervisor, in consultation with the human resources representative, should determine whether the type of accommodation requested is appropriate and feasible.

34. DISABILITY RETIREMENT. If the employee has at least 5 years of Federal civilian service and a misconduct and/or performance problem may have been caused by a medical condition, the supervisor should inform the employee of his or her possible eligibility for disability retirement and refer the employee to the servicing human resources representative for retirement counseling. In most cases, the employee is responsible for filing the retirement application.

080069

PART VI
DISAGREEMENTS, APPEALS, AND RECORDS

35. PERFORMANCE DISAGREEMENTS.

a. PIPs, position descriptions, performance standards, rating elements, ratings of record, and summary ratings, are all performance-related items that may be disputed at the NTSB.

b. Supervisory and nonsupervisory employees are encouraged to resolve matters of disagreement concerning appraisals and ratings with the rating official and the reviewing official. Failing resolution of the matter, employees may file a performance disagreement with their office director, who will convene a PRB to review the matter. Supervisory and nonsupervisory employees should also consult their servicing human resources representative to discuss appeal procedures, especially for personnel actions based on Unacceptable performance. The PRBs review the appraisal and any relevant supporting documentation, and make recommendations to the management official above the reviewing official, who shall make the final decision. If the performance disagreement is filed by a supervisory employee, the Managing Director or Chairman will be the deciding official. Suggested times for the disagreement process are: 10 working days for presentation to a PRB; 10 working days for the PRB to make a recommendation; and 10 working days for a final decision.

c. An SES executive who disagrees with the critical elements or the rating of record is encouraged to resolve the matter with the rating official and the reviewing official. Failing resolution, any relevant supporting documentation should be forwarded to the SES PRB or the Chairman within a reasonable time (usually 10 working days). The Chairman will make the final decision on all disagreements.

d. Performance disagreements are internal Board procedures and do not give rise to appeals outside the Board. See paragraph 38 below.

36. CANCELING A DISAGREEMENT. An employee may cancel a performance disagreement at any time. Once canceled, the disagreement may not be reactivated.

37. MATTERS THAT MAY NOT BE DISPUTED OR APPEALED. Progress reviews may not be disputed. Assessments of performance at the time of progress reviews can change before the end of the rating period and disputes filed before that time would be premature. However, employees may attach descriptions of matters of concern. Performance appraisal and summary performance ratings of SES members' performance are not appealable.

38. APPEALS. Eligible employees (consult with the servicing human resources representative) may appeal a reduction in grade or removal to the MSPB within 30

080070

**NTSB 1000**                                                                                    **Page 21**
**8/21/96**

calendar days after the effective date of the action.  The servicing human resources representative is available to advise any employee about the appeal process.

39.  <u>OFFICIAL RECORDS</u>.  When a performance-based action is effected, all relevant documentation concerning a reduction in grade or removal shall be available for review by the employee or his/her representative.  At a minimum, the record shall consist of a copy of the notice of proposed action, the answer of the employee when it is in writing, a summary when the employee makes an oral reply, the written notice of decision and the reasons, and any supporting material including documentation regarding the opportunity afforded the employee to demonstrate acceptable performance.  If an action ultimately is not effected, all documents should be destroyed after 1 year, unless they are a part of a negotiated settlement.  See paragraph 22(c).

Kenneth U. Jordan
Managing Director