## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**MARJORIE MURTAGH COOKE,**                   )
                                              )
      **Plaintiff,**                  )
                                              )
**v.**                                        )     **Case No.  1:06-cv-01928**
                                              )     **Judge John D. Bates**
**MARK ROSENKER, CHAIRMAN,**                  )
**NATIONAL TRANSPORTATION SAFETY**            )
**BOARD, et al.**                             )
                                              )
      **Defendant.**                 )
_____)


**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S "CORRECTED" MOTION FOR SUMMARY JUDGMENT**


      Plaintiff, Marjorie Murtagh Cooke ("Plaintiff" or "Ms. Murtagh Cooke") files this

memorandum of points and authorities in opposition to the motion for summary judgment filed

by Defendant, United States of America, in the persons of the National Transportation Safety

Board ("NTSB") and NTSB Chairman Mark Rosenker ("Rosenker") (collectively, "Defendant").

Plaintiff alleges in this case that Defendant has retaliated against her in violation of §215(a)(3)

of the Fair Labor Standards Act 29 U.S.C. §203 *et seq.* ("FLSA").  In a vague and distorted

discourse Defendant files first an incomplete motion for summary judgment highlighting

numerous material issues of fact in its own filing, then files a "corrected" version that only

makes clear the depth of the fact issues present in this case that are directly germane to the

critical elements of Plaintiff's *prima facie case* and Defendant's purported defense thereto.

Therefore, Defendant's motion should be denied.

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………......................................1

PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
IS NO GENUINE DISPUTE…………..................………………………………………………2

FACTUAL BACKGROUND.................................................................................................3

STANDARD OF REVIEW ...................................................................................................7

ARGUMENT .........................................................................................................................10

    I. AS A MATTER OF LAW, PLAINTIFF ENGAGED IN PROTECTED
    ACTIVITY WHEN SHE COMPLAINED INFORMALLY TO THE CHAIRMAN
    OF THE NTSB IN APRIL, 2004..................................................................................10

    II. PLAINTIFF ALSO UNQUESTIONABLY, AS A MATTER OF LAW,
    ENGAGED IN PROTECTED ACTIVITY ON FEBRUARY 7, 2005.........................13

    III.  PLAINTIFF HAS ESTABLISED SEVERAL ADVERSE ACTIONS, BUT
    DOES NOT ALLEGE CONSTRUCTIVE DISCHARGE, WHICH IS THE ONLY
    ADVERSE ACTION ARGUED BY DEFENDANT....................................................14

    IV. PLAINTIFF HAS ESTABLISHED A STRONG PRESUMPTION
    AND DIRECT EVIDENCE OF CAUSATION. ..........................................................16

    V. PLAINTIFF HAS ESTABLISHED THAT DEFENDANT'S PROFERRED
    LEGITIMATE BUSINESS REASONS ARE A PRETEXT – AT A MINIMUM,
    MATERIAL ISSUES OF FACT EXIST, PRECLUDING SUMMARY
    JUDGMENT .................................................................................................................19

CONCLUSION.......................................................................................................................23

REQUEST FOR ORAL ARGUMENT ................................................................................24

CERTIFICATE OF SERVICE .............................................................................................25

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Plaintiff refers this Honorable Court to the statement of undisputed facts contained within Plaintiff's Statement of Genuine Issues In Dispute at p. 3.

Plaintiff summarizes its response with respect to Defendant's Statement of Material Facts As To Which There Is No Genuine Dispute ("Defendant's Statement") as follows:

- Plaintiff agrees that the facts stated in the following numbered paragraphs are not in dispute: Paragraphs 1 and 2.

- Plaintiff disagrees with and contests the facts asserted in Paragraphs 3 through 16. The facts asserted point to the state of mind and actions allegedly taken by various members of Defendant's organization, all of which are contested and at issue in this case. Instead, Plaintiff contends that Defendant's actions were motivated by an intent to retaliate and any actions that appear otherwise are merely a pretext.

## FACTUAL BACKGROUND

Ms. Murtagh Cooke adopts, by reference, her Statement of Genuine Issues in Dispute ("Stat. Gen. Iss."), attached hereto.

Between 1997 and 1998, NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS"). *Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (Corrected)* ("Defendant's Memorandum") at p. 2. ORS and OPHMS later merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). *Id.*

Ms. Murtagh Cooke was the Chief of the Marine Division, a unit under NTSB's Office of Surface Transportation Safety, from 1994 until 1997 when the Marine Division became the OMS. Ms. Murtagh Cooke became the Director of OMS in 1997, and she remained as the Director of the OMS until she was transferred in 2005. *Id.* at 3; Stat.Gen.Iss. ¶ I.C.2-3. Each surface office director, including Ms. Murtagh Cooke, was paid at a GS-15 level and reported to the Managing Director. The Managing Director, Dan Campbell ("Campbell") had Senior Executive Service ("SES") status, and the Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status. *Defendant's Memorandum* at p. 3. Between 2000 and 2003, the Directors of ORPH and OHS, Bob Chipkevich ("Chipkevich") and Joe Osterman ("Osterman") respectively, were appointed SES status, leaving Ms. Murtagh Cooke as the only director without SES status. *Id.* at 4-5. In or about 2003 John Clark ("Clark") became the director of OAS, and he was provided SES status without any competitive review or interview, as required by the Office of Personnel Management ("OPM"). Stat.Gen. Iss. ¶ II.D.1. All modal directors, those of OAS, OHS, OMS, and ORPH, possessed equal job duties and their work required virtually

identical skills, effort, and responsibility under virtually identical working conditions.
Stat.Gen.Iss. ¶ I.A.2.

Though the NTSB argues that it sought to make all four modal directorships SES
positions, there was no actual plan to do so.  Stat.Gen.Iss. ¶ I.D.2.  This is evidenced by the fact
the Deputy Director of OAS, Deputy Director of ORE, Dean of the NTSB Academy, and
Director of the NTSB Academy became SES positions prior to the Director of OMS.
Stat.Gen.Iss. ¶ I.D.3.

As a Director without SES status, Ms. Murtagh Cooke was paid significantly less than
her male counterparts in salary and bonuses even though she performed work substantially equal
to and under similar conditions as each male director, all of whom had SES status.  Stat.Gen.Iss.
¶ I.A.1.  Due to this inequality, in or about April of 2004 Ms. Murtagh Cooke met with Chairman
Ellen Engleman-Conners ("Conners"), and she informed Conners that Ms. Murtagh Cooke was
the only Director of the four modal investigation offices without SES status and that as a result
she made substantially less money than all three of her male counterparts – and she requested
equal pay.  Stat.Gen.Iss. ¶ I.B.1.  However, Conners characterized Ms. Murtagh Cooke's request
as that of a "small child...upset that you didn't buy them the toy."  Stat.Gen.Iss. ¶ I.B.2.  Though
Campbell denies having any such conversation, Conners relayed the content of her meeting with
Ms. Murtagh Cooke to Campbell.  Stat.Gen.Iss. ¶ I.B.3.  Conners refused to meet with Ms.
Murtagh Cooke again regarding her unequal pay and conducted no follow up to Ms. Murtagh
Cooke's complaint.  Stat.Gen.Iss. ¶ I.B.2.

In or about July, 2004, NTSB advertised the OMS Director position as having SES status.
*Defendant's Memorandum* at 5.  Ms. Murtagh Cooke applied for the OMS Director position, but
NTSB cancelled the advertisement and did not grant Ms. Murtagh Cooke an interview.

Stat.Gen.Iss. ¶¶ I.C.1, I.D.4.  Prior to cancellation, the ad hoc review panel for the OMS Director SES position concluded unanimously that Ms. Murtagh Cooke was qualified for the SES position.  Stat.Gen.Iss. ¶ I.C.1.  Though the purported reasoning behind the re-advertisement of the OMS SES position was to increase the applicant pool and quash alleged rumors that Ms. Murtagh Cooke was preselected for the position, there was no announcement to cure any alleged pre-selection, the number of applicants did not change, and, most importantly, Campbell admitted that the basis of the re-advertisement was actually to ensure that Ms. Murtagh Cooke would not receive the appointment.  Stat.Gen.Iss. ¶¶ II.B.1-7.

In or about early January of 2005 when Ms. Murtagh Cooke had not yet received an evaluation for the performance period ending in 2004, she requested another meeting with Conners to learn why she had not received an evaluation for the performance period ending in 2004, but Conners refused to meet with her to discuss Ms. Murtagh Cooke's performance evaluation.  *Id.* ¶ 18, Stat.Gen.Iss. ¶ I.B.5.  Within a couple of days of not being granted a meeting with Conners in or about January of 2005, Ms. Murtagh Cooke met with the NTSB EEO Director to make a complaint.  Shortly thereafter, NTSB re-advertised the OMS Director position and described it as having SES status.  *Defendant's Memorandum* at 5.  Ms. Murtagh Cooke applied for this position, but NTSB refused to grant her an interview.  Stat.Gen.Iss. ¶ I.D.6.

As a result of receiving unequal pay for similar work to that of her male counterparts and NTSB's refusal to grant her an interview for a position she held for eight years, Ms. Murtagh Cooke initiated a sexual discrimination complaint with the NTSB EEO Director on or about February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations.  Stat.Gen.Iss. ¶ I.B.6.  Ms. Murtagh Cooke alleged in her EEO complaint that

because of her gender NTSB paid her an unequal amount for her work as the Director of OMS. Stat.Gen.Iss. ¶¶ I.A.1, I.B.6.

In or about May of 2005, NTSB Managing Director Joe Osterman notified Ms. Murtagh Cooke that NTSB did not select her for the Director of OMS position. Instead, NTSB selected John Spencer ("Spencer"), who not only was deemed unqualified when the OMS SES position was advertised in 2004, but also did not have the proper sea going experience.   Stat.Gen.Iss. ¶¶ I.E.3-4. II.C.2-4.  Ms. Murtagh Cooke noted that she had not been paid at the SES level for the position during her tenure as Director, OMS. Osterman then suggested giving her a non-SES Senior Leadership ("SL") position if she would submit bulleted responsibilities for a position description.  In response, Ms. Murtagh Cooke submitted the requested document, but Osterman subsequently informed her that despite her submission NTSB Director Conners and Campbell refused to allow NTSB to offer her a Senior Leadership position.  Defendant's Statement at ¶¶ 5-6; Defendant's Memorandum at 29.

NTSB transferred Ms. Murtagh Cooke to the Office of Safety Recommendations and Communication in or about June 2005 in lieu of granting her an SES position or the equivalency of SES pay. Stat.Gen.Iss. ¶ I.D.7.  This position was a demotion in that it involved much greatly reduced responsibilities, the elimination of a management role, and the inability to obtain advancement or equivalent bonus pay.  Stat.Gen.Iss. ¶ I.D.8.

In or about October of 2005 Ms. Murtagh NTSB transferred Ms. Murtagh Cooke again, this time to the Office of the Managing Director in lieu of granting her an SES position or the equivalency of SES pay.  Stat.Gen.Iss. ¶ I.D.9.  NTSB failed to give Ms. Murtagh Cooke an evaluation for the performance period ending in 2005, thus precluding her from receiving any opportunity to receive an award for her performance in 2005.  Stat.Gen.Iss. ¶¶ I.D.11-12.  This

position also was a demotion in that it involved greatly reduced responsibilities, elimination of a management role, and the inability to obtain advancement or equivalent bonus pay. Stat.Gen.Iss. ¶ I.D.10. Additionally, NTSB refused to issue to Ms. Murtagh Cooke new performance standards for her position in the Office of the Managing Director, thus effectively precluding her from securing any opportunity to improve her career status or to obtain any cash or merit awards in 2006. Stat.Gen.Iss. ¶ I.D.13.

Having been cast out of her career job, refused for promotion and equal pay, and demoted to a minimal job with little responsibility and no future, Ms. Murtagh Cooke retired in July, 2006. Stat.Gen.Iss. ¶ I.D.14.

## STANDARD OF REVIEW

### A.    Summary Judgment

"In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." *Heartland Regional Medical Center v. Leavitt.*, 511 F. Supp. 2d 46, 50 (D.D.C. 2007), *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Pardo-Kronemann v. Jackson* (Bates, J) --- F. Supp. 2d ---- 2008, 2008 WL 836153 at *3 (D.D.C. 2008).

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See id.* at 50; *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006); *Pardo-*

*Kronemann*, 2008 WL 836153 at \*3. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). A genuine issue is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Heartland,* 511 F. Supp. at 50; *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

**B.    Retaliation Under The Fair Labor Standards Act**

      29 U.S.C. §215(a)(3), the Fair Labor Standards Act ("FLSA"), provides that "it shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. . . ."

      As stated by this Court in *Pardo-Kronemann*, *supra*:

> The framework for establishing a prima facie case of retaliation was introduced for Title VII claims in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1]  The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to make out a prima facie case of retaliation a plaintiff must establish: "(1) that she engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) (quoting *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984)); *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). Under the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination. *See also Velikonja v. Gonzales,* 466 F.3d 122, 124 (D.C.Cir.2006); *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir.2006).

---

[1] The standard for retaliation under Title VII has been found instructive in interpreting retaliation under FLSA.  *See e.g.*, *Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008); *Nichols v. Hurley*, 921 F.2d 1101, 1103-10 (10th Cir. 1990).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The employer's burden, however, is merely one of production. *Burdine,* 450 U.S. at 254-55, 101 S.Ct. 1089. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.*

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' " *Id.* (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Id.* at 147, 120 S.Ct. 2097. Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.' " *Id.* (quoting *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors ... includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49, 120 S.Ct. 2097. As the D.C. Circuit has explained:

Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc); *see also Waterhouse v. District of Columbia,* 298 F.3d 989, 992-993 (D.C.Cir.2002).

*Id.* at **4-5.

Thus, for Defendant to establish it is entitled to summary judgment, Defendant must

show, as a matter of law, either that: i) Plaintiff can offer no set of facts to establish her prima

facie case for retaliation; or ii) even if Plaintiff meets her burden, Defendant has established, as a matter of law, that it has articulated a legitimate, non-discriminatory reason for its adverse actions against Plaintiff *and* that Plaintiff can offer no set of facts rebutting Defendant's proffered reason evidencing that the Defendant's proffered reason was a pretext for retaliation. *See Hicks v. Association of American Medical Colleges,* 503 F. Supp. 2d 48, 52 (D.D.C. 2007); *Caryk v. Coupe,* 663 F. Supp. 1243, 1253 (D.D.C. 1987); *Holcomb v. Powell,* 433 F.3d at 869-897; *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C. Cir. 2003).[2]

## ARGUMENT

### I. AS A MATTER OF LAW, PLAINTIFF ENGAGED IN PROTECTED ACTIVITY WHEN SHE COMPLAINED INFORMALLY TO THE CHAIRMAN OF THE NTSB IN APRIL, 2004.

The first element of Plaintiff's *prima facie* case is that she engaged in statutorily protected activity.

Defendant admits, at least for purposes of its motion for summary judgment, that, in April of 2004, Ms. Murtagh Cooke met with and informally complained to Conners, Chairman of the NTSB, that her pay was not equal to those of her comparators and, in addition, attempted to meet with Conners to discuss her unequal pay on numerous additional occasions, but that Conners refused to meet with her. *See Defendant's Corrected Memorandum* at p.16; *see also* Stat.Gen.Iss. ¶¶ I.A.1, I.B.1, I.B.5.

---

[2] Defendant correctly points out that once the parties acknowledge an adverse employment action has occurred and Defendant proffers a legitimate business reason for this adverse action, the focus on summary judgment moves away from the burden shifting protocol under *McDonnell Douglas* and towards whether Plaintiff can show any set of facts upon which a reasonable jury could conclude that the adverse employment decision was made for a discriminatory reason. *See Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C.Cir.2003); *Pardo-Kronemann*, 2008 WL 836153 at *5; *Defendant's Memorandum* at p. 9. Since Defendant also attempts to argue that Plaintiff cannot establish a *prima facie* case as a matter of law, Plaintiff addresses this issue as well.

Defendant also acknowledges the most current law in this district, which is also settled law in seven circuits – the vast majority of circuits - around the country,[3] holding in no uncertain terms "that the anti-retaliation provision of the FLSA, §215(a)(3), protects informal complaints." *Haile-Iyanu v. Central Parking System of VA*, 2007 WL 1954325 at *3 (D.D.C. 2007).  In a well reasoned opinion, Judge Sullivan acknowledges the D.C. Circuit's broad interpretation of the anti-retaliation provision of the Federal Mine and Health Safety Act to include informal complaints and its similarity to the FLSA.  *See id*. at *5.  Further Judge Sullivan followed "a 'course well tread' by federal circuit courts" in so holding.  *Id*. at *5, *citing Lambert v. Ackerley,* 180 F.3d 997, 1007 (9th Cir. 1999).

Defendant first argues that *Mansfield v. Billington,* 432 F. Supp. 2d 64 (D.D.C. 2006), an older case from this District which follows the small minority view of the second and fourth circuits, supports a reading of the plain language of the statute to eliminate any complaints other than "formal" complaints.  *See Defendant's Corrected Memorandum* at p. 21.  However, the FLSA clearly applies, on its face, to an employee who has "filed _any_ complaint *or* instituted …

---

[3] The Courts of Appeals for the First, Third, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have all concluded that such a complaint is protected activity. *See Valerio v. Putnam Assocs.,* 173 F.3d 35, 44 (1 st Cir.1999) ("[T]he FLSA's anti-retaliation provision will protect an employee who has filed a sufficient complaint with an employer."); *Brock v. Richardson,* 812 F.2d 121, 127 (3d Cir.1987) (employer's mistaken belief that employee had filed an external complaint grants employee statutory protection); *EEOC v. Romeo Cmty. Sch.,* 976 F.2d 985, 989-90 (6th Cir.1992) (telling an employer it may be "breaking some sort of law" is protected activity); *Brennan v. Maxey's Yamaha, Inc.,* 513 F.2d 179, 180 (8th Cir.1975) ("The Act prohibits discrimination against an employee who asserts or threatens to assert his or her FLSA rights."); *Lambert v. Ackerley,* 180 F.3d 997, 1004 (9th Cir.1999) ("[I]t must protect employees who complain about violations to their employers, as well as employees who turn to the Labor Department or the courts for a remedy."); *Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 387 (10th Cir.1984) ("The Act also applies to the unofficial assertion of rights through complaints at work."); *EEOC v. White & Son Enters.,* 881 F.2d 1006, 1011 (11th Cir.1989) ("[T]he unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the statute.").  The Courts of Appeals for the Second and Fourth Circuits have applied a more narrow interpretation.  *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 55 (2d Cir.1993); *Ball v. Memphis Bar-B-Q Co.,* 228 F.3d 360, 364 (4th Cir.2000).

any proceeding." 29 U.S.C. §215(a)(3) (emphasis added). The statute simply does not limit its application to "formal complaints", nor is there any basis to imply that the statute is applied solely "in the context of formal legal actions" (*Mansfield*, 432 F. Supp. 2d at 74), on the face of the statute or otherwise. In fact, the statute plainly applies to "any" complaint. Further, the statute protects employees who file "any" complaint, *or* institute a proceeding – and therefore the FLSA protects employees engaging in informal or formal processes. Plaintiff therefore asserts that the reasoning in *Mansfield* is untenable and flies in the face of both the plain meaning and majority-view interpretation of FLSA.

Defendant next makes the rather strained and unlikely argument that, even under *Haile-Iyanu*, although Ms. Murtagh Cooke specifically stated to Conners that "she made substantially less money than all three of her male counterparts" and further that Ms. Murtagh Cooke requested overtime and requested several meetings to discuss the issue (*see Defendant's Corrected Memorandum* at p. 16), somehow this complaint does not "claim nor imply that Plaintiff alleged a violation of the EPA, or overtime provisions of the EPA." The EPA specifically provides a cause of action for individuals of one gender who are paid less than that person's counterparts of the opposite sex who are performing equivalent work for more pay. *See* 29 U.S.C. §206(d)(1). This was exactly Ms. Murtagh Cooke's complaint. In fact, Ms. Murtagh Cooke went even further – stating "When I spoke with Ms. Conners in 2004 I was asking her for some way to make my pay comparable to my male counterparts, the other modal directors, and after that meeting Ms. Conners refused to meet with me again." Stat.Gen.Iss. ¶ I.B.1. Thus, Defendant's argument is baseless.

As a matter of prevailing law, therefore, Ms. Murtagh Cooke first engaged in statutorily protected activity in April of 2004.

## II.  PLAINTIFF ALSO UNQUESTIONABLY, AS A MATTER OF LAW, ENGAGED IN PROTECTED ACTIVITY ON FEBRUARY 7, 2005.

Defendant next attempts to argue that Ms. Murtagh Cooke first filed a formal complaint on April 16, 2005.  Defendant refers back to the "informal complaint" cases already discussed herein and cites 29 CFR §1614.105(a).

Defendant's citations to the "informal complaint" cases are irrelevant, as Ms. Murtagh Cooke initiated a formal complaint, as noted above, on February 7, 2005.  Nevertheless, even *Mansfield* is in accord that a formal complaint is "filed" under FLSA when the plaintiff "initiates" her administrative charge with the EEOC.  *See Mansfield*, 432 F. Supp. 2d at 71. 29 CFR 1614.105(a), which addresses administrative exhaustion under both Title VII and FLSA (and therefore applies to both), requires only that a complainant "initiate with a Counselor within 45 days of the date of the matter alleged to be discriminatory".  29 CFR 1614.105(a)(1).  By the terms of this regulation itself, Ms. Murtagh Cooke engaged in protected activity the moment she walked into the EEOC counselor's office on February 7, 2005 and initiated her complaint of retaliation.

In fact, a federal employee complainant *must* seek EEOC counseling within 45 days of the alleged discrimination to attempt to informally resolve a grievance first, before filing a written complaint.  29 C.F.R. § 1614.105(a)(1).  *See Anderson v. Zubieta,* 180 F.3d 329, 334 (D.C. Cir. 1999) ("Regulations issued by the Equal Employment Opportunity Commission (EEOC) require federal employees to bring Title VII complaints to the attention of an Equal Employment Opportunity counselor within 45 calendar days of the alleged discriminatory event") (emphasis added); *Short v. Chertoff,* 526 F. Supp. 37, 43 (D.D.C. 2007).  It would therefore be preposterous to suggest that Plaintiff, by complying with the law, is to be penalized

for filing her written complaint only after she has first complied with the law requiring engaging in an informal process.

Indeed, the settled law in this District is that a <u>formal</u> complaint with the EEOC is officially "filed" on the date the complainant first walks into the EEOC office and *initiates* a relevant complaint (and <u>not</u> on the date the actual written complaint is finalized). *See e.g., Weber v. Battista,* 494 F.3d 179, 182-183 (D.C. Cir. 2007) (claimant files claim for retaliation for raising equal pay act claim by initiating contact with an EEO counselor); *Warren v. Leavitt*, 2008 WL 441772 (D.C. Cir. 2008) at *1 (a plaintiff exhausts administrative remedies "by *contacting* an equal employment opportunity (EE) counselor within 45 days") (emphasis added).

Simply stated, Ms. Murtagh Cooke's initiation of a complaint with the EEO counselor on February 7, 2005, was an external, formal commencement of a claim against Defendant, and therefore constitutes the filing of a complaint under FLSA, even under the more restrictive *Mansfield* standard. *See Hicks v. Association of American Medical Colleges*, 503 F. Supp. 2d. 48, 52 ("[T]he employee must step outside his or her role of representing the company and either file (*or threaten to file*) an action adverse to the employer.") (D.D.C. 2007) (emphasis added); *Bell v. Gonzales*, 398 F.Supp. 2d 78, 94-95 (D.D.C. 2005); *Childers v. Slater,* 44 F. Supp. 2d 8, 24 (D.D.C. 1999).

## III. PLAINTIFF HAS ESTABLISED SEVERAL ADVERSE ACTIONS, BUT DOES NOT ALLEGE CONSTRUCTIVE DISCHARGE, WHICH IS THE ONLY ADVERSE ACTION DISCUSSED BY DEFENDANT.

The second element of Plaintiff's *prima facie* case is the existence of an adverse employment action.

Pages 17-22 of *Defendant's Corrected Memorandum* are devoted entirely to Defendant's argument that Plaintiff cannot establish constructive discharge as a matter of law. Unfortunately Defendant has wasted pages of space and time since Plaintiff does not now, nor ever did, allege constructive discharge.

Ms. Murtagh Cooke does, however, allege, and through discovery has established, numerous adverse actions that Defendants did take against her. Ms. Murtagh Cooke contends that all of these acts were taken in retaliation for her complaints of unequal pay occurring in April 2004 and on February 7, 2005:

1. On January 11, 2005, the NTSB Re-advertised the position for Director of OMS even though Ms. Murtagh Cooke applied for and was deemed qualified for the position.

2. On March 4, 2005, less than thirty days after her formal initiation of a complaint with the EEO office, the NTSB review panel reversed itself and deemed Ms. Murtagh Cooke unqualified, even though just a few months prior she was deemed qualified.

3. On March 28, 2005, a third NTSB review panel again deemed Ms. Murtagh Cooke unqualified, even though just a few months prior she was deemed qualified.

4. In April, 2005, the NTSB refused to award the SES promotion to Ms. Murtagh Cooke and instead awarded the position to Spencer, who had previously been deemed unqualified for the position.

5. In June 2005, the NTSB transferred Ms. Murtagh Cooke out of a modal director position and demoted her to an "Assistant Planning" position.

6. In October, 2005, the NTSB transferred Ms. Murtagh Cooke again to another demoted position entitled "Program Analyst".

Stat.Gen.Iss. ¶¶ I.D.4-10, I.E.2-4.

An employment action is an "adverse action" in the retaliation context under FLSA if a reasonable employee would have found it materially adverse. *Haile-Iyanu,* 2007 WL 1954325 at *5.

A significant reduction in responsibilities and/or demotion can form the basis of an adverse employment action. *See Burke v. Gould,* 286 F.3d 513, 522 (D.C. Cir. 2002) ("[W]e have no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action"); *Mansfield*, 432 F.Supp. 2d at 72; *Brooks-Miller v. England,* 357 F.Supp. 2d 197, 203 (D.D.C. 2004). Failure to promote a plaintiff to a position for which she is qualified and for which she applied is also a basis for an adverse employment action. *See Romero-Ostolaza v. Ridge*, 370 F.Supp. 2d 139, 150 (D.D.C. 2005); *Nails v. England,* 311 F.Supp. 2d 116, 122 (D.D.C. 2004); *Brooks-Miller v. England,* 357 F.Supp. 2d at 203; *Marshall v. Shalala,* 16 F.Supp. 2d 16, 19 (D.D.C. 1998).

Here, Ms. Murtagh Cooke has alleged, and, through testimony and documentary evidence has established, numerous adverse actions that Defendant took against her, which, as a result, left her without promotion to executive status to which she was entitled, pushed out of the modal director environment entirely thus erasing any opportunity she had for future promotion, and demoted her twice to meaningless positions with only minimal responsibility in comparison to her former role as Director of the Office of Marine Safety. Stat.Gen.Iss. ¶¶ I.D.1-14.

At a minimum, material issues of fact exist on this issue, precluding summary judgment.

## IV. PLAINTIFF HAS ESTABLISHED A STRONG PRESUMPTION AND DIRECT EVIDENCE OF CAUSATION.

The third element of Plaintiff's *prima facie* case is the existence of a causal connection between the statutorily protected activity and the adverse action.

A plaintiff can create a presumption of causation via temporal proximity – showing that her employer had knowledge of her protected activity and that the adverse action took place shortly thereafter. *See Holcomb v. Powell,* 433 F.3d 889, 903 (D.C. Cir. 2006); *Mills v. Winter,* 540 F.Supp. 2d 178, 188 (D.D.C. 2008); *Moses v. Howard Univ. Hosp.,* 474 F.Supp. 2d 117, 125 (D.D.C. 2007) (time periods of up to a few months sufficient to create the inference of a causal connection).

Here, Ms. Murtagh Cooke's complained informally but specifically about her unequal pay to Conners in April 2004.  Conners then brought the complaint to the decision maker, Dan Campbell for resolution – no action was taken.  Then, beginning less than thirty days after Ms. Murtagh Cooke initiated her EEO complaint, the NTSB, through Dan Campbell and others, began a series of adverse actions leading to its failure to promote her approximately two months later.  Shortly thereafter she was transferred and demote twice.  Stat.Gen.Iss. ¶¶ I.B.1-4, I.D.4-10.  This temporal proximity is more than sufficient to establish facts "adequate to permit an inference of retaliatory motive." *See Holcomb,* 433 F.3d at 903; *Mckenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984).[4]

"A plaintiff may also put forward direct evidence and disregard the presumption and its time limitations." *Vance v. Chao,* 496 F.Supp. 2d 182, 186 (D.D.C. 2007).  *See Timmons v. U.S. Capitol Police Bd.,* 407 F.Supp.2d 8, 12 (D.D.C.2005) ("The plaintiff can make this showing through direct or circumstantial evidence."); *Brown v. Snow,* 407 F.Supp.2d 61, 66 (D.D.C.2005)

---

[4] Not surprisingly, Dan Campbell denies that Conners ever spoke to him about Ms. Murtagh Cooke's April, 2004 complaint.  In any event, Ms. Murtagh Cooke complained directly to Campbell regarding her unequal pay on two separate occasions as well.  Stat.Gen.Iss. ¶ I.B.4.  Conners testimony that she brought the complaint to the decision maker, Dan Campbell for resolution, coupled with Ms. Murtagh Cooke's testimony that she complained directly to Campbell, erases any claim of "unawareness" by Defendant (and at least creates material issues of fact on this issue), and further bolsters Ms. Murtagh Cooke's claim that she languished in an NTSB "netherworld" while the NTSB took no action to equalize her pay or promote her. *See Holcomb,* 433 F.3d at 903.  Stat.Gen.Iss. ¶¶ I.B.1-6.

("To demonstrate causation *in the absence of direct evidence,* ... the plaintiff must show that the employer knew of the protected activity and that the adverse action occurred soon thereafter." (emphasis added)). *See also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[I]t is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case.").

Here, there are several examples of direct evidence of animus expressed by Conners, the Chariman of the NTSB, and Campbell, the Deputy Director of the NTSB and Ms. Murtagh Cooke's supervisor:

1. Conners characterized Ms. Murtagh Cooke's April, 2004 complaint for equal pay "as that of a 'small child...upset that you didn't buy them the toy.'"

2. Conners then refused, despite receiving several requests, to meet with Ms. Murtagh Cooke again regarding her unequal pay and conducted no follow up to Ms. Murtagh Cooke's complaint.

3. Though Conners testified that she met with Campbell to discuss her meeting with Ms. Murtagh Cooke in April 2004, Campbell denied having any conversation with Conners regarding Ms. Murtagh Cooke's pay or overtime.[5]

4. Campbell himself testified that his sole motivation for re-advertising the SES position was to ensure that Ms. Murtagh Cooke would not receive the appointment!   This

---

[5] This inconsistent testimony from the two top officials at NTSB is sufficient to defeat Defendant's motion for summary judgment – someone is not telling the truth about a material fact – what actions were taken regarding Ms. Murtagh Cooke's request for equal pay and whether NTSB's later refusal to promote her and further demotion was grounded in retaliatory motive. In any event, as noted above, Ms. Murtagh Cooke complained directly to Campbell regarding her unequal pay on two separate occasions as well.  Stat.Gen.Iss. ¶¶ I.B.3-5, I.D.1-10.

stunning admission, notwithstanding the fact that Ms. Murtagh Cooke had been in the

Director of OMS role for years, had received excellent performance reviews

throughout her entire tenure, was deemed qualified by the NTSB review board, and

was competed with five other qualified candidates, is far more than sufficient direct

evidence of animus at least to create material issues of fact regarding causation.

Stat.Gen.Iss. ¶¶ I.B.2-5, I.C.1-3, II.B.1.

Therefore, Ms. Murtagh Cooke has established both direct evidence and a presumption of

causation.

## V.  PLAINTIFF HAS ESTABLISHED THAT DEFENDANT'S PROFERRED LEGITIMATE BUSINESS REASONS ARE A PRETEXT; AT A MINIMUM, MATERIAL ISSUES OF FACT EXIST, PRECLUDING SUMMARY JUDGMENT.

Once Plaintiff has established her *prima case,* to succeed on this motion for summary

judgment, Defendant must establish, as a matter of law, that it has articulated a legitimate, non-

discriminatory reason for its adverse actions against Plaintiff *and* that Plaintiff can offer no set of

facts rebutting Defendant's proffered reason evidencing that the Defendant's proffered reason

was a pretext for retaliation.  *See Hicks v. Association of American Medical Colleges,* 503 F.

Supp. 2d 48, 52 (D.D.C. 2007); *Caryk v. Coupe,* 663 F. Supp. 1243, 1253 (D.D.C. 1987);

*Holcomb v. Powell,* 433 F.3d at 869-897; *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C. Cir.

2003).[6]

---

[6] While Defendant is correct that Plaintiff has the burden at trial of proving pretext (*see Defendant's Corrected Memorandum* at p.25), for purposes of this summary judgment motion, Plaintiff need only show at least one set of facts upon which a jury could infer pretext in light of all of the circumstances in evidence, including the strength of the prima facie case, direct and circumstantial evidence of retaliation, and evidence that defendant's proffered reason is false. *See Richardson v. Gutierrez*, 477 F.Supp. 2d 22, 31 (D.D.C. 2007); *Davis v. District of Columbia*, 503 F.Supp. 2d 104, 123-124 (D.D.C. 2007); *Keeley v.*

Defendant proffers little evidence of its purported legitimate business reasons, attempting to and unsuccessfully misreading the minds of the retaliators in this case.

First, Defendant cavalierly states "there is no reason to believe that Mr. Campbell was not sincere in his belief that the pool of qualified applicants was too narrow, and that there was a perception among one or more potential candidates that Plaintiff had been pre-selected for the SES Directorship of OMS." *Defendant's Memorandum* at p.25. Actually, there are many reasons : i) Campbell himself admitted he re-advertised the position solely to ensure Ms. Murtagh Cooke did not receive the appointment; ii) Campbell also admitted that he "procrastinated" intentionally because, if he told Conners that he was going to appoint Ms. Murtagh Cooke, Conners would say 'Dan, have you lost your mind'" (Stat.Gen.Iss. ¶ II.B.1.);[7] iii) Campbell broke protocol by his repeated re-advertising of the position notwithstanding having five qualified candidates;[8] and iv) Campbell has had at least one other gender discrimination claim filed against him. *Defendant's Supplemental Response to Plaintiff's Second Set of Requests for Admissions*, Ex. 33.

Next, Defendant contends that Osterman, who was accountable for the SES selection during the third re-advertisement, did not interview Ms. Murtagh Cooke because she was deemed unqualified by the third review board, was "unaware of any EEO complaint filing", and

---

*Small*, 391 F.Supp. 2d 30, 39 (D.D.C. 2005). *See also Aka v. Wasington Hosp. Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1998).

[7] Although Campbell complains of Ms. Murtagh Cooke's performance issues in his deposition, all of the evidence points to Ms. Murtagh Cooke's repeated positive performance reviews, raises year after year, and no written discussion in any record anywhere of any concerns regarding her performance. Stat.Gen.Iss. ¶¶ I.C.2-3. This argument of performance concerns is an unsubstantiated smoke screen for retaliation.

[8] Campbell's purported concern of pre-selection is also a smoke screen. Every appointment to SES of a modal office director was awarded to the incumbent – except for Ms. Murtagh Cooke. Stat.Gen.Iss. ¶ I.D.3.

[8] Campbell's purported concern of pre-selection is also a smoke screen. Every appointment to SES of a modal office director was awarded to the incumbent – except for Ms. Murtagh Cooke. Stat.Gen.Iss. ¶ I.D.3.

"this is not a situation in which the Plaintiff is significantly more qualified than John Spencer." *Defendant's Corrected Memorandum* at pp. 25-27.  However, Defendant neglects to point out that: i) Ms. Murtagh Cooke was first deemed qualified, and then was deemed unqualified without explanation (Ms. Magwood stated she had no recollection as to why this happened and no one else offers an explanation either) (Stat.Gen.Iss. ¶ I.D.5.); ii) Osterman, who was on the first review panel itself, knew that Ms. Murtagh Cooke was initially ranked qualified (Stat.Gen.Iss. ¶ I.D.6. ); iii) Osterman, as Ms. Murtagh Cooke's former associate, knew of her repeated complaints and requests for equal pay (Stat.Gen.Iss. ¶ I.B.7.); iv) Osterman knew that Spencer was first deemed unqualified, and then was deemed qualified, while Ms. Murtagh Cooke suffered the reverse fate (Stat.Gen.Iss. ¶¶ I.B.7., I.E.2-3); and v) Ms. Murtagh Cooke had much more sea going experience and much more overall experience and qualifications then Mr. Spencer.  Stat.Gen.Iss. ¶ I.C.1-4, I.E.3-4, II.C.2-3.  At a minimum, significant questions of fact exist regarding whether NTSB followed protocol, and whether the SES selection process was tainted with retaliatory motive.  To thus conclude that "there is no reason to believe that Mr. Osterman was not sincere in his belief that it would be improper to interview anyone … if that person were not ranked by the panel in the top five" (*Defendant's Memorandum* at p. 28) is just plain ridiculous.

Along the same lines is Defendant's contention that: a) "there is no reason to believe that Mr. Osterman was not sincere in his belief that that there was not sufficient work to justify the creation of an SL position for Plaintiff in the international marine area" (*Defendant's Memorandum* at pp. 29-30); b) that, therefore, Osterman "detailed" her to a "temporary position" while he would "work for a pathway for her to another position within the agency" (*Defendant's Memorandum* at p. 31) – (which never actually happened); and c) "there is no reason to believe

that Mr. Osterman was not sincere in his belief that that there was a need for Plaintiff in the Office of Safety Recommendations and Communications, and that Plaintiff serving a detail there would be a good fit for the agency." (*Defendant's Memorandum* at p. 32). From this mind-reading exercise, Defendant boldly but without justification concludes "A jury could not reasonably conclude from all of the evidence that the challenged reassignment was made for a retaliatory reason." *Defendant's Memorandum* at p.34.

In fact, it is not a far stretch at all that a jury *could* infer that a supervisor who declines to promote his employee after she complains of unequal pay, refuses to allow the employee to remain in her current division and replaces her with someone far less qualified and then transfers the employee against her will to part time positions outside of her career path and with minimal or no managerial or other accountabilities, was indeed retaliating against her.[9] Stat.Gen.Iss. ¶¶ I.D.1-14, I.E.1-4.

Therefore, Ms. Murtagh Cooke has established that Defendant's proffered legitimate business reasons are pretext. At a minimum, material issues of fact exist, precluding summary judgment. *See e.g,. Richardson*, *supra*, 477 F.Supp. 2d at 31 ("the question of pretext 'is necessarily fact intensive'"), quoting *Stevens v. Nat'l R.R. Passenger Corp*., No. 05-1924, 2006 WL 1550006 at *9 (D.D.C. 2006) (quoting *Barry v. U.S. Capitol Guide Bd*., No. 04-0168, 2005 WL 1026703, at *7 (D.D.C. May 2, 2005)).

---

[9] Defendant also attaches a new declaration of Barbara Czech, who Plaintiff has not deposed or cross-examined, asserting that Ms. Murtagh Cooke's evaluations in 2006 were not completed before she retired. *Defendant's Memorandum* at pp. 37-38. But this argument misses the point. Ms. Murtagh Cooke actually contends that Defendant failed and refused to complete her evaluation and/or produce her evaluation to her in _2004 and 2005_, and further that Ms. Conners refused to discuss Ms. Murtagh Cooke's evaluation that was produced to her late and without discussion. Stat.Gen.Iss. ¶¶ I.D.11-13. Ms. Murtagh Cooke offers this evidence as probative of retaliatory motive.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's Motion for Summary Judgment should be DENIED in its entirety.

Respectfully,

Marjorie Murtagh Cooke
*By Counsel*

/s/ David Scher
R. Scott Oswald
David Scher
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff Marjorie Murtagh Cooke*

## REQUEST FOR ORAL ARGUMENT

Ms. Murtagh Cooke requests oral argument prior to the Court's ruling on Defendant's motion.

/s/  David Scher
David Scher

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 6th day of June, 2008, I caused the foregoing Plaintiff's

Memorandum in Opposition to Defendant's "Corrected" Motion For Summary Judgment and

attached documents to be served on Defendant's counsel, Brandon Lowy, Esq., Special Assistant

United States Attorney, via the Court's ECF system.



/s/ David Scher
R. Scott Oswald
David Scher
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff Marjorie Murtagh Cooke*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARJORIE MURTAGH COOKE** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:06-cv-01928** |
| ) | **Judge John D. Bates** |
| **MARK ROSENKER, CHAIRMAN,** ) | |
| **NATIONAL TRANSPORTATION SAFETY** ) | |
| **BOARD,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

### <u>PLAINTIFF'S STATEMENT OF GENUINE ISSUES IN DISPUTE</u>

Pursuant to rule 7(h) of the Local Rules of the United States District Court for the District

of Columbia, Plaintiff Marjorie Murtagh Cooke ("Plaintiff" or "Ms. Murtagh Cooke") submits

this Statement of Genuine Issues in Dispute in opposition to the Corrected Motion for Summary

Judgment and Motion to Strike, Statement of Material Facts as to which there is no Genuine

Dispute, and supporting Memorandum of Points and Authorities filed by Defendant Mark

Rosenker, Chairman of the National Transportation Safety Board ("Defendant" or "NTSB") on

May 8, 2008.  As demonstrated below, there are numerous material facts in dispute between the

parties such that summary judgment is improper.  Accordingly, Defendant's motion for summary

judgment should be denied.

## Proper Names

- **Battocchi:** Ron Battocchi, General Counsel of the NTSB
- **Campbell:** Dan Campbell, Managing Director of NTSB during Ms. Murtagh Cooke's teenier as Director of OMS
- **Carroll:** Emily Carroll, Personnel Management Specialist within the NTSB
- **Chipkevich:** Robert J. Chipkevich, Director of ORPH, SES position holder and comparator to Ms. Murtagh Cooke
- **Clark:** John C. Clark, Director of OAS, SES position holder and comparator to Ms. Murtagh Cooke
- **Conners:** Ellen Engleman Conners, former Chairman of the NTSB
- **Ms. Murtagh Cooke:** Marjorie Murtagh Cooke, Plaintiff
- **Ellingstad:** Dr. Vernon Ellingstad, Director of ORE
- **Haueter:** Tom Haueter, Deputy Director of OAS
- **Osterman:** Joseph Osterman, former Director of OHS, SES position holder and comparator to Ms. Murtagh Cooke, current Managing Director of the NTSB
- **Magwood:** Collette Magwood, former Deputy Director of Human Resources at NTSB
- **Rosenker:** Mark Rosenker, Acting Chairman of the NTSB
- **Spencer:** John Spencer, current Director of OMS
- **Weinstein:** Elaine Weinstein, Director of OSRA
- **CFC:** United States Court of Federal Claims
- **DDC:** United States District Court for the District of Columbia
- **EEO:** Equal Employment Opportunity
- **FAA:** United States Federal Aviation Administration
- **NTSB/Board:** National Transportation Safety Board, Defendant
- **OAS:** Office of Aviation Safety, modal office within the NTSB
- **OHS:** Office of Highway Safety, modal office within the NTSB
- **OMD:** Office of Managing Director, within the NTSB
- **OMS:** Office of Marine Safety, modal office within the NTSB
- **OPM:** Office of Personnel Management
- **ORE:** Office of Research and Engineering, within the NTSB
- **ORPH:** Office of Railroad, Pipeline & Hazardous Materials Investigations, modal office within the NTSB
- **OSRA:** Office of Safety Recommendation & Accomplishments, within the NTSB
- **SES:** Senior Executive Service, government position above General Schedule (GS) levels
- **SL:** Senior Level
- **USCG:** United States Coast Guard

## Glossary

- **ad hoc review panel:** refers to one of the three review panels that reviewed applicants for the 2004 and 2005 advertisements for the Director of OMS SES position (2004 Panel: Weinstein, Chipkevich, Battocchi; First 2005 Panel: Osterman, Weinstein, Clark, Ellingstad, Chipkevich; Second 2005 Panel: Weinstein, Clark, Ellingstad, Chipkevich, Haueter)

- **modal:** refers to any of the four Directors of the four means of transportation within the NTSB: OAS, OHS, ORPH, and OMS

### Undisputed Facts

Pursuant to Local Rule 7(h), Ms. Murtagh Cooke admits only the below facts listed in Defendant's Statement of Material as to which there is no Genuine Dispute ("Defendant's Statement").  Ms. Murtagh Cooke disputes and denies all other facts asserted by Defendant as true:

1.     Plaintiff was the Director of the Office of Marine Safety ("OMS") at the National Transportation Safety Board ("NTSB"), at the GS-15 level, from 1997 until 2005. *Defendant's Statement* at ¶ 1.

2.     Plaintiff filed a formal EEO Complaint against the NTSB on April 16, 2005. *Defendant's Statement* at ¶ 2.

Ms. Murtagh Cooke asserts that the facts described in ¶¶ 13-14 of Defendant's Statement speak to the intent and mental impressions of Campbell and cannot be properly presented as fact. Ms. Murtagh Cooke further asserts that the facts described in ¶¶ 15-16 of Defendant's Statement refer to the May 7, 2008 Declaration of Barbara Czech (Ex. 4 to Defendant's Memorandum), who Ms. Murtagh Cooke has not had the appropriate notice or opportunity to depose prior to the present Motion for Summary Judgment.  As such, Ms. Murtagh Cooke is unable to confirm or expand upon such late-produced factual assertions.

## Disputed Facts and Genuine Issues

Pursuant to Local Rule 7(h), Ms. Murtagh Cooke concisely illustrates below both the material facts she asserts are true, supporting her claim, and how there are numerous genuine issues and disputed facts with those proposed by Defendant in Defendant's Statement and Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Defendant's Memorandum"). As such, Defendant's Corrected Motion for Summary Judgment and Motion to Strike must be denied.

---

### I. DEFENDANT RETALIATED AGAINST PLAINTIFF FOR COMPLAINTS REGARDING UNEQUAL PAY IN COMPARISON TO HER MALE COUNTERPARTS

**Summary:** The NTSB, in violation of 29 U.S.C. § 215(a)(3), retaliated against Ms. Murtagh Cooke for her complaints regarding her unequal pay compared to her male counterparts. In response to Ms. Murtagh Cooke's complaints, the NTSB refused to appoint her to an SES position for which she was qualified, resigned her to lower positions, and failed to properly review her work while in those demotions. The NTSB failed to follow its normal protocol with the appointment of the SES position, re-advertising the position when Ms. Murtagh Cooke was the strongest candidate and ultimately appointing an unqualified individual.

| *Ms. Murtagh Cooke's Disputed Facts* | *Defendant's Assertions* |
|---|---|
| **A. Defendant Paid A Different Wage to Plaintiff, Who Is Not Of The Same Sex As Her Comparators.** | |
| 1. Ms. Murtagh Cooke was <u>paid significantly less than her male counterparts</u>, John Clark ("Clark"), Director of OAS, Osterman, Director of and Chipkevich.   (*See* Ex. 1, Excerpts from EEO Investigative Report, Exhibit F2i) | |
| 2. All of <u>Ms. Murtagh Cooke's comparators possessed equal job duties</u>, and their work required virtually identical <u>skills</u>, <u>effort</u> and <u>responsibility</u> under virtually identical working <u>conditions</u>. (*See* Ex. 1 at F4 at 2.) | The scope of responsibilities of OHS was much larger than the scope of responsibilities of OMS. *Defendant's Memorandum* at 4. |

**B. Plaintiff Engaged In Protected Activity When She Complained Regarding Unequal Pay.**

| | |
|---|---|
| 1. In April 2004, Ms. Murtagh Cooke <u>complained</u> to Conners, Chairman of the NTSB, that <u>her pay was not equal to that of her male counterparts</u>. (*See* Ex. 2, Excerpts of Conners Deposition in DDC, at 53; *see also* Ex. 8, Plaintiff's First Amended Complaint before DDC at ¶ 13; *see also* Ex. 9, Defendants' Answer to First Amended Complaint before DDC at ¶ 13; *see also* Ex. 28[2], Excerpts of Ms. Murtagh Cooke Deposition in DDC, at 20; *see also* Ex. 29, Timeline of Retaliation) | Plaintiff's protected activity commenced on April 16, 2005, when she filed a formal EEO Complaint against the NTSB. The pre-complaint process was initiated no earlier than when Plaintiff contacted the EEO Director on February 7, 2005. *Defendant's Statement* at ¶ 2; *Defendant's Memorandum* at 12-13, 17. |
| 2. Conners characterized Ms. Murtagh Cooke's request as that of a "<u>small child...upset that you didn't buy them the toy</u>." Conners refused to meet with Ms. Murtagh Cooke again regarding her unequal pay and conduct no follow up to Ms. Murtagh Cooke's complaint. (*See* Ex. 2 at 58-59, 74-76; *see also* Ex 1 at F4 at 4) | |
| 3. Though Conners testified that <u>she met with Campbell to discuss her meeting with Ms. Murtagh Cooke</u> in April 2004, Campbell <u>denied</u> having any conversation with Conners regarding Ms. Murtagh Cooke's pay or overtime. | |

| | | |
|---|---|---|
| a. Conners <u>relayed her conversation</u> with Ms. Murtagh Cooke regarding not being paid the same as the other modal directors <u>to Campbell</u> on the same day the conversation took place. (*See* Ex. 2 at 66-68) | b. Campbell <u>denied ever discussing</u> Ms. Murtagh Cooke's request for equal pay or overtime with Conners. (*See* Ex. 19, Excerpts of Campbell Deposition in DDC, at 103-105) | |

| | |
|---|---|
| 4. In addition to meeting with Conners, Ms. Murtagh Cooke <u>addressed her concerns</u> regarding her unequal pay <u>directly with Campbell</u> himself. (*See* Ex. 28 at 56-58) | |
| 5. In January 2005, <u>Ms. Murtagh Cooke requested to meet with Conners</u> to discuss her 2004 evaluation and <u>unequal pay</u>. Conners <u>refused</u> to meet with Ms. Murtagh Cooke. (*See* Exs. 7 and 25, Emails from Ms. Murtagh Cooke to Conners; *see also* | Plaintiff's protected activity commenced on April 16, 2005, when she filed a formal EEO |

---

[2] Please note, there was an error with counsel's copy of Ms. Murtagh Cooke's deposition in the DDC, creating unnecessary blank pages. However, no testimony was lost and the excerpts include the full text of the intended sections.

| | |
|---|---|
| Ex. 2 at 23, 147, 149-152, 156-160; *see also* Ex. 29) | Complaint against the NTSB.  The pre-complaint process was initiated no earlier than when Plaintiff contacted the EEO Director on February 7, 2005. *Defendant's Statement* at ¶ 2; *Defendant's Memorandum* at 12-13, 17. |
| 6.  On February 7, 2005, <u>Ms. Murtagh Cooke filed a gender based EEO complaint</u>, in accordance with NTSB procedures, because she <u>received unequal pay</u> as the director of OMS for doing work equal to her male counterparts.    Plaintiff elected not to remain anonymous.  (*See* Ex. 8 at ¶ 20; *see also* Ex. 9 at ¶ 20; *see also* Ex. 29) | Plaintiff's protected activity commenced on April 16, 2005, when she filed a formal EEO Complaint against the NTSB.  The pre-complaint process was initiated no earlier than when Plaintiff contacted the EEO Director on February 7, 2005. *Defendant's Statement* at ¶ 2; *Defendant's Memorandum* at 12-13, 17. |
| 7.  <u>Osterman</u>, in denying Ms. Murtagh Cooke's request for equal pay, <u>knew of her complaint</u>.  (*See* Ex. 28 at 33, 56-57) | Osterman was unaware of Ms. Murtagh Cooke's EEO complaint during the second advertisement of the OMS SES position. *Defendant's Memorandum* at 27. |

**C.  Plaintiff Was Qualified For The Director Of OMS SES Position For Which She Applied.**

| | |
|---|---|
| 1.  The ad hoc review panel for the Director of OMS SES position <u>concluded unanimously that Ms. Murtagh Cooke was qualified</u> for the SES position.  (*See* Ex. 10, Excerpts of Battocchi Deposition in DDC at 133; *see also* Ex. 11, Excerpts from NTSB 30(b)(6) Deposition in CFC, at 23-24; *see also* Ex. 18, Excerpts from Chipkevich Deposition in DDC at 38-39; *see also* Ex. 13, Memorandum Regarding 2004 Selected Candidates; *see also* Ex. 17, 2004 SES Rating Sheet for Ms. Murtagh Cooke; *see also* Ex. 29) | The 2005 panel members discussed whether Plaintiff has any real time at sea or on ships, and the general consensus was that if Plaintiff had time it was very minimal, making her not among the top five candidates. |

| | |
|---|---|
| | *Defendant's Statement* at ¶ 4; *Defendant's Memorandum* at 28. |
| 2. The NTSB considered Ms. Murtagh Cooke to have <u>sufficient background and education</u> in marine accident investigation, developing reports, recommending development, advocacy, agency coordination, personnel management, and budgeting.  As such, NTSB <u>appointed Ms. Murtagh Cooke to Director of OMS</u> in 1997.  (*See* Ex. 11 at 69-73) | The 2005 panel members discussed whether Plaintiff has any real time at sea or on ships, and the general consensus was that if Plaintiff had time it was very minimal. *Defendant's Memorandum* at 28. |
| 3. Ms. Murtagh Cooke received "<u>outstanding</u>" and "<u>excellent</u>" performance <u>appraisals</u> as Director of OMS.  (*See* Ex. 11 at 78; *see also* Ex. 12, 2003-2004 Performance Review) | |
| 4. The <u>duties and qualifications</u> between the 2004 and 2005 announcements for the Director of OMS SES vacancy were <u>exactly the same.</u> (*See* Ex. 15, 2004 SES Position Vacancy Announcement; *see also* Ex. 16, 2005 SES Position Vacancy Announcement; *see also* Ex. 11 at 92-93) | |

**D.  Defendant Retaliated Against Plaintiff Through Two Adverse Actions: 1) Refusing To Appoint Her To The Director Of OMS SES Position Which Would Have Established Her Equal Pay With Her Comparators And 2) Thereafter Demoting Her To OSRA and OMD.**

| | | | |
|---|---|---|---|
| 1. There was much <u>confusion</u> and conflicting testimony regarding the proper term regarding the "<u>appointment</u>" to an SES position. | | | |
| a. Carroll clarified that the proper term for receiving an SES position is "<u>appoint</u>," not "<u>promote</u>" or "<u>award</u>." (*See* Ex. 27, Excerpts of Carroll Deposition in CFC, at 28-30) | b. Osterman stated that he was "<u>promoted</u>" to the SES position of Director of OHS in 2003. (*See* Ex. 11 at 16) | c. Campbell testified to his opinions regarding "<u>promoting</u>" Ms. Murtagh Cooke to SES.  (*See* Ex. 19 at 113) | |
| 2. Though the NTSB argued that it sought to <u>make all four modal directorships SES positions</u>, it <u>cannot confirm any actual plan</u> to do so nor recall how or when such positions came into being. | It was the NTSB's intent that each of the four modal office directors be classified and paid at the SES level. *Defendant's Memorandum* at 3. | | |

| | | |
|---|---|---|
| a. Carroll stated that in June of 1999, the <u>NTSB requested</u> from OPM <u>four SES positions</u> for the modal directorships (OAS, OHS, ORPH, and OMS). (*See* Ex. 26, Declaration of Carroll in CFC, at ¶ 5) | b. Carroll later admitted that she was <u>not aware of a request</u> by NTSB <u>for four SES positions</u> from OPM. (*See* Ex. 27 at 22) | |
| c. Carroll stated that the Director of ORPH became an SES position in or around the year <u>2000</u> due to the <u>retirement</u> of a former SES position holder. (*See* Ex. 26 at ¶ 8) | d. Carroll later testified that the Director of ORPH became an SES position in either <u>2003 or 2004</u> and admitted that she is <u>not aware as to how</u> the position became available. (*See* Ex. 27 at 27-28) | |
| 3. While Ms. Murtagh Cooke refutes any claim that the Director of OMS was smaller in size or scope than any other NTSB modal directorship, the truth was <u>NTSB did not follow its own stated plan</u> to establish SES positions for the modal directors sequentially. The Deputy Director of OAS, Deputy Director of ORE, Dean of the NTSB Academy, and Director of the NTSB Academy became SES positions prior to the Director of OMS. (*See* Ex. 24, Chart of SES Positions within the NTSB) | During all relevant time periods, the director of OAS was paid at the SES level. The director of ORPH was the most senior of the modal office directors and ran the most complex of the three surface modal offices. The scope of responsibilities of OHS was much larger than the scope of responsibilities of OMS. *Defendant's Memorandum* at 4. | |
| 4. After the ad hoc review committee <u>deemed Ms. Murtagh Cooke qualified</u> for the OMS SES position, <u>Campbell decided to re-advertize</u> the OMS SES position. (*See* Ex. 13; *see also* Ex. 19 at 114; *see also* Ex. 29) | The 2004 OMS position advertisement was cancelled because the NTSB believe that the pool of qualified candidates was too narrow, not large enough, insufficiently robust, and there was a rumor the position had been "wired" for Plaintiff. *Defendant's Statement* at ¶ 3; *Defendant's Memorandum* at 5, 24-25. | |
| 5. Though the ad hoc review committee deemed Ms. Murtagh Cooke "<u>qualified</u>" in "demonstrating command and/or | The 2005 panel members discussed whether | |

| | | |
|---|---|---|
| | responsibility of or for sea-going operations" in 2004, <u>without any change</u> in Ms. Murtagh Cooke's qualifications, it <u>listed Ms. Murtagh Cooke as "not qualified"</u> for the same category in 2005. Magwood <u>could not explain</u> the <u>difference</u> in the different panels' <u>opinions</u>. (*See* Ex. 20, March 4, 2005 SES Rating Sheet for Ms. Murtagh Cooke; *see also* Ex. 21, March 28, 2005 SES Rating Sheet for Ms. Murtagh Cooke; *see also* Ex. 3, Excerpts of Magwood Deposition in DDC, at 76-83; *see also* Ex. 29) | Plaintiff has any real time at sea or on ships, and the general consensus was that if Plaintiff had time it was very minimal, making her not among the top five candidates. *Defendant's Statement* at ¶ 4; *Defendant's Memorandum* at 28. |
| 6. | Though <u>previously qualified</u>, the ad hoc review committee <u>did not select Ms. Murtagh Cooke</u> for the new SES OMS Director position, nor deemed her qualified for an interview.  Osterman, <u>knowing Ms. Murtagh Cooke was deemed qualified</u> by the first panel, of which we was a member, <u>refused to grant her an interview</u> during the second advertisement.  (*See* Ex. 8 at ¶ 23; *see also* Ex. 9 at ¶ 23; *see also* Ex. 14, Memorandum Regarding 2005 Selected Candidates; *see also* Ex. 28 at 30-31) | Osterman, Rosenker, Campbell, and Conners decided that there was insufficient work to justify an SL position for Ms. Murtagh Cooke. *Defendant's Statement* at ¶¶ 5-6; *Defendant's Memorandum* at 29. |
| 7. | NTSB <u>transferred Ms. Murtagh Cooke to an assistant planning position</u> with OSRA in or about June 2005 in lieu of appointing her an SES position or the equivalency of SES pay.  (*See* Ex. 8 at ¶ 25; *see also* Ex. 9 at ¶ 25; *see also* Ex. 29) | The position in OSRA was one of the positions the NTSB had at the time.  Osterman saw a need for the position and deemed Ms. Murtagh Cooke qualified. *Defendant's Statement* at ¶¶ 7-8; *Defendant's Memorandum* at 31. |
| 8. | Ms. Murtagh Cooke's assistant planning position with OSRA <u>did not entail the same level of management responsibilities</u> as she had as the Director of OMS or utilize her high qualifications. (*See* Ex. 11 at 178-191 and 194-196; *see also* Ex. 28 at 17-18, 42, 199-203) | Throughout this detail, Plaintiff retained her previous pay level and benefits.  *Defendant's Memorandum* at 32. |
| 9. | NTSB <u>transferred Ms. Murtagh Cooke</u> again, in or about October of 2005, <u>to a program analyst position</u> within OMD in lieu of appointing her an SES position or the equivalency of SES pay. (*See* Ex. 8 at ¶ 26; *see also* Ex. 9 at ¶ 26; *see also* Ex. 29) | The position in OMD was one of the positions the NTSB had at the time.  Osterman saw a need for the position and deemed Ms. Murtagh Cooke qualified and would continue to look for suitable, permanent positions for Ms. Murtagh Cooke *Defendant's Statement* at |

| | |
|---|---|
| | ¶¶ 9-11; *Defendant's Memorandum* at 33-34.. |
| 10. Ms. Murtagh Cooke's program analyst position within OMD was <u>primarily archival and did not entail the same level of management responsibilities</u> as she has as the Director of OMS. (*See* Ex. 11 at 203-204; *see also* Ex. 28 at 17-18, 34) | Throughout this detail, Plaintiff retained her previous pay level and benefits. *Defendant's Memorandum* at 34. |
| 11. NTSB <u>did not always</u> provide Ms. Murtagh Cooke with an <u>evaluation</u> for her performance, especially in <u>2004 or 2005</u>. (*See* Ex. 28 at 22-23, 29-30, 153) | Plaintiff received comments from the Managing Director on her work products, Campbell always evaluated the modal office directors every time he had a conversation with them, and all Campbell's direct reports had little doubt as to whether or not they were doing a good job. *Defendant's Statement* at ¶¶ 12-14; *Defendant's Memorandum* at 35-36. |
| 12. <u>Campbell did not evaluate any of the modal directors.</u> (*See* Ex. 19 at 25-26) | Campbell always evaluated the modal office directors every time he had a conversation with them. *Defendant's Statement* at ¶ 13; *Defendant's Memorandum* at 35. |
| 13. NTSB <u>did not provide</u> Ms. Murtagh Cooke with <u>performance standards</u> or <u>appraisals</u> with regard to her work for either OSRA or OMD (*See* Ex. 28 at 17-18, 42-43; *see also* Ex. 11 at 188-193 | With the assistance of Human Resources, Plaintiff's supervisor in OMD worked on formulating performance standards for Plaintiff; Plaintiff retires before the performance standards were finalized. *Defendant's Statement* at ¶¶ 15-16. |
| 14. After NTSB's <u>transfer</u> of Ms. Murtagh Cooke <u>to OSRA and OMD</u>, Ms. Murtagh Cooke had <u>no hope of promotion or advancement</u>, and so Ms. Murtagh Cooke <u>left</u> her temporary, dead-end assignments at NTSB. (*See* Ex. 28 at 43-45, 221-223) | Plaintiff voluntarily retired from NTSB. *Defendant's Statement* at ¶ 16; *Defendant's Memorandum* at 6, 17-22. |

**E.  The Person To Whom Defendant Gave The Director Of OMS SES Position Was Not More Qualified For The Position Than Plaintiff.**

| | |
|---|---|
| 1.     Though Ms. Murtagh Cooke allegedly did not have enough marine experience to earn the OMS SES position, the NTSB <u>replaced her with Bob Bartlett, who had no marine experience whatsoever</u>.  (*See* Ex. 5, Excerpts from Osterman Deposition in DDC, at 98-99) | The 2005 panel members discussed whether Plaintiff has any real time at sea or on ships, and the general consensus was that if Plaintiff had time it was very minimal. *Defendant's Memorandum* at 28. |
| 2.     The ad hoc review committee deemed qualified and the NTSB <u>appointed the Director of OMS SES position to Spencer</u>.  (*See* Ex. 14; *see also* Ex. 29) | |
| 3.     Though <u>Spencer</u> applied for the Director of OMS SES position in 2004, he <u>was not deemed qualified</u> by the ad hoc review committee.  (*See* Ex. 22, Spencer's 2004 SES Application; *see also* Ex. 13) | Spencer had not only the requisite Bachelor's degree, he also had a Master's and a Doctorate and had been through the Coast Guard in a variety of marine safety positions. *Defendant's Memorandum* at 27. |
| 4.     Although <u>experienced maritime knowledge was essential</u> to the OMS SES position, Spencer, like Ms. Murtagh Cooke, was <u>deemed "not qualified."</u>  Nevertheless, the NTSB <u>offered Spencer the position</u>. | Spencer had not only the requisite Bachelor's degree, he also had a Master's and a Doctorate and had been through the Coast Guard in a variety of marine safety positions. *Defendant's Memorandum* at 27. |

| | | |
|---|---|---|
| a.     Campbell explained to Osterman that it was <u>necessary</u> to have "an <u>experienced maritime knowledgeable</u> individual" as the Director of OMS as an SES position.  (*See* Ex. 11 at 64). | b.     The review committee <u>deemed Spencer "not qualified"</u> in "demonstrating command and/or <u>responsibility of or for sea-going operations</u>" in their final decision.  (*See* Ex. 23, March 28, 2005 SES Rating Sheet for Spencer) | |

**II.  DEFENDANT'S REFUSAL TO APPOINT PLAINTIFF TO THE DIRECTOR OF OMS SES POSITION AND HER DEMOTION THEREAFTER WERE IN RETALIATION FOR HER COMPLAINTS REQUESTING EQUAL PAY, AND ANY DEFENSES OR PROFFERED LEGITIMATE BUSINESS REASONS ARE PURELY PRETEXTUAL**

**Summary:**  The NTSB's previous failure to follow a fair competitive process, re-advertising of the SES position, and selection of an unqualified individual for the SES position along with the clear animus of the NTSB's Chairman and Deputy Director, demonstrate NTSB's affirmative intention to refuse Ms. Murtagh Cooke the SES position notwithstanding her clear entitlement to it and to demote her in retaliation for her complaining that she was entitled to equal pay.

| *Ms. Murtagh Cooke's Disputed Facts* | *Defendant's Assertions* |
|---|---|
| **A.  The Temporal Proximity Between Ms. Murtagh Cooke's Complaints Regarding Unequal Pay And NTSB's Refusal To Appoint Her To The SES Position Demonstrate NTSB's Retaliatory Intent.** | |
| 1.  Ms. Murtagh Cooke initially complained to Conners regarding her unequal pay in April 2004.  The NTSB originally advertised for the Director of OMS SES position in July 2004.  Campbell re-advertised the SES position in January 2005.  Ms. Murtagh Cooke filed a formal EEO Complaint in February 2005.  The ad hoc review committee denied Ms. Murtagh Cooke an interview for the SES position in March 2005.  (*See* Ex. 2 at 53; *see also* Ex. 15; *see also* Ex. 16; *see also* Ex. 8 at ¶ 20; *see also* Ex. 9 at ¶ 20; *see also* Ex. 14) | Plaintiff's protected activity commenced on April 16, 2005, when she filed a formal EEO Complaint against the NTSB.  The pre-complaint process was initiated no earlier than when Plaintiff contacted the EEO Director on February 7, 2005.  *Defendant's Statement* at ¶ 2; *Defendant's Memorandum* at 12-13, 17. |
| **B.  The Re-Advertisement Of The Director Of OMS SES Position Demonstrates The Higher Scrutiny And Differential Treatment Ms. Murtagh Cooke Suffered.** | |
| 1.    Campbell <u>admitted</u>, and it was known, that he <u>re-advertized</u> the Director of OMS SES position <u>to ensure that Ms. Murtagh Cooke would not receive the SES appointment</u>; otherwise, he felt he would have been accused of <u>losing his mind</u>. (*See* Ex. 19 at 93-98, 182; *see also* Ex. 11 at 36) | The 2004 OMS position advertisement was cancelled because the NTSB believe that the pool of qualified |

| | |
|---|---|
| | candidates was too narrow, not large enough, insufficiently robust, and there was a rumor the position had been "wired" for Plaintiff. *Defendant's Statement* at ¶ 3; *Defendant's Memorandum* at 5, 24-25. |
| 2.    Although Campbell re-advertised the Director of OMS SES position due to an <u>alleged preselection</u> of Ms. Murtagh Cooke, the 2005 <u>re-advertisement was exactly the same</u> as that of the 2004 original, <u>without</u> any announcement of <u>non-preselection</u>. (*See* Ex. 11 at 37-38) | The 2004 OMS position advertisement was cancelled because the NTSB believe that the pool of qualified candidates was too narrow, not large enough, insufficiently robust, and there was a rumor the position had been "wired" for Plaintiff. *Defendant's Statement* at ¶ 3; *Defendant's Memorandum* at 5, 24-25. |
| 3.    Although Campbell re-advertized the Director of OMS SES position because of an <u>alleged</u> impression by the Coast Guard that the position was <u>preselected</u> for Ms. Murtagh Cooke, Campbell <u>never confirmed to the Coast Guard that no preselection existed</u>.  (*See* Ex. 11 at 41) | The 2004 OMS position advertisement was cancelled because the NTSB believe that the pool of qualified candidates was too narrow, not large enough, insufficiently robust, and there was a rumor the position had been "wired" for Plaintiff. *Defendant's Statement* at ¶ 3; *Defendant's Memorandum* at 5, 24-25. |
| 4.    Although Campbell re-advertized the Director of OMS SES position because of an alleged <u>desire to increase the applicant pool</u>, the NTSB <u>received the same number of applicants</u> (20) for both the original 2004 posting and subsequent 2005 posting of the position.  (*See* Exs. 13 and 14) | The 2004 OMS position advertisement was cancelled because the NTSB believe that the pool of qualified candidates was too narrow, not large enough, and there was a rumor the |

| | | |
|---|---|---|
| | | position had been "wired" for Plaintiff. *Defendant's Statement* at ¶ 3; *Defendant's Memorandum* at 5, 24-25. |
| 5. | Campbell clearly <u>does not have a problem with preferential treatment</u> within the NTSB's recruiting processes.  Although Campbell decided to re-advertise the OMS SES position due to a <u>perceived preference for Ms. Murtagh Cooke</u> for the position, Campbell himself <u>attempted to have a personal friend placed in a position within OMS</u>.  (*See* Ex. 28 at 60-62; *see also* Ex. 10 at 210) | Pursuant to OPM regulations, all SES positions must be advertised and competed. *Defendant's Memorandum* at 3. |

**C. The Selection Of An Unqualified Individual As Ms. Murtagh Cooke's Replacement Demonstrates The Higher Scrutiny And Differential Treatment Ms. Murtagh Cooke Suffered.**

| | | |
|---|---|---|
| 1. | Although Ms. Murtagh Cooke allegedly did not have enough marine experience to earn the OMS SES position, the NTSB <u>replaced her with Bob Bartlett, who had no marine experience whatsoever</u>.  (*See* Ex. 5 at 98-99) | The 2005 panel members discussed whether Plaintiff has any real time at sea or on ships, and the general consensus was that if Plaintiff had time it was very minimal; making her not among the top five candidates. *Defendant's Statement* at ¶ 4; *Defendant's Memorandum* at 28. |
| 2. | Although Spencer applied for the Director of OMS SES position in 2004, the ad hoc review panel <u>deemed Spencer unqualified</u> for the Director of OMS SES position. (*See* Ex. 22,; *see also* Ex. 13) | Spencer had not only the requisite Bachelor's degree, he also had a Master's and a Doctorate and had been through the Coast Guard in a variety of marine safety positions.  *Defendant's Memorandum* at 27. |
| 3. | Although <u>experienced maritime knowledge was essential</u> to the OMS SES position, the ad hoc review panel considered Spencer, like Ms. Murtagh Cooke, "<u>not qualified</u>" in that regard.  Nevertheless, the NTSB <u>selected Spencer for the position</u>. | Spencer had not only the requisite Bachelor's degree, he also had a Master's and a Doctorate and had been through the Coast Guard in a variety of marine safety positions.  *Defendant's* |

|  |  | *Memorandum* at 27. |
|---|---|---|
| a.     Campbell explained to Osterman that it was <u>necessary</u> to have "an <u>experienced maritime knowledgeable</u> individual" as the Director of OMS as an SES position.  (*See* Ex. 11 at 64). | b.     The review committee <u>deemed Spencer "not qualified"</u> in "demonstrating command and/or <u>responsibility of or for sea-going operations</u>" in their final decision.  (*See* Ex. 23) |  |
| 4.     Although the NTSB cited Spencer's <u>higher education</u> as a basis for his better qualification for the Director of OMS SES position, <u>there is no educational requirement for the position</u>.  (*See* Ex. 4, Excerpts of Osterman Deposition in CFC, at 75-76) | | Spencer had not only the requisite Bachelor's degree, he also had a Master's and a Doctorate and had been through the Coast Guard in a variety of marine safety positions.  *Defendant's Memorandum* at 27. |

**D.  The Promotion Of The Deputy Director Of ORE Into An SES Position Without A Competitive Application Process Or Interviews Demonstrates The Higher Scrutiny And Differential Treatment Ms. Murtagh Cooke Suffered And The NTSB's Deviation From Protocol.**

| | | |
|---|---|---|
| 1.     Clark started as the Deputy Director of ORE at the GS-15 level.  When the Deputy position became an SES position, the NTSB <u>automatically appointed Clark to the new SES position without</u> subjecting him to the same review process to which Ms. Murtagh Cooke had to endure (e.g., posting the position for a <u>competitive application</u> review process and <u>conducting interviews</u> of qualified candidates).  (*See* Ex. 6, Excerpts of Clark Deposition in CFC, at 25, 38-40) | | Pursuant to OPM regulations, all SES positions must be advertised and competed.  *Defendant's Memorandum* at 3. |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARJORIE MURTAGH COOKE )<br><br>Plaintiff, )<br><br>v. )<br><br>MARK ROSENKER, CHAIRMAN, )<br>NATIONAL TRANSPORTATION SAFETY )<br>BOARD, *et al.* )<br><br>Defendants. )<br>) | Case No. 1:06-cv-01928<br>Judge John D. Bates |

TABLE OF EXHIBITS TO PLAINTIFF'S
STATEMENT OF GENUINE ISSUES IN DISPUTE

**Exhibit    Description[1]**

1.    Excerpts from EEO Investigative Report

2.    Excerpts of Conners Deposition in DDC

3.    Excerpts of Magwood Deposition in DDC

4.    Excerpts of Osterman Deposition in CFC

5.    Excerpts from Osterman Deposition in DDC

6.    Excerpts of Clark Deposition in CFC

7.    January 7, 2005, Email from Ms. Murtagh Cooke to Towanna Price and Conners

8.    Plaintiff's First Amended Complaint in DDC

9.    Defendants' Answer to First Amended Complaint in DDC

10.    Excerpts of Battocchi Deposition in DDC

11.    Excerpts from NTSB 30(b)(6) Deposition in CFC

---

[1] For full Proper Names, please see Plaintiff's Statement of Genuine Issues in Dispute at p. 2.

12.    2003-2004 Performance Review for Ms. Murtagh Cooke

13.    Memorandum Regarding 2004 Selected Candidates

14.    Memorandum Regarding 2005 Selected Candidates

15.    2004 SES Position Vacancy Announcement

16.    2005 SES Position Vacancy Announcement

17.    2004 SES Rating Sheet for Ms. Murtagh Cooke

18.    Excerpts from Chipkevich Deposition in DDC

19.    Excerpts of Campbell Deposition in DDC

20.    March 4, 2005 SES Rating Sheet for Ms. Murtagh Cooke

21.    March 28, 2005 SES Rating Sheet for Ms. Murtagh Cooke

22.    Spencer's 2004 SES Application

23.    March 28, 2005 SES Rating Sheet for Spencer

24.    Chart of SES Positions within the NTSB

25.    January 4, 2005, Email from Ms. Murtagh Cooke to Conners

26.    Declaration of Carroll in CFC

27.    Excerpts of Carroll Deposition in CFC

28.    Excerpts of Ms. Murtagh Cooke Deposition in DDC

29.    Timeline of Retaliation

# EXHIBIT NO. 1

# NATIONAL TRANSPORTATION SAFETY BOARD

## REPORT OF INVESTIGATION

### I.  DESCRIPTION OF COMPLAINT

Name of Complainant:

Marjorie M. Murtagh
Case Number NTSB-2005-02

Title and Grade of
Complainant's Position:

Director, Office of Marine Safety
GS-1801-15/10

Name and Location of
Agency and Unit Involved
in Complaint:

Office of Marine Safety
National Transportation Safety Board

Date of Alleged Discrimination:

January 28, 2005

Kind of Discrimination Alleged:

Sex

Nature of Action, Decision, or
Condition Giving Rise to Complaint:

Pay discrimination; unequal employment
conditions

### II.  DESCRIPTION OF INVESTIGATION

Identity of Investigator:

Paul Greenberg
DSZ
1730 N. Lynn Street, Suite 601
Arlington, Virginia 22209

Date Report of Investigation
Submitted to Agency:

December 6, 2005

Place of Investigation:

Washington, DC

Dates of Investigation:

August 26, 2005 to December 1, 2005

Method of Investigation:

On-site Interviews

1

000002

## III. DESCRIPTION OF BASES AND ISSUES IN COMPLAINT

Complainant alleges she was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she has received less compensation than the compensation received by similarly situated male Office Directors. Corning Glass Works v. Brennan, 417 U.S. 188 (1974); Goodrich v. International Brotherhood of Electrical Workers, 815 F.2d 1519 (D.C. Cir. 1987).

Complainant also alleges she was treated disparately based upon sex when on January 3, 2005, she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas v. Green, 411 U.S. 792 (1973).

## IV. SUMMARY

### The pay disparity issue

From 1994 until 2005, Complainant (female) served as the head of the NTSB's Office of Marine Safety (OMS). The position was classified and paid as a GS-15 job throughout this period (Exhibit F2).

Between 1994 and 1997/98, OMS was a unit within NTSB's Office of Surface Transportation Safety, and Complainant's title was Chief. As part of a restructuring in 1997/98, the Office of Surface Transportation Safety was divided into four separate Offices: Highway Safety (OHS), Railroad Safety, Marine Safety, and Pipeline and Hazardous Materials Safety. Each Modal Office had a Director, initially paid at the GS-15 level (Exhibits F2, F3). Throughout this period, NTSB's Office of Aviation Safety existed as a separate unit (Exhibit F3).

Dan Campbell (male) served as NTSB's Managing Director (an SES position) from 2000 until 2005, and was Complainant's immediate superior during this period. According to Mr. Campbell, the position of Director of the pre-1998 Office of Surface Transportation Safety was classified as an SES job, and there may have been one other SES slot within the OST structure. When OST was divided – initially into four surface Modal Offices – NTSB made a request to the Office of Personnel Management (OPM) for additional SES slots so that each of the surface Modal Office Directors could be classified and paid at the SES level. However, OPM denied NTSB's request. As a result, the Agency did not have SES positions available to classify the surface Modal Office Directors at the SES level, and each of the four Directors were classified and paid at the GS-15 level. The persons filling these four positions were Joe Osterman (Highway Safety)(male), Bob Lauby (Railroad Safety)(male), Bob Chipkevich (Pipeline and Hazardous Materials Safety)(male), and Complainant Marjorie Murtagh (Marine Safety)(female). Later, the Railroad Safety and Pipeline and Hazardous Materials

000003

Safety Offices were merged to form the Office of Railroad, Pipeline and Hazardous Materials Safety (RPH) (Exhibit F3).

Sometime after 2000, an SES employee at the NTSB retired and an SES slot therefore became available to the Agency. Mr. Campbell recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of Director, Office of Railroad, Pipeline and Hazardous Materials Safety (RPH). This position was occupied by Bob Chipkevich. Mr. Campbell explains he made this recommendation because Mr. Chipkevich was the most senior of the surface Modal Office Directors and because RPH was the most complex of the three surface Modal Offices. Although Chairman Hall initially was inclined to assign the SES slot to the Director of Highway Safety position because of its greater visibility, Mr. Campbell explains Chairman Hall ultimately accepted the recommendation and the RPH position became an SES job (Exhibit F3).

Around 2003, an SES position was eliminated at the NTSB Academy after the then-office holder voluntarily left the Agency, which made an additional SES slot available. NTSB leadership assigned this SES slot to the position of Director, Office of Highway Safety, which was encumbered by Joe Osterman. In 2004, NTSB received authorization from OPM for an addition Senior Executive Service position, which was assigned to the Director, Office of Marine Safety job. Mr. Campbell notes it always was the Agency's goal to elevate all the surface Modal Office Directors to the SES level, and if OPM had authorized enough SES slots when requested after the 1997/98 reorganization, all the positions would have been reclassified and the Director positions advertised at the SES level. However, because OPM did not authorize the requested SES slots, the process took place gradually both by gaining new slots from OPM and by reassigning slots from elsewhere within the NTSB (Exhibit F3).

Complainant states the authority, responsibilities and functions of the Modal Office Directors are all very similar and are described in the Code of Federal Regulations. Position Descriptions for the various Director jobs are included as attachments to Complainant's affidavit, Exhibit F2. In Complainant's view, the responsibilities for the Marine Safety and Aviation Safety Directors are most similar because both Offices have duties related to international accident investigations as well as investigations of both public and non-public accidents. As the Director of OMS, Complainant was responsible for initiating and overseeing the investigations of marine accidents, major and non-major (field investigations and incidents), domestic and international, those involving public and non-public vessels, as well as those involving claims of government malfeasance and Special Investigation reports. It was also her responsibility to oversee the factual documentation, analysis, development and preparation of detailed reports, including the drafting of conclusions, probable cause and recommendations. She notes that while the Board itself has ultimate authority to determine probable cause in transportation accidents, since 1998 the Board has delegated this authority to the Modal Office Directors when they issue the accident report as a "Brief Report of Accident." Complainant states that as OMS Director she also was responsible for preparing responses to proposed marine safety rulemakings and requests for technical support,

3

both internal and external, including the technical details for development of contracts issued by the NTSB (Exhibit F2).

Complainant believes pay classifications, pay rates and awards for Office Directors are determined by the NTSB Chairman, in consultation with the Managing Director. Between March 2003 and March 2005 the NTSB Chairman was Ellen Engleman Conners (female). Dan Campbell was the Managing Director during this period. *Id.*

Complainant states she met with Chairman Engleman Conners in April 2004 to discuss concerns about her compensation. She reminded Chairman Engleman Conners that she (Complainant) was being paid as a GS-15, and therefore was not receiving pay and awards comparable to her male counterparts who were NTSB Office Directors, all of whom were male. In addition, Complainant noted there even were some Deputy Directors at the NTSB who were classified and paid as SES members. Complainant indicated she wanted to find an equitable way to resolve this issue of pay disparity. According to Complainant, Chairman Engleman Conners emphasized the Agency was working hard to get an additional SES slot approved, which would be assigned to the OMS Director position; however, if the slot was granted, Chairman Engleman Conners noted the position would need to advertised and competed at the SES level. *Id.*

Complainant indicates she made it clear to Chairman Engleman Conners that her primary concern was to be compensated at the same level as the other Office Directors, rather than receive the SES classification *per se.* Complainant suggested that greater parity would be achieved if the Agency paid her (Complainant) overtime. Complainant noted the overtime payment would help close the pay gap between herself and the male Office Directors, and also would be helpful toward achieving her "high three" salary levels for calculating pension benefits. According to Complainant, Chairman Engleman Conners expressed doubts that overtime pay was possible, but committed to exploring the issue with Human Resources and she would consider it. Complainant states she had no further meetings about compensation with Chairman Engleman Conners after April 2004, and that she was not granted overtime pay nor did she receive bonuses comparable to the male Office Directors. Further, Chairman Engleman Conners did not respond to further attempts by Complainant to meet for further discussions about pay parity. *Id.*

Separately, Complainant states she spoke with Human Resources Director Lisa Love (female) about the overtime question. Complainant states Ms. Love advised her there were no OPM barriers to paying Complainant overtime, but the Chairman would need to approve such overtime. *Id.*

Complainant notes the substantial disparities between her compensation and that of the other [male] Office Directors, and alleges the pay disparities extend back at least seven years. She notes the Director, Office of Aviation Safety (the position she alleges is most comparable to her own) and the Director, Office of Railroad, Pipeline and Hazardous Materials Safety received annual pay more than $20,000 greater than she received, and triple the amount of bonus pay given her. In addition, even the Office of Highway Safety

4

Director – also a GS-15 position until 2004 – was paid $12,000 more than a GS-15 in 2003. The OHS Director received about $14,000 more pay in 2003 than Complainant. *Id.*

Complainant states she has received exceptional performance evaluations throughout her tenure with the Agency, and most recently received an Outstanding rating from Managing Director Campbell and the reviewing official, Chairman Engleman Conners. In Complainant's view, the positions of the Modal Office Directors are comparable and she (Complainant) has successfully performed her work as the OMS Director. In Complainant's view, the only explanation for the lower level of compensation she has received is her gender. *Id.*

Complainant disputes the Agency's claim that Complainant's classification and pay were not elevated to the SES level because of a lack of SES slots. She notes that even without changing the classification of the OMS position, greater pay parity could have been achieved through overtime or bonuses. Complainant believes the Agency deliberately chose not to use these tools. Further, she asserts the Agency has received additional SES slots since 1998 but simply chose not to assign one of them to the OMS Director job. She notes the position of Deputy Director of the Office of Research and Engineering – an SES position – was advertised and filled at least three times since 1998. The persons hired into the position were all male. When the Deputy Directors were reassigned to new positions, they retained their pay in accordance with federal requirements. *Id.*

Complainant concedes that OMS was a smaller office than the other Modal Offices, but asserts her job function was equal to that of the other Modal Directors and merited equal pay. Further, she argues her Office had fewer staff members in part because the Agency was depriving her of staff resources needed to do her job (*see "denial of authority to fill vacant positions issue"* discussion, *infra*). Moreover, she notes that the classification of a position as eligible for SES pay is based on duties, level of responsibility and function, not on the number of staff supervised. *Id.*

The OMS Director position was advertised as an SES position early in 2005. Complainant applied for the position but was not among the candidates interviewed. Another candidate, John Spencer (male) was hired into the OMS Director position at the SES level. *Id.*

The statements of three management witnesses – Chairman Engleman Conners, Managing Director Campbell, and then-OHS Director Joseph Osterman[1] (male) – generally concur with the facts provided by Complainant regarding pay classification history and compensation. However, they uniformly deny Complainant's lower compensation (compared with other [male] Office Directors) was the result of gender-based pay discrimination, asserting the order for elevating the surface Modal Office Directors to the SES level – RPH first, OHS second, and OMS third – was justifiable

---

[1]    Joe Osterman succeeded Dan Campbell as NTSB Managing Director in March 2005.

00000b

based on the size and responsibilities of the respective organization units. *See* Exhibits F3, F4 & F5.

While these Agency managers acknowledge there are similarities in the overall duties of the different Office Directors, each suggest there also are significant differences that justified the decision to make the OMS job the last Office Director position to be upgraded to SES classification and pay. Mr. Campbell notes that the RPH Director runs a larger organization than OMS and must be conversant in multiple disciplines. Similarly, the OHS Director runs a larger unit and has a much higher-profile job because of the great public interest in highway safety. He notes by comparison that NTSB shares jurisdiction for investigating commercial maritime activities with the U.S. Coast Guard, and that marine accidents are the one transportation mode where the NTSB is not the primary federal investigative authority. As a consequence, NTSB has a reduced ability to have significant effect on marine safety except for promoting better safety practices in the recreational boating area (Exhibit F3).

Mr. Campbell also disputes Complainant's claim that the OMS Director job is closely comparable to the Director, Office of Aviation Safety. He states Aviation Safety is at the core of the NTSB's mission, both from a budgetary standpoint as well as public recognition. Further, the number of times the Aviation Safety Office is called upon to perform an investigation is dramatically higher than OMS. He states OMS warranted a Director at the SES level, but that SES slots are a scarce resource and it made sense for OMS to be the last Modal Office to be upgraded. He does not recall Complainant complaining to him about when the OMS Director job would be reclassified as SES, nor did Complainant raise compensation issues with him. *Id.*

Although Mr. Campbell acknowledges OMS was the last of the Modal Office Director jobs to be upgraded to SES, he notes there are other SES positions at the NTSB that have been occupied by females. He notes there were at one time two female SES employees working at the NTSB Academy, although that number has been reduced to one, Director Julie Beal. The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female, as well as the Director of the Office of Administration, Lola Ward. These are both SES positions. *Id.*

Further, Mr. Campbell observes there were chronic problems with the pace and quality of work generated by OMS under Complainant's leadership. Attached to Mr. Campbell's affidavit is a copy of an employee exit interview conducted with a departing OMS employee in 2002. The departing employee had worked for NTSB for about one year in a cooperative program, but left for the private sector. The employee commented she was leaving because the progress of work in OMS was too slow and she was afraid it would affect her work ethic. *Id.*

Mr. Campbell confirms there are two offices with Deputy Directors paid at the SES level – the Office of Aviation Safety, and the Office of Research and Engineering. He states this practice goes back decades. He asserts the high-level Deputy positions are justifiable. With regard to OAS, this unit is central to the NTSB's work and has about

6

140 staff members, while the other Offices have only 20 to 40 staffers. Having an SES-level Deputy in Research and Engineering is justifiable because the Office is staffed with a relatively large number of higher-level engineers who have advanced degrees, and the unit performs sophisticated, technical work. *Id.*

Chairman Engleman Conners states she arrived at the NTSB after all Office Director positions had been raised to the SES level except OMS and Highway Safety. She defends the decision to convert the OHS position first, noting there are 43,000 highway deaths each year in contrast to several hundred marine deaths (Exhibit F4).

*Chairman Engleman Conners confirms she was approached by Complainant about* being paid overtime, but comments she felt Complainant's proposal was "slightly bizarre." Chairman Engleman Conners states she advised Complainant that the OMS Director position would be elevated to an SES position as soon as a slot became available, at which point Complainant could apply for the job. She states she made an inquiry about ways to raise Complainant's pay, speaking either with Managing Director Campbell or HR Director Lisa Love. *Id.*

Joe Osterman was Director of the Office of Highway Safety until early 2005, and is now the NTSB Managing Director. Mr. Osterman became a member of the SES early in 2003. Prior to 2005, he served on the NTSB's Executive Performance Review Board (EPRB), which is responsible for reviewing the ratings and awards for SES employees. As the Managing Director, he now chairs the EPRB (Exhibit F5).

Mr. Osterman reports that in 2004 then-Managing Director Campbell convened the EPRB to discuss the distribution of additional SES and SL slots within the Agency. The EPRB recommended the next SES assignment should be for the OMS Director position *because OPM had allocated NTSB additional SES slots. The actual assignment of the SES position was done by the NTSB Chairman. Id.*

Mr. Osterman's account of the history of the elevating the Modal Office Director positions to the SES – and the rationale for their order – is consistent with the accounts of the other management witnesses, *supra.* Although Mr .Osterman agrees with Complainant that the Office Director positions require similar skill and effort, and their core mission is similar, he states the Offices have differing levels of responsibility. For example, RPH has responsibility for two modes of transportation (railroads and pipelines), and also provides support for the other Offices for accidents involving hazardous materials. Additionally, RPH maintains regional offices, while some Offices do not. *Id.*

Mr. Osterman asserts that like RPH, the Office of Highway Safety maintains regional offices. Although OHS does not have similar support functions for the other Offices, it generates the majority of recommendations to Congress or to state legislatures for regulatory changes. Highway accidents account for more than 43,000 deaths per year, while all the other modes of transportation combined account for fewer than 3,000 deaths per year. He notes the Office of Marine Safety is smaller than the other Offices,

and does not have regional offices. OMS provides few support functions for the other Offices. Although OMS has a limited international responsibility, this work largely involves conferences. *Id.*

With regard to the question of gender bias in deciding the order in which the Director jobs would be raised to the SES level, Mr. Osterman notes that the RPH Office Director, Bob Chipkevich, became an SES member three years before his position (OHS Director) was raised to the SES. Mr. Osterman observes that he would have liked his job at Highway Safety elevated earlier, but he knew the rationale for the order of SES assignments. In his view, Complainant understood this rationale fully as well. *Id.*

Lisa Love, Director, Human Resources Division, Office of Administration (female) states responsibility within NTSB for setting pay for SES classifications is handled by the Managing Director, with guidance from SES Program Manager Colette Magwood. She describes the process through which agencies are allocated SES slots. Each year, OPM invites agencies to request SES allocations for the upcoming fiscal year. NTSB does not always receive the number of SES positions requested (Exhibit F6).

Ms. Love is aware that some Office Directors have been paid as SES employees, while others have been paid as GS-15s. She believes the reason for the disparity in classification was due to program complexity, scope and impact of the work, and the qualifications required to perform the job. In addition, the number of SES slots allocated by OPM is a factor. She does not view it as an anomaly that some Deputy Director positions might be classified as SES while there were still Office Director positions paid on the GS scale. *Id.*

With regard to Complainant's interest in receiving overtime compensation, Ms. Love states she is advised by HR Specialist Emily Carroll that the personnel regulations do not prevent payment of overtime based on grade, but there is an overall premium pay limitation based on the amount of salary received. The applicable premium pay/overtime limitation is the biweekly salary of a GS-15 step 10 or Level V of the Executive Schedule, whichever is higher. As long as an employee's salary is below the limitation, the employee is eligible to earn premium pay/overtime. It therefore is probable Complainant could be paid some overtime compensation. However, she would need to make arrangements for overtime with her supervisor. *Id.*

A table comparing the compensation among Office Directors is found at Exhibit F1.

### The "denial of authority to fill vacancies" issue

Although the letter accepting Complainant's EEO charge focuses on a "denial of authority to fill vacancies in the Office of Marine Safety" that occurred January 3, 2005, Complainant states the January 2005 event was simply the latest in a series of similar experiences that has been on-going since 1998. Complainant asserts this pattern made it extremely difficult for OMS to apply necessary resources to its investigations and required her to work excessively long hours (Exhibit F2).

The January 2005 incident related to Complainant's effort to fill the position Marine Accident Investigator. The position was advertised, interviews were conducted and a selection was made in 2004. Complainant states that at the end of the process, Managing Director Campbell advised her she could not hire the selectee because he had applied for more than one job at the Agency. Specifically, in addition to applying for the Marine Accident Investigator position, the selectee also had applied for the OMS Director position that finally had been advertised as an SES job. According to Complainant, Campbell questioned the judgment of an applicant who had applied both for an investigator position in an Office while also applying for the most senior management position in the unit. Complainant states she was not concerned by this issue, and believes Mr. Campbell's explanation was implausible. *Id.*

In 2001, the Chief, Report Development Division, OMS, retired. Complainant states this was position was the head of a major division within OMS. The vacant position was advertised within NTSB, applicants were interviewed and Complainant made a selection. She forwarded the name of the selectee to Mr. Campbell, who then spoke directly with the selectee and decided she was unsuitable for the position. Complainant states she was prohibited from hiring a person into the position, and instead had to "make do" with the staff within her office. *Id.*

Also in 2001, Complainant reports Mr. Campbell placed a Human Performance Investigator from OMS on detail to OHS. This later became a permanent transfer. Complainant states she was prohibited from recruiting a replacement employee. *Id.*

In 2000, Complainant's Deputy Director left NTSB for a position at another agency. Although Complainant made numerous requests to fill the vacant Deputy Director position, she was not permitted to do so. As a result, OMS was the only Modal Office to operate without a Deputy. Complainant states her successor, current OMS Director Spencer, was assigned an Acting Deputy Director and has been given permission to hire a permanent Deputy Director. *Id.*

Complainant notes that in his statement to the EEO Counselor, Mr. Campbell suggested all the Office Directors were treated badly and cited the Agency's budget as prompting an overall drop in the number of positions at the NTSB. However, she attaches budget materials which she asserts support her claim that OMS was singled out for unfavorable treatment regarding staffing. Complainant states other male Office Directors were allowed to fill key slots and to increase the overall number of staff in their offices. She also states then-OHS Director Osterman would comment at meetings that his unit did not need more people and that OMS had a greater need for additional staff. *Id.*

Complainant asserts the repeated denial of opportunities for her to fill positions in her unit was discriminatory because Agency officials felt that if OMS was very small in size, the small size of the Office would in some way justify limiting the pay of its Director, who was female. She sees no reason other than sex discrimination that would explain why she was treated differently from her male counterparts in the other Modal Offices. *Id.*

Former Managing Director Campbell admits Complainant was refused opportunities to fill some positions, but denies this was discriminatory behavior motivated by Complainant's sex. With regard to the Marine Accident Investigator position, Mr. Campbell confirms Complainant's statement that he (Campbell) felt it was strange to hire a mid-level Investigator into OMS who simultaneously was seeking to become the Director of the Office. He notes also that the OMS Director position was being competed, and he thought it would be fair to delay the hire so that if a new person was hired as Director, the Director would have a chance to hire his or her own person into the job (Exhibit F3).

Mr. Campbell also confirms he stopped the hire of a new OMS Chief of Report Development. He explains Complainant wanted to fill the position with a person already working within OMS. The selectee informed Campbell that she had applied for the position because she wanted to block another co-worker from getting the job because they were incompatible. Campbell states he knew the selectee, and while he viewed her as a good editor he did not believe she would be able to manage the investigators who are a key part of the report-generating process. Mr. Campbell states he already had bad experiences with OMS' report generating abilities, citing problems with the accident report into the Staten Island Ferry crash. Mr. Campbell states he had to plead with an investigator to stay with the project rather than quit, and ultimately Campbell lifted the investigation out of OMS and personally supervised the project from the Managing Director's office. Id.

Mr. Campbell did not have a specific recollection with regard to the OMS Deputy Director position. Id.

Mr. Campbell states he normally did not view it as his role to intervene when Office Directors such as Complainant wanted to make a hire. However, he felt Complainant did not demonstrate good judgment in her selections. He recalls he once received a visit from the NTSB ethics office concerning an applicant for an OMS position. The applicant had a background with cruise ships. He was hired, and subsequently quit under a cloud. Mr. Campbell feels this experience vindicated his doubts concerning Complainant's hiring judgment. Id.

Mr. Campbell denies Complainant was singled out in her ability to hire staff for her Office. He states Complainant was allowed to fill many vacancies in her unit. Further, he states staffing levels generally are down at the Agency. He believes Complainant probably was allowed to hire more employees than other Directors because her Office had a relatively high turnover rate. Id.

Chairman Engleman Conners states she probably had some role in limiting some of the hiring. After she arrived at the Agency in 2003, she asked all senior managers to consider prioritizing the filling of positions based on the vision for the Agency, rather than simply backfilling open positions. NTSB identified 73 positions in the Agency and began a prioritizing process. Early in 2004, it was decided that the first positions to be

10

filled would be openings on the regional aviation investigation teams. At that time, the Agency had about 426 employee and was expecting to drop to about 415 positions, then 411. To avoid a RIF situation, many open positions at the Agency were not being filled. Jobs that were being filled were priority slots that had been mandated by Congress. *Id.*

Chairman Engleman Conners notes other Office Directors also were unhappy they were denied authorization to fill vacant positions, citing specifically the Director of the Office of Research and Engineering, Verne Ellenstad. She denies Complainant's being denied opportunities to fill vacancies related to her gender. *Id.*

Joe Osterman moved from the Director, OHS, position to the Managing Director job around the period when Complainant was attempting to fill the Marine Accident Investigator position in early 2005. He states the candidate selected by Complainant for the position was mediocre, and that he (Osterman) was the person who denied Complainant authority to complete the hire. This action was taken with Mr. Campbell's concurrence (Exhibit F5).

In Mr. Osterman's view, the restrictions on Complainant's ability to hire were not unique, and she was not singled out because of her gender. He states that other Office Directors also were prohibited from making hires at various times. He states his own unit, the Office of Highway Safety, lost about six positions between 200 and 2005 when he was denied authorization to hire against vacancies. This was happening throughout the Agency. *Id.*

In specific response to Complainant's assertion that he (Osterman) made several comments suggesting that OMS had a greater need for staff than OHS, Mr. Osterman states the comment was not made quite the way Complainant suggests. He states all the Offices were short-handed in some manner.

### Additional materials

Position descriptions for the Modal Director jobs are found as Exhibit F8. Performance ratings for Complainant and the employees to whom she compares herself are found as Exhibit F9. Tabulations showing positions filled in the Modal Offices are found as Exhibit F10.

## V. SURVEY OF THE GENERAL ENVIRONMENT

Position descriptions for the Office Director positions are found at Exhibit F8. As both the Complainant and Agency Managers acknowledge, there are significant similarities among the Office Director positions, as described. As discussed above, Agency Managers contend the differences between the jobs relate to a number of factors including the size of the Office's staff, number of investigations conducted, public visibility, support for investigations performed by other NTSB units, etc.

000012

A comparison of compensation of the Modal Office Directors for 2003 and 2004 is found at Exhibit F1. The comparison shows that Modal Office Directors Clark, Osterman and Chipkevich (all male) received greater compensation (salary and bonus) than Complainant during both years. During 2003, each of the male Office Directors received at least $13,000 more in compensation than Complainant. During 2004, each of the male Office Directors received at least $14,000 more in compensation than Complainant.

A listing of positions filled by each of the Offices between January 2003 and January 2005 is round at Exhibit F10. During this period, four positions were filled in the Office of Marine Safety, two positions were filled in the Office of Railroad, Pipeline and Hazardous Materials Investigations, nine positions were filled in the Office of Research and Engineering, twenty-five positions were filled in the Office of Aviation Safety, and two positions were filled in the Office of Highway Safety.

## INDEX

**TAB A:      FORMAL COMPLAINT DATA**

Exhibit A1:    Formal Complaint of Discrimination of Majorie Murtagh, dated April 16, 2005

**TAB B:      COUNSELING DATA**

Exhibit B1:    EEO Counselor's Report of Chester Fisher, dated April 7, 2005, with attachments:
- a)    Initial Interview Data Sheet.
- b)    Memorandum from EEO Counselor to Complainant re: Rights and Responsibilities of Aggrieved Parties (March 1, 2005).
- c)    Summary of Interview with Daniel Campbell.
- d)    Position Description, Director, Office of Marine Safety.
- e)    Position Description, Director, Office of Aviation Safety.
- f)    Comparison of Average Compensation of Modal Office Directors (1/1/2003 - 12/31/2004).
- g)    List of NTSB Senior Executive Service positions and employees, 2002 through FY04.
- h)    49 C.F.R. Part 800, Organization and Functions of the Board and Delegations of Authority.
- i)    Comparison of Core Functions of Office Director Positions.
- j)    NTSB Organization Chart.

Exhibit B2:    Notice of Right to File a Discrimination Complaint, dated April 1, 2005.

**TAB C:      DELINEATION OF THE ISSUES**

Exhibit C1:    Letter of Acceptance of the Complaint of Discrimination to Marjorie Murtagh from Fara D. Guest, dated July 21, 2005.

Exhibit C2:    Investigator's Letter of Authority, dated August 17, 2005.

**TAB D:      DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION**

**TAB E:      DOCUMENTATION OF APPELLATE ACTIVITY**

TAB F:                    DOCUMENTATION AND EXHIBITS

Exhibit F1:          Organizational Charts & Data:

a)                        a)    Relationship of Affiants, National Transportation Safety
                                Board, as of January 3, 2005 (Source:  EEO Investigator).
                          b)    Organization Chart, National Transportation Safety Board,
                                dated September 15, 2004 (Source:  EEO Counselor's
                                Report).
                          c)    Workforce profiles, dated September 9, 2004 (Source:
                                Marquee' Holmes, Human Resources Division):
                                Office of Aviation Safety
                                Office of Highway Safety
                                Office of Marine Safety
                                Office of Railroad, Pipeline and Hazardous Materials
                                Office of Research and Engineering
                          d)    Comparison of Average Compensation of Modal Office
                                Directors (01/01/2003 - 12/31/2004) (Source:  EEO
                                Counselor's Report)

Exhibit F2:          Affidavit of Marjorie Murtagh (female), Complainant, former
                     Director, Office of Marine Safety, NTSB, GS-15, dated October 18,
                     2005, with attachments:
                          a)    49 C.F.R. §800.2, Organization [of the NTSB].
                          b)    49 C.F.R. §800.25, Delegation to the Directors of the Office
                                of Aviation Safety, Office of Railroad Safety, Office of
                                Highway Safety, Office of Marine Safety, and Office of
                                Pipeline and Hazardous Materials Safety.
                          c)    Excerpt, NTSB FY2003 OMB Budget, pp. 11-13.
                          d)    Position description, Director, Office of Marine Safety.
                          e)    Position description, Director, Office of Aviation Safety.
                          f)    Comparison of Core Functions of Office Director Positions.
                          g)    Excerpt, Independent Safety Board Act of 1974.
                          h)    Summary of interview of Daniel Campbell dated March 14,
                                2005, performed by EEO Counselor Chester Fisher.
                          i)    Comparison of Average Compensation of Modal Office
                                Directors, 1/1/2003 - 12/31/2004.
                          j)    GS Salary Table 2003-DCB for the Washington-Baltimore
                                area, effective January 2003.
                                Locality Pay Rates for Members of the Senior Executive
                                Service, effective January 2003.
                          k)    NTSB Performance Appraisal for Marjorie Murtagh for the
                                period from August 1, 2002 to July 31, 2003.
                          l)    Excerpt (p.3), response to written questions by Chairman
                                Rogers in follow up to the testimony of the Chairman, NTSB,
                                before the Subcommittee on Transportation and Related

000015

 

Agencies Committee on Appropriations, House of
Representatives, regarding FY2003 Budget Request (April
2002).

m)    Same, p. 5.

n)    NTSB 2001 Personnel Report, excerpt relating to the Office
of Marine Safety, prepared by the Office of the Chief
Financial Officer

o)    Same, excerpts relating to the Office of Aviation Safety;
Office of Railroad, Pipeline and Hazardous Materials
Investigations; Office of Highway Safety.

p)    Investigator's file memorandum reporting that Complainant
declined to submit a rebuttal statement for the ROI
(November 11, 2005).

Exhibit F3:    Affidavit of Dan Campbell (male), Executive Director, NTSB, SES,
dated October 19, 2005, with attachment.

Exhibit F4:    Affidavit of Ellen Engleman Conners (female), former Chairman,
NTSB, dated October 17, 2005.

Exhibit F5:    Affidavit of Joseph Osterman (male), Managing Director, NTSB,
SES, dated October 24, 2005.

Exhibit F6:    Affidavit of Lisa Love (female), Director, Human Resources
Division, NTSB, GS-15, dated October 21, 2005.

Exhibit F7:    Classification Standards, General Schedule Supervisory Guide;
Memorandum from EEO Investigator regarding SES classification
standards (Source: Fara D. Guest, EEO Director).

Exhibit F8:    Position Descriptions (Source: Fara D. Guest, EEO Director):

a)    Director, Office of Marine Safety.

b)    Director, Office of Aviation Safety.

c)    Director, Office of Research and Engineering.

d)    Director, Office of Highway Safety.

e)    Director, Office of Railroad, Pipeline and Hazardous
Materials Safety.

Exhibit F9:    Performance Ratings and Standards for Complainant and the
employees to who Complainant compares herself for the two year
period prior to the denial of equal pay at issue (Source: Fara D.
Guest, EEO Director):

a)    Marjorie Murtagh, Director, Office of Marine Safety.

b)    Vernon Ellingstad (male), Director, Office of Research &
Engineering.

000016

| | c) | John C. Clark (male), Director, Office of Aviation Safety. |
| | d) | Robert Chipkevich (male), Director, Office of Rail, Pipeline and Hazardous Material Safety. |
| | e) | Joseph Osterman (male), Director, Office of Highway Safety. |

Exhibit F10:     List of positions filled, Office of Marine Safety, Office of Rail, Pipeline and Hazardous Materials Investigations; Office of Research and Engineering; Office of Aviation Safety; Office of Highway Safety 2003-2005 (Source: Marquee' Holmes, Human Resources Division).

## TAB G:  MISCELLANEOUS MATERIAL

Exhibit G1:     EEO Investigator's initial document request.

Exhibit G2:     Email correspondence on documentation requested but not provided.

000098

## ~~ATTACHMENT D~~
# National Transportation Safety Board
POSITION DESCRIPTION

Organizational Title: Director, Office of Marine Safety
Organization: Office of Marine Safety
Pay Plan Series and Grade: TBD
Incumbent: Marjorie M. Murtagh

## INTRODUCTION

This position is located in the Office of Marine Safety, National Transportation Safety Board (NTSB). The Office manages major marine transportation investigations for which go-teams are sent to the accident site. The Office investigates selected accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation regulations, requirements, policies, practices and systems in government and industry.

The incumbent serves as the Director, Office of Marine Safety (OMS), responsible for providing staff supervision and resource management, as well as overall management and direction of international and domestic marine accident investigations and reporting processes, recommendation development and marine safety program advocacy and oversight.

## MAJOR DUTIES

Plans, manages, directs and evaluates the work of the Office of Marine Safety and exercises important policy-making and policy-determining decisions impacting marine safety at the Board, at international maritime organizations, other Federal agencies and the international and domestic industry. Provides for the overall direction and technical accuracy of the investigation and reporting processes for major marine accidents.

Develops the overall requirements and schedules to accomplish the marine safety program. Reviews, approves and promulgates schedules and milestones for assigned activities. Reviews, evaluates and approves, disapproves or modifies requests for changes to milestones and schedules. Develops overall program review documentation and provides status reports on a regular basis.

Determines level of response and resource allocation for NTSB marine safety program. Upon notification of marine accident that warrants NTSB response, notifies NTSB's Chairman and Managing Director, U.S. Coast Guard, international or domestic federal agencies, e.g., State Department, foreign embassy and/or flag state representatives, as appropriate. Serves as hearing officer for public hearings. Coordinates the allocation of staff resources with other Office Directors involved in the investigation. Resolves differences between modal and support staff views regarding accident investigation scope, required resources, and analysis. Ensures, through complete and comprehensive review of the draft report, that essential issues are adequately addressed, all findings and recommendations are supported by analysis and that the draft sent forward is of the best quality. Ensures the proper presentation of the draft report before

000099

**Draft for Review**

Position Description Number MS-321519
Page 2 of 4

the Board at Board meetings.

Reviews work product of other modal and support offices. Ensures quality is commensurate with NTSB standards to promote success of NTSB marine safety program, including investigations, reports, safety recommendations and the marine safety advocacy.

Establishes and maintains liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, Federal regulators, etc. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. May be called upon to provide Congressional testimony.

Represents NTSB and serves as a member of the United States delegation at all International Maritime Organization (IMO) meetings regarding marine accident investigation issues.

Develops and justifies estimates for staff resource requirements, including personnel, funding, equipment and office space. Presents, justifies, and defends budget to all levels of management.

Implements concepts to get results through people. Makes selections, assigns work, trains and rewards employees, and corrects poor performance in a manner which maximizes the use of staff skills in achieving organizational goals. Monitors work status through formal and informal means and procedures. Ensures that appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated. Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communication between employees and their supervisors. Ensures that employees are given a real and continuing opportunity to influence their work environment and are able to participate in discussions related to methods of work accomplishment.

Essures reasonable equity within OMS of performance standards and rating techniques developed by subordinates. Ensures equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work. Evaluates subordinate supervisors and senior non-supervisory managers and serves as the reviewing official on evaluations of non-supervisory employees rated by subordinate supervisors.

Evaluates program accomplishments and their overall effectiveness. Identifies program problem areas and solicits from Division Chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions, as needed.

Works closely with HR in improving the recruitment, placement and retention of a high-quality OMS workforce. Ensures that crucial training courses needed to keep pace with today's technological improvements in marine transportation safety are provided to the staff for their technical and operational currency, as well as their development in non-technological areas. Provides effective management training to maintain a highly motivated and cohesive workforce.

Relates Equal Employment Opportunity concepts to overall responsibilities. Supports Affirmative Action Plan items while performing assigned responsibilities.

The critical nature of the work of this position requires the incumbent to be available 24 hours per day, seven days a week.

**PROGRAM SCOPE AND EFFECT**                    Factor Level 1-x (xxx pts.)

**Draft for Review**                                    Position Description Number MS-321519
Page 3 of 4

The Director, Office of Marine Safety heads a major operating program which investigates marine transportation accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation policies, practices and systems in government and industry. The program directly involves the Agency's national mission, has nationwide and international impact on public safety issues within the marine manufacturing and transportation industry, and receives frequent congressional and media attention.

**ORGANIZATIONAL SETTING**                              Factor Level 2-x (xxx pts)

The incumbent reports directly to the Managing Director, National Transportation Safety Board.

**SUPERVISORY AND MANAGERIAL AUTHORITY EXERCISED**   Factor Level 3-x (xxx pts)

The incumbent operates under the general supervision and policy direction of the Managing Director. The Director, Office of Marine Safety, oversees the overall planning, direction and timely execution of the marine safety program which is carried out by approximately 22 employees in the Office of the Director, the Major Investigations Division, and the Report Development Division. The incumbent has the full range of supervisory and management authority for subordinate supervisors and employees in development, assignment, and clearance of long range goals and objectives for the program. Exercises discretionary authority for the allocation and expenditure of funds in the MS investigations and safety program. Exercises final authority for the full range of personnel actions recommended by subordinate supervisors.

Manages the development of policy changes and organizational changes in the OMS investigations and safety program in response to changing priorities and unanticipated needs.

**PERSONAL CONTACTS**                                   Factor Level 4-x (xxx pts)

The incumbent represents the Safety Board and serves as a spokesperson for the Board with regard to marine safety activities in dealing with other domestic and international Federal, state and other government agencies, military services, Congress, marine industry groups, labor organizations, foreign governments, and public, civic and private safety groups, as appropriate. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. Often, the incumbent is placed in the position of defending agency actions or of persuading other interests to cooperate with approaches that have broad and controversial impact. Incumbent may be called upon to provide Congressional testimony.

**DIFFICULTY OF TYPICAL WORK DIRECTED**                 Factor Level 5-x (xxx pts)

The highest level of basic nonsupervisory work directed which constitutes 25 percent or more of the workload is GS-15.

**OTHER CONDITIONS**                                    Factor Level 6-x (xxx pts)

Supervision exercised by the incumbent involves exceptional integration and coordination through subordinate supervisors who each direct substantial investigative workloads at the GS-14 or higher level. The incumbent's supervision and resource decisions have a direct and substantial impact on the organizations and programs managed. Decisions by the incumbent involve significant internal and external policy issues, major resource decisions to maximize the effectiveness of accident investigation

000101

Position Description Number MS-321519
Page 4 of 4

and prevention, and the need for changes in program goals, organizational structure or delegated authorities to optimize OMS operations. Ensures that all administrative and technical programs are carried out with full conformance with the standards, policies and procedures of the Board.

## EVALUATION

Total Points:
Point Range
Grade Level:

## FINAL CLASSIFICATION:

000105

## ~~ATTACHMENT I~~
## COMPARISON OF CORE FUNCTIONS OF OFFICE DIRECTOR POSITIONS
(By Delegation of Authority)[1]

| Director, OMS[2] | Director, OHS[3] | Director, OAS[4] | Director, RPH[5] |
|---|---|---|---|
| 1. Order an investigation into the facts, conditions, and circumstances of accidents that the Board has the authority to investigate | Same as OMS | Same As OMS | Same as OMS |
| 2. Disclose factual information pertinent to all accidents or incidents as provided for in part 801 of 49 CFR Ch VIII. | | | |
| 3. Determine the probable causes of accidents. | | | |
| 4. Investigate accidents as provided under Sec. 304(a) of the Independent Safety Board Act of 1974 as amended (49 U.S.C. 1131(a)). | | | |
| | | | |

---

[1] As provided in 49 Code of Federal Regulation ("CFR") Volume 5, Chapter VIII (National Transportation Safety Board) Part 800, Subpart B – Delegation of Authority to Staff Members.
[2] Per 49 CFR 800.2 (h), the **Office of Marine Safety** ("OMS") conducts investigations of marine accidents with the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents; determines the probable cause(s) of accidents when

ATTACH

EXHIBIT F2f

1

delegated authority to do so by the Board; initiates safety recommendations to prevent future marine accidents; participates in the investigation of accidents that occur in foreign countries and that involve U.S. registered vessels; and conducts special investigations into selected marine accidents involving safety issues of concern to the Board.

[3]Per 49 CFR 800.2 (g), the **Office of Highway Safety** ("OHS") conducts investigations of highway accidents, including railroad grade-crossing accidents, within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future highway accidents; and conducts special investigations into selected highway accidents involving safety issues of concern to the Board.

[4]Per 49 CFR 800.2(e), the **Office of Aviation Safety** ("OAS") conducts investigations of all aviation accidents within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future aviation accidents; participates in the investigation of accidents that occur in foreign countries and involve U.S. registered and/or U.S. manufactured aircraft; and conducts special investigations into selected aviation accidents involving safety issues of concern to the Board.

[5] Per 49 CFR 800.2(f) and (i), the **Office of Railroad, Pipeline, and Hazardous Materials Investigations** conducts investigations of railroad, pipeline, and hazardous materials accidents within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents; including a recommendation as to the probable cause(s); determine the probable cause(s) of accidents when delegated authority to do so by the Board, initiates safety recommendations to prevent future railroad, pipeline, and hazardous materials accidents; and conducts special investigations into selected railroad, pipeline, and hazardous materials accidents involving safety issues of concern to the Board.

ATTACHMENT I, PAGE2

000110

ATTACH    EXHIBIT F2i

~~ATTACHMENT F~~
## COMPARISON OF AVERAGE COMPENSATION
## OF
## MODAL OFFICE DIRECTORS
(01/01/2003 – 12/31/2004)

| Name | 2003 Salary | 2003 SES Award | 2004 Salary | 2004 SES Award | Total Comp | Average annual Compensation |
|------|------|------|------|------|------|------|
| Clark | $142,022 | $16,080 | $142,022 | $17,000 | $317,124 | $158,562 |
| Osterman | $136,872 | $0 | $140,797 | $9,500 | $287,169 | $143,585 |
| Chipkevich | $142,022 | $16,056 | $142,022 | $16,000 | $316,100 | $158,050 |
| | | | | | $920,393 | $153,399 |
| Murtagh[1] | $121,583 | $5,400 | $126,963 | $3,400 | $257,346 | $128,673 |

DISCUSSION

This chart depicts the average compensation received by the Directors of the Offices of Aviation Safety ("OAS"), Highway Safety ("OHS"), Railroad, Pipeline, and Hazardous Materials Investigations ("RPH"), and Marine Safety ("OMS") during calendar years 2003 and 2004. Actual yearly salary was determined by dividing the annual salary by 2087[2] and multiplying the result by 80[3] x 26[4]. Total compensation includes salary and cash awards received by each individual during this period. Average annual compensation for the Directors of OAS, OHS, and RPH[5] was computed by dividing the total amount of compensation they received ($920,393) during the two years by six (6). Average annual compensation for the Director OMS was computed by dividing the total amount of compensation she received during the two years by two (2).

---

[1] Complainant
[2] To convert the annual salary to an hourly salary.
[3] The number of hours in a pay period.
[4] The number of pay periods in a calendar year.
[5] The Directors of OAS, OHS, and RPH are male.

## AFFIDAVIT OF ELLEN ENGLEMAN CONNERS

City:    Washington

State:   District of Columbia

I, **Ellen Engleman Conners**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1.    Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2.    Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated male Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1.    **Please identify your position with the NTSB?**

I am a Board member, and I am the Chairman-designate.

2.    **How long have you held this position?**

I became a Board member in March 2003, and served as Board member and Chairman. My term as Chairman ended in March 2005. I have been re-nominated to serve as Chairman, and am serving as a Board member while awaiting confirmation.

3.    **Please identify your gender.**

Female.

4.    **Describe your role in setting pay classifications and rates for Office Directors at NTSB. If you did not play a role in setting pay rates for Office Directors, please identify who did.**

I do not have a role. With regard to the number of SES positions that we have, this is handled through Human Resources through a request process to the Office of Personnel

Initials _____

000161

Management.

The agency is allocated a certain number of SES positions, and we have the ability to request additional slots. The NTSB has made such requests, and OPM's responses come back to Human Resources, the Managing Director and the Chairman. When a new SES position is available, we have discussions about where it should be assigned. The Chairman's office has a role in this, but it is a relatively rare event. I believe we have had SES positions to assign only twice since 2003: once when we were allocated an additional SES position by OPM and once when a position which previously had been designated as an SES was shifted to an SL position.

The Chairman is designated by statute as the chief executive officer of the agency, so technically I have been involved in making these assignments. However, this is done with the advice of Human Resources and the Managing Director.

5.     **Are you aware of disparities in pay classifications among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

I was aware that not all Office Directors were SES employees, particularly the Directors of the Office of Highway Safety and the Office of Marine Safety. The reason they were not classified as SES positions is very simple: we did not have enough SES positions within the agency. This was the situation when I came to the NTSB in 2003.

6.     **The Complainant has asserted the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond.**

I agree, although the differentiating factor is the workload.

Of course, we cannot forecast when there will be accidents. By law, all civil aviation accidents must be investigated, and there are more than 1700 such accidents each year, so the Office of Aviation Safety always has a large workload. But the situation with the other modes is different, because investigations are performed at the discretion of the agency. As a result, the number of investigations is variable. Generally, we determine whether to conduct an investigation based upon the number of deaths or the amount of property damage involved and the safety issues involved.

So the workload in the other modes varies, and is largely controlled by the Office Directors. The Directors make preliminary recommendations whether to investigate to the Managing Director and NTS Board member on duty, and a decision to proceed is made based on the established criteria and the availability of agency resources.

7.     **When were the other Office Director positions converted to SES positions? Did the Complainant ever speak with you about her classification or compensation level? Please describe the conversation.**

Initials _____

000162

The position of Director, Office of Highway Safety, was converted to an SES position during my tenure as Chairman when an SES slot became available. I do not know when the other Office Director positions were converted.

When I came to the NTSB as Chairman, it was my goal to make all the Office Directors SES positions either through requesting new slots from OPM or by shifting existing slots within the agency. We converted the OHS Director position first, before the OMS Director job. There are 43,000 highway deaths each year, in contrast to several hundred marine deaths. OHS is a bigger office, so we moved first with OHS and then planned to elevate the OMS position when an SES slot was available. In both situations, however, it was always understood that when the job classification was changed the incumbent Director would have to apply competitively for the new SES position.

Ms. Murtagh did speak with me once about being paid overtime. Frankly, I thought the conversation was slightly bizarre. She asked me whether I was aware she was not a member of the SES, and suggested that because she was not in an SES position the agency should pay her overtime to make up for that. I explained that the agency was looking for an additional SES slot so that the status of the OMS Director position could be raised, at which point she could apply for the job.

Ms. Murtagh was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors. I promised I would look into the situation. I discussed this with someone within the agency, either Dan Campbell or Lisa Love.

I thought the request was very bizarre. Ms. Murtagh knew we were looking for the additional SES slot, and I was encouraging her to apply for the position at the SES level when it became available.

I worked as a CEO in the private sector before coming to the NTSB, and I am accustomed to the proposition that an employee might argue for more pay based on additional performance. But Ms. Murtagh's argument was devoid of such reasoning, it was simply "Even though I am not classified as an SES employee, I'm entitled to the same pay."

8.    **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

I know there are Deputy Directors at the SES level, for example, in the Office of Aviation Safety.

The reason the OMS Director position was not classified as an SES position was that we did not have an available slot, and OMS is the smallest of the Modal Offices. Ironically,

Initials

000163

during my first two years at the NTSB there were about six major marine accidents, but this is atypical. The work of the other Offices is simply greater. Aviation Safety is huge by comparison. Railway, Pipeline and Hazardous Materials is responsible for three modes of transport. And there are 43,000 highway deaths each year.

No one was isolating the Office of Marine Safety, but it logically was last in the queue. Actually, it is my hope ultimately to make all the Deputy Directors SES positions, also.

9.    **Did the Complainant talk to you about being paid overtime as a means for bringing her compensation closer to that of the male Office Directors? Did you discuss this with the Managing Director, Dan Campbell, or with Human Resources? What was your decision and response.**

Yes, this is the method she proposed for raising her compensation. I thought it was bizarre for a manager to suggest being paid overtime.

Can it be done? I do not believe managers are entitled to overtime, unlike the investigators, for instance. I do not recall whether I made a specific decision to deny Ms. Murtagh overtime, but I would have. I do not even recall whether it would have been possible to pay her overtime.

10.    **After the discussion about possible overtime, did you evade further requests by Ms. Murtagh to discuss her compensation request? Was Ms. Murtagh ever told she would not be paid overtime?**

On several occasions, Ms. Murtagh asked me for follow up meetings. On the initial occasions, I was genuinely busy and did not have the time to meet with her. Later, I knew the SES slot for the OMS Director job was being processed, so I felt it was not appropriate to meet.

I am not sure whether Ms. Murtagh ever was contacted to be told she would not be paid overtime, no.

11.    **Was the decision to pay the OMS Director as a GS-15, rather than at the SES level, related to the fact that the OMS Director was female?**

Absolutely not.

12.    **Complainant describes several situations in which she had advertised, interviewed and selected a candidate for various positions, only to be told that she could not fill the job with the selectee. For example, earlier in 2005 she states she was denied an opportunity to hire a Marine Accident Investigator. Do you have any information about this?**

I probably had a role in this. I had asked all senior managers to get together and consider

Initials _____

000164

filling positions based upon our vision for the agency, rather than just backfilling open positions.

We identified 73 positions in the agency and began a process of prioritizing which would be filled. Early in 2004, we decided as a team that the first positions to be filled would be openings on the regional aviation investigation teams.

The agency had about 426 employees, and we were expecting to drop to about 415 positions, then 411. We were trying to avoid creating a situation where we would need to implement a reduction in force (RIF). Therefore, a lot of positions in each Office were not being filled to avoid having a RIF. We were very focused on filling just the priority slots, some of which had been mandated by Congress.

With regard to the Marine Accident Investigator position, I have no specific recollection.

13. **Complainant describes a situation several years ago in which she had advertised, interviewed and selected a candidate for the position of Chief, Report Development, only to be instructed she could not fill the job. Do you have any information about this position?**

I have no recollection of this.

14. **Around 2000, the then-Deputy Director of OMS left the NTSB. Complainant has claimed she was prohibited from hiring a new Deputy Director, making OMS the only Office without a Deputy. Do you have any information about this?**

I have a vague recollection that OMS was not allowed to fill the Deputy Director position, but I do not recall the circumstances.

15. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill?**

Some Office Directors were allowed to fill positions, and others were not allowed. It was all based on the needs of the agency and funding. For example, the Director of the Office of Research and Engineering, Verne Ellenstad, was very unhappy during this period that he was not allowed to fill some vacant positions in his unit.

16. **Was Ms. Murtagh's being denied opportunities to fill vacant positions related to her gender?**

Absolutely not. As an executive and as a woman, I find it insulting that she would even suggest this.

17. **What other witnesses do you believe have information that would be relevant to**

Initials _____

000165

your discrimination claim?

Dan Campbell and Lisa Love

18.  **Do you have any documents that are relevant to your claim of sex and pay discrimination? If so, please provide them.**

None.

19.  **Is there anything else you would like to add?**

No.

I have read the above statement consisting of 6 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_10-17-05_
Date

Ellen Engleman Conners

Witness

Initials

0001bb

# *PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____     _____
Signature of Interviewer         Signature of Affiant

_9/30/05_____     _Washington DC_____
Date                                    Place

000899

**EXHIBIT F8a**

# National Transportation Safety Board

## POSITION DESCRIPTION

Organizational Title:   Director, Office of Marine Safety
Organization:           Office of Marine Safety
Classification:         Supervisory Accident Investigator, GS-1801-15

### INTRODUCTION

This position is located in the Office of Marine Safety, National Transportation Safety Board (NTSB). The Office manages major marine transportation investigations for which go-teams are sent to the accident site. The Office investigates selected accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation regulations, requirements, policies, practices and systems in government and industry.

The incumbent serves as the Director, Office of Marine Safety (OMS), responsible for providing staff supervision and resource management, as well as overall management and direction of international and domestic marine accident investigations and reporting processes, recommendation development and marine safety program advocacy and oversight.

### MAJOR DUTIES

Plans, manages, directs and evaluates the work of the Office of Marine Safety and exercises important policy-making and policy-determining decisions impacting marine safety at the Board, at international maritime organizations, other Federal agencies and the international and domestic industry. Provides for the overall direction and technical accuracy of the investigation and reporting processes for major marine accidents.

Develops the overall requirements and schedules to accomplish the marine safety program. Reviews, approves and promulgates schedules and milestones for assigned activities. Reviews, evaluates and approves, disapproves or modifies requests for changes to milestones and schedules. Develops overall program review documentation and provides status reports on a regular basis.

Determines level of response and resource allocation for NTSB's marine safety program. Upon notification of a marine accident that warrants NTSB response, notifies NTSB's Chairman and Managing Director, the U.S. Coast Guard, international or domestic Federal agencies (e.g., State Department), foreign embassies and/or flag state representatives, as appropriate. Serves as hearing officer for public hearings. Coordinates the allocation of staff resources with other Office Directors involved in the investigation. Resolves differences between modal and support staff views regarding accident investigation scope, required resources and analysis. Ensures, through complete and comprehensive review of the draft report, that essential issues are adequately addressed, all findings and recommendations are supported by analysis and that the draft sent forward is of the best quality. Ensures the proper presentation of the draft report before the Board at Board meetings.

0 0 0 9 0 0

Reviews work product of other modal and support offices. Ensures quality is commensurate with NTSB standards to promote success of NTSB marine safety program, including investigations, reports, safety recommendations and the marine safety advocacy.

Establishes and maintains liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, Federal regulators, etc. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. May be called upon to provide Congressional testimony.

Represents NTSB and serves as a member of the United States delegation at all International Maritime Organization (IMO) meetings regarding marine accident investigation issues.

Develops and justifies estimates for staff resource requirements, including personnel, funding, equipment and office space. Presents, justifies and defends budget to all levels of management.

Implements concepts to get results through people. Makes selections, assigns work, trains and rewards employees, and corrects poor performance in a manner which maximizes the use of staff skills in achieving organizational goals. Monitors work status through formal and informal means and procedures. Ensures that appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated. Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communication between employees and their supervisors. Ensures that employees are given a real and continuing opportunity to influence their work environment and are able to participate in discussions related to methods of work accomplishment.

Ensures reasonable equity within OMS of performance standards and rating techniques developed by subordinates. Ensures equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work. Evaluates subordinate supervisors and senior non-supervisory managers and serves as the reviewing official on evaluations of non-supervisory employees rated by subordinate supervisors.

Evaluates program accomplishments and their overall effectiveness. Identifies program problem areas and solicits from Division Chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions, as needed.

Works closely with HR in improving the recruitment, placement and retention of a high-quality OMS workforce. Ensures that crucial training courses needed to keep pace with today's technological improvements in marine transportation safety are provided to the staff for their technical and operational currency, as well as their development in non-technological areas. Provides effective management training to maintain a highly motivated and cohesive workforce.

Relates Equal Employment Opportunity concepts to overall responsibilities. Supports Affirmative Action Plan items while performing assigned responsibilities.

The critical nature of the work of this position requires the incumbent to be available 24 hours per day, seven days a week.

## PROGRAM SCOPE AND EFFECT                    Factor Level 1-5 (900 pts.)

The Director, Office of Marine Safety, heads a major operating program which investigates marine transportation accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other

000901

international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation policies, practices and systems in government and industry. The program directly involves the Agency's national mission, has nationwide and international impact on public safety issues within the marine manufacturing and transportation industry, and receives frequent Congressional and media attention.

### ORGANIZATIONAL SETTING                         Factor Level 2-3 (350 pts)

The incumbent reports directly to the Managing Director, National Transportation Safety Board.

### SUPERVISORY AND MANAGERIAL AUTHORITY EXERCISED   Factor Level 3-4 (900 pts)

The incumbent operates under the general supervision and policy direction of the Managing Director. The Director, Office of Marine Safety, oversees the overall planning, direction and timely execution of the marine safety program, which is carried out by approximately 22 employees in the Office of the Director, the Major Investigations Division and the Report Development Division. The incumbent has the full range of supervisory and management authority for subordinate supervisors and employees in development, assignment and clearance of long range goals and objectives for the program. Exercises discretionary authority for the allocation and expenditure of funds in the MS investigations and safety program. Exercises final authority for the full range of personnel actions recommended by subordinate supervisors.

Manages the development of policy changes and organizational changes in the OMS investigations and safety program in response to changing priorities and unanticipated needs.

### PERSONAL CONTACTS                               Factor Level 4-4 (225 pts)

The incumbent represents the Safety Board and serves as a spokesperson for the Board with regard to marine safety activities in dealing with other domestic and international Federal, state and other government agencies, military services, Congress, marine industry groups, labor organizations, foreign governments and public, civic and private safety groups, as appropriate. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. Often, the incumbent is placed in the position of defending agency actions or of persuading other interests to cooperate with approaches that have broad and controversial impact. Incumbent may be called upon to provide Congressional testimony.

### DIFFICULTY OF TYPICAL WORK DIRECTED             Factor Level 5-8 (1030 pts)

The highest level of basic nonsupervisory work directed which constitutes 25 percent or more of the workload is GS-15.

### OTHER CONDITIONS                                Factor Level 6-6 (1325 pts)

Supervision exercised by the incumbent involves exceptional integration and coordination through subordinate supervisors who each direct substantial investigative workloads at the GS-14 or higher level. The incumbent's supervision and resource decisions have a direct and substantial impact on the organizations and programs managed. Decisions by the incumbent involve significant internal and external policy issues, major resource decisions to maximize the effectiveness of accident investigation and prevention, and the need for changes in program goals, organizational structure or delegated authorities to optimize OMS operations. Ensures that all administrative and technical programs are carried out with full conformance with the standards, policies and procedures of the Board.

000902

**EVALUATION**

Total Points:  4730
Point Range:  4055-up
Grade Level:  GS-15

**FINAL CLASSIFICATION:  Supervisory Accident Investigator, GS-1801-15**

# EXHIBIT NO. 2

1

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3      -------------------------------------X

4      MARJORIE MURTAGH COOKE              :

5                     Plaintiff           :

6           v.                            :    Case No.:

7      MARK ROSENKER, Chairman,           :    1:06CV01928

8      NATIONAL TRANSPORTATION            :

9      SAFETY BOARD                       :

10                    Defendant           :

11     -------------------------------------X

12

13                  Videotaped Deposition of

14                   ELLEN ENGLEMAN CONNERS

15

16                     Washington, D.C.

17                 Thursday, October 25, 2007

18                       9:30 a.m.

19

20

21     Job No.:  1-115016
       Pages 1 - 170
22     Reported by:  Ellen L. Ford, RPR

## Page 2

1  Videotaped Deposition of ELLEN ENGLEMAN CONNERS, held

2  at the offices of:

3

4

5      EMPLOYMENT LAW GROUP

6      888 17th Street, Northwest

7      Suite 900

8      Washington, D.C.  20006

9

10

11

12  Pursuant to agreement, before Ellen L. Ford,

13  Registered Professional Reporter and Notary Public in

14  and for the District of Columbia.

15

16

17

18

19

20

21

22

## Page 3

1          A P P E A R A N C E S

2

3  ON BEHALF OF PLAINTIFF:

4      R. SCOTT OSWALD, ESQUIRE

5      BRIAN M. LOWINGER, ESQUIRE

6      DAVID SCHER, ESQUIRE

7      EMPLOYMENT LAW GROUP

8      888 17th Street, Northwest

9      Suite 900

10      Washington, D.C.  20006

11      (202) 331-2883

12

13

14  ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:

15      MEREDYTH D. COHEN, ESQUIRE

16      UNITED STATES DEPARTMENT OF JUSTICE

17      COMMERCIAL LITIGATION BRANCH

18      1100 L Street, Northwest

19      Washington, D.C.  20005

20      (202) 353-7978

21

22

## Page 4

1          A P P E A R A N C E S  (Continued)

2

3  ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY

4  BOARD:

5      DENISE M. D'AVELLA, ESQUIRE

6      NATIONAL TRANSPORTATION SAFETY BOARD

7      OFFICE OF GENERAL COUNSEL

8      490 L'Enfant Plaza, Southwest

9      Washington, D.C.  20594

10      (202) 314-6086

11

12  ALSO PRESENT: Scott Forman, Videographer

13        Marjorie Murtagh Cooke, Plaintiff

14        Quan Luong, Esquire, US Dept. of Justice

15

16

17

18

19

20

21

22

## Page 5

1          C O N T E N T S

2  EXAMINATION OF ELLEN ENGLEMAN CONNERS        PAGE

3      By Mr. Oswald           7 - 164

4      By Mr. Luong          164 - 165

5

6          - - -

7

8          E X H I B I T S

9      (Exhibits retained by counsel.)

10  ENGLEMAN CONNERS EXHIBITS              PAGE

11  No. 1 - Performance Appraisal Form        86

12  No. 2 - Affidavit               143

13  No. 3 - signed document            144

14  No. 4 - Performance Evaluation Form     145

15  No. 5A and B - e-mails            146

16

17

18

19

20

21

22

Page 22

1    I don't remember the exact process.  I don't know
2  if I signed and then it went back to the employee, or
3  they had both signed and it came to me.  I'm sorry.  I
4  don't remember which way it was.
5    Q    Okay.  And when you say that they both
6  signed, I'm just wondering who "both" is, though.  Who
7  is -- when you say "both", what does that refer to?
8    A    I thought I stated it.  I believe it's the
9  employee and their supervisor.
10    Q    And then once the employee and the
11  supervisor sign it, then what happens to the form?
12    A    Once again, I don't remember the exact
13  sequence.  I do remember three signatures, and I
14  believe it's the employee -- the supervisor, the
15  employee, and then mine was the last signature.  I
16  think it was the last signature to -- again, that was
17  because of authorization for bonus or something like
18  that.
19    Q    I understand.  And once you had given the
20  last signature, let's say, for the bonus on the
21  performance evaluation, what would happen to the form
22  at that point, the evaluation form?

Page 23

1    A    I don't know.
2    Q    When if ever would you retain a copy of the
3  performance evaluations after you put your last
4  signature on it and sent it off for check cutting?
5    A    I did not retain any copies.
6    Q    All right.  I want to just talk about the --
7  you talked before about the employees.  At least some
8  of the employees underneath you at NTSB were also SES;
9  is that correct?
10    A    Mm-hmm.
11    Q    And how many employees were SES employees?
12    A    Let's see.  Managing Director was SES,
13  General Counsel was SES, I'm not sure if the CFO was
14  or was not, the EEO I don't think was, but I'm not
15  sure, the -- so of those that my direct reports, I'm
16  sure two of them were, but I'm not sure actually the
17  other two.
18    Q    And how about your second-line reports,
19  those that reported directly to the Managing Director?
20    A    It was a mix.  Public Affairs was a 15 -- I
21  forgot to mention them earlier.  Public Affairs was a
22  big part of what we do, too.  I'm sorry, Ted.

Page 24

1    Public Affairs was a 15, Marine was a 15,
2  Marjorie was a 15, Highways was initially a 15, the
3  Academy was an SES, and the other investigative --
4  let's see, Aviation, Rail -- Aviation, Rail -- who am
5  I forgetting again?  They were SES.
6    Q    And how many of those converted from General
7  Schedule to SES during your period of time as the
8  Administrator, the CEO and Chairman of the NTSB?
9       MS. COHEN:  Objection; assumes facts
10  not in evidence.
11    Q    You may answer the question.
12    A    Could you repeat it?
13    Q    Certainly.  How many of the positions that
14  were either directly under you or second line under
15  you became SES, converted from General Schedule to SES
16  during your tenure?
17    A    Perhaps I'm not understanding the question,
18  but I'm not aware of any that converted.  We didn't
19  convert a 15 to an SES.  We were able to gain SES
20  positions.
21    SES positions are separate.  There are not a lot
22  of them.  And so we were able to gain some through a

Page 25

1  couple of variety of measures.  There were a couple of
2  things that were able to happen so that we gained
3  SESs, and then they were allocated to a division.
4    Q    Who made the decision to allocate them to a
5  division?
6    A    I made the decision with the advice and
7  counsel of the Managing Director and the General
8  Counsel.
9    Q    Once you made the decision to allocate an
10  SES slot to a particular division, what was the
11  process that would occur once you made that decision?
12    A    Well, when -- and perhaps I need to clarify
13  when I made a decision.  My decisions were based on
14  recommendations.  I didn't come up with them and then
15  seek advice and counsel as to whether I should or
16  shouldn't.  This was a collegial environment, A, and
17  B, the majority of these were a combination of
18  conversation with Dan, who was the Managing
19  Director --
20    Q    Is that Dan Campbell?
21    A    Dan Campbell, yes, the Managing Director.
22  So I can't tell you who thunk of it first.  I mean, it

Page 50

1 understand.

2    Q   My question is, when if ever did you become
3 aware that any of the Directors of the four
4 investigative modes at the NTSB were paid differently?

5        MR. LUONG:  I'm just going to object to
6 the term "differently" as vague.

7        COURT REPORTER:  As what?

8        MR. LUONG:  Vague.

9        COURT REPORTER:  Thank you.

10    A   I'm sorry.  I really don't understand your
11 question.

12    Q   All right.  When if ever did you become
13 aware that any of the Directors at the NTSB --
14 Highway, Marine, Aviation or Rail -- were concerned
15 about the fact that he or she was paid differently
16 from other Directors at the NTSB?

17        MS. COHEN:  Objection; assumes facts
18 not in evidence.

19    Q   You may answer the question.

20    A   It's the way you're phrasing it, I'm having
21 a hard time understanding exactly what you're asking.

22    When we did -- when I was presented with the

Page 51

1 first, what you would call the annual performance
2 review, the recommendation of bonuses, there was an
3 SES pool, and so I could see from the listing who was
4 an SES and who was not an SES.

5    So at that point, I guess you could say I was
6 aware that people were paid that had different -- they
7 were in different grade levels.

8    Paid differently is confusing to me because
9 everyone is paid under the Federal Civil Service
10 System, and that has grade levels, and it has time,
11 and it has all these other things.

12    So, I mean, just sundry, everybody is paid
13 differently even within the same grade level.  You can
14 have two people who are in the same grade level, but
15 because they have different years, then one is a Level
16 2 and one is a Level 8.  They're technically paid
17 differently, but they're paid legally according to the
18 pay schedule.

19    Q   I understand.I?

20    A   So I'm just struggling with your paid
21 differently statement because --

22    Q   I understand.  When if ever did you become

Page 52

1 aware that any of the Directors of the four
2 investigative functions, the modes at the NTSB, were
3 paid a different amount of money over the course of an
4 annual basis?

5        MS. COHEN:  Objection; assumes facts
6 not in evidence.

7    A   I can't answer your question other than the
8 way I just answered it.  Everyone was paid
9 differently.  Everyone was paid according to the Civil
10 Service schedule of their grade level, and where they
11 came in at, and years experience, and all of this
12 stuff.  So everybody was paid differently.  Everyone
13 was paid according to where they were on the schedule.

14    Q   And what concerns did you have that there
15 was -- there were individuals who were different
16 places on the schedule and, therefore, paid
17 differently?

18        MS. COHEN:  Objection; assumes facts
19 not in evidence.

20    A   I had -- I mean, I don't understand.  What
21 concerns could I have?  I don't control the Civil
22 Service pay scale.

Page 53

1    Q   I understand.

2    A   This isn't the private sector where the CEO
3 can change people with, you know, whatever decision
4 they make.  There's a set of rules, and everyone is
5 paid according to where they are within the Civil
6 Service schedule.  I don't know how else to explain
7 it.

8    Q   I understand.  All right.  Let's now focus
9 on April of 2004.

10    When if ever did Marjorie Murtagh Cooke come to
11 your office and notify you that she believed that she
12 was being paid differently than other Directors at her
13 same level of the various modes in the investigative
14 function at NTSB?

15    A   We had a meeting, but I don't remember that
16 that's the phrase that she used.

17    Q   Okay.  What do you remember?

18    A   Marjorie came to my office -- and I don't
19 remember exact words as in it's been years -- but it
20 was -- she stated that she wasn't an SES, her office
21 wasn't an SES, and she didn't make as much money as
22 the folks who had an SES.  So --

Page 54

1    Q    What else?

2    A    And she wanted me to fix that, and she

3  said -- she requested overtime.

4    Q    What else?

5    A    That was pretty much it.

6    Q    Now, the meeting that you had with Marjorie

7  Murtagh Cooke, was it scheduled or was it impromptu?

8    A    Scheduled, I believe.

9    Q    Okay.  And how did Marjorie Murtagh Cooke go

10  about scheduling the meeting with you?

11   A    I don't remember.

12   Q    How would anyone of your -- in the NTSB that

13  had either first or second-line reporting schedule a

14  meeting with you?

15   A    Two ways, or three ways or four ways,

16  actually.

17       You could check with my Chief of Staff who would

18  schedule; you could grab me in the hallway; you could

19  see me after a meeting or after a hearing; or we had

20  open office hours like every Wednesday or ever other

21  Wednesday, as often as -- unless I was out on an

22  accident or something like that.  But I kept like an

Page 55

1  open office hour at least once a month where you just

2  kind of walked in; and then the fifth way was people

3  would just show up at my doorway.

4    Q    Okay.  And if one wanted to schedule a

5  meeting with you, when if ever would be appropriate to

6  send you an e-mail and ask you to schedule a meeting?

7    A    Anytime.

8    Q    That was appropriate to do that?

9    A    Mm-hmm.

10   Q    Is that -- I'm sorry.  Is that a yes?

11   A    Yes.  I'm sorry.  Yes.  Mm-hmm is a yes.

12   Q    Thank you.  All right.  So the meeting takes

13  place in your office; is that right?

14   A    Yes.

15   Q    All right.  And where were you seated?

16   A    (non-verbal response.)

17   Q    Behind your desk?  Did you have the meeting

18  at a conference table in your office?

19   A    I don't remember specifically.  I usually

20  sat at a conference table rather than behind my desk.

21  It would depend on the day.  I mean if it was one of

22  those -- if someone was just kind of coming in and

Page 56

1  out, I might stay behind my desk, sometimes I would

2  sit at the conference; it was kind of 50/50.  I don't

3  remember specifically.

4    Q    All right.  And then who spoke first at the

5  meeting with Marjorie Murtagh Cooke?

6    A    I have -- whoever said hello first.

7    Q    What knowledge did you have that the topic

8  that Marjorie Murtagh Cooke wanted to raise with you?

9    A    I don't remember having any --

10   Q    Any foreknowledge.

11   A    No.

12   Q    I understand.  And what was -- after the

13  general greeting of hello, what was the first thing

14  you remember Marjorie Murtagh Cooke saying to you?

15   A    I don't.  I mean, I don't remember very much

16  about the meeting other than the request for overtime,

17  which I thought was bizarre.

18   Q    Why was it bizarre?

19   A    Because it was -- it was out of context.  It

20  was -- it was bizarre.  It was just out of the blue.

21   Q    Why was it out of the blue?

22   A    Well, I remember -- one of the things I

Page 57

1  remember of the meeting is it wasn't a very long

2  meeting.  This wasn't a long meeting or discussion or

3  anything like that, it was just kind of out of the

4  blue.  And it was kind of like, "I'm here.  I'm not an

5  SES so you need to fix that by paying me overtime."

6       There was no justification, no rationale, no,

7  "I've been working 60 hours a week and here are my

8  hours," or anything.

9       It was just like, "You need to fix this, and

10  here's what you need to do."  I felt like it was

11  just a bizarre request.  There was no -- I didn't

12  understand where it was coming from.

13   Q    Okay.  And when if ever did you ask Marjorie

14  Murtagh Cooke where her request was coming from, in

15  your words?

16   A    Well, I mean, during the -- I think I said

17  something like, "Oh," or, "Whatever."  But there was

18  nothing else forthcoming.  It was just kind of like,

19  "I'm here.  I want you to give me overtime."  And

20  there was nothing else behind it.

21       It was just out of the blue.  It was kind of

22  bizarre.  My feeling was this is bizarre.  That's all.

Page 58

1   Q  Why was it bizarre for Marjorie Murtagh
2 Cooke to ask you to pay her overtime to equalize her
3 wage with the other Directors of the divisions?
4   A  Well --
5      MR. LUONG:  Objection; I think that
6 mischaracterizes the earlier testimony.
7   Q  You can answer the question.
8   A  First of all, she didn't say to equalize.
9 She didn't suggest that. It's just like, "I'm not an
10 SES so you have to make up for it." I mean, that was
11 the context.
12   It was -- there was no anything like that. It
13 was like a small child is upset that you didn't buy
14 them the toy -- that their father didn't buy them the
15 toy in the window, and you're the aunt, so therefore,
16 you have to buy the toy.
17   I mean, it was just out of the blue. I didn't
18 understand it. She was a manager. I didn't know if
19 it was possible to pay a manager overtime.
20   There was a lot of things about it I didn't
21 understand, so it was just a bizarre request.
22   I had never had a department head in government,

Page 59

1 in my experience in government, make a request like
2 that at either of the agencies that I had worked for.
3 So it was not something I had experienced before, and
4 it was, as I said, kind of out of the blue.
5   So bizarre is the only word -- I mean, bizarre
6 meaning not bad, not good, but out of the blue,
7 different than what normally one has as a
8 conversation.
9   Q  Well, why was it in your mind inappropriate
10 for her to ask you to make up the differential between
11 what she was being paid and what the other Directors
12 were being paid?
13      MS. COHEN:  Objection; mischaracterizes
14 evidence.
15      MR. LUONG:  Objection.
16   Q  You may answer the question.
17   A  I didn't say it was inappropriate, I said it
18 was bizarre and I hadn't experienced it before.
19   I didn't know the answer, and I said I would look
20 into it.
21   So I didn't judge it one way or another other
22 than its uniqueness in the request. When I say

Page 60

1 bizarre, I'm not saying negative, I'm saying unusual,
2 different, something I hadn't experienced and I didn't
3 completely understand.
4   And normally, when -- my experience has been if
5 someone comes and says I want a raise or I want a new
6 job or this or that, they kind of lay out their case.
7 They pitch it to you. Not a declaratory sentence. So
8 it was a unique -- it was just unique. I said I would
9 look into it and, I mean, that's all I could do at the
10 time.
11   I'm not in charge of the pay schedule for the
12 Civil Service. I didn't hire her. I didn't know all
13 the circumstances. There was no justification on her
14 part when she met with me to explain what was her
15 concerns. It was just kind of, as I said, like a
16 declaratory sentence. "You need to do this." Okay.
17   Q  Well, when Marjorie Murtagh Cooke said to
18 you that she was entitled to be paid at the same level
19 as the other Directors, what did you understand her to
20 mean by that?
21      MR. LUONG:  Objection; assumes facts
22 not in evidence.

Page 61

1   A  She didn't say that. She didn't say she was
2 entitled to be paid what the other Directors were.
3 That's not the words that she used. She did not say
4 that.
5   Q  You're certain.
6   A  Yeah.
7   Q  Okay. Now, the -- okay. When you told her
8 that you would look into it --
9   A  Mm-hmm.
10   Q  -- how did you tell her that you were going
11 to look into equalizing her pay with the other
12 Directors?
13   A  I never said I would equalize --
14      MR. LUONG:  Objection.
15   A  I did not say I would look into equalizing
16 her pay with the other Directors, I said I would look
17 into her request for overtime. That was the request
18 that she made to me. She did not say, "equalize my
19 pay," she said, "you should give me overtime because
20 I'm not an SES and they are." That's what I heard and
21 what I understood her request to be.
22   Somehow I was supposed to bend the rules, or make

1 the rules be that way, or implement rules if they

2 already existed, or find the rules or what. I wasn't

3 sure exactly what I was supposed to do, but I knew I

4 needed to find out more because she had made the

5 request and I understood it to be that.

6     But my understanding was confused because, again,

7 there was no justification, there was no pitch, there

8 was no demonstration of this is the issue and dah dah

9 dah dah and all that kind of stuff. It's just here

10 are the facts.

11     I knew that she was not an SES, and she knew she

12 was not an SES. Okay? She was a 15, they were an

13 SES.

14     I was working in the larger whole to try to

15 create SESs -- more SESs in the organization, but

16 they're not something you can just pull out of your

17 pocket, nor do I have signature authority to just make

18 someone's pay change just because someone says they're

19 not happy with the fact that the position that they

20 hold is a 15.

21     Well, that's what it was, and I -- that's just

22 what we all had at that time. It was the way it was.

1     So that being said, I was trying to figure out,

2 do managers get overtime? Do department heads get

3 overtime?

4     In the private sector, a department head did not

5 get overtime. You would have a salaried position and

6 you would be -- have the good luck to be on board 90

7 hours a week no matter what because that's the way it

8 is if you're in a salaried position.

9     So it was unique from that perspective because,

10 as a department head, I though well, I don't even know

11 if you even can qualify for overtime as a department

12 head.

13     So I couldn't say yes, Marjorie, I will give you

14 overtime because I didn't know if by law I was allowed

15 to give overtime. Because it's Civil Service. And

16 the one thing I know is you have to check the rules

17 because they're different.

18     So I couldn't answer her one way or another at

19 that time anyway until I found out more. So all I

20 could do was say, "All right, I will look into it."

21 There were a lot of other questions, but I couldn't

22 just -- and I couldn't just say, "Okay, here's your

1 overtime slip."

2     Q    When if ever did she suggest that one of the

3 things you could do was also give her a bonus to

4 equalize her pay?

5     A    I don't remember bonus, I just remember the

6 overtime. I don't remember her asking for a bonus.

7     Q    Okay.

8     A    And in fact, she had received a bonus in the

9 prior performance review, so I knew -- I mean, she --

10 that's why I don't remember her asking for a bonus

11 because I would have said, "Well, you just -- you did

12 get one," or something like that. But that part of

13 the conversation didn't occur because -- that I

14 remember, because she received a bonus the prior year,

15 I do know that.

16     Q    Okay. So I just want to make sure I

17 understand this. Marjorie Murtagh Cooke did or did

18 not ask you to use either overtime, bonus or other

19 supplemental pay to equalize the pay that -- to make

20 up the pay differential between herself and the other

21 office directors?

22          MR. LUONG:  Objection; asked and

1 answered.

2          MS. COHEN:  Objection; compound

3 question.

4          MR. LUONG:  Asked and answered, as

5 well.

6     A    That is not how she phrased it. That is not

7 the conversation I remember.

8     Q    I understand. And when did you say that you

9 would get back to Marjorie Murtagh Cooke after she met

10 with you in April of 2004 --

11          MS. COHEN:  Objection; assumes facts

12 not in evidence.

13     Q    -- and requested that you pay her overtime

14 or additional monies to equalize her pay with the

15 other Directors?

16     A    Again, that's not what she asked. She asked

17 for me to pay her -- she asked for me to pay her

18 overtime. That's what I remember. I don't remember

19 her using those other words, as I've already answered

20 several times.

21     I did not give her a time certain. I said I

22 would look into it. I did not say, "I will get back

Page 66

1 to you by noon tomorrow."
2     Q    All right. And how did you go about looking
3 into it?
4     A    That same day I went and saw Dan Campbell
5 and relayed the conversation to him.
6     Q    All right. Where did that meeting occur?
7     A    Pardon?
8     Q    Where did that meeting occur with Dan
9 Campbell?
10    A    I think I walked over to his office. It
11 was -- I mean, we tried to touch base at least once a
12 day, so it was probably, you know, towards the end of
13 the day, it was kind of like here's a list of things
14 that -- kind of touch base how the day went, that type
15 of thing. So it was one of several items.
16    Q    All right. And what did you say?
17    A    "I had this really bizarre conversation with
18 Marjorie."
19    Q    And how did he respond?
20    A    He said, "What happened?"
21    Q    What how did you reply?
22    A    I told him.

Page 67

1     Q    What did you say?
2     A    She came in, she said that she wasn't -- you
3 know, she was a 15, the others were SESs, and she
4 wanted -- she made a request for me to pay her
5 overtime. It was like two sentences, basically what
6 happened.
7     Q    And how did he respond to what -- to that?
8     A    He said, "Really," or something to that
9 effect.
10    Q    What did you say in reply?
11    A    I said, "Yeah. So can we do this? I mean,
12 I don't know," and I just started explaining all my
13 questions. I said, can -- I mean, I just started
14 saying, you know, I said, "I didn't know how to answer
15 her. I have no idea. Do department heads get
16 overtime? I haven't run into that before. I mean,
17 how does it work? I'm not really sure," you know,
18 "What are the rules?" You know, just explaining all
19 the things I didn't understand about it, because I was
20 looking to get an education, too.
21    Q    And how did Dan Campbell respond?
22    A    He said, I don't know, something like he

Page 68

1 would get into HR. I mean, we didn't -- it was
2 towards the end of the day. It wasn't that we had a
3 long time period. It was one of several items that we
4 were chatting about so it was like, "Well, I'll take
5 care of it."
6     Q    And after he said that he would take care of
7 it and get it to HR, then what did you say?
8     A    "Great, thanks," and just moved on. We had
9 a list of stuff so --
10    Q    All right. And when was the next time that
11 you talked to Dan Campbell or anybody else about
12 Marjorie Murtagh Cooke's request that the NTSB pay her
13 more in light of the fact that she was not the same
14 pay level as the other Directors?
15         MS. COHEN:  Objection; assumes facts
16 not in evidence.
17    A    That wasn't her request. Her request was
18 for overtime. So I can't respond to your question
19 because I don't agree with it.
20         I don't remember ever talking about it again. I
21 mean, I delegated it -- I delegated it on. So it
22 wasn't something I remember having another

Page 69

1 conversation about.
2     Q    With anybody else.
3     A    I don't remember if I talked to -- I don't
4 remember talking to anyone else. I can't say I
5 didn't, but I don't remember -- I mean, it was --
6 quite honestly, it was a weird day. It was just part
7 of a -- kind of a weird request. I remember it
8 because it was unusual, it was unique, it was bizarre
9 is the word I've said, because I had never had a
10 request like that. I passed it on to Dan, and that
11 was it. It was not a big deal.
12    Q    Other than Dan Campbell on the day that
13 Marjorie Murtagh Cooke came to your office in April of
14 2004 and requested that the NTSB pay her overtime --
15    A    Mm-hmm.
16    Q    -- what other NTSB official, if any, did you
17 have a discussion about Marjorie Murtagh Cooke's
18 request or the NTSB's ability to pay her more,
19 overtime or otherwise, between April of 2004 and the
20 time you left the Department in March of 2005?
21         MR. LUONG:  Objection; asked and
22 answered.

Page 70

1    A    I don't remember specifically talking to
2  anyone else about that.
3    Q    I understand.  If it had been your decision
4  to pay Marjorie Murtagh Cooke overtime, more money,
5  why would you have denied her request?
6    A    Well, I would neither deny nor agree without
7  justification.  So I would need more than I want
8  overtime.  I would need justification, I would need
9  proof that she worked more than 40 hours a week.
10   If you're paying overtime, I'm assuming that
11  means you're paying beyond a 40-hour week work
12  schedule, so there would have to be documentation,
13  things like that.  It couldn't just be pay me
14  overtime, I need to know that she was actually working
15  overtime.
16   Q    If she was working overtime, would you have
17  paid her more money?
18   A    If someone was working overtime, if it was
19  within the rules, I mean, it was allowable, which I
20  don't know, and it was appropriate for them to be paid
21  overtime, then I would follow the rules, wherever the
22  rules would lead me.

Page 71

1    But I do know you have to have a paper trail.  I
2  mean, you would have to have time cards and stuff like
3  this.  None of this was part of Marjorie's and my
4  discussion.  There was no statement, you know, Ellen I
5  worked 72 hours last week.  There was not that kind of
6  a statement.
7    So, yeah, I mean, I wouldn't have without
8  justification, appropriateness, make sure it was
9  following the rules, et cetera.  And then I would
10  only -- if it's within all those boxes are checked, I
11  don't know that there's really a decision, you're just
12  following the rules.
13   Q    Why did you never ask Marjorie Murtagh Cooke
14  to provide you with the documentation that you just
15  described to, as you say, justify her request that she
16  be paid overtime during the April, 2004 meeting.
17   A    Well, first, we never talked about it again.
18  And second, why would I ask somebody to give me
19  paperwork and everything if I didn't even know if it
20  was allowable or not.
21   I mean, when she made the request, I didn't even
22  know if it was possible.  So I'm not going to start

Page 72

1  someone down that kind of a path -- I mean, that's a
2  big homework assignment -- if I can't do it.
3    Q    And when did you first learn whether it was
4  or was not allowable?
5    A    Do you know, I still don't know.  I don't
6  know if it is or is not allowable.
7    Q    How many times did Marjorie Murtagh Cooke
8  after the April, 2004 meeting ask you for follow-up
9  meetings relating to her request for overtime or more
10  pay?
11       MS. COHEN:  Objection; assumes facts
12  not in evidence.
13       MR. LUONG:  Objection; assumes --
14   A    I know that Marjorie at a much later date
15  scheduled something with me, but I don't know that it
16  related to this meeting.  She didn't phrase it that
17  way.
18   There was some kind of an e-mail, I vaguely
19  remember.  I don't remember what the e-mail said.
20  Something about wanting to talk to me, and I thought
21  she said -- I thought the e-mail said something like
22  for a personal issue, but I really don't remember.  I

Page 73

1  don't remember exactly what the e-mail said, but I
2  think she made the meeting request by an e-mail, and I
3  think David set it up.
4    Q    How did you respond?
5    A    David set up the meeting.  I mean, David
6  scheduled a meeting.
7    Q    All right.  When was that meeting?
8    A    I don't think it happened.
9    Q    Why not?
10   A    First time we either went out of town or an
11  accident or something.  I mean, it was just -- it was
12  like can we reschedule?  Life happens, especially at
13  the NTSB.
14   I don't remember why, but that wasn't uncommon,
15  either.  My schedule got pretty hectic at times and we
16  would reschedule meetings all the time.
17   But the advantage was that when I was in the
18  building, I was always accessible, so I never really
19  worried that much because people usually didn't try to
20  have formal meetings with me because they would just
21  grab me in the hall.  That's usually when I had most
22  of my discussions with folks.  People would just grab

Page 74

1  me after a hearing or in the hallway or, when we had
2  the larger meetings, people would just stay after.
3      So I didn't really worry about rescheduling a
4  formal meeting because we always ended up usually
5  talking, I mean, whoever it was.
6      Q   Okay.  So when Marjorie Murtagh Cooke made
7  the --
8      A   And I don't remember if it was to me or to
9  David -- it might have been to David and to me or me
10  to David.  I forget, but I remember there was an
11  e-mail.
12      Q   All right.  How many times did she request
13  meetings with you -- follow-up meetings as a result of
14  her meeting in April of 2004 requesting overtime or
15  more pay?
16          MR. LUONG:  Again, objection; I think
17  it mischaracterizes testimony and assumes facts not in
18  evidence.
19      Q   You can answer the question.
20      A   I don't know that she ever did.  I know that
21  there was another time she requested a meeting via an
22  e-mail, it was either to me or David or both, and I

Page 75

1  don't remember that it referenced the previous meeting
2  at all or said what it was about.  I don't remember
3  that as it.  I remember that Marjorie wanted to meet
4  with me and we were trying to schedule it.
5      Q   Okay.  So when if ever did you ask Dan
6  Campbell whether or not he had -- since you had
7  delegated this to Marjorie and you had committed to
8  Marjorie that you would look into it and get back to
9  her, when if ever did you ask Dan Campbell, "Have you
10  gotten back to Marjorie Murtagh Cooke?  Have you
11  looked into it, investigated it, and gotten back to
12  Marjorie Murtagh Cooke about the request for overtime
13  or more pay?"
14          MR. LUONG:  Objection; mischaracterizes
15  her testimony.
16      A   I didn't follow up with Dan because I
17  assumed it was taken care of.  I delegated it to Dan,
18  Dan was a great Managing Director, he always got
19  everything done.  So, I mean, it was not an issue.
20      Q   When if ever did you tell Marjorie Murtagh
21  Cooke that you would not be responding to her, you
22  would not be following up with her, but rather that

Page 76

1  you had delegated it to Dan Campbell and that he would
2  follow up?
3      A   I don't think I ever had that conversation
4  with Marjorie.  It wasn't -- she reported to Dan, so I
5  didn't feel I was reporting to her.  I heard her
6  request, I passed it on to Dan, figured it was in the
7  works and whatever was, was.
8      Q   Okay.  And your expectations of Dan Campbell
9  was that he would look into whether or not this was
10  possible.  What did you tell him you wanted him to do?
11          MR. LUONG:  Objection; asked and
12  answered.
13      A   Exactly what I said.  I said, "Marjorie made
14  this request.  Can we do it?  Will you look into it?
15  Handle it?"  "Yes, ma'am."  That was it.  I mean,
16  just --
17      Q   When if ever did you tell -- ask Dan
18  Campbell to check with HR about whether or not it was
19  possible?
20      A   I didn't micromanage Dan Campbell.  You
21  don't micromanage someone and say that I want you to
22  call by 10:15.

Page 77

1      This man is the Managing Director of an Agency
2  and been there years, and prior to that he had been
3  the General Counsel for the organization.  I had no
4  doubt that everything would be looked at and taken
5  care of and moved on.
6      My job was not to be the HR Director, my job was
7  to be the Chairman of the NTSB.  And then in that
8  case, I was trying to do things like get money from
9  Congress and Appropriations to support the entire
10  Agency, be the spokesperson where you had major
11  accidents to make sure the traveling public felt safe,
12  do my best to respond in my role as a member, as well,
13  when we were taken out on accidents and do my job.
14      So this was a small -- were we not here today, I
15  would have forgotten the incident.  It was not a
16  milestone in my time at the NTSB.
17      Q   When did you first learn that Dan Campbell
18  hadn't taken care of and that it hadn't been resolved?
19          MR. LUONG:  Objection; assumes facts
20  not in evidence.
21      A   I assumed everything -- I assumed that it
22  was followed up and whatever the answer was, was and

Page 146

1  BY MR. OSWALD:
2    Q    All right.  I'm showing you what's been
3  marked as Exhibit No. 4.
4    I'm showing you what's been mark as Exhibit No.
5  4.  What is that document?
6    A    NTSB Performance Appraisal Form.
7    Q    All right.  And let's look at the second
8  page.  Is that your signature?
9    A    Yes.
10 (Engleman Conners Exhibit Nos. 5A and 5B - e-mails -
11 marked for identification.)
12 BY MR. OSWALD:
13   Q    I'm showing you what's been marked as
14 Exhibit 5 A and B.  Let's look at 5A for a moment.
15 What is this document?
16   A    It's a printout of an e-mail.
17   Q    From whom to whom?
18   A    Marjorie to myself.
19   Q    All right.  And what's the date?
20   A    January 4th, '05.
21   Q    And when if ever did you respond to this
22 e-mail dated Tuesday, January 24th, '05?  This is 5A.

Page 147

1    A    When did I respond?  I don't remember when I
2  responded.
3    Q    Did you ever respond?
4    A    I know we set up a meeting, the one we
5  talked about earlier that I know I had to reschedule
6  at least once.  So yes, there was a response, but I
7  don't know specifically.  It would have been through
8  David.
9    Q    You set up a meeting to talk with Marjorie
10 Murtagh Cooke as a result of her --
11   A    David would have set up a meeting.  I mean,
12 he would have -- this would have been something I
13 would have given to David.
14   Q    Okay.  And what did he tell you about
15 setting up a meeting with Marjorie Murtagh Cooke as a
16 result of the -- about the e-mail 5A sent by Marjorie
17 to you on Tuesday, January 4th, 2005?
18        MS. COHEN:  Objection; assumes facts
19 not in evidence.
20   A    I don't remember one thing or another.  I
21 mean --
22   Q    Well, when you handed it off to him, did you

Page 148

1  forward the e-mail to him?  Did you print it out and
2  give it to him?  When you say handed off to him, what
3  do you mean?
4    A    I could have forwarded it, I might have said
5  something verbally, I might have printed it and handed
6  it to him and said handle this.  This would have been
7  one of 500 things we would have done in a day --
8    Q    And what if ever --
9    A    -- that I would have handed to David.  So --
10   Q    Okay.  When if ever did David respond?
11   A    I think it was David.  I'm trying to think.
12 When was -- did he go to Government Affairs?
13   I changed Chief of Staff at some point halfway
14 through.  So it would have been David or Patrick.  It
15 would have been one of the two.  And I would have
16 said, "set up a meeting," or, "handle this," or
17 whatever.  And they would have done it.  I mean, they
18 would have contacted or followed up or whatever.
19   Q    All right.  And when if ever did David or
20 Patrick, your Chief of Staff, or whoever was your
21 Chief of Staff in that position --
22   A    He was my advisor, but yeah, that

Page 149

1  position --
2    Q    -- advisor.
3    A    -- yeah, that position.
4    Q    When if ever did they get back to you and
5  tell you they had set up a meeting?
6    A    I don't remember when.  I remember that we
7  had a subsequent meeting set, but I don't remember
8  when they responded to me.
9    Q    Okay.  And then where was that meeting with
10 Marjorie Murtagh Cooke?
11   A    As I mentioned earlier --
12        MR. LUONG:  Objection; asked and
13 answered.
14   A    -- we did not have that meeting.  It was
15 scheduled for my office.  It would have been at my
16 office, but we had to reschedule at least once.  And
17 again, as I said earlier, I don't remember if it was
18 because of travel or something, but there was some
19 reason I said, "Hey, we just need to reschedule."
20   Q    Okay.  But the only reason you rescheduled
21 it other than -- what reason did you reschedule the
22 meeting other than the fact that you had travel or

Page 150

1 there was some other conflict?

2    A    That would have been why.

3    Q    I understand.  Let's look at 5B.  And to

4 whom did you refer Marjorie Murtagh Cooke's e-mail to?

5 Tawanna Price was your Admin I understand; is that

6 right?

7    A    No, she was not my Admin.

8    Q    Fine.  Who was Tawanna Price?

9    A    Tawanna Price was Admin for the Managing

10 Director.  I did not have an Admin at the time, so she

11 filled in -- she did some things for me but not all.

12    Q    I understand.  To whom did you refer this

13 e-mail that Marjorie Murtagh Cooke -- this is 5B --

14 sent on Friday, January 7th?

15    A    I didn't.  It wasn't sent to me, it was sent

16 to Tawanna.  I was CCed on this.

17    Q    All right.  So you did what?  Did you follow

18 up with Tawanna?

19    A    No.

20    Q    Why not?

21    A    Because it was sent to Tawanna and Tawanna

22 would have handled it.  This was just a CC to me.

Page 151

1 This was to Tawanna so --

2    Q    What did you understand Marjorie Murtagh

3 Cooke wanted to talk to you about?

4    A    Well, on which e-mail?

5    Q    5A.

6    A    I didn't know.  It says, "I believe I need

7 to meet with you personally.  Please let me know when

8 you're available."

9    Q    All right.

10    A    So that doesn't give me any indication.

11    Q    And on 5B?

12    A    Well, I didn't receive 5B, I was copied on

13 5B. And it states, "Tawanna, I need to talk with the

14 Chairman regarding my evaluation.  Please let me know

15 when she can fit me into her schedule.  Thank you."

16    Q    What did you understand Marjorie Murtagh

17 Cooke wanted to talk with you about when she sent the

18 e-mail Friday, January 7th?

19        MR. LUONG:  Objection; I think that

20 question mischaracterizes the document in Exhibit 5B.

21    Q    You may answer the question.

22    A    I don't remember what you asked.  I didn't

Page 152

1 receive this, I was CCed on it.  So I would not have

2 made an opinion about the e-mail because it was not

3 sent to me, it was CCed to me.

4    So I don't know when I would have even read the

5 e-mail.  I don't know if I read it the day it was sent

6 or three weeks later.

7    I can't tell you what my state of mind was when I

8 saw the e-mail because I don't remember when I would

9 have reviewed the e-mail because, again, it was CCed

10 to me, it wasn't sent to me.

11    So I don't have an opinion.  I mean, I don't have

12 an answer for you.

13    Q    So how did you treat e-mails that were CCed

14 to you differently than e-mails that were sent to you?

15    A    If I was CCed then I was simply CCed, I was

16 copied.  It was not sent to me, and it was sent to

17 Tawanna, and Tawanna would set the meeting up.

18    It was not rocket science here so --

19    Q    When if ever did you ask Tawanna about when

20 the meeting would be with Marjorie Murtagh Cooke?

21    A    I did not supervise Tawanna.  She reported

22 and worked for the Managing Director.  She was helping

Page 153

1 me out because I did not have Admin.

2    So I would not have been checking on her, or her

3 assignments, or whether she had done something for me

4 in the way that you're suggesting.

5    We have a very competent staff, things got done,

6 I didn't need to micromanage or follow up on every one

7 of the hundreds of e-mails that would come through my

8 office every single day in order to follow up

9 something as simple as a meeting request.

10    It would have been handled under normal operating

11 procedures, and so I had great faith that what would

12 need to be done would be done.  This would not have

13 been on my follow-up list.

14    Q    Where did you keep your follow-up list?

15    A    That was an illustrative statement.  I do

16 not keep a follow-up list.  I was using that as an

17 illustration of my comment or feelings at the time.

18    Q    I see.  Did you have a task list, To Do

19 list?

20    A    Occasionally I would keep an informal legal

21 pad list of things.  I didn't keep a formal To Do

22 list.

Page 154

1   Q   Okay.  When if ever did you follow up with
2 Tawanna Price about Marjorie Murtagh Cooke's request
3 to have a meeting with you that she sent by e-mail on
4 Friday, January 7th at 5:14 p.m.?
5       MR. LUONG:  Objection.
6       MS. COHEN:  Objection.
7       MR. LUONG:  Asked and answered.
8   A   I do not believe I ever followed up with
9 Tawanna Price on this request because I know a meeting
10 was set.  So I don't remember how the meeting was set,
11 but I know the meeting had been scheduled.
12  Q   I understand.  When if ever, after you
13 canceled the meeting with Marjorie Murtagh Cooke, did
14 you ever follow up with Marjorie Murtagh Cooke to
15 either reschedule the meeting or find out what about,
16 either personally or her evaluation, it was that
17 Marjorie Murtagh Cooke wanted to talk to you about?
18      MR. LUONG:  Objection; compound.  Are
19 you asking about both exhibits now, Exhibits 5A and
20 5B?  If you are, then we object.  It's a compound and
21 confusing question.
22  Q   Do you understand my question?

Page 155

1   A   You're making assumptions in your question
2 that are incorrect.  So if I may say with respect, I
3 did not follow up with Tawanna.  I know a meeting was
4 scheduled.  I stated that I know that we had to
5 reschedule it at least once, if not twice.  I stated
6 that had in my Affidavit.
7    It was a normal scheduling request.  This was not
8 a -- anything other than normal business procedure.
9 The reason I was not concerned about it was because I
10 saw Marjorie.  I never -- I would see Marjorie.  If it
11 was such an urgent matter, there were many times when
12 she could have said, "Hey, Ellen," or stay after a
13 meeting, or approach me in the hallway, or in the
14 ladies' room, or any number of times when we would
15 share the same room or something like that.
16   I had a very informal opportunity.  People would
17 come to my doorway, walk right in, "Hey, Chairman.
18 Can we chat?"  "Sure."
19   There was so -- this was just standard.  She
20 was -- she sent in an e-mail, that's fine.  But she
21 could have just come right through the front door,
22 that would have been fine, too.

Page 156

1   Q   And you would have been happy to meet with
2 her under those circumstances.
3   A   Yes.
4   Q   Okay.  I'm going to ask one more question
5 here and then we'll take a break.
6    My question is, after you canceled the meeting
7 with Marjorie Murtagh Cooke, and I understand --
8   A   When I resched -- when I tried to reschedule
9 the meeting.  I mean, it wasn't canceled, there will
10 be no meeting, it was can we reschedule.  We need to
11 reschedule.
12  Q   All right.  You canceled and then said we
13 need to reschedule.
14  A   Right.
15  Q   All right.  When if ever did you follow up
16 with Marjorie Murtagh Cooke, with her personally, to
17 reschedule the meeting that you had with Marjorie
18 Murtagh Cooke sometime -- that you had scheduled with
19 her sometime after January 7th of 2005?
20  A   I did not personally contact her because I
21 did not personally schedule the meetings.  It was
22 through either at -- this process would have been

Page 157

1 through whoever was setting it up, whether it was
2 Tawanna, or Patrick, or at the time I think -- or
3 David.
4    I would not have stopped everything I was doing
5 because I needed to reschedule a meeting.  I would
6 have had it rescheduled by someone who was supporting
7 my scheduling meetings at the time.
8    So Tawanna -- again, I'm trying to remember if it
9 was David or Patrick, it might have been Patrick at
10 the time, would have just tried to find another time
11 to reschedule.
12  Q   I just want to make sure I'm clear.  You
13 didn't personally reach out to Marjorie Murtagh Cooke
14 after the meeting was cancelled and attempt to
15 reschedule; is that correct?
16      MR. LUONG:  One second.  I'm going to
17 ob -- I think this line of questioning is confusing
18 because I'm not sure what meeting you're talking
19 about, whether the performance evaluation meeting or
20 this meeting to discuss something personal.  But I
21 also think this question has been asked and answered.
22  Q   Is that correct?

Page 158

1    A    What's correct?

2    Q    Okay.

3    A    What is correct?

4    Q    As I understand it, your testimony is that

5  you did have a meeting scheduled with Marjorie Murtagh

6  Cooke --

7    A    Right.

8    Q    -- sometime after the two e-mails that she

9  sent you on January 4th and January 7th.  My -- am I

10  correct about that?

11    A    There was a meeting that was scheduled, yes.

12  I do not know if it was scheduled on January 5th,

13  between the two e-mails, after the two e-mails.

14    Q    But it was after the first.

15    A    I would assume so because why else would we

16  be scheduling a meeting?

17    Q    Okay.

18    A    So yes, deductively I'm going to say it

19  would have occurred after the first meeting request,

20  we would have scheduled a meeting.

21    Q    All right.  So sometime after June 4th --

22    A    January.

Page 159

1    Q    -- January 4th, 2005 --

2    A    Right.

3    Q    -- when you had a meeting scheduled with

4  Marjorie Murtagh Cooke --

5    A    Right.

6    Q    -- when if ever did you personally reach out

7  to Marjorie Murtagh Cooke and reschedule the meeting

8  that you had canceled because of your schedule,

9  conflict or otherwise?

10        MR. LUONG:  Objection; asked and

11  answered.  I also think this is getting argumentative.

12    A    I don't remember personally reaching out to

13  her to reschedule what would have been normal meeting

14  process.  I believe it would have been someone on

15  support staff, probably Patrick, or Tawanna in this

16  case, or David -- and again, I just don't remember the

17  names, this is over two years ago, I don't remember

18  specifics of when the two switched off between David

19  and Patrick.

20    Q    I understand.

21    A    I'll be happy for you to educate me

22  accordingly to that time period.  We had 435

Page 160

1  employees, and this was one meeting that -- it was a

2  meeting.

3    Q    I understand.

4        MR. OSWALD:  Let's go off the record.

5  (Recess taken.)

6        VIDEOGRAPHER:  This marks the end of

7  Tape 2 in the deposition of Miss Conners.  We're going

8  off the record.  The time it 2:15 p.m.

9  (Recess taken.)

10        VIDEOGRAPHER:  This marks the beginning

11  of Tape 3 in the deposition of Miss Conners.  We are

12  back on the record.  The time is 2:35 p.m.

13  BY MR. OSWALD:

14    Q    Beginning in March of 2005 then, what was it

15  precisely that your role was -- other than your Board

16  Member responsibilities -- between that point and

17  December?  As the Chairman Designate, who

18  responsibilities did you have under that -- under that

19  title, if any?

20    A    Zero, none.

21    Q    All right.  Since you were also a Board

22  Member, why is it that you didn't assume the office of

Page 161

1  a Board Member in -- as the other Board Members did

2  between March of '05 and December?

3    A    Because I was Chairman Designate.

4    Q    So the responsibilities as the -- as a Board

5  Member, what were your responsibilities, let's say in

6  March of -- late March, early April of '05?

7    A    As I stated earlier, we would be available

8  for launching, for major accidents, there was a

9  rotating weekly schedule, we would participate in the

10  public hearings, in the safety symposium, we would do

11  national advocacy for safety, specifically general

12  speeches to the public upon request of associations

13  and constituents, advocating pushing forward the

14  safety recommendations that were -- we were pursuing,

15  testifying in state legislatures, doing speeches, and

16  general safety advocacy.

17    Q    When if ever did your attitude towards

18  Marjorie Murtagh Cooke change during your tenure of

19  the Chairman of NTSB?

20        MS. COHEN:  Objection; vague.

21    A    I don't think my attitude changed towards

22  Marjorie.

# EXHIBIT NO. 3

1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    ------------------------------------X

4    MARJORIE MURTAGH COOKE              :

5              Plaintiff               :

6         v.                           :    Case No.:

7    MARK ROSENKER, Chairman,           :    1:06CV01928

8    NATIONAL TRANSPORTATION            :

9    SAFETY BOARD                       :

10             Defendant               :

11   ------------------------------------X

12

13            Deposition of COLLETTE MAGWOOD

14

15                Washington, D.C.

16            Friday, October 26, 2007

17                 10:00 a.m.

18

19

20   Job No.:  1-115034

21   Pages 1 - 103

22   Reported by:  Ellen L. Ford, RPR

Page 2

1 Deposition of COLLETTE MAGWOOD, held at the offices

2 of:

3

4

5        EMPLOYMENT LAW GROUP

6        888 17th Street, Northwest

7        Suite 900

8        Washington, D.C.  20006

9

10

11

12 Pursuant to agreement, before Ellen L. Ford,

13 Registered Professional Reporter and Notary Public in

14 and for the District of Columbia.

15

16

17

18

19

20

21

22

Page 3

1        A P P E A R A N C E S

2

3 ON BEHALF OF PLAINTIFF:

4        DAVID SCHER, ESQUIRE

5        DARREN FENWICK, Legal Assistant

6        EMPLOYMENT LAW GROUP

7        888 17th Street, Northwest

8        Suite 900

9        Washington, D.C.  20006

10        (202) 331-2883

11

12

13 ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:

14        MEREDYTH D. COHEN, ESQUIRE

15        UNITED STATES DEPARTMENT OF JUSTICE

16        COMMERCIAL LITIGATION BRANCH

17        1100 L Street, Northwest

18        Washington, D.C.  20530

19        (202) 353-7978

20

21

22

Page 4

1        A P P E A R A N C E S (Continued)

2

3 ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY

4 BOARD:

5        DENISE M. D'AVELLA, ESQUIRE

6        NATIONAL TRANSPORTATION SAFETY BOARD

7        OFFICE OF GENERAL COUNSEL

8        490 L'Enfant Plaza East, Southwest

9        Washington, D.C.  20594

10        (202) 314-6086

11

12 ALSO PRESENT:  Marjorie Murtagh Cooke, Plaintiff

13        Quan Luong, Esq., US Attorneys Office

14

15

16

17

18

19

20

21

22

Page 5

1        C O N T E N T S

2 EXAMINATION OF COLLETTE MAGWOOD        PAGE

3        By Mr. Scher        6 - 96

4        By Ms. Cohen        96 - 99

5        By Mr. Scher        99

6

7        - - -

8

9        E X H I B I T S

10        (Exhibits attached to transcript.)

11 MAGWOOD DEPOSITION EXHIBITS        PAGE

12 No. 1A and B - rating sheet        74

13 No. 2A and B - rating        sheet        79

14 No. 3A and B - rating sheet        83

15 No. 4A and B - rating sheet        85

16 No. 5 - unidentified        93

17 No. 6 - unidentified        93

18

19

20

21

22

Page 74

1 much with them before they make a selection.
2 Interviews are conducted.
3    Q    Okay.
4 (Magwood Exhibit No. 1A and 1B - rating sheet - marked
5 for identification.)
6 BY MR. SCHER:
7    Q    I'm going to ask you to take a look at
8 Exhibit 1A.
9    A    Mm-hmm.
10    Q    Do you know what this document is?
11    A    It's a rating sheet.
12    Q    And what is a rating sheet?
13    A    This is the rating and evaluation criteria
14 that is used for a panel.
15    Q    By a "panel", which panel do you mean?
16    A    Rating Panel.
17    Q    The Rating Panel.
18    A    Yes.
19    Q    Have you seen this particular document
20 before?
21    A    It looks familiar.
22    Q    Okay.  And how is it that you have seen it

Page 75

1 before?
2    A    Well, because I would be the one to give
3 this to the Rating Panel.  Well, let me back up here.
4 I'm just reviewing this.
5        It appears that I put the vacancy announcement
6 out.  Verbatim do I recall the document word for word?
7 No.  But I did give the Rating Panel the rating
8 documents to evaluate plans against.
9    Q    Got it.  And you see how it says, "Executive
10 Core Qualifications," on Page 1A?
11    A    Yes.
12    Q    What are those?
13    A    Executive Core Qualifications are the
14 mandatory OPM-stipulated qualifications that every
15 executive must meet.
16    Q    Okay.  And do you see where it says
17 "Rating"?
18    A    Mm-hmm.
19    Q    And then underneath it there's, "NQ".  What
20 does that mean?
21    A    Do I see where it says rating and then --
22    Q    In the first box it says, "Leading change,"

Page 76

1 on the left, and then on the right there's three --
2    A    Yes, I see it.
3    Q    What does "NQ" mean?
4    A    Not qualified.
5    Q    And "Q"?
6    A    Qualified.
7    Q    And "HQ"?
8    A    Highly qualified.
9    Q    Okay.  And who would circle these ratings?
10    A    The Rating Panel members.
11    Q    Okay.  All of them together or is it --
12    A    Each one does their own, and then
13 collectively they agree to one.  And that's why there
14 should be all signatures on it.
15    Q    Okay.  So on Page 1A, do you see how all of
16 the circles are on Q?
17    A    Yes.
18    Q    What does that mean?
19    A    It means that she's qualified to meet -- in
20 all of these respects, these are the managerial type
21 of qualifications, not the technical qualifications.
22 It's certifying that they see her as being qualified.

Page 77

1    Q    Okay.  And where are the technical
2 qualifications?
3    A    They're on the second page.  It says,
4 "Mandatory Professional Technical Qualifications."
5    Q    Okay.  Got it.  So we're on Page 1B,
6 correct?
7    A    Yes.  It would be the first two at the top.
8 The ones at the bottom are desirables and they're not
9 considered.  That's just an extra.  They are not
10 evaluated on the plan.
11    Q    What do you mean by that?
12    A    What I mean is, if a person has them, it's
13 great.  And if they don't have them, it's not held
14 against them.  It's just a desirable.
15    Q    We'd like it, but we don't need it.  Is
16 that --
17    A    Well, we'd like it and we need it.  If you
18 have it, it's wonderful.  If you don't have it, you're
19 not penalized.
20    Q    Okay.
21    A    You're not scored, if you will.  It's just
22 annotated.

Page 78

1    Q    Understood.  All right.  So let's go just at
2  the top.  These are the Mandatory Technical
3  Qualifications, and there's a 1 and a 2.
4    A    Yes.
5    Q    Okay.  And then you'll see that there's
6  circles on HQ.
7    A    Yes.
8    Q    And what does that mean?
9    A    It means that she's highly qualified for
10  both of those according to the panel.
11    Q    Okay.  And then a few windows down it says,
12  "Desirable Professional Technical Qualifications."
13    A    Yes.
14    Q    Right?  Those are the ones you said were
15  great if they have them.
16    A    Mm-hmm.
17    Q    Okay.  And then there's -- and there's a
18  circle on an HQ and a circle on a Q.
19    A    Yes.
20    Q    What does that mean?
21    A    It means that they saw her as highly
22  qualified for the first one and qualified for the

Page 79

1  second one.
2    Q    Okay.  Good.  All right.  I'm just going to
3  ask you to kind of leave this document over here for a
4  second at your side.
5    A    Okay.
6  (Magwood Exhibit No. 2A and 2B - rating sheet - marked
7  for identification.)
8  BY MR. SCHER:
9    Q    All right.  We've just shown you Exhibit 2A
10  and 2B.  Do you know what this is?
11    A    Yes.  Appears to be the rating sheet for the
12  Office of Marine --
13    Q    Okay.  And do you know what --
14    A    -- position.
15    Q    And have you seen this particular document
16  before.  You need to say it actually?
17    A    Okay.  It appears that I have.  This is what
18  was given to the Rating Panel, then I would have seen
19  it, yes.
20    Q    Was it the first Rating Panel or the second
21  Rating Panel?
22    A    I don't know.

Page 80

1    Q    All right.  Well, let's go back to Exhibit 1
2  for a second.
3    A    Okay.
4    Q    And 1B.
5    A    Okay.
6    Q    If you look down at the bottom there's a
7  date.  Do you see the date in Exhibit 1B at the bottom
8  on the right?
9    A    1B?
10    Q    Yeah, 1B.  The second page of Exhibit 1.
11    A    Yes.
12    Q    Do you see the date?
13    A    Yes.
14    Q    Okay.  What is that date?
15    A    11/15/04.
16    Q    Okay.  So would that have been the first
17  panel or the second panel?
18    A    Well, I don't exactly recall when the first
19  one is, but looking at the dates, it appears that it's
20  the first one.
21    Q    Okay.  Now, go to Exhibit 2B.  And there's a
22  date at the bottom of that?

Page 81

1    A    Yes.
2    Q    What date is --
3    A    3/4/05.
4    Q    Okay.  This may seem like on obvious
5  question, but is Exhibit 2 dated after Exhibit 1?
6    A    Yes.
7    Q    Okay.  Now, let's go back to Exhibit 2A,
8  first page.
9    A    Okay.
10    Q    All right.  Now, the Executive Core
11  Qualifications here on Exhibit 2A, are they exactly
12  the same as the Executive Core Qualifications on
13  Exhibit 1A?  Or maybe I should say what differences
14  are there, if any?
15    A    Yes, they appear to be the same thing as far
16  as the Core Qualifications are concerned.
17    Q    Okay.  Let's go to Page 2, or Exhibit 1B and
18  Exhibit 2B.
19    A    Okay.
20    Q    What differences if any is there between
21  these two pages?
22    A    Okay.  What was your question again?

Page 82

1    Q    What if any differences are there between
2 these two pages?
3    A    Other than the signatures and the dates, I
4 don't see any.
5    Q    Okay.  Thank you for going through that
6 reading exercise.  All right.
7    So I'm going ask you to look on Page 1B, at Item
8 No. 2 of Desirable Professional Technical
9 Qualifications.
10    A    Okay.
11    Q    Do you see how that says, "Demonstrated
12 command and/or responsibility of or for sea going
13 operations?"
14    A    Yes.
15    Q    What is the circle there?
16    A    Qualified.  Oh, I'm sorry.  You're right.
17 It's qualified.
18    Q    Okay.  And then let's go to Exhibit 2B.
19    A    Yes.
20    Q    All right.  And then you see how in Item No.
21 2 on the bottom, Desirable Professional Technical
22 Qualifications?

Page 83

1    A    Yes.
2    Q    It says, "Demonstrated command and/or
3 responsibility of or for sea going operations?"
4    A    Yes.
5    Q    What is circled there?
6    A    Not qualified.
7    Q    Why would that be?
8    A    I can't speculate on that.  I don't know.
9    Q    Did you ever have any conversations with
10 anyone about either of these two documents?
11    A    Did I ever have any conversation about
12 either of these two documents -- I don't recall.
13    Q    Okay.  Any idea how someone could be
14 qualified for sea going operations in 2004 and not
15 qualified four months later in 2005?
16        MS. COHEN:  Objection; calls for
17 speculation.
18    Q    You can answer.
19    A    Yeah.  I have no idea.  I don't know.
20    Q    Okay.
21 (Magwood Exhibit No. 3A and 3B - rating sheet - marked
22 for identification.)

Page 84

1 BY MR. SCHER:
2    Q    Are these two documents -- Exhibit 2 and
3 Exhibit 3, are they the same document?
4    A    I think what I have are two Exhibit 3s.
5 This doesn't have a thingy at the bottom.
6    Q    Okay.
7    A    So you're talking about this document and
8 this document?
9    Q    Correct.
10    A    2 and 3.
11    Q    Right.
12    A    Okay.  What would you like for me to do?
13    Q    Is there a difference in these two
14 documents?  I'm not asking you to do a reading
15 exercise.  Just scratch that question.
16    What is this document?
17    A    This is the rating and evaluation form for
18 the Director of Office of Marine Safety.
19    Q    Okay.  And who is the applicant to whom this
20 is referred?
21    A    On which document?
22    Q    Exhibit 3?

Page 85

1    A    John Spencer.
2    Q    Have you seen this document before?
3    A    Yes.  If it's identical to this one then
4 I've seen it before, yes.
5    Q    All right.  And can you go to Page 3B?
6    A    Mm-hmm.
7    Q    What is the date at the bottom of that
8 document?
9    A    3/4/05.
10    Q    All right.  And then you see where it says,
11 "Desirable Professional Technical Qualifications, No.
12 2, demonstrated command and/or responsibility of or
13 for sea going operations?"
14    A    Yes.
15    Q    And then what is circled there?
16    A    Qualified.
17    Q    Okay, great.  Just keep that document out
18 for a sec.
19    A    Okay.
20 (Magwood Exhibit No. 4A and 4B - rating sheet - marked
21 for identification.)
22 BY MR. SCHER:

# EXHIBIT NO. 4

1

1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2     - - - - - - - - - - - - - -x

3     MARJORIE MURTAGH COOKE,      :

4                    Plaintiff    : Case No. 06-748C

5            vs.                  : (Judge Thomas C. Wheeler)

6     THE UNITED STATES,          :

7                    Defendants   :  PAGES 1 - 261

8     - - - - - - - - - - - - - -x

9

10         Deposition of JOSEPH G. OSTERMAN, held at the

11    offices of The Employment Law Group, 888 17th Street,

12    N.W., Suite 900, Washington, D.C., commencing at 10:05

13    a.m., Thursday, May 24, 2007, before Elizabeth

14    Mingione, Notary Public.

15

16

17

18

19

20

21

22

Page 2

1  A P P E A R A N C E S   O F   C O U N S E L:

2  ON BEHALF OF THE PLAINTIFF:

3      THE EMPLOYMENT LAW GROUP, P.C.

4      BY:  BRIAN M. LOWINGER, ESQUIRE

5      888 17th Street, Suite 900

6      Washington, D.C. 20006

7      (202) 261-2806

8

9  ON BEHALF OF THE DEFENDANT:

10     DEPARTMENT OF JUSTICE, COMMERCIAL

11     LITIGATION BRANCH

12     BY:  MEREDYTH D. COHEN, ESQUIRE

13     1100 L Street, N.W., 8th Floor

14     Washington, D.C. 20530

15     (202) 353-7978

16          AND

17     NATIONAL TRANSPORTATION SAFETY BOARD

18     BY:  KATHLEEN SILBAUGH, ESQUIRE

19     490 L'Enfant Plaza East, S.W.

20     Washington, D.C. 20594

21     (202) 314-6084

22

---

Page 3

1          C O N T E N T S

2  WITNESS:  JOSEPH G. OSTERMAN

3  EXAMINATION BY:                PAGE

4      Mr. Lowinger ................................ 6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

Page 4

1          DEPOSITION EXHIBITS

2          JOSEPH G. OSTERMAN

3  NUMBER          DESCRIPTION          PAGE

4  1   NTSB Position Description, Director,  . 221
   Office of Marine Safety

5

   2   Position Description beginning with  .. 224
6  Bates 00753

7  3   Position Description beginning with  .. 226
   Bates 000759

8

   4   Position Description beginning with  .. 229
9  Bates 000766

10 5  Memorandum of Understanding, NTSB and   232
   Coast Guard

11

   6   Position Description beginning with  .. 233
12 Bates 000772

13 7   Position Description of Robert  ....... 235
   Macintosh, Jr., 11/29/05

14

   8   Letter Dated July 18, 2003 to Delores   236
15 Everett

16 9   Attachment F, Comparison of Average  .. 239
   Compensation

17

   10   NTSB Order 50, Marine Safety Program,   241
18 Dated 11/25/96

19 11   NTSB Order 20, Highway Safety  ........ 243
   Program, Dated 4/18/96

20

   12   NTSB Order 20A, Highway Safety  ....... 244
21 Program, 5/17/02

22 13   NTSB Order 40, Railroad Safety  ...... 245

---

Page 5

1          DEPOSITION EXHIBITS (Continued)

2          JOSEPH G. OSTERMAN

3  NUMBER          DESCRIPTION          PAGE

4  14   NTSB Order 30, Hazardous Materials ... 247
   and Pipeline Safety Program, 4/18/96

5

   15   Notification of Personnel Action ...... 248
6

   16   Position Description, Office of  ...... 250
7  Railroad, Pipeline and Hazardous
   Materials

8

   17   Position Description, Director,  ...... 252
9  Office of Aviation Safety

10 18   NTSB Performance Appraisal Form,  ..... 252
   Bates 233-240

11

   19   NTSB Performance Appraisal Form,  ..... 253
12 Bates 231 and 232

13 20   NTSB Organizational Chart, Bates  ..... 256
   001008

14

   21   NTSB Draft Position Description,  ..... 258
15 Director, Office of Marine Safety

16

17

18          - - -

19

20

21

22

Page 74

1  Q.  Yes.  Explain that part of it.
2  A.  It is Railroad Pipeline and Hazardous
3  Materials is the most complicated office in the
4  agency, I believe because it is a mixture of three
5  different similar and wholly dissimilar disciplines.
6      For railroad accident investigations it is
7  analogous to aviation.  We know there are not that
8  many railroads in the United States, but they are
9  relatively large.  We have working relationships and
10  familiarity with the majority of the major railroads
11  in the United States.  And that includes the majority
12  of the major Metropolitan Transit Authorities in the
13  United States.
14      In the pipeline area, it is more analogous
15  to probably the highway area.  There is lots of miles
16  of pipeline in the U.S. and lots of pipeline
17  companies.  And frequently our pipeline investigators
18  are introducing themselves to the pipeline parties
19  when they go to their investigations.
20      And then there is the third component of
21  the rail pipeline hazardous materials, and that is the
22  exclusive hazardous material part of that.  Our

Page 75

1  parties in hazardous material are generally new to the
2  NTSB on each investigation, but the hazardous material
3  function is as much a support role as it is a primary
4  modal role.
5      Hazardous materials don't get there on
6  their own.  They go by truck or train or pipeline or
7  ship or plane.  So hazardous material is generally
8  support activity for the agency.
9      We have occasionally issued hazardous
10  material reports, but for the most part our hazardous
11  material work and party system falls within the
12  purview of another modal activity.
13  Q.  I see.  What type of education is required
14  to perform the requirements of the Director of Office
15  of Marine Safety between 1997 and 2005?
16  A.  Well, the required education for the GS
17  level employees that are not technical employees, not
18  engineers, they are in federal government requires as
19  you probably know degreed personnel for engineering
20  positions, for lawyers, for some other billets.  But
21  for the Director of Marine Safety, there is no formal
22  education requirement, but there is a practical

Page 76

1  educational requirement and understanding of the
2  marine industry within the United States and also
3  internationally.
4  Q.  And --
5  A.  I think it would be difficult for a
6  nonmariner -- it wouldn't be impossible but it would
7  be difficult for a nonmariner to run the Office of
8  Marine Safety.  It would be difficult for a
9  non-aviator or avionics engineer to run the Office of
10  Aviation Safety.  It would be difficult for a
11  non-highway engineer or highway accident investigator
12  to run the Office of Highway Safety.
13  Q.  I see.
14  A.  Not impossible but it's better with that
15  background.
16  Q.  Are there any specific educational
17  requirements for the requirements of office of --
18  Director of the Office of Railroad, Pipeline and
19  Hazardous Materials between 1997 and 2005?
20  A.  There are no specific educational
21  requirements required, but that is a relatively unique
22  position in that you have to -- the gentleman who

Page 77

1  holds that position now has a background and an
2  understanding in all three disciplines that are
3  contained within that organizational unit.
4  Q.  Who's that individual?
5  A.  Robert Chipkevich.
6  Q.  I see.
7  A.  C-H-I-P-K-E-V-I-C-H.
8  Q.  And that's applicable, your statement that
9  there's no educational requirement per se to fulfill
10  the requirements of the position of Director of Office
11  of Railroad, Pipeline and Hazardous Materials; Office
12  of Marine Safety; Office of Aviation Safety and Office
13  of Highway Safety; that's correct?
14  A.  That's correct.
15  Q.  Okay.  Can you describe the abilities that
16  are required for the position of Director of Office
17  and Marine Safety between 1997 and 2005?
18  A.  The abilities fall within the categories
19  that we previously discussed, leadership, the ability
20  to supervise employees and lead a -- the practical
21  functional application of an office, process
22  development skills, coordination, communication, oral

# EXHIBIT NO. 5

1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4

5    - - - - - - - - - - - - - x

6    MARJORIE MURTAGH COOKE,      :

7            Plaintiff,          :

8        vs.                     :   Case No.:

9    MARK ROSENKER, Chairman,    :   1:06CV01928

10   NATIONAL TRANSPORTATION      :

11   SAFETY BOARD,                :

12           Defendant.          :

13   - - - - - - - - - - - - - x

14            Deposition of JOSEPH OSTERMAN

15                 Washington, D.C.

16              Monday, October 1, 2007

17                   9:47 a.m.

18

19

20   Job No.:  1-112710

21   Pages:  1 - 104

22   Reported by:  Sarah M. Bickel

Osterman Individual Deposition 100107oj

Page 2

1        Deposition of JOSEPH OSTERMAN, held at the

2  offices of:

3

4      EMPLOYMENT LAW GROUP

5      888 17th Street, Northwest

6      Suite 900

7      Washington, D.C. 20006

8      (202) 331-2883

9

10

11

12

13

14

15

16      Pursuant to agreement, before Sarah M.

17  Bickel, Court Reporter and Notary Public in and for

18  the District of Columbia.

19

20

21

22

Page 3

1       A P P E A R A N C E S

2  ON BEHALF OF THE PLAINTIFF:

3    BRIAN M. LOWINGER, ESQUIRE

4    DAVID SCHER, ESQUIRE

5    Employment Law Group

6    888 17th Street, Northwest

7    Suite 900

8    Washington, D.C. 20006

9    (202) 331-2883

10

11  ON BEHALF OF THE DEFENDANT:

12    QUAN LUONG, ESQUIRE

13    United States Department of Justice

14    555 4th Street, Northwest

15    Room 4417

16    Washington, D.C. 20001

17    (202) 514-9150

18

19

20  ALSO PRESENT:  Marjorie Murtagh Cooke

21    Meredyth D. Cohen, Esquire

22    Denise M. D'Avella, Esquire

Page 4

1       C O N T E N T S

2  EXAMINATION OF JOSEPH OSTERMAN      PAGE

3    By Mr. Lowinger        5

4

5

6

7       E X H I B I T S

8    (Attached to the Transcript)

9  OSTERMAN DEPOSITION EXHIBIT      PAGE

10  No. 1  Comparison of Average Compensation

11    of Modal Office Directors 1/03 - 12/04  35

12  No. 2  Documents        41

13

14

15

16

17

18

19

20

21

22

Page 5

1       P R O C E E D I N G S

2      JOSEPH OSTERMAN

3  having been first duly sworn, testified as follows:

4    EXAMINATION BY COUNSEL FOR PLAINTIFF

5      BY MR. LOWINGER:

6    Q  Can you please state your name for the

7  record.

8    A  Joseph Osterman.

9    Q  And Mr. Osterman, we've deposed you before

10  in an alternative capacity.  Before we start, could

11  you tell me your title?

12    A  I am the managing director of the National

13  Transportation Safety Board.

14    Q  And how long have you been the managing

15  director?

16    A  Since March of 2005.

17    Q  Okay.  Mr. Osterman, can you tell me how

18  you prepared for today's deposition?

19    A  I didn't prepare very much for today's

20  deposition.

21    Q  Okay.

22    A  I reviewed a few documents from our board

Page 98

1    Q  Were you aware that hers was lower than

2  the others?

3    A  Yes.

4    Q  Did you do anything to ensure that

5  Marjorie Murtagh Cooke's salary or other compensation

6  was changed so that it was the same as everyone

7  else's?

8    A  No, and that wouldn't have been

9  appropriate.

10    MR. LOWINGER:  No further questions.

11  Actually, you know what, one further questions.

12    BY MR. LOWINGER:

13    Q  Who's Bob Bartlet?

14    A  Bob Barlett, two Ts, B-A-R-L-E-T-T.

15  Robert Barlett is currently the director -- the

16  manager for the NTSB communication center and works

17  in my office.  He is a GS-14 level employee.  He's

18  had a variety of different positions within the

19  agency.

20    Q  What is his expertise in marine safety?

21    A  Mr. Barlett has no expertise in marine

22  safety.

Page 99

1    Q  Who replaced Marjorie Murtagh Cooke

2  immediately after she was no longer the director of

3  OMS in 2005?

4    A  Mr. Barlett was detailed as the acting

5  director in the selection and arrival of the

6  candidates for the SES.

7    Q  Did Mr. Barlett appear before the board at

8  any time as the acting director of OMS?

9    A  In a board -- in a public board meeting,

10  is that the context?

11    Q  Yes.

12    A  I don't believe so.  I'd have to go back

13  and look at the reports that were delivered to the

14  board during that time frame that he was detailed.

15    Q  And that would have been from -- when was

16  his detail?

17    A  Late May, early June of 2005 to August of

18  2005.

19    MR. LOWINGER:  Thank you.  No further

20  questions.

21    MR. LUONG:  Can we have five minutes off

22  the record?

Page 100

1    MR. LOWINGER:  Sure.

2    (Discussion off the record.)

3    MR. LUONG:  We have no questions.

4    BY MR. LOWINGER:

5    Q  Just as a follow up, Mr. Osterman, when

6  did the ERB discuss Ms. Murtagh Cooke's complaints to

7  the EEO.

8    MR. LUONG:  Objection --

9    MS. COHEN:  Objection.

10    MR. LUONG:  -- assumes facts not in

11  evidence.

12    THE WITNESS:  To my knowledge, the ERB did

13  not discuss Ms. Cooke's complaint to the EEO.

14    MR. LOWINGER:  No further questions.

15    MR. LUONG:  The witness would like to read

16  and sign.

17

18

19

20    (Signature having not been waived, the

21  deposition of JOSEPH OSTERMAN concluded at

22  12:24 p.m.)

Page 101

1    ACKNOWLEDGEMENT OF DEPONENT

2    I, JOSEPH OSTERMAN, do hereby acknowledge

3  that I have read and examined the foregoing

4  testimony, and the same is a true, correct, and

5  complete transcription of the testimony given by me

6  and any corrections appear on the attached Errata

7  sheet signed by me.

8

9

10

11  _____  _____

12  (DATE)                    (SIGNATURE)

13

14

15

16

17

18

19

20

21

22

Page 102

1  CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2      I, Sarah M. Bickel, commissioned as Sarah

3  Marie Harple, the officer before whom the foregoing

4  proceedings were taken, do hereby certify that the

5  foregoing transcript is a true and correct record of

6  the proceedings; that said proceedings were taken by

7  me stenographically and thereafter reduced to

8  typewriting under my supervision; and that I am

9  neither counsel for, related to, nor employed by any

10 of the parties to this case and have no interest,

11 financial or otherwise, in its outcome.

12      IN WITNESS WHEREOF, I have hereunto set my

13 hand and affixed my notarial seal this 2nd Day of

14 October 2007.

15

16 My commission expires:

17 August 31, 2009

18

19

20 _____

21 NOTARY PUBLIC IN AND FOR THE

22 DISTRICT OF COLUMBIA

Page 103

1      E R R A T A   S H E E T

2      IN RE:  Cooke v. Mark Rosenker

3  RETURN BY:_____

4  PAGE    LINE    CORRECTION AND REASON

5  ____    ____    _____

6  ____    ____    _____

7  ____    ____    _____

8  ____    ____    _____

9  ____    ____    _____

10 ____    ____    _____

11 ____    ____    _____

12 ____    ____    _____

13 ____    ____    _____

14 ____    ____    _____

15 ____    ____    _____

16 ____    ____    _____

17 ____    ____    _____

18 ____    ____    _____

19 ____    ____    _____

20 ____    ____    _____

21 _____    _____

22 (DATE)         (SIGNATURE)

Page 104

1      E R R A T A   S H E E T   C O N T I N U E D

2      IN RE:  Cooke v. Mark Rosenker

3  RETURN BY:_____

4  PAGE    LINE    CORRECTION AND REASON

5  ____    ____    _____

6  ____    ____    _____

7  ____    ____    _____

8  ____    ____    _____

9  ____    ____    _____

10 ____    ____    _____

11 ____    ____    _____

12 ____    ____    _____

13 ____    ____    _____

14 ____    ____    _____

15 ____    ____    _____

16 ____    ____    _____

17 ____    ____    _____

18 ____    ____    _____

19 ____    ____    _____

20 ____    ____    _____

21 _____    _____

22 (DATE)         (SIGNATURE)

# EXHIBIT NO. 6

1

1       IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    _____
                                   )
5    MARJORIE MURTAGH COOKE,       )    Case No. 06-748C
                                   )
6          Plaintiff,              )    Judge Thomas C. Wheeler
                                   )
7    vs.                           )
                                   )
8    THE UNITED STATES,            )
                                   )
9          Defendant.             )
     _____)

10

11

12

13                    DEPOSITION OF

14                    JOHN C. CLARK

15                  Washington, D.C.

16               Friday, June 29, 2007

17                    9:08 a.m.

18

19

20

21   Job No.:  1-106677
     Pages 1 through 270
22   Reported by:  John L. Harmonson, RPR

Page 2

1
2
3          Deposition of
4          JOHN C. CLARK
5
6
7  Held at the offices of:
8          THE EMPLOYMENT LAW GROUP, PC
9          888 17th Street, N.W.
10         Suite 900
11         Washington, D.C.  20006
12         (202)331-2883
13
14
15
16      Taken pursuant to the Federal Rules of Civil
17  Procedure, before John L. Harmonson, Registered
18  Professional Reporter, Notary Public in and for the
19  District of Columbia, who officiated in administering
20  the oath to the witness.
21
22

Page 3

1              APPEARANCES
2
3  ON BEHALF OF PLAINTIFF:
4      BRIAN M. LOWINGER, ESQ.
       The Employment Law Group, PC
5      888 17th Street
       Suite 900
6      Washington, D.C.  20006
       (202)331-2883
7
8
9  ON BEHALF OF DEFENDANT:
10     MEREDYTH D. COHEN, ESQ.
       Department of Justice
11     Commercial Litigation Branch
       1100 L Street, N.W.
12     8th Floor
       Washington, D.C.  20530
13     (202)353-7978
14     KATHLEEN SILBAUGH, ESQ.
       National Transportation Safety Board
15     490 L'Enfant Plaza East, S.W.
       Washington, D.C.  20594
16     (202)314-6084
17
18  ALSO PRESENT:
19     JONATHAN DUNN, Intern
20     MARLA DUNN, Intern
21
22

Page 4

1           EXAMINATION INDEX
2                        PAGE
3  EXAMINATION BY MR. LOWINGER          7
4  EXAMINATION BY MS. COHEN           259
5  EXAMINATION BY MR. LOWINGER        266
6           * * * * *
7
8           EXHIBIT INDEX
9      (Exhibits attached to transcript.)
10  EXHIBIT          DESCRIPTION          PAGE
11  1     Various "Notification of Personnel    237
12        Action"
13  2     Performance Appraisal Form for period   245
14        9/1/2000 to 8/31/2001
15  3     Performance Appraisal Form for period   246
16        9/1/2002 to 8/31/2003
17  4     SES Performance Plan and Appraisal,    246
18        11/22/06
19  5     Progress Review, 11/20/06       247
20  6     Performance Appraisal Form for period   247
21        9/1/2003 to 8/31/2004
22

Page 5

1           EXHIBIT INDEX (Cont.'d)
2  EXHIBIT          DESCRIPTION          PAGE
3  7     Organizational Listing, October 1,     248
4        2002
5  8     Organizational Listing, October 1,     250
6        2003
7  9     Organizational Listing, October 1,     250
8        2005
9  10     Weekly Reports          251
10  11     Memo from B. Strauch to B. Loeb;     253
11        September 29, 1997
12  12     Memo from B. Strauch to B. Loeb; July   253
13        2, 1999
14  13     Incentive Award Recommendation Form,   254
15        11/23/99
16  14     Memo from B. Strauch to B. Loeb;     254
17        January 12, 2000
18  15     Memo from B. Strauch to B. Loeb; June   254
19        28, 2000
20  16     Memo from B. Strauch to D. Dampbell;   256
21        December 19, 2001
22

1    A.    No, no.  Our No. 1 mandate is civil
2 aircraft accidents.
3    Q.    Uh-huh.
4    A.    And the civil fleet is anything other than
5 military and those aircraft that are involved in
6 intelligence operations.  And there's something else;
7 it's in the FARs.  If there were intelligence
8 operations involved, we may or may not investigate
9 those.
10    Q.    Sure.
11    A.    So right now the civil aircraft are all the
12 airliners, the privately owned airplanes.  Aircraft,
13 not just airplanes.
14    Q.    What's the difference between an aircraft
15 and an airplane, sir?
16    A.    Well, airplanes have wings and are powered
17 by a motor.  Then there's gliders that don't have an
18 engine.  There's helicopters that are aircraft.
19 Airships are aircraft.
20    Q.    What's an airship?
21    A.    A blimp, a dirigible.  Hot air balloons
22 would be aircraft.

1    Q.    When you were talking about public use
2 aircraft, were you referring to your work back in 1983
3 as well?  I mean, was that the term used back then?
4    A.    Yeah.  The term has always meant the same
5 thing, it's just that what changed over the years is
6 that back then we didn't have the authority to
7 investigate.  We could investigate upon request.  And
8 now we have the authority to investigate.  So public
9 use has always been the same throughout the years.
10    Q.    And you were an investigator at that stage;
11 am I correct?
12    A.    Uh-huh.
13    Q.    And from the aircraft performance
14 investigator position, where did you move to next at
15 NTSB?
16    A.    I became deputy director of the Office of
17 Research and Engineering.
18    Q.    Do you remember when that was?
19    A.    No.  I'm going to guess '96, '97, somewhere
20 in there.  That's just a guess.  It's in the records
21 somewhere.  If that's very far off, you might keep a
22 note and I'll fix it.

1    Q.    You'll have a chance.  The system gives you
2 a chance.
3    A.    Okay.
4    Q.    Can you tell me about your position as the
5 deputy director at the Office of Research and
6 Engineering?
7    A.    Sure.  The Office of Research and
8 Engineering had a number of functions.  They had a
9 Public Inquiries Branch that made all the accident
10 reports available to the public.  They had a Safety
11 Studies Group, special investigative studies for all
12 modes.  Back then we had all of the computer
13 facilities in charge of all the computers at the Board
14 and in the labs.
15       We had the Aircraft Performance Division,
16 the Metallurgy Division.  At one point -- Let's see.
17       That's all I can remember back then.  It
18 was kind of diverse so -- Oh, the Flight Data Recorder
19 and Cockpit Recorder Divisions.
20    Q.    Sure.
21    A.    So when I became deputy, I focused
22 primarily on the accident investigation and

1 engineering side, like the Airplane Performance,
2 Metallurgy, the Recorders Division.  And
3 Dr. Ellingstad focused more on the computer side, the
4 safety study side.
5    Q.    Dr. Ellingstad, is that Vern Ellingstad?
6    A.    Yes.
7    Q.    And how did you find the job in Research
8 and Engineering?  How did you land yourself in that
9 position?
10    A.    Well, somewhere in there I bid on it.  The
11 deputy slot became available.  My memory is I bid on
12 it and was selected to be deputy.  And at one point it
13 was at a GS-15 level, and then it moved into an SES
14 slot when that became available.  Various slots became
15 available throughout the years.
16       That's the best I can remember now.
17    Q.    Sure.
18       Did you divide the work with Vern
19 Ellingstad?  Was he deputy director as well, or was he
20 the director at the time?
21    A.    He was the director.
22    Q.    Okay.  And did you have to divide your work

1 can remember the dates.  It was before 2000.  Let me
2 go through the list real quick.
3          I was deputy director in R&E, got into the
4 SES in R&E.  I went down and was deputy director in
5 OAS for a period of time.  Came back and was deputy
6 director in R&E again.  The guy that came in behind me
7 didn't work out.  And then I went back as deputy
8 director of OAS and then director of OAS.
9     Q.    Did you always stay an SES during that
10 time?
11    A.    Yes.
12    Q.    So when you went from Aviation Safety back
13 to Research and Engineering, or from Research and
14 Engineering back to Aviation Safety, you never had to
15 give up your SES?
16    A.    No.
17    Q.    Do you remember when you first obtained SES
18 status?
19    A.    Oh, boy.  What did I say earlier?  I think
20 it was like '96, '97, something like that.
21    Q.    Do you think it was halfway through your
22 time in Research and Engineering as the deputy

1 director?  Was it near the end of your time, your
2 first run through?
3     A.    I was deputy director, and I came in as a
4 GS-15.  And then some short period after that they bid
5 the job -- or they bid the job to come in as a 15, so
6 I had the job as 15.  And then I can't remember
7 whether we bid that into SES or not, but I know I had
8 to go through the application process to be accepted
9 into the SES.
10          So I think the job, I went in as a 15, and
11 I don't remember whether we bid it at that point or
12 not.  There is certainly a record of that somewhere.
13 What I do remember is filling out the huge amount of
14 paperwork that seemed somewhat obscure to me.  But you
15 fill it out and it goes off somewhere.
16    Q.    It's like 40 pages long.
17    A.    I know.  And for whatever, it was accepted
18 as adequate, and then I was in the SES in that
19 position.
20    Q.    Did you have to interview for the SES
21 position?
22    A.    I don't remember.  What I do remember is

1 interviewing for the deputy, the GS-15 position.  And
2 that had been an SES position.  Dr. Loeb Haueter was
3 head of R&E and Dr. Ellingstad was deputy, and for
4 several years he was in the SES position as deputy.
5 And Dr. Loeb moved down to AS and Dr. Ellingstad moved
6 to be director.  Then I moved up as a GS-15, and then
7 that process started to see if it could be converted
8 into an SES.
9     Q.    I see.
10    A.    So whether there was an interview for that
11 back then, I just don't remember.
12    Q.    Do you remember where you saw the
13 advertisement for the SES position?
14    A.    I don't know that I saw an advertisement
15 for an SES.  I don't know what you mean,
16 advertisement.
17    Q.    A posting, maybe an internal posting.
18    A.    Well, I don't know.  No, I don't remember.
19 I remember there was a -- What I vaguely remember is
20 that I turned in my application for the SES, and I
21 understand that there were other people that did also.
22 There were a number of people that bid on the SES

1 position, and I was selected.  That's about all I
2 remember at the time.
3     Q.    Sure.
4          I'm sorry to have to ask this question
5 again, but it's just piquing my interest.  You don't
6 remember a review panel or a group of people having to
7 sit down -- having to sit down and talk to a group of
8 people or a review panel or a panel of your peers
9 regarding your qualifications for the SES position?
10    A.    There could have been.  I don't remember.
11    Q.    Do you remember interviewing for the GS-15
12 position?
13    A.    I don't remember those kind of things.  You
14 go in for an interview, you do it, it's done, and I
15 don't remember now what the process was then.
16    Q.    Maybe it wasn't an interview.  Could it
17 have been just an informal meeting that led to your
18 selection?
19    A.    I don't remember.  I frankly don't remember
20 what the process was back then for that.
21    Q.    Do you think there's any piece of
22 information I could give you that would help you

# EXHIBIT NO. 7

**Murtagh Marjorie**

---

| | |
|---|---|
| **From:** | Murtagh Marjorie |
| **Sent:** | Friday, January 07, 2005 5:14 PM |
| **To:** | Price Towanna |
| **Cc:** | Engleman Ellen |
| **Importance:** High | |

Towanna, I need to meet with the Chairman regarding my evaluation; Please let me know when she can fit me into her schedule.  Thank you.

Marjorie Murtagh
Director, Office of Marine Safety
National Transportation Safety Board
Washington, D.C.
202-314-6290

# EXHIBIT NO. 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **MARJORIE MURTAGH COOKE,** | ) | |
| **8475 Sylvan Way** | ) | |
| **Clifton, Virginia 20124,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MARK ROSENKER, CHAIRMAN,** | ) | |
| **NATIONAL TRANSPORTATION SAFETY** | ) | |
| **BOARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **Serve:** | ) | |
| | ) | |
| **UNITED STATES ATTORNEY'S OFFICE** | ) | **Case No. 1:06CV01928** |
| **FOR THE DISTRICT OF COLUMBIA** | ) | **Judge Paul L. Friedman** |
| **Attn: Civil Process Clerk** | ) | |
| **United States Attorney's Office** | ) | |
| **555 4th Street, NW** | ) | |
| **Washington, DC 20530** | ) | |
| *-Via Certified Mail* | ) | |
| | ) | |
| **UNITED STATES ATTORNEY GENERAL** | ) | |
| **10th & Pennsylvania Avenue, NW** | ) | |
| **Washington, DC 20530** | ) | |
| *-Via Certified Mail* | ) | |
| | ) | |
| **MARK ROSENKER** | ) | |
| **490 L'Enfant Plaza, SW** | ) | |
| **Washington, D.C. 20594** | ) | |
| *-Via Certified Mail* | ) | |
| | ) | |
| **NATIONAL TRANSPORTATION** | ) | |
| **SAFETY BOARD** | ) | |
| **Office of General Counsel** | ) | |
| **490 L'Enfant Plaza, SW** | ) | |
| **Washington, D.C. 20551** | ) | |
| *-Via Certified Mail* | ) | |

_____

**FIRST AMENDED CIVIL COMPLAINT FOR EQUITABLE AND
MONETARY RELIEF AND DEMAND FOR JURY[1]**

1.      This action arises out of the Defendant National Transportation Safety Board's ("Defendant" or "NTSB") unlawful employment actions against Plaintiff Marjorie Murtagh Cooke ("Plaintiff" or "Cooke").  Specifically, Cooke alleges that the NTSB retaliated against her in violation of the Fair Labor Standards Act (FLSA), as amended, 29 U.S.C. § 215(a)(3) *et seq*., for complaining about disparate pay and filing a sexual discrimination complaint when the NTSB denied Cooke an interview for the Office of Marine Safety Director position (and hired an alternate candidate), denied Cooke the opportunity to review her evaluation for 2004, withdrew an offer extended to her for a senior level position, denied her an evaluation for 2005, denied her the opportunity for monetary awards, transferred Cooke to the Office of Safety Recommendations and Communication, subsequently transferred her to the Office of the Managing Director, and denied her performance standards for her current position.


**Parties**

2.      Cooke is resident of the City of Clifton, County of Fairfax, in the Commonwealth of Virginia.

3.      Defendant Mark Rosenker is the Chairman of NTSB and is the delegated administrator of NTSB and is responsible for the lawful acts of that agency ("Chairman Rosenker").  As such, Chairman Rosenker is the proper defendant in this action pursuant to 29 U.S.C. § 203(d).

---

[1] Plaintiff is amending her complaint as a matter of course before a responsive pleading is served pursuant to Federal Rule of Civil Procedure 15(a).

**Jurisdiction and Venue**

4.      This Honorable Court has jurisdiction over the claims presented herein pursuant

to 29 U.S.C. § 216(b), as it asserts a claims that arise under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201, *et. seq.*, and specifically under 29 U.S.C. § 215(a)(3).

5.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) because

Defendant has its principal office in the District of Columbia and a substantial part of the events

or omissions giving rise to Cooke's claims occurred in the District of Columbia.

**Factual Allegations**

6.      Between 1997 and 1998, NTSB's Office of Surface Transportation Safety was

divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine

Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS").

7.      ORS and OPHMS later merged to become the Office of Railroad, Pipeline and

Hazardous Materials Safety ("ORPH").

8.      Cooke was the Chief of the Marine Division, a unit under NTSB's Office of

Surface Transportation Safety, from 1994 until 1997 when the Marine Division became the

OMS.  Cooke became the Director of OMS in 1997, and she remained the Director of the OMS

until she was transferred in 2005.

9.      Each surface office director, including Cooke, was paid at a GS-15 level and

reported to the Managing Director.  The Managing Director had Senior Executive Service

("SES") status, and the Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had

SES status.

10.      Between 2000 and 2003, the Directors of ORPH and OHS, Bob Chipkevich

("Chipkevich") and Joe Osterman ("Osterman") respectively, were awarded SES status, leaving Cooke as the only director without SES status.

11.    In or about 2003 John Clark became the director of OAS, and he was provided SES status.

12.    As a Director without SES status, Cooke was paid significantly less than her male counterparts in salary and bonuses even though she performed work substantially equal to and under similar conditions as each male director, all of whom had SES status.

13.    Due to this inequality in or about April of 2004 Cooke met with Chairman Ellen Engleman-Conners ("Conners"), and she informed Conners that Cooke was the only Director of the four modal investigation offices without SES status and that as a result she made substantially less money than all three of her male counterparts.

14.    According to Lisa Love from Human Resources, Conners had authority to authorize overtime for Cooke to make up the differential pay.

15.    After the meeting with Conners, Cooke made several attempts to meet with Conners to seek her approval for overtime pay in order to remedy the disparity between Cooke's pay and that of her male counterparts, but Conners refused to meet with Cooke to discuss the issue of the disparity between Cooke's pay and that of her male counterparts.

16.    In or about July, 2004, NTSB advertised the OMS Director position as having SES status.

17.    Cooke applied for the OMS Director position, but NTSB cancelled the advertisement and did not grant Cooke an interview.

18.    In or about early January of 2005 when Cooke had not yet received an evaluation for the performance period ending in 2004, she requested another meeting with Conners to learn

4

why she had not received an evaluation for the performance period ending in 2004, but Conners refused to meet with her to discuss Cooke's performance evaluation.

19.    Within a couple days of not being granted a meeting with Conners in or about January of 2005, Cooke met with the NTSB EEO Director to make a complaint.  Shortly thereafter NTSB re-advertised the OMS Director position and described it as having SES status.

19.    Cooke applied for this position, but NTSB refused to grant her an interview.

20.    As a result of receiving unequal pay for similar work to that of her male counterparts and NTSB refusal to grant her an interview for a position she held for eight years, Cooke filed a sexual discrimination complaint with the NTSB EEO Director on or about February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations.

21.    Cooke alleged in her EEO complaint that because of her gender NTSB paid her an unequal amount for her work as the Director of OMS.

22.    On or about March 14, 2005, NTSB Managing Director Dan Campbell in an interview with Chester Fisher, Cooke's EEO counselor, and Campbell indicated that NTSB had not yet concluded recruiting action for the OMS Director position.

23.    In or about May of 2005 NTSB Managing Director Joe Osterman notified Cooke that NTSB did not select for the Director of OMS position.  Cooke noted that she had not been paid at the SES level for the position during her tenure as Director, OMS.  Osterman then suggested giving her a non-SES Senior Leadership position if she would submit bulleted responsibilities for a position description.

24.    In response, Cooke submitted the requested document, but Osterman subsequently informed her that despite her submission NTSB Director Conners and Campbell

refused to allow NTSB to offer her a Senior Leadership position.

25.     NTSB transferred Cooke to the Office of Safety Recommendations and Communication in or about June 2005 in lieu of granting her an SES position or the equivalency of SES pay.

26.     In or about October of 2005 NTSB transferred Cooke again, this time to the Office of the Managing Director in lieu of granting her an SES position or the equivalency of SES pay.

27.     NTSB failed to give Cooke an evaluation for the performance period ending in 2005, thus precluding her from receiving any opportunity to receive an award for her performance in 2005.

28.     Additionally, NTSB refused to issue to Cooke new performance standards for her position in the Office of the Managing Director, thus effectively precluding her from securing any opportunity to improve her career status or to obtain any cash or merit awards in 2006.

**Count I**
**Fair Labor Standards Act (FLSA)**
**29 U.S.C. § 215(a)(3)**
**Retaliation**

29.     Plaintiff incorporates the allegations in paragraphs 1 through 28 as though alleged herein.

30.     Plaintiff is an "employee" as the terms are defined at 29 U.S.C. § 203(e)(2)(ii) and the Defendant National Transportation Safety Board is an "employer" as the term is defined at 29 U.S.C. § 203(d).

31.     Defendant has limited, segregated, and classified Plaintiff in a way which deprives her of employment opportunities and otherwise adversely affects her status as an

employee because of Plaintiff's complaints of unequal pay and sexual discrimination.

32.    As a direct and proximate result of the Defendant's conduct, Defendant caused

Plaintiff to suffer damages.

33.    For violations of 29 U.S.C. § 215(a)(3), Plaintiff demands such legal or equitable

relief as provided by 29 U.S.C. § 216(b), including, but not limited to, the following:

  a.  Reinstatement;
  b.  Promotion;
  c.  Economic damages including front and back pay;
  d.  Reasonable attorney's fees and costs;
  e.  Compensatory Damages;
  f.  Liquidated Damages; and
  g.  Any other relief that this Court deems just and equitable.

**Prayer for Relief**

WHEREFORE, Plaintiff prays this Honorable Court for Judgment against Defendant in

the amount of economic damages and compensatory damages to be determined at trial, plus

attorneys' fees, costs of this action, equitable relief (including upgrading Plaintiff's employment

status), and any other relief this Honorable Court deems just and proper to award.

Marjorie Murtagh Cooke
*By Counsel*

  /s/  R. Scott Oswald
R. Scott Oswald, D.C. Bar No. 458859
Brian M. Lowinger, D.C. Bar No. 472886
Employment Law Group, P.C.
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006-3307
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff*

**Jury Demand**

Plaintiff Cooke demands a jury for all issues proper to be so tried.


    /s/  R. Scott Oswald_____
    R. Scott Oswald



**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 2nd day of February, 2007, the forgoing First

Amended Complaint for Equitable and Monetary Relief and Jury Demand was served by via

using the Court's electronic transmission system, upon:

    Quan K. Luong
    United States Attorney's Office
    555 4th Street, NW
    Washington, D.C. 20530


    /s/  R. Scott Oswald_____
    R. Scott Oswald

# EXHIBIT NO. 9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARJORIE MURTAGH COOKE ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No: 06-1928 (PLF) |
| ) | |
| MARK ROSENKER, Chairman, National ) | |
| Transportation Safety Board ) | |
| ) | |
| Defendant. ) | |

## ANSWER

Defendant, Mark Rosenker, Chairman, National Transportation Board ("NTSB"), by and through its undersigned attorneys, hereby answers the plaintiff's First Amended Complaint as follows:

### FIRST AFFIRMATIVE DEFENSE

The Court lacks jurisdiction over some or all of Plaintiff's claims.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff fails to state a prima facie case under any of the claims or causes of action she has asserted.

### THIRD AFFIRMATIVE DEFENSE

Defendant had legitimate, non-discriminatory reasons for its actions which were in full compliance with law and regulation.

Defendant reserves the right to assert additional defenses, affirmative or otherwise, upon further investigation and discovery into the matters alleged. Defendant asserts all applicable statutory limitations with respect to Plaintiff's damage claims.

## SPECIFIC RESPONSES

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, Defendant further responds to Plaintiff's First Amended Complaint as follows by responding to the numbered paragraphs of the Complaint:

1.    Paragraph 1 is Plaintiff's statement of her case, to which no response is required. To the extent that they may be deemed allegations of fact, they are denied.

2.    Defendant denies the allegations of paragraph 2 of the Complaint for lack of knowledge or information sufficient to form a belief as to their truth.

3.    Defendant admits the allegations in the first sentence of paragraph 3. The allegations contained in the second sentence of paragraph 3 constitute conclusions of law, to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

4.    The allegations in paragraph 4 set forth Plaintiff's allegations regarding jurisdiction, to which no response is required. To the extent that they may be deemed allegations of fact, they are denied.

5.    The allegations in paragraph 5 set forth Plaintiff's allegations regarding venue, to which no response is required. To the extent they may be deemed allegations of fact, they are denied.

6.    Defendant admits the allegations of paragraph 6.

7.    To the extent that the term "later" is vague, Defendant denies this allegations and advises that the merger referred to in this sentence took place in 2000.

8.    Defendant admits the allegations of paragraph 8.

2

9.     Defendant admits the allegations of paragraph 9.

10.    Defendant admits that in 2000, the Director of ORPH, Bob Chipkevich, applied, interviewed, and was selected for the position of Director of the Office of Railroad, Pipeline, and Hazardous Materials Safety, an SES-level position.  Defendant also admits that in 2003, the Defendant transferred an SES slot that was vacated at the NTSB Academy to the position of Director, Office of Highway Safety.  That position was filled by Mr. Joseph Osterman in June 2004.

11.    Defendant denies the allegations of paragraph 11.

12.    Defendant denies the allegations of paragraph 12.

13.    The allegations in the first sentence of paragraph 13, "[d]ue to this inequality," constitutes a conclusion of law and Plaintiff's characterization of her case, to which no answer is required.  To the extent it may be deemed an allegation of fact, it is denied.  Defendant admits that Plaintiff met with then National Transportation Safety Board ("NTSB") Chairman Ellen Engleman Conners in April 2004.  Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 13.

14.    Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 14.

15.    Defendant denies that Conners refused to meet with plaintiff to discuss the issues of the disparity between plaintiff's pay and that of her male counterparts.  Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 15.

16.    Defendant admits the allegation of paragraph 16.

3

17. Defendant admits that plaintiff applied for the position, that no applicants were interviewed, and that the advertisement was later cancelled.

18. Defendant admits that in or around January 2005, plaintiff had not received an evaluation for the performance period ending in 2004. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 18.

19. Defendant admits that on February 7, 2005, Plaintiff made an informal complaint to the EEO Director. Defendant admits that on January 11, 2005, the NTSB issued an announcement for the Director, Office of Marine Safety, an SES position.

19. Defendant admits that Cooke applied for the position and that she was not interviewed.

20. Defendant admits that plaintiff filed a discrimination complaint and denies the remaining allegations in paragraph 20.

21. Defendant admits the allegations of paragraph 21.

22. Defendant admits the allegations of paragraph 22.

23. Defendant admits the allegations in the first sentence of paragraph 23. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the second sentence of paragraph 23. Defendant admits that allegations in the third sentence of paragraph 23 that Mr. Osterman asked Ms. Cooke to submit bullet points to support the need for a Senior Level ("SL") position.

24. Defendant admits that Plaintiff submitted the document and denies the remaining allegations in paragraph 24.

25. Defendant admits that in or around June, 2005, plaintiff was transferred to the

4

Office of Safety Recommendations and Communications. Defendant denies any other allegations in paragraph 25.

26. Defendant admits that in or around October, 2005, plaintiff was transferred to the Office of the Managing Director. Defendant denies any other allegations in paragraph 26.

27. Defendant denies the allegations of paragraph 27.

28. Defendant denies the allegations of paragraph 28.

29. Defendant's responses to paragraphs 1 through 28 are incorporated by reference.

30. The allegations contained in paragraph 30 constitute conclusions of law, to which no answer is required. To the extent they may be deemed allegations of fact, they are denied.

31. Defendant denies the allegations of paragraph 31.

32. Defendant denies the allegations of paragraph 32.

33. The allegations contained in paragraphs 33 set forth Plaintiff's prayer for relief, to which no response is required. Defendant nonetheless denies that Plaintiff is entitled to the relief set forth in paragraph 33, or to any relief whatsoever.

Defendant denies any remaining allegations not specifically admitted above. Defendant further denies that plaintiff is entitled to the relief sought in the complaint or to any relief whatsoever. ACCORDINGLY, Defendant requests that the Court dismiss the case and enter judgment for Defendant, order that the complaint be dismissed, and grant Defendant any other just and equitable relief as the Court may deem just and proper.

Respectfully submitted,

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

5

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

QUAN K. LUONG
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

6

# EXHIBIT NO. 10

1

1     UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - - +

4  MARJORIE MURTAGH COOKE,   |

5     Plaintiff,   |

6  v.        | Case No.

7  MARK ROSENKER, CHAIRMAN,  | 1:06CV01928

8  NATIONAL TRANSPORTATION  |

9  SAFETY BOARD,    |

10     Defendant.   |

11  - - - - - - - - - - - - - - - +

12

13

14    Deposition of RONALD BATTOCHI

15     Washington, D.C.

16    Friday, August 10, 2007

17     9:47 a.m.

18

19

20  Job No. 1-109402

21  Pages 1 - 228

22  Reported by: Cathy Jardim

Page 2

1    Deposition of RONALD BATTOCHI, held at the
2    offices of:
3
4    THE EMPLOYMENT LAW GROUP
5    888 17th Street, N.W.
6    Washington, D.C.  20006
7
8
9
10
11
12
13
14
15    Pursuant to notice, before Cathy Jardim,
16    Registered Professional Reporter and Notary Public of
17    the District of Columbia.
18
19
20
21
22

Page 4

1        C O N T E N T S
2    EXAMINATION OF RONALD BATTOCHI            PAGE
3    By Mr. Lowinger                6, 219
4    By Mr. Luong                216, 225
5
6
7
8        E X H I B I T S
9        (Attached to transcript)
10    BATTOCHI DEPOSITION EXHIBITS            PAGE
11    No. 1--Handwritten note, 01/03/05        183
12    No. 2--Handwritten note, 05/23/05        183
13    No. 3--Handwritten note, "Put together bullets"    187
14    No. 4--Handwritten note, 05/20/05        192
15    No. 5--Handwritten note, "Joe talked to Ron..."    194
16    No. 6--Position Vacancy Announcement        195
17    No. 7--SES Crediting Plan            201
18    No. 8--Memorandum, 12/02/2004            202
19    No. 9--Qualifications Brief            203
20    No. 10--Spencer Application Package        204
21    No. 11--SES Rating Sheet            204
22    No. 12--Memorandum, 03/28/2005            205

Page 3

1        A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        BRIAN LOWINGER, ESQUIRE
4        The Employment Law Group, PC
5        888 17th Street, N.W.
6        Washington, D.C.  20006
7        (202)331-2883
8
9    ON BEHALF OF THE DEFENDANT:
10        QUAN LUONG, ESQUIRE
11        U.S. Attorney's Office
12        501 3rd Street, N.W.
13        Washington, D.C.  20530
14        (202)514-7176
15        KATHLEEN SILBAUGH, ESQUIRE
16        Office of the General Counsel
17        National Transportation Safety Board
18        490 L'Enfant Plaza, S.W.
19        Washington, D.C.  20594
20        (202)314-6084
21
22    Also Present:  MARJORIE MURTAGH COOKE

Page 5

1        EXHIBITS (Continued)
2    BATTOCHI DEPOSITION EXHIBITS            PAGE
3    No. 13--EEO Counselor's Report            207
4    No. 14--NTSB Performance Appraisal Form        215
5    No. 15--Attachment G, Senior Executive Service    221
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 130

1  the accident reports, the timeliness of the accident
2  reports and the analysis of the issues involved, would
3  be reflected in her personnel file?
4      A  I don't know.
5          MR. LUONG:  Objection, foundation.
6          BY MR. LOWINGER:
7      Q  When there are questions raised about a
8  peer or an employee at NTSB, is there a protocol for
9  noting that in the paper anywhere?
10     A  Not that I know of.
11     Q  And who would it be up to to note that?
12     A  Supervisors, I assume.
13     Q  When did you, Elaine Weinstein, Vern
14  Ellingstad or Dan Campbell reflect their concerns
15  about any of those issues, the accident reports, the
16  quality of the reports, the timeliness of the reports,
17  the analysis of the issues involved and Marjorie
18  Murtagh Cooke's leadership and management of OMS, to a
19  superior?
20         MR. LUONG:  Objection to the extent that
21  presumes they are required to do so.
22         THE WITNESS:  I don't know.  She didn't

Page 131

1  report to me.  I don't remember reporting that to
2  anyone or taking that issue up with anybody.
3          BY MR. LOWINGER:
4      Q  Are you aware of Elaine Weinstein ever
5  doing that?
6      A  No.
7      Q  What do you know about Dan Campbell
8  bringing that to a supervisor's attention?
9      A  I don't have specific knowledge of that.
10     Q  What about general knowledge?
11     A  I would think he would, but I don't have
12  specific knowledge.
13     Q  You worked with him from 1994 all the way
14  through 2006 --
15     A  I worked with him from 1990 to 2006.
16     Q  What do you know that he would have -- what
17  do you understand that he would have done based on
18  your relationship with him?
19         MR. LUONG:  Objection.  Calls for
20  speculation.
21         THE WITNESS:  I think it would have
22  discussed it with the chairman, but I don't know that

Page 132

1  for a fact.  I don't have any specific knowledge about
2  it.
3          BY MR. LOWINGER:
4      Q  Did the chairman ever speak to you about
5  Marjorie Murtagh Cooke's performance?
6      A  Not that I can recall.
7      Q  What could I do to help you remember that,
8  are you saying you don't know or you don't recall?
9      A  I don't know.
10     Q  When was it disclosed to Marjorie Murtagh
11  Cooke that the position was going to be re-advertised?
12     A  I don't know.  I wasn't there.  I don't
13  know.
14     Q  Do you know who disclosed it to Marjorie
15  Murtagh Cooke?
16     A  I do not.
17     Q  What was Colette Magwood's role with regard
18  to the 2004 panel?
19     A  She may have been the human resources
20  advisor to the panel.
21     Q  Do you remember what she discussed with the
22  panel?

Page 133

1      A  No, and I am not sure it was Colette as
2  opposed to somebody else.
3      Q  What did Bob Chipkevich say about Marjorie
4  Murtagh Cooke's qualifications for the SES position?
5          MR. LUONG:  Objection, asked and answered.
6          THE WITNESS:  Nothing that I recall, but we
7  all unanimously agreed with the determination that in
8  our opinion, she was qualified.  I don't know if he
9  said it in so many words --
10         BY MR. LOWINGER:
11     Q  But it was unanimous that she was
12  qualified?
13     A  Yes.
14     Q  What is the impact of unanimity of a
15  decision on whether to hire someone?
16     A  I don't know if it has any impact.
17     Q  If everyone on a panel says someone is
18  highly qualified, does that carry any weight?
19     A  I don't know.
20     Q  When, if ever, in your tour of duties in
21  the managing director's office did you ever review an
22  SES panel's determination as to qualifications for a

1    Q   Do you know how it was recorded --

2    A   Exhibit 13, no, I don't.

3    Q   You are not going to opine as to the

4 authenticity of this document?

5    A   No.

6    Q   Is Charlie Perrara Dan Campbell's friend?

7    A   Yes.

8        MR. LUONG:  Objection.

9        BY MR. LOWINGER:

10   Q   How are they friends?

11   A   They fish together, they spend time

12 together.  They are friends.

13       BY MR. LOWINGER:

14   Q   Earlier in our conversation, I asked you

15 about opinions regarding Ms. Murtagh Cooke's

16 shortcomings and we discussed the following:

17 Leadership, management, we discussed analysis

18 contained in reports and report development in

19 general; is that correct, sir?

20   A   Yes.

21   Q   Other than those issues, what other

22 negative comments are there about Ms. Murtagh Cooke

1 that you are aware of?

2    A   I don't recall any.

3    Q   Now, those issues right there that we

4 discussed, were those consistent, those negative

5 comments that went to -- you mentioned a lack of

6 respect between Mr. Campbell, Mr. Ellingstad,

7 Ms. Weinstein, and I believe you also said you had

8 issues with her as well, with her performance; is that

9 correct?

10   A   I don't believe I said that.  I said I

11 didn't respect her.  I didn't say I had issues with

12 her conduct.

13   Q   You didn't respect her work?

14   A   Yes, her managment of the office.

15   Q   Is it limited to the management of the

16 office?

17   A   It is nothing personal, if that is what you

18 are asking.

19   Q   Is it limited to the management or is it

20 limited to analysis or --

21   A   I think it is both.

22   Q   And the leadership and the four or five

1 topics we mentioned before?

2    A   Yes.

3    Q   Was that consistent from 2005 to 2006 in

4 your role as general counsel, sir?

5    A   I don't recall.

6    Q   Was there any period -- let me ask it

7 another way.  Was that consistent with Dan Campbell's

8 feelings toward Ms. Murtagh Cooke from 2000 to 2006?

9    A   I don't know if it was that entire period,

10 but it was certainly consistent with Dan's views for

11 some of that period.

12   Q   And what part?

13   A   I don't know, I can't pinpoint it to you.

14   Q   Would it be closer to 2001 than 2005 that

15 it began?

16   A   I don't know.

17   Q   Would it have been a larger portion of that

18 seven-year period or six-year period or would it be a

19 shorter portion of that six-year period?

20       MR. LUONG:  Objection.  Asked and answered.

21       THE WITNESS:  I don't know.

22       BY MR. LOWINGER:

1    Q   What about with regard to Elaine Weinstein?

2        MR. LUONG:  Same objection.

3        THE WITNESS:  I don't know.

4        BY MR. LOWINGER:

5    Q   What about regarding Vern Ellingstad, same

6 question?

7    A   I am not sure what period it covered.

8    Q   When I say consistent, was that opinion

9 voiced in 2000 by those individuals and yourself?

10   A   I don't know.  I don't remember.

11   Q   Were there problems with Ms. Murtagh

12 Cooke's performance as those issues are addressed

13 beginning in 2000?

14   A   I don't recall.

15   Q   You are not saying you don't recall; you

16 are saying you don't remember?

17   A   I don't remember.

18   Q   From 2000 to 2006, what did Ms. Murtagh

19 Cooke do well?

20   A   I think some of the hiring decisions she

21 made were good, or the office made.  I don't know who

22 made them.  She is the office head.  I think some of

# EXHIBIT NO. 11

1

1       IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

        --------------------------
3       MARJORIE MURTAGH COOKE,   :
                                  :
4              Plaintiff,          :
                                  :
5          -vs-                    :        Case No. 06-748C
                                  :    Judge Thomas C. Wheeler
6       THE UNITED STATES,        :
                                  :
7              Defendant.         :
        --------------------------
8

9

10                 CORPORATE DEPOSITION OF

11       NATIONAL TRANSPORTATION SAFETY BOARD

12         by and through JOSEPH G. OSTERMAN

13                 Washington, D.C.

14               Friday, July 6, 2007

15                  9:48 a.m.

16

17

18

19

20    Job No.:  1 - 107102

21    Pages:  1 - 265

22    Reported by:  Paula M. Flint

Page 2

1          Corporate Deposition of NATIONAL
2  TRANSPORTATION SAFETY BOARD, by and through
3  JOSEPH G. OSTERMAN, held at the law offices of:
4
5          THE EMPLOYMENT LAW GROUP, P.C.
6          888 17th Street, Northwest
7               Suite 900
8          Washington, D.C.  20006
9               (202) 331-2883
10
11
12
13
14          Pursuant to agreement, before Paula M.
15  Flint, Notary Public of the District of Columbia.
16
17
18
19
20
21
22

Page 3

1          A P P E A R A N C E S
2  On behalf of the Plaintiff:
3    BY:  BRIAN M. LOWINGER, ESQUIRE
4       The Employment Law Group, P.C.
5       888 17th Street, Northwest
6       Suite 900
7       Washington, D.C.  20006
8       (202) 331-2883
9  On behalf of the Defendant:
10    BY:  QUAN K. LUONG, ESQUIRE
11       U.S. Attorney's Office, Civil Division
12       501 Third Street, Northwest
13       Room 4218
14       Washington, D.C.  20530
15       (202) 514-9150
16        and
17    BY:  KATHLEEN SILBAUGH, ESQUIRE
18       National Transportation Safety Board
19       Office of the General Counsel
20       490 L'Enfant Plaza, Southwest
21       Washington, D.C.  20594
22       (202) 314-6084

Page 4

1          C O N T E N T S
2  EXAMINATION OF JOSEPH G. OSTERMAN        PAGE:
3   Mr. Lowinger              6, 257
4   Mr. Luong                 251
5          E X H I B I T S
6  OSTERMAN DEPOSITION EXHIBIT NO.          PAGE:
7    (Exhibits subsequently
8     attached to the deposition.)
9   1    Position Vacancy Announcement     88
10  2    Memorandum                        91
11  3    Position Vacancy Announcement     92
12  4    Memorandum                        93
13  5    Operations Bulletin              226
14  6    Operations Bulletin              227
15  7    Operations Bulletin              229
16  8    Order                            232
17  9    Performance Appraisal Form       234
18  10   Performance Appraisal Form       234
19  11   Position Description             235
20  12   Position Description             237
21  13   Application                      238
22  14   Qualifications Brief             238

Page 5

1          E X H I B I T S  C O N T I N U E D
2  OSTERMAN DEPOSITION EXHIBIT NO.          PAGE
3    (Exhibits subsequently
4     attached to the deposition.)
5   15   Rating and Evaluation Plan       240
6   16   SES Rating Sheet                 243
7   17   Briefing for Panel Members       245
8   18   Organizational Structure         246
9   19   Position Description             248
10  20   Unclassified Set of Duties       249
11
12          *    *    *
13
14
15
16
17
18
19
20
21
22

Page 14

1 responses be verbal, and that they be a "yes" or a
2 "no" and not an uh-huh. Because uh-huh or a nod of
3 the head doesn't translate onto the record and it
4 leaves lots of confusion later down the road. Is
5 that okay with you, sir?
6    A.   It is.
7    Q.   And is there any reason why you couldn't
8 testify as to the topics today other than what's
9 been discussed previously so far today?
10    A.   No.
11    Q.   I guess with no further -- why don't we
12 just proceed.
13        Can you please tell me how you came to be
14 the representative for today's deposition?
15    A.   I'm currently the managing director of the
16 National Transportation Safety Board and the senior
17 career civil servant within the board.
18    Q.   And you say you're currently the managing
19 director. How long have you been the managing
20 director?
21    A.   I've been the managing director since
22 March 17, 2005.

Page 15

1    Q.   And prior to that -- can you describe to
2 me what the duties of the managing director are,
3 sir?
4    A.   The managing director is essentially the
5 chief operating officer for the agency. My
6 responsibilities are for the execution of the agency
7 mission, budget, personnel and all of the planning
8 and activity that goes on with the career staff
9 within the NTSB.
10    Q.   What does career staff mean?
11    A.   Nonpolitical staff career. Career federal
12 employees.
13    Q.   I see. And prior to that how -- what was
14 your position at NTSB, if you had one?
15    A.   Prior to that I was the director of the
16 Office of Highway Safety from 1997 to 2005.
17    Q.   Can you tell me what the duties of the
18 director of Highway Safety entail?
19    A.   A director of Highway Safety is
20 responsible for the highway accident investigation
21 activity, personnel involved with that activity,
22 budget. Not only the investigations but the

Page 16

1 development and presentation of reports associated
2 with those investigations. Also recommendations and
3 representing the board on highway safety issues.
4    Q.   And is that -- was that a GS-15 or SES
5 level position, sir?
6    A.   It was both. It was a GS-15 from 1997 to
7 2002 and -- I've seen so many numbers in my reviews
8 I may get confused. And in 2003 I was promoted to
9 the SES position.
10    Q.   I see. I'm just going to stop this line
11 of questioning just for a second because you
12 mentioned something, that you've seen so many
13 numbers during your reviews.
14    A.   I think I got those numbers earlier.
15    Q.   That's perfectly okay. I'm sure there's a
16 document out there somewhere. But you did mention
17 during your reviews -- just briefly, how did you
18 prepare for today's deposition?
19    A.   I looked over the submissions that we have
20 provided to you and then agency policies and
21 practices. Additionally, I previously interviewed
22 the former managing director, Dan Campbell, and

Page 17

1 that's it. That constitutes the bulk of my review.
2    Q.   You interviewed Dan Campbell. Did you
3 speak with anyone else besides Mr. Dan Campbell
4 regarding today's deposition?
5    A.   Other than Ms. Silbaugh, no.
6    Q.   And you said you reviewed your submissions
7 to us, the plaintiffs. What submissions were those?
8    A.   A variety of documents that include the
9 CFR, operations bulletins for the agency,
10 performance evaluations for Ms. Murtagh, position
11 descriptions. Some -- for this particular
12 deposition, some material associated with the
13 advertisement and selection process for the office
14 director for Marine Safety.
15    Q.   You said some materials related to the
16 advertisement and selection for the office -- for
17 the SES position for director of Office of Marine
18 Safety. Can we just refer to that as OMS for the
19 rest of the day?
20    A.   Certainly.
21    Q.   Are there any other abbreviations that you
22 would want to use throughout the day to keep this as

Page 18

1 efficient as possible?  Are there any others?

2    A.   I don't think so.  NTSB and OMS will --

3 and SES, senior executive service, will cover most

4 of them, I think.

5    Q.   You said you reviewed the CFR, the

6 operations bulletins, performance reviews, position

7 descriptions and the advertisement and selection

8 information related to the OMS SES position.

9       Could you just tell me whether any of that

10 information was electronic, whether you saw any of

11 it in email format or on a computer?

12    A.   No, I saw it all on paper.

13    Q.   All of it was paper.  And when you say you

14 saw information related to those topics, with regard

15 to the advertisement selection of OMS, were there

16 any -- were there any handwritten notes that you saw

17 on any of the documents?

18    A.   There were.  There were copies of

19 handwritten notes on the selection panel forms that

20 I looked at.

21    Q.   And do you know which -- do you know which

22 selection panel forms those were that you saw

Page 19

1 handwritten notes on?

2    A.   They were for the selection panel that

3 occurred in early 2005.

4    Q.   Were there any other handwritten notes

5 along the way related to the 2004 selection panels?

6    A.   No.  The only handwritten notes were

7 annotation on the selection sheet written by

8 Mr. Campbell, referring the selection for

9 readvertisement.

10    Q.   I see.

11    A.   Or for referring the job for

12 advertisement.

13    Q.   Going back to that prior line of

14 questioning with regard to your duties as the

15 director of the Office of Highway Safety, you became

16 an SES in 2002.  Were you at all involved in any of

17 the review panels for the SES position as an SES

18 member for the OMS position?

19    A.   I was.

20    Q.   Which panel were you involved in?

21    A.   From my review of the documents there was

22 a panel in 2004, a panel in early 2005, and then a

Page 20

1 second panel in 2005.  I was -- I participated in

2 the middle of those, in the first panel in 2005.

3    Q.   You did not participate in the panel in

4 2004?

5    A.   No.

6    Q.   And there's two panels, not one panel in

7 2005?

8    A.   Correct.

9    Q.   Could you describe the two panels in 2005,

10 sir?

11    A.   After the job was readvertised, the panel

12 that was convened for the review of the applications

13 occurred in, I believe, February of 2005 to review

14 the applicants that had been provided and the

15 applications that had been provided by our human

16 resource office.

17       That panel reviewed the group, eliminated

18 a few applicants as nonqualified and then ranked the

19 remaining applicants and submitted that ranking to

20 the then managing director, Mr. Campbell.

21    Q.   And you were part of that panel?

22    A.   I was part of that panel.

Page 21

1    Q.   And that's an ad hoc executive review

2 panel.  Review board panel, is that what it's

3 called?

4    A.   Yes.  It's not a standing panel.  They're

5 convened -- these review panels are convened

6 specifically for each SES job.

7    Q.   I understand.  And there was a second

8 panel.  Why was there a second panel, sir?

9    A.   There was a second panel because in the

10 interim, after the first panel, I became the

11 managing director.  And because I was involved in

12 the first panel and then would also be the selecting

13 official, that became a conflict in the OPM

14 regulations, or at least an appearance of a

15 conflict.  So I reconvened the panel, a different

16 panel, and had them look over all of the

17 applications again as if it had not occurred

18 previously and then resubmitted.

19    Q.   When did this -- when was the second panel

20 convened?

21    A.   I believe February of 2005.

22    Q.   And the first panel was convened when?

Page 22

1  A.  In the fall or late fall of 2004.

2  Q.  When was the first panel for the 2005 --

3  A.  In February of 2005.

4  Q.  So there were two panels in February 2005?

5  A.  Correct.

6  Q.  Did both panels review the -- all the

7  applications that were submitted for the SES

8  position?

9  A.  Yes.

10  Q.  And there was a full set of -- there was a

11  completely separate review by the panel members?

12  A.  Clarify the --

13  Q.  Sure.  Who was on the first panel in 2005?

14  A.  The first panel was myself, Elaine

15  Weinstein, the director of Safety Recommendations,

16  John Clark, the director of Aviation Safety, Vern

17  Ellingstad, the director of Research and

18  Engineering, and Robert Chipkevich, the director of

19  Rail, Pipeline and Hazardous Material Safety.

20  Q.  Anyone else besides yourself, Elaine

21  Weinstein, John Clark, Vern Ellingstad and Bob

22  Chipkevich for the first panel in 2005?

Page 23

1  A.  I don't believe so, but if I look at the

2  documents there may be another.  But my recollection

3  is not.

4  Q.  Sure.  What I'm -- who was on the second

5  panel in 2005, sir?

6  A.  The second panel were the same panel

7  members minus myself and the addition of Mr. Tom

8  Haueter, H-A-U-T-E-R, who was the deputy director of

9  the Office of Aviation Safety.

10  Q.  Are there records, sir, with regard to the

11  results of the first panel in 2005?

12  A.  Yes.

13  Q.  Are there records with regard to the

14  second panel in 2005?

15  A.  Yes.

16  Q.  What were -- with regard to Marjorie

17  Murtagh Cooke and the first panel, was she

18  selected -- did she pass through and was she

19  approved by human resources for the first panel as a

20  qualified applicant?

21  A.  Yes.

22  Q.  And was she determined to be qualified

Page 24

1  for -- to proceed to the next level of consideration

2  by the panel members for the first panel in 2005?

3  A.  Yes.

4  Q.  Was she determined to merit an interview

5  by the panel members in the first set of panel

6  members in 2005?

7  A.  No.

8  Q.  She was not.  Are there records regarding

9  the decision not to grant her an interview by the

10  first panel in 2005?

11  A.  There are records regarding the rating of

12  the applicants.

13  Q.  Okay.

14      MR. LUONG:  I'm sorry, I'm just going to

15  object.

16      MR. LOWINGER:  Can we just let him finish?

17      MR. LUONG:  I just want to state my

18  objection to the characterization of the question.

19  That's it.

20  BY MR. LOWINGER:

21  Q.  Please proceed.

22  A.  There are records as to the ranking of the

Page 25

1  applicants.  And the panel submitted the first five

2  members in the ranking as those that should be

3  interviewed.

4  Q.  And has NTSB produced a copy of the

5  ranking by the first 2005 panel?

6  A.  I don't believe so.  I'm not certain.

7      MR. LOWINGER:  Mr. Luong, could we please

8  have a copy of the first panel's review of the

9  candidates?

10      MR. LUONG:  We already produced that,

11  Mr. Lowinger.

12      MR. LOWINGER:  You've already produced

13  that?

14      MR. LUONG:  That's correct.

15      MR. LOWINGER:  Have you produced the

16  second set of the second panel's review in 2005?

17      MR. LUONG:  What do you mean,

18  Mr. Lowinger, by the -- I think what we just

19  produced to you earlier today was the rating and

20  ranking sheets for Cooke and for his selectee for

21  the 2005 second panel.

22      MR. LOWINGER:  Okay.  So previously --

Page 34

1  may fall into those four categories.

2        MR. LOWINGER:  Fine.

3  BY MR. LOWINGER:

4    Q.    Are you aware, sir, whether Colette

5  Magwood is still employed by NTSB?

6    A.    She is not.

7    Q.    Do you know when her career at NTSB ended?

8    A.    I believe early 2006.

9    Q.    Do you know where she's currently

10  employed, sir?

11    A.    I'm not certain, but I think it is the

12  National Oceanic & Atmospheric Administration.

13    Q.    Did she leave under good terms or not,

14  less than good terms?

15        MR. LUONG:  Objection, outside the scope

16  of the 30(b)(6) deposition.

17    A.    She left under favorable terms.

18    Q.    What changes were made in 2005 to the

19  advertisement that was not posted in -- that was

20  posted in 2005 as opposed to the 2004?  Do you

21  understand the question?  Maybe I can say it a

22  little differently.

Page 35

1    A.    No, I understand the question.  Was there

2  a difference between the 2004 advertisement and the

3  one readvertised in 2005?

4    Q.    That's right.

5    A.    Without looking at the documents I can't

6  give you an answer to that specifically.

7    Q.    Are you aware of whether or not

8  Mr. Campbell suggested edits to the 2005

9  advertisement?

10    A.    I'm not aware.  I would have to look and

11  compare the documents.

12    Q.    Could it be that there were edits

13  considered but not finally adopted in 2005?

14    A.    It could be.  I'm not aware of it.

15    Q.    Did you have any conversations with

16  Mr. Campbell regarding his editing of the vacancy

17  announcement in 2004 and 2005?

18    A.    No.

19    Q.    Did Mr. Campbell discuss his role with

20  regard to the -- his duties as the selecting

21  official in 2004 and 2005 when you spoke with him?

22    A.    He did.

Page 36

1    Q.    Can you tell me what he mentioned

2  regarding his duties and responsibilities as the

3  selecting official?

4    A.    Well, his duties and responsibilities as

5  selecting official were fairly standard.  He would

6  take the applicants provided by the ranking --

7  provided by the panel and determine which to

8  interview.  And he would conduct those interviews

9  and make a selection from those interviews and the

10  rating and ranking from the panel and the

11  applications themselves.

12        Mr. Campbell in 2004 decided to

13  readvertise the position.  And his stated reason was

14  that he learned from his discussions with leadership

15  at the Coast Guard that there was a belief by many

16  potential applicants who chose not to apply that the

17  position was preselected for Ms. Murtagh.  And he,

18  in deciding to make sure that the NTSB had the

19  broadest pool of qualified applicants, decided to

20  reannounce the application -- or reannounce the

21  advertisement.

22    Q.    When you say the broadest pool, broadest

Page 37

1  pool of what types of characteristics, sir?

2    A.    Qualified applicants.

3    Q.    When you say qualified applicants, I mean

4  the -- are we talking about -- what qualifications

5  was Mr. Campbell looking for that led him to believe

6  that he needed to readvertise the position in 2004?

7    A.    He was looking for a broader selection

8  pool.  He wasn't looking, from my understanding, for

9  different qualifications.

10        I don't believe in the first

11  advertisement, in 2004, there were many applicants.

12  And his concern for that led him to readvertise the

13  position so that there would be more applicants to

14  choose from.

15    Q.    So in doing so, how did the advertisement

16  change so that there would be more applicants who

17  would not think that it was preselected for

18  Ms. Murtagh Cooke?

19    A.    I don't believe that the advertisement

20  changed.  The nature of federal hiring, for those

21  who watch senior executive positions, there is -- it

22  is not permissible to preselect a candidate.  The

Page 38

1  rules prohibit that.
2      If an application is offered and there's a
3  belief by the community that there is a preselection
4  afoot, that an agency has a particular applicant in
5  mind and then the agency readvertises the position,
6  it essentially tells the reader, the audience who's
7  looking at these advertisements, that there is no
8  such preselection, because had there been there
9  would not have been a readvertisement. Are you
10 following?
11     Q.   I --
12     A.   So it's not necessary if you're trying to
13 tell the audience of applicants that there is no air
14 apparent necessarily, which is not permissible in
15 the federal hiring service. It's not necessary to
16 overtly say that. By readvertising it you're
17 essentially doing that.
18     Q.   What happens to the applications that were
19 submitted prior to, in 2004, when there was -- when
20 the position was readvertised?
21     A.   In a readvertisement the human resources
22 division will notify the applicants that it is going

Page 39

1  to be readvertised, and there's two choices. I'm
2  not sure which one was chosen here. Choice one is
3  to forward those existing applications into the new
4  announcement, or choice number two is, to notify the
5  applicants that they must reapply.
6      Q.   I see. And you don't know which one it
7  was this time?
8      A.   I don't. I suspect it was a notice that
9  the applicants reapply.
10     Q.   Who did Mr. Campbell speak with at Coast
11 Guard regarding the thought that there was a
12 preselection going on?
13     A.   I don't know. It was the senior
14 leadership at the time.
15     Q.   Do you know if that was a telephone
16 conversation?
17     A.   I don't know.
18     Q.   And why did he call the Coast Guard?
19     A.   I believe that Mr. Campbell was actively
20 engaged in discussions with the Coast Guard
21 regarding the continuing memorandum of understanding
22 that we had. I don't believe that there was a

Page 40

1  specific phone call for this advertisement. My
2  understanding from Mr. Campbell is that he learned
3  of this belief during other conversation.
4      Q.   So Mr. Campbell was speaking with the
5  Coast Guard about a memorandum of understanding
6  issue and it just so happened it came up that there
7  was a concern that there was a preselection going
8  on?
9      A.   Yes, that's my understanding.
10     Q.   I see. And how many candidates were there
11 in 2004?
12     A.   I think we can give you the record for
13 that. I'm not certain.
14     Q.   How many more were there in 2005, sir?
15     A.   I know that there were more by volume.
16 And we can -- I think we can give you that number.
17         MR. LOWINGER:  May we have that
18 information, please?
19         MS. SILBAUGH:  You have it.
20         MR. LUONG:  Yeah, we provided that to you.
21 BY MR. LOWINGER:
22     Q.   And how was it determined that there was a

Page 41

1  better set of qualified applicants in 2005 than
2  there were in 2004?
3      A.   There were more applicants in 2005 than
4  2004, determining their qualifications, the relative
5  ranking by the panel.
6      Q.   I see. Do you know when Mr. Campbell had
7  the conversation with the Coast Guard official?
8      A.   It was in November or December of 2004.
9      Q.   And did Mr. Campbell encourage others to
10 apply at the Coast Guard during this conversation?
11     A.   I'm not aware that he spoke to anybody
12 specifically about applying.
13     Q.   Well, during his conversation regarding
14 the OMS and learning about the concern of a
15 preselection, what did he say about readvertising
16 the position then?
17     A.   I don't believe he spoke to the Coast
18 Guard about it.
19     Q.   What was Mr. Campbell's decision-making
20 process with regard to readvertising the position
21 after his conversation?
22     A.   I think it is fairly simply in that

Page 62

1   Q.    Just identify for me, sir, all the
2   individuals that are involved in the editing of the
3   KSAs and the quality ranking factors for the 2004
4   and 2005 vacancy announcements and ranking sheets.
5   A.    It would be Mr. Campbell, as the managing
6   director and the selecting official, would have been
7   involved in modifying or revising either the KSAs or
8   quality ranking factor, and Ms. Magwood would have
9   simply executed those changes.
10   Q.    I see.  Are you aware -- so essentially --
11   let me make sure -- let me start this all again.
12   Excuse me, I started it off kind of funny.  Excuse
13   me.
14         So Mr. Campbell, as the selecting
15   official, has the authority to basically create the
16   position, the qualifications, the ultimate
17   qualifications for the position?
18   A.    Correct.  Ms. Magwood in preparing the
19   application would suggest likely preliminary KSAs,
20   but Mr. Campbell would then have the opportunity to
21   modify those, rewrite those, add, delete.
22   Q.    Are the KSAs in the vacancy announcement

Page 63

1   or just the ranking sheet?
2   A.    No, it's all in the vacancy announcement.
3   Q.    And the quality ranking factors, are those
4   in the vacancy announcement or the ranking sheet?
5   A.    I'm sorry.  I misstated the last one.  It
6   is in both.  And -- both the announcement and the
7   ranking sheet.
8         Now, one thing that I need to -- without
9   looking at the advertisement, I can't recall if
10   there was a quality ranking factor for the director
11   position OMS.  I know there are KSAs and I know
12   there were core competencies.
13   Q.    Okay.  And are you aware -- describe to me
14   what factors Mr. Campbell applied in determining
15   which KSAs and quality ranking factors would be
16   applied for the OMS SES position in 2004 and 2005.
17   A.    Mr. Campbell would have evaluated the
18   needs and the position in the agency and determined
19   the skill set that a director of the Office of
20   Marine Safety should have to meet those needs.
21   Q.    Did you speak to Mr. Campbell about the
22   needs that he determined NTSB would need and the

Page 64

1   skill set that would be needed to fulfill those?
2   A.    I did not specifically speak about that.
3   Q.    Generally did you speak to him about that,
4   about the process of developing the KSAs and the
5   quality ranking factors?
6   A.    In a very general context I did.
7   Q.    Can you tell me what he said, sir?
8   A.    He indicated that he believed that it was
9   necessary to have an experienced maritime
10   knowledgeable individual fill that position.  That's
11   about the complete context of the conversation.
12   Q.    I just want to make sure I understood you.
13   I apologize, sir.  He was looking for an experienced
14   maritime individual?
15   A.    Someone with experienced maritime --
16   maritime experience.
17   Q.    What is your understanding of what
18   maritime experience means, sir?
19   A.    An intimate knowledge of the industry.
20   The government aspects of maritime, of the maritime
21   industry, which would be knowledge of the Coast
22   Guard, knowledge of the maritime administration,

Page 65

1   knowledge of the rules and regulations governing
2   maritime, the maritime industry.  And significant
3   experience working within the maritime industry,
4   either in the government or the private sector.
5   Q.    Let me just excuse myself and my ignorance
6   here.  What is meant by maritime?
7   A.    Shipping.
8   Q.    Shipping?
9   A.    Shipping, boating, vessels, boat design,
10   naval architecture.
11   Q.    So naval architecture, shipping.  And when
12   you say shipping, you mean delivery of cargo or
13   something like that?
14   A.    There's a long list of things that involve
15   the maritime industry, from tug boats to
16   5,000-passenger cruise ships and everything in
17   between, including private boating.
18   Q.    So naval architecture, shipping, boating.
19   What other factors are involved in maritime?
20   A.    Well, there's -- the maritime industry
21   around the world and in the United States is heavily
22   regulated.  So there is a lot of regulatory

Page 66

1 framework around the maritime industry.  Knowledge
2 of that is important for that position.
3    Q.   So international and domestic regulatory
4 knowledge?
5    A.   Yes.
6    Q.   What else?
7    A.   The basic aspects of navigation, ship
8 building, how the maritime industry works, as far as
9 cruise ships, passenger ships, cargo vessels.  I'm
10 certain that I'm not covering all the areas here.
11    Q.   I'm sure it's a lot.
12    A.   It is.
13    Q.   So aside from naval architecture,
14 shipping, boating, international -- regulatory
15 knowledge of both domestic and international
16 navigation, shipping building, how the industry
17 works, cargo and vessels, is there anything else
18 that just comes to your mind in defining what
19 maritime means?
20    A.   It's a very large industry with a long
21 history and many tentacles, lots of aspects to the
22 industry.

Page 67

1    Q.   What are the factors in determining what
2 an experienced maritime -- let me -- please strike
3 that.  Let me just rephrase the question.
4      Did Mr. Campbell speak to any factors that
5 he considered were especially relevant when he
6 drafted the quality ranking factors or the KSAs?
7    A.   The KSAs are exactly the elements that he
8 believed were relevant to selecting a director of
9 marine safety.  That is why KSAs are developed, to
10 specifically identify those skill sets, knowledge,
11 skills and ability, that the applicants need to have
12 to successfully execute that job.
13    Q.   So the KSAs for 2004 and 2005 reflect
14 Mr. Campbell's belief of what an experienced -- an
15 individual with experience in maritime should have?
16    A.   Yes.  Qualify that comment.  Yes, as it
17 relates to the director of the marine safety office,
18 the director of OMS position.
19    Q.   Let's make sure we just get this right.
20    A.   The KSAs do not say, this in makes you an
21 experienced mariner.  It is the knowledge, skills
22 and abilities that NTSB believes should -- that the

Page 68

1 applicant should have to be considered for the
2 position.
3    Q.   So the KSAs and the quality ranking
4 factors reflect Mr. Campbell's belief, personal
5 belief as to what the individual with maritime
6 experience should have for experience in order to
7 serve as the director of OMS at the SES level for
8 NTSB?
9    A.   Yes.
10    Q.   Are you aware of whether or not -- let me
11 rephrase that.  Excuse me.
12      With whom else besides Colette Magwood did
13 Mr. Campbell develop the KSAs and the quality
14 ranking factors?
15    A.   I don't know if he developed them in
16 concert with anyone else or not.
17    Q.   What other resources did Mr. Campbell use
18 in order to determine the KSAs and quality ranking
19 factors?
20    A.   I don't know.
21    Q.   Other than an experienced maritime
22 individual that we just discussed, what other topics

Page 69

1 did Mr. Campbell tell you were essential to his
2 development of the KSAs and the quality ranking
3 factors for the -- for the SES position for OMS?
4    A.   I'm not certain of where you're going
5 with -- I'm not certain of the question.
6    Q.   I'll rephrase it.  Other than -- did
7 Mr. Campbell express any other factors that he felt
8 were essential to the position of the director of
9 OMS at the SES level other than maritime experience?
10    A.   Those and the core competencies.
11    Q.   Do you know when he completed -- when
12 Mr. Campbell completed the KSAs and quality ranking
13 factors in 2004 for the advertisement?
14    A.   Not specifically.  It would have been
15 prior to the public advertisement of the position
16 and shortly before the advertisement.
17    Q.   I see.  So if it was advertised in July of
18 2004 --
19    A.   It would have likely been June.
20    Q.   I see.  Can you tell me or describe to me
21 what qualifications Marjorie Murtagh Cooke had as
22 a -- in order to perform the position of director of

1 OMS at the GS-15 level?

2    A.   What I know about Ms. Cooke's background

3 is that she had come to the safety board in the

4 early '90s from the Coast Guard as the chief of the

5 marine accident investigation division, I believe

6 that was 1993, and functioned in that capacity

7 through '97.

8       In '97 the title of her position was

9 changed to director of the Office of Marine Safety,

10 and she functioned in that capacity until 2005.

11 Prior to her arrival -- and in that time -- let me

12 back up.  In that time frame she would have managed

13 the accident investigation, the marine accident

14 investigation activity and report development

15 activity for the NTSB.

16    Q.   I just didn't hear the word.  You said

17 marine accident, and then what was the other one?

18    A.   Report development activity.  Also

19 recommendation development and some of the advocacy

20 and public presentation activities on marine safety.

21       Prior to 1993, I know that she had worked

22 at the Coast Guard for a number of years,

1 specifically in a fire science field, fires aboard

2 ships.  She had experience with the international

3 maritime organization.  And she had graduated, I

4 believe, from New York Maritime with a

5 maritime-related degree.  I think it was marine

6 engineering, but I'm not certain.

7    Q.   What is involved in -- what was involved

8 between -- what was involved in the position other

9 than maritime accidents -- responding to maritime

10 accidents, development of reports, recommendation

11 development, the advocacy piece you mentioned, what

12 else was involved in the position of director of OMS

13 as performed by Marjorie Murtagh Cooke?

14    A.   In addition to what you mentioned, there

15 was basic supervision duties for the staff of the

16 Office of Maritime Safety -- or Marine Safety.

17 There was some coordination activity that she was

18 responsible for between the offices and among the

19 offices within the NTSB when it related to maritime

20 issues.  And she would occasionally prepare, or her

21 staff would prepare under her direction, speeches,

22 congressional testimony for board members and

1 others.

2    Q.   What about human resources, anything --

3 did she have duties with regard to that?

4    A.   Supervision of the personnel and all of

5 the human resources aspects that come with

6 supervision.

7    Q.   What are the aspects that come with --

8    A.   Performance management, discipline, time

9 and attendance, training, workload management, basic

10 supervision duties.

11    Q.   What about -- does she have any budgetary

12 authority?

13    A.   Prior to 1997 her budgetary authority was

14 limited as a division chief.  The organizational

15 structure was such that she, along with the other

16 modal divisions in surface, reported to a director

17 of Surface Transportation Safety.  After 1997 that

18 layer of management was eliminated and she reported

19 directly to the managing director.

20       In 1997, she had broader -- she began with

21 broader budget responsibilities, as far as the

22 application of funds necessary to do the functions

1 I've mentioned of the position.  So training funds,

2 travel funds, equipment funds for the staff and

3 activities of the Office of Marine Safety were

4 within her control.

5    Q.   What documentation outside of her -- what

6 documentation exists with regard to Marjorie Murtagh

7 Cooke's performance of her duties and

8 responsibilities as the director of OMS from 1997

9 through 2005?

10    A.   I think that there's a performance

11 evaluation that we have provided to you for 2003 and

12 2002.  There should be performance evaluations --

13 performance appraisals for the years you mentioned

14 prior to that.

15    Q.   Where would we find those -- other than

16 2002 and 2003, where would we find those performance

17 appraisals?

18    A.   They should be in her personnel file, if

19 they exist.

20    Q.   What's the difference between a

21 performance evaluation and performance appraisal,

22 sir?

Page 74

1    A.    None.  The form will say "performance
2    appraisal."
3    Q.    I apologize.
4    A.    The form will say "performance appraisal."
5    That's why I corrected it.
6    Q.    Oh, I see.
7    A.    There is no difference.  They're
8    identical.
9    Q.    Does NTSB keep all performance appraisals
10    of an employee in the personnel -- official
11    personnel file of its employees?
12        MR. LUONG:  Objection, outside the scope
13    of the 30(b)(6) deposition.
14        MR. LOWINGER:  That's a standing one,
15    isn't it?
16        MR. LUONG:  Not when it's --
17        MR. LOWINGER:  Regarding her performance
18    appraisals.
19        MR. LUONG:  You're asking about the
20    performance appraisal system within NTSB.
21        MR. LOWINGER:  Okay.
22    A.    Performance appraisals once given to the

Page 75

1    employee and signed should be maintained in their
2    personnel file.
3        I will tell you that the NTSB personnel
4    files are not complete.  They're not always placed
5    in the individual OPF, official personnel file.
6    Q.    How is that?
7    A.    Performance decrements on the part of
8    either supervisors or the human resources office.
9    Q.    So if an individual wants to see their
10    official personnel file and they notice that it's
11    lacking, what happens then?
12    A.    They can do one of two things.  They can
13    request that a copy be placed in their personnel
14    file.  They should have a copy and their supervisor
15    should have a copy.  And that's -- once that request
16    is made human resources will do that.
17        And there may be circumstances where a
18    performance appraisal was not completed and
19    therefore there is no copy.
20    Q.    The supervisor should have a copy as well?
21    A.    Yes.
22        MR. LUONG:  Brian, just so I don't

Page 76

1    continue to interrupt you, just a continuing
2    objection to this whole line of questioning about
3    the performance appraisals as outside the scope of
4    the 30(b)(6) deposition.
5    BY MR. LOWINGER:
6    Q.    Where does the supervisor keep copies of
7    performance appraisals?
8    A.    Let me clarify that.  Not all supervisors
9    keep copies of the performance appraisals.  Some do
10    and some do not.  There is no requirement that the
11    supervisor maintain a copy.
12        Once a performance appraisal is completed
13    for an individual, that completed appraisal is
14    submitted to human resources with the intention that
15    it go into the official personnel file.  Some
16    supervisors do not keep their own copies of past
17    performance appraisals.
18    Q.    Did Dan Campbell keep copies of past
19    performance appraisals for the directors?
20    A.    He did not that I'm aware of.
21    Q.    Other than performance appraisals, what
22    other documentation exists regarding Marjorie

Page 77

1    Murtagh Cooke's performance of her duties?
2    A.    I believe that's all.  I have not reviewed
3    Ms. Murtagh's official personnel file, therefore I
4    do not know if there was any disciplinary action or
5    anything else that may have occurred.  I just want
6    to clarify.  When I say I don't know, I'm not aware
7    of any.
8    Q.    I see.  Did Ms. Murtagh Cooke submit an
9    application, a separate application in 2004 and
10    2005?
11    A.    I'm not certain.  I'm not certain.  We can
12    find out, but I'm not certain if it was a different
13    application or whether -- I think I have stated
14    before I wasn't sure how HR handled the 2004
15    applicants, whether they transferred over the
16    applications to the 2005 announcement or whether
17    they asked the applicants to reapply.
18        If you are at a convenient place, can we
19    take five minutes?
20    Q.    Of course.
21        (A recess was taken.)
22    BY MR. LOWINGER:

Page 78

1    Q.    You mentioned that there's a few
2  performance appraisals in the documents submitted --
3  submitted as by NTSB related to Marjorie Murtagh
4  Cooke?
5    A.   Yes.
6    Q.   Are you aware of how Ms. Murtagh Cooke
7  rated in those performance appraisals?
8    A.   I believe one was outstanding and one was
9  excellent.
10    Q.   What does outstanding convey, sir?
11    A.   There are five levels of performance
12  rating in the GS schedule at the NTSB, and it is
13  outstanding, excellent, fully successful, minimally
14  successful and unsuccessful.  And so outstanding
15  would be the highest rating.
16    Q.   And you said her other one was an
17  excellent?
18    A.   I believe so.
19    Q.   What does that communicate or convey?
20    A.   Also excellent performance.
21    Q.   It conveyed that she's just a stellar
22  performer in her duties.  Is that correct, sir?

Page 79

1    A.   I would not -- fully successful should be
2  doing the job at the level you're being paid, not a
3  great deal more, but doing an adequate job.
4  Excellent is doing better than adequate.  And
5  outstanding is superior, above most others.
6    Q.   Are you aware of what other levels of
7  evaluation Ms. Murtagh Cooke received in -- in her
8  other performance appraisals?
9    A.   I'm not specifically aware.  I can't give
10  you a year and a rating, but my understanding is
11  that they were generally favorable, excellents or
12  outstandings.
13    Q.   And in 2004, there wasn't a performance
14  appraisal for 2004.  Are you aware of how she
15  performed in 2004, sir?
16    A.   I believe that her performance was
17  adequate.  It was -- she was doing an adequate job.
18  My understanding of her performance was based on my
19  interview with Mr. Campbell, who believed that he
20  had to assist Ms. Murtagh in some of the duties
21  within her position too often for her position, and
22  that he had to assist the Office of Marine Safety in

Page 80

1  crafting reports and completing investigations more
2  than he should have, and that is a negative comment
3  on her performance during that time frame.
4    Q.   Is that reflected in a performance
5  appraisal anywhere?
6    A.   No.
7    Q.   I see.  Are those -- his efforts related
8  to the reports authored by the Office of Marine
9  Safety, are those kept anywhere?
10    A.   Clarify the question.
11    Q.   Are Mr. Campbell's edits to the reports,
12  indication of his help on those reports, is that
13  reflected anywhere?
14    A.   Not generally, other than in the memories
15  of the individuals who participated in the meetings.
16  Most draft reports, regardless of the mode leading
17  up to the final board's report, are generally thrown
18  out.
19    Q.   They're not subject to a record retention
20  policy of any sort?
21    A.   No.  The draft reports are not forwardable
22  or they're internal communications.  And when the

Page 81

1  final board report is submitted to the board and
2  voted on by the board, it becomes the final product
3  of the board and the drafts leading up to that are
4  almost always destroyed.
5    Q.   How many reports in 2004 did Mr. Campbell
6  have to help Ms. Murtagh Cooke on?
7    A.   I know that there were several underway
8  that he was working on with her, several that were
9  high-profile investigations.  I would say five to
10  six.
11    Q.   So her office, the Office of Marine
12  Safety, was working on five to six high-profile
13  reports in 2004?
14    A.   They were working on more than five or
15  six, but five or six high-profile ones, or ones that
16  required Mr. Campbell's attention.
17    Q.   Did the managing director, is he involved
18  in reviewing reports of other modal offices at NTSB?
19    A.   The managing director is the final review
20  stage before the report is submitted to the board
21  for their consideration of every report that is
22  submitted to the board.

Page 90

1 safety and marine transportation, including
2 principles and practices of navigation, marine
3 engineering, marine regulation and accident
4 investigation, naval architecture and watchstanding
5 requirements sufficient to provide leadership in
6 directing marine accident investigation and the
7 formulation of improved safety practices."
8       And the second is, "Authoritative
9 knowledge of marine transport and its regulation and
10 demonstrated ability as spokesperson, advocate or
11 instructor in this field sufficient to ensure the
12 ability to represent NTSB's products and positions
13 during legislative, executive and industry
14 activities."
15    Q.   And underneath that there's desirable
16 technical professional qualifications, what are
17 those, sir?
18    A.   Those are additional qualifications that
19 would be desirable, but if an applicant did not have
20 those qualifications he would not eliminate them
21 from consideration.
22    Q.   I see.  And did Mr. Campbell write the

Page 91

1 mandatory technical professional qualifications and
2 desirable technical professional qualifications?
3    A.   He at least edited it.
4    Q.   Would he be the person with the final
5 approval of those?
6    A.   Yes.
7    Q.   So he had final authority?
8    A.   Correct.
9        MR. LOWINGER:  Exhibit Number 2.
10       (Document marked Deposition Exhibit
11 Number 2 for identification and subsequently
12 attached to the deposition.)
13 BY MR. LOWINGER:
14    Q.   Mr. Osterman, is this -- this is Exhibit
15 Number 2.  Is this the rating about the things you
16 mentioned before, the referral to Mr. Campbell that
17 the people -- that certain individuals qualified for
18 an interview?
19    A.   This is the memorandum to Mr. Campbell
20 from the executive resource board, the rating panel
21 following their review of the 10 applications that
22 they were given by Ms. Magwood.  It reflects that

Page 92

1 Ms. Magwood screened, for minimum qualifications, a
2 total of 20 applicants, 10 were eliminated during
3 that screen and 10 were considered by the panel, and
4 that the panel forwarded five as qualified or highly
5 qualified.
6    Q.   And was Ms. Murtagh Cooke one of those as
7 being highly qualified?
8    A.   Yes.
9        MR. LOWINGER:  Exhibit Number 3.
10       (Document marked Deposition Exhibit
11 Number 3 for identification and subsequently
12 attached to the deposition.)
13       MR. LOWINGER:  Just for the record,
14 Exhibit Number 2 are Bates numbers 820 through 821.
15 BY MR. LOWINGER:
16    Q.   Exhibit Number 3. Mr. Osterman, is
17 Exhibit Number 3 the vacancy announcement for 2005
18 as posted?
19    A.   Yes.
20    Q.   What are the mandatory executive core
21 qualifications in 2005, sir?
22    A.   They appear to be identical to the

Page 93

1 mandatory technical qualifications in the 2004
2 announcement.
3    Q.   And what are the mandatory technical
4 professional qualifications for the 2005 --
5    A.   Do you mean the desirable technical --
6    Q.   No.  First I did the mandatory core
7 qualifications.
8    A.   The core qualifications are the five that
9 I mentioned previously.  Would you like me to repeat
10 them all?
11    Q.   No.  But they don't change?
12    A.   It does not appear that they've changed.
13    Q.   And are the mandatory technical
14 professional qualifications and desirable
15 professional qualifications the same in 2004 and
16 2005?
17    A.   Yes.
18       MR. LOWINGER:  Exhibit Number 3 is Bates
19 numbers 825 through 832.
20       Exhibit Number 4.
21       (Document marked Deposition Exhibit
22 Number 4 for identification and subsequently

Page 178

1 BY MR. LOWINGER:
2    Q.    Mr. Osterman, I understand you're not
3 going to answer the question?
4    A.    Say it again.
5    Q.    You're not going to answer the question?
6    A.    No, I'm not going to answer the question.
7    Q.    When you spoke with Ms. Murtagh Cooke with
8 regard to the Office of Safety Recommendations and
9 Communication and her work there, can you describe
10 whether or not that was -- can you describe the --
11 describe to me the position that she was going to be
12 transferred to?
13    A.    Certainly.  I told her the one was a
14 temporary position, term appointment, detail if you
15 will.  It was not intended to be a permanent
16 position.  There was a need to assist the director
17 of that office in planning activities.  And I
18 considered Ms. Murtagh a good planner and felt that
19 that fit would be good for the agency and would give
20 her the opportunity to move out of the Office of
21 Marine Safety, as she wished, and also give me the
22 opportunity to design a more permanent position for

Page 179

1 Ms. Murtagh outside of the Office of Marine Safety.
2    Q.    Describe to me your conversation with
3 regard to the temporary nature of the position that
4 you assert.
5    A.    Oh, I told her that it was for -- probably
6 through the summer and early fall and it was
7 intended to work on planning activity within the
8 Office of Safety Recommendations, and that once that
9 was complete that she would return back to the
10 Office of Management.  And at that time I would
11 have -- have the opportunity to create and design a
12 job based on an organizational development model, a
13 legitimate position with substantive work in the
14 Office of Management for her.
15    Q.    What did Ms. Murtagh Cooke -- what was her
16 response to your statement with regard to the
17 temporary nature of the transfer?
18    A.    She understood it as a detail.  She
19 understood that she would be returning most likely
20 to the Office of Management when the detail was
21 complete.
22    Q.    And describe the planning activities.

Page 180

1 Actually, what was discussed with regard to the
2 return to the Office of Management?  I mean how did
3 we ever get to a position at the Office of
4 Management from Office of Marine Safety?  How did we
5 ever get that far in the process of planning her
6 next stops?
7    A.    Quite frankly, thinking a little bit
8 ahead.  At the time we had the discussion about her
9 going to the detail in Safety Recommendations, there
10 was not another 15 billet open and available to
11 place her in that was appropriate for her -- for her
12 background.  And in taking over the Office of
13 Management, I knew that there was an organizational
14 development, a redesign of that office that was
15 necessary.  I knew that we needed to have a planning
16 functionary within that office that didn't
17 previously exist, and I thought that Ms. Murtagh
18 would be a good candidate for such a position.
19 However, I hadn't worked all that out yet.  I had
20 only been in the job a couple of months.
21    Q.    Who did you all speak with in the Office
22 of Safety Recommendations and Communications with

Page 181

1 regard to placing Ms. Murtagh Cooke in that
2 position?
3    A.    The director, Elaine Weinstein.
4    Q.    What was her response?
5    A.    She was fine.  She thought it would be
6 helpful for her.  She had the need for some higher
7 level assistance at that time and she was perfectly
8 willing.  She has always had a favorable
9 relationship with Marjorie and thought it would work
10 out nicely.
11    Q.    And when you discussed the position or you
12 considered the position, what aspects of marine
13 safety work was to be involved in the position?
14    A.    It was mostly management and planning.
15 There was not nearly as much marine safety aspect to
16 the position in Safety Recommendations, but Marjorie
17 was also a manager as well as a marine safety
18 expert.
19    Q.    What marine safety work was actually
20 involved during her time at the Office of Safety
21 Recommendations and Communications?
22    A.    The details of what she did specifically

Page 182

1 within that office --

2    Q.    Yes.

3    A.    -- I'm not that familiar with.  I know
4 that she assisted the director in planning advocacy
5 activities for a variety of different recommendation
6 initiatives, some of them marine.

7    Q.    What is -- when we discuss planning,
8 describe what kind of planning Ms. Murtagh Cooke was
9 to be doing in the Office of Safety Recommendation
10 and Communications?

11    A.    My understanding is she was to be planning
12 the execution of advocacy activities and the
13 organization of recommendation tracking processes.
14 I think that's basically it.

15    Q.    What type of organization planning was to
16 be involved?

17    A.    It was recommendation planning, an
18 advocacy planning.  You mean from my office or in
19 the Office of Safety Recommendations?

20    Q.    Let's just be clear.  Describe to me the
21 plan that she was to be doing.  I just want to make
22 sure I've got this straight.  I think I misconstrued

Page 183

1 what you said.  So can you just repeat it please,
2 sir?

3    A.    Well, the details of what she was doing
4 while she was in the Office of Safety
5 Recommendations, Ms. Weinstein can probably answer
6 better than I.  However, my understanding was that
7 she was going to work on advocacy, strategic
8 planning, planning against our most-wanted safety
9 recommendations for advocacy, and also look at the
10 recommendation tracking process.

11    Q.    What does advocacy strategic planning
12 mean?

13    A.    Where we spend our resources and our time
14 and our effort to promote open safety
15 recommendations.

16    Q.    And what would Marjorie Murtagh Cooke --
17 what was your understanding that Marjorie Murtagh
18 Cooke would be doing in that work?

19    A.    My understanding is that she would work on
20 the basic structure of how to put that in an
21 organized fashion.

22    Q.    And is this a white paper, is this -- what

Page 184

1 type of --

2    A.    There is an advocacy plan for the agency
3 today.  I believe that Ms. Cooke had contributed to
4 that plan in its beginning stages, its fundamental
5 stages.  And there's also an advocacy plan for the
6 board members' activity.

7    Q.    And with whom -- and other than the
8 advocacy plan for the agency and the board, what
9 other aspects are there to the advocacy strategic
10 planning work that she was to be doing?

11    A.    Linking the activity to recommendations.

12    Q.    When you say linking to recommendations,
13 what do you mean by that?

14    A.    Identifying all of the open
15 recommendations, where the advocacy activities of
16 the agency could be most effectively used or the
17 resources against those recommendations.

18    Q.    Aside from advocacy planning and linking
19 to recommendations and open recommendation and
20 the -- how recommendation advocacy is actually used,
21 what else is involved in advocacy strategic
22 planning?

Page 185

1    A.    Prioritizing recommendations.

2    Q.    What else, sir?

3    A.    Making an assessment of available
4 resources versus desired activity and doing a
5 benefit analysis against that to determine, to make
6 sure that the limited resources are applied to the
7 most desirable activities.

8    Q.    Is there anything else, sir?

9    A.    That's basically it.

10    Q.    And what about the clinic for the safety
11 recommendations?

12    A.    The safety recommendation, that one I'm
13 not very knowledgeable of, what Ms. Weinstein had
14 her working on, but it had to do with organizing and
15 identifying within the agency the records management
16 for safety recommendation and the tracking process.

17    Q.    So record management and tracking?

18    A.    Yes.

19    Q.    What does that mean?

20    A.    Well, there are a number of
21 recommendations within the agency that the agency
22 has issued.  It's a correspondence exercise.  The

Page 186

1  recipients reply.  We reply back to them.  They
2  reply again.  It is keeping track of where the
3  recommendation is in its evolution through its life,
4  and then identifying that and making it easy to
5  capture that information.
6      Q.    So basically it's finding out in whose
7  court the ball resides?
8      A.    Whose court the ball resides and what's
9  the status of the work against the recommendation.
10          For example, if we recommended to the FAA
11  that they promulgate a regulation, they would
12  respond back to us, we'd write back with comments,
13  they write back again.  Knowing where they were in
14  the regulatory processes is a necessary item that we
15  need to know as we continue to investigate new
16  accidents.
17     Q.    How would you characterize this
18  assignment?
19     A.    As a temporary assignment for someone who
20  had demonstrable planning skill.
21     Q.    What do you know about what she actually
22  did?

Page 187

1      A.    I didn't evaluate her, and I didn't
2  monitor her daily activities.  So I'm not actually
3  sure.
4      Q.    Overall do you know what she did -- do you
5  have a sense of what she did while she was in the
6  Office of Safety Recommendations and Communications?
7      A.    My understanding is she did essentially
8  what the original design was for, assisted
9  Ms. Weinstein, who also continued her detail for a
10  short period of time to finish the project.
11     Q.    What type of -- what type of guidance did
12  Ms. Murtagh Cooke receive in performing her work in
13  determining how she was doing in performing her
14  work?
15     A.    She would have received it from
16  Ms. Weinstein.
17     Q.    Would it have been a position description?
18     A.    Position description and then personal
19  direction from the supervisor.
20     Q.    What about performance standards, should
21  she have received performance standards?
22     A.    Not for a temporary assignment.  For a

Page 188

1  detail she should have received a position
2  description for the detail, but the performance
3  standards go back to the originating office.  In
4  this case it's the Office of Management.
5      Q.    I see.  Do you know who she worked with
6  while she was doing this work?
7      A.    In Safety Recommendations?  I presume
8  Ms. Weinstein and others, but I'm not sure who.
9      Q.    What rule is there that doesn't require a
10  performance standard for Ms. Murtagh Cooke's
11  transfer in the Office of Safety Recommendations and
12  Communications?
13         MR. LUONG:  Objection to the term
14  "transfer."
15     A.    As a detail you maintain your position of
16  record, although you may be doing other duties in
17  another assignment.  The rater should consult with
18  the manager in that detailed assignment to see how
19  well they did against the position description.
20     Q.    And who would that have been?  Who would
21  have been rating her work?
22     A.    It would have been Ms. Czech.

Page 189

1      Q.    And was there a rating of Ms. Murtagh
2  Cooke's work while she was working in the Office of
3  Safety Recommendations and Communications?
4      A.    No.
5      Q.    And was -- has there ever been any
6  follow-up as to why there wasn't any rating of
7  Ms. Murtagh Cooke's work?
8      A.    Ms. Murtagh Cooke left before the end of
9  the rating cycle and the rating wasn't completed.
10  She retired before the end of the rating cycle.
11     Q.    When we say "ratings," are we talking
12  performance appraisals?
13     A.    Performance appraisals.
14     Q.    And on an annual basis how many
15  performance appraisals are given to an employee at
16  NTSB?
17     A.    Generally you get one performance
18  appraisal annually, and you get a short written
19  midterm performance appraisal.
20     Q.    And --
21     A.    It's actually called a progress review.
22     Q.    And did Ms. Murtagh Cooke receive a

Page 190

1 progress review?

2    A.   I don't believe she did.

3    Q.   And whose responsibility was it to give

4 her a progress review?

5    A.   Ms. Czech's.

6    Q.   Who is Ms. Czech and where does she work?

7    A.   At the time Ms. Czech was the associate

8 managing director.  We've changed the titles, but

9 she worked directly for me as an associate managing

10 director.

11    Q.   And was there any follow-up as to what

12 happened to her -- to Ms. Murtagh Cooke's rating --

13 what was the term of art, sir?

14    A.   The appraisal.

15    Q.   Midterm appraisal.

16    A.   Oh, the midterm appraisal.  No, I don't

17 know why it wasn't completed.

18    Q.   And what -- are you aware of how well

19 Ms. Murtagh Cooke performed while she was in the

20 Office of Safety Communication -- Safety

21 Recommendations and Communications?

22    A.   My understanding is she did fine.

Page 191

1 Ms. Weinstein was fine with what she was doing.

2    Q.   And when did the -- when was she

3 transferred back to the office of managing director?

4    A.   I know that her detail was continued in

5 October.  And I think she was transferred back

6 January of '06, thereabouts.  There should be --

7 it's getting late in the day -- a personnel action.

8    Q.   And at the end of '06 -- at the end of

9 '05, did Ms. Murtagh Cooke receive a performance

10 bonus of any sort related to her work in either OMS

11 or the Office of Safety Recommendations and

12 Communications?

13    A.   No.

14    Q.   Would a midterm performance appraisal have

15 helped her obtain a performance bonus of sort?

16    A.   Not necessarily.

17    Q.   If she was doing fine would she have

18 likely received a bonus at the end of the year, sir?

19    A.   If she was performing on a fully

20 successful level the likelihood is she would not

21 have received a bonus.  Our candidates who are

22 working at their level who do not receive excellents

Page 192

1 or outstandings generally do not receive performance

2 bonuses.

3    Q.   I see.  So when you said that it's your

4 understanding that she was performing at a level --

5    A.   Satisfactory level.

6    Q.   And is that a term of art?

7    A.   I'm trying to give you a different phrase

8 from fully successful.  She was performing at a

9 fully successful level.

10    Q.   And that's below excellent?

11    A.   That's below excellent.

12    Q.   I see.  And what documentation is there

13 with regard to the basis for an assessment that

14 Ms. Murtagh Cooke's work was fully successful?

15    A.   I don't believe there's any.

16    Q.   Did you have any communications with

17 Ms. Weinstein?

18    A.   I did.

19    Q.   And what did she say about the quality of

20 the work?

21    A.   She thought that Ms. Murtagh was working

22 out fine, doing what she was asked to do and doing

Page 193

1 it in a satisfactory manner.

2    Q.   When people are put on, as you say, a

3 detail, is it possible to receive a bonus at the end

4 of the year?

5    A.   It is.  It's possible.

6    Q.   Is it likely?

7    A.   It's possible.  It depends on the nature

8 of the detail.  Details are very unique.  And it

9 depends on what the work involved and what the

10 nature of the detail was.

11    Q.   Describe how this -- how the work

12 performed by Ms. Murtagh Cooke, the actual

13 assignment, fits within the scope of the bonus, an

14 end-of-the year bonus.

15    A.   The bonus -- it's not a bonus, it's a

16 performance award that is provided to staff who

17 receive an outstanding or an excellent and varies in

18 percentage.  A higher percentage for outstanding, a

19 lower percentage for excellent.  Generally no

20 performance award for fully successful.  And not all

21 excellent candidates receive a performance award

22 either.

1    But generally all outstanding, people who
2 are rated outstanding receive some form of
3 performance award.  And there are several different
4 forms.
5    Additionally staff can be provided with a
6 special act award for discrete activities that occur
7 outside of the general performance level.
8    Q.    Any other type of bonuses, sir?
9    A.    There are large -- seven or eight large
10 agency end-of-the-year awards that are granted,
11 chairman's award, managing director's award,
12 regional staff assistant awards, that are granted at
13 the end of the year.
14    Q.    How complex of an assignment was
15 Ms. Murtagh Cooke assigned to in the Office of
16 Safety Recommendations and Communications?
17    A.    I don't think it was particularly complex.
18 I think that it was needed and procedurally robust,
19 but it wasn't particularly difficult.
20    Q.    To what extent was Ms. Murtagh Cooke's
21 skills as a GS-15, level 10, being utilized in that
22 position?

1    A.    I think her skills as a manager and
2 planner were being utilized.  I don't believe that
3 we utilized any of her marine safety skills much.
4 But that wasn't the intention of the detail.
5    The detail was to put her into a position
6 that was, one, available and, two, matched as
7 closely as possible her skills.  She was a good
8 organizer and planner and that's what that basic
9 assignment was.
10    Q.    But if it wasn't particularly complex and
11 the highest you can run as a government employee
12 before you become an SES at a GS-15, level 10, isn't
13 it likely that it would just be a very mundane task
14 for Ms. Murtagh Cooke?
15    MR. LUONG:  Objection, argumentative.
16    A.    There weren't a lot of options.  There
17 were only two options I had.  One was to keep her in
18 the Office of Marine Safety as a national resource
19 specialist for marine safety issues or this
20 particular assignment.  It was the assignment that
21 was available.  She did not wish to stay in the
22 Office of Marine Safety, so it became the de facto

1 only assignment available.
2    Q.    Was she doing the work with anyone else,
3 sir?
4    MR. LUONG:  Objection, asked and answered.
5    A.    In Safety Recommendations she was working
6 under the direction of Ms. Weinstein, and I don't
7 know who specifically she worked with.
8    Q.    How was the planning work that was
9 required for the job similar to or related to her
10 work done in the Office of Marine Safety?
11    A.    As a director of Office of Marine Safety
12 at the 15 level, she was required to plan annually
13 the activity of the office and the staff, to
14 organize and oversee the development of different
15 product and processes.  And it is similar, not
16 identical, but it's a similar basic planning
17 function.
18    Q.    And how was it planning for putting
19 together an advocacy plan?  What was she planning
20 rather than just putting together a piece of -- it
21 sounds like she was figuring out how to put
22 together, I guess, a report on strategic -- on

1 strategic planning, it wasn't really planning going
2 forward, it was just a report on the status of it?
3    A.    No, I don't think so.  I think it was to
4 take available resources and available -- not
5 available, but the open recommendations, prioritize
6 and dovetail these two together in such a way that
7 we were using the most efficient process possible to
8 determine where to spend our limited advocacy
9 dollars.
10    Q.    And what was the result?  Was Ms. Murtagh
11 Cooke asked to produce a result?
12    A.    I know that I received from the director
13 of that office an advocacy plan.  And I believe
14 Ms. Murtagh participated in the construction of that
15 plan.  But at what level and the specific
16 deliverables, the office director would have to tell
17 you.
18    Q.    When did you receive the plan, sir?
19    A.    The advocacy plan I received in the fall
20 of '06.  It was due to me in -- not the fall of '06.
21 In the spring of '06.  It was due to me in the fall
22 of '05.

Page 198

1    Q.    And is it the type of project that someone
2  new in the position would be able to just --
3  wouldn't it be something, the type of project that
4  someone who's been performing in marine safety and
5  organizing staff to take some time to learn the
6  position, learn the scope of the work?
7    A.    To a small degree but not in a broader
8  sense, because the agency is so flat and so small
9  that the office directors in the modal offices have
10  to be involved in the development and life cycle of
11  the open recommendations.
12        So she knew the process of recommendation,
13  issuance and tracking probably as well as anyone
14  situated in the Office of Safety Recommendations.
15        I knew when I was director of Highway
16  Safety, I certainly knew the process intimately.
17    Q.    I see.  And what -- when was she
18  transferred out of the Office of Safety
19  Recommendations and Communications?
20    A.    My recollection is January 2006, December,
21  January, the holiday, right around there.
22    Q.    Was there ever a -- did you ever speak

Page 199

1  with her during this interim period?
2    A.    I spoke with her maybe once or twice while
3  she was detailed to the Office of Safety
4  Recommendations.  Casual conversation.  How's it
5  going, going fine, that kind of casual conversation,
6  nothing specific and no great detail.
7    Q.    Was there anything -- any steps taken to
8  make sure that Ms. Murtagh Cooke would be, I don't
9  know, monitored given the type of -- the type of
10  transition she had encountered from going from the
11  head of a modal office, which is a very prominent
12  position, to someone just working on a planning
13  report?
14        MR. LUONG:  Objection, characterization,
15  argumentative.
16    A.    Monitored in what way?
17    Q.    Making sure that -- frankly, that it was a
18  job that was well suited to her.
19    A.    It was not ideal.  The position was not
20  ideally suited to her, but it was the available
21  position.  And she was monitored by her supervisor,
22  Ms. Weinstein.

Page 200

1    Q.    Did she ever express any desire to return
2  to a different -- or to leave the Office of Safety
3  Recommendations and Communications during the period
4  that she worked there?
5    A.    At the beginning of her detail it was
6  clear to her, because I made it clear, that it was a
7  detail.  And the intention was to return her to the
8  Office of Management with a different position
9  designed for the needs of the agency.
10    Q.    What about the -- had she expressed any
11  interest in returning to marine safety during that
12  time?
13    A.    No, not to me.
14    Q.    And to whom would she have requested the
15  transfer?
16    A.    What transfer?
17    Q.    To whom should she have requested a return
18  to marine safety or doing work more focused on
19  marine safety issues?
20    A.    Me.
21    Q.    How would she have known to do that?
22    A.    She could have come to me at any time and

Page 201

1  asked to terminate the detail and go back to the
2  Office of Marine Safety.
3    Q.    Was there any communication between you
4  and her that would let her know that she could get
5  out of the detail, as you call it, the detail, and
6  go back to Marine Safety?
7    A.    It's sort of an awkward way of putting it.
8  She was aware that it was a detail.  She didn't want
9  to return to Marine Safety, and she never indicated
10  that, one, she was unhappy with the detail or, two,
11  that she ever wanted to return to Marine Safety.  If
12  she had these thoughts she kept them to herself and
13  didn't tell anybody.
14    Q.    So how did the detail end?
15    A.    The work was over.  The work that
16  Ms. Weinstein had needed to be done was
17  substantially complete.  And at that time I had an
18  opportunity to design a new position within the
19  Office of Management to essentially redesign the
20  organizational structure of the Office of
21  Management.  And I brought her in and spoke to her
22  and told her that I had a very credible GS-15 level

Page 202

1  position as the associate managing director for
2  strategic management, and -- although I'm not sure I
3  had titled it that at that time, but it was the
4  chief planning officer for the agency, a position
5  that did not previously exist in the administration
6  that preceded my tenure.  And I asked her if she
7  would do it.
8      I told her that I wouldn't make her do it,
9  she had the option of saying no, but that I thought
10  that her planning and presentation, especially
11  strategic planning skills, were good.  I had seen,
12  as the office director for Highway Safety, her
13  planning activity as a counterpart, as a colleague
14  when I was in that position, and she was good at
15  process flow and strategic process and
16  organizational development, and I thought she would
17  be quite good for the position.
18      She thought about it and decided that she
19  did not wish to embark on that kind of position.
20  She didn't want to do it.  And I asked her why.  And
21  she indicated that it was just too much work.  She
22  didn't want to get that heavily engaged again.  And

Page 203

1  it was a lot of work.  It was a new position,
2  creating a new process and a new, essentially,
3  function for the agency, one that maybe should have
4  existed for a long time, it hadn't, and that is a
5  permanent planning function.  So I offered that to
6  her and she declined.
7      So I told her that we would put her in a
8  program management position, program analyst
9  position until such time that we could determine
10  what other positions became available at the 15
11  level.  And we gave her the assignment of doing
12  essentially an archeology task, which was to
13  identify, one, all of the reviews and audits that
14  the agency had incurred in the last 10 years and
15  then archive the responses that the agency had
16  against all of those reviews and audits, which we
17  had not done previously.  The agency hadn't done
18  that previously.  And to do that she had to go
19  around and talk to all the office directors, find
20  out all the information, collect it, collate it and
21  put it into essentially an archive.
22      Q.   What written documentation do you have

Page 204

1  with regard to the position of -- the associate
2  strategic management position?
3      A.   Associate managing director for strategic
4  management is what it is titled now.  I think at the
5  time that I spoke to Ms. Murtagh about it, I'm not
6  sure that that was exactly the title.  It may have
7  been chief strategic planning or -- we modified the
8  title a couple of times.
9      I have a position description and a
10  performance standard and I have a new employee in
11  that position at the moment.
12      Q.   Was there a position description provided
13  to Ms. Murtagh Cooke to consider the position?
14      A.   No, because -- and I recall this
15  conversation.  I had a draft and I wanted her to
16  consider that.  And part of the duty of the -- I was
17  intending for her to do was to complete that
18  position description by refining it and finalizing
19  it as she came into it.
20      Q.   What part of planning was Ms. Murtagh
21  Cooke good at in the Office of Marine Safety?
22      A.   Process flow.

Page 205

1      Q.   What is process flow, sir?
2      A.   How one identifying the elements of --
3  it's really an industrial engineering kind of
4  aspect.  Identifying all of the elements of a
5  particular process, breaking them down, looking for
6  weaknesses within the process and suggesting
7  corrections for that.  She is methodical in her
8  assessment of -- especially process, and I thought
9  that that was a good fit.
10      Q.   At what level would she have served in the
11  chief strategic planning position?
12      A.   It's a 15 position, 15 billet.  The
13  current person, incumbent is a 15.
14      Q.   Has it ever been higher?
15      A.   It's never existed before and it's never
16  been higher.
17      Q.   Who did Ms. Murtagh Cooke work for doing
18  this archival work with regard to audits and
19  reviews?
20      A.   Ms. Czech.
21      Q.   And what did Ms. Czech -- did you speak
22  with Ms. Czech about Ms. Murtagh Cooke's performance

# EXHIBIT NO. 12

000297

# NTSB PERFORMANCE APPRAISAL FORM

SES [ ]  PMS [ X ]  SCH C [ ]

NAME : Marjorie Murtaugh
TITLE : Director
OFFICE:  Office of Marine Safety
PERFORMANCE APPRAISAL PERIOD :  FROM:    August 1, 2003   TO:   July 31, 2004

INSTRUCTIONS :  Complete this page, and for each rating element complete the second page.  All remarks should be made on a separate page and attached to this form or made on the individual rating element pages.

## Individual Rating Elements

| Element (C or NC) | Weighted Factor | Rating |
|---|---|---|
| 1. __C___ | ___2_____ | Outstanding |
| 2. __C___ | ___3____ | Excellent |
| 3. __C___ | ___2_____ | Excellent |
| 4. __C___ | ___2_____ | Outstanding |
| 5. __C___ | ___1____ | Outstanding |

### TOTAL 10

**SUMMARY PERFORMANCE RATING  Excellent**
Total of weight of Rating Elements must equal 10 and no element can have a weighted value of less than 0.5.

### CONVERSION TABLE

*Outstanding* -  In the individual element ratings the employee must meet the standard for Outstanding level in 75% of the total weight of all elements, and no element can be rated below Excellent.

*Excellent* -  In the individual element ratings the employee must meet the standards for the Outstanding and Excellent levels combined in 75% of the total weight of all the rating elements, and no element can be rated below Fully Successful.

*Fully Successful* -  Only one critical element may be rated at the Minimally Satisfactory level and all others must be Fully Successful or higher.  Non-critical elements must be Minimally Satisfactory or higher.

*Minimally Satisfactory* - Performs in a manner that falls below Fully Successful.  Two or more critical elements rated Minimally Satisfactory *must* result in an overall Minimally Satisfactory rating.

*Unacceptable (GS) Unsatisfactory (SES)* - Performs in a manner which falls below the Minimally Satisfactory level.   In the individual element ratings, one or more critical elements rated as Unacceptable/Unsatisfactory *must* result in an overall Unacceptable/Unsatisfactory rating.

RATING ELEMENT #1    CRITICAL [ X ]    NON-CRITICAL [   ]    WEIGHT OF ELEMENT [ 2 ]

000298

## SIGNATURES AND CERTIFICATIONS

RATING ELEMENTS AND PERFORMANCE STANDARDS

Rating Official:_____ Date _____

Reviewing Official:_____ Date _____

Employee: _____ Date _____


END OF YEAR RATING PERIOD EVALUATION

Rating Official: _____ Date 12/16/04

Reviewing Official: _____ Date 12-16-04

Employee: _____ Date _____

# EXHIBIT NO. 13

000820



National Transportation
Safety Board


Memorandum

---

DATE:        December 2, 2004

TO:          Dan Campbell
             Managing Director

FROM:        NTSB Executive Resource Board (ERB) Ad-Hoc Rating Panel

SUBJECT:     Rating of Applicants for the position of Director, Office of Marine Safety


Twenty applications were received in response to the announcement (WA-TB-4-083) for the position of Director, Office of Marine Safety. The HR Division conducted a minimum qualifications review of each application. As a result of this review, ten applications were forwarded to the NTSB Ad-Hoc panel of the ERB. This group of candidates includes two current employees of the Safety Board: Marjorie Murtaugh and Theodore White.

The panel members have met to discuss the candidates and to arrive at a recommendation. Five of the ten candidates are rated as Qualified (Q) or Highly Qualified (HQ) in the following areas: Executive Qualifications, Mandatory Professional/Technical Qualifications and Desirable Professional/Technical Qualifications.

Applications are forwarded for your consideration. The Human Resources Division will forward the selection to the Office of Personnel Management for certification of the executive/managerial qualifications.

Elaine Weinstein
Director, Office of Safety
Recommendations & Accomplishments

Robert J. Chipkevich
Director, Office of Railroad, Pipeline &
Hazardous Materials Investigations

Ron Battocchi
General Counsel

000822                                        3



## NATIONAL TRANSPORTATION SAFETY BOARD
### Referral and Selection Certificate

Position to be filled:          Director, Office of Marine Safety

Vacancy Announcement Number:   WA-TB-4-003

Grade Level and Series of this Certificate: ES-340

The Selecting Official:         Daniel Campbell, Managing Director

Certificate Numbers:            WA-TB-4-003

Date of Certificate:            December 2, 2004

The persons listed below are best qualified among all the eligible candidates for the position
shown above.   This group was identified after thorough evaluation and comparison of
candidates' qualifications against Office of Personnel Management standards and any special
position requirements.   You are requested to consider the attached data and arrange for
interviews regarding the candidates of interest. When a selection is determined, please indicate
the name of the person selected in the space provided below.

CANDIDATES FOR CONSIDERATION:

        See Attachment.

CANDIDATE SELECTED: _____ Re-advertize _____

Signature of Managing Director: _____ C. Campbell _____

Date of Selection: _____ 12/10/04 _____

000823                                    4

Current or Former SES Member

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|------|-----|------------------|--------------|
| None | | | |
| | | | |
| | | | |
| | | | |

SES Eligible: Qualified

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|------|-----|------------------|--------------|
| Joseph Brusseau | | Director of Field Activities for Marine Safety, Security and Environment Protection, Captain, USCG, Grade 6, Washington, D.C. | |
| Dana Goward | | Chief, Office of Programs and Architecture, Maritime, GS-301-15, Washington, D.C. | |
| Marjorie Murtaugh | | Director, Office of Marine Safety, GS-1801-15, NTSB, Washington, D.C. | |
| Vassilios Livanoa | | President, Marquest Inc. New York, N.Y. Non-Federal Applicant | |
| Pradeep Nayyar | | Senior Engineer, Military Sealift Command, Washington Navy Yard GS-0830-13, Washington, D.C. | |

Certificate audited on _____ by _____.

[ ] This certificate was used for selection.

000824                                    5

[ ] This certificate was not used; selection made from _____.

# EXHIBIT NO. 14

000833



**National Transportation
Safety Board**

**Memorandum**

DATE:     March 28, 2005

TO:       Joseph Osterman,
          Managing Director

FROM:     NTSB Executive Resource Board (ERB) Ad-Hoc Rating Panel

SUBJECT:  Rating of Applicants for the Position of Director, Office of Marine Safety

Twenty applications were received in response to the announcement (WA-TB-5-009) for the position of Director, Office of Marine Safety. The HR Division conducted a minimum qualifications review of each application. As a result of this review, 15 applications were forwarded to the NTSB Ad-Hoc panel of the ERB. This group of candidates includes three current employees of the Safety Board: Marjorie Murtaugh, James Scheffer, and Barry Strauch.

The panel determined that 8 of these 15 candidates failed to meet the standards for qualifications on either Executive Core Qualifications or Mandatory Professional/Technical Qualifications. Of the remaining candidates, it is the panel's consensus judgment that the following 5 candidates are best qualified and should be interviewed: John Spencer, Jonathan Sarubbi, Robert Butterworth, Edward Blackwood, Clyde Marsh.

These applications are forwarded for your consideration. The Human Resources Division will forward the selection to the Office of Personnel Management for certification of the executive/managerial qualifications if required.

John C. Clark, Director
Office of Aviation Safety

Robert J. Chipkevich, Director
Office of Railroad, Pipeline and Hazardous
Materials Investigations

Dr. Vernon Ellingstad, Director
Office of Research and Engineering

Tom Haueter, Deputy Director
Office of Aviation Safety

000834

2

Elaine Weinstein, Director
Office of Safety Recommendations and
Communications

000835

3



## NATIONAL TRANSPORTATION SAFETY BOARD
### Referral and Selection Certificate

Position to be filled:                  Director, Office of Marine Safety

Vacancy Announcement Number:     WA-TB-5-009

Grade Level and Series of this Certificate: ES-340

The Selecting Official:                 Joseph Osterman, Managing Director

Certificate Numbers:                   WA-TB-5-009

Date of Certificate:                    March 28, 2005

The persons listed below are best qualified among all the eligible candidates for the position shown above. This group was identified after thorough evaluation and comparison of candidates' qualifications against Office of Personnel Management standards and any special position requirements. You are requested to consider the attached data and arrange for interviews regarding the candidates of interest. When a selection is determined, please indicate the name of the person selected in the space provided below.

**CANDIDATES FOR CONSIDERATION:**      See Attachment


**Human Resources Specialist:** _____      Date: _____
                          Colette Magwood


---

**CANDIDATE SELECTED:** _____

**Selecting Official:** _____

**Date of Selection:** _____


**Approval:  Managing Director:** _____      Date: _____

000836

5

WA-TB-5-009
Director, Office of
Marine Safety

Current or Former SES Member

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|------|----|------------------|--------------|
| BLACKWOOD, E B | 8345 | Director<br>Office of Regulatory Liaison<br>GS-340<br>Washington, D.C. | |
| | | | |

SES Eligible: Qualified

| NAME | ID | CURRENT POSITION | ACTION TAKEN |
|------|----|------------------|--------------|
| BUTTERWORTH, R M | 8590 | Operations Analyst, GS-1515-15<br>Director Operational Test & Evaluation<br>Dept of Defense<br>Washington, DC | |
| MARSH, W C | 7451 | Commander, Amphibious Group Three<br>San Diego, CA | |
| SPENCER, J S | 2675 | Vice President, Technology<br>American Bureau of Shipping<br>Houston, TX | |
| SARUBBI, JD | 5740 | Commanding Officer, Marine Safety Office<br>US Coast Guard<br>Philadelphia, PA | |
| | | | |
| | | | |

Certificate audited on _____ by _____ .

[ ] This certificate was used for selection.

000837

6

[ ] This certificate was not used; selection made from _____.

# EXHIBIT NO. 15

AN EQUAL OPPORTUNITY EMPLOYER

0 0 0 8

**NATIONAL TRANSPORTATION SAFETY BOARD**

*SENIOR EXECUTIVE SERVICE*
*POSITION VACANCY ANNOUNCEMENT*

NUMBER: WA-TB-4-033

DATE OPENED: 07-14-04

DATE CLOSED: 08-11-04

NO. OF VACANCIES: 1

AGENCY CONTACT:  Human Resources Division 1-800-573-0937 or 202 314-6238
World Wide Web Address: http://www.ntsb.gov

POSITION TITLE, PAY PLAN, AND SERIES:  **Director, Office of Marine Safety**
**ES-340-00**

LOCATION:                                      **Office of Marine Safety**
**Washington, D.C.**

SALARY RANGES:                              $104,927 to $145,600*
*Rate is limited to the rate for Level III of the*
*Executive Schedule.*

**AREA OF CONSIDERATION:**    Nationwide; all groups of qualified individuals. This is a
Career Reserved Position.  **NTSB may or may not pay relocation (PCS) expenses.**

**NONCOMPETITIVE CONSIDERATION:**    Current career Senior Executives, QRB
certified graduates of SES candidate development programs and individuals with SES
reinstatement eligibility may be considered non-competitively for appointment to this position if
they meet the mandatory qualifications requirements.  Proof of noncompetitive eligibility is
required.

**REGULATIONS:**    Financial interest in certain transportation enterprises is prohibited.  The
proposed appointee will be required to file a Public Financial Disclosure Report, SF-278.
Security clearance is required.  US Citizenship is required.

**DUTIES:** The incumbent serves as Director of the Office of Marine Safety with primary
responsibility for implementing and monitoring operational policy and programs for the Office.
Oversees the investigation, analysis, development and preparation of detailed reports and
proposed probable cause determinations of major and field accidents and incidents. Assures that
all factors, both actual and potential, which may have led to the accident/incident are identified,
thoroughly and objectively examined and reported.  Also develops safety recommendations to
minimize their recurrence, special investigations, responses to proposed marine safety
rulemaking, and requests for technical support.  Manages an Office of employees in occupations

---

PRIVACY ACT REQUIREMENTS (P.L.93-579):  The referenced forms are used to determine qualifications for promotion or
employment and are authorized under Title 5 of the U.S. Code, Sections 3302 and 3361.  Each form must be submitted to consider you
for the position noted. The social security number is not required for this purpose and may be deleted.

EVALUATION METHODS: Review or evaluation of applications or personnel folders, performance appraisals, training, awards, and
if necessary, personnel inquires, pre-employment reference checks, interviews, written tests, potential appraisals, and personnel
investigations.

including Master Mariner, Marine Accident Investigation, Engineering, Naval Architecture, and Survival and Human Factors.

**QUALIFICATIONS:** There are five mandatory Executive Core qualifications that are common to all positions in the Senior Executive Service. There are also four professional/technical qualifications that are unique to this position. Two are mandatory and the other two are desirable. Applicants must demonstrate possession of the two mandatory professional/technical qualification requirement AND all the executive core qualification requirements in order to be considered basically qualified for this position. Applicants must provide detailed evidence that their knowledge, skills, and abilities meet the mandatory Executive Core qualifications listed below, and reflect the ability to perform the duties of the position.

## MANDATORY EXECUTIVE CORE QUALIFICATIONS (5):

**1. Leading Change** This core qualification encompasses the ability to develop and implement an organizational vision, which integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance change and continuity--to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. Key Characteristics of this qualification are as follows: (a) Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes; (b) Identifying and integrating key issues affecting the organization, including political, economic, social, technological, and administrative factors; (c) Understanding the roles and relationships of the components of the national policy making and implementation process, including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization; (d) Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution; (e) Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self-motivated; pursuing self-development; seeking feedback from others and opportunities to master new knowledge; (f) Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.

**2. Leading People** This core qualification involves the ability to design and implement strategies, which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. Key characteristics of this qualification are as follows: (a) Providing leadership in setting the workforce's expected performance levels commensurate with the organization's strategic objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority; (b) Promoting quality through effective use of the organization's performance management system (e.g., establishing

00081山

performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees as appropriate); (c) Valuing cultural diversity and other differences; fostering an environment where people who are culturally diverse can work together cooperatively and effectively in achieving organizational goals; (d) Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring; (e) Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations; (f) Resolving conflicts in a positive and constructive manner; this includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.

**3. Results Driven** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. Key Characteristics of this core qualification are as follows: (a) Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas; (b) Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives; (c) Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands; (d) Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans; (e) Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies; (f) Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.

**4. Business Acumen** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. Key Characteristics of this core qualification are as follows: (a) Assessing current and future staffing needs based on organizational goals and budget realities. Applying merit principles to develop, select, and manage a diverse workforce; (b) Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems; (c) Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels; (d) Overseeing procurement and contracting procedures and processes; (e) Integrating and

000815

WA-TB-4-033
Page 4

coordinating logistical operations; (f) Ensuring the efficient and cost-effective development and utilization of management information systems and other technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.

**5.  Building Coalitions/Communication** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally.  It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization.   Key Characteristics of this core qualification are as follows: (a) Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas; (b) Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management; (c) Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders; (d) Working in groups and teams; conducting briefings and other meetings;   gaining cooperation from others to obtain information and accomplish goals;  facilitating 'win-win' situations;  (e) Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect; (f) Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.

## MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION:

1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.

2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.

## DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATIONS:

00081 b

1. General knowledge and understanding of the NTSB's operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.

2. Demonstrated command and/or responsibility of or for sea-going operations.

**EVALUATION OF CANDIDATES:**

1. The Human Resources representative will review all applications to determine whether basic eligibility has been met. To meet basic eligibility, applicants must possess the mandatory Executive Core Qualifications and the mandatory technical/professional qualifications.

2. All basically qualified candidates will be referred to the NTSB Executive Resources Board (ERB) for further consideration. The ERB will group the candidates into broad categories of best qualified, qualified and not qualified. The best qualified candidates will be forwarded to the selecting official for selection.

3. The selecting official may interview any or all of the best qualified candidates and will forward a recommendation to the Chairman or her designee for final approval. The Chief, Human Resources Division will forward the selection to the Office of Personnel Management for qualifications approval, if required.

4. Applicants with career appointments in the SES, SES reinstatement eligibles and certified SES Candidate Development Program Graduates need only address the professional/technical qualification requirements as their overall executive qualifications have already been certified.

**OTHER SIGNIFICANT FACTS:**

• The NTSB is an equal opportunity employer. Non-merit factors such as sex, race, age, color, national origin, religion, etc., will not be considered. Interviews and qualification inquiries will be required.

• The law authorizes the granting of special recognition, awards, and incentive payment to members of the SES to help retain, recognize, reward, and motivate highly competent executives. Specifically, these payments and forms of recognition include: Presidential Distinguished and Meritorious rank awards; Senior Executive Service bonuses and superior accomplishment awards.

• Appointees newly selected for appointment to the SES must have their executive core qualifications approved by the Office of Personnel Management and will be subject to a one year probationary period.

• Veterans preference does not apply in the SES.

000817

- All eligibility requirements must be met by the closing date of this announcement.

- Applications must be postmarked by the closing date of the announcement.

## HOW TO APPLY:

All applicants must submit an application for consideration. The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format.  Be brief and concise, but inclusive in the description of your work experience. Forward application to:

> National Transportation Safety Board,
>
> Human Resources Division (MD-30),
>
> 490 L'Enfant Plaza, East, S.W.,
>
> Washington, D.C.  20594.

1. Submit three (3) copies of the application with original signature on each.

2. Submit three (3) copies of a Qualifications Brief, which is a statement indicating how your experience, education, training, awards, and/or self-development activities meet the qualifications requirements listed above.   The Qualifications Brief must cover the five Executive Core Qualifications and the four technical/professional qualifications. Format the brief so that each requirement is individually addressed.   It must provide sufficient information for evaluation. Do not repeat entries from your narrative work history. Instead, highlight your training, experience and accomplishments, (including examples of work assignments, projects, etc.) that directly relate to the position being filled.

3. Submit three (3) copies of your most recent performance appraisal.

4. Include the following information in your application package:

**JOB INFORMATION:**  Announcement number, job title and grade level of the position for which you are applying.

## PERSONAL INFORMATION:

- Full Name, mailing address (with zip code) and day and evening telephone numbers (with area code).

- Social Security Number.

000818

- Country of Citizenship.

- Your highest Federal civilian grade, job series and the dates held, if applicable.

- Eligibility under special hiring authority. (Indicate the basis for any eligibility and attach appropriate documentation).

## EDUCATION:

- High School information - Name of School, City, State, (Zip Code, if known) and date of diploma or GED.

- College/University information - Name of School(s), City, State, (Zip Code, if known), majors, type of degree(s) received (if no degree, show total credits earned and indicate whether semester or credit hours).

- If you qualify based on education, submit a transcript or list of courses (with credit hours), majors and grade-point average or class rank.

## WORK EXPERIENCE:

Describe your paid and non-paid work related to the position for which you are applying, including the knowledge, skills, abilities identified for this position and how you meet them. The qualification requirements must be evident in experience and/or training. For each position, include the following information:

- Your Position title (including job series and grade, if a Federal job).

- Employer's name and address.

- Supervisor's name and telephone number. (Indicate whether we may contact your current supervisor for reference purposes).

- Dates you started and ended each job.

- The number of hours worked per week.

- Your starting and ending salaries.

- Duties and accomplishments.

## OTHER QUALIFICATIONS:

0 0 0 8 1 9

- Job-related training courses completed within the last 3 years (list title, hours and date completed).

- Job-related skills (other languages, computer software/hardware skills, etc.).

- Job-related honors, awards and special accomplishments received within the last 3 years. For example: publications, memberships in professional or honor societies, leadership activities, public speaking and performance awards (give dates but do not send documents unless requested).

## CONDITIONS OF EMPLOYMENT:

- Job finalists will be asked to sign and certify the accuracy of all information they provide and to authorize a background investigation. A false statement in a part of your application may be grounds for not hiring you, or for firing you after you begin work, and may be punishable by law.

- Males born after December 31, 1959, must be registered with the Selective Service System or have a valid exemption to be eligible for Federal employment. If you receive a military or civilian annuity from the Federal government, your salary or annuity may be reduced if you take a Federal job.

- If you have any delinquent debts, you must repay those debts or face garnishment of your salary.

- Subject to satisfactory completion of a background investigation.

**The NTSB is an Equal Opportunity and Reasonable Accommodation Employer: Except where otherwise provided by law, all candidates will be considered without discrimination for any non-merit reason such as race, color, religion, gender, sexual orientation, age, national origin, political affiliation, marital status, disability, or membership or non-membership in an employee organization.**

\* \* \*

# EXHIBIT NO. 16

000825

AN EQUAL OPPORTUNITY EMPLOYER
## NATIONAL TRANSPORTATION SAFETY BOARD

*SENIOR EXECUTIVE SERVICE*
*POSITION VACANCY ANNOUNCEMENT*

**NUMBER:  WA-TB-5-009**

**DATE OPENED: 01/11/05**

**DATE CLOSED: 02/11/05**

**NO. OF VACANCIES: 1**

**AGENCY CONTACT:**     Human Resources Division 1-800-573-0937 or 202 314-6238
World Wide Web Address: http://www.ntsb.gov

**POSITION TITLE, PAY PLAN, AND SERIES: Director, Office of Marine Safety
ES-340-00**

**LOCATION:**                                    **Office of Marine Safety
Washington, D.C.**

**SALARY RANGES:**                          $107,550 to $149,200*
*Rate is limited to the rate for Level III of the
Executive Schedule.

**AREA OF CONSIDERATION:**    Nationwide; all groups of qualified individuals.  This is a
Career Reserved Position.  **NTSB may or may not pay relocation (PCS) expenses.**

**NONCOMPETITIVE CONSIDERATION:**    Current career Senior Executives, QRB
certified graduates of SES candidate development programs and individuals with SES
reinstatement eligibility may be considered non-competitively for appointment to this position if
they meet the mandatory qualifications requirements.  Proof of noncompetitive eligibility is
required.

**REGULATIONS:**    Financial interest in certain transportation enterprises is prohibited.  The
proposed appointee will be required to file a Public Financial Disclosure Report, SF-278.
Security clearance is required.  US Citizenship is required.

**DUTIES:** The incumbent serves as Director of the Office of Marine Safety with primary
responsibility for implementing and monitoring operational policy and programs for the Office.
Oversees the investigation, analysis, development and preparation of detailed reports and
proposed probable cause determinations of major and field accidents and incidents.  Assures that
all factors, both actual and potential, which may have led to the accident/incident are identified,
thoroughly and objectively examined and reported.  Also develops safety recommendations to
minimize their recurrence, special investigations, responses to proposed marine safety
rulemaking, and requests for technical support.  Manages an Office of employees in occupations
including Master Mariner, Marine Accident Investigation, Engineering, Naval Architecture, and
Survival and Human Factors.

**QUALIFICATIONS:** There are five mandatory Executive Core qualifications that are common
to all positions in the Senior Executive Service.  There are also four professional/technical

**PRIVACY ACT REQUIREMENTS (P.L.93-579):** The referenced forms are used to determine qualifications for promotion or
employment and are authorized under Title 5 of the U.S. Code, Sections 3302 and 3361. Each form must be submitted to consider you
for the position noted. The social security number is not required for this purpose and may be deleted.

**EVALUATION METHODS:** Review or evaluation of applications or personnel folders, performance appraisals, training, awards, and
if necessary, personnel inquires, pre-employment reference checks, interviews, written tests, potential appraisals, and personnel
investigations.

0 0 0 8 2 b

qualifications that are unique to this position. Two are mandatory and the other two are desirable. Applicants must demonstrate possession of the two mandatory professional/technical qualification requirement AND all the executive core qualification requirements in order to be considered basically qualified for this position. Applicants must provide detailed evidence that their knowledge, skills, and abilities meet the mandatory Executive Core qualifications listed below, and reflect the ability to perform the duties of the position.

## MANDATORY EXECUTIVE CORE QUALIFICATIONS (5):

**1. Leading Change** This core qualification encompasses the ability to develop and implement an organizational vision, which integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance change and continuity--to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. Key Characteristics of this qualification are as follows: (a) Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes; (b) Identifying and integrating key issues affecting the organization, including political, economic, social, technological, and administrative factors; (c) Understanding the roles and relationships of the components of the national policy making and implementation process, including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization; (d) Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution; (e) Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self-motivated; pursuing self-development; seeking feedback from others and opportunities to master new knowledge; (f) Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.

**2. Leading People** This core qualification involves the ability to design and implement strategies, which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. Key characteristics of this qualification are as follows: (a) Providing leadership in setting the workforce's expected performance levels commensurate with the organization's strategic objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority; (b) Promoting quality through effective use of the organization's performance management system (e.g., establishing performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees as appropriate); (c) Valuing cultural diversity and other differences; fostering an environment where people who are culturally diverse can work together cooperatively and effectively in achieving organizational goals; (d) Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring; (e) Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations; (f) Resolving conflicts in a positive and constructive manner; this

includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.

**3. Results Driven** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. Key Characteristics of this core qualification are as follows: (a) Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas; (b) Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives; (c) Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands; (d) Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans; (e) Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies; (f) Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.

**4. Business Acumen** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. Key Characteristics of this core qualification are as follows: (a) Assessing current and future staffing needs based on organizational goals and budget realities. Applying merit principles to develop, select, and manage a diverse workforce; (b) Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems; (c) Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels; (d) Overseeing procurement and contracting procedures and processes; (e) Integrating and coordinating logistical operations; (f) Ensuring the efficient and cost-effective development and utilization of management information systems and other technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.

**5. Building Coalitions/Communication** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization. Key Characteristics of this core qualification are as follows: (a) Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional

groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas; (b) Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management; (c) Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders; (d) Working in groups and teams; conducting briefings and other meetings;    gaining cooperation from others to obtain information and accomplish goals;  facilitating 'win-win' situations;   (e) Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect; (f) Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.

## MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION:

1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.

2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.

## DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATIONS:

1. General knowledge and understanding of the NTSB's operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.

2. Demonstrated command and/or responsibility of or for sea-going operations.

## EVALUATION OF CANDIDATES:

1. The Human Resources representative will review all applications to determine whether basic eligibility has been met. To meet basic eligibility, applicants must possess the mandatory Executive Core Qualifications and the mandatory technical/professional qualifications.

2. All basically qualified candidates will be referred to the NTSB Executive Resources Board (ERB) for further consideration. The ERB will group the candidates into broad categories of best qualified, qualified and not qualified. The best qualified candidates will be forwarded to the selecting official for selection.

3. The selecting official may interview any or all of the best qualified candidates and will forward a recommendation to the Chairman or her designee for final approval. The Chief,

000829

Human Resources Division will forward the selection to the Office of Personnel Management for qualifications approval, if required.

4. Applicants with career appointments in the SES, SES reinstatement eligibles and certified SES Candidate Development Program Graduates need only address the professional/technical qualification requirements as their overall executive qualifications have already been certified.

## OTHER SIGNIFICANT FACTS:

- The NTSB is an equal opportunity employer. Non-merit factors such as sex, race, age, color, national origin, religion, etc., will not be considered. Interviews and qualification inquiries will be required.

- The law authorizes the granting of special recognition, awards, and incentive payment to members of the SES to help retain, recognize, reward, and motivate highly competent executives. Specifically, these payments and forms of recognition include: Presidential Distinguished and Meritorious rank awards; Senior Executive Service bonuses and superior accomplishment awards.

- Appointees newly selected for appointment to the SES must have their executive core qualifications approved by the Office of Personnel Management and will be subject to a one year probationary period.

- Veterans preference does not apply in the SES.

- **All eligibility requirements must be met by the closing date of this announcement.**

- **Applications must be postmarked by the closing date of the announcement.**

## HOW TO APPLY:

All applicants must submit an application for consideration. The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format. Be brief and concise, but inclusive in the description of your work experience. Forward application to:

National Transportation Safety Board
Human Resources Division (MD-30)
490 L'Enfant Plaza, East, S.W.,
Washington, D.C. 20594.

1. Submit three (3) copies of the application with original signature on each.

2. Submit three (3) copies of a Qualifications Brief, which is a statement indicating how your experience, education, training, awards, and/or self-development activities meet the qualifications requirements listed above. The Qualifications Brief must cover the five

000830

Executive Core Qualifications and the four technical/professional qualifications. Format the brief so that each requirement is individually addressed. It must provide sufficient information for evaluation. Do not repeat entries from your narrative work history. Instead, highlight your training, experience and accomplishments, (including examples of work assignments, projects, etc.) that directly relate to the position being filled.

3. Submit three (3) copies of your most recent performance appraisal.

4. Include the following information in your application package:

**JOB INFORMATION:** Announcement number, job title and grade level of the position for which you are applying.

**PERSONAL INFORMATION:**

- Full Name, mailing address (with zip code) and day and evening telephone numbers (with area code).

- Social Security Number.

- Country of Citizenship.

- Your highest Federal civilian grade, job series and the dates held, if applicable.

- Eligibility under special hiring authority. (Indicate the basis for any eligibility and attach appropriate documentation).

**EDUCATION:**

- High School information - Name of School, City, State, (Zip Code, if known) and date of diploma or GED.

- College/University information - Name of School(s), City, State, (Zip Code, if known), majors, type of degree(s) received (if no degree, show total credits earned and indicate whether semester or credit hours).

- If you qualify based on education, submit a transcript or list of courses (with credit hours), majors and grade-point average or class rank.

**WORK EXPERIENCE:**

Describe your paid and non-paid work related to the position for which you are applying, including the knowledge, skills, abilities identified for this position and how you meet them. The qualification requirements must be evident in experience and/or training. For each position, include the following information:

- Your Position title (including job series and grade, if a Federal job).

- Employer's name and address.

- Supervisor's name and telephone number. (Indicate whether we may contact your current supervisor for reference purposes).

- Dates you started and ended each job.

- The number of hours worked per week.

- Your starting and ending salaries.

- Duties and accomplishments.

**OTHER QUALIFICATIONS:**

- Job-related training courses completed within the last 3 years (list title, hours and date completed).

- Job-related skills (other languages, computer software/hardware skills, etc.).

- Job-related honors, awards and special accomplishments received within the last 3 years. For example: publications, memberships in professional or honor societies, leadership activities, public speaking and performance awards (give dates but do not send documents unless requested).

**CONDITIONS OF EMPLOYMENT:**

- Job finalists will be asked to sign and certify the accuracy of all information they provide and to authorize a background investigation. A false statement in a part of your application may be grounds for not hiring you, or for firing you after you begin work, and may be punishable by law.

- Males born after December 31, 1959, must be registered with the Selective Service System or have a valid exemption to be eligible for Federal employment. If you receive a military or civilian annuity from the Federal government, your salary or annuity may be reduced if you take a Federal job.

- If you have any delinquent debts, you must repay those debts or face garnishment of your salary.

- Subject to satisfactory completion of a background investigation.

**The NTSB is an Equal Opportunity and Reasonable Accommodation Employer: Except where otherwise provided by law, all candidates will be considered without discrimination for any non-merit reason such as race, color, religion, gender,**

100832

sexual orientation, age, national origin, political affiliation, marital status, disability, or membership or non-membership in an employee organization.

\* \* \*

# EXHIBIT NO. 17

# SES RATING SHEET
## NTSB #WA-TB-4-003, Director,
## Office of Marine Safety

| APPLICANT'S NAME: | Marjorie Murtaugh |
|---|---|

| *Executive Core Qualifications* | Rating |
|---|---|
| **Leading Change:** This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity -- to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ (Q) HQ |
| **Leading People:** This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ (Q) HQ |
| **Results Driven:** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ (Q) HQ |
| **Business Acumen:** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ (Q) HQ |
| **Building Coalitions/Communications:** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ (Q) HQ |
| NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs. | |

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified  _____  No further rating required.

Qualified  ✓  Proceed with the rest of the rating.

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications** | |
| **1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.** | NQ   Q   (HQ) |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ   Q   (HQ) |

Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications. Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position. If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified     _____     No further rating required.

Qualified     ___✓___     Proceed with the rest of the rating.

| **Desirable Professional/Technical Qualifications** | |
|---|---|
| **1. General knowledge and understanding of the National Transportation Safety Board's (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.** | NQ   Q   (HQ) |
| **2. Demonstrated command and/or responsibility of or for sea-going operations.** | NQ   (Q)   HQ |

SES Panel Member(s): _Ronald X Battocchi_     Date: 11/15/04

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SESer | FORMER SESer |
|---|---|---|---|---|
| ✓ | | | | |

_Ronald Schueler_     11-15-04
_Elaine Weinstein_     11/15/04

# EXHIBIT NO. 18

1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3     - - - - - - - - - - - - -x

4     MARJORIE MURTAGH COOKE,      :

5              Plaintiff,    : Case No. 1:06CV01928

6          vs.              : (Judge Bates)

7     MARK ROSENKER, CHAIRMAN,    :

8     NATIONAL TRANSPORTATION      :

9     SAFETY BOARD,                :

10             Defendant.    :  PAGES 1 - 163

11    - - - - - - - - - - - - -x

12

13        Deposition of ROBERT CHIPKEVICH, held at the

14    offices of The Employment Law Group, 888 17th Street,

15    N.W., Suite 900, Washington, D.C., commencing at 9:38

16    a.m., Tuesday, June 12, 2007, before Elizabeth

17    Mingione, Notary Public.

18

19

20

21

22

Page 2

```
 1 A P P E A R A N C E S   O F   C O U N S E L:
 2 ON BEHALF OF THE PLAINTIFF:
 3      THE EMPLOYMENT LAW GROUP, P.C.
 4      BY:   BRIAN M. LOWINGER, ESQUIRE
 5      888 17th Street, Suite 900
 6      Washington, D.C. 20006
 7      (202) 261-2806
 8
 9 ON BEHALF OF THE DEFENDANT:
10      UNITED STATES ATTORNEY'S OFFICE
11      BY:   QUAN LUONG, ESQUIRE
12      501 Third Street, N.W.
13      Washington, D.C. 20530
14      (202) 514-9150
15         AND
16      DEPARTMENT OF JUSTICE, COMMERCIAL
17      LITIGATION BRANCH
18      BY:   MEREDYTH D. COHEN, ESQUIRE
19      1100 L Street, N.W., 8th Floor
20      Washington, D.C. 20530
21      (202) 353-7978
22         AND
```

Page 3

```
 1      NATIONAL TRANSPORTATION SAFETY BOARD
 2      BY:   KATHLEEN SILBAUGH, ESQUIRE
 3      490 L'Enfant Plaza East, S.W.
 4      Washington, D.C. 20594
 5      (202) 314-6084
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 4

```
 1           C O N T E N T S
 2 WITNESS:  ROBERT CHIPKEVICH
 3 EXAMINATION BY:                    PAGE
 4      Mr. Lowinger ................. 6
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 5

```
 1          DEPOSITION EXHIBITS
 2          ROBERT CHIPKEVICH
 3 NUMBER          DESCRIPTION       PAGE
 4 1   Interview Schedule, Director, Office  . 143
     of Marine Safety
 5
     2   Letter Dated December 2, 2004 to Dan  . 144
 6   Campbell
 7 3   Letter Dated March 28, 2005 to Joseph  150
     Osterman
 8
     4   Senior Executive Service Position  .... 154
 9   Vacancy Announcement
10 5   SES Rating Sheet, Director, Office of   155
     Marine Safety for Marjorie Murtagh
11
     6   SES Rating Sheet, Director, Office of  156
12   Marine Safety for John Spencer
13 7   Qualifications Brief, Marjorie M.  .... 157
     Murtagh
14
     8   Rating and Evaluation Plan, Director,  157
15   Office of Marine Safety
16 9   Application for John Spencer for  ..... 157
     Director, Office of Marine Safety
17
18
19
20
21
22
```

Page 38

1  Battocchi said about Miss Murtagh Cooke's application
2  in 2004?
3      A.   I don't recall.
4      Q.   What do you remember about what
5  Mr. Battocchi said during the consensus meeting with
6  regard to the other applicants in 2004?
7      A.   I don't recall.
8      Q.   Do you remember Collette Magwood's role in
9  reviewing the applications or involved in the SES
10  review process in 2004?
11      A.   No. I'm not sure if -- no.
12      Q.   Do you remember there being anyone, a final
13  evaluation or a final recommendation from the group at
14  some point in 2004 with regard to the applicants?
15      A.   Yes. There would have been at the
16  conclusion of the meeting of the panel and after
17  reviewing the applications we would have put forward a
18  best qualified list.
19      Q.   And who -- do you remember there being a
20  best qualified list in 2004?
21      A.   There probably was. That's the normal
22  process. And, yes, we would have put forward a best

Page 39

1  qualified list.
2      Q.   And who was on the best qualified list?
3      A.   I don't recall.
4      Q.   Was Marjorie Murtagh Cooke on the best
5  qualified list?
6      A.   I believe she was.
7      Q.   Okay. And when you say there's a best
8  qualified list, what does a best qualified list mean?
9  Can you describe that to me?
10      A.   Yes. That would be where after we do the
11  evaluations, a consensus evaluation for each
12  candidate, we would then look at the scoring for each
13  of the candidates and then provide that scoring or
14  that list of those candidates that had the highest
15  scoring for the elements. It would be those that
16  identified for the best qualified list.
17      Q.   What does the best qualified list convey?
18  What does that mean that you have a list of best
19  qualified applicants?
20      A.   It means that that group of candidates is
21  more qualified than other candidates that would be
22  lower in scoring.

Page 40

1      Q.   Okay. Aside from the fact that there's --
2  that that grouping of candidates is more qualified
3  than the others, does it -- what else does the best
4  qualified list represent or communicate?
5      A.   It would communicate that those are the
6  applicants that would be recommended for interview or
7  consideration.
8      Q.   I see. Okay. So other than that they
9  are -- that the individuals on the best qualified list
10  were determined to have had higher qualifications than
11  the others and that they were recommended for an
12  interview or further consideration, what else does the
13  best qualified list communicate as part of the review
14  process?
15      A.   As far as I know, that's it.
16      Q.   Okay. What happens to the best qualified
17  list?
18      A.   It is provided to the managing director
19  through the Human Resources office.
20      Q.   I see. What is on the best qualified list?
21  What -- let me explain this to you, sir. Describe to
22  me the information that's on the best qualified list?

Page 41

1      A.   I can describe generally. I don't know
2  specifically on this one.
3      Q.   Okay.
4      A.   Generally, it is a memorandum that advises
5  the managing director that we've reviewed the
6  applications and that the panel has identified the
7  listed applicants as the group that should be
8  considered for further evaluation.
9      Q.   Okay. So at the end of the consensus it's
10  determined that a memo should be prepared and it
11  should be submitted to the managing director of NTSB
12  through HR that the following individuals are
13  qualified, more qualified than the other applicants,
14  that they are -- that they merit an interview or that
15  they merit an interview or further consideration. And
16  what additional -- is there any -- and is there
17  anything else listed in the memorandum with regard to
18  those issues for the best qualified list?
19      A.   It may identify the total number of
20  applicants reviewed, or it may not; but that's
21  basically what's in the memorandum.
22      Q.   Are there any attachments to the

# EXHIBIT NO. 19

1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - - - - X

4       MARJORIE MURTAGH COOKE,          :

5                    Plaintiff,          :

6       vs.                             :  Case No.:

7       MARK ROSENKER, Chairman,         :  1:06CV01928

8       NATIONAL TRANSPORTATION SAFETY   :

9       BOARD,                           :

10                   Defendant.          :

11      - - - - - - - - - - - - - - - - X

12

13          Videotaped Deposition of DANIEL CAMPBELL

14                     Washington, D.C.

15               Thursday, November 15, 2007

16                        9:59 a.m.

17

18

19

20      Job No.:  1-115036

21      Pages:    1 - 200

22      Reported by:  Dana C. Ryan, RPR, CRR

Page 2

1        Videotaped Deposition of DANIEL CAMPBELL, held

2 at the law offices of:

3        The Employment Law Group, P.C.

4        888 17th Street, Northwest

5        Suite 900

6        Washington, D.C. 20006

7        (202) 331-3911

8

9

10       Pursuant to agreement, before Dana C. Ryan,

11 Registered Professional Reporter, Certified Realtime

12 Reporter and Notary Public in and for the District of

13 Columbia.

14

15

16

17

18

19

20

21

22

Page 3

1           A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4        R. SCOTT OSWALD, Esquire

5        DAVID SCHER, Esquire

6        BRIAN M. LOWINGER, Esquire

7        The Employment Law Group, P.C.

8        888 17th Street, Northwest

9        Suite 900

10       Washington, D.C. 20006

11       (202) 331-3911

12

13

14   ON BEHALF OF THE DEFENDANT THE UNITED STATES OF

15   AMERICA:

16       MEREDYTH D. COHEN, Esquire

17       United States Department of Justice

18       Commercial Litigation Branch

19       1100 L Street, Northwest

20       Washington, D.C. 20530

21       (202) 353-7978

22

Page 4

1        A P P E A R A N C E S   C O N T I N U E D

2

3    ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION

4    SAFETY BOARD:

5        ANDREA MCBARNETTE, Esquire

6        U.S. Attorney's Office

7        501 3rd Street, Northwest, Rm 4218

8        Washington, D.C. 20530

9        (202) 514-7153

10

11

12   ALSO PRESENT:

13       Denise M. D'Avella, Esquire, NTSB Office of

14         General Counsel

15       Marjorie Murtagh Cooke, Plaintiff

16       Scott Forman, Videographer

17

18

19

20

21

22

Page 5

1           C O N T E N T S

2 EXAMINATION OF DANIEL CAMPBELL:           PAGE:

3 By Mr. Oswald                              7

4 By Ms. McBarnette                        127

5 By Ms. Cohen                             190

6 By Mr. Oswald                            195

7

8

9

10

11

12           E X H I B I T S

13           (None)

14

15

16

17

18

19

20

21

22

Page 22

1 present a report to the managing director and to the
2 other directors that were involved in it, and it was
3 a -- a process in which you were -- you -- you --
4 you're basically peer reviewing a matter, and that's
5 how you determined, evaluated the work of an office.
6     Q    Let's talk about the annual performance
7 appraisal that you just mentioned.  Is it fair to say
8 that you would perform that annual per -- performance
9 appraisal on an annual basis?
10    A    Yes.
11    Q    All right.  And how -- how would you go
12 about that as the managing director over those
13 individuals over whom you had direct supervisory
14 authority?
15    A    I'd ask them to -- the office directors to
16 provide me with some information about what they
17 believed to have been the accomplishments that they
18 had for that year, and I think -- I don't know whether
19 my assistants or -- or human resources or -- or who
20 would present me pieces of paper that -- that would
21 look to be the basic framework of an evaluation sheet,
22 and then I would work a little bit on that.

Page 23

1     Q    And then once you had worked a little bit on
2 the evaluation sheet, what would you do?
3     A    Are we talking now about the modal office
4 directors?
5     Q    Yes.
6     A    Okay.  Because it will make a difference.
7 The people who were direct reports to me that were on
8 my staff I might handle in a different fashion than I
9 would handle a modal office director.  Modal office
10 directors really, in essence, were the heart of the
11 agency and not employees of mine, and as such the
12 chairman would be more interested in the way in which
13 a modal office performed.  And, so, that was a -- a --
14 a mutual undertaking.
15        As I say, my authority over personnel is a
16 delegated authority from the chairman, so the chairman
17 and I would reach some agreement about how modal
18 directors were to be rated and then the ratings would
19 be made.
20    Q    So you have the -- the sheet from HR that
21 has the general structure of what the evaluation would
22 be, and you've said you'd work on that some.

Page 24

1     A    Uh-huh.
2     Q    Then what would you do when you are
3 evaluating those over whom you have direct supervisory
4 authority as part of the annual performance appraisal
5 process?
6     A    I would talk to the chairman and then tell
7 the chairman that we had to go through the annual
8 appraisal process, and we would work out some
9 understanding of how we wanted to handle it.  Then I
10 would sign the documents and process the -- I think
11 it's important to understand that to some extent the
12 annual appraisal process is directly related to the
13 end-of-the-year bonus process, and that's a lot of
14 what was under consideration here.
15    Q    So once you had completed the form, you had
16 put in any of your comments and all as part of the
17 annual performance appraisal process, then what would
18 you do with that form?
19    A    Well, human resources would take the form.
20 I -- I can't really honestly say.  This is not
21 something that I spent a great deal of time thinking
22 about in terms of how pa -- pieces of paper move

Page 25

1 around the agency in personnel, but -- but after we're
2 done with the form, the form is going to end up in
3 somebody's file, and it's going to end up being
4 processed by whatever clerks process those sorts of
5 things.
6     Q    I understand.  Before it ends up in the
7 file, to what extent, if at all, would you meet with a
8 person over whom you are -- you were evaluating to
9 review the content of the performance evaluation?
10    A    It would be unlikely that I would meet with
11 anyone.
12    Q    When, if ever, did you meet with any of your
13 direct reports from 2000 through 2005 to review the
14 content of their performance appraisal?
15    A    As I say, performance appraisals were done
16 in the -- performance was evaluated in the context of
17 the way in which reports were brought to me.  My
18 direct reports had really little doubt about whether
19 or not they were doing a good job.  In fact, they were
20 probably mostly self-regulating people.  They
21 understood what their jobs were and they would do a
22 good job about it, and -- and -- and I don't think

Page 26

1  that my evaluation of them would have been a
2  productive undertaking, so I didn't do it.
3      Q    You didn't evaluate any of the modal --
4      A    No.
5      Q    -- directors?
6      A    At -- at one point we had -- we had some
7  issues about how -- how people ought to be managed,
8  and I brought into the agency some outside assistance
9  in that regard.  We -- we got all our managers
10  together, and it was a -- a group that had had -- that
11  taught this sort of stuff at Harvard University, and
12  we brought them all in and said, okay, well, this is
13  the real -- the way you really want to manage people
14  if you're interested in creativity and if you're
15  interested in production.  And -- and the core
16  teaching of that was that annual appraisals and annual
17  bonuses are anti-productive and that what you need to
18  do with people is you need to tell people what it is
19  you want from them.  And when they perform well, you
20  need to say, that's good and -- and that's what I
21  expected of you, and reward it right then.
22      But annual appraisals and annual bonuses, as

Page 27

1  I say, are likely to be anti-productive.  Most of my
2  managers agreed that that was a sensible sort of
3  thing.  Most of my managers were of the view that
4  the -- the civil service process as it stood now
5  wasn't doing anything for anybody except perhaps
6  creating a bit of antagonism and envy at the end of
7  the year, and I might add that the plaintiff was one
8  of the managers who came to me.
9      We had -- we had offered pilot programs in
10  this, and the plaintiff was one of the managers that
11  came to me and said that she was very much interested
12  in having brought -- having a pilot program like that
13  done in her office, and -- and I supported that and
14  supported it for the other managers that came to me,
15  but unfortunately it's very expensive to bring in
16  outside consultants to do that, and I wasn't given the
17  money to do it.
18      Q    When you say Ms. Murtagh Cooke wanted a
19  pilot program in her -- her office --
20      A    Uh-huh.
21      Q    -- what do you mean by that?
22      A    Well, at the end of -- Aubrey Daniels is the

Page 28

1  fellow that actually teaches I think out of the
2  University of Kentuck -- Kentucky but in coordination
3  with Harvard.
4      At the end of it we -- we asked the
5  managers, because we were -- really wanted to bring in
6  a pilot program so that we could get this adopted as
7  a -- kind of a -- an environment for the agency, and
8  we asked the managers who -- who might be interested
9  in having such a program initiated within their
10  office, and the plaintiff was the first one through my
11  door to say that she would like that, and I -- I -- I
12  thought that was probably a good idea.
13      I couldn't get the money for it.  We're --
14  we're talking here just a little under a million
15  dol -- dollars in consulting fees.  That's a lot of
16  money, and -- and, so, it didn't come to pass.
17      One of the offices did adopt it internally
18  based on -- on -- on what they had seen, and -- and
19  they got some -- some assistance that you could find
20  textually and seemed to have some success with it,
21  and -- and I don't know that -- the plaintiff's office
22  was -- was also interested in that as well, I think.

Page 29

1      Q    So I just want to make sure I understand.
2  With the modal directors, the -- those that were in
3  charge of the highway --
4      A    Uh-huh.
5      Q    -- office, the marine office, the air safety
6  office and the rail office, you did not perform annual
7  performance appraisals on any of those modal directors
8  between 2000 and 2005?
9      A    I think what you said was did I speak to
10  them after, and your question just now is did I
11  perform an appraisal.  I performed an appraisal.  Did
12  I talk to them about it afterwards?  Virtually
13  everyone is going to be rated outstanding, and they
14  didn't really need to be told that.
15      Q    And when you say, "virtually everyone is
16  going to be rated outstanding," you mean the -- the
17  modal --
18      A    The --
19      Q    -- officers --
20      A    -- modal officers, yeah.
21      Q    -- between --
22      A    Uh-huh.

Page 90

1  abilities that were necessary to perform the director
2  of the Office of Marine Safety position when the first
3  vacancy announcement was issued in late 2004?
4         MS. COHEN:  Objection, asked and
5  answered.
6         THE WITNESS:  The Office of Marine
7  Safety already existed; it already had an office
8  director.  So the announcement for the position would
9  have been largely drawn from an existing position
10 description.  And the knowledge, skills and abilities
11 and such, since there had been other offices, for
12 instance, the highway office, that had been converted,
13 if you will, from 15 to SES, there would all -- have
14 been a format for that, which suggests to me that
15 human resources would have been able to do 99 percent
16 of it.
17        On anything that they might have had
18 some question with, they might have asked me or
19 somebody else in my office, what should I do with
20 this.  That would have been the level of that input.
21 I don't -- I don't recall being directly involved at
22 all, but it's not unlikely that if Collette Magwood or

Page 91

1  Lisa Love had a question about something that they
2  might have picked the phone up and said, Dan, how do
3  you want me to handle this.  But unlike some, as I
4  mentioned earlier, that I might actually sit down and
5  have to write something on because there wasn't any
6  format to work from, this one, there would have been a
7  format and I probably was not involved very much at
8  all.
9  BY MR. OSWALD:
10    Q   So I just want to understand precisely, what
11 role did you play in the preparation of the vacancy
12 announcement, which included the job description and
13 the knowledge, skills and abilities, for the position
14 of director of Office of Mine (sic) Safety at the
15 National Transportation Safety Board when the vacancy
16 announcement -- the first vacancy announcement was
17 published in late 2004?
18        MS. COHEN:  Objection, asked and
19 answered.
20        THE WITNESS:  Very little.  I would
21 have answered the phone if somebody asked me a
22 question, and that would be about all I would remember

Page 92

1  of it.  I probably am the person who signs off on it
2  before it goes out, but in the creation of it, which I
3  believe is your question, very little.
4  BY MR. OSWALD:
5     Q   So other than -- just so I'm clear, other
6  than signing off on the vacancy announcement and
7  possibly answering a question over the telephone from
8  human resources, what other role did you play in the
9  preparation of a vacancy announcement, which included
10 the job description and knowledge, skills and
11 abilities, for the position of director of marine
12 safety for the National Transportation Safety Board
13 for the first vacancy announcement in 2004, late 2004?
14        MS. MCBARNETTE:  Objection, asked and
15 answered.
16        THE WITNESS:  I'm repeating myself now.
17 There was a format to work from.  That would mean that
18 human resources would be able to do 99 percent of the
19 work.  If there was a question they needed asked --
20 answered, they may very well have asked me.  I have no
21 recollection of that.  So they probably presented me a
22 document, and I would have signed the document after

Page 93

1  having read it, and that would be my role.
2  BY MR. OSWALD:
3     Q   In its entirety?
4     A   I have no recollection of having done
5  anything else.
6     Q   I understand.
7     A   Well, apparently --
8     Q   Now, when did you -- who was responsible for
9  the decision to rescind the vacancy announcement for
10 the director of the Office of Marine Safety, a
11 position that was announced the first time in late
12 2004, for the director of marine safety at the
13 National Transportation Safety Board?
14    A   I was.
15    Q   And why did you rescind the first vacancy
16 announcement?
17    A   Well, that's a complicated question, but
18 there were two principal things that were on my mind.
19 One was I wasn't ready to have a selection made at
20 that moment, and, two, I thought that the pool of
21 candidates had been artificially narrowed by rumor
22 that the first announcement had been wired for an

Page 94

1  internal candidate.

2    Q    Now, what factors made up your decision to

3  rescind the vacancy announcement for the director of

4  marine safety at the NTSB -- this is the 2004 first

5  vacancy announcement -- apart from your unwillingness

6  or not being ready to make a selection and your belief

7  that the pool of candidates was artificially narrowed

8  based upon a preconceived notion that there was a

9  preselection for the position; what other factors

10  other than those?

11    A    Well, I called -- when I got a list of who

12  was -- who the panel had recommended, I put the list

13  on the back of my desk and I didn't touch it very much

14  for a period of time because, as I say, I wasn't

15  really interested in seeing the selection process go

16  forward at that point in time.

17        I can't remember why I finally decided I had

18  to do something with it, but when I did, the first

19  name on the list was a captain from the Coast Guard

20  who I knew, and I called him and he told me that he

21  was now employed by Johns Hopkins and was no longer a

22  candidate, and I told him that I was kind of surprised

Page 95

1  that there -- he was the only guy that was interested.

2  Captain Brusseau was the guy who told me that it was

3  understood it was kind of wired for the plaintiff and

4  that that may have limited it, and, so, that

5  conversation with one of the applicants would have

6  been the only additional factor that I -- that went

7  into it.

8    Q    Who were the other four candidates on the

9  list that was provided to you by the panel after the

10  first vacancy announcement --

11    A    I don't remember them by name, but there was

12  a -- there was a Coast Guard guy from the operational

13  side of the Coast Guard, and then there were two

14  people from the private sector, and I don't remember

15  their names.  I do remember that I was not impressed.

16    Q    And who else?

17    A    The plaintiff.

18    Q    Marjorie Murtagh was?

19    A    Yes.

20    Q    Why did you -- so what was it about the --

21  the five candidates that were sent to you by the first

22  panel of the selection committee that led you to

Page 96

1  believe that it was -- it was artificially narrowed?

2  This is the same group that include, what, Captain

3  Prudo (sic), a Coast Guard captain and two private

4  sector folks and Marjorie Murtagh Cooke; how is it --

5    A    Could you repeat the -- I lost your question

6  and -- could you rephrase it?

7    Q    Well, what was it about the list that the

8  panel had supplied you, the list of five candidates,

9  which included Captain Prudo (sic), two private sector

10  employees, another captain in the Coast Guard and

11  Marjorie Murtagh Cooke, the incumbent in the position,

12  that led you to believe that the list was too narrow?

13    A    Well, it wasn't the list that led me to

14  believe that -- that -- that the -- it was too narrow.

15  I mean, the list -- the list didn't have any good

16  candidates in it except the first guy that I -- well,

17  I don't want to say it didn't have any good

18  candidates.  The two private sector guys I found

19  deficiencies with just looking at the -- the

20  applications.  I don't know that I -- if I had met

21  with them and talked to them that they might not have

22  been able to explain a lot of that, but I looked at it

Page 97

1  and I thought to myself, well, there's a couple of

2  glaring probabilities -- possibilities here that I'm

3  not -- I'm not very happy with.

4        The one guy that was on the top, the first

5  name there who I -- was somebody that I had dealt with

6  in Coast Guard and thought was an -- an estimable

7  person, I gave him a call and he was no longer a

8  candidate.  So now I was left with an operational guy,

9  with Marjorie Murtagh and with the two private sector

10  types who -- who had credentials that both didn't

11  really speak to the job, but also had holes in them

12  that made me very -- very nervous; periods of time

13  where people had gone from a senior vice president,

14  170,000 or $180,000 a year to a GS-12.  That's not the

15  kind of career advancement that -- that makes you

16  comfortable when you're thinking of turning someone

17  into an SES.  So it wasn't -- it wasn't a very -- it

18  wasn't a pool that I was particularly delighted with.

19    Q    And why wasn't Marjorie Murtagh Cooke a good

20  candidate for the position?

21    A    Well, she might have been a good candidate,

22  but I would have had to take it to the chairman, and

Page 98

1  she would not probably have been selected, and that's
2  one of the reasons I was not in a hurry to do this.
3  When I say I procrastinated, I procrastinated because
4  I believed that I was going to lose the office
5  director that was there; that was going to be the
6  outcome.
7      Q    What led you to believe that?
8      A    Well, I knew who the chairman was.  I knew
9  what the -- what the -- the -- the -- as I say, I
10  allowed the modal directors to make their own
11  impressions on a chairman.  I -- I gave them every
12  opportunity to prove themselves.  If I had made a
13  suggestion that Marjorie Murtagh ought to be the
14  office director during the period of time that the
15  Barberi was in play -- that's the accident that --
16  that I have now been asked to undertake by the
17  chairman -- I believe the chairman would have looked
18  at me and said, Dan, have you lost your mind.  I
19  think -- I think that that would not have been a
20  sensible thing for me to do.
21      Q    Why not?
22      A    Well, because to make somebody -- to pay

Page 99

1  somebody at the SES level to do something that they
2  don't -- they are not necessarily doing to your
3  satisfaction at the GS-15 level is not -- just not
4  sensible.  It's just -- it's not a sensible thing to
5  do.
6      Q    All right.  Well, what were the other
7  factors that led you not to believe that Marjorie
8  Murtagh Cooke would be a good candidate for the
9  position other than the fact that you believe that if
10  the -- you went and took her name to the chairman
11  that -- that she would ask you whether or not you were
12  crazy?
13      A    Marjorie Murtagh and I have been known to
14  one another since probably 1995.  So I've had a long
15  history to develop my view of whether or not she would
16  be the right candidate to run the office at the SES
17  level.  And I could, if you like, spend all the time
18  from now to lunch describing to you the difficulties
19  that I have encountered over that period of time that
20  suggest to me that -- that it's not a good idea to
21  make somebody an SES for doing something that they're
22  only accomplishing, in my view, marginally at the

Page 100

1  GS-15 level.
2      Q    What was your view about whether or not
3  Marjorie Murtagh Cooke would be a good candidate for
4  the director of marine safety at the NTSB?
5      A    I didn't think that that was sensible.  I
6  didn't think that she should be made an SES.
7      Q    And therefore selected for the director of
8  marine safety position?
9      A    Yes, I had -- I had serious, serious
10  difficulties with Marjorie's performance as the
11  director over her -- her office, both in terms of the
12  way she managed the office and in the quality of the
13  product that came out of it.
14      Q    I understand.  Now, in 1995 what was -- what
15  was your exposure to Marjorie Murtagh Cooke in 1995?
16      A    Well, I'm not really sure when it -- when it
17  first -- it might have been '97.  The first time
18  that -- that -- that I had a direct role to play in a
19  Coast Guard matter was, I think, shortly after the
20  Office of the Secretary of Transportation had been
21  changed into the four modal offices, so I think it
22  would be very early in Marjorie's leadership in the

Page 101

1  Office of Marine Safety.
2      Q    And -- and during that --
3      A    When that is, I can't say, but I think it's
4  maybe 1997 or '95 or something like that, and I am the
5  general counsel at the time.
6      Q    In 1997 or '95 did you -- do you have a
7  significant -- did you liaise significantly with the
8  Coast Guard during that period of time as general
9  counsel?
10      A    No.  This wasn't Coast Guard that I'm
11  talking about.  This is the Office of Marine Council.
12      Q    Well, I understand that.  No, my question is
13  different.  Did you have occasion to liaise with
14  the -- with the Coast Guard between 1995 and 1997?
15      A    No, I -- "liaise" would not be the -- not be
16  the right word for the relationship that I ever had
17  with the Coast Guard.  No, that was always an
18  adversarial relationship.
19      Q    Why was it adversarial?
20      A    Well, because, one, they're one of the
21  agencies of government that come under our purview
22  when we do an accident investigation.  They are the

Page 102

1 regulator of marine safety. They are the -- the --
2 the -- the -- the group within the federal government
3 that's responsible for not only the waterways but the
4 inspection of vessels and for manning requirements and
5 such. So we're investigating them at the time of an
6 accident, so there's that arm's -- to begin with,
7 there's arm's length, but secondly, and unlike the
8 other modes, we also have a shared jurisdiction there,
9 and we are sharing a jurisdiction with -- to do
10 accident investigations with an agency that is
11 hundreds of times our size, has boats and guns. So
12 we're put at a -- something of a disadvantage in that.
13        And, indeed, the very first relationship I
14 had involved -- the very first opportunity I had to
15 become involved with the Coast Guard as such was a
16 legislative fight early in my career about whether or
17 not the United States would assume the authority to do
18 off-shore accident investigation with passenger
19 vessels -- of cruise vessels that were ported in our
20 own -- in our ports but -- but theoretically flagged
21 by foreign states. And that was a -- a -- I would
22 consider a -- a fairly robust struggle between NTSB

Page 103

1 and Coast Guard, so I -- I'm not sure that I would
2 ever say that the way that I related to Coast Guard
3 was -- was to liaise with them. Long answer to a
4 short question, but I didn't liaise with Coast Guard.
5    Q   All right. The -- give me just a moment.
6 When was the first time that you and En -- Ellen
7 Engleman Conners ever discussed the fact that -- that
8 Marjorie Murtagh Cooke believed that she should be
9 paid more money than she was being paid at NTSB?
10       MS. MCBARNETTE: Objection.
11       THE WITNESS: I don't -- I don't know
12 that we ever had that discussion.
13       MS. MCBARNETTE: My objection is that
14 it's assuming facts not in evidence.
15       THE WITNESS: I don't -- I don't recall
16 any such discussion.
17 BY MR. OSWALD:
18    Q   All right. So, just so I'm clear, there was
19 no conversation between you and Ellen Engleman Conners
20 ever about the fact that Marjorie Murtagh Cooke
21 believed that she was not being paid sufficiently as
22 the director of marine safety at NTSB?

Page 104

1        MS. COHEN: Objection, asked and
2 answered.
3        THE WITNESS: I don't have recollection
4 of a conversation with Ellen about Marjorie's
5 inadequate compensation.
6 BY MR. OSWALD:
7    Q   When, if ever, did you have a discussion
8 with Ellen Engleman Conners about the fact that
9 Marjorie Murtagh Cooke wanted to be paid overtime?
10   A   I don't know that I had a discussion with
11 Ellen about overtime. I know that at some point I --
12 I learned that Marjorie might have asked somebody for
13 overtime. Whether that -- I learned that while I was
14 the executive director and Joe told me that, Joe
15 Osterman, the managing director, or whether Ellen
16 mentioned it to me when I was still the managing
17 director, I can't say, but it was a very brief
18 conversation, and I don't recall who it was with.
19   Q   When, if ever, did Ellen Engleman Conners
20 ask you to investigate, research the circumstances
21 under which NTSB could pay a managing -- a modal
22 director like Marjorie Murtagh Cooke, indeed,

Page 105

1 including Marjorie Murtagh Cooke, overtime pay?
2    A   I -- I don't have a recollection of having
3 been asked that.
4    Q   By Ellen Engleman Conners?
5    A   By anyone.
6    Q   If Ellen Engleman Conners were to testify
7 that she had a specific conversation with you in which
8 she not only told you that Marjorie Murtagh Cooke had
9 asked her whether or not NTSB could pay her overtime,
10 and, indeed, Ellen Engleman Conners asked you to
11 research this and investigate it with HR, would that
12 be correct or incorrect?
13   A   I have no recollection of the conversation.
14   Q   What investigation or other research did you
15 do in 2004 to determine whether or not Marjorie
16 Murtagh Cooke or, indeed, any of the managing -- any
17 of the modal directors could receive overtime?
18       MS. COHEN: Objection, assumes facts
19 not in evidence.
20       THE WITNESS: I wouldn't have done any
21 research. I didn't have a -- I didn't have a live
22 issue on my table from any of my office directors

Page 106

1 about overtime. If Marjorie Murtagh had been looking
2 for overtime, since I was her supervisor, she could
3 have come to me and said, Dan, you should be paying me
4 overtime. We would have had a discussion about why.
5 There are rules about overtime. There are rules about
6 a GS-15 cap on overtime. There are rules about
7 getting it preauthorized and so forth. It would have
8 been natural for Marjorie to have come to me and ask
9 me if we were going to consider doing that for her. I
10 never had that conversation with Marjorie, and I don't
11 recall having a conversation with anyone else.
12 BY MR. OSWALD:
13    Q    I understand. What are the rules as you
14 understand them about the cap for overtime for GS-15
15 employees?
16    A    Well, I'm going to mess this up big time
17 because I -- the way I know it was in the context of
18 overtime for non-GS-15s. The agency was fortunate
19 enough in, I think, 2002 to receive an exemption from
20 Congress from the rules that -- that provide what we
21 refer to as undertime; that is to say, when a GS-14
22 would work overtime, they would actually be paid at

Page 107

1 the GS-10 rate. We got the right to pay time and a
2 half, which was a substantial gain for our employees,
3 but as a consequence of that, it meant that the higher
4 rated GS-14s and the GS-15s might, as an accumulated
5 matter or a monthly matter -- and I can't even
6 remember which was the thing, whether it was within
7 a -- a -- a pay period or within an annual
8 accumulation -- that there was some cap that said you
9 couldn't go over the level of GS-15, 10, and I knew it
10 because there were people who got close to it and the
11 CFO or the -- the payroll person would come to me and
12 say, we got somebody close to it, and, you know, you'd
13 have to give some kind of warning to an office
14 director that, all right, that person is no longer
15 going to get the time and a half and maybe even no
16 longer get overtime because they're close to the cap.
17 That's what I know about the cap.
18        I had -- don't think ever considered what
19 happens to the cap, for instance, if you try and pay
20 hour-one overtime to somebody already being paid
21 GS-15, step 10. I don't know that it's even lawful to
22 do that. I never asked that question of anyone

Page 108

1 because that wasn't the way in which the question had
2 presented itself to me.
3    Q    What was the way the question was
4 presented --
5    A    Whether --
6    Q    -- to you?
7    A    -- or not a G -- what happens to a GS-14 or
8 a GS-15 lower when they get close to the cap, and I
9 didn't research the answer, but people told me that we
10 couldn't go over the cap, and, so, you know, if the
11 CFO saw somebody that was close to that, he would come
12 down to my office and say, we need to -- we need to
13 see to it that this person doesn't exceed the cap.
14    Q    Who asked you to research that?
15    A    Nobody asked me to research it.
16    Q    You just said someone had come -- when it
17 came to you, how did it come to you?
18    A    The CFO would have a -- the CFO has a
19 printout of how much he is paying people. That's --
20 you know, we're -- we're not that loose with our
21 finance, and if it looked as if somebody was going to
22 pay more than the GS-15, step 10, the payroll people

Page 109

1 and the CFO would tell me that, so apparently they
2 knew these rules. I didn't know them. That's how I
3 learned about them.
4    Q    Now, other than the August meeting on the
5 Barberi incident and then your meeting with Ellen
6 Engleman Conners in or about December of '04 when you
7 discussed downgrading Marjorie Murtagh Cooke's
8 performance from outstanding to excellent, what other
9 conversations did you have with Ellen Engleman Conners
10 about Marjorie Murtagh Cooke's performance in 2004?
11    A    In answering that question, I don't want to
12 suggest that I think you have the dates right. You're
13 probably within the ballpark, but I'm not sure August
14 and December is anything that I would have said or
15 that I certainly wouldn't feel comfortable about. I
16 think I did say August to September for one of those
17 meetings, but -- but I really want you to understand,
18 I don't -- I don't keep a calendar. I never kept a
19 calendar, so I -- I'm not going to be in any way,
20 shape or form able to get you closer than -- than a
21 relative period of time.
22        Conversations with Ellen would occur from

Page 110

1  time to time, as they would about any office director,
2  about the way that things were proceeding and the
3  difficulties that might have come up.  For instance,
4  I'm sure that I had a conversation with Ellen when it
5  came to pass that the chief investigator of the
6  Barberi accident had threatened to quit and -- and --
7  an interoffice dispute, and we would have talked about
8  that and why that was so.  And I know that -- that she
9  was of the view that I should go down and see to it
10  that that didn't happen.  It wasn't going to -- it
11  wasn't going to be good for the agency to have a chief
12  investigator quit in the middle of what was then our
13  highest profile accident, and so I did speak to the
14  gentleman and did convince him to at least stay
15  through that accident.
16        And -- and -- and that would have been the
17  kind of conversation we would have had, and Ellen
18  would have asked me during the context of that, well,
19  how does that happen, and we probably would have had
20  something of a discussion about personnel within the
21  Office of -- of Marine Safety and what my
22  understanding of their morale and their turnover

Page 111

1  issues were, so I'm sure that happened.
2      Q   Uh-huh.  What other conversations?
3      A   None come to mind.
4      Q   So when you had the conversation with Ellen
5  Engleman Conners when the investigator in the Barberi
6  accident wanted to quit, what did you discuss with
7  Ellen Engleman Conners about morale and turnover in
8  the marine safety department?
9      A   Well, I would have told her that this was
10  not a -- a kind -- a novel development and that I had
11  had some difficulties with -- with morale and -- and
12  dissension down there over the past, and that I had
13  made a con -- a -- a habit of informally doing, and
14  sometimes not so informally doing exit interviews with
15  people as they left the office, because very
16  frequently Marjorie would tell me that she had
17  somebody that was a good employee and then that good
18  employee would leave.
19        And it was not unusual for Office of Marine
20  employees to come to my office and volunteer that they
21  were unhappy.  That had happened on more than one
22  occasion.  And, so, I -- I'm certain that I described

Page 112

1  what my understanding of the situation down there was.
2        Again, because I had so many different
3  chairmen in such a short period of time, I can't
4  really remember all of the discussions I might have
5  had with any given one of them.  I had discussions,
6  I'm sure, with Marion Blakely about the same sorts of
7  subjects while she was there, so that's all I can do
8  for you.
9      Q   I understand.  So other than the Barberi
10  incident, what were the other reasons why, in your
11  opinion, Ellen Engleman Conners, if you had brought
12  her the name of Marjorie Murtagh Cooke as the new
13  director of marine safety with the SES designation,
14  2005 -- what other factors would have led Ellen
15  Engleman Conners to say to you, are you crazy?
16      A   Well, the -- that would have been the
17  factor -- Barberi would have been her factor, but
18  the -- she would not, I think, have -- have wanted to
19  make a move on that without having heard me out.  So
20  the other factor would have been my views, and my
21  views were that this was not -- this was not worth
22  doing.  This was not a good idea.

Page 113

1      Q   What was not a good idea?
2      A   Promoting Marjorie to SES to continue to run
3  an office at the SES level that there was sig --
4  significant difficulty with as a GS-15.  It's not a
5  sensible decision, and I would have told her that, so
6  I'm sure that that would have weighed heavily on it if
7  I had brought it, and -- and that would have meant
8  that we would be in the position, one, to have to
9  select from a panel that had -- from a group that I
10  didn't think really had a -- good choice in, and,
11  two, it would have meant that that would be the point
12  in time when we made a selection that Marjorie would
13  no longer be the head of the office, that the
14  plaintiff would no longer be the head of the office,
15  and I wasn't in a hurry to have that happen,
16  notwithstanding that I had difficulties with Marjorie.
17  You know, we're all human, and I was just not
18  interested in seeing it, so I procrastinated.
19      Q   Procrastinated in doing what?
20      A   In bringing to -- to a head the issue of a
21  selection for SES in marine.
22      Q   How did you bring it to a head finally?

Page 114

1    A   I don't honestly know whether somebody
2 finally said to me, Dan, you've got to do something
3 here.  I -- I was getting close to the end of being
4 the managing director, and I was trying to get things
5 that were my problems off the desk for the next guy.
6 And, so, at that point I decided to readvertise; that
7 that would -- that would be the best course for it.
8 And in the readvertisement, I thought that my -- my
9 role in it would be finished and we would just let
10 it -- let -- let it happen whatever way it was going
11 to happen, but my role in it was going to be finished.
12    Q   And how would that help you get the problem
13 off your desk?
14    A   Well, I had a -- I had a selection that
15 needed to be made, and if it wasn't going to be made
16 from -- from the first advertisement, you had to put
17 out a second one, so I put out the second one.
18    Q   I want to make sure I understand this.
19 When, if ever, did Marjorie Murtagh Cooke herself come
20 to you and tell you that she was unhappy with the
21 way -- the disparity in pay, either that she wasn't
22 being paid enough or wasn't being paid enough in

Page 115

1 relation to the other modal directors, during the
2 period of time that she was the director of marine
3 safety at NTSB?
4    A   Never.
5    Q   When the EEO counselor came to you and
6 notified you that Marjorie Murtagh Cooke had filed an
7 EEO complaint, what was your reaction?
8        MS. COHEN:  Objection --
9        THE WITNESS:  I don't know --
10        MS. COHEN:  -- assumes --
11        THE WITNESS:  I don't know --
12        MS. COHEN:  -- facts --
13        THE WITNESS:  -- who --
14        MS. COHEN:  -- not in evidence.
15        THE WITNESS:  I don't know how I
16 learned of her complaint.  My first recollection of
17 anything was that our EEO specialist told me that he
18 needed to interview me.  I don't have a recollection
19 of our EEO officer talking to me about it, but I do
20 know that at some point the EEO specialist who worked
21 for her said he needed to talk to me, and then
22 subsequently an investigator talked to me, but I can't

Page 116

1 date it.  I think that they probably have notes from
2 it that were dated, but I can't date it.
3 BY MR. OSWALD:
4    Q   And what did the EEO specialist say to you?
5    A   I think he asked me a whole bunch of
6 questions.  I -- I don't -- beyond that, I don't
7 remember, but I think that the -- I -- I -- I -- I'm
8 sure that he has a record of it, whether it was part
9 of a process that they go through.
10    Q   When was the first time that you met
11 Mr. Spencer?
12    A   Who is Mr. Spencer?
13    Q   The selectee for the --
14    A   Oh.
15    Q   -- director of the Office of Marine Safety.
16    A   I thought he might be referring to the --
17    Q   The person that you selected.
18    A   I didn't select Mr. Spencer.
19    Q   When -- when's the first time you -- you met
20 Mr. Spencer?
21        MS. MCBARNETTE:  Objection --
22        THE WITNESS:  After --

Page 117

1        MS. MCBARNETTE:  -- assumes facts not
2 in evidence.
3        THE WITNESS:  After Mr. Spencer was
4 selected, he was in the hall one day and I was
5 introduced to him.
6 BY MR. OSWALD:
7    Q   When was that?
8    A   Probably just before I left.  I think we
9 only overlapped for a period of a few weeks.
10        MR. OSWALD:  I understand.  Let's go
11 off the Record.
12        THE VIDEOGRAPHER:  We are going off the
13 Record.  The time is 12:34 p.m.
14    (Recess -- 12:34 p.m.)
15    (After recess -- 12:43 p.m.)
16        THE VIDEOGRAPHER:  We are back on the
17 Record.  The time is 12:43 p.m.
18 BY MR. OSWALD:
19    Q   After you decided to rescind the vacancy
20 announcement for the director of marine safety
21 position at NTSB, what conversations did you have with
22 Joe Osterman or -- in particular, but anybody else for

Page 182

1  me and that it might have been a month, it might have
2  been two months, it might have been three months
3  before I actually turned my attention to it full-time
4  and said, all right, I need to -- I need to move
5  forward on this. So I'm not sure what the elapse was,
6  but -- but like a lot of people, I procrastinate and I
7  also know when I'm procrastinating, so at some point I
8  said, you can't do this and you need to move forward.
9     Q   Why did you choose to procrastinate?
10    A   I wasn't anxious to -- to proceed to the
11 selection of an SES that I didn't necessarily think
12 was going to work satisfactorily. I didn't think that
13 Marjorie Murtagh Cooke, the plaintiff here, was going
14 to be selected. I would not have recommended her
15 selection, but I also didn't think that the pool
16 that -- that I looked at when I initially went through
17 was attractive.
18    Q   After the position was readvertised, did you
19 select a panel to review the incoming applications?
20    A   Yes.
21    Q   Do you know if that panel is -- was the
22 final panel that actually selected the person who was

Page 183

1  selected?
2     A   Panels themselves don't select --
3     Q   Right.
4     A   -- so the panel wouldn't have selected. I
5  believe that the panel that I suggested was the panel
6  that made the review of the applications, so that's a
7  yes. Were they a selector, I think that that's
8  probably going to be a no.
9     Q   Were you the selecting official for that
10 particular position?
11    A   No, for two reasons. One, I think I was no
12 longer the managing director; and, two, as a matter of
13 reality, the selection of any SES is going to be the
14 chairman. As I mentioned earlier, the managing
15 director works on a delegation with the chairman's
16 authority, but only on a delegation. And at the level
17 of SES, a chairman will be the determining call.
18    Q   Did you have any input on who was ultimately
19 selected?
20    A   No.
21    Q   Did you tell the panel members for the
22 second panel who they should select or review?

Page 184

1     A   No, I didn't communicate with them on the
2  merits of the panel at all.
3     Q   Did -- did you give your opinion about who
4  should be selected to the chairperson or to any other
5  officer who had input into sel -- selecting?
6     A   No.
7     Q   Are you aware if Ms. Cooke was ranked within
8  the top five for the second panel's selection in the
9  applicant pool?
10       MR. OSWALD: Objection as to form,
11 misleading.
12       THE WITNESS: I -- I'm not sure how
13 many people the panel actually considered at the top.
14 I'm not sure what they went forward with. I did hear
15 at some point that Marjorie was not to be offered an
16 interview, so she was not in their top group, but
17 that's -- that's what I know about it. I was told --
18 I've forgotten who told me that the panel was making
19 a -- a recommendation -- I don't know whether it was a
20 recommendation of one person or five people, but they
21 were making a recommendation -- and that Marjorie was
22 not included in the group that would be interviewed.

Page 185

1  BY MS. MCBARNETTE:
2     Q   Do you find that surprising?
3     A   Yes.
4        MR. OSWALD: Objection as to form,
5  ambiguous.
6        THE WITNESS: Yes, I found that
7  surprising.
8  BY MS. MCBARNETTE:
9     Q   Why?
10    A   I believed out of courtesy -- if nothing
11 else, out of courtesy to an individual that held the
12 office for that long that he or she should be
13 considered and given an opportunity to explain to his
14 or her peers why that individual would have been the
15 best choice. That's just -- I mean, that to me was --
16 that to me would have been common decency if -- if --
17 even if the person were clearly not qualified for the
18 position. By technical background, Marjorie's
19 qualified for the position, so if it had been me, I
20 certainly would have had the interview, so I was
21 surprised.
22    Q   After the selection was made, did you have

# EXHIBIT NO. 20

000895

# SES RATING SHEET
## NTSB #WA-TB-5-009,
## Director,
## Office of Marine Safety

| APPLICANT'S NAME: | Marjorie Murtagh |
|---|---|

| *Executive Core Qualifications* | Rating |
|---|---|
| <u>Leading Change</u>: This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity – to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ (Q) HQ |
| <u>Leading People</u>: This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ (Q) HQ |
| <u>Results Driven</u>: This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ (Q) HQ |
| <u>Business Acumen</u>: This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ (Q) HQ |
| <u>Building Coalitions/Communications</u>: This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ (Q) HQ |

NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs.

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified _____ No further rating required.

Qualified ____✓____ Proceed with the rest of the rating.

000896

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications**<br><br>1.  Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices. | NQ   Q   (HQ) |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ   Q   (HQ) |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications. Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position.  If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration.<br><br>        Not Qualified  _____    No further rating required.<br><br>        Qualified  ___✓___    Proceed with the rest of the rating. |  |
| **Desirable Professional/Technical Qualifications**<br><br>1.  General knowledge and understanding of the National Transportation Safety Board's  (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security. | NQ   Q   (HQ) |
| 2.  Demonstrated command and/or responsibility of or for sea-going operations. | (NQ)   Q   HQ |

| SES Panel Member(s): *[signatures]* | Date: 3-4-05 |
|---|---|

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SESer | FORMER SESer |
|---|---|---|---|---|
|  |  |  |  |  |

# EXHIBIT NO. 21

# SES RATING SHEET
## NTSB #WA-TB-5-009,
## Director,
## Office of Marine Safety

| APPLICANT'S NAME: | Marjorie Murtagh |
|---|---|

| *Executive Core Qualifications* | Rating |
|---|---|
| **Leading Change**: This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity -- to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ   (Q)   HQ |
| **Leading People**: This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ   (Q)   HQ |
| **Results Driven**: This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ   (Q)   HQ |
| **Business Acumen**: This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ   (Q)   HQ |
| **Building Coalitions/Communications**: This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ   (Q)   HQ |
| NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs. | |

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified    _____    No further rating required.

Qualified    ___✓___    Proceed with the rest of the rating.

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications** | |
| **1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.** | NQ    Q    (HQ) |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ    Q    (HQ) |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications. Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position. If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration.<br><br>        Not Qualified    _____    No further rating required.<br><br>        Qualified    \_\_✓\_\_    Proceed with the rest of the rating. | |
| **Desirable Professional/Technical Qualifications**<br><br>1. **General knowledge and understanding of the National Transportation Safety Board's (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.** | NQ    Q    (HQ) |
| 2. **Demonstrated command and/or responsibility of or for sea-going operations.** | (NQ)    Q    HQ |

SES Panel Member(s): *Elaine Bragenstein* ...    Date: 3/28/05

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SESer | FORMER SESer |
|---|---|---|---|---|
| | | | | |

005005

# EXHIBIT NO. 22

Does not meet
PTQ ...

RECEIVED
HUMAN RESOURCES OFFICE

2004 AUG 12  AM 7: 45

11731 Creek View Lane
Conroe, TX 77385
10 August 2004

National Transportation Safety Board
Human Resources Division (MD-30)
490 L'Enfant Plaza, East, S.W.
Washington, D.C. 20594

Attached is my application for the position of Director, Office of Marine Safety (Vacancy Announcement Number: WA-TB-4-033).

If you have questions or need additional information, please call me at 281-877-5790 or email me at jspencer@eagle.org.

Thank you,

John S. Spencer
John S. Spencer

Form Approved
OMB No. 3206-0219

# OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT - OF 612

You may apply for most jobs with a resume, this form, or other written format. If your resume or application does not provide all the information requested on this form and in the job vacancy announcement, you may lose consideration for a job.

| **1** Job title in announcement<br>Director, Office of Marine Safety | | **2** Grade(s) applying for<br>ES-340-00 | | **3** Announcement number<br>WA-TB-4-033 |
|---|---|---|---|---|
| **4** Last name<br>Spencer | First and middle names<br>John  Sherman | | | **5** Social Security Number<br>▇▇▇▇▇▇ |
| **6** Mailing address<br>11731 Creek View Lane | | | | **7** Phone numbers (include area code)<br>Daytime      (281) 877  5790 |
| City<br>Conroe | State<br>TX | ZIP Code<br>77385 – | | Evening      (281) 363  1231 |

## WORK EXPERIENCE

**8** Describe your paid and nonpaid work experience related to the job for which you are applying. Do **not** attach job descriptions.

| Job title (if Federal, include series and grade)<br>1)  Vice President, Technology | | | | |
|---|---|---|---|---|
| From (MM/YY)<br>05/95 | To (MM/YY)<br>present | Salary<br>$175,610 | per<br>year | Hours per week<br>40+ |
| Employer's name and address<br>American Bureau o Shipping<br>16855 Northchase Drive, Houston, TX 77060 | | | | Supervisor's name and phone number<br>James C. Card<br>(281) 877  6440 |

Describe your duties and accomplishments

For the first two years in this position my primary responsibility was to plan, budget, and direct the development of the ABS SafeHull system, and deliver a completed product. The team eventually grew to about 70 engineers, half of whom were regular ABS employees, and the rest were hourly contractors. The budget over this period was about $14 million. The final product consisted of technical criteria for the design of commercial ships, which eventually were incorporated into the ABS Rules, and a complementary computer program that was used by designers, shipyards, and ABS engineering offices worldwide. SafeHull has become a hallmark of ABS, and to a large extent forms the basis of the unified standards now under development by the world's major classification societies.

Since 1997 my responsibilities have been to focus on strategic planning, budgeting, and the routine activities of the Technology Group, reporting to the Senior Vice President of Technology. I drafted the ABS Technology Strategy, which has been in use for several years, and led the development of our long-term plans, which form the basis of our annual planning documents and budget. Technology's departments include Rule Development, Research, Safety & Human Factors, Offshore Technology, Risk & Reliability, Marine Engineering Systems, and SafeHull (structures), and I work with all of them in planning, project monitoring, and resolving technical, personnel, and financial issues. I hire contractors, sign contracts, authorize expenditures, approve travel, review/approve technical papers, chair meetings, and handle other routine matters for Technology. I also mentor and advise department managers and other employees on dealing with people, representing ABS, and professional development.

I have a number of collateral responsibilities such as

- Represent ABS as a member of the U.S. delegations to the IMO Maritime Safety Committee and Marine Environment Protection Committee. In that capacity I have advised on matters such as double hull tankers, bulk carriers safety, and ship and port facility security.
- Represent the U.S. scientific community on the design philosophy committee of the international Ship and Offshore Structures Congress.
- Chair the Papers Committee of the Society of Naval Architects and Marine Engineers (SNAME), and develop the technical program for the Society's annual meetings.
- Prepare and give presentations concerning ABS, Technology, and specific projects, to internal and external customers, and at various fora.

Plan, organize and facilitate at least two meetings annually with our Division Vice Presidents/Directors of Technology and Business Development. They are our main points of contact with external customers around the world. At the meetings we plan the annual Technology development programs, address marketing issues, and develop strategies on improving ABS's business and market share.

A recent accomplishment was attending USCG and IMO meetings on the development of the International Ship and Port Facility Security Code, providing input to the U.S. delegation, and determining related business opportunities for ABS. Within a month of completion of the Code in December 2002, I drafted and ABS published its Guide for Ship Security, which included not only the ISPS Code, but also guidance for conducting security assessments, establishing security levels, and example plans. This was the first such document available to the world shipping community. I also played a leading role in helping ABS to become a Recognized Security Organization, and organizing a new security related business line for ABS.

**2)** Job title (if Federal, include series and grade)
Vice President, Technology and Business Development

| From (MM/YY) 10/90 | To (MM/YY) 05/95 | Salary $130,000 | per year | Hours per week 40+ |
|---|---|---|---|---|

| Employer's name and address ABS Americas 16855 Northchase Drive, Houston, TX 77060 | Supervisor's name and phone number Vincent Roth ( ) |
|---|---|

Describe your duties and accomplishments

This was a new position created as part of the ABS2000 initiative, and so I had some latitude in developing it. The new Americas Division was responsible for about a third of ABS's $150 million worldwide business, and was responsible for ABS operations in the western hemisphere. I was responsible for three major areas:

- As the senior technical person, I was oversaw the quality of engineering plan review, including technical decisions and interpretations of the ABS Rules. I was also responsible for planning and coordinating all Rule development activities in the division, and interfacing with the ABS Corporate office and other divisions on Rule development matters. I also chaired the ABS technical committees in the division, such as the Committee on Naval Architecture, the Committee on Engineering, and the Great Lakes Technical Committee.
- One of the goals of ABS2000 was to make ABS the technology leader among classification societies. My responsibility was to represent ABS technology throughout the division, to maintain contacts with clients, attract new customers, and increase ABS market share. I spent more than half my time on the road, giving presentations to ship owners and ship builders, delivering papers and speeches at various meetings, making contacts and establishing business relationships, and representing ABS at organizations such as SNAME, ASTM, API, USCG, MMS, and other governmental and industry groups. I also developed the marketing portion of the division annual business plan and coordinated client visits with other ABS offices and country managers. I also met periodically with my counterparts in the Europe and Pacific divisions for strategy, planning, and coordination meetings.
- My other major responsibility was serving as the division Management Quality Representative. This was a very exciting and challenging part of the job. In 1990 when I left the USCG, TQM was just gaining a foothold, and I appreciated its value and potential. ABS hadn't yet begun its journey to quality, so my job as MQR really started on the ground floor. Under the guidance of the Corporate Director of Total Quality, I led the division's part in achieving ISO9000 certification for ABS. I helped draft the ABS Mission Statement, Quality Policy, Quality Manual, and oversaw the division's efforts to write procedures for all of our work processes. I also chaired the division Quality Steering Committee, and served on the Corporate Quality Steering Committee. I audited our offices, responded to internal and external audits, supervised corrective action teams, and worked hard to sell the program to skeptics.

One of my most satisfying accomplishments was winning class for ABS on a new series of containerships, which were to be the largest in the world. During a routine client visit I learned that the shipping company was considering some new designs, but was concerned about the technical uncertainties with building something well beyond anyone's experience. They were considering working with our competitor, which had been trying hard to gain a foothold in the U.S. I developed a plan for demonstrating ABS's technology superiority, initiated studies by our Corporate research staff, and made several presentations to the shipping company. We worked the issues together for several months, and ABS was awarded class on the ships.

**3)** Job title (if Federal, include series and grade)
GS-871-12 to GM-871-15

| From (MM/YY) 07/69 | To (MM/YY) 09/90 | Salary $ | per | Hours per week 40+ |
|---|---|---|---|---|

| Employer's name and address Commandant (G-MTH), U.S. Coast Guard Washington, DC 20593 | Supervisor's name and phone number A. E. Henn |
|---|---|

Describe your duties and accomplishments

I will summarize my whole Coast Guard career here. Upon graduation from college in 1969, I was commissioned in the USCG Reserve and spent four years on active duty, doing plan review in the 8th District (mmt) and writing

regulations at Headquarters. I was then hired as a GS-12 naval architect. I took a year's leave of absence to get my Masters at MIT on a SNAME scholarship, was promoted to GS-13 in 1974, and to GM-14 several years later. My work consisted primarily of developing technical policies, conducting casualty analyses, and responding to inquiries from the public. All this was in Merchant Marine Technical.

As the structures expert at USCG HQ, I was deeply involved in developing the relationship between the USCG at ABS, whose Rules the USCG uses for U.S. flag vessels. I helped negotiate and drafted the first MOU between ABS and the USCG in 1981.

Following the loss of the Ocean Ranger in 1982, IMO began a six-year effort to rewrite the MODU Code; I participated on two IMO subcommittees during this process, providing guidance to the U.S. position on structures, stability, and heliports. I also led the U.S. effort at IMO to provide alternative dynamic based stability standards in the MODU Code.

Starting around 1980 I regularly represented the USCG and promoted its safety programs at various governmental and non-governmental committees and symposia. I was active on the Ship Structure Committee, eventually becoming chairman of its subcommittee in the late 1980s. I also served as general chairman of the joint SNAME/SSC Ship Structure Symposium in 1985 and was on the steering committee of other symposia, such as OMAE and ISOPE. I was also on the editorial board of two international technical journals.

From 1983 to 1986 I was chief of the Structures & Load Line Section of the Naval Architecture Branch, where I supervised three naval architects. From 1986 to 1987 I was Technical Advisor to the chief of G-MTH, where I coordinated activities of the division's branches, and was the point of contact for the entire G-M research program. In 1987 I was promoted to GM-15, supervisory naval architect and Chief of the Naval Architecture Branch.

I led activities between 1987 and 1990 that have had a significant and lasting impact on ship safety. The first was providing technical support to the Coast Guard's initiative at IMO to develop international regulations for subdivision of cargo ships, which until then were not required to meet any standard. My branch conducted studies and wrote the regulations that were intended to apply to all ships calling in U.S. ports, which was largely intended to convince IMO to develop international standards. We had a very tight schedule, and four of us put in 60 hour weeks for over a year. We made the deadline and presented a compelling case that resulted in the approval of new international requirements.

Another project has improved the survivability of passenger ships after damage. The old regulations dated back nearly to the Titanic, and were generally sufficient for ocean liners. However, when cruise shipping became a major industry, the hull form changed, with the result that the ships were much more susceptible to capsizing after damage. I led the technical effort and was the main advocate at IMO to introduce the concept of residual stability for passenger ships. There was a fair amount of resistance from industry because the proposed criteria reduced a ships' payload a little. However, after a couple of unfortunate but timely accidents, IMO agreed with the need, and adopted what became the 1990 amendments to SOLAS.

From 1976 to 1989 I also attended night school at GWU, at first just to improve my job skills and to take advantage of the GI Bill. After a time I realized that with a little more effort I could earn a doctorate, so I did. In 1989 I was selected by the USCG to attend the senior course at the U.S. Naval War College. That program was the most rewarding year of my life, and it changed my outlook on many things. It gave me skills, perspectives, and a maturity that I may never have achieved otherwise.

| 4) | Job title (if Federal, include series and grade) Commissioned Officer, United States Coast Guard Reserve (Ensign to Captain) | | | | |
|---|---|---|---|---|---|
| | From (MM/YY) 06/69 | To (MM/YY) 12/94 | Salary $ | per | Hours per week |
| | Employer's name and address United States Coast Guard | | | | Supervisor's name and phone number Richard F. Healing (202) 314-6058 |

Describe your duties and accomplishments

The final part of my career that I believe has some relevance to the position I am applying for is my 25 years with the Coast Guard Reserve. Commissioned in 1969, I spent four years on active duty. From 1973 to 1994, when I retired as a Captain, I was affiliated with a number of Reserve units, serving as training officer once and executive officer twice, and having collateral duties such as classified material control officer. I also spent a few years in volunteer training units, augmenting the regular USCG in various capacities, particularly marine safety. I also attended several courses at RTC Yorktown during my annual active duty. I have commanded two Reserve Units, CGRU MSD Cove Point, Maryland, where the Reserves took over from the Regulars on week ends; and CGRU HQ Flag Plot, where we largely took over from the Regulars on week ends.

I have had two assignments that concern national security. The first was as a readiness planner for the 5th CG District, and the second was as a duty executive officer at the Secretary of Defense's Crisis Coordination Center (OSD/CCC). As a readiness planner I had three primary activities: drafting and reviewing plans for the 5th District and its units, planning USCG and joint service readiness exercises, and controlling readiness exercises. USCG military

readiness in the early 1980s was largely port security -- protecting civilian facilities of military importance, and protecting essential waterways and waterborne commerce. Although the threat has changed in the past 15 years, I imagine the response is similar, although much more visible today. Readiness planning also involved interaction and coordination with the other branches of the military and civilian authorities and law enforcement agencies, both federal and local.

The assignment at OSD/CCC was the most interesting of my Reserve career. I was assigned shortly after this joint service unit was established. The CCC was staffed almost entirely by Reserve Officers, including two from the USCGR (O-5/O-6). Our initial duties were to formalize the procedures for civilian decision-making regarding military operations. This required working with the JCS and Assistant Secretaries of Defense to identify scenarios, authorities, and actions required; writing down the procedures; and getting everyone's agreement. My job as a duty XO during exercises was to screen all message traffic, route it for action or info to the appropriate OSD component, track its progress, and facilitate successful resolution of issues. I also prepared and led the daily briefing for DOD principals. During some exercises I served as OSD liaison to the JCS Command Center. Besides being very interesting and challenging, this assignment gave me extensive experience and understanding of the organization and workings of the federal government, military CINCs, and the national command authority in situations involving national security. I held a top secret security clearance for this duty. My thesis at the Naval War College was on crisis management.

| 9 | May we contact your current supervisor? | | |
|---|---|---|---|
| | YES ☒   NO ☐ → | If we need to contact your current supervisor before making an offer, we will contact you first. | |

## EDUCATION

| 10 | Mark highest level completed. | Some HS ☐ | HS/GED ☐ | Associate ☐ | Bachelor ☐ | Master ☐ | Doctoral ☒ |
|---|---|---|---|---|---|---|---|

| 11 | Last high school (HS) or GED school. Give the school's name, city, State, ZIP Code (if known), and year diploma or GED received. |
|---|---|
| | Hackley School, Tarrytown, NY 10591, 1965 |

**12** Colleges and universities attended. Do **not** attach a copy of your transcript unless requested.

| Name | | | Total Credits Earned | | Major(s) | Degree (if any) | Year Received |
|---|---|---|---|---|---|---|---|
| | | | Semester | Quarter | | | |
| 1) United States Naval War College | | | | | National Security and Strategic Studies | M.A. | 1991 |
| City<br>Newport | State<br>RI | ZIP Code<br>02841 - | | | | | |
| 2) George Washington University | | | | | Structural Engineering | D.Sc. | 1989 |
| Washington | DC | 20052 - | | | | | |
| 3) Massachusetts Institute of Technology | | | | | Naval Architecture and Marine Engineering | S.M. | 1974 |
| Cambridge | MA | 02139 - | | | | | |
| 4) Webb Institute of Naval Architecture | | | | | Naval Architecture and Marine Engineering | B.S. | 1969 |
| Glen Cove | NY | 11542 - | | | | | |

## OTHER QUALIFICATIONS

| 13 | **Job-related** training courses (give title and year).  **Job-related** skills (other languages, computer software/hardware, tools, machinery, typing speed, etc.  **Job-related** certificates and licenses (current only).  **Job-related** honors, awards, and special accomplishments(publications, memberships in professional/honor societies, leadership activities, public speaking, and performance awards.)  Give dates, but do **not** send documents unless requested. |
|----|---|

American Management Association Course for Presidents and CEOs (4.5 days) 1994
Crosby Management College - Creating the Reliable Organization (formerly QIPM) (3 days) 1992
Institute of Management Studies - Team Dynamics: Improving the Decision Making Process (2 days) 1996

Secretary of Transportation Award for Meritorious Achievement (DOT Silver Medal) - two awards - 1988 & 1990
Commandant's Superior Award for Meritorious Achievement (DOT Bronze Medal) - two awards

Vice President, Society of Naval Architects and Marine Engineers (SNAME)
SNAME Landers Fellow (full scholarship to M.I.T.)

Consistently received Outstanding Performance ratings as a Coast Guard civilian employee.

Chairman, SNAME Papers Committee
Past Chairman, Interagency Ship Structure Subcommittee
Chairman, several Ship Structure Committee project technical committees
USCG/ABS representative on numerous industry panels and committees
Author and presenter for over 30 technical papers at U.S. and foreign symposia
Chairman, Ship Structure Symposium 1985

## GENERAL

| 14 | Are you a U.S. citizen? | YES ☒ | NO ☐ | ➡ | Give the country of your citizenship. | | | | |
|----|---|---|---|---|---|---|---|---|---|
| 15 | Do you claim veterans' preference? | NO ☐ | YES ☒ | ➡ | Mark your claim of 5 or 10 points below. | | | | |
| | **5 points** ☒ ➡ Attach your DD 214 or other proof. | | **10 points** ☐ ➡ | Attach an *Application for 10-Point Veterans' Preference* (SF 15) and proof required. | | | | | |
| 16 | Were you ever a Federal civilian employee? | | | | | Series | Grade | From (MM/YY) | To (MM/YY) |
| | | NO ☐ | YES ☒ ➡ | For highest civilian grade give: | | 871 | 15 | 1987 | 09 1990 |
| 17 | Are you eligible for reinstatement based on career or career-conditional Federal status? | | | | | | | | |
| | | NO ☐ | YES ☒ ➡ | If requested, attach SF 50 proof | | | | | |

## APPLICANT CERTIFICATION

| 18 | I certify that, to the best of my knowledge and belief, all of the information on and attached to this application is true, correct, complete and made in good faith.  I understand that false or fraudulent information on or attached to this application may be grounds for not hiring me or firing me after I begin work, and may be punishable by fine or imprisonment.  **I understand** that any information I give may be investigated. |
|----|---|

_John S Spencer_                                     _8/10/2004_
SIGNATURE                                             DATE SIGNED

For the ECQs, I have not repeated the text of the key characteristics. However, in order to make my response easier to follow, I have organized my response according to the six key characteristics that address each ECQ.

## ECQ-1. LEADING CHANGE

a. As the first Management Quality Representative for the ABS Americas Division (about 500 persons), I led the transition of the Division to an ISO 9000 certified company. This involved chairing the division steering committee, overseeing development and implementation of quality procedures, supervising training, and conducting and following through on audits. This process took over two years. As Vice President for Technology and Business Development I also formulated and led the division's program to implement the CEO's vision of transforming ABS from a reactive, survey based company to a proactive, technology and customer service oriented company.

b. As a member of the executive team formulating and establishing the CEO's "ABS2000" vision, I played a major role in defining the company's Mission, strategic objectives, quality policy (all of which have withstood the test of time), and subsequent annual business plans. As one of the first members of the Secretary of Defense Crisis Coordination Center, I played a major role in developing the policies and operational procedures that helped make the facility successful.

c. My 17 years as a civilian at USCG Headquarters and my 25 years as a Coast Guard Reserve officer have given me experience and insight into the workings of the U.S. government. My year at the Naval War College, four years assigned to the OSD Crisis Coordination Center, and four years as a Coast Guard readiness planner have given me a broad perspective on U.S. national security objectives and policies. Since 1990 I have maintained my interest in national security issues by reading and following current events.

d. Almost everything in life undergoes change, and decisions are almost always made with incomplete information, especially if timeliness is important. The annual plan that we create for ABS Technology leaves space for the 20 percent of our time that is always taken by unplanned events. We prepare for changing priorities and for the unexpected by considering alternative strategies based on different scenarios. We place a high value on planning, and we modify our plans as necessary to achieve our overall goals as circumstances change. As a result, our highest priority objectives are almost always achieved in the desired time frame.

e. The path my life has taken has been influenced by my decisions to pursue an opportunity even though the eventual outcome may have been uncertain. That included my choice of college, joining the military, going to graduate school, getting married, and leaving a secure government job to work in the private sector. My greatest contribution to society has been and is in marine safety, and at this point in my career I believe I can best serve that objective at NTSB.

f. Most of my work involves managing many projects simultaneously, meeting deadlines, conducting negotiations, traveling, responding to changing priorities, and meeting new demands. The main way I cope with this is by keeping everyone appropriately informed, managing expectations, and not making unrealistic commitments. It is also important to keep a positive outlook, and have a life outside of the job.

## ECQ-2. LEADING PEOPLE

a. Even with over 60 engineers on the Technology staff, the initiation and assignment of new projects depend to a large degree on the available resources and skill sets. Whether the project is an individual or team effort, I gather potential participants at the start to define the objectives, scope, deliverables, and time line. There is often a good discussion so that everyone has the same understanding of the tasks and goals. If the project involves several people, the team develops a plan consistent with our original intentions. Once agreed, this plan is an informal contract between management and the team – we get together periodically to ensure the work is on track and to address potential problems. My role is to advise and to provide resources or decisions the team cannot obtain on their own.

b. ABS has struggled for many years to find a suitable performance management system, and the system presently used is still not as good as the ones I used in the Coast Guard to supervise military and civilian employees. However, I augment the ABS system with individual feedback, often associated with specific projects, plus an intermediate reviews. I believe in being honest, straightforward, and not threatening when dealing with employees, and I give them the same respect I expect of them.

c. Cultural diversity is a strength of ABS. In Technology, over half our engineers are European or Asian. My greatest challenge sometimes is communicating in English. I find that this diversity produces different approaches to solving problems, and sensitivity to culture helps us avoid misunderstandings based on stereotypes or assumptions about each other. This diversity exists at all grade levels in Technology.

d. Our evaluation system has a training component, and everyone on the staff is encouraged to take at least one course per year. Some courses are technical, but many relate to improving performance or learning management or supervisory skills. We have identified potential future leaders in the group, and give them work assignments, opportunities, and challenges specifically intended to develop their potential.

e. In the Technology group everyone has to work together at one time or another. We conduct all hands meetings twice a year and informal lunches or gatherings more often. Communication is open. If there is a situation that could lead to a problem, it is usually identified and addressed before it becomes serious. I am honored that hardly a day goes by that someone doesn't stop by my office to seek my advice or opinion on something related to interacting with others.

f. Most problems stem from misunderstandings, and so honesty, integrity, and mutual respect are qualities that must be nurtured and encouraged. As an executive I must be seen as fair, knowledgeable, and unbiased. I address conflicts and potential conflicts as soon as I am aware of them, and they generally require different approaches depending on their nature and severity, and the people involved. Sometimes humor is useful. Tact is always useful. If I believe that an individual cannot fit into the organization, I work them to help them realize it themselves, and I try to help them find something else where they can be successful.

## ECQ-3. RESULTS DRIVEN

a. The two largest projects I have directed were the cargo ship subdivision regulatory project, in support of Admiral Kimes's initiative at IMO (1987-1989), and the SafeHull project at ABS (1995-1998). The latter project consisted of 150 man-years of effort and a $14 million budget. Both projects succeeded through careful planning, clear goals, and well-defined milestones and timelines. I also maintained management support through regular reporting, demonstrations of progress, and well-justified requests for resources.

b. In 2002 I drafted the ABS Technology Strategy and led development of ABS's first long-term (5 years) Technology plan. The Strategy is still current, and the long-term plan is updated periodically. It forms the basis of our annual Technology project plan (50 to 100 projects) and annual budget ($14 million). We have been successful each of the past three years in accomplishing all of our major objectives.

c. Although not-for-profit, ABS does not receive any financial support other than the revenue earned through providing commercial services. As Vice President of Technology and Business Development for the ABS Americas division, I was responsible for coordinating marketing and customer feedback. The majority of my time was spent visiting customers and developing strategies and plans to develop and deliver new products to meet their needs. Since becoming corporate Vice President for Technology, I have been responsible for developing and delivering the technology oriented products and services of ABS. ABS and ABS Americas have enjoyed steady growth while I was in those positions.

d. One of the key elements in the ABS Quality System is the Corrective Action System and continuous improvement process. I have led a number of Corrective Action Teams to investigate our processes, identify root causes to problems, and propose improvements and solutions. I developed the system presently used in Technology to prioritize projects to determine which ones would be undertaken. As a readiness planner in the Coast Guard Reserve, I designed and was the lead controller for readiness exercises throughout the Fifth Coast Guard District.

e. Planning and obtaining resources only helps get things started. Successful completion of projects requires meaningful and well-defined goals, milestones, schedules, and continual monitoring of progress. I have participated on and led many projects and team efforts in my career. As an executive, I have trained others to do so, and now mostly maintain an overview of other people's work, getting involved only when necessary to provide leadership and assistance beyond the capabilities of the team. One of my main responsibilities is assuring that the product delivered is what the customer expects.

f. I believe I was hired by ABS specifically for my skills in recognizing opportunities and improving the quality and value of services. In my last several years with the USCG, and in 14 years with ABS, I have worked continuously to promote the organization, our products and services, and the values we represent. Through honesty and integrity, I have made skeptics into believers, and made many friends along the way. I believe in personal commitments and value long-term success over short-term gain.

### ECQ-4. BUSINESS ACUMEN

My 14 years in the private sector have given me rigorous training and experience in managing business. I have played a major role in the overall development of the ABS business, and have had an executive role in directing the technical development aspect of ABS's business.

a. When placed in charge of SafeHull, ABS's largest strategic project ever, I was tasked with planning, developing, a delivering the most sophisticated commercial ship structural design criteria and program in the world. The effort grew to over 70 full time engineers plus outside contracts and lasted for more than two years. The project was a success. Since then I have played an executive role in planning, budgeting, and managing ABS's technology program, which has a staff of 65, a budget of $14 million, and completes over 50 projects a year.

b. As Vice President of Technology for several years I was responsible for monitoring Technology's budget (approximately $1 million per month), explaining variances between budget and actual expenditures, making adjustments necessary to maintain budget, and writing periodic reports. I reviewed all financial reports in detail, and identified many areas where savings could be realized. I am also responsible for authorizing travel, approving expense reports, and approving invoices to be paid for ABS Technology.

c. I believe that a business plan should drive a budget and not vice versa. At ABS, working with others, I develop an annual business plan based on company needs and priorities, and propose a budget based on that plan. Both have to be realistic, taking into account prior years' budgets and expenditures, program and financial goals, and direction from top management. I also have to be able to convince management to support the plan. Adjustments are made as the overall company budget is settled, and additional adjustments are made based on actual expenses and changes in program priorities.

d. As a GM-15 branch chief at USCG Headquarters, and chairman of the interagency Ship Structure Subcommittee, I was moderately involved in the government contracting business. Contracting in the private sector is much simpler; however, I transferred some of what I learned into the way ABS Technology manages its contracts in order to improve overall accountability and record keeping. In my present capacity I approve (sign) contracts for technical services and products, and approve subsequent invoices for payment. Our contracting work is audited by the ABS financial group and outside auditors.

e. In ABS Technology, logistics are relatively minor. We arrange and coordinate worldwide training, either through delivering the training overseas, or by arranging training in Houston and coordinating student attendance. There is some activity with respect to visas and other authorizations for international travel and students. We also arrange for temporary assignments of staff, between ABS Houston and worldwide offices, and for foreign shipyard engineers to make extended visits to ABS Houston. Other logistics, including delivering marketing materials, attending trade shows, and getting supplies are routine aspects of doing business.

f. ABS is a technology driven company, and Corporate Technology provides the technology. Our engineers develop state of the art programs for design and assessment of ship structures, machinery, and systems. We develop and maintain databases to identify trends in ship performance and safety, and we maintain all of our documents electronically. ABS Rules and Guides are web based, and we now offer web based analysis programs to our customers. We have established electronic meeting rooms to coordinate our worldwide activities in standards development and business development. As engineers, we all like technology -- however, I had had to encourage people not to let technology get in the way of human contact and communication.

## ECQ-5. BUILDING COALITIONS/COMMUNICATION

a. I have written, presented, and published over 40 papers of technical or policy nature, and have given countless presentations to groups of various sizes and dispositions. Sometimes the presentations are formal PowerPoint style, and sometimes the talks are informal and extemporaneous. Most presentations have some sort of business objectives, and they are often followed by discussions or question and answer sessions where clear responses and tactful delivery are required. Many of the presentations have been to foreign audiences.

b. During a senior management training course, the business psychologist observing an exercise remarked that I networked more than most people. I find that keeping people informed and in the loop, and valuing their contributions, makes for a strong team and successful results. I also believe in giving credit and recognition to others. I am not reluctant to ask for help if needed, or bring up problems with the boss, but I try to avoid pestering management with constant updates of little significance. My participation in military exercises on the OSD staff and leadership of projects for the USCG and ABS have taught me the importance of accurate and timely communication both up and down the line.

c. In the 1980s I represented the USCG on a multi-year effort with the American Petroleum Institute to develop a recommended industry practice for tension leg platforms. I succeeded in convincing the industry to adopt a maritime safety approach to these floating structures. Some years after the code was completed, an executive from Shell told me that I showed them the value of having the government as a partner in developing standards for new concepts. I also was the primary author and negotiator of the first MOU between ABS and the USCG in 1981, and authored a subsequent MOU between the parties in 1995, establishing the Alternative Compliance Program, but this time sitting on the opposite side of the table. I have also led and participated in several other multiparty development efforts at IMO, industry standards and research groups, and interagency groups such as the Ship Structure Committee.

d. I prefer team efforts to individual projects, because the results are usually better. There is a synergy in groups that arises from diversity of thought and a desire to be a contributing team member. Much of what I do at ABS is a team activity, and I am often the team leader. I view my involvement with IMO working groups and industry associations as team efforts. The duty section I served with in the OSD Crisis Center was a team, although rather than produce our own product, we served as facilitators for timely and appropriate coordination and communication between JCS and the national civilian command authority.

e. People who feel respected and valued are motivated to do their best. This is generally easy to achieve in a one-on-one situation. However, in groups, a person may feel misunderstood or unappreciated if other members tend to dominate the action. As a team player or leader I try to observe the group dynamics and direct the activity so everyone stays involved. When working in a group, I treat everyone equally and do not tolerate any inappropriate behavior, even in jest. If I find it necessary to admonish or correct someone, I will do so quickly, but I am mindful if it should be done in private, so as not to embarrass anyone in the group.

f. People tell me that I am a good writer. As a young Ensign on an integration board, the Captain said I had written the only narrative he had ever seen that he couldn't improve upon. In the 1970s I was usually the person who put together and edited the reports the branch wrote, including extensive casualty analyses and a report to the President on ship maneuvering. My positions in the USCG and industry have required extensive writing, sometimes on very technical matters and sometimes on fine points of policy, where complex issues must be precisely explained. I still write letters to customers, summaries and forewords of reports, and presentations to (and for) senior executives. Writing doesn't necessarily come easy, but I always try to do it well.

**MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION 1: Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.**

My entire 35 year professional career has been with two organizations whose missions include a strong focus on maritime safety: 21 years with the Marine Safety, Security, and Environmental Protection program of the U.S. Coast Guard, and 14 years with the American Bureau of Shipping, a leading international ship classification society. Without repeating too much of the career narrative contained in the "Work Experience" portion of my application, I would like to summarize some of my experience that I believe is relevant to this position.

a. <u>Education</u>: Bachelors and Masters in Naval Architecture & Marine Engineering; Masters thesis addressed short term and long term loading correlation on ships. Doctorate in Structural Engineering; dissertation on effect of inspections on structural reliability of offshore platforms.

b. <u>College work experience</u>: 2 months as outside machinist at Avondale Shipyard. 3 months seagoing experience as cadet aboard cargo and passenger ships for MooreMcCormack Lines and Grace Line.

c. <u>Ship plan review</u>: 2.5 years conducting plan approval of U.S. flag ships and boats to USCG regulations and ABS Rules, primarily structures, arrangements, structural fire protection, intact stability, and damage stability. Supervised 50 stability tests. Developed approval criteria for new vessel types such as crane barges, high speed aluminum crewboats, and pontoon boats.

d. <u>Casualty investigation</u>: Capsizing of uninspected Arkansas cable barge ferry and determination of appropriate loading criteria. Sinking of small passenger vessel *Captain Crunch* and associated examination and report of wood boats in service in South Florida. Brittle fracture of tank barge B-105.

e. <u>Casualty analysis</u>: Led first thorough USCG technical analysis of a ship lost without trace, *SS Poet* (1980). Included wave hindcast analysis based on projected route and weather, assessment of stability, structural analysis based on condition at last inspection. Led and participated in numerous studies of ship casualties since then, including most recently loading and material studies of *MV Castor* (2000) and *MV Prestige*.(2002).

f. <u>Technical support</u>: Conducted analyses and drafted reports for Commandant's action on USCG Marine Boards of Investigation and NTSB recommendations for numerous marine casualties, including *IOS 3301*, *Edmund Fitzgerald*, *Chester Poling*, *Ocean Ranger*, *Marine Electric*, and *Glomar Java Sea*.

g. <u>Standards development</u>: Developed structural criteria for Gulf of Mexico crewboats in 1980, which is still in use today. Initiated and led work at IMO that resulted in 1990 SOLAS amendments on residual stability of passenger ships.

h. <u>Analytical tools</u>: Directed development and use of latest analytical tools for structural analysis, nonlinear ship motions and loads, LNG sloshing, etc.

i. <u>Vessel inspection</u>: Qualified as USCG marine inspector.

**MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION 2:** Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.

a. Drafted and interpreted USCG & IMO regulations: As staff naval architect, Chief, Structures & Load Lines Section, and Chief, Naval Architecture Branch, drafted regulations, NVICs, IMO position papers, responses to appeals. Supervised regulatory initiative for domestic and international requirements for dry cargo ship subdivision and supported associated IMO activities.

b. Authored technical papers and reports: Drafted parts and did final edit of USCG report to the President on Vessel Maneuverability. Authored for publication and presented over 30 papers for various domestic and international fora, primarily relating to marine safety, vessel design, ship and offshore structures, and ship intact and damage stability. Most papers were to promote current USCG and ABS initiatives and support policy and business objectives. Authored ABS *Guide for Vessel Security*.

c. Developed research programs: Identified need, planned projects, budgeted, and directed external and internal projects to address technical issues and develop new standards. Responsibility steadily increased from a few projects in the 1980s to more than 50 by 2000, with a corresponding overall responsibility for 55 engineers and $14M annual budget. Major research areas include ship & offshore structures, marine engineering, risk & reliability, safety assessment, human factors, hydrodynamics, and performance monitoring. Chaired interagency Ship Structure Subcommittee.

d. Represented U.S. at IMO: Served as advisor to U.S. delegation at over 50 IMO meetings, including Subcommittee on Design and Equipment, Flag State Implementation, Maritime Safety Committee, and Marine Environment Protection Committee. Served as chief U.S. representative to Subcommittee on Stability, Load Lines and Fishing Vessels Safety. Chaired IMO working group on development of IMO Code on Intact Stability. Main topics of responsibility included passenger vessel safety, MODU Code, bulk carrier safety, cargo ship stability, tanker pollution prevention, ISM, and ship and port facility security.

e. Represented USCG & ABS on government & industry committees: Served as USCG member on API committee that wrote 3 industry recommended practices, on ABS MODU committee, ASTM F-25, ISO TC8, ISSC, and several SNAME committees. As VP of ABS, chaired ABS Committee on Naval Architecture, Committee on Engineering, and Committee on MODUs. Served on or chaired several symposia steering committees (OMAE, ISOPE, SSC, PRADS). Member of Editorial Board of technical journals (*Marine Technology*, *Marine Structures*). Wrote article on ship structural design for 2001 *McGraw-Hill Yearbook of Science & Technology*. Chairman of SNAME Papers Committee for annual meeting and *Transactions*. Served as VP of SNAME for Central U.S.

**DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATION 1: General knowledge and understanding of the NTSB's operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.**

a.  From 1972 to 1990 I worked in the Marine Technical and Hazardous Materials Division at USCG Headquarters. About 15 percent of my time was spent on conducting and reviewing casualty analyses and reports, and responding to NTSB recommendations. As I advanced in my career, my level of involvement and responsibilities increased to the point that the Commandant's actions that I drafted were generally accepted without modification and became the basis of subsequent domestic rulemaking and international safety initiatives. I have attended and participated in numerous investigations and hearings, and have extensive firsthand knowledge of the organization and workings of the Coast Guard, DOT, and NTSB. I have maintained a good working relationship with the USCG since joining ABS in 1990, including regular visits to USCG Headquarters and participation at IMO meetings.

b.  I have been deeply involved with maritime security issues since 2001, including participation in all of the IMO Maritime Safety Committee and Ship and Port Facility Security Working Group meetings relating to the International Ship and Port Facility Security Code. Following adoption of the ISPS Code in December 2002, I authored the ABS *Guide for Ship Security*, which was the first publication of the Code. It also contained the current Coast Guard requirements on ship security, as well as guidance on and examples of security assessments and security plans. I was a key player in ABS's recognition by several governments as a Recognized Security Organization and the establishment of ABS's RSO team.

c.  During my career as a Coast Guard Reserve Officer I have held assignments relating to port and vessel security and national security. I spent 5 years as a readiness planner in Portsmouth, VA, writing and reviewing emergency plans, and planning and supervising readiness exercises for the navigable waterways in the 5th Coast Guard District. I also spent 4 years in the Pentagon in a joint service assignment with the Secretary of Defense's Crisis Coordination Center, working on national security issues. I was also Commanding Officer of the USCG HQ Flag Plot unit.

**DESIRABLE TECHNICAL/PROFESSIONAL QUALIFICATION 2: Demonstrated command and/or responsibility of or for sea-going operations.**

a. Following 4 years active duty in Merchant Marine Technical, I spent 21 years in various assignments as a Coast Guard Reserve officer. I was Training Officer and Executive Officer of two small boat units in Washington DC, Executive Officer of the Marine Safety Reserve Unit in Norfolk, and Commanding Officer of the Cove Point, MD, LNG facility reserve unit.

87.
...ice of Personnel Management
...rker 296

| | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| ...e (Last, First, Middle)<br>...PENCER, JOHN S     19171 | | [redacted] | [redacted] | 09-30-90 |

| ...ST ACTION | | SECOND ACTION | |
|---|---|---|---|

| ...ode | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 17 | RESIGNATION | | |
| ...ode | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| ...PM | REG 715.202 | | |
| ...ode | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| ...ROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| SUPVY NAVAL ARCHITECT (STABILITY)<br>PD NO=570849PE    BU NO=1E08<br>RQ=986070500    CST CNTR=70420 | |

| ...y Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M | 0871 | 15 | 00 | $72,332 | PA | | | | | | |

Name and Location of Position's Organization
...EADQUARTERS
...FF OF MARINE SAFETY,SEC & ENVIR PROT
...ARINE TECH & HAZARDOUS MATERIALS DIV
...AVAL ARCHITECTURE BRANCH

22. Name and Location of Position's Organization

...MPLOYEE DATA

...Veterans Preference
1—None    3—10 Pt. Disab.    5—10 Pt. Other
2—5 Pt.    4—10 Pt. Comp.    6—10 Pt./30% Comp.

24. Tenure   1    0—None    2—Conditional    1—Permanent    3—Indefinite

25. Agency Use

26. Veterans Preference for RIF   [X] YES   [ ] NO

...REGU   WAIVED LIFE INSURANCE

28. Annuitant Indicator   9    1—Reempl. Ann-CS    5—RETM & CS    2—RETM    4—RETO & CS    9—Not Applicable    2—RETO

29. Pay Rate Determinant

...Retirement Plan   CS

31. Service Comp. Date (Leave)   09-02-69

32. Work Schedule   F    F—Full-time    I—Intermittent    J—INT Seasonal    P—Part-time    G—FT Seasonal    H—FT On Call    O—PT Seasonal    R—PT On Call

33. Part-Time Hours Per Biweekly Pay Period

...OSITION DATA

...Position Occupied
1—Competitive Service    3—SES General
2—Excepted Service    4—SES Career Reserved

35. FLSA Category   E    E—Exempt    N—Nonexempt

36. Appropriation Code   SEE REMARKS BELOW

37. Bargaining Unit Status   8888

Duty Station Code
11-0010-001

39. Duty Station (City—County—State or Overseas Location)   WASHINGTON, DISTRICT OF COLUMBIA

| Agency Data<br>P PROG=00 | 41.<br>SUPV CSC=1 | 42.<br>POSTYPE=1 | 43. | 44.<br>POSITION SENSITIVITY = SN |
|---|---|---|---|---|

Remarks
PPROP = 101.299/080/00    /98 70420 /1111
WD ADDRES = 8052 COUNSELOR ROAD, MANASSAS, VA, 22111    REASON SEP =
...ROMOTION AND CAREER OPPORTUNITIES OUTSIDE THE GOVERNMENT
...EALTH BENEFITS COVERAGE IS EXTD FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO
CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONT)
...UMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE

...Employing Department or Agency
...DEPARTMENT OF TRANSPORTATION/USCG

50. Signature/Authentication and Title of Approving Official
*[signature]* Cynthia N. Combs
CHF, R&PP SEC, HQ CV PRS BR

| ...Agency Code<br>TD-02 | 48. Personnel Office ID<br>2783 | 49. Approval Date<br>09-24-90 |
|---|---|---|

**THIS IS AN IMPORTANT RECORD**
**SAFEGUARD IT.**

| | | | | |
|---|---|---|---|---|
| 1. LAST NAME-FIRST NAME-MIDDLE NAME | | 2. SERVICE NUMBER 51696 | | 3. SOCIAL SECURITY NUMBER |

**PERSONAL DATA**

1. LAST NAME-FIRST NAME-MIDDLE NAME
SPENCER, John Sherman

4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS
TRANSPORTATION-USCGR

| 5a. GRADE, RATE OR RANK | b. PAY GRADE | 6. DATE OF RANK | | |
|---|---|---|---|---|
| LTJG | O-2 | DAY 29 | MONTH JUL | YEAR 1970 |

7. U.S. CITIZEN — [X] YES  [ ] NO

8. PLACE OF BIRTH (City and State or Country)
Schenectady, New York

| 9 DATE OF BIRTH | | |
|---|---|---|
| DAY | MONTH | YEAR |

**SELECTIVE SERVICE DATA**

10a. SELECTIVE SERVICE NUMBER
Unknown

b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE
#2, Balboa, Canal Zone

c. DATE INDUCTED

| DAY | MONTH | YEAR |
|---|---|---|
| | | Not Applicable |

**TRANSFER OR DISCHARGE DATA**

11a. TYPE OF TRANSFER OR DISCHARGE
Release From Active Military Service

b. STATION OR INSTALLATION AT WHICH EFFECTED
USCG Headquarters, Washington, D.C.

c. REASON AND AUTHORITY
Expiration of Active Duty Commitment - (see Remarks)
Voluntarily Serving on Active Duty

| c. EFFECTIVE DATE | | |
|---|---|---|
| DAY 03 | MONTH JUL | YEAR 1973 |

12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND
USCG Headquarters, Washington, D.C.

13a. CHARACTER OF SERVICE
HONORABLE

b. TYPE OF CERTIFICATE ISSUED
see remarks

14. DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED
Commander(r), 1st Coast Guard District, Boston, Massachusetts

15. REENLISTMENT CODE
Not Applicable

| 16. TERMINAL DATE OF RESERVE/ UMT&S OBLIGATION | | | 17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION | 18. TERM OF SERVICE (Years) | c. DATE OF ENTRY | | |
|---|---|---|---|---|---|---|---|
| DAY 19 | MONTH JUN | YEAR 1975 | a. SOURCE OF ENTRY: [ ] ENLISTED (First Enlistment) [ ] ENLISTED (Prior Service) [ ] REENLISTED [X] OTHER Called to active duty | (03) | DAY 04 | MONTH JUL | YEAR 1969 |

18. PRIOR REGULAR ENLISTMENTS
None

19. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC
ENS (O-1)

20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State)
Falmouth, Massachusetts

**SERVICE DATA**

21. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County, State and ZIP Code)
P.O. Box 696, Falmouth,
(BARNSTABLE), Massachusetts 02541

| 22. STATEMENT OF SERVICE | YEARS | MONTHS | DAYS |
|---|---|---|---|
| a. (1) NET SERVICE THIS PERIOD | 04 | 00 | 00 |
| CREDITABLE FOR BASIC PAY PURPOSES (2) OTHER SERVICE | 00 | 00 | 14 |
| (3) TOTAL (Line 1 plus Line 2) | 04 | 00 | 14 |
| b. TOTAL ACTIVE SERVICE | 04 | 00 | 00 |
| c. FOREIGN AND/OR SEA SERVICE | 00 | 00 | 00 |

23a. SPECIALTY NUMBER & TITLE
462000 00

b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER
Not Applicable

24. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED
National Defense Service Medal

25. EDUCATION AND TRAINING COMPLETED
None

**VA AND EMP. SERVICE DATA**

26a. NON-PAY PERIODS TIME LOST (Preceding Two Years)
TL:   None
EXLV: None

b. DAYS ACCRUED LEAVE PAID
-15-

28 VA CLAIM NUMBER
c. None

27a. INSURANCE IN FORCE (NSLI or USGLI)
[ ] YES  [X] NO

b. AMOUNT OF ALLOTMENT
NA

29. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE
[X] $15,000  [ ] $10,000  [ ] $5,000  [ ] NONE

c. MONTH ALLOTMENT DISCONTINUED
NA

**REMARKS**

30. REMARKS
Block 11c cont:  Authority - COMDT(G-PO-2) OTO dtd 31 May 1973 - 611
Block 13b cont:  No certificate issued at time of release from active duty.
College - 4 years

**AUTHENTICATION**

31. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County, State and ZIP Code)
6435 Beechwood Ave, Sarasota,
(SARASOTA), Florida 33581

32. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED
*John Sherman Spencer*
JOHN SHERMAN SPENCER

33. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER
E. S. WHITAKER, CWO3, USCG
CHMILPERSACTBR

34. SIGNATURE OF OFFICER AUTHORIZED TO SIGN
*E. S. Whitaker*

PREVIOUS EDITION OF THIS FORM IS TO BE USED.

ARMED FORCES OF THE UNITED STATES
REPORT OF TRANSFER OR DISCHARGE

DD FORM 214N
1 JULY 70

S/N 0102-002-0201

006088

For further information about

1.    My work at ABS, please contact
      VADM James C. Card, USCG (Ret.)
      Senior Vice President, American Bureau of Shipping
      16855 Northchase Drive
      Houston, TX 77060
      Tel: 281-877-6440

2.    My work at IMO, please contact
      Mr. Tom Allan
      Chairman of the IMO Maritime Safety Committee
      Director, Maritime & Coastguard Agency
      Spring Place 105 Commercial Road
      Southampton SO15 1EG England
      44 23 8032 9110

3.    Personal reference, please contact
      VADM William F. Rea, USCG (Ret.)
      1600 South Joyce St. #720
      Arlington, VA 22202
      703-521-3878

Other references available on request.



FOUNDED 1862

10 August 2004

National Transportation Safety Board
490 L'Enfant Plaza East, SW
Washington, D.C. 20594

The attached form is my most recent evaluation for J. S. Spencer. The period covered is from 1 May 2003 to 30 April 2004. I want to add a few words of explanation to it, because you may not be familiar with the ABS evaluation system. The ABS evaluation process is relatively new and is still undergoing development. It is nowhere as comprehensive or useful as the systems I was familiar with in my many years with the Coast Guard. Please know that the method of scoring and the relatively succinct comments on the attached form are intended to reflect outstanding performance.

A score of "3" on an item is the expected level of performance. A "4" is well above average, and a "5" is exceptional. I evaluated 12 managers/executives this year, and Dr. Spencer received the highest total score.

I would be happy to discuss this evaluation or anything else about Dr. Spencer to support his job application with the National Transportation Safety Board. I am familiar with the position he is applying for, and I believe he is an outstanding candidate for it.

Sincerely,

James C. Card, VADM USCG (Ret.)
Senior Vice President

006090

## Competence Evaluation Details

## Bureau Competencies

### A. Integrity
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors
- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 5**
Comments: A most trusted member of the ABS leadership team. He continues to model the behavior desired from a senior executive. Very considerate of all in Technology. Many trust him with sensitive issues.

### B. Teamwork and Teamwork and Cooperation
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors
- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 4**
Comments: A team builder. He includes all who need to be involved in deciding an issue. Is the "go to" person for many in Technology who need advice on technical issues. Will expend extra effort researching a topic to help an engineer solve a problem.

### C. Customer Focus
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors
- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 5**
Comments: Well known by the marine industry. They call frequently because they trust his technical guidance. Quickly acts on requests from ABS engineers and vice presidents/directors of Technology and business Development. The visit he coordinated for Oshima shipyard engineering leaders was excellent.

## D. Adaptability, Innovation & Change
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors
- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 4**
Comments: A creative thinker. He is always looking for new opportunities to develop technical products and solve organizational issues. Easily modified plans for Technology reorganization when CEO directed other options.

## E. Leading & Managing Others
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors
- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 4**
Comments: As the second in "command" of Technology he is responsible for overseeing all our product development efforts and in specifically guiding our R&D and Rule Development programs. 2003 was the most productive year for Technology in large measure because of his leadership.

## F. Results Orientation
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors
- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 4**
Comments: Focused on delivering quality products, he always adds value to others' efforts. His own projects and technical papers are of the highest quality. Best writer in Technology and probably all of ABS.

## G. Goal Achievement
Performance
- 1 - Meets few behaviors
- 2 - Meets some behaviors
- 3 - Meets most behaviors

- 4 - Meets all behaviors
- 5 - Exceeds all behaviors

**Score 4**

Comments: Completed most objectives assigned in last year's CGDP as well as many other projects.

**Overall Competence Information**
**Total Score 30**

Comments: Jack Spencer a stalwart in ABS Technology. His low profile sometimes has people think he is not busy or productive. Not true. Much of what was accomplished this past year has his fingerprints on it. A great person to have on our team.

# EXHIBIT NO. 23

# SES RATING SHEET
## NTSB #WA-TB-5-009,
### Director,
### Office of Marine Safety

| APPLICANT'S NAME: | John Spencer |
|---|---|

| Executive Core Qualifications | Rating |
|---|---|
| **Leading Change:** This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity -- to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ    Q    HQ |
| **Leading People:** This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ    Q    HQ |
| **Results Driven:** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ    Q    HQ |
| **Business Acumen:** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ    Q    HQ |
| **Building Coalitions/Communications:** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ    Q    HQ |

NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs.

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

Not Qualified   _____    No further rating required.

Qualified    ✓    Proceed with the rest of the rating.

005007

2

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications** | |
| **1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.** | NQ   Q   (HQ) |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ   Q   (HQ) |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications.  Applicants must rated "Qualified" on both of the Mandatory Professional/Technical Qualifications in order to be considered basically qualified for this position.  If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration. <br><br> Not Qualified _____  No further rating required. <br><br> Qualified ___✓___  Proceed with the rest of the rating. | |
| Desirable Professional/Technical Qualifications | |
| 1. General knowledge and understanding of the National Transportation Safety Board's (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security. | NQ   Q   (HQ) |
| **2. Demonstrated command and/or responsibility of or for sea-going operations.** | (NQ)   Q   HQ |

SES Panel Member(s): *Elaine B. Weinstein* *Col. Chas* *Robert Swaim*   Date: 3/28/05

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SESer | FORMER SESer |
|---|---|---|---|---|
| | | | | |

005008

# EXHIBIT NO. 24

**\*\*SENIOR EXECUTIVE SERVICE\*\***

| OFFICE | TITLE | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|
| Office of the Managing Director Office of Management | Managing Director | Career Reserved | Daniel Campbell | Daniel Campbell | Daniel Campbell | Daniel Campbell | Daniel Campbell | Joe Osterman | Joe Osterman |
| Office of the Managing Director Office of Management | Assoc. MD for Planning and Operations | Career Reserved | James Arena | James Arena | James Arena | James Arena | James Arena | Transferred slot to AD | |
| Office of the Managing Director Management | Executive Director Noncareer Position | General | Established | Vacant | Vacant | Vacant | Vacant | Vacant | Vacant |
| Office of the Managing Director Office of Management | Associate MD for Quality Assurance | Career Reserved | Ralph Johnson | Vacant | Vacant | Transferred to the Academy | | | |
| Office of the Managing Director Office of Management | Deputy Managing Director | Career Reserved | | | | | | | David Mayer |
| Office of the General Counsel | General Counsel | General | Ronald Battocchi | Ronald Battocchi | Ronald Battocchi | Ronald Battocchi | Ronald Battocchi | Ronald Battocchi | Gary Halbert |
| Office of the Chief Financial Officer | Chief Financial Officer | Career Reserved | Mitchell Levine | Steve Goldberg | Steve Goldberg | Steve Goldberg | Steve Goldberg | Steve Goldberg | Steve Goldberg |
| Office of Aviation Safety | Director | Career Reserved | Bernie Loeb | Bernie Loeb | John Clark | John Clark | John Clark | John Clark | Tom Haueter |
| Office of Aviation Safety | Deputy Director | Career Reserved | John Clark | John Clark | Tom Haueter | Tom Haueter | Tom Haueter | Tom Haueter | Vacant |
| Office of Aviation Safety | Deputy Director | Career Reserved | Ronald Schleede | | | | | | |
| Office of Research and Engineering | Director | Career Reserved | Vern Ellingstad | Vern Ellingstad | Vern Ellingstad | Vern Ellingstad | Vern Ellingstad | Vern Ellingstad | Vern Ellingstad |
| Office of Research and Engineering | Deputy Director | Career Reserved | vacant | Alan Kushner | Alan Kushner | Alan Kushner | Vacant | Joseph Kolly | Joseph Kolly |
| Office of Safety Recommendations and Accomplishments | Director | Career Reserved | Barry Sweedler | Elaine Weinstein | Elaine Weinstein | Elaine Weinstein | Elaine Weinstein | Elaine Weinstein | Elaine Weinstein |
| Office of Railroad, Pipeline, and Hazardous Materials | Director | Career Reserved | | Robert Chipkevich | Robert Chipkevich | Bob Chipkevich | Bob Chipkevich | Bob Chipkevich | Bob Chipkevich |
| NTSB Academy | Dean | | | | Established | Franklin Richey | Transferred to Highway | | |
| NTSB Academy | Director | Career Reserved | | | Julie Beal | Julie Beal | Julie Beal | | |
| Office of Govt Affairs and Public Affairs | Director Noncareer Position | General | Goelz | Goelz | Jamie Finch | Vacant | Vacant | Vacant | Vacant |
| Office of Highway Safety | Director | Career Reserved | | | | | Joseph Osterman | Vacant | Bruce Magladry |
| Office of Marine Safety | Director | Career Reserved | | | | | Director; MS To be filled | John Spencer | John Spencer |
| Office of Administration | Director | Career Reserved | | | | | Vacant | Lola A. Ward | Lola A. Ward |
| Allocation | | | | | | | NEW - used in FYO4, MS | | |

006022

Human Resources Division
National Transportation Safety Board

# EXHIBIT NO. 25

| | |
|---|---|
| **From:** | Murtagh Marjorie |
| **Sent:** | Tuesday, January 04, 2005 9:31 AM |
| **To:** | Engleman Ellen |
| **Importance:** | High |

Madame Chairman,

I believe I need to meet with you personally.  Please let me know when you are available.

Thank you,

Marjorie

*Marjorie Murtagh*
*Director, Office of Marine Safety*
*National Transportation Safety Board*
*Washington, D.C.*
*202-314-6290*

# EXHIBIT NO. 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE,                )
                                       )
                Plaintiff,             )
                                       )
        v.                             )    No. 06-748C
                                       )    (Judge Wheeler)
THE UNITED STATES,                     )
                                       )
                Defendant.             )

## DECLARATION OF EMILY T. CARROLL

Pursuant to 28 U.S.C. § 1746, I, Emily T. Carroll, declare that the following is true and

correct and based upon my personal knowledge, my review of National Transportation

Safety Board ("NTSB") files and records, my review of the records at issue in this litigation,

and information I acquired from others in the course of my performance of my official duties,

and that I am competent to testify to the matters contained herein.

1.   I currently serve as a Human Resources Specialist in the Human Resources Division of

     the Office of Administration at the NTSB.  I have held this position since February

     2000.  Since April 1980, I have served in the Human Resources Division in various

     positions, such as Personnel Assistant and Human Resources Specialist.

2.   I am over the age of 18 and have personal knowledge of the matters set forth herein and

     if called as a witness could competently testify thereto.

3.   As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of

     Surface Transportation Safety was divided into four separate surface modal offices,

     each with its own director.

4.   There are two ways for the NTSB to elevate a position to the Senior Executive Service

     ("SES") level.  The NTSB can request and receive an allocation of an SES slot from the

A1

Office of Personnel Management ("OPM"). Once the agency receives this allocation, it can use it as it deems necessary. Alternatively, when a vacancy occurs in one of the allotted slots that the agency has, that position can be filled by reassignment of a current SES employee to that position or through a competitive recruitment process. The NTSB cannot create a new SES position without OPM authorization.

5.  In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be classified and paid at the SES level. OPM denied this request.

6.  For a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale.

7.  During the relevant time period, the positions of Director and Deputy Director of the Office of Aviation Safety ("OAS") were paid at the SES level.

8.  Some time after 2000, an SES employee retired and an SES slot became available. Senior officials at the NTSB determined that the position of Director of the newly created Office of Railroad, Pipeline, and Hazardous Materials Safety ("ORPH") would be assigned an available SES slot.

9.  Pursuant to OPM regulations, all SES positions must be advertised and competed. An employee who encumbers a GS-level position that is reclassified to the SES level, may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. See OPM Guide to the Senior Executive Service at page 11. Mrs. Cooke has never held a career SES appointment.

2

A2

10. Once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position.

11. Mr. Robert Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES.

12. In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, those requests were denied by OPM.

13. In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. This position was transferred to OHS and advertised as an SES position.

14. Mr. Joseph Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES.

15. In 2004, the NTSB requested and received an additional SES slot from OPM. Senior officials at the NTSB allocated this slot to the position of Director of the Office of Marine Safety (OMS). The position was advertised as an SES position. The advertisement was subsequently cancelled prior to a selection being made.

3

A3

16.  The NTSB again advertised the Director of OMS position as an SES position in early
     2005.  Ms. Cooke again submitted an application for this position.

17.  The NTSB recommended Mr. John Spencer for this SES position to OPM, and he was
     approved for an appointment to the SES

18.  Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22,
     2005.  Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005 until the
     date of her retirement, on July 3, 2006.

19.  GS-15 employees are eligible for overtime pay within the Federal system.  However,
     there is a limit on the amount of overtime pay that GS employees may receive.  Ms.
     Cooke was not eligible to receive overtime pay to the extent that her total salary would
     exceed the greater of GS-15, step 10 or level V of the Executive Schedule.  As Ms.
     Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director
     of OMS, in overtime she was only eligible to receive an amount equal to the difference
     between her salary and the premium pay limitation.

20.  Overtime is defined as hours of work that are officially ordered or approved by a
     supervisor before the hours are worked.  However, overtime does not include hours of
     work that an employee incurs in connection with an accident investigation.

21.  Pursuant to 5 C.F.R. § 575.301, an agency may pay a retention allowance

     [W]hen an agency determines that the unusually high or unique qualifications
     of the employee or a special need of the agency for the employee's services
     makes it essential to retain the employee and that the employee would be likely
     to leave the Federal service in the absence of an incentive.

4

A4

22. Each GS pay grade has incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step.

23. From 2003 to 2005, Ms. Cooke received all step increases to which she was entitled.

24. NTSB employees who hold Senior Level ("SL") positions must demonstrate technical competencies.

25. SL employees may not perform supervisory duties more than 25 percent of the time.

26. Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special act in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase.

27. Performance awards are based upon performance and are not intended meant to augment one's salary.

28. Between 2003 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beal, and Elaine Weinstein. Between 2001 and 2005, Lola Ward, Julie Beale, and Elaine Weinstein were each approved for appointments to the SES.

29. Lola Ward, Julie Beal, and Elaine Weinstein are all female, and were required to compete for their positions. All of them competed against male applicants.

5

A5

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this ___29th___ day of November 2007, in Washington, D.C.


Emily T. Carroll
Human Resources Specialist
National Transportation Safety Board

6

A6

# EXHIBIT NO. 27

1

1      IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2   -----------------------------------x

3   MARJORIE MURTAGH COOKE,            :

4             Plaintiff        :   No. 06-748C

5        v.                    : (Judge Wheeler)

6   THE UNITED STATES,               :

7             Defendant        :

8   -----------------------------------x

9

10           Deposition of EMILY CARROLL

11              Washington, D.C.

12           Tuesday, February 12, 2008

13                10:05 a.m.

14   Job No.:  1-122456

15   Pages 1 - 76

16   Reported by:  Alda Mandell, RPR

17

18

19

20

21

22

Page 2

1        Deposition of EMILY CARROLL, held at the

2   offices of:

3

4        EMPLOYMENT LAW GROUP

5        888 17th Street, Northwest

6        Suite 900

7        Washington, D.C.  20006

8        (202)331-2883

9

10       Pursuant to agreement, before Alda Mandell,

11  Registered Professional Reporter and Notary Public of

12  the District of Columbia.

13

14

15

16

17

18

19

20

21

22

Page 3

1              A P P E A R A N C E S

2

3   ON BEHALF OF PLAINTIFF:

4        DAVE SCHER, ESQUIRE

5        THE EMPLOYMENT LAW GROUP, P.C.

6        888 17th Street, Northwest

7        Suite 900

8        Washington, D.C.  20006

9        (202)331-2883

10

11  ON BEHALF OF DEFENDANT

12       MEREDYTH D. COHEN, ESQUIRE

13       UNITED STATES DEPARTMENT OF

14       JUSTICE

15       CIVIL DIVISION

16       1100 L Street, Northwest

17       Washington, D.C.  20530

18       (202)305-2061

19

20            and

21

22

Page 4

1        A P P E A R A N C E S  (Continued)

2

3        KATHLEEN SILBAUGH, ESQUIRE

4        NATIONAL TRANSPORTATION SAFETY

5        BOARD

6        490 L'Enfant Plaza East, Southwest

7        Washington, D.C.  20594

8        (202)314-6084

9

10  Also Present:  MARJORIE MURTAGH COOKE

11

12            C O N T E N T S

13  EXAMINATION OF EMILY CARROLL            PAGE

14       By Mr. Scher                5

15       By Ms. Cohen               67

16

17            E X H I B I T S

18          (None)

19

20

21

22

Page 5

1            P R O C E E D I N G S

2            EMILY CARROLL

3   having been duly sworn, testified as follows:

4        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5   BY MR. SCHER:

6    Q    Good morning, Ms. Carroll.  My name is Dave

7   Scher.  How are you?

8    A    I'm doing good.

9    Q    Good.  I'm an attorney for Ms. Murtagh Cooke

10  here in this case and I'm just going to be asking you

11  a series of questions today.  Have you ever had your

12  deposition taken before?

13   A    No.

14   Q    Okay.  All right.  I'm just going to go over

15  a few ground rules and sort of how things work and

16  just to kind of give you some background information.

17  All right.  So basically I'm going to ask you a series

18  of questions.  I ask that you answer them completely,

19  fully and accurately.  Every once in a while --

20  hopefully just every once in a while -- Ms. Cohen may

21  make an objection.  If she does, please allow her to

22  make the objection and when she's done, then you can

Page 22

1 the specifics.

2    Q    Right.

3    A    But having known that we recruited to fill

4 slots --

5    Q    Right.

6    A    -- we had to have a position or used another

7 position in the agency. So it could have been one of

8 the two ways.

9    Q    Okay. I understand.

10    A    Okay.

11    Q    I'm asking a very specific question. I

12 apologize. I'm not being clear so I'm going to try to

13 be really clear. Okay?

14    A    Uh-huh.

15    Q    I'm asking whether you know at some point in

16 time NTSB made a single request for four SES slots for

17 all modal directors all at the same time.

18    A    I can't definitively answer that. I don't

19 remember.

20    Q    Okay. That's fine. I really am only

21 interested in what you know.

22    A    Uh-huh.

Page 23

1    Q    But I guess you do know that at some point

2 in time NTSB made requests for SES slots for these

3 modal directors. At some point in time.

4    A    At some point in time. Yes.

5    Q    Okay. Do you know why the NTSB did that?

6    A    No.

7    Q    Do you know who made the requests?

8    A    The request is signed by the Chairman so it

9 would have been -- for NTSB that would have been the

10 Managing Director and the Chairman.

11    Q    And who was the Managing Director? I guess

12 it depends on the point in time.

13    A    It depends on the point in time. Our

14 Managing Directors have changed.

15    Q    Okay. That's fine. Do you know whether at

16 any point in time that NTSB made a request for an SES

17 position for a modal director and that request was

18 denied by OPM?

19    A    What I know of that process is that you make

20 a request identifying positions. They respond with a

21 number.

22    Q    Okay.

Page 24

1    A    So I can't definitively say that X was

2 approved and X was given.

3    Q    I see.

4    A    I know that NTSB advertised certain

5 positions that they had to have a slot for.

6    Q    I see. So I understand how this works, NTSB

7 would say I want -- I'm making up this number now --

8 10 SES slots and then OPM says you get eight or

9 whatever they say. And then NTSB decides what to do

10 with them. Is that how this process works?

11    A    Correct.

12    Q    So OPM does not say you must use it for this

13 or you must use it for that?

14    A    No. OPM does not say that.

15    Q    How does the NTSB determine where to

16 allocate those specific slots?

17    A    That decision would be made by the Managing

18 Director in consultation with the Chairman. I don't

19 know what things they consider in that discussion.

20    Q    Okay. All right. When the four offices

21 were created or when OSTS was split into four offices,

22 do you know what pay levels those modal directors were

Page 25

1 paid initially?

2    A    No.

3    Q    Do you know whether they were all classified

4 at the same pay level?

5    A    SES positions by classification are SES

6 positions. Their pay is separate and not necessarily

7 aligned with that. They have a range. And so without

8 knowing specific people, I don't remember it at that

9 level of detail.

10    Q    Understood. Okay. What I'm asking is when

11 the four modal offices were originally created, they

12 were not SES positions, correct?

13    A    Correct.

14    Q    Okay. Do you know what they were?

15    A    More than likely they were GS-15's.

16    Q    Okay. What does GS-15 mean by the way?

17    A    It is a general scheduled position at Grade

18 15.

19    Q    Is there a level higher than 15?

20    A    On the general schedule, no.

21    Q    All right. Now, were all of the four modal

22 directors paid at the level of GS-15 before they

Page 26

1 became SES?

2    A    Yes.

3    Q    Okay. I want to turn your attention to the

4 Office of Airline Safety or OAS. When if ever was the

5 Director of OAS paid at the SES level?

6    A    When if ever?

7    Q    Yes.

8    A    The Director of OAS is an SES position.

9    Q    It is now?

10    A    It is now.

11    Q    Okay. Do you know when it became an SES

12 position?

13    A    I've always remembered it to be an SES

14 position.

15    Q    As long as you --

16    A    As long as I can remember, it has been an

17 SES position.

18    Q    Okay. Do you know when if ever the Deputy

19 Director of OAS was ever paid at the SES level?

20    A    The Deputy Director in OAS has been in SES

21 for as long as I remember --

22    Q    Also for as long as you remember?

Page 27

1    A    Also for as long as I remember. I am

2 pausing because that -- by deputy position, I mean the

3 person second to the Director.

4    Q    Correct. Yes. So the answer to that --

5    A    The answer to the question is as long as

6 I've known it to be, it's an SES.

7    Q    Okay. Do you know why the Director and

8 Deputy Director of OAS were, as long as you remember,

9 paid at the SES level?

10    A    That's how those positions were classified.

11    Q    Do you know why they were classified that

12 way?

13    A    No.

14        MR. SCHER: Off the record.

15        (Discussion off the record)

16        MR. SCHER: Go on the record.

17 BY MR. SCHER:

18    Q    Do you know whether at some point an SES

19 slot became available for the Director of the Office

20 of Railway -- Pipeline and Hazardous Materials, which

21 I'm going to use ORPH because I can't seem to say this

22 correctly.

Page 28

1    A    That's fine. Yes. The Director of RPH?

2    Q    Yes.

3    A    Yes.

4    Q    Do you know when that happened?

5    A    Without having the approximate dates -- I

6 don't have approximate dates. Somewhere around 2004.

7 2003, 2004. Somewhere in that area.

8    Q    And do you know how that slot became

9 available?

10    A    No. No, I do not.

11    Q    Okay. Do you know why the NTSB gave the SES

12 slot to ORPH?

13    A    No, I do not.

14    Q    When if ever, to your knowledge, okay, has

15 an NTSB employee been non competitively promoted to do

16 an SES position?

17    A    Non competitively promoted?

18    Q    Yes.

19    A    By noncompetitive promotion do you mean that

20 they were moved in there without announcement and

21 bidding on the job?

22    Q    Yes. That's what I'm asking.

Page 29

1    A    Okay. For me that's not a promotion.

2    Q    Okay. What is that?

3    A    It's just a movement. It's back to

4 reassignment. The reassignment question.

5    Q    Okay. So --

6    A    I just wanted to make sure I understand --

7    Q    Okay.

8    A    -- how you mean the person was put in the

9 job.

10    Q    Okay. Well, other than reassignment, is it

11 possible for an NTSB employee to be promoted to an SES

12 position in a noncompetitive manner?

13        MS. COHEN: Objection to the term promoted.

14    A    No.

15 BY MR. SCHER:

16    Q    Just to cover all bases. Other than through

17 reassignment, is it possible for an NTSB employee to

18 be awarded an SES position in a noncompetitive manner?

19        MS. COHEN: Objection to the term awarded.

20    A    By NTSB employee -- no.

21        MR. SCHER: Okay. Can we go off the record

22 a second.

Page 30

1       (Discussion off the record)
2   BY MR. SCHER:
3       Q    What is the correct terminology for an
4   employee moving from a non SES position level to an
5   SES level position?  What is the correct term?
6       A    If an employee moves from a non SES position
7   to an SES position, they have to compete for it.
8       Q    Okay.
9       A    So it would be a competitive selection.
10      Q    Okay.  Would you call them then promoted to
11  that position?
12      A    I generally don't say promoted.  I say
13  appointed.
14      Q    Appointed?
15      A    Yes.
16      Q    Okay.  Would you say awarded ever?
17      A    No.  I would not use awarded with that type
18  of process.
19      Q    Okay.  So you would not use the word
20  promoted and you would not use the word awarded,
21  correct?
22      A    Correct.

Page 31

1       Q    But you would use the word appointed.  Okay.
2   All right.  When if ever has an NTSB employee been
3   appointed to an SES position in a noncompetitive
4   manner?
5          MS. COHEN:  Objection.  Vague.
6          MR. SCHER:  You can answer.
7          THE WITNESS:  Is the question that you're
8   asking me again about a GS employee going to an SES
9   position or an SES employee going to an SES position?
10         MR. SCHER:  A GS employee going to an SES
11  position.
12         THE WITNESS:  I'm sorry.  Can you repeat
13  that one more time?
14         MR. SCHER:  Absolutely.  Okay.
15  BY MR. SCHER:
16      Q    Let's do this in a hypothetical.  It will be
17  easier.  I have an NTS employee.  That NTS employee's
18  a GS-15.  I want to appoint that NTS employee to an
19  SES position.  Is there any I can do that without
20  competing him?
21      A    No.
22      Q    Thank you.

Page 32

1       A    You're welcome.
2       Q    To your knowledge, has every single SES
3   position appointed within NTSB been advertised and
4   completed?
5       A    Can you repeat that?
6       Q    Absolutely.  To your knowledge, has every
7   single SES position appointed within NTSB been
8   advertised and competed?
9       A    No.
10      Q    Okay.  When has it not been advertised and
11  competed?
12      A    When NTSB moves an SES incumbent, current
13  SES person, from one position to another.
14      Q    Okay.  All right.  So to your knowledge, has
15  every single SES position appointed from a GS-15 or
16  lower to an SES position been -- within NTSB been
17  advertised and competed?
18      A    Yes.
19      Q    Okay.  Do you know whether NTSB allocated
20  SES slots to the different modal offices in a
21  particular priority order?
22      A    Oh.  No, I do not.

Page 33

1       Q    Do you know whether at some point NTSB
2   requested an SES slot for the Director of the Office
3   of Marine Safety?
4       A    Yes.
5       Q    And I'm going to use OMS now for Office of
6   Marine Safety, okay?
7       A    Okay.
8       Q    Do you know when that was?
9       A    I don't have a specific time frame for that.
10      Q    Okay.  Do you know the year?
11      A    I know that the position was advertised in
12  '05 and I believe '06 but I don't know whether or
13  not -- what the time frame was between the allocation
14  to when we advertised it.  I know we advertised a
15  position, SES, in OMS.
16      Q    Do you know what happened when it was
17  initially advertised?
18      A    When it was initially advertised, it was
19  readvertised.
20      Q    Okay.  Do you know why it was readvertised?
21      A    No.
22      Q    When if ever has NTSB advertised and then

# EXHIBIT NO. 28

1

| | | |
|---|---|---|
| 1 | 1 | IN THE UNITED STATES DISTRICT COURT |
| | | FOR THE DISTRICT OF COLUMBIA |
| 2 | 2 | |
| 3 | 3 | - - - - - - - - - - - - - - - x |
| 4 | 4 | MARJORIE MURTAGH COOKE          : |
| 5 | 5 |           Plaintiff          : |
| 6 | 6 | vs.                          :   Civil Action No.: |
| 7 | 7 | MARK ROSENKER, CHAIRMAN      :   06-7480 |
| | | NATIONAL TRANSPORTATION |
| 8 | 8 | SAFETY BOARD                 : |
| 9 | 9 |           Defendant          : |
| 10 | 10 | - - - - - - - - - - - - - - - x |
| 11 | 11 | |
| 12 | 12 | |
| 13 | 13 |                       Washington, D.C. |
| 14 | 14 |                       Wednesday, November 28, 2007 |
| 15 | 15 | |
| 16 | 16 | |
| 17 | 17 | Deposition of: |
| 18 | 18 |                   MARJORIE M. COOKE |
| 19 | 19 | the Deponent, called for examination by counsel for the |
| 20 | 20 | Defendant, pursuant to notice and agreement as to time |
| 21 | 21 | and place, at 501 3rd Street, N.W., Washington, D.C., |
| 22 | 22 | before Sean Williams, a Notary Public in and for the |
| 23 | 23 | State of Maryland. |
| 24 | 24 | |
| 25 | 25 | |

Page 2

1 1 APPEARANCES:
2 2     On Behalf of the Plaintiff:
          DAVE SCHER, ESQUIRE
3 3     The Employment Law Group, P.C.
          888 17th Street, N.W.
4 4     Suite 900
          Washington, D.C. 20006-3307
5 5     (202) 331-2883
6 6     On Behalf of the Defendant:
          ANDREA McBARNETTE, ESQUIRE
7 7     Assistant United States Attorney
          U.S. Department of Justice
8 8     555 4th Street, N.W.
          Washington, D.C. 20530
9 9     (202) 514-7153
10 10   On Behalf of the Agency:
          DENISE M. D'AVELLA, ESQUIRE
11 11   National Transportation Safety Board
          Office of General Counsel
12 12   490 L'Enfant Plaza East, S.W.
          Washington, D.C. 20594-2000
13 13   (202) 314-6086
14 14
15 15
16 16
17 17
18 18
19 19
20 20
21 21
22 22
23 23
24 24
25 25

Page 3

1 1             I N D E X
2 2 WITNESS        EXAMINATION        PAGE
3 3 Marjorie Cooke    Direct - Ms. McBarnette      4
4 4
              E X H I B I T S
5 5
    EXHIBIT NUMBER       DESCRIPTION        PAGE
6 6
      1   Notes of meeting with          147
7 7       Mr. Osterman
8 8     2   Request for Personnel Action and    154
            Unclassified Duties
9 9
      3   Request for Personnel Action      157
10 10
      4   Answers to Interrogatories       170
11 11
12 12
13 13
14 14
15 15
16 16
17 17
18 18
19 19
20 20
21 21
22 22
23 23
24 24
25 25

Page 4

1 1           P R O C E E D I N G S
2 2 (10:00 a.m.)
3 3
4 4     BY MS. McBARNETTE:
5 5     Q.  This is U.S. Attorney Andrea McBarnette for the
6 6 Defendant, so today I'll be asking you some questions.
7 7 Have you had a deposition before?
8 8     A.  Yes.
9 9     Q.  All right.  So I'm going to go over the ground
10 10 rules.  They might be familiar to you.
11 11     First of all, when I ask questions, if you
12 12 don't understand something that I said, certainly stop
13 13 me.  I'll be happy to rephrase it for you or explain it
14 14 to you.
15 15     A.  Okay.
16 16     Q.  If at any time you want to take a break, want
17 17 to get more water or just take a break, that's fine.
18 18 We'll stop and we'll accommodate you for that.  And you
19 19 have an attorney.  If he chooses to object, we'll pause
20 20 and let him do his objections and then you can answer
21 21 after that.
22 22     So those are the basic ground rules.  And my
23 23 preliminary question for you today is have you taken any
24 24 medication or anything that would affect your ability to
25 25 answer or understand today?

Page 5

1 1     A.  No.
2 2     Q.  All right.  So let's start.  Can you tell me
3 3 about your educational background briefly after high
4 4 school?
5 5     A.  I went to the Bellevue School of Nursing in New
6 6 York for a year and decided then to not pursue nursing,
7 7 I went to the -- I went to two community colleges in New
8 8 York, one at Orange County and the other at Rockland
9 9 County.  Rockland County Community College, I finished my
10 10 associates degree in -- I think it was science and
11 11 engineering.  And then I graduated -- I went to the State
12 12 University of New York Maritime College and graduated
13 13 from there with a bachelor of engineering degree in 1974.
14 14     Q.  Any other degrees?
15 15     A.  Other than the associates degree, no.
16 16     Q.  And did you have a field of special admission?
17 17     A.  At Maritime College?
18 18     Q.  Um-hum.
19 19     A.  Yes, marine engineering and Naval architecture.
20 20     Q.  Let's talk about your employment.  After you
21 21 graduated from the Maritime Academy, can you tell me
22 22 about your work history?
23 23     A.  Yes.
24 24     Q.  Okay.  I know that goes back to, what is it,
25 25 the 1970s, but if you can keep it brief.

Page 14

1 1  well, which in our case was the American Bureau of
2 2  Shipping.
3 3      So you have to make sure that every piece of
4 4  equipment complies with all of the regulations and
5 5  standards that are to be applied.  When both Coast Guard
6 6  and ABS come aboard for inspection you have to be
7 7  prepared to show them what you have done and that they
8 8  are in working order.
9 9      Q.  Okay.
10 10     A.  And I operated on my license.  I'm not sure I
11 11  mentioned that.  I had a -- I was a licensed engineer.
12 12  So you have to obtain a Coast Guard license in order to
13 13  be able to do all of this.
14 14     Q.  Okay.  Is that license something that you got
15 15  after you graduated from the Academy or is it a part of
16 16  the education that you received?
17 17     A.  It was actually a part of the education that I
18 18  received, but I did not actually get my license until
19 19  after I graduated and I stayed at the Academy -- well,
20 20  it's not the Academy.  It's Maritime College.
21 21      When I stayed at Maritime College, I continued
22 22  to go to sea with the school ship.  The school ship goes
23 23  to sea every year.  So I went to sea with the school ship
24 24  and applied for my license, and I believe I was the first
25 25  one in the United States, first woman in the United

Page 15

1 1  States, to acquire that license.
2 2      Q.  Okay.  You mentioned earlier that you have had
3 3  depositions before.  Have you filed any lawsuits before?
4 4      A.  Yes.
5 5      Q.  Okay.  Can you tell me all the lawsuits that
6 6  you have filed?
7 7      A.  Okay.  The lawsuit that I filed was for
8 8  entrance to Maritime College, and that was in the early
9 9  '70s.  When I applied to Maritime College they said
10 10  they'd be delighted to have me as a student, but I was a
11 11  woman and they didn't expect -- they didn't accept women.
12 12  So I took them to court and they ultimately agreed that
13 13  that was something they were willing to do.
14 14     Q.  Okay.  That was one lawsuit.
15 15     A.  Yeah.  And the only other one, I think, is the
16 16  other half of this one, and I'm not sure if that even
17 17  counts as a -- which is the Equal Pay Act --
18 18     Q.  And does --
19 19     A.  -- lawsuit and, again, I don't know because I
20 20  don't know all the legal ins and outs of all of this, but
21 21  --
22 22     Q.  That's fine.
23 23     A.  -- I'm assuming that complies with your
24 24  question.
25 25     Q.  For the record, though, could you explain what

Page 16

1 1  the Equal Pay Act case is?
2 2      A.  Sure.  The Equal Pay Act case is that I worked
3 3  as the Director of Office of Marine Safety from 1997
4 4  through 2005 and I was not paid the same as my male
5 5  counterparts.  I was paid substantially less.
6 6      Q.  All right.  Directing your attention to the
7 7  present lawsuit and your claims here, what claims do you
8 8  have in this lawsuit?
9 9      A.  That I was retaliated against by the Agency for
10 10  engaging in protected activity which was my involvement
11 11  in the Equal Pay Act lawsuit.
12 12     Q.  So how do you allege that you were retaliated
13 13  against?
14 14     A.  I was retaliated against.  Primarily the first
15 15  time was when I was denied an interview for the position
16 16  that I had held for oh, almost ten years at that point.
17 17     Q.  Denied an interview for --
18 18     A.  For the -- the position that I held was the
19 19  Director of the Office of Marine Safety.  It was known --
20 20  from my perspective it was known that that position
21 21  didn't change, but it was then granted an SES recruitment
22 22  by the Agency, and when that recruitment for -- because I
23 23  was being paid at the GS-15 level.  All of my
24 24  counterparts were being paid at the SES level.  So when
25 25  that advertisement came out I applied for it and I was

Page 17

1 1  selected for an interview, but I was not granted an
2 2  interview.  So that was the first time that I was
3 3  retaliated against.
4 4      Q.  You were selected for what?
5 5      A.  An interview.
6 6      Q.  Okay.  And what else do you claim also
7 7  encompasses your retaliation claims?
8 8      A.  Okay.  That I was, again, retaliated against
9 9  for participating in a protected activity.  I was denied
10 10  an interview for the position. I was removed from my
11 11  position and moved out of my specialty which was marine
12 12  safety.  I was specifically not just removed, but
13 13  humiliated in the process.  They wanted to make sure they
14 14  did that apparently, too.  But I was moved from the
15 15  Office of Marine Safety to the Office of Safety
16 16  Recommendations and Accomplishments.
17 17      I was not involved in any marine work there.  I
18 18  was not given any evaluations for my work from 2004 until
19 19  my retirement interim, my retirement in 2006.  I wasn't
20 20  given any performance standards for the position that --
21 21  whatever position it was in the Office of Safety
22 22  Recommendations and Accomplishments.
23 23      I was transferred from there in October of 2005
24 24  to a position in the Office of the Managing Director,
25 25  again no performance standards, no evaluations, no

Page 18

1  1  anything.
2  2      I think I've covered it all.  No awards.  I
3  3  wasn't given any opportunity even to even review how well
4  4  I was doing, how well I was not doing, if that were the
5  5  case, in the latter two positions, as well as the latter
6  6  part of -- after April of 2004, after I had spoken to the
7  7  Chairman, from that point on I was treated very, very
8  8  poorly.
9  9      Q.  Okay.  You have listed now a number of actions.
10 10  Specifically, who do you claim retaliated against you?
11 11      A.  The Chairman of the Safety Board.
12 12      Q.  Who would be?
13 13      A.  Ellen Engleman-Connors.  The Managing Director,
14 14  Daniel Campbell, the new Managing Director, Joseph
15 15  Osterman, the members of the panel for the 2005
16 16  readvertised SES position, the now Chairman, Mark
17 17  Rosenker, the former General Counsel, Ron Batachi
18 18  (phonetic sp.).  Would you like me to -- you held up your
19 19  hand.  Do you want me to stop or --
20 20      A.  I'm writing as fast as I can.  I was just
21 21  hoping you'd slightly slow down so I can get the names.
22 22      Q.  Oh, certainly.  If you'd asked me to slow down,
23 23  I'd be happy to do that.  I just didn't understand your
24 24  signal.
25 25      A.  Sure.  I didn't want to completely interrupt

Page 19

1  1  your flow.  I'm sorry.  You said Mark Rosenker and then
2  2  you said --
3  3      A.  The former General Counsel, Ron Batachi.
4  4      Q.  Okay.
5  5      A.  My supervisors, Elaine Weinstein when I was in
6  6  the Office of Safety Recommendations and Accomplishments,
7  7  and my -- it's still not clear to me who my supervisor
8  8  was when I was in the Office of the Managing Director, so
9  9  it was either Joseph Osterman or, by default, one of his
10 10  deputies, whoever it was that was responsible for giving
11 11  me and making sure that I had them.  I assume it's Mr.
12 12  Osterman actually who was responsible to make sure that I
13 13  had performing standards and give me an opportunity to
14 14  not just to perform, but to -- and, of course, Mr.
15 15  Osterman in particular because he denied me the
16 16  opportunity to continue to pursue my marine career.
17 17      Q.  Okay.  Anyone else?
18 18      A.  I think that's everybody.
19 19      Q.  Let's start with Ms. Connors.  Can you tell me
20 20  what she did that you claim was retaliatory?
21 21      MR. SCHER:  Well, just one second, okay?  I'm
22 22  going to let her answer.  I'm objecting to this line of
23 23  questioning as misleading and possibly a
24 24  mischaracterization, so the -- Ms. Murtagh Cooke's
25 25  obviously not a lawyer.  The details of her allegations

Page 20

1  1  of discrimination are as outlined in her complaint and
2  2  various motion practice and discovery that's already been
3  3  submitted.  Having said that, she can answer all the
4  4  questions you want to ask.  I just don't want it to be
5  5  interpreted that her testimony is in any way limiting
6  6  those claims.  Go ahead.
7  7      WITNESS:  Thank you.
8  8      MS. McBARNETTE:  Okay.  In general objections
9  9  shouldn't be speaking objections, so any grounds for
10 10  objections, I'd prefer if we could keep them short.  But,
11 11  in any event.
12 12      MR. SCHER:  Okay.
13 13      BY MS. McBARNETTE:
14 14      Q.  -- I was asking you about your retaliation
15 15  claim and you said earlier that you believe that Ms.
16 16  Connors retaliated against you.  Could you please tell me
17 17  what she did that you believe was retaliatory?
18 18      A.  When I spoke with Ms. Connors in 2004 I was
19 19  asking her for some way to make my pay comparable to my
20 20  male counterparts, the other modal directors, and after
21 21  that meeting Ms. Connors refused to meet with me again
22 22  and I believe retaliated in her role with regard to the
23 23  advertisement and decision to readvertise the position in
24 24  2004.
25 25      Q.  Are you saying that she had a role in

Page 21

1  1  advertising that position again?
2  2      A.  Yes, she did.  She had a role in advertising
3  3  and in the readvertisement of that position.  The lack of
4  4  equal pay, of course, is a separate issue, I think.
5  5  Again, I'm not the lawyer.  So she, along with Dan
6  6  Campbell, denied me the opportunity even to be
7  7  interviewed for that position.
8  8      She denied me an evaluation.  The evaluation
9  9  that I received for 2004 -- 2003/2004 was signed by Ms.
10 10  Engleman-Connors, but it was never given to me by Ms.
11 11  Engleman-Connors.  She had given me my evaluation in 2003
12 12  for the 2002/2003 evaluation.  I had had a personal
13 13  meeting with her.  She told me how wonderful a job I was
14 14  doing.  It was absolutely outstanding.  And she had me
15 15  sign the paperwork and she signed the paperwork at the
16 16  same time.
17 17      Q.  What year was this?
18 18      A.  This was in November, I believe, of 2003.  Yes,
19 19  November of 2003, so that was my 2002/2003 evaluation.
20 20  Okay.
21 21      Q.  Do you recall when Ms. Connors became or
22 22  entered her position?
23 23      A.  In 2002, I believe.
24 24      Q.  Could you give me the beginning of the year,
25 25  the middle of the year, the end of the year?

Page 22

1  1    A.  Yeah.  I'm sorry because we had Marian Blakey
2  2  before that and Marian Blakey was moved over to the FAA.
3  3  I'm trying to remember even in terms of accidents if I
4  4  can recall when she became Chairman, but I know that
5  5  throughout 2003 we had had -- virtually every major
6  6  accident was marine and Ellen Engleman-Connors had been
7  7  on scene for a number of them.  I think she was in
8  8  training for the Norway.  Again, I don't have the exact
9  9  dates that Ellen Engleman-Connors became Chairman.  I'm
10 10  sure the Board can provide you with that information.
11 11    Q.  So let me get back to my original question.
12 12  You were telling me the ways that Ms. Connors retaliated
13 13  against you and you began to talk about getting an
14 14  evaluation or the failure to get an evaluation.  Can you
15 15  elaborate on that, please?
16 16    A.  Yes.  I received an evaluation in 2003 from Ms.
17 17  Engleman-Connors.  In 2004 I did not receive an
18 18  evaluation from Ms. Engleman-Connors.  The evaluation
19 19  paperwork was placed in -- the first time I saw it was
20 20  when it was given to me at the end of the informal
21 21  investigation that was conducted by Paul Greenberg
22 22  (phonetic sp.) who was a contract investigator for the
23 23  Safety Board on this -- on my EEO suit.  So the first
24 24  time I saw that paperwork was in, I don't know, December
25 25  of 2005, I think.  I never saw the evaluation that was

Page 23

1  1  apparently signed by Ms. Engleman-Connors sometime in
2  2  2004 or early 2005.  I don't know which.  So that's -- I
3  3  had no opportunity to review the evaluation.  I had no
4  4  opportunity to appeal the evaluation since apparently it
5  5  was a downgrade from outstanding to exceeds fully
6  6  successful.  I had no opportunity to do anything about
7  7  it.
8  8    Q.  Why not?
9  9    A.  I didn't get it.  I did not get an evaluation.
10 10  Without a written evaluation there's nothing to appeal.
11 11    Q.  Did you ask for an evaluation?
12 12    A.  I did.
13 13    Q.  Do you recall when you asked for it?
14 14    A.  I asked for my evaluation from Dan Campbell on
15 15  -- I believe it's either January 3rd or January 4th of
16 16  2005 or a copy of it.  And, excuse me, I followed up
17 17  asking to meet with Ellen Engleman-Connors several times
18 18  after that, but she refused to meet with me.
19 19    Q.  And when you asked to meet with her, did you
20 20  specifically say it was for your evaluation?
21 21    A.  I did on one occasion.  That's correct.
22 22    Q.  Okay.  I don't want to stop you.  If you can
23 23  continue with other actions that you think was
24 24  retaliatory on the part of Ms. Connors.
25 25    A.  Okay.  The 2005 readvertisement of the position

Page 24

1  1  -- Ms. Engleman-Connors was Chairman, I believe, up until
2  2  March of 2005, and then she became Chairman in Waiting or
3  3  something, Chairman Designate -- sorry, Chairman
4  4  Designate.  So from -- so during that time period she was
5  5  involved in the recruitment, the secondary advertisement
6  6  -- the second advertisement for the position and the
7  7  recruitment.  She was also involved in the -- according
8  8  to Joe Osterman, she was also involved in the decision --
9  9  after he had told me he wanted me to submit bullets for
10 10  an SL position, he indicated that she was the -- one of
11 11  the members of the group that had said no, they would not
12 12  even consider me for an SL position.  And my removal from
13 13  the Office of Marine Safety.
14 14    Q.  Okay.  You also mentioned that Dan Campbell
15 15  retaliated against you.  Can you tell me how you believe
16 16  he retaliated against you?
17 17    A.  Dan Campbell was the person who signed the
18 18  piece of paper that said readvertise.  He refused to
19 19  interview me for the position even though I was
20 20  considered one of the highly qualified candidates for the
21 21  position.  He retaliated in downgrading me without giving
22 22  me any opportunity to review my evaluation, did not give
23 23  me an evaluation.
24 24    Q.  He retaliated by downgrading you or he
25 25  retaliated by not giving you an opportunity to appeal his

Page 25

1  1  decision?
2  2    A.  Both.  He retaliated by speaking to the group
3  3  that were evaluating the recruitment in 2005.
4  4    Q.  I'm sorry.  I'm not following you.
5  5    A.  When he readvertised -- when he chose to
6  6  readvertise the position, he told me that the executives
7  7  had decided to readvertise for one reason.  Others have
8  8  testified that he told them that he was readvertising, so
9  9  I don't know what went on in the conversations, but I do
10 10  know that there were conflicting conversations.
11 11    Q.  So what did he do that was retaliatory?
12 12    A.  By refusing to give me an interview, by
13 13  readvertising the position with directions, I believe, to
14 14  the group who were evaluating, who were paneling the
15 15  position when it was readvertised.
16 16    Q.  What directions?
17 17    A.  Not to include me on the list, and that is -- I
18 18  can't tell you what he specifically said because I was
19 19  not there.  I can tell you that based on my analysis of
20 20  the facts, that's what I believe occurred.
21 21    Q.  Okay.  Let me talk about this for a second.
22 22  You alleged that Dan Campbell told the panel members for
23 23  the second advertisement not to include you on a list.
24 24  Which list is this?
25 25    A.  The list for interview for the position.

Page 26

1    Q.  And you believe this because someone told you
2  that's what he did?
3    A.  I believe -- based on the facts of what I have
4  read, reviewed, so far in this case, I believe that.
5    Q.  But you don't come to this conclusion because
6  someone on the panel told you that Dan said that to them?
7    A.  I came to that conclusion based on a whole
8  series of facts, and some of that is based on testimony
9  from members of the panel at different times.
10    Q.  But I'm just trying to be really clear.  Did
11  anyone on the panel come to you and say Dan Campbell told
12  us not to place you on the interview list?
13    A.  No.
14    Q.  Did anyone outside the panel come to you and
15  say Dan Campbell told the panel not to put you on the
16  interview list?
17    A.  Repeat that question, please.
18    Q.  Did anyone outside the panel come to you and
19  say Dan Campbell told the panel not to put you on the
20  interview list?
21    A.  No.
22    Q.  And Dan Campbell never told you that he told
23  the panel not to put you on the interview list?
24    A.  No, he told me something completely different.
25    Q.  How is it that you come to the conclusion that

Page 27

1  Dan Campbell told the panel not to put you on the
2  interview list?
3    A.  Because Mr. Campbell has made conflicting
4  statements about what he -- what the outcome of that
5  decision was with the readvertisement and his statements
6  conflict with what others have stated, and he made it
7  perfectly clear that -- in his deposition that he would
8  not consider it.  So I don't think that he would have
9  held back.  If he were willing to state it in a
10  deposition, I doubt he would have been reluctant to state
11  it to the members of the Executive Review Board.
12    Q.  So this is just a theory of yours?
13    MR. SCHER:  Objection, misleading.  Go ahead,
14  you can answer.
15    WITNESS:  Yeah, it's my analysis of the facts.
16    BY MS. McBARNETTE:
17    Q.  Your conclusion to what must have occurred?
18    A.  It's my analysis of the facts.
19    Q.  Your interpretation of the facts?
20    MR. SCHER:  Objection, asked and answered,
21  argumentative.  You can answer.
22    WITNESS:  My analysis of the facts.
23    BY MS. McBARNETTE:
24    Q.  And, again, you facts -- your analysis of the
25  facts is not based on anybody's actual testimony to you

Page 28

1  of a conversation that they had with Dan Campbell
2  informing that he said that you shouldn't be included on
3  the interview list?
4    A.  No, that's correct.
5    Q.  All right.  So you were listing the ways in
6  which Dan Campbell retaliated against you.  Can you
7  repeat to me what I've --
8    A.  Sure.
9    Q.  -- already listed so -- okay.  What I have is
10  you discussed the readvertisement of the SES position.
11    A.  I'm sorry.  He?
12    Q.  You discussed the readvertisement of the SES
13  position.  You discussed a refusal to interview you for
14  the position.  You discussed the downgrading of your
15  evaluation, I believe, in the 2003 to 2004 time period.
16    A.  Correct.
17    Q.  You discussed not getting that evaluation --
18    A.  Not receiving it, that's correct.
19    Q.  -- until a later date.
20    A.  Or seeing it the first time, so it was never
21  handed to me by anybody in my chain of command.
22    Q.  And you discussed an assumption that Dan
23  Campbell told the panel not to include you on the list.
24    MR. SCHER:  Objection, mischaracterization.
25    BY MS. McBARNETTE:

Page 29

1    Q.  That is what I have.  Is there anything else
2  that you'd like to add to what you believe Dan Campbell
3  did to retaliate against you?
4    A.  He did not give me an interim evaluation either
5  in -- well, 2005 is when he moved on from -- and he did
6  not give me a final evaluation for 2004/2005.
7    Q.  Okay.  Let me back up.  No interim evaluation
8  from what time period?
9    A.  2004/2005.
10    Q.  Okay.  And no evaluation for what other time
11  frame?
12    A.  2004/2005.
13    Q.  No.  You said an interim evaluation for 2004 to
14  2005, and then you also said an evaluation -- a different
15  evaluation?
16    A.  By law you're required to give two evaluations
17  to personnel.  One is an interim and the second one is a
18  final.  Now Mr. Campbell claims that in January of 2005
19  he moved from the Managing Director position to the
20  Executive Director position.  I don't have any firsthand
21  knowledge of that other than what he says.  The
22  announcement of that change was not made until March of
23  2005 so, again, I don't know -- I don't have access to
24  his personnel folder to know precisely when it is he
25  moved from one position to the other, and Joe Osterman

Page 30

1  1    would have then become my immediate supervisor.  But Mr.
2  2    Osterman or Mr. Campbell, one of those two people as the
3  3    Managing Director, was required to give me an evaluation
4  4    for 2004/2005 and I never received one.
5  5        Q.   Okay.  Is that it for Dan Campbell?
6  6        A.   Dan Campbell was also involved in, as I
7  7    understand it from Joe Osterman, the decision not to
8  8    consider an SL position that he had asked me to provide
9  9    bullets for, that he had offered and asked me to provide
10 10   bullets for.  He claims that he had political management,
11 11   indicating Dan Campbell, Ellen Engleman-Connors and Mark
12 12   Rosenker, as the people who would not permit that to
13 13   occur.  And there may be other things that I'm
14 14   overlooking at this moment, but I believe that captures
15 15   most of it from Dan Campbell.
16 16       Q.   Okay.  Let's talk about Mr. Osterman.  Can you
17 17   give me a list of what you believe he did to retaliate
18 18   against you?
19 19       A.   Yeah.  Mr. Osterman was on the first panel in
20 20   2005 in which he claimed my name was not put forward for
21 21   -- or was not going to be put forward for an interview,
22 22   but in March he recused himself from that panel and they
23 23   held a second panel.  The --
24 24       Q.   So -- I'm sorry.  Please go ahead.
25 25       A.   No.  Please go ahead.

Page 31

1  1        Q.   I just wasn't understanding.  What did he do?
2  2    What was retaliatory?
3  3        A.   In the evaluation for an interview, the
4  4    evaluation of the -- yeah, an evaluation to determine if
5  5    I should be considered for an interview for the position
6  6    I'd held for the last ten years, Mr. Osterman testified
7  7    that he was part of the first panel that decided not to
8  8    include my name on the list, so I believe he retaliated
9  9    then.
10 10           He retaliated in May of 2005 when he absolutely
11 11   refused to let me remain in the Office of Marine Safety
12 12   when he replaced me with a person from Highway Safety who
13 13   was in charge of administrative work, gathering uniforms
14 14   for personnel, that type of thing.  He replaced me with
15 15   him.  He had him present a report that I had completed.
16 16       Q.   I'm sorry.  Could you tell me who you're
17 17   talking about?
18 18       A.   Bob Barlett is the gentleman's name who was put
19 19   in my position in June of 2005.
20 20       Q.   And what position was that?
21 21       A.   Director of the Office of Marine Safety.  Mr.
22 22   Barlett has absolutely no marine background.  Mr.
23 23   Barlett, as I said, was known throughout the Agency as
24 24   the chief of stuff.  He was asked to -- he was assigned
25 25   to that position.  He presented a report, the Tacky 2

Page 32

1  1    (phonetic sp.) which I had completed in early June of
2  2    2005.  He presented it to the Board as his report.  He
3  3    was in that position until the fall of 2005, and I was
4  4    removed and placed in the Office of Safety
5  5    Recommendations and Accomplishments.
6  6        Q.   When were you removed?
7  7        A.   June of 2005.
8  8        Q.   And were you removed after you did not receive
9  9    the SES position?
10 10       A.   Yes.
11 11       Q.   Were you removed after someone, excuse me, was
12 12   selected for the SES position?
13 13       A.   Yes.  Again, this is only information that I
14 14   have based on what people told me, so I don't have the
15 15   exact dates of things occurring.  I take that back.
16 16   Based on what they have told me, they had selected
17 17   someone for the Director position, Jack Spencer, and they
18 18   were going to make the announcement and I was being
19 19   removed.
20 20       Q.   So what was retaliatory then was that Bob
21 21   Barlett was put in what was your position?
22 22       A.   Director of the Office of Marine Safety.
23 23       Q.   And then what else was retaliatory?
24 24       A.   I was removed from the office.  That was the
25 25   main issue.  I was removed from my career position, my

Page 33

1  1    marine career position.  I was not even allowed to remain
2  2    in the Office of Marine Safety.  I offered to assist with
3  3    the transition to make it as easy on my staff as
4  4    possible, that I would work for Jack when he came in to
5  5    help make him successful, and I was told hell, no, you
6  6    are out of here by Joe Osterman.
7  7        Q.   Is there anything else that Mr. Osterman did
8  8    that you believe was retaliatory?
9  9        A.   Yeah.  Mr. Osterman also denied me equal pay
10 10   during the time period that he was Managing Director.
11 11       Q.   During the time period that he was Managing
12 12   Director he denied you equal pay.  What position were you
13 13   holding at the time?
14 14       A.   Director of the Office of Marine Safety.  The
15 15   announcement that he was made the new Managing Director
16 16   came out, I believe, in March, so between March and June
17 17   I was still the Director of the Office of Marine Safety.
18 18   Mr. Osterman was aware that I was involved in an equal
19 19   pay complaint and he also did not do anything to equalize
20 20   my pay.
21 21       Q.   And what would that have involved in order to
22 22   equalize your pay?
23 23       A.   That would have been a number of options.  I
24 24   think I've already talked about those in my Equal Pay Act
25 25   suit.  But he could have used whatever system was allowed

Page 34

1 1  by OPM and certainly within NTSB.  NTSB had used a number
2 2  of procedures that -- their interpretation of the
3 3  regulations had apparently allowed them to use an SL
4 4  position in the past for an increase in pay and they had
5 5  done that.  They had used an SL position.
6 6    Q.  Okay.  I would like to know if there is
7 7  anything else that you'd like to include in the
8 8  retaliatory acts for Mr. Osterman.
9 9    A.  Let's see, we've gotten up through June of
10 10  2005.  When he moved me to the Office of Safety
11 11  Recommendations and Accomplishments, in October 2005 he
12 12  moved me to the Office of the Managing Director, and
13 13  throughout that time period he refused to let me work on
14 14  anything marine right through to my retirement in July of
15 15  2006.
16 16      He did not give me any performance standards.
17 17  He did not give me any interim evaluations, any final
18 18  evaluations, any opportunities to achieve awards even in
19 19  the administrative position he had placed me in or
20 20  positions he had placed me in.  And, again, I think that
21 21  covers everything, but I'm not positive.
22 22    Q.  You mentioned that you thought the 2005 panel,
23 23  which is the panel comprising -- well, I should back up.
24 24  For the 2005 panel, the panel that existed after the SES
25 25  position was readvertised, you mentioned you thought that

Page 35

1 1  panel retaliated against you and I wanted to find out
2 2  which members of the panel are you alleging retaliated
3 3  against you.
4 4    A.  I'm going to say all of them because the
5 5  summary evaluation for my assessment based on the
6 6  recruitment action had technical requirements for the
7 7  position, and one of the technical requirements was sea
8 8  time.  I say that because that's what Mr. Osterman
9 9  testified to.  They were specifically looking for people
10 10  who had time at sea aboard ships.  Clearly, I had time
11 11  aboard ships at sea and I was deemed not qualified.  In
12 12  2004 -- my credentials hadn't changed in that time period
13 13  -- I was deemed qualified in that same element.
14 14    Q.  Do you recall if the sea time category was a
15 15  requirement or was just deemed desirable?
16 16    A.  In the 2004 panel, in order to be qualified you
17 17  had to have both the mandatory and desirable
18 18  qualifications.  In the 2005 panel, I believe that was
19 19  changed, but --
20 20    Q.  So in 2005 --
21 21    A.  -- I'm basing that on memory, not having a
22 22  piece of paper in front of me, so I don't know.
23 23    Q.  That's fine.  But in 2005, was it a mandatory
24 24  requirement or desirable category?
25 25    A.  It was a desirable, is what it was listed as.

Page 36

1 1    Q.  Okay.  Who were the members of the panel for
2 2  2005?
3 3    A.  I'm going to have to go on other people's
4 4  testimony here because I was not part of the panel, so
5 5  all I can do is tell you what I have heard were the
6 6  members of the panel, but I don't actually have firsthand
7 7  knowledge of it.  If you'd like me to speculate on that,
8 8  I'll do that, but I believe that there were -- again, I'm
9 9  going to ask you if that's what you'd like me to do, to
10 10  give you my secondhand information as to who was on the
11 11  panel.
12 12    Q.  Well, when did you get the secondhand
13 13  information?  How did you come to understand who was on
14 14  the panel and when?
15 15    A.  Some of it was from testimony.  Some of it was
16 16  from, I think, pieces of paper.
17 17    Q.  Testimony during the course of this litigation?
18 18    A.  Correct.
19 19    Q.  But when you were working for the Agency, you
20 20  weren't aware of who was on the second panel?
21 21    A.  That's correct.
22 22    Q.  So even though you don't know who was on the
23 23  panel, you believe they retaliated against you anyway, is
24 24  that correct?
25 25    A.  Even though I don't know everybody who was on

Page 37

1 1  the panel, do I believe they retaliated against me?
2 2    Q.  Right.
3 3    A.  Yes.
4 4    Q.  So you aren't claiming that specific
5 5  individuals retaliated against you, I guess, then on the
6 6  panel?  Is it the panel at large or specific individuals
7 7  that retaliated against you?
8 8    A.  Well, the panel's made up of specific
9 9  individuals.
10 10    Q.  And each one retaliated against you?
11 11    A.  All I have is the summary of what their
12 12  assessment was, so I don't have any of the discussion
13 13  that went on.  I do know that there were two members of
14 14  the panel in 2004 who were also on the 2005 panel.
15 15    Q.  Who were they?  Did you know that at the time
16 16  when you were working for the Agency?
17 17    A.  No.
18 18    Q.  Okay, but you know it now?
19 19    A.  But I -- yes, I believe I know it now.
20 20    Q.  Okay.  Tell me who --
21 21    A.  One was Bob Chipkevitch (phonetic sp.) and the
22 22  other one was Elaine Weinstein (phonetic sp.).  The third
23 23  one I definitely knew at the time and that was the
24 24  General Counsel, Ron Batachi.
25 25    Q.  And you believe he was on the second panel?

Page 38

1  1     A.  No, he was not on the second panel.  He was on
2  2  the first panel only.
3  3     Q.  And you believe the first panel discriminated
4  4  against you?
5  5     A.  No.  The first panel determined that I was
6  6  highly qualified.
7  7     Q.  So I'm just trying to be clear.  Do you believe
8  8  that Ron Bartowski [sic] retaliated against you?  You
9  9  mentioned his name, so I'm trying to --
10 10    A.  Oh, you're talking about when he was on the
11 11  first panel?  No, that is not part of the retaliation.
12 12    Q.  Okay.
13 13        REPORTER:  Sorry, counselor.  You guys are
14 14  talking over each other.  Try not to.  Thanks.
15 15        BY MS. McBARNETTE:
16 16    Q.  Do you have any reason to believe why Bob
17 17  Chipkevitch would retaliate against you?
18 18    A.  Only his conversations with Dan Campbell.
19 19    Q.  That he told you about?
20 20    A.  No.
21 21    Q.  Okay.  So explain to me the reasons that you
22 22  have to believe that he would retaliate against you.
23 23    A.  Again, it's my analysis of the facts, that Mr.
24 24  Chipkevitch at some point became aware of either my
25 25  protected activity directly or indirectly --

Page 39

1  1     Q.  What I had --
2  2     A.  -- via Dan Campbell.
3  3     Q.  And the same question then for Elaine
4  4  Weinstein, do you believe -- how is it that you believe
5  5  she would retaliate against you?  Why?
6  6     A.  Why do I believe she would retaliate against me
7  7  if she had known that I was involved in protected
8  8  activity?  Ms. Weinstein had shared information with me
9  9  in the past about her involvement in a prior case.  I
10 10  believe Ms. Weinstein would be -- you asked for why I
11 11  believed that she would be a person who would retaliate
12 12  against me.
13 13    Q.  You mentioned Mark Rosenker was also someone
14 14  who had retaliated against you.  Can you explain to me
15 15  what he did to make you say that he retaliated against
16 16  you?
17 17    A.  The decision to not consider an SL position was
18 18  what Mr. Osterman told me.  His -- Mark Rosenker was one
19 19  of the political managers.  He was the Acting Chairman, I
20 20  believe, at the time, and so the -- and Mr. Osterman told
21 21  me that I had two choices in May of 2005.  One was to
22 22  move from the Office of Marine Safety to a space in
23 23  Research and Engineering and I would work in the Office
24 24  of Safety Recommendations and Accomplishments or to
25 25  retire, and he had had that discussion, he said, with

Page 40

1  1  Mark Rosenker, Ellen Engleman-Connors, Dan Campbell and
2  2  Ron Batachi.
3  3     Q.  The two choices were what?
4  4     A.  I had two choices.  One was to -- excuse me.
5  5  They were removing me from the Office of Marine Safety,
6  6  so it was to move to the Office of Safety Recommendations
7  7  and Accomplishments or to retire.  Those were my two
8  8  options.
9  9     Q.  And Mark Rosenker retaliated against you by how
10 10  again?
11 11    A.  Removing me from the Office of Marine Safety,
12 12  removing me from my career.
13 13    Q.  Mark Rosenker did?
14 14    A.  Joe Osterman told me that Mark Rosenker was one
15 15  of the people who made that decision, that's correct.
16 16    Q.  To move you from OMS to a different office?
17 17    A.  To a different office or to retire.  I had two
18 18  choices.  I wasn't even eligible to retire at that point,
19 19  so I had one choice.
20 20    Q.  Anything else?
21 21    A.  He continued as Chairman, as the second line
22 22  supervisor, up until -- again, it wasn't clear to me who
23 23  my supervisor and second line supervisor were after June
24 24  of 2005, but through June of 2005 he was my second line
25 25  supervisor so, therefore, if Joe Osterman were my first

Page 41

1  1  line supervisor, then Mark Rosenker was my second line
2  2  supervisor and he, too, failed to give me an evaluation
3  3  for 2004/2005 --
4  4     Q.  Anything else?
5  5     A.  -- which, of course, precluded me from not just
6  6  the evaluations but, again, from any award money.
7  7     Q.  Okay.  Anything else?
8  8     A.  That's all that comes to mind right now.  Of
9  9  course, he was the Chairman right through my retirement,
10 10  so any -- yeah, that's all that comes to mind right now.
11 11    Q.  And you also mentioned a General Counsel
12 12  discriminated against you.
13 13    A.  Ron Batachi.
14 14    Q.  How so?
15 15    A.  Ron, according to Joe, was one of the people
16 16  who participated in that group decision to remove me from
17 17  the Office of Marine Safety.  So when you say
18 18  discriminated, it was retaliation.
19 19    Q.  Yes.  Any other way that he retaliated against
20 20  you?
21 21    A.  I would say that was the major one.
22 22    Q.  You also mentioned that Elaine Weinstein
23 23  retaliated against you.  Can you tell me how?
24 24    A.  Elaine was a member of the 2005 panel and
25 25  changed my evaluation for the technical sea time from

Page 42

1  1  qualified to not qualified, so her participation in that
2  2  panel -- one, for the second courses, she did not give me
3  3  any performance standards during the time period that I
4  4  worked for her. In fact, she didn't even give me any  --
5  5  I didn't have any marine work, but I didn't even have
6  6  work that would qualified in any way, shape or form as
7  7  being work that an executive or a professional would be
8  8  involved in. I was doing administrative work for Ms.
9  9  Weinstein when I was in the Office of Safety
10 10 Recommendations and Accomplishments.
11 11    Q. So she retaliated against you by giving you
12 12 work?
13 13    A. Giving me administrative work. There were no
14 14 performance standards. There was no evaluation from Ms.
15 15 Weinstein during the time period that I worked for her.
16 16    Q. How long did you work for her?
17 17    A. From June of 2005 through October of 2005.
18 18    Q. Anything else?
19 19    A. That's all that comes to mind right now.
20 20       REPORTER: Counselor, I'd like to switch tapes.
21 21             (OFF THE RECORD)
22 22             (ON THE RECORD)
23 23    BY MS. McBARNETTE:
24 24    Q. Do you recall who your supervisor was after
25 25 Elaine Weinstein?

Page 43

1  1    A. Joe Osterman, I believe.
2  2    Q. Anyone else?
3  3    A. It was difficult to tell, but I think either --
4  4  one of his deputies may have by default served as my
5  5  supervisor, either Barbara Check (phonetic sp.) or David
6  6  Myer.
7  7    Q. Are you alleging that either Barbara Check or
8  8  David Myer retaliated against you?
9  9    A. If they were the supervisors of record, then
10 10 they did not provide me with performance standards, gave
11 11 me no interim evaluation, gave me no final evaluation.
12 12    Q. Okay. We just went through a very long list.
13 13 Is there anything else that you can think of that
14 14 comprises your retaliation claim?
15 15    A. Essentially forcing me to retire I would
16 16 consider as an overall outcome of the retaliation.
17 17    Q. And who forced you to retire?
18 18    A. The decision makers at the Agency who removed
19 19 me from my career work in marine safety.
20 20    Q. Can you be specific and name them?
21 21    A. Okay. Let me see if we can go back through the
22 22 people who started the process. I think I've already
23 23 answered this, but I'll try again. The people that Mr.
24 24 Osterman told me he had discussed it with were -- so it
25 25 would be Joseph Osterman.

Page 44

1  1    Q. Discussed what with?
2  2    A. The removal from the Office of Marine Safety.
3  3  So the first one would be Mr. Osterman. The second one
4  4  would be -- well, let me just go down the list, Daniel
5  5  Campbell, Ellen Engleman-Connors, Mark Rosenker and Ron
6  6  Batachi.
7  7    Q. And what did these individuals do to force you
8  8  to retire?
9  9    A. They removed me from my career. I was doing
10 10 administrative work after I was removed from the Office
11 11 of Marine Safety. I was not permitted to stay in my
12 12 career field.
13 13    Q. Anything else?
14 14    A. Other than not being permitted to remain in my
15 15 career field? That was, in fact, the major reason why
16 16 I was forced to retire, yes.
17 17    Q. That was, in fact, one of the major reasons?
18 18 Is there another major reason?
19 19    A. I said that was the major reason why I was
20 20 forced to retire.
21 21    Q. I'm trying to find out all the reasons that you
22 22 claim that you were forced to retire, so if you can list
23 23 them for me I'd appreciate it.
24 24    A. Well, that is essentially the reason why I
25 25 retired. I was not working in marine. I had absolutely

Page 45

1  1  no hope of ever getting back to marine at the Safety
2  2  Board. I had a 30 year career at risk that was -- that I
3  3  was deprived of. I had to find a way somehow to get back
4  4  into marine work, and so the only way I could do that was
5  5  to find outside employment.
6  6    Q. Is that it?
7  7    A. That's it.
8  8    Q. Okay. So if you can just take one more moment
9  9  and think if there's any other claim that you're making
10 10 for retaliatory acts and then let me know.
11 11    MR. SCHER: Objection, asked and answered.
12 12    MS. McBARNETTE: Well, the last time I asked
13 13 she came up with a new one, so I'm asking again just in
14 14 case there's something else that you may have missed.
15 15    MR. SCHER: That's fine. You can answer.
16 16    WITNESS: Okay. No, I don't think that I can
17 17 think of anything else right now, but I don't know that
18 18 that was a new one. I think that was --
19 19    BY MS. McBARNETTE:
20 20    Q. Or at least one that you hadn't mentioned
21 21 before.
22 22    A. Okay.
23 23    Q. So in your complaint you mentioned that you had
24 24 a conversation with Ms. Connors in April of 2004. Could
25 25 you explain how it came that you were talking with Ms.

Page 54

1 1 but by saying to her I'm not being paid the same as my
2 2 male counterparts in the modal offices, I felt it was
3 3 enough information for her to be able to understand that.
4 4 She's a lawyer or she was a lawyer. I don't know if she
5 5 is or not, but I felt she was certainly intelligent
6 6 enough to be able to understand.
7 7     Q.  Did she say anything to you to indicate that
8 8 she believed that yes, in fact, you were being
9 9 discriminated against?
10 10     A.  Other than the remark about tell me about it,
11 11 there are deputies who are SES.  She was the first one to
12 12 raise the SES issue.  I was not.
13 13     Q.  And what does tell me about it, there are
14 14 deputies that are SES mean to you?  I know I asked you
15 15 this before, but if you could clarify what that statement
16 16 signifies to you.
17 17     A.  If signified to me that she understood that
18 18 there were deputies, male deputies, who were being paid
19 19 more than I was.
20 20     Q.  Did she say that there were male deputies or
21 21 did she just say that there were deputies that are SES?
22 22     A.  She said there were deputies.
23 23     Q.  But you took it to mean that there were male
24 24 deputies?
25 25     A.  There were only male deputies in the other

Page 55

1 1 modal offices.
2 2     Q.  And you took it to mean that she was only
3 3 referring to the modal offices?
4 4     A.  She could have also have meant RE.  They also
5 5 had male deputies in RE who were SES, but you'd have to
6 6 ask her.  She just made the comment.  I just moved on
7 7 from there.  It was not the SES that I was specifically
8 8 focusing on.
9 9     Q.  Well, this comment you take -- you seem to be
10 10 taking it as significant.  I'm trying to figure out why.
11 11 On its face it doesn't seem to pertain to gender, so how
12 12 is it that you took the statement to mean something in
13 13 regards to gender?
14 14     MR. SCHER:  Objection, mischaracterization,
15 15 argumentative.  Go ahead.
16 16     WITNESS:  Yeah.  I think I've already answered
17 17 your questions.
18 18     BY MS. McBARNETTE:
19 19     Q.  Yes.  Could you please explain?
20 20     A.  Please explain?
21 21     Q.  How is it that you took this statement to mean
22 22 something regarding gender?
23 23     A.  Because the Deputy SESers in the other offices
24 24 were all male.
25 25     Q.  Did you have a conversation regarding unequal

Page 56

1 1 pay with any other person in the executive branch
2 2 executives, any other executives?
3 3     A.  Dan Campbell.
4 4     Q.  When did you discuss with Dan Campbell that you
5 5 weren't getting paid the same amount as your male
6 6 counterparts?
7 7     A.  There were at least two occasions.  The first
8 8 one came sometime about Bob Chipkevitch had been given
9 9 the SES in Railroad, and Joe Osterman and I had a meeting
10 10 with Dan Campbell.  We were talking about work and the
11 11 issue was raised about when were Joe and I going to get
12 12 SES positions.  We weren't being paid the same as -- in
13 13 fact, it was not when were we going to get SES positions,
14 14 it was when were we going to get paid the said as
15 15 Chipkevitch, now Aviation and Mail were being paid at
16 16 this level, and Dan Campbell we've submitted paperwork.
17 17 We're consistently submitting paperwork for SES
18 18 positions, and Joe immediately responded even faster than
19 19 I did that it was not the SES position specifically that
20 20 he was interested in, he was interested in the pay and I
21 21 responded, as I say, virtually at the same time to say
22 22 the same thing, it was the issue of pay.
23 23     Q.  Any other time?
24 24     A.  Yes.  When the advertisement was put out for
25 25 the Director of the Office of Highway Safety, I went in

Page 57

1 1 to see Dan Campbell and asked him again.  He said I don't
2 2 know when I'm going to take care of you.  I know right
3 3 now I have to do this for Joe.
4 4     Q.  Who was the Director of Highway Safety?
5 5     A.  When?
6 6     Q.  At this time?  You said that there was an SES
7 7 advertised, so at the time who was the Director?
8 8     A.  Joe Osterman.
9 9     Q.  And when you went in to see Dan Campbell when
10 10 this position was advertised --
11 11     A.  Yes.
12 12     Q.  -- what exactly was your complaint?
13 13     A.  What was my complaint?
14 14     Q.  Yeah.
15 15     A.  It was my request for pay essentially, to ask
16 16 what about me getting paid.  He said I don't know when
17 17 I'm going to -- I don't know about you.  All I know is
18 18 right now I've got to do this for Joe.
19 19     Q.  Okay.
20 20     A.  And that's -- you know, we could put it in
21 21 quotes, but it was -- that was the general statement that
22 22 he made.
23 23     Q.  And this was the second time then that you had
24 24 asked Dan Campbell about getting paid higher than what
25 25 you were receiving, equal to that of other modal heads,

Page 58

1  1  is that correct?

2  2    A.  Well, when you say the second time, it was

3  3  another time that I had said it to him because there was

4  4  another occasion in which I had asked him about being

5  5  paid for overtime, and he said I'll for you what I

6  6  would do -- what I did when I was General Counsel, and

7  7  that was I would tell my attorneys that if they worked

8  8  overtime, they could take a day off now and again and I

9  9  would look the other way.

10  10    Q.  So did he tell you that you could get overtime

11  11  pay?

12  12    A.  No.  He said it was -- my working overtime was

13  13  one of the privileges of working in the office as a

14  14  manager.

15  15    Q.  So you have just described three conversations

16  16  regarding pay.

17  17    A.  Correct.

18  18    Q.  Do you recall any other conversations that you

19  19  may have had with Dan Campbell regarding pay?

20  20    A.  Regarding pay or regarding equal pay?

21  21    Q.  Pay equal to other modal heads.

22  22    A.  That would be -- those are the three that I

23  23  recall.

24  24    Q.  The first conversation that you mentioned, you

25  25  and Mr. Osterman met with Dan Campbell.  Did you convey

Page 59

1  1  to Mr. Campbell that you believed that there was some

2  2  sort of gender discrimination going on and that was why

3  3  you weren't getting the same pay as the other modal

4  4  heads?

5  5    A.  No.

6  6    Q.  The second time that you mentioned -- this is

7  7  when the SES position was advertised for Highway Safety

8  8  -- did you mention or convey to Dan Campbell that you

9  9  believed that you were being discriminated against and

10  10  not getting the pay because you were a woman?

11  11    A.  No.

12  12    Q.  The third conversation that you discussed

13  13  regarding overtime, did you convey during that

14  14  conversation that you believed you weren't getting paid

15  15  equal to the other modal heads because there was some

16  16  sort of gender discrimination going on?

17  17    A.  I did not mention gender discrimination, no.

18  18    Q.  The first time that you had a conversation with

19  19  Dan Campbell, at least the first conversation that you

20  20  mentioned -- this is when you and Mr. Osterman met with

21  21  Dan Campbell -- you mentioned that Mr. Chipkevitch had

22  22  gotten his SES.  Can you tell me what time frame we're

23  23  talking about?

24  24    A.  That would have been, I believe, in the 2000

25  25  time frame, is when Mr. Chipkevitch got his SES.  Now

Page 60

1  1  when the conversation took place, I can't give you -- it

2  2  would be sometime between when Bob Chipkevitch was given

3  3  the SES and when the advertisement came out for the

4  4  Director of the Office of Highway Safety.

5  5    Q.  Which was when?

6  6    A.  I believe that was in 2003.

7  7    Q.  So when the SES was advertised for the Director

8  8  of Highway Safety, you had a conversation with Dan

9  9  Campbell.  When about did you have this conversation with

10  10  Mr. Campbell?

11  11    A.  When the advertisement came out.

12  12    Q.  So sometime in 2003?

13  13    A.  Yes.  That probably would have been -- yes.  It

14  14  was yeah, sometime in 2003.

15  15    Q.  The third conversation that you mentioned where

16  16  you asked for overtime pay, do you recall about when you

17  17  had this conversation?

18  18    A.    That conversation was linked to a recruitment.

19  19  It was a recruitment for the Chief of the Report

20  20  Development Division.  I believe that was in 2003.  It

21  21  may have been 2002, but somewhere in that time period.

22  22    Q.  You said that it was linked to the Chief of the

23  23  Report Development Division or an advertisement for that

24  24  position.

25  25    A.  It was linked to his -- it was linked to the

Page 61

1  1  outcome of that advertisement.

2  2    Q.  Was there a person who was selected for that

3  3  position?

4  4    A.  Yes.

5  5    Q.  Who was it?

6  6    A.  Patricia Barnes.

7  7    Q.  Were you asked for overtime because you

8  8  believed Patricia Barnes was getting overtime?

9  9    A.  I asked for overtime because Mr. Campbell

10  10  refused to agree to promoting to Patricia Barnes, and he

11  11  then refused to let me -- since he would not agree to who

12  12  I had selected, he had -- he had asked me to consider for

13  13  the position a personal friend of his, Charlie Pierra

14  14  (phonetic sp)., and when I did not select Mr. Pierra, he

15  15  called me into his office and he asked me several

16  16  questions because when I had sent forward the

17  17  advertisement with my selection, Patricia Barnes, I had

18  18  sent it forward with a memo telling him that I wanted to

19  19  thank the panel as well, and I wanted to thank the

20  20  panel for doing such a nice job on it.

21  21    Q.  So I'm not sure I understand what the

22  22  connection is between your asking for overtime and Mrs.

23  23  Barnes' promotion or non-promotion.

24  24    A.  Because Mr. Campbell also said he would not let

25  25  me readvertise for the position, so I was not going to

Page 62

1 1  get anybody into that position since I did not select the
2 2  person he wanted, which is why in April of 2004 I
3 3  included that request when I went to see the Chairman.
4 4  He would not let me readvertise for the position, which
5 5  meant I was going to have to continue working excessive
6 6  hours to make up for a missing billet.
7 7  Q. So in April of 2004 when you asked for overtime
8 8  from Ms. Connors, you already knew that Dan Campbell
9 9  believed that you could not get overtime pay?
10 10  A. No.
11 11  Q. Dan Campbell had already denied you overtime
12 12  pay by April 2004, is that correct?
13 13  A. Dan Campbell had said he would instead look the
14 14  other way if I wanted to take time off when I worked
15 15  overtime. He did not say that I was not eligible for
16 16  overtime. He did not say that I could not receive
17 17  overtime. What he said was I could take a day off which
18 18  was ludicrous. The reason I was putting in the overtime
19 19  already was to make up for missing personnel. For me to
20 20  take a day off would only serve to interfere with my
21 21  completion of projects.
22 22  Q. Did you tell Mr. Campbell at the time that you
23 23  didn't want a day off, you wanted overtime pay?
24 24  A. Yes.
25 25  Q. And what did he say?

Page 63

1 1  A. I said to him if I were to take a day off, all
2 2  it would do would be to serve to undermine my completing
3 3  my projects on time.
4 4  Q. And what did he say?
5 5  A. He said that was one of the privileges I
6 6  derived from being a manager.
7 7  Q. So did he answer your question, whether you
8 8  could or could not get overtime pay?
9 9  A. He answered the question as to whether he was
10 10  going to let me get overtime pay, yes.
11 11  Q. Did you consider that to be an official request
12 12  for overtime pay, the conversation that you had with Mr.
13 13  Campbell?
14 14  A. Yes.
15 15  Q. Did you submit any paperwork requesting
16 16  overtime?
17 17  A. You have to get approval in advance for
18 18  overtime. Submitting paperwork is not something you can
19 19  do after the fact. You have to get approval in advance
20 20  to be paid overtime.
21 21  Q. Was it your understanding that you could get
22 22  overtime?
23 23  A. That I was eligible for overtime?
24 24  Q. Um-hum.
25 25  A. Yes. It was my understanding I was eligible

Page 64

1 1  for overtime. I believe at the time I asked him I was
2 2  probably a 15/8, but I may have been a 15/9. I don't --
3 3  I'd have to look at some dates and see.
4 4  Q. How did you come to this understanding that you
5 5  could get overtime?
6 6  A. It actually was linked to the -- we had
7 7  received special authority from Congress for true
8 8  overtime. It was very unusual. I think there were a
9 9  number of agencies it permitted, but I think it's a very
10 10  specialized authority. And we had received it for people
11 11  who were involved with launches to accident scenes. The
12 12  interpretation of the Agency was that it was not just for
13 13  people who were actually at the accident scene, but it
14 14  was people who were supporting the accident back at the
15 15  office, and when I had a team on scene, I was up -- I
16 16  can't say I was up 24 hours a day, but I was -- it was
17 17  around the clock responsibility. I'd take a nap, come
18 18  back to getting onto the phone or following up or
19 19  whatever. I mean it was -- you literally slept wherever
20 20  you could whenever you could if even only for a half-an-
21 21  hour.
22 22  Q. I would like to know how you came to the
23 23  conclusion that it was an office interpretation that
24 24  those at the accident scene would also include those that
25 25  were at the office and not at the accident scene.

Page 65

1 1  A. Mr. Campbell made that announcement.
2 2  Q. Do you know if any other directors of modal
3 3  offices got overtime?
4 4  A. I don't know.
5 5  Q. Are you aware if other modal heads believed
6 6  that they could get overtime?
7 7  A. I don't know.
8 8  MS. McBARNETTE: Let's go off the record for a
9 9  minute.
10 10  (OFF THE RECORD)
11 11  (ON THE RECORD)
12 12  BY MS. McBARNETTE:
13 13  Q. Just to follow up with the overtime
14 14  conversation, are you aware of any caps on overtime?
15 15  A. Yes.
16 16  Q. Okay. What caps are you aware of?
17 17  A. 15/Step 10, I believe, is one of the caps that
18 18  exists for overtime. True overtime, I believe, that it
19 19  was also restricted by that cap.
20 20  Q. Did you become a 15/Step 10?
21 21  A. In January or February of 2005.
22 22  Q. Did you ever tell anyone that you thought that
23 23  you were being discriminated against by not getting the
24 24  same pay as the other modal heads based on gender?
25 25  A. When you say anybody, who do you mean? Do you

Page 150

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 152

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 151

1   A.  As I said, he would sit down and say you've
2   completed some useful this year.  Here's some money we've
3   decided to give to you.
4       Q.  He would sit down to do this or would this be
5   something he would do in passing?
6       A.  No, we would sit down to do this.  Sometimes we
7   would sit down.  I would say -- yes, I would say in
8   general we were sitting down.
9       Q.  But you don't recall ever having a substantive
10  conversation about your performance --
11      A.  No.
12      Q.  -- with Dan Campbell?
13      A.  No.
14      Q.  Did the Chairpeople tend to have sit down
15  conversations with you about your performance?
16      A.  When -- I'm trying to remember since prior to
17  Marian Blakey coming on board it was very rare.  Ellen
18  Engleman-Connors had a sit down with me in 2003, which
19  was my 2002/2003 evaluation and, yes, we sat down.
20      Q.  The year before, how did you get your
21  performance evaluation?
22      A.  I don't know that I got a performance
23  evaluation the year before, a written one.  I don't know
24  and I don't have any copies of them, if they existed, and
25  apparently the Board doesn't either.

Page 153

1       Q.  Do you recall how you received past performance
2   evaluations?
3       A.  As I said, it would be either -- again, as I
4   say, it was not a -- it was certainly not a ritual with
5   Dan Campbell.
6       Q.  For example, would you get it in your box?
7       A.  I would not always receive a written
8   evaluation.  As I said, the one thing I did receive every
9   year was a performance award, money, and so there was not
10  always a piece of paper to go with that other than the
11  paperwork that was necessary to be filled out for the
12  award.
13          There were separate pieces of paper, and those
14  pieces of paper would be -- it would have a -- it's a
15  format that the Agency has and it would say award, and
16  then somebody would have to check if it were a special
17  performance award, was it related to annual performance.
18  You know, the check mark would be there for what it was
19  and the dollar amount, and that would then be reflected
20  on a formal -- that was the handwritten version that
21  would be signed by the Managing Director and I believe
22  the Chairman every year, and that would be the only --
23  sometimes the only pieces of paper that I would receive.
24      Q.  Did Marian Blakey sit down with you and
25  evaluate your performance?

Page 154

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 155

1  1    A.  I don't believe Marian Blakey was there during
2  2  that final performance period.
3  3    Q.  Did Carol Carney (phonetic sp.) ever sit down
4  4  with you and evaluate your performance?
5  5    A.  I don't recall if she did or not but, again, I
6  6  don't know if she were the person who was there at the
7  7  time or not.
8  8    Q.  At the time of your performance evaluation?
9  9    A.  My final evaluation, yes.
10 10    Q.  What about Jim Hall, do you recall if he ever
11 11  sat down with you and discussed your performance?
12 12    A.  Yes.  Jim Hall I recall telling me how I was at
13 13  the top of my game.
14 14    Q.  Do you recall having a formal session where you
15 15  actually sat down with him and discussed your
16 16  performance?
17 17    A.  Well, going through the elements of the
18 18  performance and what I would consider to be a formal
19 19  review, no.
20 20    Q.  Did anyone ever sit down with you and do a
21 21  formal review of your performances throughout the years?
22 22    A.  Yeah, Ellen Engleman-Connors did in -- at the
23 23  end of 2003.
24 24    Q.  And she talked about each category of
25 25  performance?

Page 156

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 157

1  1    A.  She did.  She said you've done outstanding
2  2  work.  She said it's been an incredible year.  Your
3  3  leadership of the office is testament to your work.  She
4  4  said you don't have perfect O's because nobody got
5  5  perfect O's.  Nobody is perfect in my book.  I said okay.
6  6  She said here's the -- we're giving you some money for
7  7  that and I need you to sign your performance evaluation
8  8  because that's one of the mandatory things in order to
9  9  document receipt of the -- it doesn't mean you agree with
10 10  it, it just means you've received it.  You sign it.  You
11 11  give it back.  She signed it and kept it.
12 12    Q.  What year was that sit down conversation?
13 13    A.  2003.
14 14    Q.  And you received a cash award in 2003?
15 15    A.  Correct.
16 16    Q.  In 2004 did you receive a cash award?
17 17    A.  In 2004 -- I'm going to have to go back just a
18 18  little bit because the time period between when your
19 19  performance is evaluated and you actually get the money
20 20  in your paycheck are not necessarily in the same year.
21 21    Q.  Okay.
22 22    A.  So 2003 I received the paperwork for the cash
23 23  award, but the money may not have shown up in my paycheck
24 24  until January of 2004.  So my 2002/2003 evaluation was
25 25  given to me like in November of 2003, but the money may

Page 198

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 200

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 199

1  1    Q.  Okay.
2  2    A.  -- and I was just jotting down notes as he said
3  3  it.
4  4    Q.  Did he, in fact, ever offer you a position
5  5  regarding strategic planning?
6  6    A.  As I said, I think the strategic planning -- in
7  7  terms of offering me a position, I was never "offered a
8  8  position."  He, I think, included the strategic planning
9  9  work that he needed done in the work that I ultimately
10 10  ended up doing at -- when I was transferred from Safety
11 11  Recommendations to the Office of the Managing Director.
12 12    Q.  Okay.  Before you began to work for the
13 13  Managing Director's office, did you have a detail over in
14 14  the Office of Safety Recommendations?
15 15    A.  When I was removed from the Office of Marine
16 16  Safety, I was transferred over to work for Elaine
17 17  Weinstein in the Office of Safety Recommendations and
18 18  Accomplishments.
19 19    Q.  And what were you told that you'd be doing
20 20  there?
21 21    A.  There was some work over there that she had.
22 22  It was -- once a year the office directors were required
23 23  by law to go through an accounting of if we had
24 24  procedures and protocols in place, if we were using those
25 25  procedures and protocols.  Every office in the government

Page 201

1  1  is required to do it.  Her office was no exception and
2  2  the way that it was done in her office was essentially to
3  3  ask each manager to fill out a form.  Those forms were
4  4  then forwarded to me.  I summarized those forms and put
5  5  them into a package for Elaine Weinstein to sign and send
6  6  forward to the CFO.  That paperwork actually went through
7  7  the Chief Financial Officer.
8  8    Q.  Did you ever complain to Ms. Weinstein about
9  9  the work that you had from her?
10 10    A.  Oh, yes.
11 11    Q.  And what did you complain about?
12 12    A.  That there was no marine work.
13 13    Q.  Did you expect her to give marine work to you?
14 14    A.  She had an element within her office for marine
15 15  safety recommendations that there could have been some
16 16  work in that area, but --
17 17    Q.  Did that area work with the Office of Marine
18 18  Safety?
19 19    A.  Yes.
20 20    Q.  What other types of complaints did you have for
21 21  Ms. Weinstein?
22 22    A.  The work was administrative.  It did not
23 23  require a GS-15 or an SES, anybody of that caliber, to do
24 24  it.
25 25    Q.  Did you have a position description for that

Page 202

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 204

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 203

| | | |
|---|---|---|
| 1 | 1 | particular job? |
| 2 | 2 | A.  No. |
| 3 | 3 | Q.  How did you know what responsibilities and |
| 4 | 4 | duties you had? |
| 5 | 5 | A.  I didn't. |
| 6 | 6 | Q.  Was Ms. Weinstein responsible for giving you a |
| 7 | 7 | performance appraisal? |
| 8 | 8 | A.  She should have, yes. |
| 9 | 9 | Q.  And did she? |
| 10 | 10 | A.  No. |
| 11 | 11 | Q.  Where did you go after you stopped working for |
| 12 | 12 | Ms. Weinstein? |
| 13 | 13 | A.  To the Office of the Managing Director. |
| 14 | 14 | Q.  How did that come about? |
| 15 | 15 | A.  I was told I was being moved to the Office of |
| 16 | 16 | the Managing Director.  Elaine had apparently -- she said |
| 17 | 17 | she had no marine work for me again, and she had talked |
| 18 | 18 | to Joe Osterman and I was being transferred to the Office |
| 19 | 19 | of the Managing Director. |
| 20 | 20 | Q.  Did you understand that you'd be doing marine |
| 21 | 21 | work over at the Office of the Managing Director? |
| 22 | 22 | A.  No. |
| 23 | 23 | Q.  Who was your supervisor during that time? |
| 24 | 24 | MR. SCHER:  Objection, asked and answered three |
| 25 | 25 | times.  Go ahead. |

Page 205

| | | |
|---|---|---|
| 1 | 1 | WITNESS:  Yeah.  I believe it was Joe |
| 2 | 2 | Osterman. |
| 3 | 3 | BY MS. McBARNETTE: |
| 4 | 4 | Q.  Was he your first line supervisor? |
| 5 | 5 | A.  I believe so. |
| 6 | 6 | Q.  Did you get work from Joe Osterman? |
| 7 | 7 | A.  Yes. |
| 8 | 8 | Q.  You would go to his office and he would provide |
| 9 | 9 | work for you? |
| 10 | 10 | A.  I talked to -- yes, I would go to his office |
| 11 | 11 | and he would provide -- he gave me work assignments, um- |
| 12 | 12 | hum. |
| 13 | 13 | Q.  Did you ever ask anyone for a position |
| 14 | 14 | description? |
| 15 | 15 | A.  Yes, I believe I did, but I believe that was |
| 16 | 16 | not -- yes, I -- |
| 17 | 17 | Q.  How long were you in that position? |
| 18 | 18 | A.  From June of 2005 through October of 2005 I was |
| 19 | 19 | in the Office of Safety Recommendations and |
| 20 | 20 | Accomplishment, so in October of 2005 I was transferred |
| 21 | 21 | from SR over to the MD's office and I was in a position |
| 22 | 22 | from that time until I retired in July of 2006. |
| 23 | 23 | Q.  Did you discuss being discontented with the |
| 24 | 24 | work that you were doing with anyone in the Managing |
| 25 | 25 | Director's office? |

Page 218

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 220

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 219

1  A.  Okay.  Oh, okay.
2  Q.  And who has signed here, can you tell?
3  A.  It says -- I believe it says Barbara Check and
4  David Mayer, but I don't know if they -- if those are
5  those are their signatures specifically because I'm not a
6  signature expert, but I'll -- and Kim Butler Baylor who's
7  the Human Resources Specialist.
8  Q.  Okay.
9  A.  As I said, normally you'd expect to see that on
10  002273, but I don't see that there.
11  Q.  But you don't have any reason to believe that
12  these signatures aren't theirs?
13  A.  I have no reason to believe it's not theirs,
14  no.
15  Q.  And on the first page, Part 1, the Request for
16  Personnel Action, is this document pertaining to you, for
17  example, for preparation of SF 50, the name Marjorie Ann
18  Murtagh?
19  A.  I'm sorry.  Where are you looking at
20  preparation for SF 50?
21  Q.  Part B.
22  A.    Am I looking at the wrong page or -- oh, sorry.
23  I see it now, Part B, for preparation of SF 50.  Yes,
24  Marjorie Murtagh.
25  Q.  Did you see these pages when you worked for the

Page 221

1  Agency?
2  A.  Probably.
3  Q.  So you saw the position description for your
4  reassignment effective October 16th, 2005?
5  A.  Repeat that again.
6  Q.  So you saw the position description for your
7  assignment that was effective October 16th, 2005?
8  A.  No.
9  Q.  But you saw these pages when you worked for the
10  Agency?
11  A.  Well, these pages aren't signed until December
12  12th of 2005, so if I had seen them, it would have been
13  after that time.
14  Q.  After October?
15  A.  After December.
16  Q.  After December.  Do you recall when you retired
17  from the NTSB?
18  A.  Yes.
19  Q.  When?
20  A.  July 4th, 2006.
21  Q.  Were you eligible for retirement at that time?
22  A.  Yes.
23  Q.  When did you become eligible?
24  A.  In October of 2005.
25  Q.  Why did you retire?

Page 222

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 223

1    1       A.   I was forced to retire.
2    2       Q.   How so?
3    3       A.   I had at that point spent a year outside of my
4    4    career.  I had spent 30 years establishing a career in
5    5    marine safety and I had been removed from that career,
6    6    and I knew that if I stayed any longer I would not be
7    7    able to pick up my career at all, so I looked for a
8    8    position that I could at least continue my career in, and
9    9    financially my husband and I worked out a way that we
10  10   could stay alive if I retired.
11  11       Q.   Why did you decide to retire at that time, July
12  12   2nd, 2006?
13  13       A.   It was, I believe, July 4th of 2006.  It was
14  14   when I could get a job in marine safety.  It was an
15  15   opportunity for me to, as I said, get a position that I
16  16   could continue my career in, and I already had a one year
17  17   gap in my career that I was going to have to explain for
18  18   the rest of my career as a result of the retaliation I
19  19   had experienced at NTSB.
20  20       Q.   So you left NTSB to go to a new job?
21  21       A.   I left NTSB to retire and go to a new job,
22  22   that's correct.
23  23       Q.   And what was the new job again?
24  24       A.   I work as an associate for Robson Forensics,
25  25   Incorporated.

Page 225

1    1       Q.   Did you ever attempt to rescind your
2    2    retirement?
3    3       A.   No.  Did I ever intend to rescind my
4    4    retirement?
5    5       A.   Attempt.
6    6       Q.   Did I ever -- oh, sorry.  Yes, you're correct,
7    7    that's what you said, did I ever attempt to, no.  I was
8    8    not offered any marine work in the government, so I
9    9    couldn't do that.
10  10       Q.   Before you retired what positions did you apply
11  11   to in your field?
12  12       A.   The one that I got.
13  13       Q.   Just one?
14  14       A.   Correct.
15  15       Q.   So within the year that you spent away from
16  16   being the Director of OMS you only applied to one job?
17  17       A.   I looked for positions -- I searched for
18  18   positions that would allow me to use my background and
19  19   experience and that's the one that came up, um-hum.
20  20       Q.   Were there any other jobs that you were
21  21   eligible for within your field that you didn't apply to?
22  22       A.   Not that I know of.
23  23       Q.   Does that include the federal government as
24  24   well as the private sector?
25  25       A.   Yes, not that I know of.

# EXHIBIT NO. 29

# Timeline of Retaliation Against Ms. Murtagh Cooke

**Apr 2004**

Cooke Complained to Conners of Unequal Pay *(Ex. 2 at 53; Ex. 8 at ¶ 13; Ex. 9 at ¶ 13)*

Conners Relays Conversation to Campbell *(Ex. 2 at 66-68)*

**Jan 11, 2005**

NTSB Re-Advertised OMS Director SES Position *(Ex. 9 at ¶ 19)*

**Jun 2005**

NTSB Transfers Cooke to OSRA Assistant Planning Position *(Ex. 8 at ¶ 25; Ex. 9 at ¶ 25)*

**Oct 2005**

NTSB Transfers Cooke to an OMD Program Analyst Position *(Ex. 8 at ¶ 26; Ex. 9 at ¶ 26)*

**Jan 2005**

Cooke Requests Meeting with Conners on Unequal Pay. Conners Refuses *(Exs. 7 and 25; Ex. 2 at 23, 147, 149-152, 156-160.)*

**Feb 7, 2005**

Cooke Files Gender Based EEO Complaint *(Ex. 8 at ¶ 20; Ex. 9 at ¶ 20)*

**Mar 4, 2005**

Second SES Review Panel Deems Cooke Unqualified for Position *(Ex. 20)*

**Jul 2005**

NTSB Appoints OMS SES Position to Spencer *(Defendant's Memorandum, Ex. 17)*

**Dec 2, 2004**

First SES Review Panel Deems Cooke Qualified for Position *(Ex. 13)*

First SES Review Panel Deems Spencer Unqualified for Position *(Ex. 13)*

**Mar 28, 2005**

Third SES Review Panel Deems Cooke Unqualified for Position *(Ex 14)*

Third SES Review Panel Deems Spencer Qualified for Position *(Ex 14)*

| Apr 2004 | Jul 2004 | Oct 2004 | Jan 2005 | Apr 2005 | Jul 2005 |