## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MARK ROSENKER, Chairman, | ) | No. 1:06-cv-01928-JDB |
| National Transportation Safety Board, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE (CORRECTED VERSION)

### I.    Motion to Strike Jury Demand Is Unopposed

NTSB included a Motion to Strike the Jury Demand with its Motion for Summary Judgment ("MSJ").  See R. 24, Exh. 1.  Plaintiff filed no opposition to this Motion to Strike. Thus, for all the reasons presented in the Defendant's Motion, Plaintiff's request for a jury trial should be denied, and Defendant's Motion to Strike should be granted.

### II.    Plaintiff has No Cause of Action for Constructive Discharge

A reasonable interpretation of Plaintiff's alleged facts and argument led to a potential claim of constructive discharge, NTSB argued in its Motion why such a claim is invalid.  In her response, Plaintiff includes in the title of subpart III, "Plaintiff…Does Not Allege Constructive Discharge…."  R. 30 at 14.  Therefore, for the sake of clarity and to the extent that Plaintiff alleges constructive discharge in name or theory, because the Defendant's Motion is unopposed, it should be granted.  Plaintiff's claim of constructive discharge should be dismissed.

### III.    Under FLSA, Plaintiff First Engaged in Protected Activity on April 16, 2005.

An employee engages in FLSA protected activity when she has (1) filed any complaint; (2) instituted or caused to be instituted any proceeding under or related to the FLSA; (3) testified or is

about to testify in any FLSA proceeding; or (4) served or is about to serve on an industry

committee. 29 U.S.C. § 215(a)(3). Plaintiff is artful in her attempt to argue that she initiated

protected activity in 2004; however, her interpretation contradicts the majority of case law. The

Second and Fourth Circuits apply the narrowest interpretation of filing a complaint, following the

plain language of the statute and limiting the application of § 215 to cases in which a formal

complaint has been filed. The First, Fifth, and Ninth Circuits, which were relied upon by the this

Court in deciding Haile-Iyanu, discussed below, allow less formal complaints to qualify for

protection, but only where they meet some minimum qualifications. These minimum

qualifications require that complaints: 1) be in writing; 2) clearly assert statutory rights; and 3)

implicate a formal complaint process. See Lambert v. Ackerley, 180 F.3d 997, 1006 (9th Cir.

1999); Valerio v. Putnam Associates Inc., 173 F.3d 35, 42 (1st Cir. 1999). The complaint process

in the present case does not meet the minimum requirements of this middle approach, either.

Finally, the broadest interpretive approach (and now followed by the fewest circuits) is followed

by the Sixth and Eleventh Circuits, finding most complaints about potentially unlawful working

conditions to be covered by the provisions of § 215. These cases demonstrate that Plaintiff's

protected activity began in April 2005. See R. 23[1], Exh. 1.

### A. As a Matter of Law, Plaintiff Did Not Engage in Protected Activity in April 2004

Plaintiff alleges that she engaged in protected activity in April 2004 when "she informed

[Ms. Engleman] Conners that Cooke was the only Director of the four modal investigation offices

without SES status and that as a result she made substantially less money than all three of her male

---

[1]     "R." followed by a number refers to the document identified at that number on this Court's docket
entries.

counterparts." See R. 6 at ¶ 13.[2]  Plaintiff relies on Haile-Iyanu v. Central Parking System of VA,

2007 WL 1954325 at *3 (D.D.C. 2007), to assert the point that the "vast majority"[3] of Federal

circuits have held that "the anti-retaliation provision of the FLSA, §215(a)(3), protects informal

complaints." R. 30 at 11.  In doing so Plaintiff ignores the fact that Haile-Iyanu does not represent

the majority opinion of the judges in this District who have commented on this issue,[4] as this

Court has noted that the "narrow holdings of the Second and Fourth Circuits[,]"which have found

that informal oral complaints do not constitute protected activity, "are more consistent with

FLSA's language…." Rodriguez v. Puerto Rico Fed. Affairs Admin., 338 F.Supp.125, 130-31

(D.D.C. 2004) (Robertson, J.).

    In Mansfield v. Billington, 432 F. Supp. 2d 64 (D.D.C. 2006), this Court asserted that the

plain language of the EPA's retaliation provision, which discusses the filing of "any complaint" in

the context of formal legal actions, 29 U.S.C. § 215(a)(3), expressly limits the scope of its

application.  Id. at 74 (citing Ball v. Memphis Bar-B-Q Co. Inc., 228 F.3d 360, 364 (4th Cir.

2000)).  Plaintiff, however, puts undue emphasis on the word "any", in an attempt to broaden the

Mansfield holding and reconcile it with Haile-Iyanu, as well as reflect the false idea that "the

FLSA protect employees engaging in informal or formal processes." R. 30 at 12.[5]  Plaintiff fails

to acknowledge that FLSA protection applies following *any complaint* that is *filed.*  See 29 U.S.C.

---

[2]     Plaintiff's Opposition cited to Defendants MSJ incorrectly, claiming that "Defendant admits [that Plaintiff] attempted to meet with Conners to discuss her unequal pay on numerous additional occasions [after April 2004], but that Conners refused to meet with her." Plaintiff's Opposition at 10.  Defendant does not make such an admission.  Rather, in starting one sentence that Plaintiff quoted with "Plaintiff also states that…", Defendant intended to simply acknowledge Plaintiff's allegations regarding her conversation with Ms. Engleman-Conners. See R. 24 Exh. 1.

[3]     Apparently, Plaintiff considers seven of thirteen circuits (53%) to constitute a "vast majority."

[4]     The Court in Hicks v. Association of American Medical Colleges supports the more expansive Haile-Iyanu view regarding informal complaints to EEO counselors, but held that informal complaints to supervisors do not constitute protected activity under FLSA. See Hicks, 503 F. Supp. 2d. 48, 54 (D.D.C. 2007).

[5]     Plaintiff later acknowledges that Mansfield cannot be reconciled with Haile-Iyanu by explaining that an "external, formal commencement of a claim" is required to trigger retaliation under FLSA, as explained by "the more restrictive Mansfield standard." R. 30 at 14.

§ 215(a)(3).  Therefore, regardless of the nature of any conversations that Plaintiff had with Ms.

Engleman Connors in 2004, none of them were filed complaints that could constitute protected

activity under FLSA.[6]

### B.  As a Matter of Law, Plaintiff Did Not Engage in Protected Activity in February 2005

Plaintiff also alleges that she engaged in protected activity under FLSA because she

"initiated a formal complaint" on February 7, 2005.  See R. 6 at ¶ 20; R. 30 at 14 (emphasis

omitted).   However, the inconsistency of Plaintiff's arguments expose the fact that neither

Plaintiff's conversation with Ms. Engleman Conners in April 2004 nor her informal EEO

complaint of February 2005 constitute protected activity under FLSA.  In her first argument

alleging protected activity, Plaintiff accentuates the term "any complaint" to promote the idea that

any verbal complaint constitutes protected activity under FLSA.  See R. 30 at 12.  Next, in her

argument promoting her February 2005 actions as protected activity, Plaintiff highlights the idea

of a "formal" complaint in order to couch those actions as sufficient to trigger retaliation under the

Mansfield standard.  Id. at 13 ("Defendant's citations to the 'informal complaint' cases are

irrelevant….").  Plaintiff has not presented alternative arguments, and therefore she cannot argue

both sides of the issue.[7]

Nevertheless, Plaintiff now claims that she filed her formal EEO complaint by initiating

contact with an EEO Counselor on February 7, 2005.  Id. at 13.  Plaintiff again turns to Mansfield,

---

[6]       Plaintiff's discussion of the content of her April 2004 conversation with Ms. Engleman Conners is irrelevant to the legal point at issue because it pertains to Equal Pay Act discrimination claims that are being litigated currently in the Court of Federal Claims.

[7]       If Plaintiff truly believes that "any complaint" is sufficient to constitute protected activity, then there would be no value in also alleging that she filed a formal complaint as well.  In the same vein, if Plaintiff truly believes that a "formal complaint" is the true trigger of protected activity, then there is no possible way that she engaged in such protected activity as early as April 2004, when she conversed with Ms. Engleman Conners regarding her concerns over her pay.  Moreover, such an argument negates Plaintiff's original reliance on Haile-Iyanu, in which the Court found that "FLSA…protects informal complaints."  Haile-Iyanu, 2007 WL 1954325 at *3.

but uses an unrelated point to attempt to illustrate that a complaint is filed when an individual

"'initiates' her administrative charge with the EEOC."  R. 30 at 13 (citing Mansfield, 432 F. Supp.

2d at 71).[8]  As Defendant has explained previously, the Court in Mansfield recognized that Title

VII protects employees who have "*opposed any practice* made an unlawful employment practice

by this subchapter", 42 U.S.C. § 2000e-3(a) (emphasis added), but it contrasted this reading to the

considerably less inclusive language of the EPA's anti-retaliation provision, which that only

protects the filing of complaints in the context of specific formal actions.  Mansfield, 432 F. Supp.

2d at 74 (citing Lambert v. Genessee Hosp., 10 F.3d 46, 55 (2d Cir. 1993).

    Assuming *arguendo* that Mansfield does provide that "initiating" something constitutes

the filing of a complaint, Plaintiff applies this term incorrectly to the Code of Federal Regulations

in a futile attempt to assert that FLSA requires merely that an individual initiate a conversation

with an EEO Counselor to engage in protected activity.  Perhaps Plaintiff's misquotation of 29

C.F.R. §1614.105(a)(1)[9], in omitting the word "contact", is indicative of the fact that she also

ignores that this Section is entitled "Pre-complaint processing".  See 29 C.F.R. §1614.105; R. 30

at 13.  A Regulation subsection that describes specifically a prerequisite cannot simultaneously

describe the end result.  Section 1614.105(a)(1), which explains that an aggrieved person must

---

[8]    The argument that Plaintiff cites to explain this point is actually a discussion about a plaintiff
exhausting her administrative remedies under Title VII of the Civil Rights Act of 1964.  See Mansfield, 432
F. Supp. 2d at 71 ("[T]he plaintiff filed her administrative charge alleging discrimination [, fulfilling] Title
VII's requirement that the plaintiff initiate an administrative charge….  The defendant … has not
demonstrated that the plaintiff failed to exhaust her administrative remedies….") (internal citations
omitted).

[9]    29 C.F.R. § 1614.105, entitled "*Pre-complaint* processing", states:
    (a) Aggrieved persons who believe they have been discriminated against on the basis of race, color,
religion, sex, national origin, age or handicap must consult a Counselor *prior to* filing a complaint in order
to try to informally resolve the matter.
    (1) An aggrieved person must initiate *contact* with a Counselor within 45 days of the date of the
matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date
of the action.
(a) Aggrieved persons who believe they have been discriminated against on the basis of race, color,
(emphasis added).

contact a counselor *before* filing a complaint, cannot state that contacting a counselor constitutes filing the complaint itself.

Plaintiff's additional arguments to support Plaintiff's untenable position are equally misguided. Plaintiff cites <u>Weber v. Battista</u>, 494 F.3d 179, 182-183 (D.C. Cir. 2007), to assert that a "claimant files claim for retaliation for raising equal pay act claim by initiating contact with an EEO counselor[.]" However, the Court in <u>Weber</u> cites 29 C.F.R. §1614.105(a)(1) in the same way that Defendants have above, and even goes further, adding that "The [Office of Equal Employment Opportunity] 'shall dismiss' the complaint insofar as it 'raises a matter that has not been brought to the attention of a Counselor and is not like or related to a matter that has been brought to the attention of a Counselor.'" <u>Weber</u>, 494 F.3d at 183 (<u>quoting</u> 29 C.F.R. § 1614.107(a)(2). Clearly, contact with an EEO Counselor (an "informal complaint") is required *before* a "formal" complaint can be filed. Therefore, Plaintiff did not file a complaint, or engage in protected activity, when she contacted an EEO counselor on February 7, 2005. [10]

### IV.    Plaintiff Has Not Created a Presumption of Causation

Plaintiff claims that the decision to cancel the first vacancy announcement and re-advertise the SES Director of OMS position were adverse actions from which she suffered due to the agency's retaliation against her for filing a complaint under the Equal Pay Act. She has not demonstrated, however, a causal connection between her alleged protected activity in April 2004 (her conversation with Chairman Engleman Conners) and the alleged adverse action of January 2005 (readvertisement of the position).

---

[10]    Plaintiff's reference to <u>Warren v. Leavitt</u> is inapposite because the Courts recognition that one must contact an EEO Counselor within 45 days of an adverse action was applied in the context of exhausting one's administrative remedies under Title VII. <u>See Warren</u>, 2008 WL 441772 at * 1 (D.C. Cir. 2008). Plaintiff's references to <u>Bell v. Gonzales</u>, 398 F.Supp. 2d 78 (D.D.C. 2005), and <u>Childers v. Slater</u>, 44 F. Supp. 2d 8 (D.D.C. 1999), are also inapposite because they apply to Title VII actions.

A plaintiff may demonstrate the requisite causal relationship by showing that her employer had knowledge of her protected activity and that the adverse action took place shortly thereafter.[11] This Court also has noted that "where 'mere temporal proximity' is the only evidence of causation, the proximity must be 'very close,'" and that a three to four month proximity has been held to be insufficient. Chandamuri v. Georgetown University, 274 F. Supp. 2d 71, 85 (D.D.C. 2003) (quoting Clark County Sch. Dist., 532 U.S. at 273). Finally, this Court has recognized that certain periods "are insufficient as a matter of law to support a stand-alone inference of a causal connection." Kwon v. Billington, 370 F. Supp. 2d 177, 187 (D.D.C. 2005) (Bates, J.) (citing Buggs v. Powell, 293 F. Supp. 2d 135, 149 (D.D.C. 2003) (seven months too long).[12]

Assuming *arguendo* that Plaintiff engaged in protected activity in April 2004,[13] the first action that Plaintiff alleges was retaliatory was too attenuated from alleged protected activity to constitute retaliation. Plaintiff alleges that she engaged in protected activity when she spoke with Ms. Engleman Conners in April 2004. The first retaliatory adverse action that Plaintiff claims, namely, that "the NTSB re-advertised the position for Director of OMS even though Ms. Murtagh Cooke applied for and was deemed qualified for the position", took place in January 2005, nine months later. R. 30 at 15. As recognized by this Court as a matter of law, this action (and therefore all of the adverse actions alleged by Plaintiff) is too attenuated from the alleged protected activity of April 2004 to establish a presumption of causal connection by way of

---

[11]     Mills v. Winter, 540 F.Supp. 2d 178, 188 (D.D.C. 2008) (citing Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006)). The temporal proximity must be "very close." Id. (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).

[12]     See also Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995) ("Courts generally hold that if at least four months pass after the protected activity without employer reprisal, no inference of causation is created.").

[13]     The decision to cancel the vacancy announcement and readvertise occurred before both filing of the formal EEO complaint in April 2005 and plaintiff's contact with the EEO office to commence the informal counseling process. Thus, should Defendant prevail on its contention that Plaintiff did not engage in activity protected under the FLSA before filing her written complaint, or even before engaging in the counseling process, Plaintiff's claim in this regard should be dismissed.

temporal proximity.  Furthermore, as Plaintiff alleges no other reprisals and has presented no

direct evidence of causation during this time period, Plaintiff has failed to establish the causal

connection prong of a *prima facie* case of retaliation.[14]

### V.    Plaintiff Does Not Establish Causation Through Direct Evidence

Plaintiff purports to set forth direct evidence of animus by Ms. Engleman Conners and Mr.

Campbell toward Plaintiff in an attempt to establish a causal connection between her alleged

protected activity and the alleged retaliatory actions.  R. 30 at 18-19.  However, the acts are not

"examples of direct evidence of animus" and do not establish any causation.

Plaintiff reports out of context the comment by Ms. Engleman Conners that Plaintiff's

request to equalize her pay during their April 2004 conversation was "as that of a ''small child ...

upset that you didn't buy them the toy.'"  R. 30 at 18.  When placed in context, this comment

---

[14]    Plaintiff's claim that a disagreement regarding whether Ms. Engleman Conners spoke with Mr. Campbell regarding Plaintiff's concerns about her pay is sufficient to defeat a summary judgment motion is incorrect.  See R. 30 at 17-18 n.4-5.  The issue is immaterial.

> "The mere existence of *some* alleged factual dispute between the parties" will not defeat summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)].  A fact is "material" if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination. Id. at 248.  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)].

Holcomb v. Powell, 433 F.3d at 889 (emphasis in original).  Even if Ms. Engleman Conners relayed a conversation with Plaintiff to Mr. Campbell on the same day that the conversation occurred in April 2004, the alleged first adverse action is too attenuated for a causal connection to be considered.  See R. 30 at 19. Furthermore, whether Plaintiff told Mr. Campbell about her concerns herself is immaterial, as Plaintiff testified that each of those alleged conversations took place before April 2004, when Plaintiff claims she first engaged in protected activity (had a conversation with Ms. Engleman Conners regarding her pay).  See R. 30, Exh. 28 at 56-58.  As a result, any dispute regarding whether Ms. Engleman Conners spoke with Mr. Campbell about Plaintiff's concerns is irrelevant, and therefore, not a material fact.  Summary judgment is not precluded.

cannot be viewed as direct evidence of retaliatory animus.  See Id., Exh. 2 at 58:13-14.  In further

describing Plaintiff's request, Ms. Engleman Conners explained that "[f]irst of all, [Plaintiff]

didn't say to equalize.  She didn't suggest that.  It's just like, "I'm not an SES so you have to make

up for it." I mean, that was the context."  Id. at Exh. 2 at 58:8-11.  Ms. Engleman Conners went

on to add that she

> didn't judge it one way or another other than its uniqueness in the request. When I
> say bizarre, I'm not saying negative, I'm saying unusual, different, something I
> hadn't experienced and I didn't completely understand.  And normally, when -- my
> experience has been if someone comes and says I want a raise or I want a new job
> or this or that, they kind of lay out their case.  They pitch it to you. Not a
> declaratory sentence. So it was a unique -- it was just unique. I said I would look
> into it and, I mean, that's all I could do at the time.

Id. at Exh. 2 at 59:21-60:10.  Although there is no dispute that Ms. Engleman Conners made the

comment that Plaintiff alleges, when put into context one can see that the comment reflected her

confusion regarding the situation, not animus towards Plaintiff.

Further, in alleging that Ms. Engleman Conners "refused" to meet with Plaintiff after their

April 2004 meeting, Plaintiff mischaracterizes Ms. Engleman Conners' testimony in order to

create a non-existent animus toward Plaintiff.  See R. 30 at 18.  For most of the time of which

Plaintiff complains, Ms. Engleman Conners "was genuinely busy and did not have the time to

meet with her." Id. at Exh. 1 at F4 at 4.  Furthermore, Ms. Engleman Conners also explained that

"when I was in the building, I was always accessible, so I never really worried that much because

people usually didn't try to have formal meetings with me because they would just grab me in the

hall. That's usually when I had most of my discussions with folks." Id. at Exh. 2. at 73:17-22.

Moreover, Ms. Engleman Conners testified,

> the reason I was not concerned about [rescheduling a meeting with Plaintiff] was
> because I saw Marjorie.  I never—I would see Marjorie.  If it was such an urgent
> matter, there were many times when she could have said, "Hey, Ellen," or stay after
> a meeting, or approach me in the hallway, or in the ladies' room, or any number of
> times when we would share the same room or something like that.  I had a very

> informal opportunity.   People would come to my doorway, walk right in, "Hey,
> Chairman. Can we chat?"  "Sure."  There was so—this was just standard.  She
> was—[Plaintiff] sent in an e-mail, that's fine.  But she could have just come right
> through the front door, that would have been fine, too.

Id. at Exh. 2. at 154:1-22.

Later on, Ms. Engleman Conners "knew the SES slot for the OMS Director job was being

processed, [and therefore she] felt it was not appropriate to meet."  Id. at Exh. 1 at F4 at 4.  Thus,

even though Ms. Engleman Conners and Plaintiff did not meet regarding Plaintiff's request for

overtime pay after April 2004, the circumstances in their greater context do not reflect retaliatory

animus on the part of Ms. Engleman Conners toward Plaintiff.[15]

Plaintiff's next allegation, that Mr. Campbell "denied having any conversation with

Conners regarding Ms. Murtagh Cooke's pay or overtime," is also a mischaracterization of his

testimony.  See Id. at 18.  In fact, Mr. Campbell explained that he did not "have recollection of a

conversation with [Ms. Engleman Conners] about [Plaintiff's] inadequate compensation."  R. 30,

Exh. 19 at 104:3-5.  Defendant's memory regarding a particular fact cannot be attributed to an

animus toward Plaintiff.  Nevertheless, even if the fact of whether Ms. Engleman Conners spoke

with Mr. Campbell regarding Plaintiff's pay were a disputed fact, it is not  material.  As explained

above, Plaintiff claims that she told Mr. Campbell about her concerns herself.[16]  The alleged

disputed fact is also immaterial because Mr. Campbell admitted that he had a conversation with

someone and "learned that Marjorie might have asked somebody for overtime… but it was a very

brief conversation, and I don't recall who it was with."  R. 30, Exh. 19 at 104:12-18.

Plaintiff's final allegation of direct evidence of animus toward Plaintiff, that Mr.

"Campbell himself testified that his *sole* motivation for re-advertising the SES position was to

---

[15]     Neither of the emails that Plaintiff presents indicates that Plaintiff intended to speak with Ms.
Engleman Conners regarding her concerns over unequal pay.  See Exhs. 7, 25.

[16]     See n.14, *supra*.

ensure that Ms. Murtagh Cooke would not receive the appointment" is a gross mischaracterization of the testimony in this case that is so clear that no dispute regarding the facts can remain once Mr. Campbell's full discussion of the situation is brought to light.  See id. at 18 (emphasis added).  Mr. Campbell explained that there were "*two principal things* that were on [his] mind" when he rescinded the first vacancy announcement for the SES Office Directorship of OMS.  Id., Exh. 19 at 93:18 (emphasis added).  "One was I wasn't ready to have a selection made at that moment, and, two, I thought that the pool of candidates had been artificially narrowed by rumor that the first announcement had been wired for an internal candidate."  Id., Exh. 19 at 93:19-94:1.  Secondly, Mr. Campbell explained that he did not rescind the SES vacancy appointment to ensure that Plaintiff would not receive the appointment, but rather because "she would not probably have been selected."  Id., Exh. 19 at 98:1.  He further explained that to pay "somebody at the SES level to do something that they don't -- they are not necessarily doing to your satisfaction at the GS-15 level is not -- just not sensible. It's just -- it's not a sensible thing to do."  Id., Exh. 19 at 99:1-5.[17]  This testimony reflects conclusively that Mr. Campbell did not re-advertise the SES OMS Directorship for any sole purpose, nor was any purpose to ensure that Plaintiff was not appointed to the position.  He wanted to ensure a rich and extensive applicant pool.

Plaintiff has mischaracterized significantly the events that took place following her conversation with Ms. Engleman Conners in April 2004 in order to create an air of animus toward her.  However, as these events have been clarified above, Plaintiff's supervisors made the

---

[17]    Mr. Campbell's testimony reflects his belief that even if he had selected Plaintiff from the first pool of candidates presented to him, that she would not have been appointed for the position:  "If I had made a suggestion that Marjorie Murtagh ought to be the office director during the period of time that the Barberi was in play -- that's the accident that -- that I have now been asked to undertake by the chairman -- I believe the chairman would have looked at me and said, Dan, have you lost your mind."  Id. at Exh. 19 at 98:12-18.

decisions they did because they were the normal and/or best business decisions for the benefit of the Agency.

**VI.    The Agency had Legitimate, Non-discriminatory Reasons for its Actions, and Plaintiff Cannot Prove Pretext**

**A.   Dan Campbell has Legitimate, Non-discriminatory Reasons for his Actions, and these Reasons Withstand a Claim of Pretext.**

In her opposition brief, Plaintiff makes various assertions to support her claim that the facts support a finding of pretext.  See R. 30 at 20-22.  Her claims, however, are inaccurate and misleading.  In addition, Plaintiff fails to acknowledge that the Defendant, like any other Federal agency, may cancel a vacancy announcement and re-advertise a position.  Simple speculation that the announcement was cancelled and re-advertised for retaliatory reasons is insufficient to withstand summary judgment.

Plaintiff contests Mr. Campbell's decision to re-advertise the SES OMS Directorship in January 2005, asserting that he re-advertised the position solely to prevent Plaintiff from receiving the appointment.  As Defendant explained above, Mr. Campbell had multiple reasons for advertising the position, primarily that the pool of qualified applicants was too weak.  Campbell testified, "the pool of candidates had been artificially narrowed by rumor that the first announcement had been wired for an internal candidate."  Id., Exh. 19 at 93:20-94:1.  Thus, an administrative decision was made, in the agency's best interest, to re-advertise the position, with the hope and expectation that more well-qualified individuals would apply, and giving the selecting official more opportunity to make the best choice for the SES Director of OMS and, thus, the Agency.

Plaintiff further asserts that Mr. Campbell "broke protocol by his repeated re-advertising of the position notwithstanding having five qualified candidates,"  but she failed to substantiate this

allegation, referencing no "protocol".[18]  R. 30 at 20.  Furthermore, Plaintiff's table, to which she

refers throughout her "Statement of Genuine Issues of Dispute", does not contain any reference to

protocol regarding the advertising of SES positions in NTSB.  See R. 30, Exh. 24.  As a result,

there is no genuine dispute of material fact with regard to this allegation.

Plaintiff's final argument regarding Mr. Campbell, that he "has had at least one other

gender discrimination claim filed against him", is not evidence of pretext with regard to his re-

advertisement of the SES OMS Directorship.  Id. at 20.  Although Plaintiff cites to an Exhibit 33

from a discovery response, she does not attach it to her Opposition.  See id.  Furthermore,

discrimination complaints are filed against an agency, not a particular person.  Most importantly,

Campbell has no claims alleged directly against him related to his actions and there have been no

findings of discrimination against Mr. Campbell.

### B.  Joseph Osterman has Legitimate, Non-discriminatory Reasons for his Actions, and these Reasons Withstand a Claim of Pretext

Plaintiff makes inaccurate and misleading statements regarding the role of Mr. Osterman in

this case.  Plaintiff states that Mr. Osterman was "accountable for the SES selection during the

third re-advertisement," and that he did not interview her because "she was deemed unqualified by

the third review board."  Id. at 20.  These are gross misstatements of fact.  The position was re-

advertised once; Plaintiff was found qualified by the HR screening; the third ad-hoc panel did not

place her in the top five best qualified.  As the selecting official for the SES Director of OMS, Mr.

Osterman received a list of the five best-qualified candidates from the reconstituted third

application review panel on March 28, 2005, and Plaintiff was not on the list.  See R. 24, Ex. 1 at

27.  Of significance, while Mr. Osterman knew that Plaintiff was not ranked among the five best-

qualified candidates by the third ad hoc review panel, he was not a member of this panel.  See R.

---

[18]     "Repeated re-advertising of the position" is an exaggeration.  The vacancy announcement was
cancelled and re-advertised once.

25, Ex. 3 at 134:9-13, 19-21.  In fact, he reconvened the review panel and placed Tom Haueter in his place because subsequent to his sitting on the panel, but prior to the selection, he was appointed as the Managing Director of NTSB.  See id., Ex. 3 at 138:3-10.  Furthermore, at the time of the panel's submission of the list of five best qualified candidates (just 11 days after he assumed the duties of the Managing Director), Mr. Osterman was not aware of Plaintiff's concerns regarding her pay and that she had a conversation with Ms. Engleman Conners nearly one year prior, in April 2004.  Mr. Osterman also was unaware of Plaintiff's EEO Complaint at the time that the panel was reconstituted.  See id., Ex. 3 at 150:16-20.  Mr. Osterman learned of Plaintiff's discussion with Ms. Engleman Conners when he met with Plaintiff to tell her another candidate had been selected for the Director of OMS.  Id.  Plaintiff's allegation that Mr. Osterman knew of Plaintiff's "complaint" seems to be made in the general sense, in that there is no substantiated allegation that Mr. Osterman was aware of her informal or formal EEO complaint, or concerns of unequal pay, only that Plaintiff thought she should be paid more because she was a GS-15 office director.  See id., Ex. 28 at 33:18-20, 56:4-57:3.  This is insufficient to prove pretext.

Defendant does not dispute that Plaintiff was found to be qualified for the SES Director of OMS position by both rating panels.  However, Plaintiff misconstrues the hiring process and documents when alleging that the she was more qualified and/or more scrutinized than the selectee, Dr. Spencer, for the OMS Director position.  It is not disputed that the Human Resources department ("HR") representative found Plaintiff's applications qualified under the announcement and the review panels considered them.  R. 25, Exhs. 22, 25, 27; Rating Sheets (attached as Exh. 2 hereto).  However, the rating memo from the March 28, 2005 (third ad hoc) panel to the Managing Director indicates that this panel did not find Plaintiff to be *highly* qualified, but found other applicants to be so.  R. 25, at Exh. 25.  As is clear from the memos and rating sheets, the different rating panels were comprised of different members.  Id. at Exhs. 22, 25, 27; Exh. 2.  Different

panels can come to different conclusions about the qualifications of the applicants, as the application evaluation process is not an exact science, and this independent evaluation by each panel is justification for any discrepancy.  Plaintiff has not shown and indeed cannot show that the panel members (all directors or deputy directors of the modal offices and the Office of Safety Recommendations) conspired to retaliate against her for filing a complaint under the FLSA.  Of significance, no evidence suggests that any of the panel members knew, at the time they evaluated Plaintiff's application, that she had filed a complaint or contacted the EEO office to engage in the informal complaint process.  Her mere speculation or conclusion based on her own feelings is insufficient to prove pretext.[19]  "[I]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  [Sh]e must show that the explanation given is a phony reason." Fischbach v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996); accord Patterson v. Johnson, 505 F.3d 1296, 1300-01 (D.C. Cir. 2007).[20]

Defendant does not dispute that Mr. Osterman, as the Managing Director, chose not to interview Plaintiff.  Instead, Mr. Osterman directed the interviews of the highly qualified candidates including the selectee for the SES Director of OMS, Dr. Spencer.  Although immaterial to this Motion, it was HR, and not any accused rating panelist, that placed Dr. Spencer's 2004 application in the "not qualified" category.  Deposition of Collette Magwood (attached as Exh. 3 hereto), 52:19-53:6.[21]  Furthermore, Plaintiff misstates the facts about the necessity of maritime

---

[19]     Once the moving party has properly supported its motion, the non-movant must come forward with specific facts showing there is a genuine issue for trial.  The non-movant must do more than simply show there is some "metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

[20]     "Once the employer has articulated a non-discriminatory explanation for its action, … the issue is not "the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers."  Fischbach, 86 F.3d at 1183 (quoting, McCoy v. WGN, 957 F.2d 368, 373 (7th Cir. 1992)).

[21]     However, no interviews were held for this announcement and no selection was made.  See R. 25, Exh. 22 at 3.

knowledge.  See R. 30 at 21.  Mr. Campbell, as former Managing Director, suggested to Mr.

Osterman that the selectee should have maritime knowledge, and contrary to Plaintiff's assertion,

knowledge is different from sea-going experience.  See id.  Both Mandatory

Professional/Technical Qualifications require familiarity with "…water safety and marine

transportation, including principles and practices of navigation, marine engineering, marine

regulation and accident investigation, naval architecture…" and "[a]uthoritative knowledge of

marine transport and its regulation…."  R. 25, Exhs. 21, 24.  Whereas the "sea-going operations"

category, for which both Plaintiff and Spencer were found not qualified by the final review panel,

was a desired qualification, which is not evaluated under the rating plan.  Defendant has explained

that such a qualification is a bonus if the candidate possesses it, but lack thereof did not penalize

any candidate.  Id., Exhs. 26, 27; Exh. 2; Exh. 3 at 77:5-19.

    Contrary to Plaintiff's speculation about discriminatory motive, with these facts presented

in full, it is clear that the Agency was making legitimate business decisions.

## VII.  Defendant's Material Facts Remain Unrefuted[22]

    Defendant found Plaintiff's "Statement of Genuine Issues in Dispute" chart difficult to

follow, so Defendant instead tracked Plaintiff's arguments to its Motion and its own "Statement of

Material Facts as to Which There is No Genuine Dispute."  This comparison shows clearly that

there are limited facts in dispute concerning the issues at bar, and of the few disputed facts, none

are material.  As a preliminary matter, Plaintiff begins her chart with a section titled "Defendant

Paid a Different Wage to Plaintiff, Who Is Not Of The Same Sex As Her Comparators."  R. 30-2

at 4.  The alleged inequity in pay among the modal directors is the basis for Plaintiff's claims

---

[22]    Plaintiff makes assertions of fact, which are immaterial and misleading, in her table titled, "Plaintiff's Statement of Genuine Issues in Dispute."   Because they are irrelevant to the Motion, Defendant does not address them in this Reply.  However, Defendant clarifies Plaintiff's misstatements of immaterial facts in Exhibit 1.

under the Equal Pay Act pending in the U.S. Court of Federal Claims. See 06-00748 (Fed. Cl.).
None of these supposed disputed facts are relevant to this case and they should be disregarded.

Further, Plaintiff insinuates surprise at the inclusion of a declaration from Barbara Czech.
R. 30 at 22 n.9. Such a reaction is unfounded. Not only was Ms. Czech Plaintiff's supervisor
during her last position at the Board, and was identified on documents provided to Plaintiff during
discovery, but Plaintiff initially identified her as a potential deponent, then chose not to finalize
the scheduling of her deposition. See Exh. 4. Thus, Plaintiff had every opportunity to discover
facts known by Ms. Czech.

Starting at the beginning of the Agency's Material Facts, Plaintiff does not dispute the
facts set forth by Defendant in paragraphs 1 and 2. R. 30 at 2.

### A.  Re-advertisement of SES Director Position After First Panel

In paragraph 3, Defendant stated that in "December 2004, Managing Director Daniel
Campbell cancelled the July 2004 Office of Marine Safety ("OMS") position advertisement prior
to a selection being made because he believed that the pool of qualified applicants was too narrow
and insufficiently robust." Defendant's Statement of Material Facts Not In Dispute ("SMF"), ¶ 3
(internal citations omitted).  In response, Plaintiff alleges that there are
"many reasons" as to why Mr. Campbell readvertised the position, but she only alleges one, that
Campbell "re-advertised the position solely to ensure Ms. Murtagh Cooke did not receive the
appointment." R. 30 at 20. However, Plaintiff ignores one of Campbell's reasons for re-
advertising the SES Director position, and she misconstrues the second reason given. Contrary to
Plaintiff's assertion, Mr. Campbell testified that "[Cooke] might have been a good candidate, but I
would have had to take it to the chairman, and [Cooke] would not probably have been selected,
and that's one of the reasons I was not in a hurry to do this. When I say I procrastinated, I
procrastinated because I believed I was going to lose the office director that was there; that was

17

going to be the outcome." R. 30, Exh. 19 at 97:19-98:6.  More importantly, Campbell testified,

"the pool of candidates had been artificially narrowed by rumor that the first announcement had

been wired for an internal candidate."  Id., Exh. 19 at 93:20-94:1.  There is no fact in the sections

cited, or in existence, that states it was known that Mr. Campbell readvertised the position to

exclude Plaintiff.

### B.  2005 Reconstituted Selection Panel:  Non-selection for SES Position

In paragraph 4, Defendant stated that Mr. "Osterman decided that he would only interview

the top five candidates selected for an interview by the reconstituted 2005 panel because he

thought that it was improper for the panel to recommend the incumbent of the position for an

interview when the incumbent was ranked by the panel to be outside the top five candidates.

SMF, ¶ 4 (internal citations omitted).  Plaintiff alleges that this fact is "just plain ridiculous"

because i) Plaintiff was first deemed qualified, and then was deemed unqualified;  ii) Mr.

Osterman knew that Plaintiff was initially ranked qualified; iii) Mr. Osterman knew of  Plaintiff's

repeated complaints and requests for equal pay; iv) Mr. Osterman knew that Mr. Spencer was first

deemed unqualified, and then was deemed qualified, while Plaintiff suffered the reverse fate; and

v) Plaintiff had much more sea going experience and much more overall experience and

qualifications then Mr. Spencer.   R. 30 at 21.

Plaintiff is attempting to blur the steps in the selection process, and misstate the actions,  to

create a factual conflict that does not exist.  Contrary to Plaintiff's statement, in each selection

review, she was found to be qualified by both the Human Resources (HR) representative, and all

of the selection panels considered her applications.[23] R. 25, Exhs. 22, 25, 27; Exh. 2.  However, as

---

[23]    Although immaterial to this Motion, HR, not the review panel, placed Spencer's 2004 application
in the "not qualified" category.  Exh. 3 at 52:19-53:6  However, no interviews were held for this
announcement and no selection was made.  R. 25, Exh. 22.

evidenced by its memo to Mr. Osterman, the March 28, 2005 panel did not find Cooke highly qualified, but found other applicants highly qualified. R. 25, Exh. 25. As is clear from the memos from the review panels, and rating sheets, the panels were comprised of different members; and these different panels came to different conclusions about the qualifications of the applicants. Id., Exhs. 22, 25, 27; Exh. 2.

It is not disputed that Mr. Osterman, as the Managing Director, chose not to interview Plaintiff. He chose to interview the candidates presented by the review panel, but left the option of extending beyond that list, if needed. 30(b)(6) Deposition (attached as Exh. 5 hereto), at 140:3-15. Contrary to Plaintiff's assertions, the final application review panel found both Dr. Spencer's and Plaintiff's sea-going experience to be deficient, and ranked each as Not Qualified (NQ). See Exh. 2. However, the sea-going operations category was a desired qualification, which is not evaluated under the crediting plan. It is a benefit if the candidate possesses it, but it is not held against her/him if s/he does not. R. 25, Exhs. 26, 27; Exh. 2; Exh. 3 at 77:5-19. Moreover, the interview panel found Dr. Spencer's experience highly desirable for the Director position.

> Mr. Spencer had not only the requisite marine Bachelor's degree, he also had a Master's (sic) and a doctorate. Mr. Spencer had been through the Coast Guard in a variety of marine safety positions and had retired as a captain, Coast Guard captain. He then went on to manage the technical development program at the American Bureau of Shipping for a number of years. He has authored a number of papers. He has chaired a number of international committees on maritime safety. He was well-known in the industry and very well respected.

Exh. 5 at 131:5-132:6. In response to Plaintiff's question about how Dr. Spencer's education ranked higher than Plaintiff's, Mr. Osterman stated,

> Marjorie Murtagh Cooke has a Bachelor's degree in marine engineering, I believe, and that is essentially the end of her formal education. I believe. … But Dr. Spencer's three formal education degrees are all in maritime. And his 40-odd-year career has been exclusively in the maritime industry and both in the regulatory side and at the industry side.

Id.

Finally, contrary to Plaintiff's assertion, at the time of the selection of the Director of OMS, Mr. Osterman did not know of Plaintiff's alleged complaints about equal pay. Mr. Osterman did not become the Managing Director until March 17, 2005. Prior to his assuming the role of Managing Director, he was the Director of OHS. In that position, he sat on the first review panel for the evaluation of the 2005 applications to the SES Director of OMS. See R. 25, Exh. 27. "I don't believe any of the panel members knew that there was an EEO claim or filing of any type. EEO filings are private. Our EEO director does not advertise that information. " "And I wasn't aware of it in advance of the panel." Exh. 5 at 116:6-22. The alleged relay of Plaintiff's conversation with Ms. Engleman Conners about receiving additional pay occurred after Mr. Osterman became Managing Director, see R. 30, Exh. 28 at 33:11-20, when Mr. Osterman informed her that she had not been selected for SES Director of OMS. This, obviously, was after the selection process and does not conflict with his testimony that he was unaware of any complaints or EEO activity during the selection process.

### C. Refusal to Offer Plaintiff a Senior Level Position

In paragraph 5, Defendant stated that Mr. Osterman "reviewed Plaintiff's proposal outlining the duties and responsibilities of a Senior Level position that Plaintiff suggested be created for her, and then met with Acting Chairman Mark Rosenker, Executive Director Dan Campbell, and Chairman Designee Ellen Engleman Conners regarding their evaluation of the Agency's need for such a position." SMF, ¶ 5 (internal citations omitted). Plaintiff has cited no facts in contradiction; therefore, this material fact is not in dispute.

In paragraph 6, Defendant stated that Mr. Osterman, Mr. Rosenker, Mr. Campbell, and Ms. Engleman Conners "agreed that there was not sufficient work to justify the SL position as proposed by Plaintiff." SMF, ¶ 6 (internal citations omitted). Plaintiff has cited no facts in contradiction; therefore, this material fact is not in dispute.

**D. Detail from OMS to Office of Safety Recommendations and Communications ("SRC" or "SRA")**

In paragraph 7, Defendant stated that following "Plaintiff's non-selection as Director of OMS at the SES level, MD Osterman offered Plaintiff a planning manager position as a detail in the Office of Safety Recommendations and Communications ("SRC"), 'because there was an immediate need for a 15-level manager in [that office] for a specific duration of time.'" SMF, ¶ 7 (internal citations omitted). Plaintiff did not have a direct response, only to say that her supervisor transferred "her against her will to part time positions outside of her career path and with minimal or no managerial or other accountabilities." R. 30 at 22. Plaintiff's response does not contradict the material fact stated by Defendant, as they are not mutually exclusive; therefore, the material fact stated by Defendant is not in dispute.

In paragraph 8, Defendant stated that Mr. Osterman "considered [Plaintiff] a good planner and felt that [the] fit [in the proposed SRC position] would be good for the agency…." SMF, ¶ 8 (internal citations omitted). Plaintiff did not have a direct response, only to say that her supervisor "transferred her against her will to part time positions outside of her career path and with minimal or no managerial or other accountabilities." R. 30 at 22. Plaintiff's response does not contradict the material fact stated by Defendant, as they are not mutually exclusive; therefore, the material fact stated by Defendant is not in dispute.

**E. Transfer from SRC to Office of Management**

Defendant also stated in paragraphs 9-11 that during "Plaintiff's detail in [SRC, Mr.] Osterman had time to evaluate the needs of the agency, and particularly the Office of Management ["OMD"], wherein he needed a GS-15 level associate managing director for strategic management, or chief planning officer for the agency." SMF, ¶ 9 (internal citations omitted). Mr. "Osterman offered the position to Plaintiff when her detail ended in SRC and told Plaintiff 'that

[he] wouldn't make her do it, [Plaintiff] had the option of saying no, but that [he] thought that [Plaintiff's] planning and presentation, especially strategic planning skills, were good.'" Id. at ¶ 10 (internal citations omitted). Plaintiff, however, declined this position. "When MD Osterman planned to transfer Plaintiff to [OMD] after Plaintiff declined an associate managing director position, he informed Plaintiff 'that we would put [Plaintiff] in a program management position, program analyst position until such time that we could determine what other positions became available at the 15 level.'" Id. at ¶ 11 (internal citations omitted).

Plaintiff did not have a direct response to the statements, but only said that "NTSB transferred [Plaintiff] again, in or about October of 2005, to a program analyst position within OMD in lieu of appointing her an SES position or the equivalency of SES pay." R. 30-2, Plaintiff's Statement of Disputed Facts ("SDF"), ¶ I.D.9. Defendant does not dispute that Plaintiff was reassigned to the OMD, and that this position was not an SES position, and thus not entitled to and SES salary, or the equivalent of an SES salary. Plaintiff further added that Plaintiff's "program analyst position within OMD was primarily archival and did not entail the same level of management responsibilities as she has as the Director of OMS." Id. at I.D.10. Defendant does not dispute that Plaintiff's position in OMD was not a supervisory position, and thus she did not have the same management obligations as she did while the Director of OMS. Plaintiff has cited no facts in contradiction; therefore, Defendant's material facts 9-11 are not in dispute.

### F. Performance Appraisals

Defendant stated in paragraphs 12-14 that in 2005, "Plaintiff received comments from the Managing Director on her work products, and likewise received feedback from her supervisors in the Office of the Managing Director, once transferred to that position." SMF, ¶ 12 (internal citations omitted). "MD Campbell evaluated the modal office directors every time he had a conversation with them about anything of substance." Id. at ¶ 13 (internal citations omitted).

22

"Performance was evaluated in the context of in the way in which reports were brought to [MD Campbell]. [His] direct reports had really little doubt about whether or not they were doing a good job." Id. at ¶ 14 (internal citations omitted).

Plaintiff responded by alleging that "NTSB did not always provide [Plaintiff] with an evaluation for her performance, especially in 2004 or 2005", SDF, at I.D.11, and that "Campbell did not evaluate any of the modal directors." Id., I.D.12. There is no dispute that Cooke did not receive a written evaluation for 2004, but she nonetheless received evaluation of her work, as described above. Mr. Campbell "evaluated [office directors] every time we had a conversation about anything of substance." Deposition of Daniel Campbell (attached hereto as Exh. 6) at 20:7-9. "It would be in context of the development of a report that the analysis of an office director and indeed the analysis of an office is undertaken." Id. at 21:18-22. Again, Plaintiff presents only part of Mr. Campbell's testimony, which gives a false impression of the facts. Mr. Campbell's answer about not evaluating the modal directors, cited above, relates to meeting with the Directors to discuss their written performance evaluations. He did, however, evaluate his subordinates. "I think what you said was did I speak to them after, and your question just now is did I perform an appraisal. I performed an appraisal. Did I talk with them about it afterwards? Virtually everyone is going to be rated outstanding, and they didn't really need to be told that." Id. at 29:9-14. Despite her conclusory statement, Plaintiff has presented no evidence to indicate that Mr. Campbell failed to evaluated her in the way that he explained in his testimony, or that he evaluated her in a different manner than the other modal office directors. Therefore, these are not material facts in genuine dispute.

The necessary time period had not elapsed for Plaintiff to receive her 2005 appraisal. Plaintiff voluntarily retired on July 3, 2006. R. 25, Exh. 20. Her position at the time of her retirement was Program Analyst in the OMD. With the assistance of HR, Plaintiff's supervisor,

Ms. Czech, was drafting performance standards for Plaintiff's position.  R. 25, Exh. 4 at ¶ 8.

Plaintiff retired before the performance standards were finalized.  Id. at ¶ 10.  Ms. Czech stated,

"If Ms. Cooke did not retire, I would have completed an annual review of her performance, upon

her completion of at least ninety days under her performance standards.  As a part of that review, I

would have considered Ms. Cooke for a performance award."  Id. at ¶ 11.  Therefore, Plaintiff did

not receive a 2005 appraisal because it was not due at the point of her retirement.

### G.  Performance Standards

Defendant stated in paragraphs 15-16 that with "the assistance of the Human Resources

Division, Ms. Czech, Plaintiff's supervisor in the Office of Management, worked on formulating

performance standards for Plaintiff's new program analyst position while she served there."  SMF,

¶ 15 (internal citations omitted).  "Plaintiff retired before the performance standards were

finalized."  Id., ¶ 15 (internal citations omitted).  Plaintiff did not have a direct response to the

statements, but only said that "NTSB did not provide [Plaintiff] with performance standards or

appraisals with regard to her work for either OSRA or OMD."  SDF, at I.D.13.  Although not

contrary to the agency's explanation, there is no dispute that Plaintiff did not receive performance

standards or an appraisal for her work in OMD; however, as stated above, the appraisal was not

due at the point of Plaintiff's retirement.  Plaintiff was on a detail to SRA, and therefore her

performance standards related back to her permanent position, for which there is no dispute that

she had standards.  Exh. 5 at 187:20-188:4.  Plaintiff has cited no facts in contradiction to those set

forth by Defendant; therefore, this material fact is not in dispute.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' Motion for Summary

Judgment and Motion to Strike, Defendants respectfully request that the Court GRANT

Defendants' Motion for Summary Judgment and GRANT Defendants' Motion to Strike.

Respectfully Submitted,

/s/ _____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/ _____

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ _____

BRANDON L. LOWY
Special Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
(202) 307-0364

Attorneys for Defendants

25

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARJORIE MURTAGH COOKE,                  )
                                         )
                 Plaintiff,              )
        v.                               )
                                         )
MARK ROSENKER, Chairman,                 )      .    No. 1:06-cv-01928-JDB
National Transportation Safety Board,    )
                                         )
                 Defendant.              )
_____  )

## Exhibit 1 - None of Plaintiff's Few Disputed Facts Are Material

Plaintiff's "Statement of Genuine Issues in Dispute" chart is designed to create the

appearance of disputes that do not exist.  Plaintiff has asserted in her chart many more facts than

Defendant claims are material; thus, Defendant is compelled to address the additional claims.  As

a preliminary matter, Plaintiff begins her chart with a section titled "Defendant Paid a Different

Wage to Plaintiff, Who Is Not Of The Same Sex As Her Comparators."  R. 30-2, Plaintiff's

Statement of Disputed Facts ("SDF"), at 4.  The alleged inequity in pay among the modal

directors is the basis for Plaintiff's claims under the Equal Pay Act, which is pending in the U.S.

Court of Federal Claims. See 06-00748 (Fed. Cl.).  None of these supposed disputed facts are

relevant to this case and should be disregarded.

In its Reply, Defendant already has addressed many of the alleged facts enumerated by

Plaintiff, but will address the remainder in the order Plaintiff arranged them.  In paragraph I.B.1,

Plaintiff states, "In April 2004, Ms. Murtagh Cooke complained to Conners, Chairman of the

NTSB, that her pay was not equal to that of her male counterparts."  SDF, ¶ I.B.1 (internal

citations omitted).  Plaintiff misstates the facts about her interactions with Ms. Engleman

Conners.  Ms. Engleman Conners testified, "I did not say I would look into equalizing her pay



EXHIBIT
1

with the other Directors, I said I would look into her request for overtime. That was the request that she made to me. She did not say, 'equalize my pay,' she said, 'you should give me overtime because I'm not an SES and they are.' That's what I heard and what I understood her request to be." Deposition of Ellen Engleman Conners (attached hereto at Exh. 7), at 60:15-21. This difference in description of the conversation, however, is immaterial because neither statement by Plaintiff to Ms. Engleman Conners would constitute protected activity. See Reply brief at 2-4.

In paragraph I.B.4, Plaintiff states that in "addition to meeting with Conners, Ms. Murtagh Cooke addressed her concerns regarding her unequal pay directly with Campbell himself." SDF, ¶ I.B.4 (internal citations omitted). However, the first two conversations that Plaintiff testified she had with Mr. Campbell related to the allocation of SES positions. During the first, Mr. Osterman, a male, also was present at the meeting, and by Plaintiff's testimony, spoke about the SES allocation process. Deposition of Plaintiff (attached hereto as Exh. 8), at 56:7-22. Most notably, Plaintiff did not mention to Campbell that she believed she was being treated differently because of her gender. Id. at 58:24-59:5. It is unreasonable to conclude this was a request for "equal pay" when a male was in the same circumstance. From Plaintiff's testimony, the second conversation focused on the progression of the SES allocations, the timing of the appointment to the modal offices, and not Plaintiff's pay level. "[Mr. Campbell] said I don't know when I'm going to take care of you. I know right now I have to do this for [Mr. Osterman]." Id. at 57:1-3. Again, Plaintiff did not convey to Mr. Campbell that she believed she was being treated differently because she is a woman. Id. at 59:6-11. Plaintiff's alleged third conversation with Mr. Campbell about pay, when she allegedly asked for overtime, instead concerned Mr. Campbell's refusal to allow Plaintiff to select whom she desired for the Chief of

2

the Report Development Division in OMS in 2002 or 2003. Her complaint was not about equal pay to the other modal directors, but that she "was going to have to continue working excessive hours to make up for a missing billet." Id. at 61:24-62:6. Plaintiff said nothing to Campbell about her alleged belief that she was being paid differently than the other modal directors because of gender discrimination. Plaintiff testified, "I did not mention gender discrimination, no." Id. at 59:12-17.

Defendant agrees with all statements in section I.C of Plaintiff's table; Plaintiff was found to be qualified for the SES Director of OMS position. Thus, there are not facts in dispute. However, Plaintiff's facts do not refute the Agency's arguments.

In paragraph I.D.1 Plaintiff states,

> There was much confusion and conflicting testimony regarding the proper term regarding the "appointment" to an SES position. Carroll clarified that the proper term for receiving an SES position is "appoint," not "promote" or "award." Osterman stated that he was "promoted" to the SES position of Director of OHS in 2003. Campbell testified to his opinions regarding "promoting" Ms. Murtagh Cooke to SES.

SDF, ¶ 1.D.1 (internal citations omitted). Oddly, Plaintiff seems to suffer from the same confusion. See R. 30 at 16 ("Failure to promote a plaintiff to a position…"); id. at 17 ("…NTSB…began a series of adverse actions leading to its failure to promote her…."); id. at 17 n.4 ("…further bolsters [Plaintiff's] claim that….NTSB took no action to equalize her pay or promote her."); id. at 18 n.5 ("…NTSB's later refusal to promote her…"); id. at 22 ("…supervisor who declines to promote his employee after she complains…"). Nonetheless, the term used does not rise to the level of a *material* fact, and does not alter the justification for summary judgment.

In paragraph I.D.2, Plaintiff states,

3

Though the NTSB argued that it sought to make all four modal directorships SES positions, it cannot confirm any actual plan to do so nor recall how or when such positions came into being. Carroll stated that in June of 1999, the NTSB requested from OPM four SES positions for the modal directorships (OAS, OHS, ORPH, and OMS). Carroll later admitted that she was not aware of a request by NTSB for four SES positions from OPM. Carroll stated that the Director of ORPH became an SES position in or around the year 2000 due to the retirement of a former SES position holder. Carroll later testified that the Director of ORPH became an SES position in either 2003 or 2004 and admitted that she is not aware as to how the position became available.

SDF, ¶ I.D.2 (internal citations omitted). Although not material to this action, the plan for SES

allocations to the modal directors was addressed in Mr. Campbell's deposition, Ms. Engleman

Conners' deposition, and in the letters seeking these positions from OPM. See Exh. 6 at 61:15-

68:5; Exh. 7 at 24:9-34:28; R. 25, Exh. 14. Further, Plaintiff attempts to create conflict in

testimony from Ms. Carroll by comparing Carroll's declaration, a document that is written with

the benefit of documentary support, with testimony at her deposition where she was given no

documentary support.

But Plaintiff misstates the alleged testimony. Paragraph 5 of Carroll's declaration

submitted in the U.S. Court of Federal Claims relates to the use of SES slots once allocated by

OPM. R. 30, Exh. 26 at ¶ 5. Paragraph 8 discusses the request to OPM for SES slot for the four

surface modal directors. Id. at ¶ 8. When asked during her deposition, which occurred prior to

the completion of her declaration, she did not say she was not aware of a request, but merely, "I

can't definitely answer that. I don't remember." Deposition of Emily Carroll (attached hereto as

Exh. 9), at 22:15-19. Similarly, Plaintiff tries to create a conflict about the SES appointment of

the Director of ORPH. First, the paragraph to which Plaintiff cites in the declaration is incorrect.

Paragraph 8 relates to the request to OPM for all surface modal directors to become SES. R. 30,

Exh. 26 at ¶ 8. Paragraph 11 discusses the appointment of the ORPH Director to the SES. Id.,

Exh. 26 at ¶ 11. Again, prior to the completion of the declaration, Carroll testified, "I don't have

4

the approximate dates. Somewhere around 2004. 2003, 2004. Somewhere in that area." Exh. 9

at 28:4-7. Again, however, this is a false attempt at conflict. Plaintiff was provided the

Personnel Actions for the modal directors that indicate when each was appointed to the SES.

Plaintiff chose not to use these documents during Ms. Carroll's deposition, and instead asked her

to provide her best memory.

> In paragraph I.D.3, Plaintiff states,

> While Ms. Murtagh Cooke refutes any claim that the Director of OMS was
> smaller in size or scope than any other NTSB modal directorship, the truth was
> NTSB did not follow its own stated plan to establish SES positions for the modal
> directors sequentially. The Deputy Director of OAS, Deputy Director of ORE,
> Dean of the NTSB Academy, and Director of the NTSB Academy became SES
> positions prior to the Director of OMS.

SDF, ¶ I.D.3 (internal citations omitted). Again, although not material to Plaintiff's claims,

(actually counter to Plaintiff's claims because the SES Director of the Academy selectee was a

woman), the plan discussed in testimony and at issue was that of appointing the modal directors

to the SES. See Exh. 6 at 61:15-68:5; Exh. 7 at 24:9-34:28; R. 25, Exh. 14. The Director and

Deputy Director of OAS and RE were SES level positions prior to the dissolution of the surface

office into the modal offices. See R. 30, Exh. 24. The NTSB Academy began operations in

August 2003 and was not a modal office. See Exh. 5.

> In paragraphs I.D.7-8, Plaintiff stated, "NTSB transferred Ms. Murtagh Cooke to an

assistant planning position with OSRA in or about June 2005 in lieu of appointing her an SES

position or the equivalency of SES pay. Ms. Murtagh Cooke's assistant planning position with

OSRA did not entail the same level of management responsibilities as she had as the Director of

OMS or utilize her high qualifications." SDF, ¶ I.D.7-8 (internal citations omitted). Although

the intent of the statement is not in dispute, Cooke was detailed to a position with unclassified

duties in SRA. See R. 25, Exhs. 18, 28. There is no dispute that this detail was not to a

supervisory position, nor was it a marine-specific position. See Exh. 5 at 194:14-195:9. There is

no dispute that Cooke was not paid an SES salary because she did not encumber an SES position.

Further, there was no justification, under the compensation rules, for increasing her pay beyond

the GS-15 level she had been receiving. See Exh. 5 at 148:15-149:4. None of these statements

about Plaintiff's detail to SRA, or her transfer to OMD, however, support a claim of retaliation.

Instead, they are business decisions that had to be made to address the needs of the NTSB and

Plaintiff once Dr. Spencer was selected as the Director of OMS.

 In paragraphs I.D.9-10, Plaintiff stated, "NTSB transferred Ms. Murtagh Cooke again, in

or about October of 2005, to a program analyst position within OMD in lieu of appointing her an

SES position or the equivalency of SES pay. Ms. Murtagh Cooke's program analyst position

within OMD was primarily archival and did not entail the same level of management

responsibilities as she has as the Director of OMS." SDF, ¶ I.D.9-10 (internal citations omitted).

There is no dispute that Plaintiff was reassigned to the OMD, and that this position was not an

SES position, and thus not entitled to and SES salary, or the equivalent of an SES salary. There

is no dispute that Plaintiff's position in OMD was not a management position, and thus she did

not have the same supervisory obligations as she did while the Director of OMS. As stated

above, there was no justification for increasing her pay. See Exh. 5 at 148:15-149:4.

 In paragraph I.D.14, Plaintiff states, that after "NTSB's transfer of Ms. Murtagh Cooke to

OSRA and OMD, Ms. Murtagh Cooke had no hope of promotion or advancement, and so Ms.

Murtagh Cooke left her temporary, dead-end assignments at NTSB." SDF, ¶ I.D.14 (internal

citations omitted). Not only is this comment immaterial to this Motion, but it is not a factual

statement, rather conjecture that Plaintiff believed she had no opportunity for promotion or

advancement. Plaintiff refused a management job that she was offered. When Plaintiff's detail

in SRA ended, Mr. Osterman offered her a position as the associate managing director for strategic management, a new position at the agency. See Exh. 5 at 201:14-202:17. Plaintiff declined the position, stating that it was too much work to create a new process. Id. at 202:18-203:7. Additionally, SES positions were competed after the Director of OMS, but Plaintiff did not apply. These positions included the Chief Information Officer, the Director OHS, and the Deputy Managing Director. Id. at 213:14-22.

In paragraph I.E.1, Plaintiff stated, "[t]hough Ms. Murtagh Cooke allegedly did not have enough marine experience to earn the OMS SES position, the NTSB replaced her with Bob Bartlett, who had no marine experience whatsoever." SDF, ¶ I.E.1 (internal citations omitted).[1] Although immaterial to the Motion, it is not disputed that, as a temporary measure, Mr. Osterman replaced Plaintiff with an employee from outside the marine office until Dr. Spencer, the selectee, could begin.

In paragraphs I.E.2-4, Plaintiff stated,

The ad hoc review committee deemed qualified and the NTSB appointed the Director of OMS SES position to Spencer. Though Spencer applied for the Director of OMS SES position in 2004, he was not deemed qualified by the ad hoc review committee. Although experienced maritime knowledge was essential to the OMS SES position, Spencer, like Ms. Murtagh Cooke, was deemed "not qualified." Nevertheless, the NTSB offered Spencer the position. Campbell explained to Osterman that it was necessary to have "an experienced maritime knowledgeable individual" as the Director of OMS as an SES position. The review committee deemed Spencer "not qualified" in "demonstrating command and/or responsibility of or for sea-going operations" in their final decision.

SDF, ¶ I.E.2-4 (internal citations omitted).[2] Although immaterial to this Motion, HR, not the review panel, placed Spencer's 2004 application in the "not qualified" category. Exh. 3 at 52:19-53:6. However, no interviews were held for this announcement and no selection was made. See R. 25, Exh. 22.

---

[1]   This allegation is repeated later as paragraph II.C.1.
[2]   Paragraph I.E.3 is repeated later as paragraph II.C.2. Paragraph I.E.4 is repeated later as paragraph II.C.3.

Plaintiff misstates the facts about the necessity of maritime knowledge. Mr. Campbell did suggest to Mr. Osterman that the selectee should have maritime knowledge, but contrary to Plaintiff's assertion, however, knowledge is different from sea-going experience. Both Mandatory Professional/Technical Qualifications require familiarity with "…water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture…" and "[a]uthoritative knowledge of marine transport and its regulation…." R. 25, Exhs. 21, 24. The sea-going operations category, for which both Plaintiff and Spencer were found not qualified by the final review panel, was a desired qualification, which is not evaluated under the crediting plan. It is a benefit to the candidate if the s/he possesses it, but it is not held against her/him if s/he does not. Id. at Exhs. 26, 27; Exh. 2; Exh. 3 at 77:5-19.

In paragraph II.B.2, Plaintiff stated, "[a]lthough Campbell re-advertised the Director of OMS SES position due to an alleged preselection of Ms. Murtagh Cooke, the 2005 re-advertisement was exactly the same as that of the 2004 original, without any announcement of non-preselection." SDF, ¶ II.B.2 (internal citations omitted). The Agency does not dispute that the position announcements for the SES Director of OMS in 2004 and 2005 were virtually identical. Contrary to Plaintiff's argument, however, there is no need for a statement about preselection in a subsequent announcement. "If an application is offered and there's a belief by the community that there is a preselection afoot, that an agency has a particular applicant in mind and then the agency re-advertises the position, its essentially tells the reader, the audience who's looking at these advertisements, that there is no such preselection, because had there been there would not have been a re-advertisement." Exh. 5 at 37:15-38:10.

8

In paragraph II.B.3, Plaintiff stated, "[a]lthough Campbell re-advertized the Director of OMS SES position because of an alleged impression by the Coast Guard that the position was preselected for Ms. Murtagh Cooke, Campbell never confirmed to the Coast Guard that no preselection existed." SDF, ¶ II.B.3 (internal citations omitted). Although it is immaterial to this Motion whether Campbell confirmed to the Coast Guard that the Director of OMS position was not preselected, there was no need to do so. "I think it is fairly simple in that believing that we had a small pool of applicants, and that small pool was the result of a belief within the industry that this was a preselected position, that in order to ensure a larger pool of qualified applicants, he re-advertised the position. And that's, quite frankly, all he would need to do to announce to potential applicants that it was not preselected for any particular individual." Exh. 5 at 41:19-42:8.

In paragraph II.B.4, Plaintiff stated, "[a]lthough Campbell re-advertized the Director of OMS SES position because of an alleged desire to increase the applicant pool, the NTSB received the same number of applicants (20) for both the original 2004 posting and subsequent 2005 posting of the position." SDF, ¶ II.B.4 (internal citations omitted). The Agency does not dispute the quantity of applicants from the two position announcements was the same, 20. However, Plaintiff is overlooking the key difference in those pools: the number of qualified applicants rose by 50% (10 in the first pool; 15 in the second), giving the Agency more viable applicants from which to choose. R. 25; Exhs. 22, 25.

In paragraph II.B.5, Plaintiff stated, "Campbell clearly does not have a problem with preferential treatment within the NTSB's recruiting processes. Although Campbell decided to re-advertise the OMS SES position due to a perceived preference for Ms. Murtagh Cooke for the position, Campbell himself attempted to have a personal friend placed in a position within

9

OMS." SDF, ¶ II.B.5 (internal citations omitted). Plaintiff's statement is irrelevant to this claim, and not supported by the testimony. Plaintiff's testimony was simply that "...since he would not agree to who I had selected, he had—he had asked me to consider for the position a personal friend of his, Charlie Pereira. When I did not select Mr. Pereira, he called me into his office and he asked me several questions...." No preselection occurred because no selection was finalized at that time. See Exh. 8 at 61:9-62:6. Plaintiff's reference to Mr. Battocchi's deposition asks merely whether Charlie Pereira was Mr. Campbell's friend, and has nothing to do with preselection for a position. See Deposition of Ron Battocchi (attached as Exh. 10 hereto), at 210:4-5.

In paragraph II.C.4, Plaintiff stated, "[a]lthough the NTSB cited Spencer's higher education as a basis for his better qualification for the Director of OMS SES position, there is no educational requirement for the position." SDF, ¶ II.C.4 (internal citations omitted). Plaintiff is inappropriately and inaccurately focusing on one aspect of the comparison in qualifications between Plaintiff and Spencer. The applications for the SES Director of OMS seek educational background. R. 25, Exh. 21, 24. Further, the mandatory Technical/Professional Qualifications include requirements that may be education based. For example, the position seeks "broad familiarity with...marine engineering [and] naval architecture." Id., Exhs. 21, 24. Cooke has a degree in naval architecture; Spencer has three degrees in maritime. See Exh. 5 at 131:3-132:6. Education is information the rating panel can use to determine qualification, and level of qualification, of the applicants. Significantly, Mr. Osterman discussed the differences in education because that was the question Plaintiff posed. See Id. at 131:17-132:6.

Finally, in paragraph II.D.1, Plaintiff states, "Clark started as the Deputy Director of ORE at the GS-15 level. When the Deputy position became an SES position, the NTSB automatically

appointed Clark to the new SES position without subjecting him to the same review process to which Ms. Murtagh Cooke had to endure (e.g., posting the position for a competitive application review process and conducting interviews of qualified candidates)." SDF, ¶ II.D.1 (internal citations omitted). Contrary to Plaintiff's assertion, and as the testimony and documents prove, Clark competed for his SES position. In his deposition, and surprisingly within the pages Plaintiff identified, Clark testified, "I had to go through the application process to be accepted into the SES....What I vaguely remember is that I turned in my application for the SES, and I understand that there were other people that did also. There were a number of people that bid on the SES." Deposition of John Clark (attached as Exh. 11 hereto) at 37:21-40:22. Clark's Personnel Action, SF-50, furthermore, clearly states the selection was made according to announcement; therefore, no genuine dispute of material fact exists. See Exh. 12.

# SES RATING SHEET
## NTSB #WA-TB-5-009,
## Director,
## Office of Marine Safety

| APPLICANT'S NAME: | Marjorie Murtagh |
|---|---|

| Executive Core Qualifications | Rating |
|---|---|
| **Leading Change:** This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity — to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ  (Q)  HQ |
| **Leading People:** This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ  (Q)  HQ |
| **Results Driven:** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ  (Q)  HQ |
| **Business Acumen:** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ  (Q)  HQ |
| **Building Coalitions/Communications:** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ  (Q)  HQ |

NOTE: If applicant is a current or former Senior Executive (with reinstatement eligibility), they are assumed "Highly Qualified" in the five ECQs.

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

| | | |
|---|---|---|
| Not Qualified | _____ | No further rating required. |
| Qualified | ✓ | Proceed with the rest of the rating. |

**EXHIBIT**
Tabbies
2

005004

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications**<br><br>**1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.** | NQ    Q    (HQ) |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ    Q    (HQ) |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications. Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position.  If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration.<br><br>Not Qualified  _____   No further rating required.<br><br>Qualified      _√____   Proceed with the rest of the rating. | |
| **Desirable Professional/Technical Qualifications**<br><br>1. **General knowledge and understanding of the National Transportation Safety Board's  (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.** | NQ    Q    (HQ) |
| 2. **Demonstrated command and/or responsibility of or for sea-going operations.** | (NQ)    Q    HQ |

SES Panel Member(s): *[signatures]*    Date: 3/28/05

| QUALIFIED | NOT QUALIFIED | CDP GRADUATE | CURRENT SESer | FORMER SESer |
|---|---|---|---|---|
| | | | | |

005005

**NATIONAL TRANSPORTATION SAFETY BOARD**
Washington, D.C. 20594

Office of Safety Recommendations
and Accomplishments

Murtagh -

Limited demonstration of
Leading people - barely
qualifies on ECRs #2
very limited at sea experience
single vessel, single job
restricted to boiler room
Engine activity

Familiarity with NTSB and
Coast Guard policies, processes,
and procedures

005006

# SES RATING SHEET
## NTSB #WA-TB-5-009,
### Director,
### Office of Marine Safety

| APPLICANT'S NAME | John Spencer |
|---|---|

| Executive Core Qualifications | Rating | | |
|---|---|---|---|
| **Leading Change:** This core qualification encompasses the ability to develop and implement an organizational vision that integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance changes and continuity — to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. | NQ | Q | (HQ) |
| **Leading People:** This core qualification involves the ability to design and implement strategies that maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. | NQ | Q | (HQ) |
| **Results Driven:** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. | NQ | Q | (HQ) |
| **Business Acumen:** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. | NQ | Q | (HQ) |
| **Building Coalitions/Communications:** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external policies that impact the work of the organization. | NQ | Q | (HQ) |

[NOTE: If applicant is a current or former Senior Executive with reinstatement eligibility, they are assumed Highly Qualified in the five ECQs]

Review Rating and Evaluation Plan for a more detailed description of each of the five (5) Executive Core Qualifications (ECQ's). Applicants must be rated at least "Qualified" on all 5 of the executive core qualification requirements in order to be considered basically qualified for this position. If they rated "Not Qualified" on one or more of the executive core qualifications, they are to be rated "Not Qualified" and given no further consideration.

|   |   |   |
|---|---|---|
| Not Qualified | _____ | No further rating required. |
| Qualified | ✓ | Proceed with the rest of the rating. |

005007

2

| *Professional/Technical Qualifications* | Rating |
|---|---|
| **Mandatory Professional/Technical Qualifications** | |
| **1. Broad familiarity with water safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices.** | NQ  Q  (HQ) |
| **2. Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate, or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities.** | NQ  Q  (HQ) |
| Review Rating and Evaluation Plan for a more detailed description regarding both of the Mandatory Professional/Technical Qualifications. Applicants must rated "Qualified" on both of the Mandatory Professional/Technical qualification requirements in order to be considered basically qualified for this position. If they are rated "Not Qualified" on either one of the Mandatory Professional/Technical Qualifications, they are to be rated "Not Qualified" and given no further consideration.<br><br>Not Qualified  _____  No further rating required.<br><br>Qualified  ___✓___  Proceed with the rest of the rating. | |
| **Desirable Professional/Technical Qualifications**<br><br>1.  **General knowledge and understanding of the National Transportation Safety Board's (NTSB's) operations and familiarity with the operations of the United States Department of Transportation, the United States Coast Guard, and the relationship of national security organizations to coastwise and inter-coastal security.** | NQ  Q  HQ |
| 2.  **Demonstrated command and/or responsibility of or for sea-going operations.** | (NQ)  Q  HQ |
| SES Panel Member(s): *Elaine Weinstein* *[signatures]* | Date: 3/28/05 |

| QUALIFIED | NOT QUALIFIED | CDE GRADUATE | CURRENT SES | FORMER SES |
|---|---|---|---|---|
| | | | | |

005008

2

**NATIONAL TRANSPORTATION SAFETY BOARD**
Washington, D.C. 20594

OFFICE OF SAFETY RECOMMENDATIONS
AND ACCOMPLISHMENTS

Spencer — rich and
technically diverse background

Experience with accident
investigation and analysis

Doctorate at GWU structural engineering

Masters at MIT Naval Architecture
& Marine Engineering

Strong background on
Coast Guard and IMO regulations

Excellent writer

[illegible handwritten lines]

Although he has very limited
[illegible] he has other
qualifications [illegible] very well
suited to the Board.

005009

DEPOSITION OF COLLETTE MAGWOOD
CONDUCTED ON FRIDAY, OCTOBER 26, 2007

1 (Pages 1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF COLUMBIA
 3   ------------------------------X
 4   MARJORIE MURTAGH COOKE          :
 5         Plaintiff               :
 6         v.               :  Case No.:
 7   MARK ROSENKER, Chairman,       :  1:06CV01928
 8   NATIONAL TRANSPORTATION        :
 9   SAFETY BOARD                   :
10         Defendant              :
11   ------------------------------X
12
13        Deposition of COLLETTE MAGWOOD
14
15             Washington, D.C.
16        Friday, October 26, 2007
17             10:00 a.m.
18
19
20   Job No.: 1-115034
21   Pages 1 - 103
22   Reported by: Ellen L. Ford, RPR
```

**Page 2**

```
 1   Deposition of COLLETTE MAGWOOD, held at the offices
 2   of:
 3
 4
 5        EMPLOYMENT LAW GROUP
 6        888 17th Street, Northwest
 7        Suite 900
 8        Washington, D.C.  20006
 9
10
11
12   Pursuant to agreement, before Ellen L. Ford,
13   Registered Professional Reporter and Notary Public in
14   and for the District of Columbia.
15
16
17
18
19
20
21
22
```

**Page 3**

```
 1             A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFF:
 4        DAVID SCHER, ESQUIRE
 5        DARREN FENWICK, Legal Assistant
 6        EMPLOYMENT LAW GROUP
 7        888 17th Street, Northwest
 8        Suite 900
 9        Washington, D.C. 20006
10        (202) 331-2883
11
12
13   ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:
14        MEREDYTH D. COHEN, ESQUIRE
15        UNITED STATES DEPARTMENT OF JUSTICE
16        COMMERCIAL LITIGATION BRANCH
17        1100 L Street, Northwest
18        Washington, D.C. 20530
19        (202) 353-7978
20
21
22
```

**Page 4**

```
 1          A P P E A R A N C E S (Continued)
 2
 3   ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY
 4   BOARD:
 5        DENISE M. D'AVELLA, ESQUIRE
 6        NATIONAL TRANSPORTATION SAFETY BOARD
 7        OFFICE OF GENERAL COUNSEL
 8        490 L'Enfant Plaza East, Southwest
 9        Washington, D.C. 20594
10        (202) 314-6086
11
12   ALSO PRESENT: Marjorie Murtagh Cooke, Plaintiff
13        Quan Luong, Esq., US Attorneys Office
14
15
16
17
18
19
20
21
22
```

EXHIBIT
3

2007 NOV 14 P 1:52

RECEIVED NTSB
OFFICE OF GENERAL COUNSEL

DEPOSITION OF COLLETTE MAGWOOD
CONDUCTED ON FRIDAY, OCTOBER 26, 2007

13 (Pages 49 to 52)

49

1  position was advertised more than once?
2     A  Yes.
3     Q  Okay.  So now I'd like to speak specifically
4  about the very first time it was advertised.  Okay?
5     A  Okay.
6     Q  And what I would like you to do — and I can
7  ask you through a series of questions.  But perhaps to
8  avoid confusion, what I'd love it if you did is if you
9  walked us through the entire process with respect to
10  this position exactly as you remember it; who you
11  spoke to, when it was advertised, how it was
12  advertised, the whole review process, everything
13  through to the point that it was readvertised.
14     A  Okay.
15           MS. COHEN:  Objection; compound
16  question.
17     Q  Go on.
18     A  So you'd like for me to go through the whole
19  recruitment process --
20     Q  Yes.
21     A  -- for the first advertisement?
22     Q  Correct.

50

1     A  Okay.
2     Q  Do you remember when this was, by the way?
3     A  I don't recall the date.
4     Q  Okay.  Do you recall whether it was in 2004?
5     A  Yes, I believe it was in 2004.
6     Q  Do you remember the month?
7     A  I don't.
8     Q  Okay.  Go on.
9     A  We get approval to recruit for the vacancy
10  announcement, the vacancy announcement is posted, it's
11  put out for advertisement, it's open for a certain
12  number of days, usually 30, the vacancy closes.
13     Q  Okay.  I'm just going to stop you for just a
14  moment.  I apologize.
15     A  Mm-hmm.
16     Q  But I really am interested in your
17  recollection of this particular advertisement, the
18  first time it was advertised for this position rather
19  than generally.
20     So the specific actions that you took with
21  respect to this position.
22     A  Okay.  Those are the specific things that I

51

1  did --
2     Q  Okay.
3     A  -- with this position.
4     Q  Go on.
5     A  So advertised the position, it closed,
6  received the applications, reviewed the applications,
7  determined who was minimally qualified, who was not
8  qualified, referred that to the Rating Panel, the
9  Rating Panel came up with who was best qualified, that
10  is referred for interviews, interviews are conducted,
11  I'm notified if a selection is made.
12     If a selection is made we prepare a case.  It
13  goes to OPM -- an ECQ case, package also.  It goes to
14  OPM for Qualifications Review Board.
15     Q  Now, in this instance with respect to the
16  first advertisement of this position, was a selection
17  made?
18     A  No.
19     Q  Okay.  Do you know why a selection was not
20  made?
21     A  I don't.
22     Q  Who would know why a selection was not made?

52

1     A  The selection --
2           MS. COHEN:  Objection; calls for
3  speculation.
4     A  Well, I would imagine the person who
5  requested the position would know why they did not
6  make a selection.
7     Q  Okay.  Is that the selecting officer?
8     A  The selecting official.
9     Q  The selecting official.  Okay.  Thank you.
10     Okay.  So with respect to the first advertisement
11  of this position, did Mrs. Murtagh Cooke submit an
12  application?
13     A  Yes.
14     Q  And did she meet the minimum qualifications?
15     A  I don't recall.
16     Q  Okay.  And did Mr. Spencer submit an
17  application?
18     A  I don't recall.  Oh, yes.  Yes.
19     Q  Okay.  And did he meet the minimum
20  qualifications?
21     A  I annotated that he did not meet the minimum
22  qualifications.

DEPOSITION OF COLLETTE MAGWOOD
CONDUCTED ON FRIDAY, OCTOBER 26, 2007

14 (Pages 53 to 56)

53

1    Q   What did you mean by you "annotated"?
2    A   It was my determination that he did not meet
3 the minimum qualifications.
4    Q   Okay. And why did he not meet the minimum
5 qualifications?
6    A   I don't recall.
7    Q   Did you document that somewhere?
8    A   I don't recall if I did or not.
9    Q   Okay. If someone does not meet the minimum
10 qualifications in general, do you make any notes about
11 that?
12    A   If someone does not meet qualifications,
13 it's annotated, yes.
14    Q   I'm just wanting to understand the word
15 "annotated".
16    A   I document down that they don't meet a
17 certain -- whatever. How do I it, I don't remember.
18    Q   Okay. Where do you put those annotations?
19    A   Usually I put it right on the application.
20    Q   Okay. Great. Now, for this advertisement,
21 this first advertisement of the position, do you
22 recall who was on the Ratings Panel?

54

1    A   I don't.
2    Q   Do you recall who was on the Interview
3 Panel?
4    A   I don't.
5    Q   Okay. Now, this position is readvertised --
6    A   Mm-hmm.
7    Q   -- correct?
8    A   Mm-hmm, yes.
9    Q   Do you know when that was?
10    A   I don't recall the date.
11    Q   Okay. Do you recall if it was 2005?
12    A   Probably. I don't think it was too, too
13 long after it closed, but probably. I don't recall
14 exactly.
15    Q   Okay. Now, I'm going to ask you, just like
16 you did before, to walk us through the process that
17 occurred --
18    A   Okay.
19    Q   -- with the readvertisement.
20    A   Okay. So I get notified that the position
21 needs to be readvertised.
22    Q   All right. Who notified you of that?

55

1    A   I don't recall who notified me.
2    Q   Okay.
3    A   But we put the vacancy announcement back out
4 on the street. And that happens, you know, with cases
5 sometimes, they're readvertised.
6    Sometimes we put those who previously applied
7 need not reapply. Sometimes we don't put that on it
8 when we readvertise.
9    But the vacancy announcement goes out on the
10 street. It's for X amount of time. It closes.
11 Applications come in from the candidates. We review
12 the candidates for minimum qualifications. Rating
13 Panel convenes. Submit the applications to the Rating
14 Panel. They've got rating and evaluation criteria.
15    They go through their process. I get a list of
16 those who are best qualified. That goes to the
17 Interview Panel. They conduct interviews and then I'm
18 notified.
19    Q   Okay. In this second readvertisement --
20    A   Yes.
21    Q   -- do you know whether a candidate was
22 selected?

56

1    A   Yes.
2    Q   Okay. And who was that candidate?
3    A   Jack Spencer.
4    Q   Okay.
5    MR. SCHER:  Off the record a second.
6 (Recess taken.)
7 BY MR. SCHER:
8    Q   So with this second readvertisement of the
9 position, do you recall whether Mrs. Murtagh Cooke
10 applied for the position?
11    A   You know, it's like the obvious. I can't --
12 I don't remember, but I'm assuming that she did. I
13 don't recall.
14    Q   Okay. Incidentally, in this second
15 readvertisement, was there anybody else who reviewed
16 applications other than you?
17    A   Usually what I do is give the not-qualifieds
18 to the Rating Panel along with my qualified so that I
19 can get a subject matter expert to assist me.
20    Q   Okay. But other than you, is there anyone
21 else who does the initial qualified, not-qualified
22 determination?

DEPOSITION OF COLLETTE MAGWOOD
CONDUCTED ON FRIDAY, OCTOBER 26, 2007

20 (Pages 77 to 80)

77

1    Q   Okay. And where are the technical
2  qualifications?
3    A   They're on the second page. It says,
4  "Mandatory Professional Technical Qualifications."
5    Q   Okay. Got it. So we're on Page 1B,
6  correct?
7    A   Yes. It would be the first two at the top.
8  The ones at the bottom are desirables and they're not
9  considered. That's just an extra. They are not
10  evaluated on the plan.
11    Q   What do you mean by that?
12    A   What I mean is, if a person has them, it's
13  great. And if they don't have them, it's not held
14  against them. It's just a desirable.
15    Q   We'd like it, but we don't need it. Is
16  that —
17    A   Well, we'd like it and we need it. If you
18  have it, it's wonderful. If you don't have it, you're
19  not penalized.
20    Q   Okay.
21    A   You're not scored, if you will. It's just
22  annotated.

78

1    Q   Understood. All right. So let's go just at
2  the top. These are the Mandatory Technical
3  Qualifications, and there's a 1 and a 2.
4    A   Yes.
5    Q   Okay. And then you'll see that there's
6  circles on HQ.
7    A   Yes.
8    Q   And what does that mean?
9    A   It means that she's highly qualified for
10  both of those according to the panel.
11    Q   Okay. And then a few windows down it says,
12  "Desirable Professional Technical Qualifications."
13    A   Yes.
14    Q   Right? Those are the ones you said were
15  great if they have them.
16    A   Mm-hmm.
17    Q   Okay. And then there's — and there's a
18  circle on an HQ and a circle on a Q.
19    A   Yes.
20    Q   What does that mean?
21    A   It means that they saw her as highly
22  qualified for the first one and qualified for the

79

1  second one.
2    Q   Okay. Good. All right. I'm just going to
3  ask you to kind of leave this document over here for a
4  second at your side.
5    A   Okay.
6    (Magwood Exhibit No. 2A and 2B - rating sheet - marked
7  for identification.)
8  BY MR. SCHER:
9    Q   All right. We've just shown you Exhibit 2A
10  and 2B. Do you know what this is?
11    A   Yes. Appears to be the rating sheet for the
12  Office of Marine —
13    Q   Okay. And do you know what —
14    A   — position.
15    Q   And have you seen this particular document
16  before. You need to say it actually?
17    A   Okay. It appears that I have. This is what
18  was given to the Rating Panel, then I would have seen
19  it, yes.
20    Q   Was it the first Rating Panel or the second
21  Rating Panel?
22    A   I don't know.

80

1    Q   All right. Well, let's go back to Exhibit 1
2  for a second.
3    A   Okay.
4    Q   And 1B.
5    A   Okay.
6    Q   If you look down at the bottom there's a
7  date. Do you see the date in Exhibit 1B at the bottom
8  on the right?
9    A   1B?
10    Q   Yeah, 1B. The second page of Exhibit 1.
11    A   Yes.
12    Q   Do you see the date?
13    A   Yes.
14    Q   Okay. What is that date?
15    A   11/15/04.
16    Q   Okay. So would that have been the first
17  panel or the second panel?
18    A   Well, I don't exactly recall when the first
19  one is, but looking at the dates, it appears that it's
20  the first one.
21    Q   Okay. Now, go to Exhibit 2B. And there's a
22  date at the bottom of that?

**Silbaugh Kathleen**

| | |
|---|---|
| **From:** | Luong, Quan (USADC) [Quan.Luong@usdoj.gov] |
| **Sent:** | Tuesday, May 01, 2007 8:49 AM |
| **To:** | Silbaugh Kathleen |
| **Cc:** | Cohen, Meredyth (CIV) |
| **Subject:** | FW: Cooke v. Rosenker: Depositions |

FYI.

---

**From:** Luong, Quan (USADC)
**Sent:** Tuesday, May 01, 2007 8:48 AM
**To:** 'Brian M. Lowinger'
**Subject:** RE: Cooke v. Rosenker: Depositions

Brian – I am actually in depositions all day today and tomorrow and will be starting a trial on Monday. I have some time on Friday morning if you would like to talk then. Let me know. Thanks.

---

**From:** Brian M. Lowinger [mailto:blowinger@employmentlawgroup.net]
**Sent:** Monday, April 30, 2007 6:52 PM
**To:** Luong, Quan (USADC)
**Cc:** R. Scott Oswald; Darren Fenwick
**Subject:** Cooke v. Rosenker: Depositions

Quan,
Please advise when you are available for a call, hopefully tomorrow at noon, to discuss dates for depositions. Specifically, in addition to the 30(b)(6), I would like to set dates to depose the following individuals who are current employees of NTSB:

- Bob Chipkevich – current Director of ORPH
- Joseph Osterman – current Managing Director of NTSB
- Elaine Weinstein – NTSB official
- Jim Rosenberg -
- Barbara Check -

In addition, I would like to set dates to depose the following former employees:

- Dan Campbell – former Managing Director of NTSB
- Ellen Engleman Conners – former Chairman of NTSB
- Gary Halbert – former Counsel of NTSB
- Ron Battochi – former General Counsel of NTSB
- Lisa Love – former HR official at NTSB

Thank you.
Brian

**Brian M. Lowinger | Associate**
**202.261.2817 | blowinger@employmentlawgroup.net**



**EXHIBIT**

4

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

1 (Pages 1 to 4)

1

```
1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2                          DC
3   ----------------
    MARJORIE MURTAGH COOKE, :
                          :
4       Plaintiff,  :
                          :
5       -vs-        : Case No. 06-748C
                    : Judge Thomas C. Wheeler
6   THE UNITED STATES,  :
                          :
7       Defendant.  :
    ----------------
8
9
10          CORPORATE DEPOSITION OF
11   NATIONAL TRANSPORTATION SAFETY BOARD
12    by and through JOSEPH G. OSTERMAN
13           Washington, D.C.
14           Friday, July 6, 2007
15                9:48 a.m.
16
17
18
19
20   Job No.: 1 - 107102
21   Pages: 1 - 265
22   Reported by: Paula M. Flint
```

2

```
1       Corporate Deposition of NATIONAL
2   TRANSPORTATION SAFETY BOARD, by and through
3   JOSEPH G. OSTERMAN, held at the law offices of:
4
5       THE EMPLOYMENT LAW GROUP, P.C.
6           888 17th Street, Northwest
7               Suite 900
8           Washington, D.C. 20006
9               (202) 331-2883
10
11
12
13
14       Pursuant to agreement, before Paula M.
15   Flint, Notary Public of the District of Columbia.
16
17
18
19
20
21
22
```

3

```
1              APPEARANCES
2   On behalf of the Plaintiff:
3     BY: BRIAN M. LOWINGER, ESQUIRE
4         The Employment Law Group, P.C.
5         888 17th Street, Northwest
6         Suite 900
7         Washington, D.C. 20006
8         (202) 331-2883
9   On behalf of the Defendant:
10    BY: QUAN K. LUONG, ESQUIRE
11        U.S. Attorney's Office, Civil Division
12        501 Third Street, Northwest
13        Room 4218
14        Washington, D.C. 20530
15        (202) 514-9150
16        and
17    BY: KATHLEEN SILBAUGH, ESQUIRE
18        National Transportation Safety Board
19        Office of the General Counsel
20        490 L'Enfant Plaza, Southwest
21        Washington, D.C. 20594
22        (202) 314-6084
```

4

```
1              CONTENTS
2   EXAMINATION OF JOSEPH G. OSTERMAN        PAGE:
3   Mr. Lowinger              6, 257
4   Mr. Luong                 251
5            EXHIBITS
6   OSTERMAN DEPOSITION EXHIBIT NO.          PAGE:
7      (Exhibits subsequently
8       attached to the deposition.)
9    1   Position Vacancy Announcement      88
10   2   Memorandum                    91
11   3   Position Vacancy Announcement      92
12   4   Memorandum                    93
13   5   Operations Bulletin           226
14   6   Operations Bulletin           227
15   7   Operations Bulletin           229
16   8   Order                    232
17   9   Performance Appraisal Form      234
18   10  Performance Appraisal Form      234
19   11  Position Description          235
20   12  Position Description          237
21   13  Application              238
22   14  Qualifications Brief          238
```

**EXHIBIT**
5

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

10 (Pages 37 to 40)

**37**

1  pool of what types of characteristics, sir?
2      A.    Qualified applicants.
3      Q.    When you say qualified applicants, I mean
4  the -- are we talking about -- what qualifications
5  was Mr. Campbell looking for that led him to believe
6  that he needed to readvertise the position in 2004?
7      A.    He was looking for a broader selection
8  pool. He wasn't looking, from my understanding, for
9  different qualifications.
10         I don't believe in the first
11  advertisement, in 2004, there were many applicants.
12  And his concern for that led him to readvertise the
13  position so that there would be more applicants to
14  choose from.
15      Q.    So in doing so, how did the advertisement
16  change so that there would be more applicants who
17  would not think that it was preselected for
18  Ms. Murtagh Cooke?
19      A.    I don't believe that the advertisement
20  changed. The nature of federal hiring, for those
21  who watch senior executive positions, there is -- it
22  is not permissible to preselect a candidate. The

**38**

1  rules prohibit that.
2         If an application is offered and there's a
3  belief by the community that there is a preselection
4  afoot, that an agency has a particular applicant in
5  mind and then the agency readvertises the position,
6  it essentially tells the reader, the audience who's
7  looking at these advertisements, that there is no
8  such preselection, because had there been there
9  would not have been a readvertisement. Are you
10  following?
11      Q.    I --
12      A.    So it's not necessary if you're trying to
13  tell the audience of applicants that there is no air
14  apparent necessarily, which is not permissible in
15  the federal hiring service. It's not necessary to
16  overtly say that. By readvertising it you're
17  essentially doing that.
18      Q.    What happens to the applications that were
19  submitted prior to, in 2004, when there was -- when
20  the position was readvertised?
21      A.    In a readvertisement the human resources
22  division will notify the applicants that it is going

**39**

1  to be readvertised, and there's two choices. I'm
2  not sure which one was chosen here. Choice one is
3  to forward those existing applications into the new
4  announcement, or choice number two is, to notify the
5  applicants that they must reapply.
6      Q.    I see. And you don't know which one it
7  was this time?
8      A.    I don't. I suspect it was a notice that
9  the applicants reapply.
10      Q.    Who did Mr. Campbell speak with at Coast
11  Guard regarding the thought that there was a
12  preselection going on?
13      A.    I don't know. It was the senior
14  leadership at the time.
15      Q.    Do you know if that was a telephone
16  conversation?
17      A.    I don't know.
18      Q.    And why did he call the Coast Guard?
19      A.    I believe that Mr. Campbell was actively
20  engaged in discussions with the Coast Guard
21  regarding the continuing memorandum of understanding
22  that we had. I don't believe that there was a

**40**

1  specific phone call for this advertisement. My
2  understanding from Mr. Campbell is that he learned
3  of this belief during other conversation.
4      Q.    So Mr. Campbell was speaking with the
5  Coast Guard about a memorandum of understanding
6  issue and it just so happened it came up that there
7  was a concern that there was a preselection going
8  on?
9      A.    Yes, that's my understanding.
10      Q.    I see. And how many candidates were there
11  in 2004?
12      A.    I think we can give you the record for
13  that. I'm not certain.
14      Q.    How many more were there in 2005, sir?
15      A.    I know that there were more by volume.
16  And we can -- I think we can give you that number.
17         MR. LOWINGER: May we have that
18  information, please?
19         MS. SILBAUGH: You have it.
20         MR. LUONG: Yeah, we provided that to you.
21  BY MR. LOWINGER:
22      Q.    And how was it determined that there was a

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

11 (Pages 41 to 44)

**41**

1   better set of qualified applicants in 2005 than
2   there were in 2004?
3   A.   There were more applicants in 2005 than
4   2004, determining their qualifications, the relative
5   ranking by the panel.
6   Q.   I see. Do you know when Mr. Campbell had
7   the conversation with the Coast Guard official?
8   A.   It was in November or December of 2004.
9   Q.   And did Mr. Campbell encourage others to
10  apply at the Coast Guard during this conversation?
11  A.   I'm not aware that he spoke to anybody
12  specifically about applying.
13  Q.   Well, during his conversation regarding
14  the OMS and learning about the concern of a
15  preselection, what did he say about readvertising
16  the position then?
17  A.   I don't believe he spoke to the Coast
18  Guard about it.
19  Q.   What was Mr. Campbell's decision-making
20  process with regard to readvertising the position
21  after his conversation?
22  A.   I think it is fairly simply in that

**42**

1   believing that we had a small pool of applicants,
2   and that small pool was the result of a belief
3   within the industry that this was a preselected
4   position, that in order to ensure a larger pool of
5   qualified applicants, he readvertised the position.
6   And that's, quite frankly, all he would need to do
7   to announce to potential applicants that it was not
8   preselected for any particular individual.
9   Q.   You just mentioned that he had authority
10  to make a determination to readvertise again based
11  on his — based on the criteria. What is that
12  criteria, sir?
13  A.   Clarify.
14  Q.   What authority did Mr. Campbell have to
15  make a determination to readvertise?
16  A.   Mr. Campbell could make a variety of
17  decisions based on the panel's — once the panel
18  completed its work, he could interview applicants,
19  he could not interview applicants, he could make a
20  selection in either of those two categories. He
21  could readvertise the position or he could cancel
22  the position altogether, cancel the announcement.

**43**

1   Those are essentially his choices.
2   Q.   Was anyone interviewed in 2004?
3   A.   I do not believe so.
4   Q.   Was anyone considered for interview in
5   2004?
6   A.   I know that the panel submitted —
7   completed their work in the 2004 application and
8   submitted the best qualified list to Mr. Campbell.
9   Q.   And was Marjorie Murtagh Cooke on the best
10  qualified list?
11  A.   She was in the top five, yes.
12  Q.   Is there any requirement that there be a
13  top five?
14  A.   No.  Five is a number selected by the
15  panel as a manageable number for interviews.  SES
16  interviews are lengthy, involved, require some
17  resources.  And the panel's purpose is to identify
18  the best applicants within the pool of applicants so
19  that the selecting official can choose the top group
20  to interview.  Otherwise the panel doesn't really
21  have any great utility.
22  Q.   I see.

**44**

1       MR. LOWINGER:  Can we just go off the
2   record for a second?
3       (Discussion off the record.)
4   BY MR. LOWINGER:
5   Q.   What are the expectations for the number
6   of applicants for the SES position in 2004?  Was
7   there an expectation that there would be a lot of
8   applicants, just a few?  How does the agency
9   determine that it has a qualified pool?
10  A.   The expectations are somewhat subjective,
11  but the belief — the general belief is that we
12  should, in an SES announcement, receive at least 25
13  to 30 applicants for a position. They are
14  relatively coveted positions and infrequently
15  available, especially in unique skill sets such as
16  the OMS director where it is a marine industry type
17  of position.
18      So there are some senior executive service
19  positions in the government where there are a lot of
20  these types of positions. Attorney is a good
21  example of one, where there are a lot of SES
22  attorneys, general counsels and the deputy general

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

29 (Pages 113 to 116)

---

**113**

1    I mentioned previously that Mr. Campbell
2  announced the ERB, that he was going to reannounce
3  the position. And my request to be on the panel
4  came through Ms. Magwood. From Mr. Campbell, I
5  presume.
6    Q.   Well, let's just clarify this. When
7  Mr. Campbell announced that he was going to
8  readvertise the position to the ER -- to the
9  executive review board?
10   A.   Resource board.
11   Q.   Resource board, excuse me. Did he say
12  anything about Marjorie Murtagh Cooke?
13   A.   No, no. There was no more than a
14  30-second comment in the ERB meeting.
15   Q.   What did he say specifically?
16   A.   Specifically he said --
17       MR. LUONG:  Objection. It's been asked
18  and answered already.
19   A.   Without being verbatim, he said
20  essentially that he didn't think there was a
21  sufficient pool of qualified applicants and he was
22  going to reannounce it to see if he could enlarge

---

**114**

1  the pool of applicants.
2    Q.   And are you aware of whether or not
3  Mr. Campbell actually reviewed the applications of
4  the five people recommended in 2004?
5    A.   I don't believe he did.
6    Q.   And then you'd mentioned that people --
7  are people placed on the ad hoc review panel or do
8  people volunteer for it?
9    A.   No, it's not a volunteer, it's an
10  assignment. Generally by the selecting official,
11  depending on the availability of the individual.
12   Q.   And how does the selecting official know
13  who to appoint?
14   A.   What they look for are people who are --
15  have the ability to make a judgment on the
16  credentials and qualifications of the applicants.
17      So in this case, at least in the panel
18  that I participated in and the second panel, like
19  positions, the director of aviation safety, highway
20  safety, rail safety, were included because the
21  positions were similar. And the director of
22  research and engineering and safety recommendations

---

**115**

1  were included because these two offices work every
2  day with the Office of Marine Safety. They are
3  co-dependent offices.
4    Q.   I see. Do the ranking sheets reflect the
5  panel's discussion with regard to the individual's
6  qualifications?
7    A.   They do. They reflect the consensus at
8  the conclusion of the discussion.
9    Q.   So when the conversation's over, who's the
10  person who prepares the ranking sheet?
11   A.   In the circumstance of my panel, it's
12  whoever in the group volunteers to do it, but all of
13  the members review and sign it.
14   Q.   What was discussed -- describe to me what
15  conversations or what communications there were
16  during your review panel with regard to Ms. Murtagh
17  Cooke's meeting with Ellen Engleman Conners in April
18  of 2004.
19      MR. LUONG:  Objection, assumes facts not.
20  in evidence.
21   A.   Well, there was no discussion about her --
22  any meeting that she had with Chairman Conners.

---

**116**

1    Q.   Was there a general knowledge of the
2  meeting?
3    A.   I didn't have a general knowledge of the
4  meeting. I can't tell you what the other four panel
5  members knew, but it wasn't discussed.
6    Q.   And describe to me what was communicated
7  with regard to Ms. Murtagh Cooke's complaint filed
8  with the EEO office at NTSB when you reviewed her
9  application.
10      MR. LUONG:  Objection, assumes facts not
11  in evidence.
12   A.   I don't believe any of the panel members
13  knew that there was an EEO claim or filing of any
14  type. EEO filings are private. Our EEO director
15  does not advertise that information.
16   Q.   Okay.
17   A.   Unless the individual tells you.
18   Q.   Were any of the panel members that you
19  were -- that you sat with, did the issue come up
20  during the conversation?
21   A.   No, the issue did not come up. And I
22  wasn't aware of it in advance of the panel.

---

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

33 (Pages 129 to 132)

129

1  Q. How are the – in what manner were the
2  other applicants in 2005, as determined by the
3  second panel, how were they better qualified than
4  Marjorie Murtagh Cooke for the SES position?
5  A. The panel determined that they had all had
6  significant experience in the maritime industry or
7  in the regulatory area or significant experience
8  aboard ship. And most of them had multiple tiers of
9  experience, different experiences in different
10 aspects of the industry, both private and
11 government, and different technical aspects of the
12 industry, from environmental protection, which is a
13 big marine issue, to ship design to significant
14 supervisory experience.
15 Q. What were the factors that were most
16 important in determining that those individuals were
17 better qualified than Marjorie Murtagh Cooke?
18 A. The breadth of the experience, not only
19 the diversity of the experience among the applicants
20 but also the level of experience and the level of
21 supervision and interaction, both domestically and
22 internationally.

130

1  Q. How would their international experience
2  rate higher than Marjorie Murtagh Cooke's?
3  A. Some of them -- it depends on the
4  applicants, but some of them were heavily engaged in
5  international committees and chairpersons of such
6  committees on marine safety and environment issues.
7  Some were head -- the head of joint international
8  programs. That's one aspect of the breadth of
9  experience that I had mentioned.
10 Q. So environmental, supervisory, the breadth
11 of experience, the level of experience, the
12 supervision and the international domestic work, I
13 guess regulatory work or work with outside
14 organizations --
15 A. Right.
16 Q. -- were all factors that demonstrated that
17 they were better qualified than Marjorie Murtagh
18 Cooke?
19 A. Yes.
20 Q. Any others?
21 A. No. Each applicant, of course, was
22 somewhat different, they're individuals, and their

131

1  experiences were different. But in a broad sense
2  their breadth and level of experience was superior.
3  Q. What about Mr. Spencer's experience was
4  superior to Ms. Murtagh Cooke's?
5  A. Mr. Spencer had not only the requisite
6  marine Bachelor's degree, he also had a Master's and
7  a doctorate.
8      Mr. Spencer had been through the Coast
9  Guard in a variety of marine safety positions and
10 had retired as a captain, Coast Guard captain. He
11 then went on to manage the technical development
12 program at the American Bureau of Shipping for a
13 number of years. He has authored a number of
14 papers. He has chaired a number of international
15 committees on maritime safety. He was well-known in
16 the industry and very well respected.
17 Q. So how does his -- how did his education
18 rank higher than Marjorie Murtagh Cooke's?
19 A. Marjorie Murtagh Cooke has a Bachelor's
20 degree in marine engineering, I believe, and that is
21 essentially the end of her formal education. I
22 believe. Without looking at her application. I

132

1  would need to look specifically at her application.
2      But Dr. Spencer's three formal education
3  degrees are all in maritime. And his 40-odd-year
4  career has been exclusively in the maritime industry
5  and both in the regulatory side and at the industry
6  side. And he has spent some time on ships as well.
7  Q. When you say some time, what kind of ships
8  did he spend his time on?
9  A. For the most part Coast Guard vessels when
10 he was with the Coast Guard.
11 Q. And did it matter to the board what type
12 of vessels a person was actually on?
13 A. Not necessarily. Time at sea, time
14 actually in command of different aspects of a ship
15 were desirable.
16 Q. What type of ships were desirable, sir?
17 A. I don't think that one was necessarily
18 more than the other, it was the experience of being
19 at sea. A Coast Guard cutter is different than a
20 cruise ship, but being at sea is still -- has the
21 same basic principle as far as command of a vessel
22 or aspects of a vessel.

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

35 (Pages 137 to 140)

**137**

1  A.  Without referring to the document I can't
2  tell you exactly the date.
3  Q.  And what -- who gave the procedural
4  discussion this time?
5  A.  It would have been Ms. Magwood.
6  Q.  And the second time around, what was the
7  discussion with regard to Marjorie Murtagh Cooke's
8  application?  Can you describe the conversation?
9  A.  I don't know the conversation that
10  occurred within the panel.  I wasn't part of that.
11  And I don't know if they discussed -- had the same
12  conversation that we had in the first panel of '05
13  regarding her position and whether she ought to be
14  interviewed or not.  I don't know.
15  Q.  Was there a ranking sheet the second time
16  around?
17  A.  Yes.
18  Q.  And how did Ms. Murtagh Cooke rank the
19  second time around as opposed to the first time
20  around in 2005?
21  A.  I think in the same position.  I think she
22  was number 7 out of 12 or 13.

**138**

1  Q.  The only distinction being that Tom
2  Haueter was involved the second time around?
3  A.  Tom Haueter took my place and otherwise
4  the panel was the same.
5  Q.  And what was Tom Haueter's position with
6  regard to Marjorie Murtagh Cooke's application?
7  A.  All I can tell you is that he signed,
8  along with the other panel members, the
9  recommendation to me, the managing director, for the
10  top five people.
11  Q.  Did you have any conversations with him
12  about this?
13  A.  Mr. Haueter, no.
14  Q.  Did you have any conversations with any of
15  the other members of the second 2005 panel?
16  A.  I did not until the interviews.  And
17  during the interviews, as we interviewed the top
18  five members, Mr. -- or Dr. Ellingstad and
19  Ms. Weinstein and Mr. Chipkevich knew the
20  applications from their review on the panel and had
21  conversations about those five individuals during
22  the interviews.

**139**

1  Q.  But what about regarding Marjorie Murtagh
2  Cooke?
3  A.  No, I didn't have conversation with the
4  panel members.
5  Q.  What about -- the interviewers were
6  basically the same.  Was there any discussion
7  amongst the interviewers that Marjorie Murtagh Cooke
8  was not selected for an interview?
9  A.  No, no.  The interviews were specific to
10  the applicant that was being interviewed at that
11  time.
12  Q.  Did you participate in that re-interview?
13  A.  I did.
14  Q.  After the interviews were completed,
15  what -- were you going to say something, sir?
16  A.  Yeah, I'm trying to -- no, never mind.
17  Q.  Are you sure?
18  A.  I'm trying to make sure that I give you
19  the right people on the interview.  And I think that
20  I've done that.
21  Q.  Who gave Marjorie Murtagh Cooke notice
22  that she wasn't going to be granted an interview?

**140**

1  A.  I did.
2  Q.  Describe to me the conversation.
3  A.  I brought her in and I told her that she
4  was -- that we had conducted five interviews of five
5  applicants and we were prepared to make a selection.
6  I did not bring her in and say she was not going to
7  be interviewed.  And the reason for that is had the
8  five top applicants not worked out during the
9  interviews, I had the option of moving further down
10  the list.
11  So I was not going to advertise that she
12  wasn't in the top five until such a point that we
13  had conducted those interviews and decided whether
14  we could make a selection from that crew, which I
15  could.
16  Q.  So after you told her that you conducted
17  interviews and that you were in the position to make
18  a selection, what was the next thing said?
19  A.  Well, I talked to her about the fact that
20  she was going to no longer be the director of the
21  Office of Marine Safety, that a new SES employee was
22  going to come in sometime in the summer and take

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

37 (Pages 145 to 148)

145

1   to the SES.
2       Q.   Okay.  Was there any discussion after she
3   said that -- after she said that, what was said
4   next?
5       A.   Well, then the discussion was about what
6   kind of positions she would potentially want to do.
7   In the agent one-on-one -- execute the agency, she
8   brought forward this idea of the international
9   liaison.  We talked about it.  It was a discussion.
10  And I thought it was an interesting concept.  And I
11  told her to develop it further and come back with
12  her thoughts on what she felt she could do with this
13  position.
14      Q.   What office would that SL international
15  position, liaison position be in?
16      A.   As we were discussing it we were
17  discussing it in the Office of Managing Director, my
18  office.
19      Q.   I see.  Why would it be in the Office of
20  the Managing Director?
21      A.   At the moment the agency has an SL
22  position for international aviation functions, which

146

1   is the majority of the international work that goes
2   on within the NTSB.  But there are other
3   international aspects of the agency that are not
4   represented by that SL position.
5       The person that currently occupies it,
6   that position, Mr. MacIntosh, deals almost
7   exclusively with aviation issues, while there are
8   some marine, a few highway and some rail and
9   pipeline issues that are international issues, and
10  there was no, at that time, liaison in the agency to
11  manage that activity, that international activity.
12      Q.   Is the international aviation SL position,
13  is that in the Office of the Managing Director as
14  well?
15      A.   No, that's in the Office of Aviation
16  Safety.
17      Q.   After you discussed the aviation -- the
18  international position and interest in equal pay,
19  what else was discussed during that first meeting?
20      A.   The only other topic that was discussed
21  was she thanked me and thanked me for being frank
22  and clear in the conversation with her and indicated

147

1   that she had not always understood or been -- in her
2   opinion things had not been communicated well to her
3   in the past.  That pretty much covers the content of
4   that meeting.
5       Q.   Was there anything discussed with regard
6   to the meeting with Ellen Engleman Conners?
7       A.   I don't believe so.
8       Q.   Did she mention communications with Ellen
9   Engleman Conners regarding equal pay and her efforts
10  to try to get equal pay?
11      A.   At some point in one of the meetings
12  Ms. Murtagh indicated that she had met with Member
13  Conners -- Engleman Conners and had tried to meet
14  with her again but could not.
15      Q.   And what was -- was that the first or
16  second meeting?
17      A.   I don't recall.  It was in one of those
18  meetings.
19      Q.   Either the first one or the second?
20      A.   Where she mentioned -- and I suspect it
21  was the first, because she was talking about
22  communication, her concern about not --

148

1   communication flow not going very well for her.
2       Q.   And what about -- what did she say about
3   the meeting other than the communication?  Did she
4   mention the fact that she was seeking equal pay and
5   had sought equal pay because she was the only woman
6   doing equal work and was not being paid at the same
7   level as the men?
8       A.   Yeah, I believe she did.  I believe she
9   did.  I think that I testified earlier that -- or at
10  least I mentioned earlier that I learned of her
11  concern about equal pay through the deposition, or
12  maybe that was the EEO.  I think that was the EEO.
13  No, I think she did mention it.  Much of that topic
14  was about equal pay in that first meeting.
15      Q.   I see.  And what did you respond when you
16  discussed equal pay besides the SL position?
17      A.   Well, I told her that the SES position
18  that she had applied for was a competitive position,
19  that she was not selected.  I could not legally just
20  arbitrarily improve her salary.  I don't have that
21  ability and couldn't do it.  That if she was
22  interested in making more salary we would need to

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

38 (Pages 149 to 152)

149

1  find a rational and justifiable mechanism for doing
2  that. And this is when we talked about the
3  potential for her developing an SL position within
4  the Office of Management.
5      Q.   What was your understanding as to what
6  would -- what Ms. Murtagh Cooke would need to do in
7  order to obtain the SL position when you discussed
8  that during your first meeting?
9      A.   I did discuss it. I said first we would
10  have to have a justifiable need. We would have to
11  identify the position and craft a position
12  description.
13          Secondly, we would have to obtain the
14  billet from OPM. SES and SL billets are allocated
15  from OPM. I just can't create a billet. I have to
16  request it from the Office of Personnel Management
17  with a justification and a rationale behind it.
18          Once granted that billet it then becomes a
19  competitive billet, because it is a promotion. All
20  promotions have to be done competitively. So there
21  would be an announcement. She would have to
22  compete. She would have to be selected and then --

150

1  that's the process. And we discussed that as well.
2      Q.   And how long -- the duration of the
3  process, did you discuss that at all?
4      A.   How long that would take?
5      Q.   Yes.
6      A.   Not likely. I don't think that I
7  discussed that, but I sent her off on the first
8  step, which was to create essentially a concept.
9      Q.   And a week later you had a meeting -- let
10  me just ask this question.
11          Before the meeting ended, what else was
12  discussed with regard to equal pay? Did you discuss
13  the equal -- the EEO complaints at all during the
14  first meeting?
15      A.   No, I don't recall that.
16      Q.   Were you aware of it at that point?
17      A.   I don't think so. I don't think I was
18  aware of the EEO complaint. I think I was aware
19  that she had met with Chairman Engleman Conners, but
20  I don't think I was aware of the EEO complaint.
21      Q.   When you took over -- when you took over
22  for Mr. Campbell, did you have any discussions with

151

1  regard to Marjorie Murtagh Cooke and her tenure
2  given that she was at that point not likely to be
3  selected for the SES position?
4      A.   When the sheet came from the panel, after
5  I reconstituted the panel, had them redo their work
6  and the sheet came back to me, it was clear that she
7  was not in the top five. And I mentioned to
8  Mr. Campbell that she was not in the top five.
9          At that stage he wanted essentially to be
10  an arm's length from the process because I was the
11  selecting official.
12      Q.   What did he say about Marjorie Murtagh
13  Cooke, about her not being in the top five?
14      A.   I don't believe he had any comment at all.
15  I informed him and he made note of it and that was
16  the end of the conversation.
17      Q.   How did he make note of it?
18      A.   He acknowledged that I gave him the
19  information.
20      Q.   And how did you give him the information?
21      A.   Verbally. I told him that I was going to
22  prepare for five interviews for the position, that

152

1  Marjorie was not in the top five and that he needed
2  to be aware of that.
3      Q.   Why would he need to be aware of that?
4      A.   Because she was the incumbent at the 15th
5  level.
6      Q.   And how would that impact him?
7      A.   It is -- as the executive director, he had
8  overall direction at that time for the activities of
9  the agency. The activities that go on with hiring
10  and so on with staff concern not only the managing
11  director but the executive director as well.
12      Q.   Was he surprised that she wasn't selected
13  for an interview?
14      A.   I don't believe so because I believe that
15  he knew from the previous panel that she had not
16  made the top five as well.
17      Q.   And did he speak to you about that, that
18  he had not -- that she had not been selected the
19  first time, in 2005?
20      A.   I don't think so. I know that
21  Mr. Campbell, through conversations with me,
22  believed that if it was plausible that the incumbent

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

47 (Pages 185 to 188)

185

1    A.   Prioritizing recommendations.

2    Q.   What else, sir?

3    A.   Making an assessment of available

4    resources versus desired activity and doing a

5    benefit analysis against that to determine, to make

6    sure that the limited resources are applied to the

7    most desirable activities.

8    Q.   Is there anything else, sir?

9    A.   That's basically it.

10   Q.   And what about the clinic for the safety

11   recommendations?

12   A.   The safety recommendation, that one I'm

13   not very knowledgeable of, what Ms. Weinstein had

14   her working on, but it had to do with organizing and

15   identifying within the agency the records management

16   for safety recommendation and the tracking process.

17   Q.   So record management and tracking?

18   A.   Yes.

19   Q.   What does that mean?

20   A.   Well, there are a number of

21   recommendations within the agency that the agency

22   has issued.  It's a correspondence exercise.  The

186

1    recipients reply.  We reply back to them.  They

2    reply again.  It is keeping track of where the

3    recommendation is in its evolution through its life,

4    and then identifying that and making it easy to

5    capture that information.

6    Q.   So basically it's finding out in whose

7    court the ball resides?

8    A.   Whose court the ball resides and what's

9    the status of the work against the recommendation.

10        For example, if we recommended to the FAA

11   that they promulgate a regulation, they would

12   respond back to us, we'd write back with comments,

13   they write back again.  Knowing where they were in

14   the regulatory processes is a necessary item that we

15   need to know as we continue to investigate new

16   accidents.

17   Q.   How would you characterize this

18   assignment?

19   A.   As a temporary assignment for someone who

20   had demonstrable planning skill.

21   Q.   What do you know about what she actually

22   did?

187

1    A.   I didn't evaluate her, and I didn't

2    monitor her daily activities.  So I'm not actually

3    sure.

4    Q.   Overall do you know what she did -- do you

5    have a sense of what she did while she was in the

6    Office of Safety Recommendations and Communications?

7    A.   My understanding is she did essentially

8    what the original design was for, assisted

9    Ms. Weinstein, who also continued her detail for a

10   short period of time to finish the project.

11   Q.   What type of -- what type of guidance did

12   Ms. Murtagh Cooke receive in performing her work in

13   determining how she was doing in performing her

14   work?

15   A.   She would have received it from

16   Ms. Weinstein.

17   Q.   Would it have been a position description?

18   A.   Position description and then personal

19   direction from the supervisor.

20   Q.   What about performance standards, should

21   she have received performance standards?

22   A.   Not for a temporary assignment.  For a

188

1    detail she should have received a position

2    description for the detail, but the performance

3    standards go back to the originating office.  In

4    this case it's the Office of Management.

5    Q.   I see.  Do you know who she worked with

6    while she was doing this work?

7    A.   In Safety Recommendations?  I presume

8    Ms. Weinstein and others, but I'm not sure who.

9    Q.   What rule is there that doesn't require a

10   performance standard for Ms. Murtagh Cooke's

11   transfer in the Office of Safety Recommendations and

12   Communications?

13        MR. LUONG:  Objection to the term

14   "transfer."

15   A.   As a detail you maintain your position of

16   record, although you may be doing other duties in

17   another assignment.  The rater should consult with

18   the manager in that detailed assignment to see how

19   well they did against the position description.

20   Q.   And who would that have been?  Who would

21   have been rating her work?

22   A.   It would have been Ms. Czech.

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

49 (Pages 193 to 196)

193

1    it in a satisfactory manner.
2        Q.   When people are put on, as you say, a
3    detail, is it possible to receive a bonus at the end
4    of the year?
5        A.   It is.  It's possible.
6        Q.   Is it likely?
7        A.   It's possible.  It depends on the nature
8    of the detail.  Details are very unique.  And it
9    depends on what the work involved and what the
10   nature of the detail was.
11       Q.   Describe how this -- how the work
12   performed by Ms. Murtagh Cooke, the actual
13   assignment, fits within the scope of the bonus, an
14   end-of-the year bonus.
15       A.   The bonus -- it's not a bonus, it's a
16   performance award that is provided to staff who
17   receive an outstanding or an excellent and varies in
18   percentage.  A higher percentage for outstanding, a
19   lower percentage for excellent.  Generally no
20   performance award for fully successful.  And not all
21   excellent candidates receive a performance award
22   either.

194

1        But generally all outstanding, people who
2    are rated outstanding receive some form of
3    performance award.  And there are several different
4    forms.
5        Additionally staff can be provided with a
6    special act award for discrete activities that occur
7    outside of the general performance level.
8        Q.   Any other type of bonuses, sir?
9        A.   There are large -- seven or eight large
10   agency end-of-the-year awards that are granted,
11   chairman's award, managing director's award,
12   regional staff assistant awards, that are granted at
13   the end of the year.
14       Q.   How complex of an assignment was
15   Ms. Murtagh Cooke assigned to in the Office of
16   Safety Recommendations and Communications?
17       A.   I don't think it was particularly complex.
18   I think that it was needed and procedurally robust,
19   but it wasn't particularly difficult.
20       Q.   To what extent was Ms. Murtagh Cooke's
21   skills as a GS-15, level 10, being utilized in that
22   position?

195

1        A.   I think her skills as a manager and
2    planner were being utilized.  I don't believe that
3    we utilized any of her marine safety skills much.
4    But that wasn't the intention of the detail.
5        The detail was to put her into a position
6    that was, one, available and, two, matched as
7    closely as possible her skills.  She was a good
8    organizer and planner and that's what that basic
9    assignment was.
10       Q.   But if it wasn't particularly complex and
11   the highest you can run as a government employee
12   before you become an SES at a GS-15, level 10, isn't
13   it likely that it would just be a very mundane task
14   for Ms. Murtagh Cooke?
15       MR. LUONG:  Objection, argumentative.
16       A.   There weren't a lot of options.  There
17   were only two options I had.  One was to keep her in
18   the Office of Marine Safety as a national resource
19   specialist for marine safety issues or this
20   particular assignment.  It was the assignment that
21   was available.  She did not wish to stay in the
22   Office of Marine Safety, so it became the de facto

196

1    only assignment available.
2        Q.   Was she doing the work with anyone else,
3    sir?
4        MR. LUONG:  Objection, asked and answered.
5        A.   In Safety Recommendations she was working
6    under the direction of Ms. Weinstein, and I don't
7    know who specifically she worked with.
8        Q.   How was the planning work that was
9    required for the job similar to or related to her
10   work done in the Office of Marine Safety?
11       A.   As a director of Office of Marine Safety
12   at the 15 level, she was required to plan annually
13   the activity of the office and the staff, to
14   organize and oversee the development of different
15   product and processes.  And it is similar, not
16   identical, but it's a similar basic planning
17   function.
18       Q.   And how was it planning for putting
19   together an advocacy plan?  What was she planning
20   rather than just putting together a piece of -- it
21   sounds like she was figuring out how to put
22   together, I guess, a report on strategic -- on

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

51 (Pages 201 to 204)

**201**

1  asked to terminate the detail and go back to the
2  Office of Marine Safety.
3      Q.   Was there any communication between you
4  and her that would let her know that she could get
5  out of the detail, as you call it, the detail, and
6  go back to Marine Safety?
7      A.   It's sort of an awkward way of putting it.
8  She was aware that it was a detail. She didn't want
9  to return to Marine Safety, and she never indicated
10  that, one, she was unhappy with the detail or, two,
11  that she ever wanted to return to Marine Safety. If
12  she had these thoughts she kept them to herself and
13  didn't tell anybody.
14      Q.   So how did the detail end?
15      A.   The work was over. The work that
16  Ms. Weinstein had needed to be done was
17  substantially complete. And at that time I had an
18  opportunity to design a new position within the
19  Office of Management to essentially redesign the
20  organizational structure of the Office of
21  Management. And I brought her in and spoke to her
22  and told her that I had a very credible GS-15 level

**202**

1  position as the associate managing director for
2  strategic management, and -- although I'm not sure I
3  had titled it that at that time, but it was the
4  chief planning officer for the agency, a position
5  that did not previously exist in the administration
6  that preceded my tenure. And I asked her if she
7  would do it.
8      I told her that I wouldn't make her do it,
9  she had the option of saying no, but that I thought
10  that her planning and presentation, especially
11  strategic planning skills, were good. I had seen,
12  as the office director for Highway Safety, her
13  planning activity as a counterpart, as a colleague
14  when I was in that position, and she was good at
15  process flow and strategic process and
16  organizational development, and I thought she would
17  be quite good for the position.
18      She thought about it and decided that she
19  did not wish to embark on that kind of position.
20  She didn't want to do it. And I asked her why. And
21  she indicated that it was just too much work. She
22  didn't want to get that heavily engaged again. And

**203**

1  it was a lot of work. It was a new position,
2  creating a new process and a new, essentially,
3  function for the agency, one that maybe should have
4  existed for a long time, it hadn't, and that is a
5  permanent planning function. So I offered that to
6  her and she declined.
7      So I told her that we would put her in a
8  program management position, program analyst
9  position until such time that we could determine
10  what other positions became available at the 15
11  level. And we gave her the assignment of doing
12  essentially an archeology task, which was to
13  identify, one, all of the reviews and audits that
14  the agency had incurred in the last 10 years and
15  then archive the responses that the agency had
16  against all of those reviews and audits, which we
17  had not done previously. The agency hadn't done
18  that previously. And to do that she had to go
19  around and talk to all the office directors, find
20  out all the information, collect it, collate it and
21  put it into essentially an archive.
22      Q.   What written documentation do you have

**204**

1  with regard to the position of -- the associate
2  strategic management position?
3      A.   Associate managing director for strategic
4  management is what it is titled now. I think at the
5  time that I spoke to Ms. Murtagh about it, I'm not
6  sure that that was exactly the title. It may have
7  been chief strategic planning or -- we modified the
8  title a couple of times.
9      I have a position description and a
10  performance standard and I have a new employee in
11  that position at the moment.
12      Q.   Was there a position description provided
13  to Ms. Murtagh Cooke to consider the position?
14      A.   No, because -- and I recall this
15  conversation. I had a draft and I wanted her to
16  consider that. And part of the duty of the -- I was
17  intending for her to do was to complete that
18  position description by refining it and finalizing
19  it as she came into it.
20      Q.   What part of planning was Ms. Murtagh
21  Cooke good at in the Office of Marine Safety?
22      A.   Process flow.

DEPOSITION OF JOSEPH G. OSTERMAN
CONDUCTED ON FRIDAY, JULY 6, 2007

54 (Pages 213 to 216)

213

1    A.   She was frequently unhappy, as the
2    director of Marine Safety unhappy with the
3    management and unhappy with the process and unhappy
4    with board members and other activities. I didn't
5    notice any of that when she was working in the
6    Office of Management.
7    Q.   Were there other positions available to
8    her while she was in the Office of Managing Director
9    that she could have taken?
10    A.   There are some positions that were offered
11    by the agency for competitive – offered as a
12    competitive bid. But to the best of my knowledge
13    she did not apply for any of those.
14    Q.   Do you know what positions those were?
15    A.   Well, after she left the Office of Marine
16    Safety, we advertized for a chief information
17    officer at the SES level and a director of Highway
18    Safety at the SES level, my former position, and
19    deputy managing director at the SES level. There
20    were then a number of 15-level positions, none of
21    which I thought she was particularly well-suited
22    for. Deputy CIO, deputy chief information officer,

214

1    which is a very technology-laden computer billet.
2    But there were several SES positions she could have
3    competed for.
4    Q.   Was the deputy managing director an SES
5    position?
6    A.   Yes.
7    Q.   And did anyone speak with her about that
8    position?
9    MR. LUONG:  Objection to the extent this
10    is outside the scope of the 30(b)(6) deposition.
11    A.   I didn't speak to her about the position.
12    Q.   How would she have learned about it?
13    A.   Like everyone else, through the
14    competitive advertisement.
15    Q.   Where is the competitive advertisement
16    posted?
17    A.   It's posted on the intra and Internet site
18    and then the USA jobs.
19    Q.   Was Ms. Murtagh Cooke provided a computer
20    at work?
21    A.   Yes.
22    Q.   Was that computer linked to the intranet?

215

1    A.   Say it again.
2    Q.   Was the computer linked to the network,
3    the intranet network?
4    A.   Yes. All the computers border link to the
5    intranet.
6    MR. LOWINGER:  Can we take a break?
7    (A recess was taken.)
8    BY MR. LOWINGER:
9    Q.   Sir, you've used the word "detail" any
10    number of times today. Can you tell me what a
11    detail is?
12    A.   It is a temporary assignment to another
13    activity or position.
14    Q.   And outside of OMS, what other
15    opportunities were available to Ms. Murtagh Cooke to
16    work on marine safety issues after Mr. Spencer –
17    after she was removed from the position of director
18    of OMS?
19    A.   There's probably only four places that
20    touch marine safety issues. The Office of Marine
21    Safety, the Office of Research and Engineering, the
22    Office of Safety Recommendations, and where they

216

1    touch it is in the safety recommendation
2    correspondence activity, and then occasionally with
3    the board members.
4    Q.   What steps were taken by the agency to put
5    Ms. Murtagh Cooke in a position related to marine
6    safety after her removal from the directorship
7    position?
8    A.   Ms. Cooke indicated she did not want to be
9    in the Office of Marine Safety. I looked through
10    the agency to determine where there was another
11    acceptable position. The single billet, which was a
12    14-level billet in the Office of Safety
13    Recommendations, that dealt with marine safety
14    recommendations, was already filled.
15    In the Office of Research and Engineering
16    there were no specific marine positions available.
17    And I mentioned the board members, but the board
18    members' billet, the few that are there are
19    political billets, not career positions. And it was
20    unlikely that she would be eligible for one of
21    those.
22    Q.   Aside from OMS, Research and Engineering,

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

1 (Pages 1 to 4)

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3      - - - - - - - - - - - - - - X
 4   MARJORIE MURTAGH COOKE,        :
 5          Plaintiff,    :
 6   vs.                :  Case No.:
 7   MARK ROSENKER, Chairman,    : 1:06CV01928
 8   NATIONAL TRANSPORTATION SAFETY :
 9   BOARD,                :
10          Defendant.    :
11      - - - - - - - - - - - - - - X
12
13      Videotaped Deposition of DANIEL CAMPBELL
14          Washington, D.C.
15          Thursday, November 15, 2007
16              9:59 a.m.
17
18
19
20   Job No.: 1-115036
21   Pages:  1 - 200
22   Reported by:  Dana C. Ryan, RPR, CRR
```

**Page 2**

```
 1      Videotaped Deposition of DANIEL CAMPBELL, held
 2   at the law offices of:
 3          The Employment Law Group, P.C.
 4          888 17th Street, Northwest
 5          Suite 900
 6          Washington, D.C. 20006
 7          (202) 331-3911
 8
 9
10      Pursuant to agreement, before Dana C. Ryan,
11   Registered Professional Reporter, Certified Realtime
12   Reporter and Notary Public in and for the District of
13   Columbia.
14
15
16
17
18
19
20
21
22
```

**Page 3**

```
 1          APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4      R. SCOTT OSWALD, Esquire
 5      DAVID SCHER, Esquire
 6      BRIAN M. LOWINGER, Esquire
 7      The Employment Law Group, P.C.
 8      888 17th Street, Northwest
 9      Suite 900
10      Washington, D.C. 20006
11      (202) 331-3911
12
13
14   ON BEHALF OF THE DEFENDANT THE UNITED STATES OF
15   AMERICA:
16      MEREDYTH D. COHEN, Esquire
17      United States Department of Justice
18      Commercial Litigation Branch
19      1100 L Street, Northwest
20      Washington, D.C. 20530
21      (202) 353-7978
22
```

**Page 4**

```
 1      APPEARANCES CONTINUED
 2
 3   ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION
 4   SAFETY BOARD:
 5      ANDREA MCBARNETTE, Esquire
 6      U.S. Attorney's Office
 7      501 3rd Street, Northwest, Rm 4218
 8      Washington, D.C. 20530
 9      (202) 514-7153
10
11
12   ALSO PRESENT:
13      Denise M. D'Avello, Esquire, NTSB Office of
14          General Counsel
15      Marjorie Murtagh Cooke, Plaintiff
16      Scott Forman, Videographer
17
18
19
20
21
22
```

EXHIBIT

6

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

5 (Pages 17 to 20)

**17**

1 agency.
2    Q   The layout of NTSB, where was — on what
3 floor was your office as the managing --
4    A   Sixth --
5    Q   -- director?
6    A   -- floor.
7    Q   Okay. And how close was your office to --
8 to the chairman's office during that period of time,
9 Eng — Ellen Engleman Conners?
10   A   Do you want that in feet, in --
11   Q   Sure.
12   A   It's probably 200 feet maybe. The office --
13 the managing director's office is a separate suite
14 from the chairman's office, but it is adjacent to the
15 suite. There is a door between the two suites. My
16 office was at the far end of the managing director's
17 suite. The chairman's office was at the far end of
18 her suite. I could yell loud enough that she could
19 hear me and vice versa, but --
20   Q   I – I understand. I understand. How often
21 did you meet with, on average, Ellen Engleman Conners,
22 the chairman, during the period of time that she was

**18**

1 the chairman and you were the managing director?
2    A   Well, if she was in the office, it would be
3 unlikely that I would not see her.
4    Q   On any given day?
5    A   Yeah.
6    Q   And when you say you would see her on a
7 daily basis when she was in the office, to what extent
8 would you have a substantive conversation with her on
9 days that you would see her in the office?
10   A   Well, it would not be uncommon, but it's --
11 it wasn't a daily event, but it would not be uncommon.
12 The chairman has a lot of the -- the chairman handles
13 the public side of the agency. The managing director
14 handles a lot of the – the matter that is not yet
15 public, that's in process and so forth, and, so, my
16 day and hers would be very different.
17   Q   When you would meet with Engleman -- Ellen
18 Engleman Conners, where would those meetings take
19 place?
20   A   Well, one of three places. She would not
21 infrequently come to my office if she had something
22 that she wanted to talk to me about. If there were to

**19**

1 be other people involved in the meeting, it was more
2 likely to be in her office. And there was a
3 conference room in between us, and if there were a lot
4 of people involved, it would probably have been in the
5 conference room.
6    Q   And how often would the -- these meetings be
7 impromptu as opposed to scheduled meetings on a daily
8 basis?
9    A   They would be more likely to be impromptu by
10 a large margin.
11   Q   And this is when Engleman -- Ellen Engleman
12 Conners would come down to your office to talk to you
13 about various things that were going on?
14   A   Or tell me that there was a -- an office --
15 I mean, meeting in her office that she would like me
16 to attend, yes. There -- there -- and I had a
17 managing director's meeting that the chairman might
18 attend, and it was infrequently scheduled, so -- and
19 I -- I don't believe that she had any scheduled
20 meetings that would routinely have been scheduled, so
21 they were in that sense almost always impromptu.
22   Q   I understand. The -- the modal directors

**20**

1 and the other directors over whom you had direct
2 supervision, how often would you evaluate their –
3 these individuals' performance, how regularly?
4    A   What do you mean by "evaluate"?
5    Q   Well, what — what do you mean -- when I say
6 the word "evaluate," what does that mean to you?
7    A   Well, I evaluated them every time we had a
8 conversation about anything of substance. I mean,
9 that's what you have to do.
10   Q   Let's use the -- the more formal term
11 "evaluate," meaning an evaluation process. How often
12 would you evaluate employees over whom you had direct
13 supervisory authority when you were at NTSB both as a
14 general counsel, managing director and then a --
15 finally executive director from on or about 1990
16 through 2005?
17   A   Well, it would be -- it would be an ongoing
18 thing. The -- in the general counsel's office there
19 were very few people, and we all worked very closely
20 together, so there wasn't any -- any sense in which
21 there was a need to sit down and -- and -- and talk to
22 one another about how we were thinking about one

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

6 (Pages 21 to 24)

21

1 another. It was pretty -- a pretty tight-knit group,
2 so you had an annual appraisal at the end of the year
3 that you had to do for civil service rules, and that
4 would have been undertaken.
5     If a problem arose, it was probably going to
6 be in the context of a -- of a proceeding or a case
7 and you'd work it out in that manner, so that's pretty
8 much the way I did it in the general counsel's office.
9     As a managing director, as I mentioned
10 before, the principal -- my principal responsibility
11 from the standpoint of what a chairman would expect of
12 me was quality product. The agency works by way of
13 presentation of accident reports to a board, and the
14 managing director is the person who signs those
15 reports and presents them to the board as a nearly
16 finished product. The board obviously is going to
17 meet on them and make determinations.
18     It would be in the context of the
19 development of a report that the analysis of an office
20 director and indeed the analysis of an office is
21 undertaken. That would culminate in what was known as
22 a director's review in which an office director would

22

1 present a report to the managing director and to the
2 other directors that were involved in it, and it was
3 a -- a process in which you were -- you -- you --
4 you're basically peer reviewing a matter, and that's
5 how you determined, evaluated the work of an office.
6     Q   Let's talk about the annual performance
7 appraisal that you just mentioned. Is it fair to say
8 that you would perform that annual per -- performance
9 appraisal on an annual basis?
10     A   Yes.
11     Q   All right. And how -- how would you go
12 about that as the managing director over those
13 individuals over whom you had direct supervisory
14 authority?
15     A   I'd ask them to -- the office directors to
16 provide me with some information about what they
17 believed to have been the accomplishments that they
18 had for that year, and I think -- I don't know whether
19 my assistants or -- or human resources or -- or who
20 would present me pieces of paper that -- that would
21 look to be the basic framework of an evaluation sheet,
22 and then I would work a little bit on that.

23

1     Q   And then once you had worked a little bit on
2 the evaluation sheet, what would you do?
3     A   Are we talking now about the modal office
4 directors?
5     Q   Yes.
6     A   Okay. Because it will make a difference.
7 The people who were direct reports to me that were on
8 my staff I might handle in a different fashion than I
9 would handle a modal office director. Modal office
10 directors really, in essence, were the heart of the
11 agency and not employees of mine, and as such the
12 chairman would be more interested in the way in which
13 a modal office performed. And, so, that was a -- a --
14 a mutual undertaking.
15     As I say, my authority over personnel is a
16 delegated authority from the chairman, so the chairman
17 and I would reach some agreement about how modal
18 directors were to be rated and then the ratings would
19 be made.
20     Q   So you have the -- the sheet from HR that
21 has the general structure of what the evaluation would
22 be, and you've said you'd work on that some.

24

1     A   Uh-huh.
2     Q   Then what would you do when you are
3 evaluating those over whom you have direct supervisory
4 authority as part of the annual performance appraisal
5 process?
6     A   I would talk to the chairman and then tell
7 the chairman that we had to go through the annual
8 appraisal process, and we would work out some
9 understanding of how we wanted to handle it. Then I
10 would sign the documents and process the -- I think
11 it's important to understand that to some extent the
12 annual appraisal process is directly related to the
13 end-of-the-year bonus process, and that's a lot of
14 what was under consideration here.
15     Q   So once you had completed the form, you had
16 put in any of your comments and all as part of the
17 annual performance appraisal process, then what would
18 you do with that form?
19     A   Well, human resources would take the form.
20 I -- I can't really honestly say. This is not
21 something that I spent a great deal of time thinking
22 about in terms of how pa -- pieces of paper move

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

8 (Pages 29 to 32)

29

```
1      Q   So I just want to make sure I understand.
2   With the modal directors, the -- those that were in
3   charge of the highway --
4      A   Uh-huh.
5      Q   -- office, the marine office, the air safety
6   office and the rail office, you did not perform annual
7   performance appraisals on any of those modal directors
8   between 2000 and 2005?
9      A   I think what you said was did I speak to
10  them after, and your question just now is did I
11  perform an appraisal. I performed an appraisal. Did
12  I talk to them about it afterwards? Virtually
13  everyone is going to be rated outstanding, and they
14  didn't really need to be told that.
15     Q   And when you say, "virtually everyone is
16  going to be rated outstanding," you mean the -- the
17  modal --
18     A   The --
19     Q   -- officers --
20     A   -- modal officers, yeah.
21     Q   -- between --
22     A   Uh-huh.
```

31

```
1   comments about the person's performance, would you
2   sign the form?
3      A   I think I had to.
4      Q   Okay. And who else would sign the form?
5      A   Well, if we're talking about modal directors
6   again, there have to be two signatures on the form,
7   because, as I mentioned, there are -- there are --
8   it's connected with the bonus process, and you can't
9   spend money and the government -- well, this recent
10  thing in the D.C. government, I'm not sure, but
11  theoretically you -- it -- you -- you have to have two
12  signatures, so the chairman would be the -- the
13  signing official since that's the official above me.
14  If I take an action, I have to have a reviewing
15  official. My report is to the chairman, so it would
16  be the chairman.
17     Q   And who else would sign the annual
18  performance appraisal that would lead to bonuses
19  and -- other than you and the -- and the chairman of
20  the NTSB?
21     A   The employee signs an appraisal form, I
22  believe.
```

30

```
1      Q   -- 2000 and --
2      A   Uh-huh.
3      Q   -- 2005 --
4      A   Yeah.
5      Q   -- is that correct?
6      A   Yeah, I think that's pretty much the way it
7   was.
8      Q   All right. Now, turning to --
9      A   I don't want to leave you with the
10  impression that if I had a difficulty with somebody's
11  performance that I couldn't express to them what it
12  was that they needed to do to -- to -- to bring that
13  particular function back into play, so I don't -- I
14  don't -- I'm pretty sure that everybody knew when
15  there were difficulties, but to do it annually
16  wouldn't make any sense. Sit down the day before
17  Christmas and talk about things that happened in -- in
18  October or April, senseless.
19     Q   I understand. All right. The -- the
20  performance appraisals that -- that you did conduct
21  that -- the forms themselves, after you -- it came
22  from HR and it was filled out and you then put in your
```

32

```
1      Q   And when does the employee sign the
2   appraisal form in -- in the sequence of this process?
3      A   Well, obviously after the other two
4   signatures.
5      Q   All right. And, so, who would -- once you
6   had completed your comments on the form, then what
7   would you do with the annual performance appraisal
8   after you had inserted your comments, you had signed;
9   what would you do next?
10     A   I probably would give it to somebody to have
11  it distributed to wherever it needed to be
12  distributed.
13     Q   You would give it to whom?
14     A   Well, either to Lisa Love or Towanna Price
15  or whoever it -- these were likely to be a stack of
16  things, and I'd say to somebody that I'm done with
17  them and then they would be gone.
18     Q   And at what point would you have this
19  conversation with the chairman about what her comments
20  or -- input was on the performance appraisal, if
21  ever?
22     A   Well, early on in the process to figure out
```

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

16 (Pages 61 to 64)

61

1   of position that would be an appropriate position for
2   an SL position?
3      A   As I just said, I don't know that I ever had
4   that conversation with Ellen.
5      Q   All right.  When was the first time you had
6   a conversation with Ellen Engleman Conners about how
7   the agency should allocate SES positions within the
8   agency?
9          MS. COHEN:  Objection, assumes facts
10  not in evidence.
11         THE WITNESS:  I don't know that I had
12  that conversation.
13  BY MR. OSWALD:
14     Q   Is it possible you had that conversation?
15     A   Well, it would have been more than possible
16  that we had a conversation about particular office
17  arrangements.  Let me say -- let me put this -- there
18  were two SES at one point out at our academy.  I was
19  not in favor of that and probably would have made that
20  point to the chairman.
21         Ellen Engleman Conners was in favor of
22  having an administrative office back at the level of

62

1   SES, and NTSB had had one.  When we moved to having an
2   independent controller, chief financial officer, that
3   SES was allocated to the chief financial officer, so
4   now human resources and contracting and acquisitions
5   and so forth was headed up by a series of GS-15s
6   reporting directly to the managing director, which was
7   not fun for the managing director, but -- but made
8   sense in -- in the sense that it avoided using an SES
9   in that area.
10         And until we had all the modal offices at
11  the SES level, I would have been opposed to putting an
12  SES back there.  But we got to the point where we had
13  the SES for that position, so Ellen and I would have
14  had a conversation about that.  I don't know that
15  Ellen and I would ever have had a conversation about
16  SES in modal offices because that was presumed.
17         I had written -- one of the first things I
18  did when I became managing director was written --
19  I -- I authored a letter to OPM indicating that the
20  modal offices, now that they were independent, ought
21  to be staffed at the SES level.  And we requested SES
22  to do that, and OPM denied it, and we -- I think

63

1   annual -- I think that was an annual -- you know, it
2   was sort of -- it was almost like a ritual.  I'll ask
3   OPM, and they'll say no.  And eventually they said yes
4   to one or two; I can't remember what, but we
5   eventually got it done by pulling an SES from here and
6   pulling an SES from there.  Sometimes the chairmen
7   were agreeable to that.  Other times the chairmen
8   would expend those SESs in ways that -- that I would
9   not have preferred, but --
10     Q   And why did you believe that all of the
11  modal offices, this would be the -- the highway
12  office, the marine office, the air office and the rail
13  and pipeline office, all should have SES designation?
14     A   Well, if you look at the federal pay scale,
15  you'll see that it's fairly well compacted, and it's
16  not uncommon for us to have highly graded
17  investigators because it's a -- it's a -- you know,
18  we're a skill-intensive agency, and, so, you can have
19  GS-15 investigators or GS-14 -- high step GS-14
20  investigators, and their compensation can be very,
21  very close to the compensation of their office
22  director, and if that makes sense to you, then you

64

1   look at business differently than I do.
2          So to me it was simply an issue of money.
3   It was simply an issue of, if you're going to run the
4   office, if you're going to take the responsibility for
5   it, if -- if -- if you're going to be at the top, I
6   want to put in an incentive.  I want to put a pyramid
7   there.  I want the right people to crawl up there.
8          It was not uncommon at NTSB for people to --
9   to -- to refuse to take, for instance, a division
10  chief job on the grounds that they were already doing
11  the work and they didn't need the hassle of management
12  and there wasn't another nickel in it for them.
13  That's government service.
14         So for me it was basically, all right, we
15  had gone from an office that had been run by two SES;
16  we were going to four offices.  I was not in favor of
17  that, but if that's what was going to happen, I -- I
18  was definitely in favor of going -- of putting in the
19  SES.  I've been in the SES myself since the day it was
20  created in 1978, so I'm -- I'm not going to -- I'm not
21  going to look at an office director and say, you
22  shouldn't be an SES.  I think that -- I think they

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

17 (Pages 65 to 68)

65

1   should, so that was -- that was a no-brainer for me.
2       Q   I understand.  When the SES came free from
3   the academy, who was it who made the decision to
4   allocate that SES position to the highway modal office
5   director position?
6       A   It would have been the chairman.  Which
7   chairman, I -- I'm going to be at a loss for again,
8   because there were -- I probably would not have
9   allowed -- let me -- let me back up a little bit.  I
10  probably would not have allowed that decision to go
11  forward too quickly if I had an acting chairman who I
12  knew was about to be replaced, and I was in that
13  position not infrequently where the -- the -- a
14  nomination had been sent up and I knew that an acting
15  chairman was, you know, months away from -- from going
16  back to board member status and I'd have a new
17  chairman in.  That's not sensible for a lot of
18  reasons, including the interpersonal relationships
19  that may then occur between a board member and a
20  chairman about who -- who decided what was going to be
21  an SES and who made the selection.  Presidential
22  appointees can be jealous about those kind of

66

1   prerogatives.
2       But it -- so assuming that it was the
3   academy that went to highway -- and I think you're
4   correct on that, but I'm not sure -- a chairman will
5   have made that decision; although, I will have
6   presented that as a -- as a given.  If -- if I -- if
7   the -- if the chairman is sitting in front of me and
8   said, well, what do we do with this, I would have
9   said, oh, we need to move this into the modes.
10      Q   And -- and who was it who made the decision
11  to assign the -- recommendation to assign the academy
12  SES position to highway as opposed to any other modal
13  office?
14      A   Well, I've been 100 percent behind that, so
15  if we're looking for a recommendation -- I'm not sure
16  there was a recommendation because I'm not sure that
17  there was ever any -- any -- any debate or
18  consideration about it, but if there -- if -- if you
19  want someone to have recommended it, I'll recommend
20  it, because it's -- from the institutional standpoint,
21  it's pretty much a no-brainer.
22      Q   Why is that?

67

1       A   Unfortunately there's 44,000 people who die
2   every year on the highways.  The -- as an institution,
3   NTSB is dependent upon aviation.  It -- it -- it began
4   in aviation.  It was actually part of the Civil
5   Aeronautics Board that I was a part of back in the
6   '70s.  Our budget is predicated on aviation.  I think,
7   in fact, when we do reauthorization, we go before the
8   aviation subcommittees of the -- of the commerce
9   committees on both sides.  I don't even think the full
10  committee is here.  I think it's all done in aviation.
11      And of course aviation have their -- there
12  are very important parts of the aviation that NTSB
13  needs to be involved in.  I don't want to downplay
14  that.  But if you were to ask yourself where NTSB can
15  have an impact, there's less than -- less than a
16  thousand people probably dying in aviation every year,
17  and most of that not in commercial aviation.  There's
18  less than just -- I think in an -- marine it's around
19  700 people a year.  In highway it's 44,000.  It's --
20  it's almost a million worldwide, and that's the --
21  that's the area, and we're -- and we're -- as a -- as
22  a result of that, we're sort of organized in that

68

1   fashion.  We have regional offices in highway.
2   It's -- it's -- it's a no-brainer from our standpoint
3   that that's where we can have the impact.  That's
4   where you want to do most of your business that is
5   discretion -- that is a discretionary call.
6       Q   And who was the incumbent at that time?
7       A   A fellow named Joe Osterman.
8       Q   And prior to your recommendation and Ellen
9   Engleman Conner's transfer of the SES slot from the
10  academy over to highway --
11      A   Again --
12      Q   -- to this --
13      A   -- you're --
14      Q   -- position --
15      A   -- assuming it's Ellen.  I -- I'm not sure
16  it is, but -- but I'll take your word for it for the
17  purposes of the discussion.
18      Q   All right.  In light of highway's -- the
19  modal directors importance to NTSB, how had you gone
20  about making sure that -- that Joe Osterman had
21  received more money in that position given all the
22  responsibilities that he had had?

93

1 having read it, and that would be my role.
2 BY MR. OSWALD:
3    Q   In its entirety?
4    A   I have no recollection of having done
5 anything else.
6    Q   I understand.
7    A   Well, apparently --
8    Q   Now, when did you -- who was responsible for
9 the decision to rescind the vacancy announcement for
10 the director of the Office of Marine Safety, a
11 position that was announced the first time in late
12 2004, for the director of marine safety at the
13 National Transportation Safety Board?
14    A   I was.
15    Q   And why did you rescind the first vacancy
16 announcement?
17    A   Well, that's a complicated question, but
18 there were two principal things that were on my mind.
19 One was I wasn't ready to have a selection made at
20 that moment, and, two, I thought that the pool of
21 candidates had been artificially narrowed by rumor
22 that the first announcement had been wired for an

94

1 internal candidate.
2    Q   Now, what factors made up your decision to
3 rescind the vacancy announcement for the director of
4 marine safety at the NTSB -- this is the 2004 first
5 vacancy announcement -- apart from your unwillingness
6 or not being ready to make a selection and your belief
7 that the pool of candidates was artificially narrowed
8 based upon a preconceived notion that there was a
9 preselection for the position; what other factors
10 other than those?
11    A   Well, I called -- when I got a list of who
12 was -- who the panel had recommended, I put the list
13 on the back of my desk and I didn't touch it very much
14 for a period of time because, as I say, I wasn't
15 really interested in seeing the selection process go
16 forward at that point in time.
17       I can't remember why I finally decided I had
18 to do something with it, but when I did, the first
19 name on the list was a captain from the Coast Guard
20 who I knew, and I called him and he told me that he
21 was now employed by Johns Hopkins and was no longer a
22 candidate, and I told him that I was kind of surprised

95

1 that there -- he was the only guy that was interested.
2 Captain Brusseau was the guy who told me that it was
3 understood it was kind of wired for the plaintiff and
4 that that may have limited it, and, so, that
5 conversation with one of the applicants would have
6 been the only additional factor that I -- that went
7 into it.
8    Q   Who were the other four candidates on the
9 list that was provided to you by the panel after the
10 first vacancy announcement --
11    A   I don't remember them by name, but there was
12 a -- there was a Coast Guard guy from the operational
13 side of the Coast Guard, and then there were two
14 people from the private sector, and I don't remember
15 their names.  I do remember that I was not impressed.
16    Q   And who else?
17    A   The plaintiff.
18    Q   Marjorie Murtagh was?
19    A   Yes.
20    Q   Why did you -- so what was it about the --
21 the five candidates that were sent to you by the first
22 panel of the selection committee that led you to

96

1 believe that it was -- it was artificially narrowed?
2 This is the same group that include, what, Captain
3 Prudo (sic), a Coast Guard captain and two private
4 sector folks and Marjorie Murtagh Cooke; how is it --
5    A   Could you repeat the -- I lost your question
6 and -- could you rephrase it?
7    Q   Well, what was it about the list that the
8 panel had supplied you, the list of five candidates,
9 which included Captain Prudo (sic), two private sector
10 employees, another captain in the Coast Guard and
11 Marjorie Murtagh Cooke, the incumbent in the position,
12 that led you to believe that the list was too narrow?
13    A   Well, it wasn't the list that led me to
14 believe that -- that -- that the -- it was too narrow.
15 I mean, the list -- the list didn't have any good
16 candidates in it except the first guy that I -- well,
17 I don't want to say it didn't have any good
18 candidates.  The two private sector guys I found
19 deficiencies with just looking at the -- the
20 applications.  I don't know that I -- if I had met
21 with them and talked to them that they might not have
22 been able to explain a lot of that, but I looked at it

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

25 (Pages 97 to 100)

97

1  and I thought to myself, well, there's a couple of
2  glaring probabilities -- possibilities here that I'm
3  not -- I'm not very happy with.
4      The one guy that was on the top, the first
5  name there who I -- was somebody that I had dealt with
6  in Coast Guard and thought was an -- an estimable
7  person, I gave him a call and he was no longer a
8  candidate. So now I was left with an operational guy,
9  with Marjorie Murtagh and with the two private sector
10  types who -- who had credentials that both didn't
11  really speak to the job, but also had holes in them
12  that made me very -- very nervous; periods of time
13  where people had gone from a senior vice president,
14  170,000 or $180,000 a year to a GS-12. That's not the
15  kind of career advancement that -- that makes you
16  comfortable when you're thinking of turning someone
17  into an SES. So it wasn't -- it wasn't a very -- it
18  wasn't a pool that I was particularly delighted with.
19      Q   And why wasn't Marjorie Murtagh Cooke a good
20  candidate for the position?
21      A   Well, she might have been a good candidate,
22  but I would have had to take it to the chairman, and

98

1  she would not probably have been selected, and that's
2  one of the reasons I was not in a hurry to do this.
3  When I say I procrastinated, I procrastinated because
4  I believed that I was going to lose the office
5  director that was there; that was going to be the
6  outcome.
7      Q   What led you to believe that?
8      A   Well, I knew who the chairman was. I knew
9  what the -- what the -- the -- the -- as I say, I
10  allowed the modal directors to make their own
11  impressions on a chairman. I -- I gave them every
12  opportunity to prove themselves. If I had made a
13  suggestion that Marjorie Murtagh ought to be the
14  office director during the period of time that the
15  Barberi was in play -- that's the accident that --
16  that I have now been asked to undertake by the
17  chairman -- I believe the chairman would have looked
18  at me and said, Dan, have you lost your mind. I
19  think -- I think that that would not have been a
20  sensible thing for me to do.
21      Q   Why not?
22      A   Well, because to make somebody -- to pay

99

1  somebody at the SES level to do something that they
2  don't -- they are not necessarily doing to your
3  satisfaction at the GS-15 level is not -- just not
4  sensible. It's just -- it's not a sensible thing to
5  do.
6      Q   All right. Well, what were the other
7  factors that led you not to believe that Marjorie
8  Murtagh Cooke would be a good candidate for the
9  position other than the fact that you believe that if
10  the -- you went and took her name to the chairman
11  that -- that she would ask you whether or not you were
12  crazy?
13      A   Marjorie Murtagh and I have been known to
14  one another since probably 1995. So I've had a long
15  history to develop my view of whether or not she would
16  be the right candidate to run the office at the SES
17  level. And I could, if you like, spend all the time
18  from now to lunch describing to you the difficulties
19  that I have encountered over that period of time that
20  suggest to me that -- that it's not a good idea to
21  make somebody an SES for doing something that they're
22  only accomplishing, in my view, marginally at the

100

1  GS-15 level.
2      Q   What was your view about whether or not
3  Marjorie Murtagh Cooke would be a good candidate for
4  the director of marine safety at the NTSB?
5      A   I didn't think that that was sensible. I
6  didn't think that she should be made an SES.
7      Q   And therefore selected for the director of
8  marine safety position?
9      A   Yes, I had -- I had serious, serious
10  difficulties with Marjorie's performance as the
11  director over her -- her office, both in terms of the
12  way she managed the office and in the quality of the
13  product that came out of it.
14      Q   I understand. Now, in 1995 what was -- what
15  was your exposure to Marjorie Murtagh Cooke in 1995?
16      A   Well, I'm not really sure when it -- when it
17  first -- it might have been '97. The first time
18  that -- that -- that I had a direct role to play in a
19  Coast Guard matter was, I think, shortly after the
20  Office of the Secretary of Transportation had been
21  changed into the four modal offices, so I think it
22  would be very early in Marjorie's leadership in the

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

26 (Pages 101 to 104)

101

1  Office of Marine Safety.
2     Q  And -- and during that --
3     A  When that is, I can't say, but I think it's
4  maybe 1997 or '95 or something like that, and I am the
5  general counsel at the time.
6     Q  In 1997 or '95 did you -- do you have a
7  significant -- did you liaise significantly with the
8  Coast Guard during that period of time as general
9  counsel?
10    A  No.  This wasn't Coast Guard that I'm
11 talking about.  This is the Office of Marine Council.
12    Q  Well, I understand that.  No, my question is
13 different.  Did you have occasion to liaise with
14 the -- with the Coast Guard between 1995 and 1997?
15    A  No, I -- "liaise" would not be the -- not be
16 the right word for the relationship that I ever had
17 with the Coast Guard.  No, that was always an
18 adversarial relationship.
19    Q  Why was it adversarial?
20    A  Well, because, one, they're one of the
21 agencies of government that come under our purview
22 when we do an accident investigation.  They are the

102

1  regulator of marine safety.  They are the -- the --
2  the -- the -- the group within the federal government
3  that's responsible for not only the waterways but the
4  inspection of vessels and for manning requirements and
5  such.  So we're investigating them at the time of an
6  accident, so there's that arm's -- to begin with,
7  there's arm's length, but secondly, and unlike the
8  other modes, we also have a shared jurisdiction there,
9  and we are sharing a jurisdiction with -- to do
10 accident investigations with an agency that is
11 hundreds of times our size, has boats and guns.  So
12 we're put at a -- something of a disadvantage in that.
13    And, indeed, the very first relationship I
14 had involved -- the very first opportunity I had to
15 become involved with the Coast Guard as such was a
16 legislative fight early in my career about whether or
17 not the United States would assume the authority to do
18 off-shore accident investigation with passenger
19 vessels -- of cruise vessels that were ported in our
20 own -- in our ports but -- but theoretically flagged
21 by foreign states.  And that was a -- a -- I would
22 consider a -- fairly robust struggle between NTSB

103

1  and Coast Guard, so I -- I'm not sure that I would
2  ever say that the way that I related to Coast Guard
3  was -- was to liaise with them.  Long answer to a
4  short question, but I didn't liaise with Coast Guard.
5     Q  All right.  The -- give me just a moment.
6  When was the first time that you and En -- Ellen
7  Engleman Conners ever discussed the fact that -- that
8  Marjorie Murtagh Cooke believed that she should be
9  paid more money than she was being paid at NTSB?
10       MS. MCBARNETTE:  Objection.
11       THE WITNESS:  I don't -- I don't know
12 that we ever had that discussion.
13       MS. MCBARNETTE:  My objection is that
14 it's assuming facts not in evidence.
15       THE WITNESS:  I don't -- I don't recall
16 any such discussion.
17 BY MR. OSWALD:
18    Q  All right.  So, just so I'm clear, there was
19 no conversation between you and Ellen Engleman Conners
20 ever about the fact that Marjorie Murtagh Cooke
21 believed that she was not being paid sufficiently as
22 the director of marine safety at NTSB?

104

1        MS. COHEN:  Objection, asked and
2  answered.
3        THE WITNESS:  I don't have recollection
4  of a conversation with Ellen about Marjorie's
5  inadequate compensation.
6  BY MR. OSWALD:
7     Q  When, if ever, did you have a discussion
8  with Ellen Engleman Conners about the fact that
9  Marjorie Murtagh Cooke wanted to be paid overtime?
10    A  I don't know that I had a discussion with
11 Ellen about overtime.  I know that at some point I --
12 I learned that Marjorie might have asked somebody for
13 overtime.  Whether that -- I learned that while I was
14 the executive director and Joe told me that, Joe
15 Osterman, the managing director, or whether Ellen
16 mentioned it to me when I was still the managing
17 director, I can't say, but it was a very brief
18 conversation, and I don't recall who it was with.
19    Q  When, if ever, did Ellen Engleman Conners
20 ask you to investigate, research the circumstances
21 under which NTSB could pay a managing -- a modal
22 director like Marjorie Murtagh Cooke, indeed,

VIDEOTAPED DEPOSITION OF DANIEL CAMPBELL
CONDUCTED ON THURSDAY, NOVEMBER 15, 2007

27 (Pages 105 to 108)

105

1  including Marjorie Murtagh Cooke, overtime pay?
2      A  I -- I don't have a recollection of having
3  been asked that.
4      Q  By Ellen Engleman Conners?
5      A  By anyone.
6      Q  If Ellen Engleman Conners were to testify
7  that she had a specific conversation with you in which
8  she not only told you that Marjorie Murtagh Cooke had
9  asked her whether or not NTSB could pay her overtime,
10  and, indeed, Ellen Engleman Conners asked you to
11  research this and investigate it with HR, would that
12  be correct or incorrect?
13      A  I have no recollection of the conversation.
14      Q  What investigation or other research did you
15  do in 2004 to determine whether or not Marjorie
16  Murtagh Cooke or, indeed, any of the managing -- any
17  of the modal directors could receive overtime?
18      MS. COHEN:  Objection, assumes facts
19  not in evidence.
20      THE WITNESS:  I wouldn't have done any
21  research.  I didn't have a -- I didn't have a live
22  issue on my table from any of my office directors

106

1  about overtime.  If Marjorie Murtagh had been looking
2  for overtime, since I was her supervisor, she could
3  have come to me and said, Dan, you should be paying me
4  overtime.  We would have had a discussion about why.
5  There are rules about overtime.  There are rules about
6  a GS-15 cap on overtime.  There are rules about
7  getting it preauthorized and so forth.  It would have
8  been natural for Marjorie to have come to me and ask
9  me if we were going to consider doing that for her.  I
10  never had that conversation with Marjorie, and I don't
11  recall having a conversation with anyone else.
12  BY MR. OSWALD:
13      Q  I understand.  What are the rules as you
14  understand them about the cap for overtime for GS-15
15  employees?
16      A  Well, I'm going to mess this up big time
17  because I -- the way I know it was in the context of
18  overtime for non-GS-15s.  The agency was fortunate
19  enough in, I think, 2002 to receive an exemption from
20  Congress from the rules that -- that provide what we
21  refer to as undertime; that is to say, when a GS-14
22  would work overtime, they would actually be paid at

107

1  the GS-10 rate.  We got the right to pay time and a
2  half, which was a substantial gain for our employees,
3  but as a consequence of that, it meant that the higher
4  rated GS-14s and the GS-15s might, as an accumulated
5  matter or a monthly matter -- and I can't even
6  remember which was the thing, whether it was within
7  a -- a -- a pay period or within an annual
8  accumulation -- that there was some cap that said you
9  couldn't go over the level of GS-15, 10, and I knew it
10  because there were people who got close to it and the
11  CFO or the -- the payroll person would come to me and
12  say, we got somebody close to it, and, you know, you'd
13  have to give some kind of warning to an office
14  director that, all right, that person is no longer
15  going to get the time and a half and maybe even no
16  longer get overtime because they're close to the cap.
17  That's what I know about the cap.
18      I had -- don't think ever considered what
19  happens to the cap, for instance, if you try and pay
20  hour-one overtime to somebody already being paid
21  GS-15, step 10.  I don't know that it's even lawful to
22  do that.  I never asked that question of anyone

108

1  because that wasn't the way in which the question had
2  presented itself to me.
3      Q  What was the way the question was
4  presented --
5      A  Whether --
6      Q  -- to you?
7      A  -- or not a G -- what happens to a GS-14 or
8  a GS-15 lower when they get close to the cap, and I
9  didn't research the answer, but people told me that we
10  couldn't go over the cap, and, so, you know, if the
11  CFO saw somebody that was close to that, he would come
12  down to my office and say, we need to -- we need to
13  see to it that this person doesn't exceed the cap.
14      Q  Who asked you to research that?
15      A  Nobody asked me to research it.
16      Q  You just said someone had come -- when it
17  came to you, how did it come to you?
18      A  The CFO would have a -- the CFO has a
19  printout of how much he is paying people.  That's --
20  you know, we're -- we're not that loose with our
21  finance, and if it looked as if somebody was going to
22  pay more than the GS-15, step 10, the payroll people

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

1 (Pages 1 to 4)

---

**Page 1**

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2
3    ---------------------X
4    MARJORIE MURTAGH COOKE    :
5         Plaintiff  :
6         v.      : Case No. 06-748C
7    THE UNITED STATES    : Judge Thomas C. Wheeler
8         Defendant  :
9    ---------------------X
10
11        Videotaped Deposition of
12        ELLEN ENGLEMAN CONNERS
13
14        Washington, D.C.
15        Thursday, October 25, 2007
16        9:30 a.m.
17
18
19
20    Job No.: 1-115016
21    Pages 1 - 169
22    Reported by: Ellen L. Ford, RPR

COPY

---

**Page 2**

1    Videotaped Deposition of ELLEN ENGLEMAN CONNERS, held
2    at the offices of:
3
4
5    EMPLOYMENT LAW GROUP
6        888 17th Street, Northwest
7        Suite 900
8        Washington, D.C. 20006
9
10
11
12    Pursuant to agreement, before Ellen L. Ford,
13    Registered Professional Reporter and Notary Public in
14    and for the District of Columbia.
15
16
17
18
19
20
21
22

---

**Page 3**

1    A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF:
3        R. SCOTT OSWALD, ESQUIRE
4        BRIAN M. LOWINGER, ESQUIRE
5        DAVID SCHER, ESQUIRE
6        EMPLOYMENT LAW GROUP
7        888 17th Street, Northwest
8        Suite 900
9        Washington, D.C. 20006
10        (202) 331-2883
11
12    ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:
13        QUAN LUONG, ESQUIRE
14        UNITED STATES ATTORNEYS OFFICE
15        501 3rd Street, Northwest, Room 4218
16        Washington, D.C. 20530
17        (202) 514-7176
18
19    ALSO PRESENT: Scott Forman, Videographer
20        Marjorie Murtagh Cooke, Plaintiff
21        Meredyth D. Cohen, Esq.
22        Denise M. D'Avella, Esq.

RECEIVED 2007 NOV 13

---

**Page 4**

C O N T E N T S

EXAMINATION OF ELLEN ENGLEMAN CONNERS    PAGE
    By Mr. Oswald         6 - 163
    By Mr. Luong          163 - 164

        - - -

E X H I B I T S
    (Exhibits retained by counsel.)
ENGLEMAN CONNERS EXHIBITS        PAGE
No. 1 - Performance Appraisal Form        85
No. 2 - Affidavit            142
No. 3 - signed document            143
No. 4 - Performance Evaluation Form        144
No. 5A and B - e-mails            145

EXHIBIT 7

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

6 (Pages 21 to 24)

**21**

1    I don't remember the exact process. I don't know
2  if I signed and then it went back to the employee, or
3  they had both signed and it came to me. I'm sorry. I
4  don't remember which way it was.
5    Q   Okay. And when you say that they both
6  signed, I'm just wondering who "both" is, though. Who
7  is -- when you say "both", what does that refer to?
8    A   I thought I stated it. I believe it's the
9  employee and their supervisor.
10    Q   And then once the employee and the
11  supervisor sign it, then what happens to the form?
12    A   Once again, I don't remember the exact
13  sequence. I do remember three signatures, and I
14  believe it's the employee -- the supervisor, the
15  employee, and then mine was the last signature. I
16  think it was the last signature to -- again, that was
17  because of authorization for bonus or something like
18  that.
19    Q   I understand. And once you had given the
20  last signature, let's say, for the bonus on the
21  performance evaluation, what would happen to the form
22  at that point, the evaluation form?

**22**

1    A   I don't know.
2    Q   When if ever would you retain a copy of the
3  performance evaluations after you put your last
4  signature on it and sent it off for check cutting?
5    A   I did not retain any copies.
6    Q   All right. I want to just talk about the --
7  you talked before about the employees. At least some
8  of the employees underneath you at NTSB were also SES;
9  is that correct?
10    A   Mm-hmm.
11    Q   And how many employees were SES employees?
12    A   Let's see. Managing Director was SES,
13  General Counsel was SES, I'm not sure if the CFO was
14  or was not, the EEO I don't think was, but I'm not
15  sure, the -- so of those that my direct reports, I'm
16  sure two of them were, but I'm not sure actually the
17  other two.
18    Q   And how about your second-line reports,
19  those that reported directly to the Managing Director?
20    A   It was a mix. Public Affairs was a 15 -- I
21  forgot to mention them earlier. Public Affairs was a
22  big part of what we do, too. I'm sorry, Ted.

**23**

1    Public Affairs was a 15, Marine was a 15,
2  Marjorie was a 15, Highways was initially a 15, the
3  Academy was an SES, and the other investigative --
4  let's see, Aviation, Rail -- Aviation, Rail -- who am
5  I forgetting again? They were SES.
6    Q   And how many of those converted from General
7  Schedule to SES during your period of time as the
8  Administrator, the CEO and Chairman of the NTSB?
9      MS. COHEN: Objection; assumes facts
10  not in evidence.
11    Q   You may answer the question.
12    A   Could you repeat it?
13    Q   Certainly. How many of the positions that
14  were either directly under you or second line under
15  you became SES, converted from General Schedule to SES
16  during your tenure?
17    A   Perhaps I'm not understanding the question,
18  but I'm not aware of any that converted. We didn't
19  convert a 15 to an SES. We were able to gain SES
20  positions.
21    SES positions are separate. There are not a lot
22  of them. And so we were able to gain some through a

**24**

1  couple of variety of measures. There were a couple of
2  things that were able to happen so that we gained
3  SESs, and then they were allocated to a division.
4    Q   Who made the decision to allocate them to a
5  division?
6    A   I made the decision with the advice and
7  counsel of the Managing Director and the General
8  Counsel.
9    Q   Once you made the decision to allocate an
10  SES slot to a particular division, what was the
11  process that would occur once you made that decision?
12    A   Well, when -- and perhaps I need to clarify
13  when I made a decision. My decisions were based on
14  recommendations. I didn't come up with them and then
15  seek advice and counsel as to whether I should or
16  shouldn't. This was a collegial environment, A, and
17  B, the majority of these were a combination of
18  conversation with Dan, who was the Managing
19  Director --
20    Q   Is that Dan Campbell?
21    A   Dan Campbell, yes, the Managing Director.
22  So I can't tell you who thunk of it first. I mean, it

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

7 (Pages 25 to 28)

25

1  wasn't a question of I've got this great idea, I'm
2  going to go tell Dan, because I didn't have --
3  political appointees don't have that kind of
4  authority.
5      If you're in the private sector, you might have,
6  and you can have that kind of I'll just make the
7  decision authority as the CEO.
8      But the CEO term is not really accurate when
9  you're in the public sector because it is a check and
10  balance. And you have signature authority for the
11  organization, but you do not have CEO authority in the
12  way that you do in the private sector.
13      So it's a little misleading to say -- say it.
14  Even though it's described that way, the reality is
15  it's not that way. So I don't know how else to
16  explain it.
17      So we and I were looking to do everything we
18  could to improve the NTSB. And that meant gaining
19  whatever assets that we could for the organization,
20  improving the organization as it was and leading it to
21  a better place.
22      And so part of that would -- was the looking for

26

1  SES allocations as part of the larger management
2  review. Not a reorganization in a formal sense, but
3  resource allocation perhaps would be a way to describe
4  it.
5      Q  So once you made the decision to allocate an
6  SES position with the advice and counsel of Dan
7  Campbell, how did the process work from there?
8      A  It was a big sheet of paper. Before I came
9  on board, I can't speak definitively, but my
10  interpretation and what I saw was that positions
11  were -- all positions, all the hiring was kind of
12  scattered. It wasn't in a plan. There was no
13  succession planning, which is part of the President's
14  Management Agenda and requirement, and I was trying to
15  implement PMA across the board. That was part of my
16  responsibility. So that meant fiscal responsibility,
17  budgetary review, all aspects of human capital
18  investment, which would include making sure the right
19  people were in the right place and having the right
20  opportunities and the right resources, and that's
21  everything from pencils and pens to training. So it's
22  everything. So it's part of a much broader picture.

27

1      I can't remember exactly when came from what.
2  But we had an SES come open from the Academy when the
3  person left who was holding that position. It was
4  called President of the Academy I think was the
5  position. That person left and so that was open.
6      And once you had an open SES you could -- you
7  could move it around. It didn't have to stay at the
8  Academy.
9      That's one of the advantages of an SES is that
10  it's -- I guess it's a little bit like a marble. You
11  can put it on a different place on the board.
12      So I can't tell you which marble was from which,
13  but I think we had two, and we were trying for two
14  more, if memory serves. We were had -- we were able
15  to get two and then we were trying for two more,
16  something along those lines.
17      Q  And once -- when you say, "moving it around
18  the board like a marble," when did the Academy SES
19  position become available?
20      A  I don't remember the exact time. It was
21  fairly early on. In my memory it was fairly early on.
22  I can't -- I would have to find out from a calendar

28

1  when exactly it was. My memory it was fairly early on
2  when I was Chairman, but I don't remember the exact
3  date. I don't remember the exact date.
4      Q  In or about 2003, 2000 --
5      A  Again, my memory tells me it was the first
6  year, but -- I mean, I'm thinking it was the first
7  year, but I don't know exactly.
8      Q  I understand. All right. And where did you
9  assign that -- where did you place the marble, assign
10  the SES slot when it became available because the
11  incumbent at the Academy had left and left the SES
12  slot available for reassignment?
13      A  Well, we didn't want to keep it at the
14  Academy because we didn't think we needed an SES at
15  the Academy at the time. It was just starting.
16      We had a lot of issues that we had to do for
17  business development and just figuring out what the
18  Academy was or wasn't going to be.
19      At the moment it was a building that was still
20  being constructed, and so -- and we really needed SESs
21  more in the operating system.
22      So my goal was to get all the modes, the way I

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

8 (Pages 29 to 32)

29

1  would say it in speech is, to the same level of
2  attention that Aviation had. Because the NTSB is very
3  Aviation centric. By mission, by tradition, by reson
4  detra.
5      So the goal was to have, what I would say is, the
6  bar of safety be raised in all the modes, because I
7  was a multi-modal person, not an Aviation person. I
8  came from the surface world, not the Aviation world --
9  one of the few Chairman who wasn't Aviation centric --
10  to bring all the modes up to the same level.
11     Because, as I would say, if someone dies in a
12  transportation accident, their family's grief isn't
13  changed by whether it's an aviation accident or car
14  accident; the grief and the loss is the same.
15     So we needed to move away from the Aviation
16  centric view and try to include all the modes and all
17  transportation safety. So --
18     Q   So why did you want to bring the Highway,
19  the Pipeline as one mode up to the Aviation mode and
20  the Marine Division up to the Aviation mode, and the
21  Pipeline, HAZMAT and Rail up to the Aviation level?
22     A   For the reasons I just said. When someone

30

1  dies in a transportation accident, the loss to
2  society, the loss to their family isn't mitigated by
3  whether it's an aviation accident or rail accident or
4  pipeline accident or a boating accident, the loss is
5  the same, and yet the attention given, the ability
6  to -- the amount of accidents that were investigated,
7  the resources that were allocated within the Agency,
8  the majority were aviation.
9      Now, there was a reason for that. Because if you
10  look at the NTSB legislation, which created the
11  Agency, if you look at the code, by law we were
12  required to investigate every civil aviation accident
13  in the United States. By law, required. That's the
14  one thing we had to do. There was no we won't do that
15  one. We had to investigate or cause to be
16  investigated every civil aviation accident in the
17  United States.
18     And that didn't require death. That could have
19  been just an accident. So that was about 1700 a year.
20  So it wasn't a small number by any means, but mostly
21  those were general aviation.
22     When there would be a very large, if you will,

31

1  accident, a major airline accident, TWA 800 or
2  American 587, which is -- people usually recognize
3  because of all the media attention and, of course, the
4  great trauma and horrible loss of life that
5  accompanies those, those would take a lot of resources
6  and many years, et cetera and so forth.
7      So there's nothing wrong about the NTSB being
8  aviation centric because that's what it is by its very
9  reason to exist.
10     But that being said, because we have
11  responsibility for the other modes, and because my
12  personal and professional belief was that all safety
13  mattered in all modes, I wanted to raise the
14  attention, raise the bar, raise the resources on all
15  the other modes.
16     It would never be the same, but just to that
17  awareness itself was a major change for the Agency.
18     Q   And how did you feel that the -- was the
19  most appropriate way to go about doing that, raising
20  the bar for each one of the modes?
21     A   Well, it was a combination of a desire to
22  raise the bar, implement the President's Management

32

1  Agenda, which included human capital development and
2  support, and what I considered just good business
3  sense.
4      We looked at the entire Agency, not one office or
5  one department, and said what do we need to do here?
6  We had approximately 435 employees when I came on
7  board, our budget was about 75 million, if memory
8  serves; not a lot of money and not a lot of people for
9  being the independent safety agency for the entire
10  United States in all modes of travel and
11  transportation.
12     So I tried to fill -- figure out where do we need
13  people versus what I considered in the past people
14  kind of raised their hand and said oh, me, me, me.
15     I want to hire somebody, and whoever was the
16  squeakiest wheel would get the person. It seemed in
17  the past that whoever had the squeakiest wheel would
18  get the allocation versus a planned allocation of
19  where we were going to put the resources.
20     So the Managing Director and I and with the team,
21  which was the larger team, heads of all the
22  departments, we basically said what are your needs?

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

**33**

1  Everybody tell us your needs.
2      And we came up with, I think it was about 93
3  positions, if memory serves. I want to say 93 because
4  I used it in speeches, so I'm hoping it's 93. But it
5  was a significant number, it was a little less than
6  100, but it was a significant number of positions.
7      And what we said to everybody is don't tell me
8  you need six more people. That doesn't help me to go
9  to Congress and sell that for you. Because obviously
10  we couldn't do anything about an appropriation.
11      Tell me what you need and why. So it was by
12  title, kind of a mini job description, and by grade.
13  You know.
14      I need a -- I need a materials expert. I need a
15  Navy architect. I need a pipeline specialist in flow
16  design XYZ. That would be GS14 probably. And this
17  would be, you know, probably the title -- you know,
18  kind of a job description and title versus just I need
19  the blank check.
20      So we put that together. And along with that was
21  my desire to ensure that each of the divisions -- my
22  goal was to have each of the department heads be an

**34**

1  SES, which is not what it was when I came in.
2      Q   And why was that your goal?
3      A   I thought that by raising the bar to having
4  an SES, which is the highest level of Civil Service,
5  it's a statement. An SES is a higher level of
6  professionalism, abilities, et cetera and so forth.
7      When you put an SES in charge of a division or
8  department or office or whatever that unit is called,
9  it's making a statement about its importance. It's
10  making a statement that -- about the qualifications
11  and requirements. And this allows you to build a
12  larger team.
13      And it also means that that person has a very
14  significant level of skills that accompanies the
15  ability to be an SES. Because an SES requires more
16  than just having skills, there's a whole level of
17  other skills that are attached. They are the
18  Embassadors of Civil Service.
19      Q   And to what extent were the Directors of
20  each of the investigative modes Embassadors of their
21  organizations?
22      A   I'm sorry. I don't know what you mean by

**35**

1  that.
2      Q   Well, to what extent -- when you say the SES
3  were Embassadors for the responsibilities under their
4  job, let's say, title and duties, to what extent was
5  that the case with each of the Directors, if at all?
6      A   Well, I would say Aviation definite -- I
7  mean, again, I'm not -- when I say Embassador of Civil
8  Service, that's how it's been described to me. And
9  when I talk to people --
10      The concept behind an SES is that they could be
11  placed in any government agency and be effective,
12  which is different than a technical line operator who
13  only knows accounting or law or something like that.
14      An SES is meant to be multi-faceted in their
15  abilities and have a level of expertise so that you
16  could --
17      The idea, when the SESs were created, if my
18  understanding is correct, is that an SES at the
19  Department of State could be taken over and become an
20  SES at Department of Transportation and be equally
21  effective because they had a greater skill set than
22  just the technical knowledge or operational knowledge

**36**

1  or something like that.
2      That they are essentially like a -- I don't want
3  to say mini CEO -- but that capability that they could
4  be moved anywhere. And the original idea, if I
5  understand the Senior Executive Service, was that they
6  would ultimately be moved around various agencies
7  being able to take expertise from one agency to
8  another and kind of be Embassadors, roving
9  Embassadors, if you will, like our Embassy staff is.
10      So that's why I say Embassador of, not within
11  the NTSB, but that is my understanding and my
12  respect for the role of the SES.
13      Q   And to what extent was that indeed your
14  intention to put individuals in each one of the SES
15  positions, let's say the Directors of each of the
16  four -- the investigative divisions and the two other
17  divisions that would be and have that executive
18  expertise as opposed to any kind of line expertise?
19      A   That was my -- that was my hope is that, if
20  we went that route -- now, we looked at a lot of
21  different things, though.
22      So one thing was looking at is to whether -- we

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

14 (Pages 53 to 56)

53

1    Q    What else?
2    A    And she wanted me to fix that, and she
3 said -- she requested overtime.
4    Q    What else?
5    A    That was pretty much it.
6    Q    Now, the meeting that you had with Marjorie
7 Murtagh Cooke, was it scheduled or was it impromptu?
8    A    Scheduled, I believe.
9    Q    Okay.  And how did Marjorie Murtagh Cooke go
10 about scheduling the meeting with you?
11    A    I don't remember.
12    Q    How would anyone of your -- in the NTSB that
13 had either first or second-line reporting schedule a
14 meeting with you?
15    A    Two ways, or three ways or four ways,
16 actually.
17       You could check with my Chief of Staff who would
18 schedule; you could grab me in the hallway; you could
19 see me after a meeting or after a hearing; or we had
20 open office hours like every Wednesday or ever other
21 Wednesday, as often as -- unless I was out on an
22 accident or something like that.  But I kept like an

54

1 open office hour at least once a month where you just
2 kind of walked in; and then the fifth way was people
3 would just show up at my doorway.
4    Q    Okay.  And if one wanted to schedule a
5 meeting with you, when if ever would be appropriate to
6 send you an e-mail and ask you to schedule a meeting?
7    A    Anytime.
8    Q    That was appropriate to do that?
9    A    Mm-hmm.
10    Q    Is that -- I'm sorry.  Is that a yes?
11    A    Yes.  I'm sorry.  Yes.  Mm-hmm is a yes.
12    Q    Thank you.  All right.  So the meeting takes
13 place in your office; is that right?
14    A    Yes.
15    Q    All right.  And where were you seated?
16    A    (non-verbal response.)
17    Q    Behind your desk?  Did you have the meeting
18 at a conference table in your office?
19    A    I don't remember specifically.  I usually
20 sat at a conference table rather than behind my desk.
21 It would depend on the day.  I mean if it was one of
22 those -- if someone was just kind of coming in and

55

1 out, I might stay behind my desk, sometimes I would
2 sit at the conference; it was kind of 50/50.  I don't
3 remember specifically.
4    Q    All right.  And then who spoke first at the
5 meeting with Marjorie Murtagh Cooke?
6    A    I have -- whoever said hello first.
7    Q    What knowledge did you have that the topic
8 that Marjorie Murtagh Cooke wanted to raise with you?
9    A    I don't remember having any --
10    Q    Any foreknowledge.
11    A    No.
12    Q    I understand.  And what was -- after the
13 general greeting of hello, what was the first thing
14 you remember Marjorie Murtagh Cooke saying to you?
15    A    I don't.  I mean, I don't remember very much
16 about the meeting other than the request for overtime,
17 which I thought was bizarre.
18    Q    Why was it bizarre?
19    A    Because it was -- it was out of context.  It
20 was -- it was bizarre.  It was just out of the blue.
21    Q    Why was it out of the blue?
22    A    Well, I remember -- one of the things I

56

1 remember of the meeting is it wasn't a very long
2 meeting.  This wasn't a long meeting or discussion or
3 anything like that, it was just kind of out of the
4 blue.  And it was kind of like, "I'm here.  I'm not an
5 SES so you need to fix that by paying me overtime."
6       There was no justification, no rationale, no,
7 "I've been working 60 hours a week and here are my
8 hours," or anything.
9       It was just like, "You need to fix this, and
10 here's what you need to do and."  I felt like it was
11 just a bizarre request.  There was no -- I didn't
12 understand where it was coming from.
13    Q    Okay.  And when if ever did you ask Marjorie
14 Murtagh Cooke where her request was coming from, in
15 your words?
16    A    Well, I mean, during the -- I think I said
17 something like, "Oh," or, "Whatever."  But there was
18 nothing else forthcoming.  It was just kind of like,
19 "I'm here.  I want you to give me overtime."  And
20 there was nothing else behind it.
21       It was just out of the blue.  It was kind of
22 bizarre.  My feeling was this is bizarre.  That's all.

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

15 (Pages 57 to 60)

**57**

1    Q    Why was it bizarre for Marjorie Murtagh
2  Cooke to ask you to pay her overtime to equalize her
3  wage with the other Directors of the divisions?
4    A    Well --
5        MR. LUONG:  Objection; I think that
6  mischaracterizes the earlier testimony.
7    Q    You can answer the question.
8    A    First of all, she didn't say to equalize.
9  She didn't suggest that. It's just like, "I'm not an
10 SES so you have to make up for it." I mean, that was
11 the context.
12      It was -- there was no anything like that. It
13 was like a small child is upset that you didn't buy
14 them the toy -- that their father didn't buy them the
15 toy in the window, and you're the aunt, so therefore,
16 you have to buy the toy.
17      I mean, it was just out of the blue. I didn't
18 understand it. She was a manager. I didn't know if
19 it was possible to pay a manager overtime.
20      There were a lot of things about it I didn't
21 understand, so it was just a bizarre request.
22      I had never had a department head in government,

**58**

1  in my experience in government, make a request like
2  that at either of the agencies that I had worked for.
3  So it was not something I had experienced before, and
4  it was, as I said, kind of out of the blue.
5      So bizarre is the only word -- I mean, bizarre
6  meaning not bad, not good, but out of the blue,
7  different than what normally one has as a
8  conversation.
9    Q    Well, why was it in your mind inappropriate
10 for her to ask you to make up the differential between
11 what she was being paid and what the other Directors
12 were being paid?
13      MS. COHEN:  Objection; mischaracterizes
14 evidence.
15      MR. LUONG:  Objection.
16    Q    You may answer the question.
17    A    I didn't say it was inappropriate, I said it
18 was bizarre and I hadn't experienced it before.
19      I didn't know the answer, and I said I would look
20 into it.
21      So I didn't judge it one way or another other
22 than its uniqueness in the request. When I say

**59**

1  bizarre, I'm not saying negative, I'm saying unusual,
2  different, something I hadn't experienced and I didn't
3  completely understand.
4      And normally, when -- my experience has been if
5  someone comes and says I want a raise or I want a new
6  job or this or that, they kind of lay out their case.
7  They pitch it to you. Not a declaratory sentence. So
8  it was a unique -- it was just unique. I said I would
9  look into it and, I mean, that's all I could do at the
10 time.
11      I'm not in charge of the pay schedule for the
12 Civil Service. I didn't hire her. I didn't know all
13 the circumstances. There was no justification on her
14 part when she met with me to explain what was her
15 concerns. It was just kind of, as I said, like a
16 declaratory sentence. "You need to do this." Okay.
17    Q    Well, when Marjorie Murtagh Cooke said to
18 you that she was entitled to be paid at the same level
19 as the other Directors, what did you understand her to
20 mean by that?
21      MR. LUONG:  Objection; assumes facts
22 not in evidence.

**60**

1    A    She didn't say that. She didn't say she was
2  entitled to be paid what the other Directors were.
3  That's not the words that she used. She did not say
4  that.
5    Q    You're certain.
6    A    Yeah.
7    Q    Okay. Now, the -- okay. When you told her
8  that you would look into it --
9    A    Mm-hmm.
10    Q    -- how did you tell her that you were going
11 to look into equalizing her pay with the other
12 Directors?
13    A    I never said I would equalize --
14      MR. LUONG:  Objection.
15    A    I did not say I would look into equalizing
16 her pay with the other Directors, I said I would look
17 into her request for overtime. That was the request
18 that she made to me. She did not say, "equalize my
19 pay," she said, "you should give me overtime because
20 I'm not an SES and they are." That's what I heard and
21 what I understood her request to be.
22      Somehow I was supposed to bend the rules, or make

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

18 (Pages 69 to 72)

**69**

1    A   I don't remember specifically talking to
2  anyone else about that.
3    Q   I understand. If it had been your decision
4  to pay Marjorie Murtagh Cooke overtime, more money,
5  why would you have denied her request?
6    A   Well, I would neither deny nor agree without
7  justification. So I would need more than I want
8  overtime. I would need justification, I would need
9  proof that she worked more than 40 hours a week.
10    If you're paying overtime, I'm assuming that
11  means you're paying beyond a 40-hour week work
12  schedule, so there would have to be documentation,
13  things like that. It couldn't just be pay me
14  overtime, I need to know that she was actually working
15  overtime.
16    Q   If she was working overtime, would you have
17  paid her more money?
18    A   If someone was working overtime, if it was
19  within the rules, I mean, it was allowable, which I
20  don't know, and it was appropriate for them to be paid
21  overtime, then I would follow the rules, wherever the
22  rules would lead me.

**70**

1    But I do know you have to have a paper trail. I
2  mean, you would have to have time cards and stuff like
3  this. None of this was part of Marjorie's and my
4  discussion. There was no statement, you know, Ellen I
5  worked 72 hours last week. There was not that kind of
6  a statement.
7    So, yeah, I mean, I wouldn't have without
8  justification, appropriateness, make sure it was
9  following the rules, et cetera. And then I would
10  only -- if it's within all those boxes are checked, I
11  don't know that there's really a decision, you're just
12  following the rules.
13    Q   Why did you never ask Marjorie Murtagh Cooke
14  to provide you with the documentation that you just
15  described to, as you say, justify her request that she
16  be paid overtime during the April, 2004 meeting?
17    A   Well, first, we never talked about it again.
18  And second, why would I ask somebody to give me
19  paperwork and everything if I didn't even know if it
20  was allowable or not.
21    I mean, when she made the request, I didn't even
22  know if it was possible. So I'm not going to start

**71**

1  someone down that kind of a path -- I mean, that's a
2  big homework assignment -- if I can't do it.
3    Q   And when did you first learn whether it was
4  or was not allowable?
5    A   Do you know, I still don't know. I don't
6  know if it is or is not allowable.
7    Q   How many times did Marjorie Murtagh Cooke
8  after the April, 2004 meeting ask you for follow-up
9  meetings relating to her request for overtime or more
10  pay?
11      MS. COHEN:  Objection; assumes facts
12  not in evidence.
13      MR. LUONG:  Objection; assumes --
14    A   I know that Marjorie at a much later date
15  scheduled something with me, but I don't know that it
16  related to this meeting. She didn't phrase it that
17  way.
18    There was some kind of an e-mail, I vaguely
19  remember. I don't remember what the e-mail said.
20  Something about wanting to talk to me, and I thought
21  she said -- I thought the e-mail said something like
22  for a personal issue, but I really don't remember. I

**72**

1  don't remember exactly what the e-mail said, but I
2  think she made the meeting request by an e-mail, and I
3  think David set it up.
4    Q   How did you respond?
5    A   David set up the meeting. I mean, David
6  scheduled a meeting.
7    Q   All right. When was that meeting?
8    A   I don't think it happened.
9    Q   Why not?
10    A   First time we either went out of town or an
11  accident or something. I mean, it was just -- it was
12  like can we reschedule? Life happens, especially at
13  the NTSB.
14    I don't remember why, but that wasn't uncommon,
15  either. My schedule got pretty hectic at times and we
16  would reschedule meetings all the time.
17    But the advantage was that when I was in the
18  building, I was always accessible, so I never really
19  worried that much because people usually didn't try to
20  have formal meetings with me because they would just
21  grab me in the hall. That's usually when I had most
22  of my discussions with folks. People would just grab

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

19 (Pages 73 to 76)

73

1  me after a hearing or in the hallway or, when we had
2  the larger meetings, people would just stay after.
3      So I didn't really worry about rescheduling a
4  formal meeting because we always ended up usually
5  talking, I mean, whoever it was.
6      Q   Okay. So when Marjorie Murtagh Cooke made
7  the —
8      A   And I don't remember if it was to me or to
9  David — it might have been to David and to me or me
10  to David. I forget, but I remember there was an
11  e-mail.
12     Q   All right. How many times did she request
13  meetings with you — follow-up meetings as a result of
14  her meeting in April of 2004 requesting overtime or
15  more pay?
16         MR. LUONG: Again, objection; I think
17  it mischaracterizes testimony and assumes facts not in
18  evidence.
19     Q   You can answer the question.
20     A   I don't know that she ever did. I know that
21  there was another time she requested a meeting via an
22  e-mail, it was either to me or David or both, and I

74

1  don't remember that it referenced the previous meeting
2  at all or said what it was about. I don't remember
3  that as it. I remember that Marjorie wanted to meet
4  with me and we were trying to schedule it.
5      Q   Okay. So when if ever did you ask Dan
6  Campbell whether or not he had — since you had
7  delegated this to Marjorie and you had committed to
8  Marjorie that you would look into it and get back to
9  her, when if ever did you ask Dan Campbell, "Have you
10  gotten back to Marjorie Murtagh Cooke? Have you
11  looked into it, investigated it, and gotten back to
12  Marjorie Murtagh Cooke about the request for overtime
13  or more pay?"
14         MR. LUONG: Objection; mischaracterizes
15  her testimony.
16     A   I didn't follow up with Dan because I
17  assumed it was taken care of. I delegated it to Dan,
18  Dan was a great Managing Director, he always got
19  everything done. So, I mean, it was not an issue.
20     Q   When if ever did you tell Marjorie Murtagh
21  Cooke that you would not be responding to her, you
22  would not be following up with her, but rather that

75

1  you had delegated it to Dan Campbell and that he would
2  follow up?
3      A   I don't think I ever had that conversation
4  with Marjorie. It wasn't — she reported to Dan, so I
5  didn't feel I was reporting to her. I heard her
6  request, I passed it on to Dan, figured it was in the
7  works and whatever was, was.
8      Q   Okay. And your expectations of Dan Campbell
9  was that he would look into whether or not this was
10  possible. What did you tell him you wanted him to do?
11         MR. LUONG: Objection; asked and
12  answered.
13     A   Exactly what I said. I said, "Marjorie made
14  this request. Can we do it? Will you look into it?
15  Handle it?" "Yes, ma'am." That was it. I mean,
16  just --
17     Q   When if ever did you tell -- ask Dan
18  Campbell to check with HR about whether or not it was
19  possible?
20     A   I didn't micromanage Dan Campbell. You
21  don't micromanage someone and say that I want you to
22  call by 10:15.

76

1      This man is the Managing Director of an Agency
2  and been there years, and prior to that he had been
3  the General Counsel for the organization. I had no
4  doubt that everything would be looked at and taken
5  care of and moved on.
6      My job was not to be the HR Director, my job was
7  to be the Chairman of the NTSB. And then in that
8  case, I was trying to do things like get money from
9  Congress and Appropriations to support the entire
10  Agency, be the spokesperson where you had major
11  accidents to make sure the traveling public felt safe,
12  do my best to respond in my role as a member, as well,
13  when we were taken out on accidents and do my job.
14     So this was a small -- were we not here today, I
15  would have forgotten the incident. It was not a
16  milestone in my time at the NTSB.
17     Q   When did you first learn that Dan Campbell
18  hadn't taken care of and that it hadn't been resolved?
19         MR. LUONG: Objection; assumes facts
20  not in evidence.
21     A   I assumed everything -- I assumed that it
22  was followed up and whatever the answer was, was and

VIDEOTAPED DEPOSITION OF ELLEN ENGLEMAN CONNERS
CONDUCTED ON THURSDAY, OCTOBER 25, 2007

39 (Pages 153 to 156)

153

1    Q   Okay. When if ever did you follow up with
2   Tawanna Price about Marjorie Murtagh Cooke's request
3   to have a meeting with you that she sent by e-mail on
4   Friday, January 7th at 5:14 p.m.?
5          MR. LUONG: Objection.
6          MS. COHEN: Objection.
7          MR. LUONG: Asked and answered.
8    A   I do not believe I ever followed up with
9   Tawanna Price on this request because I know a meeting
10   was set. So I don't remember how the meeting was set,
11   but I know the meeting had been scheduled.
12    Q   I understand. When if ever, after you
13   canceled the meeting with Marjorie Murtagh Cooke, did
14   you ever follow up with Marjorie Murtagh Cooke to
15   either reschedule the meeting or find out what about,
16   either personally or her evaluation, it was that
17   Marjorie Murtagh Cooke wanted to talk to you about?
18          MR. LUONG: Objection; compound. Are
19   you asking about both exhibits now, Exhibits 5A and
20   5B? If you are, then we object. It's a compound and
21   confusing question.
22    Q   Do you understand my question?

154

1    A   You're making assumptions in your question
2   that are incorrect. So if I may say with respect, I
3   did not follow up with Tawanna. I know a meeting was
4   scheduled. I stated that I know that we had to
5   reschedule it at least once, if not twice. I stated
6   that I had in my Affidavit.
7       It was a normal scheduling request. This was not
8   a -- anything other than normal business procedure.
9   The reason I was not concerned about it was because I
10   saw Marjorie. I never -- I would see Marjorie. If it
11   was such an urgent matter, there were many times when
12   she could have said, "Hey, Ellen," or stay after a
13   meeting, or approach me in the hallway, or in the
14   ladies' room, or any number of times when we would
15   share the same room or something like that.
16       I had a very informal opportunity. People would
17   come to my doorway, walk right in, "Hey, Chairman.
18   Can we chat?" "Sure."
19       There was so -- this was just standard. She
20   was -- she sent in an e-mail, that's fine. But she
21   could have just come right through the front door,
22   that would have been fine, too.

155

1    Q   And you would have been happy to meet with
2   her under those circumstances.
3    A   Yes.
4    Q   Okay. I'm going to ask one more question
5   here and then we'll take a break.
6       My question is, after you canceled the meeting
7   with Marjorie Murtagh Cooke, and I understand --
8    A   When I resched -- when I tried to reschedule
9   the meeting. I mean, it wasn't canceled, there will
10   be no meeting, it was can we reschedule. We need to
11   reschedule.
12    Q   All right. You canceled and then said we
13   need to reschedule.
14    A   Right.
15    Q   All right. When if ever did you follow up
16   with Marjorie Murtagh Cooke, with her personally, to
17   reschedule the meeting that you had with Marjorie
18   Murtagh Cooke sometime -- that you had scheduled with
19   her sometime after January 7th of 2005?
20    A   I did not personally contact her because I
21   did not personally schedule the meetings. It was
22   through either at -- this process would have been

156

1   through whoever was setting it up, whether it was
2   Tawanna, or Patrick, or at the time I think -- or
3   David.
4       I would not have stopped everything I was doing
5   because I needed to reschedule a meeting. I would
6   have had it rescheduled by someone who was supporting
7   my scheduling meetings at the time.
8       So Tawanna -- again, I'm trying to remember if it
9   was David or Patrick, it might have been Patrick at
10   the time, would have just tried to find another time
11   to reschedule.
12    Q   I just want to make sure I'm clear. You
13   didn't personally reach out to Marjorie Murtagh Cooke
14   after the meeting was cancelled and attempt to
15   reschedule; is that correct?
16          MR. LUONG: One second. I'm going to
17   ob -- I think this line of questioning is confusing
18   because I'm not sure what meeting you're talking
19   about, whether the performance evaluation meeting or
20   this meeting to discuss something personal. But I
21   also think this question has been asked and answered.
22    Q   Is that correct?

1             IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4  - - - - - - - - - - - - - - - x

5  MARJORIE MURTAGH COOKE     :

6           Plaintiff     :

7  vs.                  :    Civil Action No.:

8  MARK ROSENKER, CHAIRMAN    :    06-7480
    NATIONAL TRANSPORTATION
9  SAFETY BOARD          :

10          Defendant     :

11  - - - - - - - - - - - - - - - x

12

13

14                    Washington, D.C.

15             Wednesday, November 28, 2007

16

17

18  Deposition of:

19              MARJORIE M. COOKE

20  the Deponent, called for examination by counsel for the

21  Defendant, pursuant to notice and agreement as to time

22  and place, at 501 3rd Street, N.W., Washington, D.C.,

23  before Sean Williams, a Notary Public in and for the

24  State of Maryland.



EXHIBIT

8

56

1  pay with any other person in the executive branch

2  executives, any other executives?

3      A.   Dan Campbell.

4      Q.   When did you discuss with Dan Campbell that you

5  weren't getting paid the same amount as your male

6  counterparts?

7      A.   There were at least two occasions.  The first

8  one came sometime about Bob Chipkevitch had been given

9  the SES in Railroad, and Joe Osterman and I had a meeting

10  with Dan Campbell.  We were talking about work and the

11  issue was raised about when were Joe and I going to get

12  SES positions.  We weren't being paid the same as -- in

13  fact, it was not when were we going to get SES positions,

14  it was when were we going to get paid the said as

15  Chipkevitch, now Aviation and Mail were being paid at

16  this level, and Dan Campbell we've submitted paperwork.

17  We're consistently submitting paperwork for SES

18  positions, and Joe immediately responded even faster than

19  I did that it was not the SES position specifically that

20  he was interested in, he was interested in the pay and I

21  responded, as I say, virtually at the same time to say

22  the same thing, it was the issue of pay.

23      Q.   Any other time?

24      A.   Yes.  When the advertisement was put out for

25  the Director of the Office of Highway Safety, I went in

57

 1   to see Dan Campbell and asked him again.  He said I
 2   don't know when I'm going to take care of you.  I know
 3   right now I have to do this for Joe.
 4        Q.   Who was the Director of Highway Safety?
 5        A.   When?
 6        Q.   At this time?  You said that there was an SES
 7   advertised, so at the time who was the Director?
 8        A.   Joe Osterman.
 9        Q.   And when you went in to see Dan Campbell when
10   this position was advertised --
11        A.   Yes.
12        Q.   -- what exactly was your complaint?
13        A.   What was my complaint?
14        Q.   Yeah.
15        A.   It was my request for pay essentially, to ask
16   what about me getting paid.  He said I don't know when
17   I'm going to -- I don't know about you.  All I know is
18   right now I've got to do this for Joe.
19        Q.   Okay.
20        A.   And that's -- you know, we could put it in
21   quotes, but it was -- that was the general statement that
22   he made.
23        Q.   And this was the second time then that you had
24   asked Dan Campbell about getting paid higher than what
25   you were receiving, equal to that of other modal heads,

1  is that correct?

2      A.    Well, when you say the second time, it was

3  another time that I had said it to him because there was

4  another occasion in which I had asked him about being

5  paid for overtime, and he had said I'll for you what I

6  would do -- what I did when I was General Counsel, and

7  that was I would tell my attorneys that if they worked

8  overtime, they could take a day off now and again and I

9  would look the other way.

10     Q.    So did he tell you that you could get overtime

11 pay?

12     A.    No.   He said it was -- my working overtime was

13 one of the privileges of working in the office as a

14 manager.

15     Q.    So you have just described three conversations

16 regarding pay.

17     A.    Correct.

18     Q.    Do you recall any other conversations that you

19 may have had with Dan Campbell regarding pay?

20     A.    Regarding pay or regarding equal pay?

21     Q.    Pay equal to other modal heads.

22     A.    That would be -- those are the three that I

23 recall.

24     Q.    The first conversation that you mentioned, you

25 and Mr. Osterman met with Dan Campbell.  Did you convey

1  to Mr. Campbell that you believed that there was some

2  sort of gender discrimination going on and that was why

3  you weren't getting the same pay as the other modal

4  heads?

5      A.  No.

6      Q.  The second time that you mentioned -- this is

7  when the SES position was advertised for Highway Safety

8  -- did you mention or convey to Dan Campbell that you

9  believed that you were being discriminated against and

10  not getting the pay because you were a woman?

11      A.  No.

12      Q.  The third conversation that you discussed

13  regarding overtime, did you convey during that

14  conversation that you believed you weren't getting paid

15  equal to the other modal heads because there was some

16  sort of gender discrimination going on?

17      A.  I did not mention gender discrimination, no.

18      Q.  The first time that you had a conversation with

19  Dan Campbell, at least the first conversation that you

20  mentioned -- this is when you and Mr. Osterman met with

21  Dan Campbell -- you mentioned that Mr. Chipkevitch had

22  gotten his SES.  Can you tell me what time frame we're

23  talking about?

24      A.  That would have been, I believe, in the 2000

25  time frame, is when Mr. Chipkevitch got his SES.  Now

60

1   when the conversation took place, I can't give you -- it

2   would be sometime between when Bob Chipkevitch was given

3   the SES and when the advertisement came out for the

4   Director of the Office of Highway Safety.

5       Q.   Which was when?

6       A.   I believe that was in 2003.

7       Q.   So when the SES was advertised for the Director

8   of Highway Safety, you had a conversation with Dan

9   Campbell.   When about did you have this conversation with

10  Mr. Campbell?

11      A.   When the advertisement came out.

12      Q.   So sometime in 2003?

13      A.   Yes.   That probably would have been -- yes.   It

14  was yeah, sometime in 2003.

15      Q.   The third conversation that you mentioned where

16  you asked for overtime pay, do you recall about when you

17  had this conversation?

18      A.   That conversation was linked to a recruitment.

19  It was a recruitment for the Chief of the Report

20  Development Division.   I believe that was in 2003.   It

21  may have been 2002, but somewhere in that time period.

22      Q.   You said that it was linked to the Chief of the

23  Report Development Division or an advertisement for that

24  position.

25      A.   It was linked to his -- it was linked to the

61

1  outcome of that advertisement.

2      Q.   Was there a person who was selected for that

3  position?

4      A.   Yes.

5      Q.   Who was it?

6      A.   Patricia Barnes.

7      Q.   Were you asked for overtime because you

8  believed Patricia Barnes was getting overtime?

9      A.   I asked for overtime because Mr. Campbell

10 refused to agree to promoting to Patricia Barnes, and he

11 then refused to let me -- since he would not agree to who

12 I had selected, he had -- he had asked me to consider for

13 the position a personal friend of his, Charlie Pierra

14 (phonetic sp)., and when I did not select Mr. Pierra, he

15 called me into his office and he asked me several

16 questions because when I had sent forward the

17 advertisement with my selection, Patricia Barnes, I had

18 sent it forward with a memo telling him that I wanted to

19 thank the panel as well, and I wanted him to thank the

20 panel for doing such a nice job on it.

21     Q.   So I'm not sure I understand what the

22 connection is between your asking for overtime and Mrs.

23 Barnes' promotion or non-promotion.

24     A.   Because Mr. Campbell also said he would not let

25 me readvertise for the position, so I was not going to

1    get anybody into that position since I did not select

2    the person he wanted, which is why in April of 2004 I

3    included that request when I went to see the Chairman.

4    He would not let me readvertise for the position, which

5    meant I was going to have to continue working excessive

6    hours to make up for a missing billet.

7        Q.    So in April of 2004 when you asked for overtime

8    from Ms. Connors, you already knew that Dan Campbell

9    believed that you could not get overtime pay?

10       A.    No.

11       Q.    Dan Campbell had already denied you overtime

12   pay by April 2004, is that correct?

13       A.    Dan Campbell had said he would instead look the

14   other way if I wanted to take time off when I worked

15   overtime.  He did not say that I was not eligible for

16   overtime.  He did not say that I could not receive

17   overtime.  What he said was I could take a day off which

18   was ludicrous.  The reason I was putting in the overtime

19   already was to make up for missing personnel.  For me to

20   take a day off would only serve to interfere with my

21   completion of projects.

22       Q.    Did you tell Mr. Campbell at the time that you

23   didn't want a day off, you wanted overtime pay?

24       A.    Yes.

25       Q.    And what did he say?

DEPOSITION OF EMILY CARROLL
CONDUCTED ON TUESDAY, FEBRUARY 12, 2008

1 (Pages 1 to 4)

**Page 1**

1    IN THE UNITED STATES COURT OF FEDERAL CLAIMS
2    ————————x
3    MARJORIE MURTAGH COOKE,        :
4         Plaintiff    : No. 06-748C
5         v.              : (Judge Wheeler)
6    THE UNITED STATES,        :
7         Defendant    :
8    ————————x
9
10        Deposition of EMILY CARROLL
11           Washington, D.C.
12        Tuesday, February 12, 2008
13              10:05 a.m.
14    Job No.: 1-122456
15    Pages 1 - 76
16    Reported by: Alda Mandell, RPR
17
18
19
20
21
22

**Page 2**

1        Deposition of EMILY CARROLL, held at the
2    offices of:
3
4        EMPLOYMENT LAW GROUP
5        888 17th Street, Northwest
6        Suite 900
7        Washington, D.C. 20006
8        (202)331-2883
9
10        Pursuant to agreement, before Alda Mandell,
11    Registered Professional Reporter and Notary Public of
12    the District of Columbia.
13
14
15
16
17
18
19
20
21
22

**Page 3**

1        A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFF:
4        DAVE SCHER, ESQUIRE
5        THE EMPLOYMENT LAW GROUP, P.C.
6        888 17th Street, Northwest
7        Suite 900
8        Washington, D.C. 20006
9        (202)331-2883
10
11    ON BEHALF OF DEFENDANT
12        MEREDYTH D. COHEN, ESQUIRE
13        UNITED STATES DEPARTMENT OF
14        JUSTICE
15        CIVIL DIVISION
16        1100 L Street, Northwest
17        Washington, D.C. 20530
18        (202)305-2061
19
20            and
21
22

**Page 4**

1    A P P E A R A N C E S  (Continued)
2
3        KATHLEEN SILBAUGH, ESQUIRE
4        NATIONAL TRANSPORTATION SAFETY
5        BOARD
6        490 L'Enfant Plaza East, Southwest
7        Washington, D.C. 20594
8        (202)314-6084
9
10    Also Present: MARJORIE MURTAGH COOKE
11
12        C O N T E N T S
13    EXAMINATION OF EMILY CARROLL        PAGE
14    By Mr. Scher                5
15    By Ms. Cohen               67
16
17        E X H I B I T S
18           (None)
19
20
21
22

EXHIBIT
9

DEPOSITION OF EMILY CARROLL
CONDUCTED ON TUESDAY, FEBRUARY 12, 2008

6 (Pages 21 to 24)

21

1    Q   Okay. Do you have an idea of what year?
2    A   No.
3    Q   Okay. All right. Do you know whether this
4    request was made for all four modal offices all at the
5    same time?
6    A   Without looking at the specific request,
7    that would be hard for me to answer. I know at given
8    points in time requests were made and those type of
9    positions were included in the requests.
10   Q   Okay. So are you saying that at some point
11   in time NTSB made its biannual request, if you will,
12   for SES slots and in that request they included SES
13   slots for the four modal offices? Is that what you're
14   saying? I'm just trying to understand.
15   A   I'm backing into the answer --
16   Q   Okay.
17   A   -- because I know that those positions have
18   been filled within SES so we had to have a slot in
19   order to advertise.
20   Q   Okay.
21   A   So I'm kind of backing into it without being
22   on the inside of the process. I wouldn't have known

22

1    the specifics.
2    Q   Right.
3    A   But having known that we recruited to fill
4    slots --
5    Q   Right.
6    A   -- we had to have a position or used another
7    position in the agency. So it could have been one of
8    the two ways.
9    Q   Okay. I understand.
10   A   Okay.
11   Q   I'm asking a very specific question. I
12   apologize. I'm not being clear so I'm going to try to
13   be really clear. Okay?
14   A   Uh-huh.
15   Q   I'm asking whether you know at some point in
16   time NTSB made a single request for four SES slots for
17   all modal directors all at the same time.
18   A   I can't definitively answer that. I don't
19   remember.
20   Q   Okay. That's fine. I really am only
21   interested in what you know.
22   A   Uh-huh.

23

1    Q   But I guess you do know that at some point
2    in time NTSB made requests for SES slots for these
3    modal directors. At some point in time.
4    A   At some point in time. Yes.
5    Q   Okay. Do you know why the NTSB did that?
6    A   No.
7    Q   Do you know who made the requests?
8    A   The request is signed by the Chairman so it
9    would have been -- for NTSB that would have been the
10   Managing Director and the Chairman.
11   Q   And who was the Managing Director? I guess
12   it depends on the point in time.
13   A   It depends on the point in time. Our
14   Managing Directors have changed.
15   Q   Okay. That's fine. Do you know whether at
16   any point in time that NTSB made a request for an SES
17   position for a modal director and that request was
18   denied by OPM?
19   A   What I know of that process is that you make
20   a request identifying positions. They respond with a
21   number.
22   Q   Okay.

24

1    A   So I can't definitively say that X was
2    approved and X was given.
3    Q   I see.
4    A   I know that NTSB advertised certain
5    positions that they had to have a slot for.
6    Q   I see. So I understand how this works, NTSB
7    would say I want -- I'm making up this number now --
8    10 SES slots and then OPM says you get eight or
9    whatever they say. And then NTSB decides what to do
10   with them. Is that how this process works?
11   A   Correct.
12   Q   So OPM does not say you must use it for this
13   or you must use it for that?
14   A   No. OPM does not say that.
15   Q   How does the NTSB determine where to
16   allocate those specific slots?
17   A   That decision would be made by the Managing
18   Director in consultation with the Chairman. I don't
19   know what things they consider in that discussion.
20   Q   Okay. All right. When the four offices
21   were created or when OSTS was split into four offices,
22   do you know what pay levels those modal directors were

DEPOSITION OF EMILY CARROLL
CONDUCTED ON TUESDAY, FEBRUARY 12, 2008

7 (Pages 25 to 28)

25

1  paid initially?
2     A   No.
3     Q   Do you know whether they were all classified
4  at the same pay level?
5     A   SES positions by classification are SES
6  positions. Their pay is separate and not necessarily
7  aligned with that. They have a range. And so without
8  knowing specific people, I don't remember it at that
9  level of detail.
10    Q   Understood. Okay. What I'm asking is when
11 the four modal offices were originally created, they
12 were not SES positions, correct?
13    A   Correct.
14    Q   Okay. Do you know what they were?
15    A   More than likely they were GS-15's.
16    Q   Okay. What does GS-15 mean by the way?
17    A   It is a general scheduled position at Grade
18 15.
19    Q   Is there a level higher than 15?
20    A   On the general schedule, no.
21    Q   All right. Now, were all of the four modal
22 directors paid at the level of GS-15 before they

27

1     A   Also for as long as I remember. I am
2  pausing because that -- by deputy position, I mean the
3  person second to the Director.
4     Q   Correct. Yes. So the answer to that --
5     A   The answer to the question is as long as
6  I've known it to be, it's an SES.
7     Q   Okay. Do you know why the Director and
8  Deputy Director of OAS were, as long as you remember,
9  paid at the SES level?
10    A   That's how those positions were classified.
11    Q   Do you know why they were classified that
12 way?
13    A   No.
14    MR. SCHER:  Off the record.
15    (Discussion off the record)
16    MR. SCHER:  Go on the record.
17 BY MR. SCHER:
18    Q   Do you know whether at some point an SES
19 slot became available for the Director of the Office
20 of Railway -- Pipeline and Hazardous Materials, which
21 I'm going to use ORPH because I can't seem to say this
22 correctly.

26

1  became SES?
2     A   Yes.
3     Q   Okay. I want to turn your attention to the
4  Office of Airline Safety or OAS. When if ever was the
5  Director of OAS paid at the SES level?
6     A   When if ever?
7     Q   Yes.
8     A   The Director of OAS is an SES position.
9     Q   It is now?
10    A   It is now.
11    Q   Okay. Do you know when it became an SES
12 position?
13    A   I've always remembered it to be an SES
14 position.
15    Q   As long as you --
16    A   As long as I can remember, it has been an
17 SES position.
18    Q   Okay. Do you know when if ever the Deputy
19 Director of OAS was ever paid at the SES level?
20    A   The Deputy Director in OAS has been in SES
21 for as long as I remember --
22    Q   Also for as long as you remember?

28

1     A   That's fine. Yes. The Director of RPH?
2     Q   Yes.
3     A   Yes.
4     Q   Do you know when that happened?
5     A   Without having the approximate dates -- I
6  don't have approximate dates. Somewhere around 2004.
7  2003, 2004. Somewhere in that area.
8     Q   And do you know how that slot became
9  available?
10    A   No. No, I do not.
11    Q   Okay. Do you know why the NTSB gave the SES
12 slot to ORPH?
13    A   No, I do not.
14    Q   When if ever, to your knowledge, okay, has
15 an NTSB employee been non competitively promoted to do
16 an SES position?
17    A   Non competitively promoted?
18    Q   Yes.
19    A   By noncompetitive promotion do you mean that
20 they were moved in there without announcement and
21 bidding on the job?
22    Q   Yes. That's what I'm asking.

DEPOSITION OF RONALD BATTOCHI
CONDUCTED ON FRIDAY, AUGUST 10, 2007

1 (Pages 1 to 4)

|  |  |
|---|---|
| 1 | 3 |

**Page 1**

1  UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3  - - - - - - - - - - - - - +
4  MARJORIE MURTAGH COOKE,         |
5         Plaintiff,              |
6  v.                    | Case No.
7  MARK ROSENKER, CHAIRMAN,   |1:06CV01928
8  NATIONAL TRANSPORTATION        |
9  SAFETY BOARD,             |
10        Defendant.           |
11  - - - - - - - - - - - - - +
12
13
14        Deposition of RONALD BATTOCHI
15              Washington, D.C.
16           Friday, August 10, 2007
17              9:47 a.m.
18
19
20. Job No. 1-109402
21  Pages 1 - 228
22  Reported by: Cathy Jardim

**Page 2**

1        Deposition of RONALD BATTOCHI, held at the
2  offices of:
3
4  THE EMPLOYMENT LAW GROUP
5  888 17th Street, N.W.
6  Washington, D.C. 20006
7
8
9
10
11
12
13
14
15     Pursuant to notice, before Cathy Jardim,
16  Registered Professional Reporter and Notary Public of
17  the District of Columbia.
18
19
20
21
22

**Page 3**

1          A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3     BRIAN LOWINGER, ESQUIRE
4     The Employment Law Group, PC
5     888 17th Street, N.W.
6     Washington, D.C. 20006
7     (202)331-2883
8
9  ON BEHALF OF THE DEFENDANT:
10     QUAN LUONG, ESQUIRE
11     U.S. Attorney's Office
12     501 3rd Street, N.W.
13     Washington, D.C. 20530
14     (202)514-7176
15     KATHLEEN SILBAUGH, ESQUIRE
16     Office of the General Counsel
17     National Transportation Safety Board
18     490 L'Enfant Plaza, S.W.
19     Washington, D.C. 20594
20     (202)314-6084
21
22  Also Present:  MARJORIE MURTAGH COOKE

**Page 4**

1          C O N T E N T S
2  EXAMINATION OF RONALD BATTOCHI        PAGE
3  By Mr. Lowinger              6, 219
4  By Mr. Luong                216, 225
5
6
7
8          E X H I B I T S
9          (Attached to transcript)
10  BATTOCHI DEPOSITION EXHIBITS          PAGE
11  No. 1—Handwritten note, 01/03/05        183
12  No. 2—Handwritten note, 05/23/05        183
13  No. 3—Handwritten note, "Put together bullets"   187
14  No. 4—Handwritten note, 05/20/05        192
15  No. 5—Handwritten note, "Joe talked to Ron..."   194
16  No. 6—Position Vacancy Announcement       195
17  No. 7—SES Crediting Plan            201
18  No. 8—Memorandum, 12/02/2004         202
19  No. 9—Qualifications Brief           203
20  No. 10—Spencer Application Package       204
21  No. 11—SES Rating Sheet            204
22  No. 12—Memorandum, 03/28/2005        205

EXHIBIT

10

DEPOSITION OF RONALD BATTOCHI
CONDUCTED ON FRIDAY, AUGUST 10, 2007

53 (Pages 209 to 212)

209

1    A  I don't know.  I didn't ask that it be
2  prepared, I don't think.
3        MR. LOWINGER:  Are we off the seal?
4        MR. LUONG:  I can tell you where it is.
5  Starting at Exhibit 3.  We can go back –
6        MR. LOWINGER:  Starting with Exhibit 4 –
7        MR. LUONG:  I think we went out from under
8  seal with Exhibit 3.
9        MR. LOWINGER:  Exhibit 2 is under seal.
10        MR. LUONG:  Correct.  Well, the questions
11  related to Exhibit 2.
12        MR. LOWINGER:  So it will go from question
13  2, and when we start with question 3, please take it
14  off the seal.
15        THE WITNESS:  I don't think I have ever
16  seen this document, Exhibit 13.
17        BY MR. LOWINGER:
18    Q  Would it be recorded in the normal course
19  of NTSB's events?
20    A  I believe so.
21    Q  Do you know how it was recorded --
22    A  Exhibit 13, no, I don't.

210

1    Q  You are not going to opine as to the
2  authenticity of this document?
3    A  No.
4    Q  Is Charlie Perrara Dan Campbell's friend?
5    A  Yes.
6        MR. LUONG:  Objection.
7        BY MR. LOWINGER:
8    Q  How are they friends?
9    A  They fish together, they spend time
10  together.  They are friends.
11        BY MR. LOWINGER:
12    Q  Earlier in our conversation, I asked you
13  about opinions regarding Ms. Murtagh Cooke's
14  shortcomings and we discussed the following:
15  Leadership, management, we discussed analysis
16  contained in reports and report development in
17  general; is that correct, sir?
18    A  Yes.
19    Q  Other than those issues, what other
20  negative comments are there about Ms. Murtagh Cooke
21  that you are aware of?
22    A  I don't recall any.

211

1    Q  Now, those issues right there that we
2  discussed, were those consistent, those negative
3  comments that went to -- you mentioned a lack of
4  respect between Mr. Campbell, Mr. Ellingstad,
5  Ms. Weinstein, and I believe you also said you had
6  issues with her as well, with her performance; is that
7  correct?
8    A  I don't believe I said that.  I said I
9  didn't respect her.  I didn't say I had issues with
10  her conduct.
11    Q  You didn't respect her work?
12    A  Yes, her managment of the office.
13    Q  Is it limited to the management of the
14  office?
15    A  It is nothing personal, if that is what you
16  are asking.
17    Q  Is it limited to the management or is it
18  limited to analysis or –
19    A  I think it is both.
20    Q  And the leadership and the four or five
21  topics we mentioned before?
22    A  Yes.

212

1    Q  Was that consistent from 2005 to 2006 in
2  your role as general counsel, sir?
3    A  I don't recall.
4    Q  Was there any period – let me ask it
5  another way.  Was that consistent with Dan Campbell's
6  feelings toward Ms. Murtagh Cooke from 2000 to 2006?
7    A  I don't know if it was that entire period,
8  but it was certainly consistent with Dan's views for
9  some of that period.
10    Q  And what part?
11    A  I don't know, I can't pinpoint it to you.
12    Q  Would it be closer to 2001 than 2005 that
13  it began?
14    A  I don't know.
15    Q  Would it have been a larger portion of that
16  seven-year period or six-year period or would it be a
17  shorter portion of that six-year period?
18        MR. LUONG:  Objection.  Asked and answered.
19        THE WITNESS:  I don't know.
20        BY MR. LOWINGER:
21    Q  What about with regard to Elaine Weinstein?
22        MR. LUONG:  Same objection.

DEPOSITION OF JOHN C. CLARK
CONDUCTED ON FRIDAY, JUNE 29, 2007

1 (Pages 1 to 4)

---

**Page 1**

```
 1   IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3
 4   _____
                       )
 5   MARJORIE MURTAGH COOKE, )  Case No. 06-748C
                       )
 6      Plaintiff,   )  Judge Thomas C. Wheeler
                       )
 7   vs.            )
                       )
 8   THE UNITED STATES,    )
                       )
 9      Defendant.    )
     _____)
10
11
12
13         DEPOSITION OF
14         JOHN C. CLARK
15         Washington, D.C.
16         Friday, June 29, 2007
17         9:08 a.m.
18
19
20
21   Job No.: 1-106677
     Pages 1 through 270
22   Reported by: John L. Harmonson, RPR
```

---

**Page 2**

```
 1
 2
 3         Deposition of
 4         JOHN C. CLARK
 5
 6
 7   Held at the offices of:
 8         THE EMPLOYMENT LAW GROUP, PC
 9         888 17th Street, N.W.
10         Suite 900
11         Washington, D.C. 20006
12         (202)331-2883
13
14
15
16      Taken pursuant to the Federal Rules of Civil
17   Procedure, before John L. Harmonson, Registered
18   Professional Reporter, Notary Public in and for the
19   District of Columbia, who officiated in administering
20   the oath to the witness.
21
22
```

---

**Page 3**

```
 1                  APPEARANCES
 2
 3   ON BEHALF OF PLAINTIFF:
 4         BRIAN M. LOWINGER, ESQ.
            The Employment Law Group, PC
 5         888 17th Street
            Suite 900
 6         Washington, D.C. 20006
            (202)331-2883
 7
 8
 9   ON BEHALF OF DEFENDANT:
10         MEREDYTH D. COHEN, ESQ.
            Department of Justice
11         Commercial Litigation Branch
            1100 L Street, N.W.
12         8th Floor
            Washington, D.C. 20530
13         (202)353-7978
14         KATHLEEN SILBAUGH, ESQ.
            National Transportation Safety Board
15         490 L'Enfant Plaza East, S.W.
            Washington, D.C. 20594
16         (202)314-6084
17
18   ALSO PRESENT:
19         JONATHAN DUNN, Intern
20         MARLA DUNN, Intern
21
22
```

---

**Page 4**

```
 1              EXAMINATION INDEX
 2                            PAGE
 3   EXAMINATION BY MR. LOWINGER        7
 4   EXAMINATION BY MS. COHEN         259
 5   EXAMINATION BY MR. LOWINGER      266
 6            * * * * *
 7
 8              EXHIBIT INDEX
 9       (Exhibits attached to transcript.)
10   EXHIBIT      DESCRIPTION         PAGE
11    1   Various "Notification of Personnel   237
12        Action"
13    2   Performance Appraisal Form for period  245
14        9/1/2000 to 8/31/2001
15    3   Performance Appraisal Form for period  246
16        9/1/2002 to 8/31/2003
17    4   SES Performance Plan and Appraisal,   246
18        11/22/06
19    5   Progress Review, 11/20/06       247
20    6   Performance Appraisal Form for period  247
21        9/1/2003 to 8/31/2004
22
```

EXHIBIT

11

DEPOSITION OF JOHN C. CLARK
CONDUCTED ON FRIDAY, JUNE 29, 2007

10 (Pages 37 to 40)

37

1    meet the standard of a writer/editor, perhaps even
2    lawyers. But there is a very functional level that
3    engineers or investigators can get their thoughts down
4    and progress it through to a logical conclusion. So
5    it's much more technical.
6        Q.   I've read plenty of scientific journals and
7    enjoyed the love of passive voice.
8            Well, excuse me. I didn't mean to suggest,
9    sir, that you are an editor. I guess what I was
10   trying to say was more of an oversight --
11       A.   Oh, yeah, I agree with that. I understand
12   your comment.
13       Q.   Okay. And you were the deputy director in
14   Research and Engineering. Then did you move from
15   there to another position before you arrived at the
16   director of Aviation Safety?
17       A.   Uh-huh.
18       Q.   What was your next step?
19       A.   I was deputy director in the Office of
20   Aviation Safety.
21       Q.   And when did you take that position, sir?
22       A.   If I could get them all laid out, maybe I

38

1    can remember the dates. It was before 2000. Let me
2    go through the list real quick.
3            I was deputy director in R&E, got into the
4    SES in R&E. I went down and was deputy director in
5    OAS for a period of time. Came back and was deputy
6    director in R&E again. The guy that came in behind me
7    didn't work out. And then I went back as deputy
8    director of OAS and then director of OAS.
9        Q.   Did you always stay an SES during that
10   time?
11       A.   Yes.
12       Q.   So when you went from Aviation Safety back
13   to Research and Engineering, or from Research and
14   Engineering back to Aviation Safety, you never had to
15   give up your SES?
16       A.   No.
17       Q.   Do you remember when you first obtained SES
18   status?
19       A.   Oh, boy. What did I say earlier? I think
20   it was like '96, '97, something like that.
21       Q.   Do you think it was halfway through your
22   time in Research and Engineering as the deputy

39

1    director? Was it near the end of your time, your
2    first run through?
3        A.   I was deputy director, and I came in as a
4    GS-15. And then some short period after that they bid
5    the job -- or they bid the job to come in as a 15, so
6    I had the job as 15. And then I can't remember
7    whether we bid that into SES or not, but I know I had
8    to go through the application process to be accepted
9    into the SES.
10           So I think the job, I went in as a 15, and
11   I don't remember whether we bid it at that point or
12   not. There is certainly a record of that somewhere.
13   What I do remember is filling out the huge amount of
14   paperwork that seemed somewhat obscure to me. But you
15   fill it out and it goes off somewhere.
16       Q.   It's like 40 pages long.
17       A.   I know. And for whatever, it was accepted
18   as adequate, and then I was in the SES in that
19   position.
20       Q.   Did you have to interview for the SES
21   position?
22       A.   I don't remember. What I do remember is

40

1    interviewing for the deputy, the GS-15 position. And
2    that had been an SES position. Dr. Loeb Haueter was
3    head of R&E and Dr. Ellingstad was deputy, and for
4    several years he was in the SES position as deputy.
5    And Dr. Loeb moved down to AS and Dr. Ellingstad moved
6    to be director. Then I moved up as a GS-15, and then
7    that process started to see if it could be converted
8    into an SES.
9        Q.   I see.
10       A.   So whether there was an interview for that
11   back then, I just don't remember.
12       Q.   Do you remember where you saw the
13   advertisement for the SES position?
14       A.   I don't know that I saw an advertisement
15   for an SES. I don't know what you mean,
16   advertisement.
17       Q.   A posting, maybe an internal posting.
18       A.   Well, I don't know. No, I don't remember.
19   I remember there was a -- What I vaguely remember is
20   that I turned in my application for the SES, and I
21   understand that there were other people that did also.
22   There were a number of people that bid on the SES

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) CLARK, JOHN C | 16880 | 2. Social Security Number | 3. Date of Birth | 4. Effective Date 06-08-97 |
|---|---|---|---|---|

**FIRST ACTION**

| 5-A. Code 542 | 5-B. Nature of Action CONV TO SES CAREER APPT |
|---|---|
| 5-C. Code V2M | 5-D. Legal Authority 5 U.S.C. 3393 |
| 5-E. Code | 5-F. Legal Authority |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| 6-C. Code | 6-D. Legal Authority |
| 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number SUPERVISORY GENERAL ENGINEER (DEP DIR) PD NO=640535RE01   BU NO=NT1 ORG=4001   CST CNTR=4001 | 15. TO: Position Title and Number DEPUTY DIRECTOR PD NO=TBES0010RE   BU NO=NT1 ORG=4001   CST CNTR=4001 |
|---|---|

| 8. Pay Plan GS | 9. Occ. Code 0801 | 10. Grade/Level 15 | 11. Step/Rate 10 | 12. Total Salary $98,714 | 13. Pay Basis PA | 16. Pay Plan ES | 17. Occ. Code 0340 | 18. Grade/Level 00 | 19. Step/Rate 02 | 20. Total Salary/Award $108,824 | 21. Pay Basis PA |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay $92,161 | 12B. Locality Adj. $6,553 | 12C. Adj. Basic Pay $98,714 | 12D. Other Pay $0 | 20A. Basic Pay $101,600 | 20B. Locality Adj. $7,224 | 20C. Adj. Basic Pay $108,824 | 20D. Other Pay $0 |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization OFFICE OF RESEARCH AND ENGINEERING OFFICE OF DIRECTOR WASHINGTON, DC 20594 | 22. Name and Location of Position's Organization OFFICE OF RESEARCH AND ENGINEERING OFFICE OF THE DIRECTOR WASHINGTON, DC 20594 |
|---|---|

**EMPLOYEE DATA**

| 23. Veterans Preference 1 – None   3 – 10-Point/Disability   5 – 10-Point/Other 2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | 24. Tenure 0 – None   2 – Conditional 1 – Permanent   3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF YES   NO |
|---|---|---|---|

| 27. FEGLI BASIC/ADD 2 TIMES PAY/FAMILY | 28. Annuitant Indicator NOT APPLICABLE | 29. Pay Rate Determinant |
|---|---|---|

| 30. Retirement Plan FERS & FICA | 31. Service Comp. Date (Leave) 09-20-81 | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied 1 – Competitive Service   3 – SES General 2 – Excepted Service   4 – SES Career Reserved | 35. FLSA Category E – Exempt N – Nonexempt | 36. Appropriation Code SEE REMARKS BELOW | 37. Bargaining Unit Status 8888 |
|---|---|---|---|

| 38. Duty Station Code 11-0010-001 | 39. Duty Station (City – County – State or Overseas Location) WASHINGTON, DISTRICT OF COLUMBIA |
|---|---|

| 40. AGENCY DATA SP PROG=00 | 41. SUPV CSC=2 | 42. POS TYPE=1 | 43. | 44. POSITION SENSITIVITY = 2 |
|---|---|---|---|---|

45. Remarks
APPROP = 397 .0 /000/100  /4001  /1111
SALARY IN BLOCK 12C INCLUDES A LOCALITY-BASED PAYMENT OF 7.11%. SALARY IN BLOCK 20C INCLUDES A LOCALITY-BASED PAYMENT OF 7.11%. SUBJECT TO COMPLETION OF ONE-YEAR SES PROBATIONARY PERIOD BEGINNING 06-08-1997. EMPLOYEE HAS GUARANTEED PLACEMENT RIGHTS DURING PROBATION. VETERAN PREFERENCE IS NOT APPLICABLE TO THE SENIOR EXECUTIVE SERVICE. TENURE AS USED FOR 5 USC 3502 IS NOT APPLICABLE TO THE SENIOR EXECUTIVE SERVICE. ELIGIBLE FOR SICK AND ANNUAL LEAVE. FROZEN SERVICE: 06 YRS 03 MOS (FOR OPM ACTUARIAL PURPOSES ONLY). CREDITABLE MILITARY SERVICE: NONE. EMPLOYEE IS COVERED BY FERS BECAUSE OF PREVIOUS ELECTION. VACANCY ANNOUNCEMENT, WA-TB-7-040, QRB APPROVED; OPM FORM 1390 DATED 06-03-97.

003712

| 46. Employing Department or Agency NATL TRANSPORTATION SAFETY BOARD | 50. Signature/Authentication and Title of Approving Official Julma Blew DIRECTOR OF PERSONNEL |
|---|---|
| 47. Agency Code TB-00 | 48. Personnel Office ID 4107 | 49. Approval Date 06-18-97 | |

5-Part   50-316

**2 – OPF Copy – Long-Term Record – DO NOT DESTROY**

Editions Prior to 7/91 Are Not Usable After 6/30/
NSN 7540-01-333-62

EXHIBIT
12