## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARJORIE MURTAGH COOKE,**

    **Plaintiff,**

       **v.**

**MARK ROSENKER, Chairman,**
**Nat'l Transp. Safety Bd.,**

    **Defendant.**

**Civil Action No.  06-1928 (JDB)**

### MEMORANDUM OPINON

    Plaintiff Marjorie Murtagh Cooke ("Cooke" or "plaintiff") is the former Director of the Office of Marine Safety, the office within the National Transportation Safety Board ("NTSB") that is responsible for investigating marine accidents.  Cooke brings this action against defendant Mark Rosenker, in his official capacity as Chairman of the NTSB, alleging that she was retaliated against in violation of the Fair Labor Standards Act.  Currently before the Court is the NTSB's motion for summary judgment.[1]  Cooke opposes the motion, arguing that a reasonable jury could conclude from all of the evidence that she was retaliated against and that there are genuine issues of material fact that preclude summary judgment.  Upon careful consideration of the motion, the parties' several memoranda, the applicable law, and the entire record, the Court will grant the NTSB's motion.

### BACKGROUND

    The NTSB is an independent federal agency charged with determining the probable cause

---

[1] The NTSB also makes a motion to strike the jury demand from the First Amended Complaint pursuant to Fed. R. Civ. P. 12(f).  Because the Court will grant summary judgment to the NTSB, it will deny the motion to strike as moot.

of transportation accidents and promoting transportation safety.  Def.'s Ex. 5.  As part of a

restructuring that occurred in the late 1990s, the NTSB's Office of Surface Transportation Safety

was divided into four separate modal offices:  the Office of Highway Safety ("OHS"); the Office

of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous Materials Safety ("OPHS");

and the Office of Marine Safety ("OMS").  First Am. Compl. ("Am. Compl.") ¶ 6.  ORS and

OPHS later merged to form the Office of Railroad, Pipeline, and Hazardous Materials

Investigations ("ORPH").  Id. ¶ 7.  The surface modal offices, as they are known, conduct

investigations of accidents within the NTSB's jurisdiction; prepare reports for submission to the

NTSB and release to the public setting forth the facts and circumstances of such accidents,

including a recommendation as to the probable cause(s); determine the probable cause(s) of

accidents when delegated authority to do so by the NTSB; initiate safety recommendations to

prevent future accidents; and conduct special investigations into selected accidents involving

safety issues of concern to the NTSB.  See 49 C.F.R. § 800.2.

Prior to the NTSB's restructuring, Cooke was the Chief of the Marine Division from 1994

until 1997.  When the Marine Division became OMS in 1997, Cooke became the Director of

OMS, and she remained in that position until 2005.  Am. Compl. ¶ 8.  For a period of time after

the restructuring, the directors of the surface modal offices were each paid at the same level on

the federal government's General Schedule ("GS") scale -- the GS-15 level.  Id. ¶ 9; Decl. of

Emily Carroll ("Carroll Decl.") ¶ 7.  The directors of the surface modal offices report to the

NTSB's Managing Director.  Dan Campbell was the Managing Director from 2000 until early

2005.  See Aff. of Dan Campbell ("Campbell Aff.") at 1.  As the Managing Director, Campbell

had Senior Executive Service ("SES") status, which entitled him to a higher pay level than the

surface modal office directors.[2]  See Am. Compl. ¶ 9.

According to the NTSB, there was a plan in place to convert each of the surface modal office directors to a SES position.  See Aff. of Ellen Engleman Conners ("Conners Aff.") at 3. But converting the director positions from the GS-15 level to the SES level did not occur overnight.  To begin with, the number of SES level positions allotted to the NTSB is determined by the Office of Personnel Management ("OPM").[3]  See id. at 1-2; Carroll Decl. ¶ 3.  The NTSB does, however, have discretion regarding how its allotted SES slots are utilized, and when a vacancy occurs in an existing SES position, the NTSB can fill that position or reassign the SES slot to another position within the agency.  See Carroll Decl. ¶ 5.  Likewise, when the NTSB is allocated a new SES slot by OPM, it can be used to create a new SES level position or to convert an existing non-SES level position to the SES level.  See id. ¶ 4.  If the NTSB chooses to convert a position to the SES level, then the employee who holds the reclassified position cannot be noncompetitively promoted to the SES position unless that employee previously held a career SES appointment.  See OPM Guide to Senior Executive Service Qualifications ("OPM Guide") at 1, 4, available at http://www.opm.gov/ses/references/SES_Quals_Guide_2006.pdf (last visited Feb. 26, 2009).  Therefore, in most instances when the NTSB, or any other agency, seeks to fill a

_____

[2] According to the United States Office of Personnel Management, "[t]he SES pay range has a minimum rate of basic pay equal to 120 percent of the rate for GS-15, step 1, and the maximum rate of basic pay is equal to the rate for Level III of the Executive Schedule."  Office of Personnel Management, Performance & Compensation, http://www.opm.gov/ses/performance/salary.asp (last visited Feb. 26, 2009).

[3] Around the time that Dan Campbell became Managing Director, in June 1999, the NTSB made a request to OPM to authorize SES positions for all of the surface modal office directors, but OPM did not grant the request.  See Campbell Aff. at 2.  In July 2001, the NTSB made another request to OPM for SES slots for the Director of OHS and the Director of OMS, but that request was also denied.  See Carroll Decl. ¶ 15.

position reclassified to the SES level, it must -- pursuant to OPM regulations -- advertise the position and allow for a competitive recruitment process.  See id. at 4.  During the process, an agency rating panel reviews and ranks the candidates, and recommends the best qualified candidates to the selecting official -- in this case, the NTSB's Managing Director.  The selecting official then must choose the candidate best qualified for the position and submit the candidate's application package to OPM's Qualifications Review Board ("QRB").  The QRB must certify the candidate's qualifications before that individual's appointment to the SES is finalized.  See id.

In 2001, a SES position became available within the NTSB, and it was determined that the Director of ORPH would be reclassified to the SES level.  See Carroll Decl. ¶ 11.  Bob Chipkevich, the incumbent Director of ORPH, was at the GS-15-level and had never held a career SES appointment.  Consequently, the NTSB advertised the position and allowed for a competitive recruitment process.  After applying for the position, Chipkevich was eventually selected by the NTSB and appointed as the SES level Director of ORPH.  See id. ¶¶ 13-14.  Two years later, in 2003, a similar sequence of events occurred with regard to the SES reclassification of the Director of OHS.  Once another SES spot opened up, it was determined that the Director of OHS would be reclassified as a SES position.  See id. ¶ 16.  Again, the incumbent Director of OHS, Joe Osterman, was a GS-15 level employee and had never previously held a career SES appointment; hence, the NTSB advertised the position and conducted a competitive recruitment process.  See id.  Osterman applied for the position, he was selected, and -- after the QRB's certification of his qualifications -- he was appointed as the SES level Director of OHS.  See id. ¶ 17.

After Osterman's appointment to a SES position in 2004, the Director of OMS remained

as the only surface modal office director categorized as a GS-15 level position, and Cooke became concerned that she was being "paid significantly less than her male counterparts in salary and bonuses." Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 4. Cooke voiced this concern to the NTSB's then-Chairman, Ellen Engleman Conners ("Conners"), in an April 2004 meeting. Cooke testified that at the meeting, "[she] discussed the fact that [she] was not being paid the same as [her] male counterparts." Dep. of Marjorie Murtagh Cooke ("Cooke Dep.") at 48:16-17. Cooke also claims that "she informed Conners that [she] was the only Director of the four modal investigation offices without SES status and that as a result she made substantially less money than all three of her male counterparts – and she requested equal pay." Pl.'s Opp'n at 4. While Conners testified that she did not recall the precise words used by Cooke in their meeting, she did recall that Cooke "stated that she wasn't an SES, her office wasn't an SES, and she didn't make as much money as the folks who had an SES." Dep. of Ellen Engleman Conners ("Conners Dep.") at 53:20-22. Conners also testified that Cooke requested overtime to "fix" this differential in pay. See id. at 54:2-3, 57:2-12. Following the meeting, Cooke claims that she "made several attempts to meet with Conners to seek her approval for overtime pay in order to remedy the disparity between Cooke's pay and that of her male counterparts, but Conners refused to meet with Cooke to discuss the issue." Am. Compl. ¶ 15. For her part, Conners testified that she "was always accessible" to meet with Cooke, but could not recall why she never did. See Conners Dep. at 72:7-75:4. She also testified that she relayed Cooke's request to Dan Campbell, Cooke's immediate supervisor, and asked him to follow-up on Cooke's request for overtime. See id. at 66:2-68:9, 75:16-76:16. The parties agree that Cooke was never paid overtime.

Shortly after the April 2004 meeting, the NTSB finally received an additional SES slot from OPM, and it was allocated to the OMS Director position.  See Def.'s Ex. 14; Carroll Decl. ¶ 18.  Because Cooke, as the incumbent Director, had never held a career SES appointment, she could not be noncompetitively promoted to the SES level position.  See Def.'s Ex. 16; OPM Guide at 1, 4.  Accordingly, in July 2004, the Director of OMS was advertised as a SES position by the NTSB, and the competitive recruitment process began.  See Def.'s Ex. 21.  Twenty individuals, including Cooke, applied for the position.  See Carroll Decl. ¶ 18.  Once the applications were received, Collette Magwood, Assistant Director of the NTSB's Human Resources Division, reviewed the qualifications of all applicants and determined that ten, including Cooke, met the minimum qualifications required for the position.  Id.  These ten applications were then referred to the NTSB's rating panel.  In line with OPM procedure, when a SES position is advertised, the NTSB's Managing Director appoints a rating panel composed of 3 to 5 SES members to rate the qualifications of those applicants who, according to Human Resources, meet the minimum qualifications for the position.  See OPM Guide at 4; Carroll Decl. ¶ 19.  Human Resources provides the panel with a "Rating and Evaluation Plan" that identifies the criteria that the panel must use to rate the qualifications of the applicants.  See Def.'s Ex. 23.  In this instance, the rating plan listed five Executive Core Qualifications, two Mandatory Professional/Technical Qualifications, and two Desirable Professional/Technical Qualifications.  Id.  The panel evaluated each applicant's experience, education, and training against the plan and arrived at a consensus rating on each of the qualifications criteria.  See Carroll Decl. ¶ 20.  For each element, applicants were rated as follows:  HQ (Highly Qualified); Q (Qualified); or NQ (Not Qualified).  See Def.'s Ex. 23.

Managing Director Campbell appointed a three-person panel to rate the candidates for the OMS Director position.  The panel was composed of Ron Battochi, General Counsel, Bob Chipkevich, Director of ORPH, and Elaine Weinstein, Director of Safety Recommendations and Accomplishments.  Def.'s Ex. 22.  After completing its review, the panel identified the five best qualified candidates for the position and, on December 2, 2004, referred them to Campbell to be considered for selection.  Cooke was rated as one of the five best qualified applicants.  Id.  Soon thereafter, Campbell cancelled the vacancy announcement after he made the decision not to conduct any interviews or make a selection from the group of applicants referred to him by the panel.  See Campbell Dep. at 93:14-97:18; Carroll Decl. ¶ 20.  According to Campbell, he made such a decision because he was unhappy with the quality of the top five candidates.  See Campbell Dep. at 96:7-97:18.  Moreover, he believed that "the pool of candidates had been artificially narrowed by [a] rumor that the first announcement had been wired for [the incumbent, Cooke]."  Id. at 93:15-94:1.

Within weeks of Campbell's decision to cancel the vacancy announcement, the NTSB re-advertised the SES level OMS Director position in January 2005.  See Def.'s Ex. 24.  Cooke and nineteen other individuals applied for the position.  See Def.'s Ex. 25.  Around this time, Cooke contends that she also "filed a sexual discrimination complaint with the NTSB EEO Director on or about February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations."  Am. Compl. ¶ 20.  The NTSB admits that Cooke had a meeting with the Equal Employment Opportunity ("EEO") Director in February 2005, see Answer ¶ 19, but it characterizes the meeting not as a formal complaint, but rather as part of the pre-complaint process mandated by 29 C.F.R. § 1614.105.  See Def.'s Reply in Supp. of Mot. for Summ. J. and

Mot. to Strike ("Def.'s Reply") at 5-6.  In any event, there is no dispute that on April 16, 2005, Cooke filed a formal EEO complaint alleging, inter alia, that she was discriminated against based upon her gender in violation of the Equal Pay Act.  Def.'s Ex. 1.

Meanwhile, the competitive recruitment process for the SES level OMS Director position moved forward.  The NTSB's Human Resources Division reviewed twenty applications and concluded that fifteen applicants, including Cooke, met the minimum qualifications for the position.  See Carroll Decl. ¶ 24.  These applications were referred to a new five-person rating panel appointed by Campbell.  The second rating panel was composed of two individuals from the original panel, Weinstein and Chipkevich, and three new members, John Clark, Director of OAS, Dr. Vernon Ellingstad, Director of the Office of Research and Engineering, and Joe Osterman, Director of OHS.  Def.'s Ex. 25.  As with the first panel, the second rating panel reviewed the applicants and ranked them according to the criteria set forth in the "Rating and Evaluation Plan."  See Def.'s Ex. 26.  At the conclusion of the second panel's evaluation, the five best qualified candidates were referred to Campbell to be considered for selection.  See Carroll Decl. ¶ 24.  The second rating panel did not rank Cooke among the five best qualified candidates and she was not referred to Campbell for consideration.  See id.; Def.'s Ex. 25.  Once again, however, no action was ever taken on the second panel's recommendations, this time because Campbell was in the midst of changing positions, from Managing Director to Executive Director, and would no longer play any role in the selection of the new SES Director of OMS.  See Campbell Dep. at 183:9-20; Osterman Dep. at 134:4-13.

In March 2005, Joe Osterman replaced Campbell as the NTSB's Managing Director, and became the selecting official for the SES Director of OMS position.  Because Osterman had been

a member of the second rating panel, he reconstituted the rating panel -- naming Tom Haueter, his replacement as Director of OHS, to the panel -- and directed the panel to reevaluate all of the candidates.  See Osterman Dep. at 134:9-13, 19-21; Def.'s Ex. 25.  The third rating panel evaluated the candidates once again according to the criteria set forth in the "Rating and Evaluation Plan" and, on March 28, 2005, the panel provided Osterman with a list of the five best qualified candidates.  See Osterman Dep. at 134:22-135:14; Def.'s Ex. 25.  Cooke was not among the top five candidates referred to Osterman for consideration.  Osterman testified that the third rating panel ranked Cooke as the seventh best qualified candidate for the position.  See Osterman Dep. at 137:15-22.  Osterman also said that although he did not rule out interviewing Cooke for the position, the decision was made to interview only the top five candidates at first, which was the typical practice for SES positions at the NTSB.  See id. at 105:5-108:9, 139:21-140:15, 154:1-11.

After the top five candidates were interviewed, John Spencer was selected for the position of the SES Director of OMS, and he was appointed to the position in August 2005.  See Def.'s Ex. 17; Carroll Decl. ¶ 25.  Spencer had applied for the position when it was initially advertised in 2004, but at that time Collette Magwood of the NTSB's Human Resources Division determined that Spencer did not meet the minimum qualifications required for the position and she did not refer his application to the first rating panel.  See Dep. of Collette Magwood ("Magwood Dep.") at 52:16-53:6.  Spencer reapplied for the position in 2005, and he was eventually selected after being ranked as one of the five best candidates by the third and final rating panel.  See Def.'s Ex. 25.

Osterman met with Cooke in or about May 2005 to inform her that she had not been

selected as the SES Director of OMS.  See Am. Compl. ¶ 23; Answer ¶ 23.  Osterman testified

that at the time he met with Cooke -- following Spencer's selection -- he does not believe that he

"was aware of [Cooke's] EEO Complaint."  Osterman Dep. at 150:12-20.  During their meeting,

Osterman and Cooke discussed the possibility of creating a new position for Cooke that would

potentially allow her to increase her pay.  The proposed position was a Senior Leadership

position that would operate as an international liaison under the Managing Director.  See id. at

145:5-18, 148:17-149:4.  Because a new Senior Leadership position of this type would require

authorization from OPM, and would need to be filled via a competitive recruitment process,

Osterman requested that Cooke prepare a proposal outlining the job responsibilities.  See id. at

149:5-150:1.  Soon thereafter, Cooke prepared a proposal and shared it with Osterman.  See id.

at 157:15-158:3.  Osterman reviewed the proposal and subsequently met with Acting Chairman

Mark Rosenker, Executive Director Dan Campbell, and Chairman Designee Ellen Engleman

Conners to discuss the NTSB's need for such a position.  See id. at 159:8-163:11.  During that

meeting, the NTSB's senior leadership agreed that there was not sufficient work to justify the

Senior Leadership position as proposed by Cooke.  See id. at 160:14-18, 164:5-9.

     Once the decision was made not to seek permission from OPM to create a new Senior

Leadership position, Osterman met with Cooke to discuss her options.  See id. at 164:11-14.

Osterman testified that he and Cooke discussed the possibility that a new GS-15 level national

resource specialist position could be created for Cooke within OMS, but it was ultimately

decided that this was not the best option because it would be awkward for Cooke, as the

outgoing Director, to remain in OMS under the new Director, Spencer.  See id. at 165:7-166:18.

Osterman testified that he then offered Cooke a planning manager position as a detail in the

Office of Safety Recommendations and Communications ("SRC") "because there was an immediate need for a 15-level manager in [that office] for a specific duration of time." Id. at 164:18-21.  He stated that he "considered [Cooke] a good planner and felt that that fit [within SRC] would be good for the agency . . . and also give me the opportunity to design a more permanent position for [Cooke] outside of the Office of Marine Safety." Id. at 178:18-179:1. Osterman also testified that "[a]t the time we had the discussion about her going to the detail in [SRC], there was not another [GS-15 level] billet open and available to place her in that was appropriate for her -- for her background." Id. at 180:8-12.  Ultimately, Cooke was detailed to SRC in June 2005 for a period of 120 days.  Def.'s Ex. 18.  In this position, Cooke continued to be paid at the GS-15 level. Id.  For her part, Cooke testified that she "offered to assist with the transition to make it as easy on my staff as possible, that I would work for Jack [Spencer] when he came in to help make him successful," but Osterman detailed her to SRC nonetheless.  Cooke Dep. at 33:2-6.  Cooke also testified that she was given two options "move to the Office of Safety Recommendations and Accomplishments or to retire.  Those were my two options." Id. at 40:6-8.

During Cooke's detail to SRC, Osterman had time to evaluate the needs of the agency, and particularly the Office of Management, wherein he needed a GS-15 level associate managing director for strategic management, or chief planning officer for the agency. See Osterman Dep. at 201:17-202:7.  When Cooke's detail to SRC ended in October 2005, Osterman testified that he offered the associate managing director position to Cooke and told her "that [he] wouldn't make her do it, she had the option of saying no, but that [he] thought that her planning and presentation, especially strategic planning skills, were good. . . . [and] she would be quite good

for the position." Id. at 202:8-17.  Cooke considered the offer, but declined the associate

managing director position.  See id. at 202:18-20.  Osterman testified that after Cooke declined

the position he informed her "that we would put her in a program management position, program

analyst position [within the Office of Management] until such time that we could determine what

other positions became available at the 15 level."  Id. at 203:7-11.  Cooke was reassigned to a

program analyst position within the Office of Management on October 16, 2005.  Def.'s Ex. 19.

In that position she continued to be paid at the GS-15 level.  Id.  Cooke remained in that position

until July 2006 when she retired from the NTSB.  Cooke Dep. at 160:16-20.

Cooke originally filed suit in this Court in April 2006 alleging violations of both the

Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 215(a)(3).  That case was assigned to another judge of this Court.  In October 2006, an

amended complaint was filed containing only the EPA claim, and on Cooke's motion the case

was then transferred to the United States Court of Federal Claims.  Within weeks, in November

2006, Cooke commenced this action by filing a single-count complaint alleging retaliation in

violation of the FLSA.  An amended complaint followed in 2007 and after full discovery the

NTSB filed the instant motion for summary judgment.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.  Retaliation Under the FLSA and the McDonnell Douglas Framework

The FLSA's anti-retaliation provision states that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).  Hence, in order to establish a prima facie case of retaliation under the FLSA, a plaintiff must demonstrate (1) that the employer was aware that plaintiff was engaged in statutorily protected activity, (2) that the

employer took adverse action against the plaintiff, and (3) that there was a causal relationship between the two.  Hicks v. Ass'n of Amer. Med. Colleges, 503 F. Supp. 2d 48, 51 (D.D.C. 2007); Caryk v. Coupe, 663 F. Supp. 1243, 1253 (D.D.C. 1987).  When appropriate, courts look to Title VII cases in interpreting the FLSA.  See Darveau v. Detecon, Inc., 515 F.3d 334, 342 (4th Cir. 2008); Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 305-07 (4th Cir. 2004); Nichols v. Hurley, 921 F.2d 1101, 1103-10 (10th Cir. 1990).  Because the elements of a prima facie case of retaliation are essentially identical under the FLSA and Title VII, the Court finds that Title VII case law is instructive here.  The Court will, however, be mindful "to respect any differences in language and purpose between Title VII and the FLSA."  Darveau, 515 F.3d at 342.

The framework for establishing a prima facie case of retaliation for Title VII claims follows McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence.  Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of retaliation, a plaintiff must demonstrate:  "(1) that she engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)).  Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination.  See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v.

Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.  The employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Id.

Where assessment of the employer's legitimate, nondiscriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. Dist. of Columbia, 298 F.3d 989, 992-993 (D.C.

Cir. 2002).

In other words, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole remaining issue is retaliation vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful retaliation), and any properly considered evidence supporting the employer's case. Reeves, 530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

**DISCUSSION**

**I.    Protected Activity**

The Court must first address the threshold question whether Cooke engaged in statutorily protected activity. Under the FLSA, an individual engages in statutorily protected activity when he or she "has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Here, Cooke engaged in several activities purported to be statutorily protected -- all of which concern whether Cooke "filed any complaint" regarding unequal pay and sexual discrimination.

There is some disagreement among the circuits whether an informal or internal complaint constitutes "any complaint" within the meaning of section 215(a)(3).  The Courts of Appeals for the First, Third, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have concluded that an informal complaint to an employer can constitute protected activity for purposes of the FLSA. See Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 44 (1st Cir. 1999) ("[T]he FLSA's anti-retaliation provision will protect an employee who has filed a sufficient complaint with an employer."); Lambert v. Ackerly, 180 F.3d 997, 1004 (9th Cir. 1999) ("[W]e conclude that 'any complaint' related to the FLSA includes complaints made to employers."); EEOC v. Romeo Cmty. Sch., 976 F.2d 985, 989-90 (6th Cir. 1992) (telling an employer it may be "breaking some sort of law" is protected activity); EEOC v. White & Son Enters., 881 F.2d 1006, 1011 (11th Cir. 1989) ("[T]he unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the statute."); Brock v. Richardson, 812 F.2d 121, 125 (3d Cir. 1987) (finding that an employee is statutorily protected even no when formal complaint was filed, but employer mistakenly believes such a complaint was filed); Love RE/MAX of Am., Inc., 738 F.2d 383, 387 (10th Cir. 1984) ("The Act also applies to the unofficial assertion of rights through complaints at work."); Brennan v. Maxey's Yamaha, Inc., 513 F.2d 179, 180 (8th Cir. 1975) ("The Act prohibits discrimination against an employee who asserts or threatens to assert his or her FLSA rights.").  On the other hand, the Second and Fourth Circuits have ruled that an informal complaint to an employer is not protected activity under the FLSA.  See Ball v. Memphis Bar-B-Q Co., 228 F.3d 360, 364 (4th Cir. 2000) (finding that an "intra-company complaint" is not a protected activity within the plain language of section 215(a)(3)); Lambert v. Genesee Hosp., 10 F.3d 46, 55 (2d Cir. 1993) ("The plain language of

[section 215(a)(3)] limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor.").

Although the D.C. Circuit has not addressed this issue, three judges of this Court have spoken, and they too have reached conflicting conclusions. Compare Haile-Iyanu v. Central Parking Sys. of Va., Inc., 2007 WL 1954325, at *3 (D.D.C. 2007) (Sullivan, J.) ("[T]his Court . . . holds that the anti-retaliation provision of the FLSA, § 215(a)(3), protects informal complaints."), with Mansfield v. Billington, 432 F. Supp. 2d 64, 75 (D.D.C. 2006) (Urbina, J.) ("The court concludes that by its terms, [section 215(a)(3)] does not protect the plaintiff's [informal complaint] to her employer."), and Rodriguez v. Puerto Rico Fed. Affairs Admin., 338 F. Supp. 2d 125, 130-31 (D.D.C. 2004) (Robertson, J.) (stating in dicta that the narrower construction applied by the Second and Fourth Circuits is more consistent with the statutory language); see also Hicks, 503 F. Supp. 2d at 52 (Huvelle, J.) (stating that the "Court need not choose sides" because even under the broad interpretation of section 215(a)(3), plaintiff's claim fails).

Ultimately, the Court need not get bogged down in this conflict because under either interpretation of section 215(a)(3) -- broad or narrow -- Cooke engaged in statutorily protected activity when she filed a formal EEO complaint on April 16, 2005. See Def.'s Ex. 1. Cooke asserts, however, that she took two discrete actions prior to the filing of her formal EEO complaint that also constitute protected activity. The first was an April 2004 meeting with the NTSB's then-Chairman Ellen Engleman Conners at which Cooke "informed Conners that [she] was the only Director of the four modal investigation offices without SES status and that as a

result she made substantially less money than all three of her male counterparts – and she requested equal pay."  Pl.'s Opp'n at 4.  The second was, according to Cooke, the initiation of her EEO complaint through a meeting with an EEO counselor in or about February 7, 2005.  Id. at 13-14.

Even under the broad interpretation of section 215(a)(3), this Court has observed that "'not all amorphous expressions of discontent related to wages and hours constitute complaints filed within the meaning of § 215(a)(3).'"  Hicks, 503 F. Supp. 2d at 52 (quoting Ackerly, 180 F.3d at 1007).  Rather, "'it is the assertion of statutory rights (i.e., the advocacy of rights) by taking some action adverse to the company . . . that is the hallmark of protected activity under § 215(a)(3).'"  Id. (quoting McKenzie v. Renberg's, Inc., 94 F.3d 1478, 1486 (10th Cir. 1996)) (emphasis in original).  Moreover, "'[i]n order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.'"  Id. at 52-53 (quoting McKenzie, 94 F.3d at 1486-87).

Assuming arguendo, then, that the broad interpretation of section 215(a)(3) applies, as Cooke argues that it should, see Pl.'s Opp'n at 10-12, Cooke's meeting with the EEO counselor on or about February 7, 2005 constitutes a protected activity because it represents a threat "to file[ ] an action adverse to [her] employer . . . [and an] activit[y] that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA."  Hicks, 503 F. Supp. 2d at 52-53.  However, based on the record and despite drawing all inferences in favor of

the non-movant Cooke, even under the broad interpretation of section 215(a)(3) Cooke did not

engage in statutorily protected activity when she met with Conners in April 2004.  Cooke

testified that during her meeting with Conners, "[Cooke] discussed the fact that [she] was not

being paid the same as [her] male counterparts."  Cooke Dep. at 48:16-17.  Cooke further argues

that she "informed Conners that [she] was the only Director of the four modal investigation

offices without SES status and that as a result she made substantially less money than all three of

her male counterparts – and she requested equal pay."  Pl.'s Opp'n at 4.  Conners testified that she

recalled that Cooke "stated that she wasn't an SES, her office wasn't an SES, and she didn't make

as much money as the folks who had an SES."  Conners Dep. at 53:20-22.

It is clear that when Cooke met with Conners, Cooke was unhappy with her

compensation relative to her male counterparts.  Equally clear, however, is the fact that Cooke

attributed this disparity in compensation to her lack of SES status -- she told Conners that she

was the only director who did not have SES status, that she made less than her male

counterparts, and that she wanted equal pay.  See Pl.'s Opp'n at 4.  In Hicks, the Court observed

that "[t]he common thread linking all these [informal complaint] cases is that the employees

undertook to raise their rights under the statute and to complain about the employer's practices."

503 F. Supp. 2d at 54.  But Cooke did not endeavor to "raise her rights under the statute" when

she met with Conners in April 2004.  There is no evidence that Cooke mentioned the FLSA, the

EPA, discrimination, or any other topic that could reasonably be perceived -- by Conners or

anyone else -- as an attempt or threat to invoke her statutory rights.  Cooke's meeting with

Conners was an "amorphous expression[ ] of discontent related to [her] wages," Ackerly, 180

F.3d at 1007 -- an act that does not, under these circumstances, amount to "filing any complaint"

within the meaning of section 215(a)(3).  Hence, Cooke did not engage in protected activity

when she met with Conners in April 2004.[4]

## II.    The NTSB's Proffered Legitimate, Non-Discriminatory Reasons for Its Actions and Cooke's Evidence of Retaliation

At the earliest, then, even under a broad interpretation of section 215(a)(3), Cooke first

engaged in statutorily protected activity on February 7, 2005 when she met with an EEO

counselor; hence, no event that preceded that date can constitute an adverse action for the

purposes of Cooke's prima facie case of retaliation.[5]  See Hill v. Kempthorne, 577 F. Supp. 2d

58, 66 (D.D.C. 2008) (alleged adverse action that occurred two months prior to protected activity

"cannot in any sense constitute reprisal for the protected activity").  In the retaliation context, the

Supreme Court has indicated that an employer's adverse action need not take any specific form

to be actionable; instead, it must be the sort of action that is "materially adverse, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination."  White, 548 U.S. at 68 (quoting Rochon, 438 F.3d at 1219) (internal

quotation marks omitted).  Cooke has alleged five discrete adverse actions:  (1) the second rating

panel's decision, on March 4, 2005, not to rank Cooke as one of the five best qualified candidates

---

[4] For the reasons set forth in footnote 9, infra, even if the Court had determined that the April 2004 meeting constituted protected activity, the outcome -- summary judgment in favor of the NTSB -- would be the same.

[5] Cooke alleges one such event -- the January 2005 re-advertisement of the SES Director of OMS position "even though Ms. Murtagh Cooke applied for and was deemed qualified for the position" by the first rating panel.  Pl.'s Opp'n at 15.  Of course, evidence related to this event will be considered as part of the Court's central inquiry "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis."  Adeyemi, 525 F.3d at 1226.

for the SES Director of OMS position; (2) the third rating panel's decision, on March 28, 2005, not to rank Cooke as one of the five best qualified candidates; (3) Cooke's non-selection for the SES Director of OMS position in April 2005; (4) Cooke's detail to SRC in June 2005 to work as a planning manager; and (5) Cooke's reassignment to the Office of Management in October 2005 to work as a program analyst. See Pl.'s Opp'n at 15. For purposes of this motion only, the Court will assume that each of these actions was "materially adverse" to Cooke.

Nonetheless, the NTSB has met its burden of production by proffering a legitimate, non-discriminatory reason for each of its actions. See Burdine, 450 U.S. at 254-55. Thus, in line with the D.C. Circuit's "streamlined approach" to the McDonnell Douglas framework, the Court will not engage in a prolonged evaluation of the sufficiency of Cooke's prima facie case. See Adeyemi, 525 F.3d at 1226; Brady, 520 F.3d at 494. Instead, the Court will move directly from its assessment of the NTSB's proffered legitimate, non-discriminatory reasons for its actions to the central question "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis." Adeyemi, 525 F.3d at 1226.

**A.     The 2005 Rating Panels and Non-Selection for SES Director of OMS**

**1.     The NTSB's Proffered Legitimate, Non-Discriminatory Reason for Its Actions**

Because the NTSB has proffered the same legitimate, non-discriminatory reason for all of its actions relating to Cooke's non-selection -- she was not the best qualified candidate for the position -- the Court will analyze them together. Initially, however, the Court will consider, briefly, the specifics of Cooke's allegations.

Cooke first alleges that on March 4, 2005 "the [second] NTSB review panel reversed itself and deemed [her] unqualified, even though just a few months prior she was deemed qualified." Pl.'s Opp'n at 15. Likewise, she alleges that on March 28, 2005 "a third NTSB review panel again deemed [her] unqualified, even though just a few months prior she was deemed qualified." Id. Lastly, Cooke alleges that in April 2005 "the NTSB refused to award the SES promotion to [her] and instead awarded the position to Spencer, who had previously been deemed unqualified for the position." Id. Essentially, Cooke contends that because she engaged in protected activity in February 2005 -- several months after the first rating panel ranked her as one of the five best qualified candidates but a few weeks before the second rating panel made its assessments -- her ranking vis-á-vis the other candidates (i.e., outside the top five) and, ultimately, her non-selection were retaliatory.

The NTSB's explanation for Cooke's non-selection paints a different picture. In January 2005, the NTSB re-advertised the SES level OMS Director position. Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 25; see also Def.'s Ex. 24. Cooke and nineteen other individuals applied for the position. Def.'s Mem. at 25; see also Def.'s Ex. 25. Collette Magwood of the NTSB's Human Resources Division then reviewed the applications and concluded that fifteen applicants, including Cooke, met the minimum qualifications for the position. Def.'s Mem. at 26; see also Carroll Decl. ¶ 24. These applications were referred to a new five-person rating panel appointed by Campbell. This second rating panel was composed of two individuals from the original panel -- Elaine Weinstein, Director of SRC,[6] and Bob

---

[6] According to Weinstein, the name of her division changed several times since 2000, and it has also been referred to as the Office of Safety Recommendations and Accomplishments and the Office of Safety Recommendations and Advocacy. See Decl. of Elaine Weinstein

Chipkevich, Director of ORPH -- and three new members -- John Clark, Director of OAS, Dr.
Vernon Ellingstad, Director of the Office of Research and Engineering, and Joe Osterman,
Director of OHS.  Def.'s Ex. 25.  All of the members of the second rating panel were "SES office
directors involved in accident investigation or accident investigation support."  Def.'s Mem. at
26; see also Campbell Dep. at 120:5-15.  As with the first rating panel in 2004, "this second
panel rated and ranked the 15 applicants who Ms. Magwood determined were minimally
qualified using a rating schedule."  Id.; see also Ex. 26.  "After completing their review, the
second panel identified [the] five best qualified candidates and referred them to Mr. Campbell to
be considered for selection.  This panel determined that Ms. Cooke did not rank in the top five
candidates."  Def.'s Mem. at 26 (citations omitted); see also Def.'s Ex. 25.

No action was ever taken on the second panel's recommendations because Campbell was
in the midst of changing positions -- from Managing Director to Executive Director -- and would
no longer play any role in the selection of the new SES Director of OMS.  See Campbell Dep. at
183:9-20; Osterman Dep. at 134:4-13.  In March 2005, Joe Osterman replaced Campbell as
Managing Director and, accordingly, Osterman became the selecting official for the SES
Director of OMS position.  Def.'s Mem. at 26.  Because Osterman had been a member of the
second rating panel, he reconstituted the panel -- adding Tom Haueter, his replacement as
Director of OHS -- and directed the panel to reevaluate all of the candidates.  See Osterman Dep.
at 134:9-13, 19-21; Def.'s Ex. 25.  Once again, the third rating panel evaluated the candidates
according to the criteria set forth in the "Rating and Evaluation Plan."  Def.'s Ex. 26.  Osterman,
as the selecting official, then "received a list of five best qualified candidates from the

("Weinstein Decl.") ¶ 1, n.1.

reconstituted panel on March 28, 2005, and [Cooke] was not on the list." Def.'s Mem. at 27; <u>see also</u> Ex. 25. Osterman testified that the third rating panel ranked Cooke as the seventh best qualified candidate for the position, <u>see</u> Osterman Dep. at 137:15-22, and although he did not rule out interviewing her for the position, he "decided to interview only the top five candidates, as had been the usual procedure, because he thought that it would be improper to interview anyone, the incumbent of the position or otherwise, if that person were not ranked by the panel in the top five." Def.'s Mem. at 27; <u>see also</u> Osterman Dep. at 105:5-108:9, 139:21-140:15, 154:1-11. After the top five candidates were interviewed, John Spencer was selected for the position of the SES Director of OMS, and he was appointed to the position in August 2005. <u>See</u> Def.'s Ex. 17; Carroll Decl. ¶ 25.

### 2. Cooke's Evidence of Retaliation

The NTSB has met its burden of production with respect to a legitimate, non-discriminatory reason for its actions. <u>See</u> <u>Burdine</u>, 450 U.S. at 254-55. Hence, the Court next turns to the central inquiry: "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis." <u>Adeyemi</u>, 525 F.3d at 1226. Because "the strength of the plaintiff's prima facie case" is relevant to this inquiry, <u>see</u> <u>Reeves</u>, 530 U.S. at 148-49, the Court will first assess whether there is any evidence of a "causal relationship" between Cooke's protected activity and her non-selection as the SES Director of OMS, <u>see</u> <u>Hicks</u>, 503 F. Supp. 2d at 51.

"A plaintiff may demonstrate the requisite causal relationship by showing that her employer had knowledge of her protected activity and that the adverse action took place shortly

thereafter."  Mills v. Winter, 540 F. Supp. 2d 178, 188 (D.D.C. 2008) (citing Holcomb v. Powell,

433 F.3d 889, 903 (D.C. Cir. 2006)).  "[I]f the only circumstantial evidence of causation is

temporal proximity between the protected activity and the alleged retaliatory action, then those

events must be very close in time for that evidence to be sufficient for a jury to infer a retaliatory

motivation."  Pardo-Kronemann v. Jackson, 541 F. Supp. 2d 210, 218 (D.D.C. 2008).  Because

Cooke arguably engaged in protected activity in February 2005, the second and third rating

panels evaluated the candidates in March 2005, and the selection of Spencer (i.e., Cooke's non-

selection) came in April 2005, the temporal proximity of these events is clear.[7]  There is,

however, scarce evidence in the record to establish that Osterman or any of the members of the

rating panels "had knowledge of [Cooke's] protected activity."  Mills, 540 F. Supp. 2d at 188.

Cooke testified that once Osterman took over as Managing Director, "[he] was aware that

[she] was involved in an equal pay complaint."  Cooke. Dep. at 33:18-19.  Cooke's statement

regarding Osterman's knowledge of her protected activity is conclusory and is unaccompanied by

any corroborative details regarding how she obtained such information.  See Greene v. Dalton,

164 F.3d 671, 675 (D.C. Cir. 1999) ("Although, as a rule, statements made by the party opposing

a motion for summary judgment must be accepted as true for the purpose of ruling on that

motion, some statements are so conclusory as to come within an exception to that rule.");  Brown

v. Small, 2007 WL 158719, at *3 (D.D.C. 2007) ("[T]he nonmoving party may not rely solely on

allegations or conclusory statements" to withstand summary judgment.).  By contrast, Osterman

testified that at the time he met with Cooke -- following Spencer's selection -- he does not

---

[7] Cooke's subsequent undisputed protected activity of filing a formal EEO complaint on
April 16, 2005 occurred after the selection of Spencer (and Cooke's non-selection).

believe that he "was aware of [Cooke's] EEO Complaint." Osterman Dep. at 150:12-20. He also testified that he "was aware that [Cooke] had met with Chairman Engleman Conners, but I don't think I was aware of the EEO complaint." Id. at 150:18-20. If Cooke believed that Osterman "was aware that [she] was involved in an equal pay complaint" based on his knowledge of her April 2004 meeting with Conners, then such knowledge cannot support an inference of causation here as the Court has already found that the April 2004 meeting was not protected activity. Ultimately, however, because the Court must draw all inferences in favor of the non-moving party, the Court will draw an inference of causation in favor of Cooke -- albeit a weak one -- based on her conclusory testimony that Osterman had knowledge of her protected activity.

Beyond Cooke's own statement, however, the NTSB claims that there is no further evidence from which a causal relationship may be properly inferred. The NTSB asserts that "no evidence suggests that any of the panel members knew, at the time they evaluated Plaintiff's application, that she had filed a complaint or contacted the EEO office to engage in the informal complaint process." Def.'s Reply at 15. Indeed, Osterman testified that he does not "believe any of the panel members knew that there was an EEO claim or filing of any type. EEO filings are private. Our EEO director does not advertise that information." Osterman Dep. at 116:12-15. Although Cooke does not squarely address this issue in her brief, a review of the record reveals that there is no evidence at all -- by way of deposition testimony or otherwise -- to suggest that any of the members of the second or third rating panels had knowledge that Cooke had initiated the EEO process in February 2005.

Although the inference of causation is weakened due to the paucity of evidence regarding the NTSB's knowledge of Cooke's EEO activity, Cooke also claims that the record contains

"direct evidence of animus," which would obviate the need to rely on circumstantial evidence to demonstrate causation.  Pl.'s Opp'n at 17-18.  Cooke cites four items that purport to demonstrate retaliatory animus.  These items are statements or actions attributed to Ellen Engleman Conners and Dan Campbell -- two individuals who had minor roles in the work of the rating panels and the selection of the SES Director of OMS.[8]  Even when drawing all inferences in favor of a non-movant plaintiff, evidence that an individual harbored animus toward the plaintiff, but played no role in the alleged retaliation, does little to further plaintiff's case.  See Pardo-Kronemann, 541 F. Supp. 2d at 221.  Moreover, the events cited by Cooke all occurred prior to the commencement of her protected activity in February 2005.  This fact undermines any suggestion that the purported animus is direct evidence of a causal relationship between Cooke's protected activity and her non-selection -- one cannot engage in a retaliatory act if there is not yet any legally cognizable basis for reprisal.  See Hill, 577 F. Supp. 2d at 66.  Nonetheless, the Court will analyze these examples because any evidence probative of animus is still relevant to the broader inquiry.

First, Cooke asserts that Conners's characterization of Cooke's April 2004 complaint for equal pay as akin to "a small child . . . upset that you didn't buy them the toy" is evidence of animus.  See Pl.'s Opp'n at 18; Conners Dep. at 58:13-14.  Although there is no dispute that Conners made the statement during her deposition, the NTSB argues that "[w]hen placed in

---

[8] Campbell constituted the second rating panel, but after Osterman took over as Managing Director, Campbell had no involvement in constituting the third rating panel or in the ultimate selection of Spencer.  See Campbell Dep. at 183:9-20; Osterman Dep. at 134:4-13. Conners, as Chairman and Chief Executive of the agency, had ultimate authority to make the SES Director selection, see Conners Aff. at 2; Campbell Dep. 183:12-17, but there is no evidence in the record to suggest that she played any role in the process prior to approving the candidate recommended by Osterman.

context, this comment cannot be viewed as direct evidence of retaliatory animus."  Def.'s Reply at 8-9.  Just prior to making this statement, Conners testified that Cooke's request struck her as "bizarre" and "out of the blue" because "[t]here was no justification, no rationale, no 'I've been working 60 hours a week and here are my hours,' or anything."  Conners Dep. at 57:3-22. Instead, Conners said that Cooke told her "'I'm here.  I'm not an SES so you need to fix that by paying me overtime.'"  Id. at 57:4-5.  Conners added that "there was nothing else behind" the request, and that she "didn't understand it."  Id. at 57:20, 58:17-18.  Finally, Conners testified that she "didn't judge [Cooke's request] one way or another other than its uniqueness in the request. When I say bizarre, I'm not saying negative, I'm saying unusual, different, something I hadn't experienced and I didn't completely understand.  And normally, when -- my experience has been if someone comes and says I want a raise or I want a new job or this or that, they kind of lay out their case.  They pitch it to you.  Not a declaratory sentence.  So it was a unique -- it was just unique."  Id. at 59:21-60:8.  The NTSB contends that "when put into context one can see that the comment reflected [Conners's] confusion regarding the situation, not animus toward Plaintiff."  Def.'s Reply at 9.  Even drawing all inferences in favor of Cooke, the Court agrees with the NTSB and finds that when considered in context with the rest of her deposition testimony, Conners's statement is not indicative of retaliatory animus.

Second, Cooke alleges that following their April 2004 meeting, "Conners then refused, despite receiving several requests, to meet with [her] again regarding her unequal pay and conducted no follow up to [her] complaint."  Pl.'s Opp'n at 18.  In response, the NTSB argues that Cooke "mischaracterizes Ms. Engleman Conners' testimony in order to create a non-existent animus toward Plaintiff."  Def. Reply at 9.  Cooke complains that Conners refused to meet with

her throughout 2004 and early 2005.  The record contains two January 2005 emails -- one from

Cooke to Conners and one from Cooke to Conners's assistant -- with requests to set up a

meeting.  Pl.'s Exs. 7, 25.  Neither email contains any reference to unequal pay.  In her affidavit,

Conners stated that during this period she "was genuinely busy and did not have the time to meet

with [Cooke]."  Pl.'s Ex. 1, F4 at 4.  Conners also testified that when she "was in the building,

[she] was always accessible, so [she] never really worried that much because people usually

didn't try to have formal meetings with me because they would just grab me in the hall.  That's

usually when [she] had most of [her] discussions with folks."  Conners Dep. at 73:17-22.

Further, Conners explained that she was not concerned about scheduling a formal meeting with

Cooke

> because I saw Marjorie. I never -- I would see Marjorie.  If it was such an urgent
> matter, there were many times when she could have said, "Hey, Ellen," or stay
> after a meeting, or approach me in the hallway, or in the ladies' room, or any
> number of times when we would share the same room or something like that.  I
> had a very informal opportunity.  People would come to my doorway, walk right
> in, "Hey, Chairman. Can we chat?"  "Sure."  There was so -- this was just
> standard.  [Cooke] was -- she sent in an e-mail, that's fine.  But she could have
> just come right through the front door, that would have been fine, too.

Id. at 155:9-22.  Later in 2004, once Conners knew "the SES slot for the OMS Director job was

being processed, [she] felt it was not appropriate to meet."  Pl.'s Ex. 1, F4 at 4.  In light of the

foregoing, the NTSB asserts that although Conners and Cooke did not meet to follow up on their

April 2004 meeting, "the circumstances in their greater context do not reflect retaliatory animus

on the part of Ms. Engleman Conners toward Plaintiff."  Def.'s Reply at 10.  The Court agrees

and concludes that from this evidence a jury could not draw a legitimate inference that Conners

was personally hostile toward Cooke.

Third, Cooke asserts that Conners and Campbell gave conflicting testimony regarding

whether they had a conversation about Cooke's request for increased pay or overtime.  See Pl.'s Opp'n at 18.  Cooke claims that "[t]his inconsistent testimony from the two top officials at NTSB is sufficient to defeat Defendant's motion for summary judgment [because] someone is not telling the truth about a material fact."[9]  Id. at 18 n.5.  Again, the NTSB responds that Cooke's allegation is grounded in a mischaracterization of the testimony.  Def.'s Reply at 10.  Although Conners testified that she spoke to Campbell about Cooke's April 2004 request for overtime pay, Conners Dep. at 66:2-68:9, 75:16-76:16, Campbell testified that he did not "have recollection of a conversation with [Conners] about [Cooke's] inadequate compensation," Campbell Dep. at 104:3-5.  The NTSB argues that Campbell's uncertain "memory regarding a particular fact cannot be attributed to an animus toward Plaintiff."  Def.'s Reply at 10.  Under these circumstances, the Court agrees that Campbell's failure to recollect a specific fact does not, without more, demonstrate that he harbored animus toward Cooke.

Finally, Cooke claims that there is direct evidence of animus because "Campbell himself testified that his sole motivation for re-advertising the SES position [in January 2005] was to

---

[9] The NTSB argues, convincingly, that even if there is an issue of fact regarding whether the conversation between Conners and Campbell occurred, such an issue of fact would be immaterial and would not preclude summary judgment.  See Def.'s Reply at 8 n.14.  Under these circumstances, the fact of that conversation, which allegedly took place almost a year prior to Cooke's first protected activity in February 2005, does not bear upon the issue of causation. Moreover, even assuming arguendo that the Court had ruled in Cooke's favor that her April 2004 meeting with Conners was a protected activity, and assuming also that Campbell did have a conversation with Conners about Cooke's pay in or about April 2004, the first adverse action alleged by Cooke occurred in January 2005.  This gap of eight months is too attenuated to demonstrate a causal relationship between the two events.  See Kwon v. Billington, 370 F. Supp. 2d 177, 187 (D.D.C. 2005) (citing Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995) ("[C]ourts generally hold that if at least four months pass after the protected activity without employer reprisal, no inference of causation is created.")); Buggs v. Powell, 293 F. Supp. 2d 135, 149 (D.D.C. 2003) (seven-month delay is insufficient by itself to create an inference of causation).

ensure that Ms. Murtagh Cooke would not receive the appointment!"  Pl.'s Opp'n at 18.  Once

again, the NTSB attacks Cooke's allegation as "a gross mischaracterization of the testimony."

Def.'s Reply at 11.  An objective assessment of the testimony reveals that the NTSB is correct --

Cooke has mischaracterized Campbell's testimony to create an appearance of animus.

Campbell made a number of statements regarding why he chose to re-advertise the SES

Director of OMS position, rather than select from among the five candidates referred to him by

the first rating panel in December 2004.  He testified that he made the decision to re-advertise

the position because he was unhappy with the quality of the top five candidates.  See Campbell

Dep. at 96:7-97:18.  Moreover, he believed that "the pool of candidates had been artificially

narrowed by [a] rumor that the first announcement had been wired for [the incumbent, Cooke]."

Id. at 93:15-94:1.  He testified that the individual he regarded as the best candidate -- Joseph

Brusseau, formerly a Director of Field Activities for Marine Safety, Security and Environment

Protection in the United States Coast Guard, see Def.'s Ex. 22 -- informed Campbell "that he was

now employed by Johns Hopkins and was no longer a candidate."  Id. at 94:20-22.  Campbell

added that Cooke "would not probably have been selected," id. at 98:1, because "to pay

somebody at the SES level to do something that they don't -- they are not necessarily doing to

your satisfaction at the GS-15 level is not -- just not sensible," id. at 98:22-99:4.  Hence,

according to Campbell, he was faced with the undesirable prospect of selecting a candidate --

from the remaining pool of four -- who he viewed as flawed and, in the process, he was likely to

displace the incumbent Director, Cooke.  See id. at 96:13-98:6.  Instead of making a selection,

then, Campbell cancelled the position announcement and elected to re-advertise in January 2005.

Cooke's contention that Campbell testified "that his sole motivation for re-advertising the SES

position was to ensure that Ms. Murtagh Cooke would not receive the appointment" is not an accurate or permissible reading of the testimony.  Campbell testified that, in his view, the best decision for the NTSB at that time was to re-advertise, rather than make a selection, in the hope of attracting a better applicant pool.  Again, even drawing all inferences in favor of Cooke, Campbell's testimony is not indicative of retaliatory animus.

Cooke also contends that Campbell's testimony regarding the decision to re-advertise is evidence of pretext.  Cooke cites four pieces of evidence that purport to demonstrate pretext:  (1) Campbell's "admission" that he re-advertised solely to prevent Cooke from getting the position; (2) his "admission" that "he 'procrastinated' intentionally because, if he told Conners that he was going to appoint [Cooke], Conners would say 'Dan, have you lost your mind'"; (3) "Campbell broke protocol by his repeated re-advertising of the position notwithstanding having five qualified candidates"; and (4) Campbell has had at least one other gender discrimination complaint filed against him.  Pl.'s Opp'n at 20.  Three of these "examples" of pretext can be disposed of in short order.  For the same reasons the Court concluded that Campbell's testimony regarding the decision to re-advertise was not evidence of retaliatory animus, it also is not evidence of pretext.  And with respect to Cooke's allegation that Campbell broke protocol "by his repeated re-advertising of the position," the NTSB asserts, correctly, that the allegation is inaccurate because Campbell only re-advertised once, not repeatedly.  Def.'s Reply at 13 n.18. Moreover, there is no citation to the specific "protocol" Campbell is accused of breaking, and Cooke's contention is unsupported by the record.  Finally, Cooke's assertion that there was a past

complaint of discrimination filed against Campbell also has no support in the record.[10]

As to the last purported example of pretext -- the "lost your mind" statement -- this too, much like Conners's "small child" comment, is not probative of pretext when examined in the context of the relevant testimony.  Campbell testified that "[i]f [he] had made a suggestion that [Cooke] ought to be the office director during the period of time that the Barberi[11] was in play -- that's the accident that -- that I have now been asked to undertake by the chairman -- I believe the chairman would have looked at me and said, 'Dan, have you lost your mind.'" Campbell Dep. at 98:12-18.  As discussed above, Campbell also testified that Cooke "would not probably have been selected," id. at 98:1, had he recommended her to Conners because "to pay somebody at the SES level to do something that they don't -- they are not necessarily doing to your satisfaction at the GS-15 level is not -- just not sensible," id. at 98:22-99:4.  Thus, the NTSB asserts that Campbell's "lost your mind" comment "reflects his belief that even if he had selected [Cooke] from the first pool of candidates presented to him, that she would not have been appointed for the position" by Chairman Conners, the person with ultimate authority to submit a SES candidate's name to OPM for approval.  Def.'s Reply at 11 n.17.  The Court concurs.  Cooke has, once again, taken a snippet of testimony, ignored the context in which it was made, and mischaracterized it in an attempt to manufacture favorable evidence.  The Court concludes, then,

---

[10] Cooke cites to Exhibit 33 to support her allegation, but no such exhibit was filed with her brief.  The Court notes that because of the complete absence of evidence to demonstrate pretext, even if Cooke had properly supported this allegation, it alone would be insufficient to alter the Court's analysis or the ultimate outcome here.

[11] The Andrew J. Barberi is the name of the Staten Island ferry that crashed into a pier killing ten of its passengers and injuring numerous others on October 15, 2003.  See Janny Scott & William K. Rashbaum, The Ferry Crash: Overview; 10 Die as Staten Island Ferry Slams Into Pier, N.Y. Times, Oct. 16, 2003, at A1.

that Campbell's "lost your mind" testimony is not probative of pretext.

Cooke also contends that the circumstances surrounding Spencer's selection as the SES Director of OMS -- specifically, Osterman's knowledge of the first rating panel's recommendations -- is evidence of pretext.  See Pl.'s Opp'n at 21.  Cooke points to Spencer's selection as evidence of retaliation for five reasons:  (1) "Cooke was first deemed qualified [by the first rating panel in 2004], and then was deemed unqualified without explanation"; (2) Osterman knew that Cooke was first deemed qualified; (3) Osterman "knew of her repeated complaints and requests for equal pay"; (4) "Osterman knew that Spencer was first deemed unqualified, and then was deemed qualified, while [Cooke] suffered the reverse fate"; and (5) Cooke "had much more sea going experience and much more overall experience and qualifications then [sic] Mr. Spencer."  Id.

With respect to Cooke's contention that Osterman "knew of her repeated complaints and requests for equal pay," the Court has already addressed this issue in assessing whether there is evidence of a causal relationship between Cooke's protected EEO activity and the alleged adverse actions relating to Cooke's non-selection as SES Director of OMS.  It bears repeating simply that the only evidence that Osterman had any knowledge of Cooke's EEO activity prior to Cooke's non-selection is Cooke's conclusory, uncorroborated assertion that Osterman "was aware that [Cooke] was involved in an equal pay complaint."  Cooke. Dep. at 33:18-19.  As to Cooke's other allegations, the NTSB asserts that they are rooted in "gross misstatements of fact."  Def.'s Reply at 13.  In response to the purported evidence of pretext relating to Cooke's diminished standing from the first rating panel to the second and third rating panels, the NTSB contends that Cooke "misconstrues the hiring process and documents," that there is a legitimate explanation

-35-

for any changes in applicant ratings between the 2004 rating panel and the 2005 ratings panels, and that Cooke is relying on "mere speculation" to argue that the NTSB's explanation is pretext. Id. at 14-15.

To begin with, the NTSB "does not dispute that Plaintiff was found to be qualified for the SES Director of OMS position by both rating panels." Id. at 14. The first rating panel in 2004 also found Cooke to be "highly qualified" -- i.e., among the five best qualified candidates. Def.'s Ex. 22. However, the third rating panel in March 2005, which was comprised of different members and considered a larger pool of "qualified" applicants, "did not find Plaintiff to be highly qualified [i.e., a top five candidate], but found other applicants to be so." Def.'s Reply at 14 (emphasis in original); see also Def.'s Ex. 25. These were the applicants that were interviewed, and the applicants from which the new SES Director, Spencer, was ultimately selected.

With regard to Spencer's ratings, the NTSB points out, correctly, that "it was HR, and not any accused rating panelist, that placed Dr. Spencer's 2004 application in the 'not qualified' category." Def.'s Reply at 15; see also Magwood Dep. at 52:19-53:6. When Spencer reapplied in early 2005, HR deemed him to be "qualified," as it deemed fourteen others, including Cooke. After evaluation by the third rating panel, Spencer was also deemed to be "highly qualified" (i.e., a top five candidate). Def.'s Ex. 25. The evaluation sheets demonstrate that the pool of "qualified" applicants was larger in 2005 (15) than in 2004 (10). Compare Def.'s Ex. 25 with Def.'s Ex. 22. According to the NTSB the "independent evaluation by each panel is justification for any discrepancy" in the ratings because "[d]ifferent panels can come to different conclusions about the qualifications of the applicants, as the application evaluation process is not an exact

science."  Def.'s Reply at 14-15.  Moreover, because it contends that any discrepancy in the ratings from panel to panel is explainable and legitimate, the NTSB asserts that Cooke is relying on "mere speculation" to argue that the NTSB's explanation is pretext.  See, e.g., Asghar v. Paulson, 580 F. Supp. 2d 30, 37 n.15 (D.D.C. 2008) ("Plaintiff's unsupported, personal speculation about the motivations of [her employer] is, without more, simply not enough to show pretext.");  Brown, 2007 WL 158719, at *6 ("Speculation as to one panel member's hidden motives is insufficient to counter the defendant's explanation that the plaintiff was not the best qualified candidate for the position.").

Similarly, the NTSB argues that Cooke's contentions about her superior experience and qualifications are inaccurate and speculative.  Even if Cooke were correct, "that, without more, would indicate nothing more than the defendant made a faulty hiring decision," Vasilevsky v. Reno, 31 F. Supp. 2d 143, 150 (D.C. Cir. 1998) -- it would not be evidence of pretext or retaliation.  However, this Court has recognized that "[i]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture."  Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 71 (D.D.C. 2006) (quoting Aka, 156 F.3d at 1294).  The evidence demonstrates that no such legitimate inference can be drawn here.  Spencer's educational background was superior to Cooke's because he possessed both a relevant Master's degree and doctorate, which Cooke did not.  Compare Pl.'s Ex. 22 with Cooke Dep. at 5:5-15 and Def.'s Ex. 16.  Further, the third rating panel rated Spencer as "highly qualified" with regard to all

"Executive Core Qualifications," Pl.'s Ex. 23, while it rated Cooke only "qualified" in those areas, Pl.'s Ex. 21.  Simply put, there is no evidence in the record to suggest that "some other strong consideration, such as discrimination," Kalinoski, 435 F. Supp. 2d at 71, influenced the panel's decision here -- the panel simply concluded that Spencer was one of the best qualified candidates for the position.

Lastly, Cooke argues that summary judgment is precluded because "[a]t a minimum, significant questions of fact exist regarding whether NTSB followed protocol, and whether the SES selection process was tainted with retaliatory motive."  Pl.'s Opp'n at 21.  The Court rejects this argument.  Contrary to Cooke's contention, the record supports the conclusion that the NTSB conducted a thorough, impartial, and OPM-mandated competitive recruitment process in selecting the SES Director of OMS.  Moreover, there is simply no basis in the record for a reasonable jury to infer that the selection process "was tainted with a retaliatory motive."  Hence, there is not a genuine issue of fact sufficient to preclude summary judgment; instead, there is a failure by Cooke to proffer sufficient evidence to withstand summary judgment.  And, of course, by pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  Accordingly, and in light of all the record evidence and Cooke's weak prima facie case of retaliation, the Court concludes that with regard to Cooke's claims relating to the second and third rating panels and her non-selection as SES Director of OMS, Cooke has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis."  Adeyemi, 525 F.3d at 1226.

B.    **Detail to the Office of Safety Recommendations and Communications**

1.    **The NTSB's Proffered Legitimate, Non-Discriminatory Reason for Its Actions**

Cooke alleges that in the wake of her non-selection for the SES Director of OMS position her detail to SRC in June 2005 to work as a planning manager was retaliatory. See Pl.'s Opp'n at 15. The NTSB responds by asserting that it had legitimate, non-discriminatory business reasons for detailing Cooke to SRC and that its decision was in the best interests of the agency.

These reasons, which the Court concludes satisfy the NTSB's burden of production, are as follows. Osterman testified that he met with Cooke in or about May 2005 to inform her that she had not been selected as the SES Director of OMS. See Am. Compl. ¶ 23; Answer ¶ 23. During their meeting, Osterman and Cooke discussed the possibility of creating a new position for Cooke that would potentially allow her to increase her pay. The proposed position was a Senior Leadership position that would operate as an international liaison under the Managing Director. See Osterman Dep. at 145:5-18, 148:17-149:4. Because a new Senior Leadership position of this type would require authorization from OPM, and would need to be filled via a competitive recruitment process, Osterman requested that Cooke prepare a proposal outlining the job responsibilities. See id. at 149:5-150:1. Soon thereafter, Cooke prepared a proposal and shared it with Osterman. See id. at 157:15-158:3. Osterman reviewed the proposal and subsequently met with Acting Chairman Mark Rosenker, Executive Director Dan Campbell, and Chairman Designee Ellen Engleman Conners to discuss the NTSB's need for such a position. See id. at 159:8-163:11. During that meeting, the NTSB's senior leadership agreed that there was not sufficient work to justify the Senior Leadership position as proposed by Cooke. See id. at 160:14-18, 164:5-9.

Once the decision was made not to seek permission from OPM to create a new Senior

Leadership position, Osterman met with Cooke to discuss her options.[12]  See id. at 164:11-14.

Osterman testified that he ultimately offered Cooke a planning manager position in SRC

"because there was an immediate need for a 15-level manager in [that office] for a specific

duration of time."  Id. at 164:18-21.  He stated that he "considered [Cooke] a good planner and

felt that that fit [within SRC] would be good for the agency . . . and also give me the opportunity

to design a more permanent position for [Cooke] outside of the Office of Marine Safety."  Id. at

178:18-179:1.  Osterman also testified that "[a]t the time we had the discussion about her going

to the detail in [SRC], there was not another [GS-15 level] billet open and available to place her

in that was appropriate for her -- for her background."  Id. at 180:8-12.  Ultimately, Cooke was

detailed to SRC in June 2005 at the GS-15 level for a period of 120 days.  Def.'s Ex. 18.

### 2.      Cooke's Evidence of Retaliation

Cooke relies upon the same evidence already discussed at length above to demonstrate

that her detail was retaliatory.  The Court will not repeat that discussion in full here.  The Court

observes, however, that the inference of causation based on temporal proximity is enhanced here

because Cooke's formal EEO complaint was filed on April 16, 2005 and she was detailed to SRC

less than two months later on June 6, 2005.  The NTSB does not dispute that it had knowledge of

her formal EEO complaint, nor does it dispute that Cooke's detail was sufficiently close in time

to create an inference of a causal relationship.

---

[12] There is some disagreement regarding what options were given to Cooke at this time.
Compare Cooke Dep. at 40:6-8 with Osterman Dep. at 165:7-166:18.  However, any issue of fact
is immaterial as Cooke has offered no evidence to demonstrate that the NTSB's proffered
legitimate, non-discriminatory reasons for detailing her were pretextual.

Beyond that, however, the evidence of retaliation is no more persuasive than before. Cooke argues that summary judgment is improper here because "it is not a far stretch at all that a jury <u>could</u> infer that a supervisor who declines to promote his employee after she complains of unequal pay, refuses to allow the employee to remain in her current division and replaces her with someone far less qualified and then transfers the employee against her will to part time positions outsider her career path and with minimal or no managerial or other accountabilities [sic], was indeed retaliating against her."  Pl.'s Opp'n at 22 (emphasis in original).  But Cooke is simply restating her own version of the materially adverse actions that she believes she suffered. The sheer fact that Cooke endured a sequence of events that she perceived to be unfavorable to her does not, without more, make the NTSB's legitimate, non-discriminatory explanation pretextual.  Inferring retaliation on this basis would amount to improper speculation.  <u>See</u> <u>Asghar</u>, 580 F. Supp. 2d at 37 n.15 ("Plaintiff's unsupported, personal speculation about the motivations of [her employer] is, without more, simply not enough to show pretext.").

The Court, then, is unpersuaded that Cooke has carried her burden of producing "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis."  <u>Adeyemi</u>, 525 F.3d at 1226.  Therefore, the Court concludes that summary judgment in favor of the NTSB is appropriate on Cooke's claim of retaliation based on her June 2005 detail to SRC.

**C.      Reassignment to the Office of Management**

Although the NTSB has proffered a legitimate, non-discriminatory reason for its October 2005 decision to reassign Cooke to a program analyst position in the Office of Management,

there is no need to reach the agency's justification because Cooke's prima facie case is deficient

on its face.  Cooke's claim of retaliation based on her reassignment to the Office of Management

fails because there is no evidence of a causal relationship between that action and Cooke's last

protected activity in April 2005.  The Court has already concluded that the record does not

contain any direct evidence of causation.  Hence, Cooke must establish causation through

circumstantial evidence, and "if the only circumstantial evidence of causation is temporal

proximity between the protected activity and the alleged retaliatory action, then those events

must be very close in time for that evidence to be sufficient for a jury to infer a retaliatory

motivation."  Pardo-Kronemann, 541 F. Supp. 2d at 218.  Cooke was reassigned to the program

analyst position in the Office of Management in October 2005.  Def.'s Ex. 19.  She last engaged

in protected activity on April 16, 2005 when she filed her formal EEO complaint.  Def.'s Ex. 1.

This amounts to a six-month gap between Cooke's last protected activity and the alleged

retaliatory act.  The case law supports the conclusion that, as a matter of law, a six-month delay

by itself is insufficient to demonstrate the close temporal proximity necessary to infer a

retaliatory motivation.  See Kwon, 370 F. Supp. 2d at 187 (citing Woods, 889 F. Supp. at 187

("[C]ourts generally hold that if at least four months pass after the protected activity without

employer reprisal, no inference of causation is created.")); Buggs, 293 F. Supp. 2d at 149 (seven-

month delay is insufficient by itself to create an inference of causation).  Consequently, the

Court concludes that, lacking any evidence or inference of causation, Cooke cannot make out a

prima facie case of retaliation for the claim based on her reassignment in October 2005.

      Even if there were sufficient evidence to infer causation, moreover, the NTSB would still

be entitled to summary judgment because, on this record, a reasonable jury could not find that

the NTSB's asserted non-discriminatory reason was pretextual and that the NTSB instead

intentionally retaliated against Cooke.  See Adeyemi, 525 F.3d at 1226.  Osterman testified that

during Cooke's detail to SRC he had time to evaluate the needs of the agency, and particularly

the Office of Management, where he needed a GS-15 associate managing director for strategic

management, or chief planning officer for the agency.  See Osterman Dep. at 201:17-202:7.

When Cooke returned from her SRC detail, Osterman offered her the associate managing

director position, but she declined.  See id. at 202:8-20.  After Cooke declined the position,

Osterman informed her "that we would put her in a program management position, program

analyst position [within the Office of Management] until such time that we could determine what

other positions became available at the 15 level."  Id. at 203:7-11.  Hence, Cooke's reassignment

to the Office of Management was a function of necessity for the NTSB because there were no

other positions available at the GS-15 level.

Cooke does not offer any new evidence that purports to demonstrate that the NTSB's

justification for her reassignment was pretextual.  Instead, she relies upon the same evidence of

retaliation reviewed above.  In light of all the evidence and the demonstrated weakness of

Cooke's prima facie case, the Court finds that Cooke has not carried her burden of producing

sufficient evidence for a jury to rule in her favor on this claim.  Therefore, the Court will grant

summary judgment to the NTSB on Cooke's claim of retaliation based on her October 2005

reassignment to the Office of Management.

> ### D.     **Performance Evaluations and Performance Standards**

Although not raised as such in Cooke's brief, the NTSB's alleged failure to give her

formal performance evaluations for 2004 and 2005, as well as its failure to give her performance

standards for the program analyst position in the Office of Management, were essentially asserted as adverse actions in the Amended Complaint.[13]  See Am. Compl. ¶¶ 18, 27, 28. Consequently, the Court will consider them in resolving this motion.[14]  In each instance, there is no need to reach the NTSB's proffered legitimate, non-discriminatory reason for its actions because Cooke's prima facie case is plainly deficient.

### 1.    Performance Evaluations

Cooke claims that the NTSB failed to give her a formal performance evaluation for the performance periods ending in 2004 and 2005, "thus precluding her from receiving any opportunity to receive an award for her performance."  Id. ¶ 27.  She alleges that her 2004 performance evaluation was withheld in January 2005 when "Conners refused to meet with [Cooke] to discuss [her] performance evaluation."  Id. ¶ 18.  The alleged withholding of Cooke's 2004 evaluation in January 2005 thus pre-dates the commencement of her protected activity in February 2005.  An event that preceded the commencement of Cooke's protected activity cannot constitute an adverse action for purposes of Cooke's prima facie case of retaliation.  See Hill, 577 F. Supp. 2d at 66.  Consequently, Cooke's claim of retaliation based on the withholding of her 2004 performance evaluation fails on its face.

Cooke's claim of retaliation based on the withholding of her 2005 performance evaluation

---

[13] As stated previously, the Court will assume arguendo, and for purposes of this motion only, that these actions were "materially adverse" to Cooke.

[14] Although not alleged expressly as a separate claim in the Amended Complaint, the NTSB also argues that Cooke has not presented sufficient evidence to withstand summary judgment on an implied claim for constructive discharge.  See Def.'s Mem. at 17-22.  In response, Cooke acknowledges that she has not raised any claim for constructive discharge.  See Pl.'s Opp'n at 15 ("Plaintiff does not now, nor ever did, allege constructive discharge."). Consequently, the Court need not address this issue.

fails because there is no evidence of a causal relationship between that action and Cooke's last protected activity in April 2005. As discussed above, the record does not contain any direct evidence of causation. Hence, Cooke must establish causation through circumstantial evidence, here the temporal relationship of the events. The earliest Cooke could have expected a performance evaluation for 2005 was January 2006, which makes nine months between Cooke's last protected activity in April 2005 and the alleged retaliatory act. Such a gap is plainly insufficient to demonstrate the close temporal proximity necessary to infer a retaliatory motivation. See Kwon, 370 F. Supp. 2d at 187; Buggs, 293 F. Supp. 2d at 149; see also Pardo-Kronemann, 541 F. Supp. 2d at 218 ("[I]f the only circumstantial evidence of causation is temporal proximity between the protected activity and the alleged retaliatory action, then those events must be very close in time for that evidence to be sufficient for a jury to infer a retaliatory motivation.").

### 2. Performance Standards

Cooke finally alleges that the "NTSB refused to issue [her] new performance standards for her position in the Office of Managing Director, thus effectively precluding her from securing any opportunity to improve her career status or to obtain any case or merit awards in 2006." Am. Compl. ¶ 28. Once again, her claim fails because the only evidence of a causal relationship is circumstantial, and the alleged retaliatory act is too remote in relation to her last protected activity. Cooke filed her formal EEO complaint on April 16, 2005. Def.'s Ex. 1. She was reassigned to work as a program analyst in the Office of Management in October 2005. Def.'s Ex. 19. Even if the Court assumes that Cooke should have been given new performance standards on the day that she was reassigned -- the assumption that is most favorable to her -- the

Court has already concluded that a gap of six months between Cooke's reassignment and her last

protected activity is insufficient to demonstrate the close temporal proximity necessary to infer a

retaliatory motivation.  The Court's conclusion is no different here and, accordingly, Cooke's

claim of retaliation based on the NTSB's failure to issue her new performance standards for her

program analyst position must fail for want of the causal connection required to state a prima

facie case.

## **CONCLUSION**

For the foregoing reasons, the Court will grant defendant NTSB's motion for summary

judgment.  A separate Order accompanies this Memorandum Opinion.


<u>      /s/ John D. Bates         </u>

JOHN D. BATES
United States District Judge


Dated:  <u>February 27, 2009</u>